UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ARPAD TOLNAY              :
                          :
        Plaintiff,        :
                          :   Civil No.  3:02CV1514 (JCH)
V.                        :
                          :
MELVIN WEARING            :
                          :   November 24, 2003
        Defendant.        :

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

In this action, New Haven Police Officer Arpad Tolnay alleges that defendant retaliated against him with punitive actions in the wake of plaintiff's involvement in a highly publicized arrest and in consequence of plaintiff's statements and expression of opinion regarding the defendant's and other city officials' conduct in response to the arrest. By his motion, defendant appears not to understand the nature of the expressive activity and factual bases which underlie the first amendment claims in this case. The moving papers do not include any affidavits, contain very selective excerpts of deposition testimony and omit material evidence. Defendant would have this case summarily decided on the question whether plaintiff was disrespectful or insubordinate toward his boss during a meeting and invites this court to credit in toto not only his version of the facts but declare that defendant's motive was pure. He thus employs a reductionist approach, and presents a sanitized account of his treatment of the plaintiff shorn of numerous

facts and disconnected from the politically charged context which led to Officer Tolnay's suspension and reassignment.

As is shown below and by the exhibits and affidavits appended hereto, the cumulative evidence presents factual issues which only a jury may resolve, among them defendant's motive in interrogating and disciplining the plaintiff, the credibility of his account of his meeting with the plaintiff, whether the discipline was a pretext for punishment of protected expression and whether the discipline was contrived with the further aim of chilling the plaintiff from further expression on the issue of politically-based law enforcement practices in the department and/or from further enforcement actions against lawbreakers with political ties to City Hall.

## II. PLAINTIFF'S VERSION OF THE FACTS

The absence in defendant's motion of many pertinent facts is evident from the five short paragraphs devoted to the facts. See Def.'s Memo. of Law at pp.2-5. The record discloses the following. Plaintiff was on patrol during the evening of July 26, 2002 when he was dispatched at approximately 9:20 p.m. to the area of the Second Star of Jacob Church located in the Fair Haven section of New Haven in response to citizen complaints of excessive noise. Officer Jaime Abate was dispatched as a cover unit. This was not the first time that residents who lived in that neighborhood called the police to complain about the noise. Officers had already once responded to the site earlier that evening and apparently thought they succeeded in convincing church leaders

2

to lower the volume of amplified music and/or move inside an outdoor ceremony that was being conducted on property not owned by the Church. Plaintiff's Exhibit 2, pp. 7-8; Exhibit 3. As plaintiff neared the location he could hear "very very loud" music from a full city block away and upon arrival observed that church members were blasting amplified music from concert-sized speakers located outside of the building and positioned such that the music was blaring outward. Plaintiff approached a male and asked him to turn the volume down but the music was so loud that plaintiff could not be heard and had to repeat himself. The man refused and walked away from Officer Tolnay, reappearing with another man who was irate, screaming and stating he would not lower the volume. As plaintiff proceeded to his vehicle to retrieve his infraction booklet, a man, later identified as Armando Hernandez, ran out of the church toward both officers, screaming and flailing his arms about in a face-to-face confrontation, and stated he refused to lower the volume. Because this incident involved a church service, Officer Tolnay tried to afford these men "as much respect and patience as [one] can", but Hernandez was aggressive, rude and uncooperative. He screamed repeatedly, "I'm not going to turn anything down - you are going to have to take me to jail". Plaintiff asked Hernandez to calm down and repeated that a simple solution was to merely turn the music down. Hernandez persisted to flail his hands about in the officers' faces and again screamed, "you are going to have to take me to jail", this time engaging in theatrics by putting his hands behind his back, daring the officers to handcuff him. He was again advised to calm down. The officers quickly found themselves

LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541

surrounded by an unruly crowd of people who had exited the church, approached the officers and began screaming at them. No doubt spurred by the audience Hernandez continued to scream and approached the officers in a manner which caused the plaintiff to have to step back so as not to be pushed by Hernandez. Hernandez was then detained by the plaintiff and placed in a police vehicle. At this point, the crowd had surrounded the officers and continued to hurl derogatory comments at them. Another officer pulled up in a patrol vehicle as plaintiff was moving Hernandez up the street. The third officer attempted to contain the crowd and stop the protesters from following the plaintiff to the police vehicle. The third officer also asked plaintiff if he "knew who he had" (in reference to Hernandez). Plaintiff was advised that Hernandez was the pastor of the Church and he should "move him out of there". Exh. 2, pp.12-14; Exh. 1¶5

The plaintiff radioed for supervisory assistance and one Sgt. Hoffman arrived at the scene. As Sgt. Hoffman was being briefed, a vehicle pulled up next to them and another male exited, ran toward Sgt. Hoffman and loudly yelled, "I want to go to jail with him". (In reference to Hernandez). This man, later identified as Daniel Rodriguez, continued to yell at Sgt. Hoffman and repeated his demand to accompany Hernandez to jail. Rodriguez approached the officers in a highly agitated state and the officers attempted to maintain a safe distance as Rodriguez continued to invade the officers' "safety zone". At this point, Hernandez made a sudden move, demanded again, "take me to jail", and in doing so backed into Sgt. Hoffman. The Sergeant and the plaintiff were then attempting to keep their attention focused on Hernandez and Rodriguez at

4

the same time. Sgt. Hoffman warned Rodriguez to relax or face arrest. Instead of obeying the Sergeant, Rodriguez continued to yell and scream and moved toward the officers in an excited manner yelling, "No! You are going to take me to jail with him" while pointing at Hernandez. At this point, the officers and their supervisor believed their safety was in jeopardy. Sgt. Hoffman had enough when Rodriguez pushed into him. Both men were arrested[1]. Rodriguez was charged with breach of peace and interfering with an officer. Hernandez was given a misdemeanor summons for breach of peace. Exhs. 2 at pp.14-19; Exhs.1, 3, 4.

Once confined in plaintiff's patrol vehicle, and after plaintiff prepared the misdemeanor summons, Hernandez complained that the date plaintiff chose for Hernandez's court appearance was inconvenient as he planned to travel to Puerto Rico at that time. The plaintiff reminded Hernandez that he was not ordered to turn the music off but was asked merely to lower the volume and further, that the church members did not have to discontinue their service. Plaintiff reminded Hernandez that "other people are also entitled to have a right to peace in their own homes". Hernandez agreed with the plaintiff and conceded that things got out of hand and in retrospect he should have cooperated with the officers. The plaintiff decided to extend a courtesy

---

[1] As plaintiff recalled, Sgt. Hoffman repeatedly warned Rodriguez to calm down and relax and stated that Hernandez was not going to jail (but would merely be issued a summons). After ignoring repeated pleas from the Sergeant and the plaintiff Rodriguez pushed up against the Sergeant. Sgt. Hoffman apparently had had enough and informed Rodriguez that he was under arrest. Exh. 2 at p. 16.

to Hernandez and accordingly changed his court appearance date to accommodate Hernandez's travel plans. Hernandez was released and did not have to go to the police station. Exh. 2 at pp. 24-26; Exh. 4.

The arrestees were strangers to the plaintiff and at the point of arrest, the plaintiff did not know they were ministers.[2] Neither man was dressed in religious garb; both were wearing regular clothes. Neither identified themselves as a pastor or minister. The plaintiff estimated that the unruly crowd numbered approximately sixty people who were yelling and screaming. Many of them were shouting threats and insults. Among the crowd were two young boys, later identified as the sons of Daniel Rodriguez, who were making hand gestures and giving the officers the "finger".(fn) Among the comments directed at the plaintiff were "[you're] going to get arrested", [you're] going to lose your job", "we're going to call the mayor" and, "within five minutes the mayor is going to be here". Exh. 2 at p. 21; Exh. 1 at ¶ 5. The plaintiff described the event as being "like nothing else [he'd] ever seen before" and he felt like he was in "bizzaro world". Exh. 2 at p. 18.

What appears at first thought to have been a grandiose expectation by some in the crowd that the mayor would take sides against the officers turned out to have been an astute political assessment. A local firestorm of controversy erupted in the wake of this incident. The mayor of

---

[2]   Whether Mssrs. Hernandez and Rodriguez are ordained ministers or have other credentials is unknown. Whether either holds the title of "minister" at the Second Star of Jacob Church or other church is equally unknown. Since they have been referred to as such, plaintiff will refer to them herein as ministers.

6

New Haven, John DeStefano, appeared at the Second Star Jacob Church before a crowded congregation and apologized for the arrests. The press, obviously notified in advance of the mayor's appearance, had a reporter in attendance to recount Mayor DeStefano's "repentant speech" during which he announced to "[members] of the 1,000-strong congregation" that all charges against Rodriguez and Hernandez had been "dismissed". Mayor DeStefano received a standing ovation. The mayor's appearance and remarks were the subject of a prominent article and headline in the New Haven Register. Exh. 6. Many police officers were incensed and the New Haven Police Union leadership publically accused the mayor of grandstanding and pandering to New Haven's Hispanic Community for political gain. Publicity ensued over accusations that the mayor and Chief Wearing interfered with a lawful and proper arrest and secured dismissal of the charges for improper political reasons and by such sent a "disturbing message" to rank and file officers and the public as well. The accusations against the mayor and the chief were the subject of another prominent headline and extensive article, an editorial by the Editor of the New Haven Register and letters to the Editor, one of which, from an ex-police officer, likewise accused the mayor and the defendant of "selling out" police officers who were lawfully performing their duties. Exhs. 6, 7 and 8.

**The Second Encounter With Daniel Rodriguez.**

On August 3, 2002, the plaintiff was on patrol in his assigned district when he observed a Jeep Wrangler in operation with two unrestrained children standing on the side-step bumpers holding on to the roll bars in the open-top jeep. Another officer riding with him was alarmed and

thought the motorist should be stopped. The plaintiff activated his overhead lights and stopped the vehicle. Upon approach, plaintiff observed that one of the children appeared to be 10-11 years old and the other 14-15 years old. Upon further approach, the plaintiff was able to observe the operator and it was Daniel Rodriguez, the same individual he arrested on July 26, 2002. It then became obvious that Rodriguez and the children were distributing flyers in connection with a planned protest of Rodriguez's earlier arrest. Now aware, through department circles and publicity, of apparent political influence exercised by and on behalf of Rodriguez, the plaintiff was reluctant to cite Rodriguez. He advised Rodriguez that while he had an absolute right to distribute the flyers the children needed to be inside of the vehicle and secured with safety restraints. The children got into the jeep and the plaintiff allowed Rodriguez to go on his way without penalty. Exh. 6; Exh. 2 at pp. 43-48.

Not only was Mr. Rodriguez in violation of Connecticut General Statutes § 14-272a[3] but could lawfully have been charged with Risk of Injury to a Minor in violation of C.G.S. § 53-21 for a need to stop the vehicle suddenly or in the event of rear-end or other collision, the children would be at risk of serious injury or death. Given what plaintiff believed to be Mr. Rodriguez's apparent connections to City Hall, the plaintiff feared taking enforcement action against

---

[3]
  C.G.S. § 14-272a prohibits the operation of "any truck type motor vehicle with a gross vehicle weight rating not exceeding 7500 pounds having an open-rear section or any motor vehicle having an open bed when a child under the age of sixteen years in such open-rear section or open bed unless such child wears a properly adjusted and fastened safetybelt . . . ."

8

Case 3:02-cv-01514-EBB   Document 25   Filed 12/05/2003   Page 9 of 20

Rodriguez and thus let him go but immediately radioed his supervisor, one Sgt. Burgh, and briefed him on the encounter. The transmission was overheard by Capt. Francisco Ortiz, Sgt. Burgh's superior. Capt. Ortiz communicated by radio to Sgt. Burgh and asked him to switch to "channel one". Plaintiff switched to the same channel and overheard Capt. Ortiz stating, in reference to plaintiff, "I don't know what it is that you got from that Fair Haven officer, but just tell him to do his job. Tell him I don't want him running around having silly conversations. Tell him to do his job and not have any contact with anyone involved [in the July 26th arrest]". Sgt. Burgh also informed the plaintiff that he was, per Captain Ortiz, to "stay away" from Hernandez and Rodriguez. Exh. 2 at pp. 45-48; Exh. 6.

Since other officers monitor channel one, as do members of the public, the plaintiff was embarrassed by the Captain's comments and order. He received e-mails from other officers who expressed disbelief that Capt. Ortiz made such a remark over the channel. Later, plaintiff was advised by Sgt. Burgh that Captain Ortiz had ordered an immediate memorandum of the incident to be submitted prior to the end of his shift. The plaintiff complied and authored a memorandum directed to Captain Ortiz which also referred Ortiz to the details contained in plaintiff's case incident report. In that report, plaintiff recounted all details related to the motor vehicle incident and concluded his account with an explanation as to why no enforcement action was taken against Rodriguez. He indicated that he thought he was unable "to act to his full potential" and that he "acted with judgment that was imposed on his police jurisdiction due to the identity and political involvement of Rodriguez." He furthered that he "was reaffirmed by his actions (sic) . . . as [he]

9

Law Offices of Karen Lee Torre • 51 Elm Street, Suite 307, New Haven, Connecticut 06510 • Tel: (203) 865-5541

was instructed by . . . Capt. F. Ortiz to not have any contact with person(s) involved in the incident that occurred on 7/26/02". Exh. 6.

Within several hours of the motor vehicle stop involving Daniel Rodriguez, Captain Ortiz went to Rodriguez's home, at 9:30 p.m. on a Saturday night, to address Rodriguez's "civilian complaint" that he was harassed and abused by three officers during this stop, officers who were "rude", "disrespectful" and had "poor attitudes". The civilian complaint appeared not to have been lodged in the usual manner and was not in writing but the result of Rodriguez having a direct line to Captain Ortiz as complaints are normally handled through the Department's internal affairs process and not by a Captain rushing over to someone's house on a Saturday night. Exh. 1, ¶9.

Captain Ortiz read the plaintiff's case incident report and on August 8, 2002, submitted a memorandum to Chief Wearing in which he recounted Rodriguez's allegations against the plaintiff and fellow officers and stated that Rodriguez wanted him (Ortiz) to "look into the officer's harassment . . and address the officers' rude and disrespectful attitudes towards him". Exh. 11.

Captain Ortiz appended to this memorandum the reports of the other officers involved, including that of Officer Waleska Bermudez who was riding in plaintiff's vehicle and who recounted that it was she who noticed the children hanging off of the moving vehicle, feared for their safety and asked Officer Tolnay to stop the vehicle. She also recounted Rodriguez's intemperate behavior. Exh. 11. Given the overwhelming evidence in the reports, Captain Ortiz

10

acknowledged that Rodriguez was pulled over "for a legitimate motor vehicle violation". The Captain then concluded his memorandum with the following comments:

> I also read the report completed by Officer Arpad Tolnay (refer to CN 44465) and find myself very disturbed by the content, which reflects his opinion that he cannot adequately or effectively perform his duties due to the political influence he believes has been exerted by Reverend Daniel Rodriguez. **This officer's written report is unacceptable and his comments inappropriate and have no relevance to the initial motor vehicle stop. At the time of this writing, Officer Tolnay is on vacation and this matter will continue upon his return to duty.**

**Exh. 11.** (Emphasis in bold supplied)

The day after Captain Ortiz submitted this memorandum, he issued a memorandum to the plaintiff and Officer Jaime Abate (but not Sgt. Hoffman) dated August 9, 2002 which stated: "Per Chief Melvin Wearing, *you are hereby ordered*, upon your return to duty on August 13, 2002 at 1600 hours, to report to the office of the Chief to meet with him." Exh. 11. (Italics in original). It was this meeting which led to the plaintiff's suspension and reassignment and, his being required to undergo training in "dealing with interpersonal interactions with supervisors and the community". Exh. 12. Several days earlier, a crowd estimated at 1,000 in number marched to and rallied at police headquarters to protest the summons issued to Hernandez and the arrest of Rodriguez, the very demonstration publicized through the leaflets Rodriquez distributed with the children.[4] Chief Wearing could not recall making any inquiry into whether a permit for the march was sought as required by city ordinance. Exh. 16 at p. 22-24. Chief Wearing was present at the rally. Id. at p.20. According to the reporter who covered the event,

---

[4] Chief Wearing estimated the crowd at 250-300 people. Exh. 16 at p. 20.

was instructed by . . . Capt. F. Ortiz to not have any contact with person(s) involved in the incident that occurred on 7/26/02". Exh. 6.

Within several hours of the motor vehicle stop involving Daniel Rodriguez, Captain Ortiz went to Rodriguez's home, at 9:30 p.m. on a Saturday night, to address Rodriguez's "civilian complaint" that he was harassed and abused by three officers during this stop, officers who were "rude", "disrespectful" and had "poor attitudes". The civilian complaint appeared not to have been lodged in the usual manner and was not in writing but the result of Rodriguez having a direct line to Captain Ortiz as complaints are normally handled through the Department's internal affairs process and not by a Captain rushing over to someone's house on a Saturday night. Exh. 1, ¶9.

Captain Ortiz read the plaintiff's case incident report and on August 8, 2002, submitted a memorandum to Chief Wearing in which he recounted Rodriguez's allegations against the plaintiff and fellow officers and stated that Rodriguez wanted him (Ortiz) to "look into the officer's harassment . . and address the officers' rude and disrespectful attitudes towards him". Exh. 11.

Captain Ortiz appended to this memorandum the reports of the other officers involved, including that of Officer Waleska Bermudez who was riding in plaintiff's vehicle and who recounted that it was she who noticed the children hanging off of the moving vehicle, feared for their safety and asked Officer Tolnay to stop the vehicle. She also recounted Rodriguez's intemperate behavior. Exh. 11. Given the overwhelming evidence in the reports, Captain Ortiz

10

Armando Hernandez announced to the crowd that a "city administrator" asked him whether the arresting officer should be disciplined. Exh. 7.

Mayor John DeStafano, Jr. was deposed regarding his knowledge of and involvement in these incidences. While the most frequent answer he gave was "I don't recall" he did personally know Armando Hernandez and Daniel Rodriguez. Armando Hernandez supported his campaign for office. Hernandez was part of "an endorsement group of Latinos" who endorsed him for mayor at a press conference. As to Daniel Rodriguez, he recalls being "in his presence". He understood Hernandez to be someone who leads one of the largest congregations in the city. Exh. 20 at pp. 9-12. The mayor has made campaign appearances at the Second Star of Jacob Church. The mayor personally contacted Armando Hernandez regarding his arrest "on the basis of concern of the relationship between my police department and large congregation". Id. at pp. 17-18. The mayor cannot identify any other individual arrested by New Haven officers and facing prosecution whom he telephoned to discuss the arrest, even though New Haven officers effect thousands of arrests per year. Id. at p. 24. The mayor also attended a meeting with ministers regarding the arrest but "can't recall" whether Hernandez was present. Indeed, he "can't recall" the identity of any of the minsters with whom he met. Id. at pp. 26-27. He concedes conferring with Chief Wearing regarding the arrests but "can't recall" who initiated the contact, "can't recall" whether it was over the phone or in person, "can't recall" if he made any notes, "can't recall" whether he asked Wearing to get the charges dropped, "can't recall" whether he contacted the States Attorney's Office, and "doesn't believe" that he attended the protest rally. When reminded that

LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541

the protest rally took place only a matter of months before his deposition, the mayor said that he doesn't specifically recall "attending" but added: "I guess I don't preclude it out. . ." As to whether he was the "city official" identified by Hernandez as the one who asked him whether the arresting officer should be disciplined the mayor testified that he could not "recollect" making such a statement. When asked simply whether he had a failure of memory or whether he could rule out ever having done such a thing, he once again repeated that he had "no recollection". He repeated the failure of recollection several times. Id. at pp. 32-36. The mayor did not contend with the prominent news coverage of he appearance before the congregation of the Second Star of Jacob Church and his apology to them for the actions of the officers. He further conceded that prior to issuing the apology, he neither sought to discuss the matter with Officer Tolnay nor did he seek to speak to and give an ear to neighborhood residents who repeatedly complained about the excessive noise at the church. He also gave no thought as to whether his public apology would embarrass the arresting officers, undermine their confidence or serve as ammunition for any false arrest suit brought by the arrestees against the officers, a suit made possible by the nolle of all charges. Finally, he gave a non-responsive answer as to whether he gave any thought to the fact that his actions would encourage the arrestees and others to be oppositional or disrespectful in with future encounters with New Haven police. Id. at pp. 50-65.

**Disposition of the Criminal Charges against Hernandez and Rodriguez.**

Mssrs. Rodriguez and Heranandez were due to appear in the Superior Court in New Haven on August 27, 2002. All customary arrest documents were transmitted to the States Attorney's

>
> at that .
> \*\*\*\*
> Q: Did you ask him to dismiss the case?
> A: No, I didn't.
> A: Did you use your influence in attempting to get that result?
> A. No, I did not.

Exh. 16 at pp. 13-14, 16.

The New Haven Superior Court processes many thousands of arrests and summons each year effected and issued by New Haven police officers. Exh. 13 at ¶ 3. Despite repeated invitation, Chief Wearing could not identify any other instance in which he appeared at the courthouse for the purpose of influencing a prosecutor to drop charges against a defendant. Exh. 16 at pp. 35-39.

Attorney Newman claims some failure of recollection as to the details of his meeting with the Chief . He could not relate Chief Wearing's exact words but admitted that he had the impression there was no desire for prosecution. Exh. 17 at p. 21-22. He was unaware of any controversy over these arrests and learned of a public controversy while reading the next day's newspaper. Id. at p. 23. He claims that before he made the decision to nolle all charges, he thoroughly read the case incident reports on the arrests. He did not recall, however, seeing anything in Officer Tolnay's report which indicated any improper conduct on the part of the arrestees beyond that involving amplified music which disturbed the neighbors. He also claimed not to have read anything which suggested the officers believed their safety was jeopardized by the conduct of the arrestees and their supporters, nor anything which suggested the officers were

15

targeted by an unruly crowd which converged on the officers or that either arrestee engaged in conduct which served to incite the crowd to threaten the officers. He saw nothing in the report which indicated that any of the officers had to retreat for their personal safety. Id. at 29-30.

Attorney Newman acknowledged that dismissal of criminal charges exposes an arresting officer to a civil action for false arrest yet he did not speak to Officer Tolnay prior to disposing of the charges. He conceded that in other cases where charges are nolled, his office has insisted that a defendant admit the arrest was supported by probable cause so as to not turn a gratuitous nolle into an opportunity to sue police officers. Id. at 31-32. He further acknowledged that in many cases where there is no interest in prosecuting to the fullest extent, a defendant will be convinced to plead guilty to an infraction which allows the charges to be fairly resolved, the arrestee to avoid a criminal record and shields the arresting officers from a potentially vexing and frivolous false arrest. Id. at 33-34. This was not done in the case of Hernandez and Rodriguez.

Attorney Newman would not agree that Chief Wearing attempted to influence his decision in the case and merely characterized the encounter as a "conversation". He expressly denied that Wearing told him how to handle the charges. Id at 40-42. He conceded that he could not recall any other instance in which Chief Wearing personally appeared at the courthouse to speak to him regarding whether and how a case should be prosecuted. Id. at 42.

Attorney Newman's secretary, Sherri Murowski, remembers the incident clearly and in more detail. Ms. Murowski has worked in the States Attorney's Office for 16 years and David Newman is her immediate supervisor. Her desk is right outside of Attorney Newman's office and

16

positioned such that she could look into his office. Exh. 18 at pp. 4-6. She saw Chief Wearing appear in the States Attorney's office, which was unusual, and then walk into Attorney Newman's private office. She overheard the entire conversation as no one closed the office door. Chief Wearing asked Newman to look at two files, indicating that the defendants were arrested several days before and that "he was getting a lot of complaints from the community on the arrests". Newman asked for their names, and then asked Ms. Murowski to retrieve the files. She heard Newman ask Wearing, "what do you want me to do with these?" and Wearing responded, "I'd like you to take care of them. I don't want these two people coming to court." Newman responded "whatever you want." and, according to Murowski, "that was the end of the conversation there". The files were immediately handed back to her and she noticed the files were already marked "disposed of". According to Ms. Murowski, this was unusual. She further stated that this incident caused some controversy within the States Attorney's office, with several staffers reacting to Wearing's and Newman's conduct with disbelief and shock. There was no doubt in Ms. Murowski's mind that Chief Wearing appeared there for the purpose of influencing Newman's disposition of the charges; indeed that it appeared to be the only reason for the Chief's visit. There is no doubt in her mind that Attorney Newman was in fact influenced by Chief Wearing in the decision to nolle the charges. She had never seen this happen before. Exh. 15 at pp.14-23.

Lt. Leo Bombalicki, a 24-year veteran of the department and member of the Executive Board of the Police Union witnessed the interrogation of the plaintiff by Chief Wearing in a

meeting of August 16, 2002. Lt. Bombalicki has witnessed many such meetings over the years between members, officers and Chief Wearing and Wearing's predecessors. Per agreement between the Union and the City, the Union is advised of all planned interrogations or pre-disciplinary meetings with members and written notices and records of all disciplinary actions imposed must be transmitted to the Union's office located within police headquarters. Exh. 13 at ¶ 4. According to Bombalicki, Chief Wearing was aggressive and rude to Officer Tolnay during the meeting. Wearing peppered the plaintiff with questions regarding his conduct in arresting the ministers and in the motor vehicle stop involving Daniel Rodriguez. Wearing appeared to be attempting to bait the plaintiff into an admission that he committed wrongdoing or exercised bad judgment in those incidents. The plaintiff defended all of his conduct as proper and lawful but often was not able to complete a sentence as Wearing repeatedly interrupted him and cut off his answers. When plaintiff attempted to answer the chief's questions, and the answers appeared not to be what Wearing wished, he became agitated his agitation escalated the more Tolnay defended the propriety of his conduct. At one point, Chief Wearing was on his feet thrusting his finger in the plaintiff's face. The Chief was especially angered by plaintiff's complaint regarding the conduct of Captain Ortiz. When plaintiff explained why he did not take enforcement action against Daniel Rodriguez in connection with the motor vehicle stop, Chief Wearing was irked at plaintiff's suggestion that Rodriguez enjoyed political favor with City Hall, plaintiff's statement that he feared "another meeting" with the Chief had he issued a summons to Rodriguez. It appeared to the plaintiff and Lt. Bombalicki that the Chief was trying to instigate

18

and provoke the plaintiff into losing his temper. The Chief was further incensed at plaintiff's expressed opinion that the meeting was politically motivated as was the taking of sides by City officials against the officer in favor of Rodriguez and Hernandez. Id. ¶¶ 15.

The Chief repeatedly faulted the plaintiff for making the arrests without seeking guidance from a supervisor. He claimed to have read the plaintiff's arrest report prior to the meeting but clearly did not. A review of the report reveals not only that plaintiff radioed his supervisor but Sgt. Hoffman appeared and was in fact the one who authorized the arrest after Daniel Rodriguez repeatedly disobeyed his commands and thrust into him.

While officers are expected to observe the proper decorum at all times in meetings with superior officers, superior officers and the Chief are likewise expected to behave in a professional and civilized manner. The Chief was purposely provoking and bullying the plaintiff. The plaintiff rose from his chair, indicated that he wanted the meeting over with and wished to seek legal counsel before answering further questions. Lt. Bombalicki first told the plaintiff to relax and sit down and then asked him to leave the room and wait outside in the hallway. Once the plaintiff exited, Lt. Bombalicki addressed the Chief who stated that he did not wish to speak further with Officer Tolnay because everybody was "hot" and another meeting would be scheduled. Exh. 1, 2, 13 at ¶¶ 13-15.

The plaintiff was ordered to reappear at Chief Wearing's office on April 15, 2002. Plaintiff thought there would be further discussion regarding the ministers but the chief opened the meeting by stating he wished no further discussion about the ministers but instead indicated

LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541

that the meeting was for the purpose of advising Officer Tolnay that he was suspended. Plaintiff was suspended for 10 days (an effective 17 day suspension), and suffered a disciplinary reassignment to a less desirable desk job for seven months. Exh. 1.

The disciplinary action meted out to plaintiff was unusual, harsh by department standards, and disparate from action taken against other officers for similar and much more serious offenses. Exh. 13 at ¶¶ 16- 22. In far too many cases, Chief Wearing not only failed and refused to discipline an officer but did not subject an officer to an interrogation or internal investigation despite charges and clear evidence of serious misconduct of a nature which implicates an officer's fitness for the occupation itself. Id; Exh. 16 at pp. 65-88.

For example, Chief Wearing took no action against a sergeant who engaged in a disruptive temper tantrum in the lobby of the police station and, in front of civilians referred to police officers of Irish decent as "Irish mother fuckers" whom she was "sick of".[5] The Chief took no action against the same sergeant (Diane Langston) in connection with her arrest by Hamden Police Officers for creating a disturbance in a bank while in uniform and hurling a racial slur at a bank teller. Not only did he not take disciplinary action, he did not even order an internal affairs investigation. He justified this by noting, incredibly, that lots of police officers are "arrested" in New Haven "all the time". Id. at pp. 77-79. When asked to identify other officers in his department who were arrested, the defendant hedged and then indicated that so many New

---

[5] The Chief acknowledged this allegation and claims to have "admonished" Sgt. Langston but states there is "probably no record of this". Exhibit 16 at p. 85-86.