Haven officers have been arrested for criminal conduct that he cannot remember them all. Id at p. 80. The Chief dismissed the significance of many of these arrests as involving domestic violence or "fights in bars" and distinguishes such criminal conduct from "selling drugs". Id at p. 81. He later conceded, however, that Lt. Sonya Atkinson was arrested on drug dealing charges. Id. at p. 81. As to Lt. Atkinson, he conceded taking no action against her in connection with previous misconduct which, if dealt with appropriately, might have relieved the department and the City of New Haven from the embarrassment of Lt. Atkinson's later arrest for dealing drugs. He acknowledged that he was advised of evidence that Lt. Atkinson, then a sergeant, had been accused by her superiors of lying and fabricating a death certificate when called upon to justify a bereavement leave. He conceded that he took no action against her. Id. at pp. 71-75. In connection with Sgt. Langston's arrest, he believes it appropriate to wait until the outcome of the criminal prosecution which he does in such "minor" cases. Id. at p. 85.[6] The Chief acknowledges that with respect to the incidents involving Langston, her conduct at a minimum would constitute "conduct unbecoming a police officer" the very charge that he lodged against Officer Tolnay.

During discovery, the defendant disclosed records of discipline imposed on other officers charged with insubordination or disrespect to a superior officer and conduct unbecoming an

---

6
    Why the outcome of the criminal prosecution is relevant to the Chief is unknown. Sgt. Langston could avail herself of diversionary programs such as Accelerated Rehabilitation despite being guilty as charged.

21

officer. See Exhs. 14, 15. While space does not permit a detailed analysis here, a review of the 17 personnel memoranda indicates that officers and other employees received discipline ranging from a written reprimand to maximum 5 day suspension for such conduct, with the average suspension being 1 to 2 days. Of more import, however, is the content of the Chief's memoranda where he acknowledges, respecting suspensions of 1 to 2 days, that an officer's clean record was a factor in the decision. In the rare instances where a 5 day suspension was imposed, it was clear that the officer involved was receiving a more severe penalty because of a history of misconduct. With respect to one 5 day suspension, it involved insubordination and disrespect in the course of an internal affairs investigatory interview. Per a note on the document, a contest of the discipline was settled with a reduction of the suspension to 2.5 days. The Chief noted that he understands that in the context of disciplinary meetings, he acknowledges one's right to "object to intimidating tactics" and that "in the heat of the battle tempers may flair and the tone of each party might become confrontational or hostile". He distinguished such circumstances, however, from the situation which prompted the discipline in this case involving Detective Mark Calafiore.

Against the backdrop of this evidentiary record[7], the question is whether the cumulative evidence, circumstantial and otherwise, is sufficient to support a rational jury's conclusion that the action taken against Officer Tolnay were designed to punish, and chill the future exercise of, expressive activity on a matter of public concern.

---

[7]
> Which is uncontested with the exception of the dispute over who said what and how in the meeting between the Chief and the plaintiff.

22

## III. ARGUMENT

### A. DEFENDANT'S MOTION MUST BE DENIED FOR THERE ARE GENUINE ISSUES TO BE TRIED REGARDING THE FACTORS WHICH MOTIVATED DEFENDANT'S DECISION TO CHARGE AND DISCIPLINE THE PLAINTIFF AND THE NATURE AND SEVERITY OF THE ADVERSE ACTIONS.

**1. Standard of Review**

The courts are in agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue of material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law.

When passing upon a motion for summary judgment, the court may not resolve factual disputes or make credibility determinations. In re Unisys Savings Plan Litigation, 74 F.3d 420 (3d Cir. 1996). The court must resolve any ambiguities and draw all inferences against the moving party. Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51 (2d Cir. 1991). The court must construe the evidence in the light most favorable to the party opposing summary judgment and deny the motion unless no construction of the evidence could support judgment in the plaintiff's favor. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 14 (2d Cir. 1993); Union Pacific Corp. v. United States, 5 F.3d 523, 525 (Fed. Cir. 1993). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

23

To raise a genuine issue of material fact sufficient to defeat a summary judgment motion, the opponent need not match, item for item, each piece of evidence proffered by the moving party. So long as the opponent has offered enough evidence to exceed the "mere scintilla" threshold, summary judgment is to be denied. In re Unisys Savings Plan Litigation, supra, 74 F.3d 420, 433.

Even if the non-movant's evidence appears "implausible," the court may not "weigh" the evidence and must proceed with the greatest caution. R. B. Ventures, Ltd. v. Shane, 112 F.3d 54, 58-59 (2d Cir. 1997). "If reasonable minds could differ as to the import of the evidence and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." Id. at 59, quoting Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988).

2. **Issues of Defendant's Intent and Motivation, On Which this Case Turns, Are Inappropriate for Resolution By Summary Judgment.**

The Second Circuit Court of Appeals has noted that "[S]ummary Judgment is ordinarily inappropriate where an individual's intent or state of mind are implicated. Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (1988). Writings and other "smoking gun" evidence rarely exist in employment cases to directly establish pretext or an ulterior or improper motive such as is alleged in the instant case. Gallo v. Prudential Residential Serv., 22 F.3d 1219, 1224 (2d Cir. 1994) Therefore, courts must be "especially chary" in handing out summary judgment in such cases. Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996). As is shown below

LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541

and by the appended affidavits and exhibits, there is not only sufficient but compelling evidence that defendant's actions were driven by an ulterior and improper motive and it would thus be inappropriate for the Court to decide this disputed and key factual matter.

    3.    **The Evidence Suffices to Support A Rational Jury's Conclusion that Defendant's Actions were Designed to Punish Plaintiff On Account Of His Speech And Chill Any Further Expressive Activity.**

    i.    **The Elements of the Cause of Action.**

The court must utilize a three part test when analyzing whether a public employee's First Amendment rights were violated. First, the employee must establish as a matter of law that her speech was on a matter of public concern. Next, the employee must prove that the protected speech was a substantial or motivating factor in the adverse action(s) challenged. Once the employee satisfies this burden, a defendant, if he chooses, may allege and prove that he would have taken the same action even in the absence of the protected speech. Mt. Healthy Board of Education v. Doyle, 97 S. Ct. 568 (1977); Givhan v. Western Line Consolidated School District, 99 S. Ct. 693 (1979); Connick v. Myers, 103 S. Ct. 1684 (1983); White Plains Towing Corp. v. Patterson, 991 F.2d 1049 (2d. Cir. 1993) cert. denied, 114 S. Ct. 185 (1993) ; Lewis v. Cowen, 165 F.3d 154 (2d. Cir.) cert. denied, 528 U.S. 823 (1999).

Since defendant denies a nexus between the speech and the adverse actions, there is no occasion for the court to balance any competing interests of the employer,[8] leaving in this case the singular issue whether defendant's asserted reasons for taking the challenged actions are a pretext for unlawful retaliation and chilling of protected expression.

### ii    The Plaintiff's Speech Was Unquestionably A Matter of Public Concern.

It is well-established that "[i]ndividuals do not relinquish their First Amendment rights by accepting employment government." Harman v. City of New York, 140 F.3d 111, 117 (2d Cir. 1998). Moreover, the United States Supreme Court has stated that "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." Garrity v. New Jersey, 385 U.S. 493, 500 (1967). "To the extent that being a policeman is public employment with unique characteristics, the right of the employee to speak . . . may be more or less limited. It is not, however, destroyed." Muller v. Conlisk, 429 F.2d. 901, 904 (7 Cir. 1970). Although speech related to internal personnel disputes is not ordinarily of public concern, "speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials . . . clearly concerns matters of public import." Conaway v. Smith, 853 F.2d 789, 796 (10 Cir. 1988)  The government, however, does have "interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with

---

[8]    See Pickering v. Board of Education, 88 S.Ct. 1731 (1968)(articulating the balancing of interests that courts should employ in cases where the value of even protected speech may be outweighed by the employer's interest in avoiding disruption to its operations caused by the speech.)

26

regulation of the speech of the citizenry in general." Pickering v. Board of Educ., 391 U.S. 563, 568 (1968). Thus, in assessing the validity of a restraint on public employee speech, courts must "arrive at a balance between the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government] as an employer, in promoting the efficiency of the public services it performs through its employees." Id.

On the issue of protected expression, defendant focuses exclusively on his office meeting with the plaintiff and notably fails to address, much less discuss, the uncontested evidence of the hostility toward plaintiff on account of his remarks in the case incident report on the Rodriguez motor vehicle stop. No doubt, defendant would be hard pressed to argue that such expression is unprotected. Nevertheless, the weakness of defendant's argument respecting the circumstances and setting of plaintiff's remarks to the Chief would equally afflict any such arguments respecting the case incident report. In advancing the suggestion that plaintiff's oral remarks to the Chief were unprotected, defendant notes that the meeting was not "a public forum", the plaintiff was on-duty at the time and he not make the statements to the "public through any media outlet". See Def.'s Memo. of Law at pp. 9-10. Defendant cites no case in support of this argument for established authority does not support it. The fact that Officer Tolnay did not communicate his comments and beliefs to the public or the press but expressed them internally in his reports and in his meeting with the Chief does not strip the expression of First Amendment protection. See Givhan v. Western Consolidated School District, 99 S.Ct. 693 (1979) (employee speech need not be "public" to be accorded first amendment protection); see also Dill v. City of Edmond, 155 F.3d

27

1193 (10th Cir. 1998)( officer's internal memo to police chief stating he was aware of exculpatory evidence respecting department's prime suspect in murder case where investigators appeared bent on pursuing suspect was protected by the first amendment). Thus the fact that Officer Tolnay chose a private forum within the police department is of no consequence. See also Conaway v. Smith, 853 F.2d 789, 797 (10th Cir. 1988). "[P]olice officers have the same rights that other citizens have to reveal or bring forward information of general importance despite any contrary desire by their superiors". They are not "gagged by loyalty to the chain-of-command concept". Oladeinde v. City of Burmingham, 118 F. Supp. 2d 1185, (N. D. Ala. 1998). It is likewise immaterial that plaintiff's case incident reports, particularly the one involved in the Rodriguez motor vehicle stop, were made in the course of his duties as a police officer for at least a portion of the report was clearly designed to address an issue of perceived of improprieties on the part of superiors. See Dill v. City of Edmond, supra at 1202 ("Plaintiff's speech concerned possible wrongdoing by the police officers investigating the . . . homicides"); cf. Koch v. The City of Hutchinson, 847 F.2d 1436 (10th Cir. 1988) ( Fire Marshall's routine report regarding the cause of a fire was not of public concern since there was no evidence that the report was "motivated or inspired by . . . alleged improprieties or by the desire to expose those improprieties" Id. at 1448.

Moreover, given Captain Ortiz's memorandum (Exh. 11), his immediate order to plaintiff to account for his conduct, and the Chief's quick rise to anger at any critical comments or complaints about Ortiz, it well appears that the conduct of Ortiz and Wearing was calculated to

prevent the very "public" speech the absence of which defendant cites in urging summary judgment.

Defendant's heavy reliance on Heil v. Santoro, 147 F. 3d 103 (2d Cir. 1998) is misplaced for the facts in Heil are readily distinguishable from those in the instant case. In Heil, an officer unethically came into possession of a confidential document authored by attorneys for the plaintiff's municipal employer which outlined strategy for negotiations with plaintiff's union. The document was prominently labeled "CONFIDENTIAL MEMORANDUM" yet plaintiff copied it and attached it to an Unfair Labor Practice charge ("ULP") which he filed against his employer, a charge which was later was withdrawn by the Union. The plaintiff was called into an investigatory meeting with his superiors and later disciplined for his conduct in publically disclosing a confidential document, failing to provide truthful answers in the interrogation and insubordination for disobeying a direct order. The District Court reasoned that even if the filing of the ULP charge was a substantial factor in defendant's decision to discipline him, in the requisite balancing analysis, the value of such expression was outweighed by defendant's interest in preventing disruption of police department work. Id. at 108. Moreover, Heil's "speech came close to the line separating public from private speech". Id. at 12. The Court of Appeals agreed and further noted that under a mixed motives analysis, see, e.g., Mt. Healthy City School Bd. Of Educ. v Doyle, 429 U.S. 274, 287 (1977), there was no evidence that his employer would not ordinarily have disciplined him for his offenses, i.e., that the discipline was pretextual, nor was there any evidence to indicate that the severity of the discipline was disproportionate. Id. at 111.

29

Another distinguishing feature of <u>Heil v. Santoro</u> is that the allegedly protected expression (the ULP filing) was inextricably bundled with the admitted misconduct - the possession and submission of the privileged document that was the predicate of the ULP charge. In the instant case, plaintiff presents credible evidence that the justification for the discipline - disrespectful and insubordinate conduct toward the Chief - was a pretext devised and employed by defendant to retaliate against and punish plaintiff for conduct which could not lawfully be punished, to wit: plaintiff's implication that political considerations had infected the department and chilled his ability to discharge properly his duties as a law enforcement officer. Paradoxically, an interest defined and cited by the District Court in <u>Heil</u> as a factor in its holding is implicated in the instant case, not by plaintiff's conduct but by the conduct of the other players involved. In <u>Heil</u>, the District Court noted the strong interest police departments have in maintaining "discipline, esprit de corps, and uniformity among employees", and further, that "order and confidence between officers and their superiors are essential to the operation of a law enforcement agency . . . .". <u>Id.</u> at 109, citing Opinion at 18-19 (citations omitted). In the instant case, Officer Tolnay, rightfully it appears, believed that his superiors undermined these interests by their own conduct which, it cannot be contested, led to anger and dissension among the ranks, a failure of confidence in the department's leadership and embarrassing publicity over a rift in the department played out in public.

Plaintiff's written record and oral expression of his concerns are not only deserving of protection but of a heightened level of protection because it involved a well-founded perception

30

that influence peddling had contaminated a proper arrest and what would have been a lawful prosecution. If indeed these two ministers (and Rodriguez on more than one occasion) were being accorded special privileges and relief from having to answer for law-breaking because they lead and have influence over a large political constituency of the Mayor (and of Captain Ortiz, an aspirant to the Chief's Office) such is undoubtedly a matter of public concern. The public has a strong interest in knowing whether police officers are being compromised or intimidated in the performance of their duties by superiors or other elected officials driven by political or other self-interest. Citizens who call for police assistance and relief have a right to have the law enforced when the peace and enjoyment of their home is being disrupted and that right does not turn on whether the persons responsible for the disruption are considered vote-getters for a mayor or potential lobbyists for one who aspires to be the next chief of police. Nor should it depend on whether a law-breaker is capable of provoking hundreds or thousands to public protest. Indeed, the ability of Hernandez and Rodriguez to mobilize hundreds to march and protest is itself evidence which permits one of many inferences upon which rational jurors may conclude that plaintiff's expression was a motivating factor in the intimidation and punishment he suffered - which is that the Chief and others in fact "sold out" officers to appease two men who influence many, they did it for political gain, got called for their petty corruption and didn't like it one bit.

Neighborhood residents with school-age children being bombarded at 9:30 p.m. by music from concert-size speakers directed their way would undoubtedly be interested in knowing whether officers are disabled from enforcing the law for reasons of rank politics. The plaintiff's

complaints, and any complaints he might have made in a more public fashion, created a risk that any gain realized by pandering to the ministers and their constituents might be offset by disappointment or disgust on the part of other city residents who perceive such conduct by chiefs and elected officials to reflect poorly on their character and integrity - and thus their fitness for office.

In contrast to defendant's reliance on Heil v. Santoro the facts of the instant case are more akin to those in O'Brien v. Town of Caledonia, 748 F. 2d 403 (7th Cir. 1984) in which the plaintiff police officer was involved in two controversial arrests, one of which involved a citation issued to the Town Supervisor. The police chief interfered with both enforcement actions, in the first by exercising his influence to get the charges dismissed and in the second by getting the citation issued to the Town Supervisor dismissed. The plaintiff expressed concern that the dismissals in both cases were motivated by political considerations and he discussed his concerns with several officials outside of the department. In according the highest level of protection to such speech, which the court considered to be of "great public interest" the Court of Appeals observed that "[w]hile not all means of criticism by a policeman are protected by the First Amendment, a policeman's right must be vigilantly protected because he or she is 'extraordinarily able to inform the public of deficiencies in this important governmental department". Id. at 406-407 citing Pickering v. Bd. Of Educ., 391 U.S. 563, 572 (1968) (Internal citation omitted.)[9]

---

[9] The O'Brien court's observations were made in the context of the plaintiff's challenge of the validity of his department's regulations prohibiting such speech, the violation of which resulted in O'Brien being disciplined for misconduct and insubordination. Despite O'Brien's

32

### iii.   Compelling Evidence of Pretext Exists

Defendant understandably avoids mention and discussion of his own written comments and those of Captain Ortiz which serve to undermine defendant's claim that the discipline and the reassignment of the plaintiff were solely and legitimately based on misconduct unrelated to any protected activity. See Exhs. 11, 12. The memoranda from both men clearly or, at the least, quite arguably, undermine defendant's characterization of his actions as sterile. Plaintiff's being ordered to appear at the Chief's office came on the heels of Captain Ortiz's memorandum of August 8, 2002 by which he recounts the "Citizens (sic) Complaint" lodged by Daniel Rodriguez. Exh. 11. It readily appears that the "complaint" was lodged with Captain Ortiz who made a bee-line to Rodriguez's home at 9:30 on a Saturday night within hours of the motor vehicle stop about which Rodriguez was complaining. Captain Ortiz publishes what appear to be patently false and contrived allegations of misconduct by Rodriguez, allegations which are completely belied by the reports of all officers involved and indeed acknowledged as probably baseless by Captain Ortiz himself. Even Captain Ortiz would be hard pressed to defendant Rodriguez's driving about town with children hanging off an open vehicle. With that, Captain Ortiz nonetheless concludes his memo by noting how "very disturbed" he was by the <u>content</u> of Officer Tolnay's case incident

---

apparent insubordination, the court reasoned: "[w]hile we do not wish to encourage disobedience in public employees, neither can we permit a governmental body to insulate itself from public scrutiny by declaring all of its official business to be confidential. It appears that O'Brien's alleged breach of the confidentiality rule was necessary to the presentation of the important public issues and there was no evidence that it was gratuitous or manipulative Id. at 407.

report. He was disturbed with Tolnay's expressed opinion that he could not "adequately or effectively perform his duties due to the political influence he believes has been exerted by Reverend Rodriguez." Captain Ortiz writes that such comments were "unacceptable" and "inappropriate". In closing, he notes that when Officer Tolnay returns from vacation, the "matter will continue upon his return to duty". What he meant by that is clear. Shortly thereafter, Tolnay was ordered to the Chief's office where he found himself accused, interrupted and badgered by a Chief of Police who appeared to be fishing for an excuse to discipline him and who observed the decorum of one of the officers whose barroom brawling the Chief cares little about.

The Chief's comments in his August 16, 2002 memorandum likewise speak volumes about the probable existence of an ulterior motive. After preliminary delivery of a self-serving post-hoc justification for the suspension, the Chief notes that Officer Tolnay "began to 'trash talk' the captain of patrol" (Ortiz) and "disrespectfully expressed his position that this meeting was solely political". The Chief goes on to defend Captain Ortiz's conduct. Further noteworthy, and perhaps most meaningful, is the Chief's expressed hope that in the future Officer Tolnay will not write "police reports which reflect his . . . political speculations". This evidence, especially when viewed against the backdrop of the politically charged context in which this took place, is compelling evidence of pretext.

This Court must look at the cumulative record as a whole and not view each item of evidence or each possible inference by itself or in a vacuum.

34
LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541

Additional evidence abounds from which jurors may not only discredit Wearing's sanitary characterization of the discipline but flatly reject it as preposterous, especially when judged against the backdrop of what can only be described as eye-popping evidence that Wearing cares not one whit about other officers (supervisors at that) who are taken out of banks in handcuffs while in uniform, engage in public disturbances, refer to fellow officers as "Irish Mother F- - -ers[10]" fraudulently obtain paid leave, fabricate death certificates and engage in criminal conduct by engaging in barroom brawls and beating up their wives. Given such compelling evidence of not only a disturbingly selective practice of meting out discipline but an approach to issues of officer misconduct and discipline which jurors may well deem bizarre and shocking, the material issue of defendant's motivation in disciplining Officer Tolnay can hardly be deemed appropriate for summary adjudication.

Defendant's established pattern and practice of disciplining or not disciplining officers would be likewise meaningful to jurors. It is undisputed that Officer Tolnay had an excellent record, a factor cited by the defendant when imposing one to two day suspensions on others for like misconduct. Finally, though additional evidence isn't even necessary, an improper motive behind Captain Ortiz's instigation is strongly suggested by evidence of his ambition to be the next chief of police and the report that the ministers for whom he bent over backwards and bended the law were among his strongest and most influential lobbyists when eh sought the appointment upon

---

[10]  In his deposition, Chief Wearing acknowledged being advised of this incident and when pressed to explain why no discipline was imposed responded by asking " is that a crime?" See Exh. 16 at p. 87.

Wearing's retirement. In short, the cumulative evidence in this case shows that Officer Tolnay was the victim of classic municipal politics and political horse trading. Lest this court or others think that such is to be expected and it doesn't make for a first amendment case, one must consider the effect of defendant's conduct on the plaintiff and others when they encounter Daniel Rodriguez, Armando Hernandez or anyone else with political ties driving intoxicated through the streets of New Haven, placing innocent adults and children at risk. The issue is important, it is serious and attempting to speak of it and bring it to light must be accorded a high level of constitutional protection. As Judge Arterton noted in Dillon v. Bailey, 45 F. Supp. 2d. 167 (1999), an employee's charge of unlawful conduct should be given far greater weight in the balancing exercise than a complaint about the fairness of internal operation and that "without disclosure by law enforcement insiders... willing to report their well-founded belief of existence of wrongdoing by fellow law enforcement officers, such corruption is most difficult to detect, prove or prevent." Id. at p. 174. See also Rookard v. Health and Hospital Corp., 71 F. 2d 41, 46 (2d Cir. 1983) (speech about corrupt practices carries great weight); Cahill v. O'Donnell, 7 F. Supp. 2d 341 (S.D.N.Y. 1998) (Police corruption is a matter of political and social concern to the community) As the Fifth Circuit Court of Appeals has observed:

> If whistleblowing were not within the protective bosom of the first amendment, our government would be shorn of many of the instruments of investigation, which effectively had led to the elimination of a few bad apples among the barrels . . . public employees are uniquely qualified to reveal unseemly machinations of fellow employees because they observe them on a daily basis.

Brown v. Texas A & M University, 804 F. 2d 327, 336 (5th Cir. 1986)

36

In this case, there is ample, indeed overwhelming, evidence that the adverse actions against the plaintiff were fueled by his oral and written comments which recorded undoubtedly "unseemly machinations" by others in the discharge of their official duties.

All of the appended exhibits indicate that many of the facts in this case are uncontested. There was a hue and cry from members of the church over the arrest and citation. Exhs. 5, 7. There was an unprecedented interference by the Chief with the state's attorneys office handling of the prosecution, a matter as to which defendant's credibility is undermined by the testimony of a neutral witness. Exh. 18. Indeed, the Chief's conduct caused consternation among staff at the superior court. Clear evidence that political considerations had infected these events was the mayor's public apology to the congregation, in front of the press. While throughout his deposition, the mayor repeatedly gave answers that we have unfortunately come to expect from politicians (to wit: "I don't recall, I don't recollect, I might have. . .") the mayor did concede that he knew both ministers and enjoyed the political support Hernandez who was among an "endorsement group of Latinos" with respect to his campaign for office. He conceded that the Second Star of Jacob Church is one of the largest congregations in New Haven. The mayor's numerous failures of recollection as to his role in the Chief's decision to interfere with the prosecution is clearly a matter for jurors to assess and disbelieve with good reason.

Officer Tolnay's law enforcement actions in both incidents cannot be legally or even fairly challenged as improper in any way, particularly where his account is backed up by other officers and a supervisor involved. Thus, jurors may readily agree with the plaintiff that the instigation of

actions. See, e.g., Vasbinder v. Ambach, 926 F.2d 1333 (2d Cir. 1991); Dobosz v. Walsh, 892 F.2d 1135 (2d Cir. 1989); Rooker v. Health and Hospitals, Corp., 710 F.2d 41 (2d Cir. 1983). Indeed, the Second Circuit in Vasbinder noted the law in this regard was clearly established as early as 1981 Id. at 1341; see also Piesco v. Koch, 12 F.3d 332 (2d Cir. 1993) (discussing Dobosz v. Walsh); Bieluch v. Sullivan, 999 F.2d 666 (2d Cir. 1993) (retaliatory transfer of State Trooper to Litchfield); Cahill v. O'Donnell, 7 F. Supp. 2d 341 (S.D.N.Y. 1988) (involuntary transfer for report of corruption); Broderick v. Roache, 996 F. 2d 1294 (1st Cir. 1993) (discussing impact of malicious intent to retaliate on qualified immunity analysis).

Moreover, defendant's denial of a nexus between the speech and the adverse actions precludes a grant of qualified immunity, either by this Court on summary judgment or by a jury, in the absence of defendant's concession of a nexus between the two, since defendant will have deprived all of the evidence of "disruption" or the nature and credibility of any other competing interest which is alleged to outweigh the value of the plaintiff's speech. In Vasbinder v Ambach, defendants employed a trial strategy of denying a nexus between the protected speech and the adverse action complained of and then assigned error in the trial court's failure to submit to the jury factual issues going to immunity. Judge Kearse, writing for a unanimous panel, noted that if defendants had been more "forthright" and conceded a nexus between the speech and the adverse action, they might have been entitled to a balancing test and jury interrogatories, if necessary, to resolve any disputed facts necessary to the Court's balance. But having claimed that the adverse action "had nothing to do" with the protected speech, "there was no such fact issue for the jury."

Id. at 1340.   See also McCardle v. Haddad, 131 F.3d 43, 51-52 (2d. Cir. 1997)  (qualified immunity defense incompatible with defense on the merits). [11]

Accordingly, for all of the foregoing reasons, Defendant's motion should be denied.

Respectfully submitted:

THE PLAINTIFF
ARPAD TOLNAY

BY: _____
Karen Lee Torre
Fed. Bar No. 01707
51 Elm Street, Suite 307
New Haven, CT 06150
Tel.203-865-5541
FAX:(203) 865-4844
His Attorney

**CERTIFICATION**

I hereby certify that a copy of the foregoing was hand delivered on this 24th day of November, 2003, to: Jonathan H. Beamon, Esq., Assistant Corporation Counsel, Office of the New Haven Corporation Counsel 165 Church Street, 4th Floor, New Haven, CT 06510

_____
KAREN LEE TORRE

---

[11] Having denied a nexus between the speech and the adverse actions, defendant cannot obviously be heard to claim that the adverse action was necessary because the speech had a disruptive effect on the agency's operations.  Thus, the balancing of interests articulated in Pickering v. Board of Education, 88 S. Ct. 1731 (1968) does not come into play.  Compare Lewis v. Cowen, 165 F.3d 154 (2d Cir.) cert. denied 528 U.S. 823 (1999) where State of Connecticut officials readily conceded a nexus between plaintiff's speech and the adverse action thus setting an appropriate stage for a claim of immunity as a matter of law.