UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ARPAD TOLNAY,                  :
            Plaintiff         :
                              :
                              :
     v.                       :    3:02-CV-1514 (EBB)
                              :
                              :
MELVIN WEARING,               :
            Defendant         :

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Plaintiff Arpad Tolnay ("Plaintiff" or "Tolnay"), has filed
a Complaint in this Court against former New Haven Chief of
Police Melvin Wearing ("Defendant" or "Wearing"), alleging that
Wearing violated his rights under the First Amendment by engaging
in a course of retaliatory conduct, including suspension from
Plaintiff's employment as a New Haven police officer, following
Plaintiff's involvement in a highly publicized arrest and in
consequence of Plaintiff's statements and expressions of opinions
regarding the Defendant's, and other city officials', conduct in
response to that arrest.  Defendant contends that Plaintiff's
suspension, and other actions taken, were the direct result of
Plaintiff's insubordinate and disrespectful conduct during a
meeting with Wearing, called to discuss the situation at hand,
and nothing more.  All relevant papers having been filed with the
Court, the Motion is ready for decision.

**STATEMENT OF FACTS**

The Court sets forth only those facts deemed necessary to an

understanding of the issues raised in, and decision rendered on, this Motion.  The facts are distilled from the Complaint, the parties' Local Rule 56(a) Statements, their memoranda of law, and the exhibits submitted therewith.

In keeping with his theory of the case, Defendant has set forth five paragraphs delineating what he believes to be the facts at issue herein. The paragraphs track his Local Rule 56(a)(1) Statement. These facts, and evidence thereof, are confined to a solitary meeting, which meeting took place on August 13, 2002 and was attended by Plaintiff, Defendant, Lt. Leo Bombalicki ("Bombalicki"), the union representative, Scott Nabel, the Director of Human Resources for the New Haven Police Department, and Officer Jaime Abate ("Abate"), another New Haven police officer.[1]/

In contradistinction, Plaintiff's memorandum of law consists of twenty-four pages of facts, commencing with the evening of the highly publicized criminal charges noted above and culminating with his suspension and other allegedly negative actions taken against him by Wearing, on August 15.

The Court finds that a cohesive analysis of the claims set forth in this action may only be conducted by a thorough review of the facts spanning the time frame as set forth by Plaintiff. A final determination of what the material facts are at issue in

---

[1]/ Unless noted, all events related herein occurred in 2002.

2

this litigation, thus enabling the Court to decide the present Motion, may only be accomplished in this manner. [2]

At approximately 9:20 p.m., on the evening of July 26, Plaintiff was patrolling the area of Fair Haven, part of New Haven, Connecticut, when he was dispatched to the Second Star of Jacob Church in response to citizens' complaints of excessive noise. This was the second time that evening that police officers had been called to the area of the Church for the same reason. Abate was dispatched as a cover unit. Plaintiff's Exhibit 2, Deposition of Arpad Tolnay (July 9, 2003) at 7:13-14, 15-18, 24-25; 15:1-5, 11-14 ("Arpay Dep.").[3]

As he approached the area of the Church, Plaintiff could hear "very, very loud" music from approximately a block away and, upon arrival, took note that members of the congregation were playing music from concert-sized speakers in the window areas of the Church, amplifying the music outside of the Church. Attempting to shout over the blaring music, Tolnay initially spoke to one congregant, asking him to turn the volume down, which request was refused. The man walked away from Tolnay and

_____

[2] Consistent with his theory of the case, Wearing has not disputed the majority of the facts as set forth by Plaintiff, but chooses not to respond to them. Nevertheless, the facts chronicling the events set forth herein are taken from testimony under oath, written police reports and internal memoranda, and affidavits. The Court also takes judicial notice of the reports of events as published by the New Haven Register.

[3] Each of facts of the events culminating in the final criminal charges discussed herein are also set forth in Plaintiff's Case Incident Report, dated July 26, 2002, which Report is Plaintiff's Exhibit 3, filed in support of his opposition to the present Motion.

returned a moment later with another member of the Church, who, "from the get-go, . . . was very irate and . . . started screaming that they wouldn't turn the music down. . . ." *Id.* at 10:4-9, 18-21. Tolnay, after advising these men that they would receive an infraction for creating a public disturbance if they did not lower the sound, and being rebuffed by them, returned to his patrol vehicle for his infraction pad.[4]/ *Id.* at 10:22-25; 26:2-4. As he bent over the trunk to retrieve the pad, Tolnay heard loud "screaming" and turned to observe an individual, later identified as Armando Hernandez ("Hernandez"), waving his hands and shouting into the face of Abate. *Id.* at 11:13-19. Immediately, Tolnay went to Abate's side and requested the man to "relax and calm down." Instead, Hernandez put his hands behind his back and "started screaming, '[t]ake me to jail. I'm not turning the music down. Take me to jail." Hernandez continued to behave in this manner, moving closer and closer to Tolnay and Abate. Each became "a bit frightened" as Hernandez continued to physically push his way into their "safety zone." *Id*. at 14:4; 22:12. By this time, approximately sixty church members had exited the building and surrounded the officers, shouting at them. The shouts included the warnings to the officers that: "[y]ou don't know who you're dealing with. We're going to call

---

[4]/ Tolnay testified that he had to go and retrieve his infraction pad because, when he arrived, "[a]t that time, obviously, not having had any intention of having to take police action, I didn't have my infraction book." Tolnay Dep at 11:4-7.

the mayor.  You're going to get in trouble." *Id.* at 11:23-25;
12:18-20; 13:3-4, 8-10.

For the safety of the officers, and in an attempt to defuse
the situation, Tolnay put Hernandez into the back seat of his
police vehicle.  As he was doing so, a third officer arrived on
the scene, querying of Tolnay if he knew the identity of
Hernandez, which inquiry Tolnay answered in the negative.  The
officer, who exited his vehicle to assist with crowd control,
advised Tolnay that Hernandez was "the Reverend" of the Church
and that Tolnay should "get him out of" the area, due to
unfolding events.[5]/ *Id.* at 14:5-11; 23:22.  Tolnay called his
supervisor, one Sgt. Hoffman ("Hoffman"), alerting him to the
situation and advising him that it was his intention to move his
vehicle, with Hernandez in the back seat, up one block and away
from the crowd.

After removal, Tolnay, due to a notable change in Hernandez'
temperament, determined that he would issue to Hernandez a
misdemeanor summons for breach of peace, which did not require
that Hernandez be booked and processed at a police station.

Hoffman immediately proceeded to the scene.  Within seconds
of Hoffman arriving at the placement of Plaintiff's vehicle, just
as he was being briefed by Plaintiff and agreeing with his

_____

[5]/ Inasmuch as Hernandez was not garbed in any different, identifying
clothing, Tolnay was unaware that Hernandez was a minister.  The same was true
of Daniel Rodriguez, neither of whom he had met prior to the evening of July
26. Tolnay Dep. at 19:1-3, 20-24.

intentions, a second vehicle pulled up next to them.  A man,
later identified as another minister, one Daniel Rodriguez
("Rodriguez"), quickly exited the vehicle, and ran toward
Hoffman, stating in a loud voice: "I want to go to jail with
him." [6]/  Rodriguez, placing his hands behind his back, and
continuing to loudly demand that he be put in Hernandez' place or
be taken with him, ignored Hoffman when Hoffman advised that
Hernandez was not being taken to jail.  Rather, he continued to
approach the officers, entered their physical "safety zone" and,
finally, pushed his body into Hoffman's.  "Okay; now you're going
to go[,] under arrest" decided Hoffman.  Resultingly, Tolnay
placed Rodriguez under arrest for interfering with a police
officer and breach of peace, after which Rodriguez was taken to a
detention center for processing.  *Id.* at 14:20-25; 15:3-12;
15:25; 16:1-15; 16:19-22.

    A short time later, the criminal charges were made known to
the general populace by the publication in the New Haven
Register, in its Top Stories division, of an article entitled
"Two Ministers Charged Over Noise Complaints."  The story
contained a "demand" by a city councilman that "police and city
officials explain the incident and apologize." Wearing was quoted
in the article as stating, "[t]here certainly was a violation of

---

    [6]/ Rodriguez was accompanied by two young boys, later identified as his
sons.

6

the law relating to the statutes, but there's clearly a better way of dealing with these situations than making an arrest." Plaintiff's Exhibit 5.

On August 1, six days after the incident and twenty-six days prior to the ministers' required appearance date in the Superior Court, Wearing traveled to the state courthouse and asked to speak with one David Newman ("Newman"), Supervisory Assistant State's Attorney for the Judicial District of New Haven.  During the conversation, Newman asked his assistant to retrieve the two files, after which he proceeded to the arraignment court and nolled all charges.  Wearing, in his deposition, denied that he told Newman directly that he wanted the charges dropped.[7] Rather, he told Newman that he and the "community" each had "some concerns with it." "I go to the court, there was some concern, there was some concern in the community regarding these ministers being arrested.  So I went over there to talk to David Newman about the case and just to show my concern regarding the matter of the arrest."  Wearing Dep. at 14:4-7; 14:22-24; 15:1-3.  When asked, Newman testified that, based solely on his meeting with Wearing, it was his impression that the police department had no

---

[7]/ When asked, "[d]id you, in fact, appear physically in the building at 121 Elm Street for the purpose of exerting influence on the prosecutors in the case with respect to their decision making [sic] on how to prosecute Mr. Hernandez and Mr. Rodriguez ?", Wearing answered, "I did."  Plaintiff's Exhibit 16, Deposition of Melvin Wearing (May 2, 2003) at 12:23-24; 13:1-4 ("Wearing Dep.").

interest in prosecuting either of these two ministers.[8]/
Plaintiff's Exhibit 17, Deposition of David Newman (October 17,
2003) at 21:4-9 ("Newman Dep."). "My impression was it would
serve no great interest in the community . . . ." *Id.* at 21:18-
19. Newman was firm in his denial of any undue influence placed
upon him by Wearing which caused him to nolle the charges, taking
full responsibility for the disposition and the decision
regarding it. *Id.* at 41:7-9; 42; 1-5.  When asked, he
acknowledged that there had been no other instance in which
Wearing personally appeared at the courthouse to discuss with him
whether a case should be nolled or not. *Id.* at 42:3-5, 10-15.[9]/

   Ms. Sherri Murowski, whose immediate supervisor was Newman,
testified that, because her desk was placed right outside
Newman's office, positioned such that she could look into his
office, and because the office door remained open, she could hear
the discussion between Wearing and Newman regarding the criminal
charges against Hernandez and Rodriguez.  Plaintiff's Exhibit 18,
Deposition of Sherri Murowski (October 17, 2003) at 9-14
("Murowski Dep.").  According to her testimony, Newman inquired

---

   [8]/ Newman did not speak with Plaintiff or any other police officer
involved in the arrests prior to nolling the charges.

   [9]/ Newman testified that, on the day following his nolle of the charges,
when he "saw 'the' newspaper article", he contacted Michael Dearington, the
State's Attorney for the Judicial District of New Have, who was then on
vacation.  He did so in order to afvise Dearington that he had nolled the
charges.  He did not recall Dearington's "attitude toward the situation."
Newman Dep. at 27:1-8.

as to the identity of the people that Wearing was there to
discuss and that he "would do whatever he could to help him out."
*Id.* at 14:6-9.  Wearing advised Newman that he "was getting a lot
of complaints from the community on the [ministers'] arrests."
*Id.* at 14:18-20.  After retrieving the files for him at his
request, Murowski testified, she heard Newman ask Wearing,
"[w]hat do you want me to do with these?", to which Wearing
responded, "I'd like you to take care of them.  I don't want
these two people coming to court." According to Murowski, Newman
responded "[w]hatever you want" and the conversation ended. *Id.*
at 15:14-17; 16:21-24; 17:1-3.  When Newman returned the files to
Muraski, they were already marked "disposed of", which she
characterized as "unusual."  She also testified that the disposal
of these cases, and the manner thereof, created controversy
within the office.  She described colleagues as "shocked" and "in
disbelief".  *Id.* at 21:20-24; 22:12-20.

     As reported in a second headline article in the New Haven
Register, three days following the nolle of the charges, Mayor
John DeStefano ("DeStefano") attended the evening services on
Sunday, August 4, at Hernandez' church, where he addressed the
congregation.  After announcing that all charges against the two
ministers had been dismissed, he apologized to the members for
the incident "out of respect and responsibility" and called upon
them to hold New Haven police officers in a positive light

despite the incident. DeStefano Dep. at 36:23-24; 37:1-3;
Plaintiff's Exhibit 9.  DeStefano received a standing ovation.
Plaintiff's Exhibit 9.

The reaction of New Haven police officers to this address
was swift.  The lead headline story next published by the New
Haven Register, on page one, was entitled "Cops: Mayor, chief
'sold us out'" and contained a demand by the police union for an
apology of its own.  The article reported that officers "were
seething over the mayor's apology . . . accusing the
administration of selling out police for political expedience."
The police union president was quoted as remarking that "[w]e
don't need any grandstand play by our mayor or chief so they're
back in line with the Hispanic community.  Stand up for your
officers, whether it's politically correct or not."  He stated
further, "[j]ust put enough pressure on City Hall and you'll get
your charges dismissed and an apology", adding that neither
DeStefano nor Wearing had ever met with Tolnay or the other
officers involved in the events of July 26, in order to hear
their versions of what had transpired.  Plaintiff's Exhibit 8.
When asked during his deposition, DeStefano confirmed this fact,
yet acknowledged that he had contacted Hernandez "[r]egarding the
incident that occurred; the totality of the incident that
occurred which included his arrest."  Deposition of John
DeStefano, Jr. (May 2, 2003) at 17:9-17; 40:22-24; 41:1-3

10

("DeStefano Dep.").[10]/

Another of the New Haven Register's Top Stories reported
that, on the day after DeStefano's apology, "1,000 Protestors
Rally Over Ministers' Arrests". [11]/  The article gave an account
of a group of demonstrators, numbering close to 1,000, which had
paraded through the streets of New Haven under police escort,
converging on the steps of police headquarters, to protest the
criminal charges.  Hernandez and Rodriguez, along with a group of
Christian and Muslim clergy, stood atop a flatbed and addressed
the crowd.  "If there is an injustice, we will be here to say
what we have to say", proclaimed one of the clergy. The author of
the newspaper article wrote further that Hernandez had announced
to the crowd that he had declined an inquiry from a city
administrator over whether the arresting officer should be
disciplined.  Plaintiff's Exhibit 7.  Wearing attended the rally,
which he estimated numbered 250-300 people, during which he spoke
with Rodriguez in order to meet with him afterwards.  Wearing
Dep. at 20:10-13; 20:17-18; 21:10-12.

In the meantime, on August 3, Plaintiff was patrolling his
assigned Fair Haven district when he saw a fellow officer,

_____

[10]/ DeStefano testified that he did not contact any of the complainants.
He did not know who the complainants were, nor did he ever attempt to find
out.  He never directed anyone subordinate to him to contact them, in order to
find out how they felt about the incident.  DeStefano Dep. at 24:16-24; 25:1-
5.

11/ Although DeStefano had issued his apology the night before, the
demonstration had already been planned and those involved determined to go
ahead with the march.  *See* Plaintiff's Exhibit 9.

Waleska Bermudez ("Bermudez") on foot patrol. He offered her a
ride, as it was near shift change and she had begun walking back
to headquarters.  As they drove, both officers observed a Jeep
Wrangler in operation, with no roof covering and with two
children standing on the side-step bumpers outside of the
vehicle, hanging onto the roll bars.  Plaintiff's Exhibit 11,
Memoranda of Officers.  Pursuant to the officers' reports, each
determined that the motorist should be stopped.[12]/  Tolnay
approached the driver's side from the rear, while Bermudez
approached the two children in order to tell them to get into the
vehicle and put their seat belts on. Plaintiff's Exhibit 11,
Bermudez Memorandum.  Tolnay could not see the driver; however,
as he reached the driver's side door, Tolnay recognized him as
Rodriguez and the children as his sons.  Plaintiff's Exhibits 6,
11, Tolnay Case Incident Report (Narrative) at p. 3 ("Tolnay
Report").  When Rodriguez recognized Tolnay, he turned and made a
comment which Tolnay did not hear but which Bermudez reported as
"[g]et inside before they start harassing me again."  *Id.*;
Bermudez Memorandum.  Tolnay then noticed that the three
occupants were distributing fliers regarding the rally discussed
above.  "This officer being aware of the political influence that
was exercised by Rodriguez regarding said incident and the

---

[12]/ In her memorandum concerning the stop, Bermudez wrote, "[i]n fear of
the children' [sic] safety who were obviously in danger while riding on the
outside of a moving vehicle, I asked Officer Tolnay to stop the vehicle." *See*
Plaintiff's Exhibit 11.

impending protest this officer stated to Rodriguez that he had
the absolute right to distribute the fliers but that the two (2)
young males needed to be inside the cab of the vehicle with their
safety restraints fastened. The above stated comment was given
verbatim" Tolnay Report at p. 3-4.

As soon as the children were inside the vehicle, with their
seatbelts fastened, Tolnay told Rodriguez that he was free to go,
without the issuance of a summons of any kind.  He immediately
contacted his supervisor, one Sgt. Burgh ("Burgh"), to brief him
on the encounter.  The transmission was overheard by then-Capt.
Francisco Ortiz ("Ortiz"), who quickly contacted Burgh by radio,
telling him to switch to "channel one", the communications
channel, a frequency often monitored by other officers and the
public.[13]/  Tolnay switched to the same channel and heard Ortiz
stating, in reference to Tolnay, "I don't know what it is you got
from that Fair Haven officer, but just tell him to do his job.
Tell him I don't want him running around having . . . silly
conversations.  Tell him to do his job and not have any contact
with anyone involved [in the July 26 arrest]".  Tolnay Dep. at
45:8-25; 46:1-4.  Burgh also informed Plaintiff that he was, per
Ortiz, to "stay away" from Rodriguez.  *Id.* at 48:2-4.  *See also*

---

[13]/ DeStefano named Ortiz Chief of Police in 2003.  Hernandez and
Rodriguez were named among those prominently involved in the lobbying for
Ortiz and in "stepping up pressure on the mayor to pick Ortiz."   See
Plaintiff's Exhibit 19, New Haven Register (May 21, 2003): "Search for police
chief stirs debate".

Tolnay Report at pp. 4-5.

Burgh next advised Plaintiff, and the other officers in attendance during, or immediately following, the traffic stop, that Ortiz had ordered memoranda of the incident from them, to be filed by the close of their shift.  Each complied, with Tolnay referencing his complete Case Incident Report for more details. *See* Plaintiff's Exhibit 11.

In his report, Tolnay set forth two statutes which Rodriguez had been in violation of, including risk of injury to a minor. Nevertheless, he had not cited Rodriguez, and concluded, "[t]his officer feels he was not able to act to his full potential at that time based on the circumstances of said situation.  This officer feels that at the moment in question he acted with judgement [sic] which was imposed on his police jurisdiction due to the identity and political involvement of Rodriguez.  This officer was reaffirmed by his actions after the completion of the incident as this officer was instructed by the patrol shift supervisor Capt. F. Ortiz to not have any contact with any person(s) involved in the incident that occurred on 7/26/02." Plaintiff's Exhibits 6, 11.

On August 8, Ortiz sent a memorandum to Wearing regarding a "Citizens [sic] Complaint."  Plaintiff's Exhibit 11. In it, he reported that, approximately two hours after the above-referenced traffic stop, he personally had gone to Rodriguez' home in

14

response to a complaint from Rodriguez about the conduct of three police officers who "began to harass" him while he was distributing fliers. [14]/  Rodriguez informed Ortiz that Bermudez had been "rude and insensitive and exhibited a poor attitude in speaking with him".  *Id.*  He further opined to Ortiz that "the officers were harassing him because he was distributing fliers promoting a rally against the Police Department".  Ortiz wrote, "Reverend Rodriguez was particularly concerned with the fact that Officer Tolnay was targeting him, since he was the same officer who arrested the Reverend 1 week prior to this motor vehicle stop."  *Id.*

Ortiz synopsized the officers' memoranda for Wearing, noting that "Officer Bermudez's memo reflects that Officer Tolnay in fact did pull over the Reverend for a legitimate motor vehicle violation and did not know who he was until they approached him."

Ortiz concluded:

> In addition to the memos submitted by the officers, I also read the report completed by Officer Arpad Tolnay (refer to CN 44465) and find myself very disturbed by the content, which reflects his opinion that he cannot adequately or effectively perform his duties due to the political influence he believes has been exerted by Reverend Daniel Rodriguez.
>
> This officer's written report is unacceptable and his comments are inappropriate and have

---

[14]/ There were only two officers at the scene during this encounter, as set forth in the memoranda to Ortiz.  Two others arrived after Tolnay had already advised Rodriguez that he was free to go.

> no relevance to the initial motor stop. At
> the time of this writing, Officer Tolnay is
> on vacation and this matter will continue
> upon his return duty to work.

*Id.*

On August 13, Tolnay attended the above-referenced meeting in Wearing's office, at Wearing's directive, in order "to discuss" the events of July 26 and August 3.[15]/  Wearing scheduled the meeting because "[a]s Chief of Police, it is my duty to fully investigate such significant incidents [the events of July 26], in this case, with the primary purpose of determining if or how such negative outcomes could be avoided in the future. . . There was also a subsequent incident [the stop on August 3]. . .; Captain Ortiz was concerned that such a stop might have been retaliatory.  Again, it is my duty to investigate this matter."  *See* Defendant's Exhibit C, "Summary of Incident", (authored and signed by Wearing, describing August 13 meeting).

As evidenced by the exhibits in this case, reports of this meeting vary widely.  Wearing asserts that his tone from the outset was calm, not confrontational or accusatory in nature. Although at times he "disagreed to some extent with the particular tactics employed [on July 26]", he "did not criticize the officers and instead offered some constructive suggestions to

---

[15]/ Hoffman, the supervisor, was not asked to attend this meeting and Wearing never directed any inquiries regarding the July 26 incident to him. He asked Abate one question during the meeting.  Plaintiff's Exhibit 1, Affidavit of Arpad Tolnay at ¶ 13 ("Tolnay Aff.").

guide future conduct", including getting "a supervisor involved to mediate disputes of great sensitivity." [16]/ *Id.* He testified that Tolnay was "excited, boisterous, and disrespectful. . . He was very disrespectful", whereas Wearing was "always a gentleman" during the meeting. Wearing Dep. at 43:21-22; 45:17; 46:4. Wearing denied that he ever became agitated and unprofessional during the meeting and vehemently answered in the negative when asked if he had stuck his finger toward Tolnay's face. *Id.* at 45:24; 46:1-7. The Summary of Incident provides that Plaintiff's conduct during the meeting "started out as inappropriate and deteriorated through the session to the extent that he violated several Department Rules. His initial demeanor was somewhat arrogant, and he dismissed my early questions by starting the story where he felt it was relevant. I had to remind him that I was asking the questions and I was gathering the information I felt was relevant." Defendant's Exhibit C. According to Wearing, the meeting had not been called as a disciplinary hearing; rather, "it became a disciplinary [sic] after he acted out the way he acted in my office." Wearing Dep. at 46:20-21. "I thought he was disrespectful to the office of the chief,

---

[16]/ Wearing testified at his deposition that, if a sergeant had been at the scene prior to the arrests being made, the incident could have been resolved without any arrest and "we could have . . . resolved the whole matter." Wearing Dep. at 60:5-10. Wearing also testified that he had read all police reports of the incidents prior to this meeting. Plaintiff contends that he did not, inasmuch as, if he had, he would have known that Plaintiff had, in fact, called for supervisory assistance. Plaintiff points to his Case Incident Report, which provides that Hoffman arrived as he was writing out the summons for Hernandez and prior to the arrest of Rodriguez.

disrespectful to me personally.  And I have over the years spent,
[sic] you know, several officers, hundreds of officers and none
of them acted out the way Officer Tolnay acted in my office."
*Id.* at 44:19-24.

Plaintiff's version of the meeting is diametrically opposed.
He testified that, as he attempted to provide an answer to
Wearing's questions, Wearing interrupted him, interjected his own
thoughts, or cut him off, telling him "to get to the point".
Tolnay Dep. at 50:20-21; 51:23-24. "During the whole course of
conversation, like I said, I was interrupted.  I don't believe
that I began to disclose any information without being
interrupted."  *Id.* at 54:17-20.[17]/  Wearing set this tone at the
very beginning of the meeting.  *Id.* at 51:6-7.  Repeatedly,
Wearing asked if Tolnay believed that he had done "everything
right" on the evening of July 26 or if Tolnay "could have done
something different."  When Tolnay answered the first inquiry in
the positive and the second in the negative, Wearing appeared
dissatisfied and asked again, in a different way.  Wearing
continued to ask Plaintiff about his interaction with church
members during the first time the police were called to that
scene on July 26, even though Tolnay advised Wearing twice that

---

[17]/ "Chief Wearing kept interrupting me, refusing to allow me to finish
a sentence and became more and more agitated each time I refused to concede,
as he was prodding me to do, that I had engaged in any inappropriate behavior
with respect to either incident."  Plaintiff's Exhibit 1, Affidavit of Arpad
Tolnay (November 20, 2003) at ¶ 3 ("Tolnay Aff.").

he had no interaction on the first call. Tolnay testified that, in attempting to answer the question for the third time, he stated, "Sir, I didn't have any interaction with any of the church members on the first call. If you'd like, I'll move on to when I did." *Id.* 52:24-25; 53:1; 53:6-8. According to Tolnay, Wearing immediately told him to stop speaking, pointed his finger at him, and loudly pronounced, "You have a smart mouth." Tolnay felt that he was in a difficult position, inasmuch as this was the Chief of Police to whom he gave respect, yet he himself was not being treated as an adult. *Id.* 53:22-25; 54:1. Tolnay further described this portion of the meeting as "frustating", as he became convinced that Wearing was asking questions for which Tolnay had no answer due to the fact that Wearing had never read Tolnay's reports and was without first-hand knowledge of what they contained.[18]/ *Id.* 53:11-20; 54:14-16.

In his testimony and in his affidavit, Plaintiff asserts that, when he expressed his opinion that Ortiz's conduct had been inappropriate and unprofessional, and when he referred to Rodriguez's political ties to the Police Department, this in particular angered Wearing. Tolnay Dep. at 57:8-25; Tolnay Aff. at 4. Tolnay testified that, during the August 13 meeting, "[Wearing] interrupted me again when I was going into details about the motor vehicle stop and asked me why I didn't make an

---

[18]/ *See* Footnote 16.

arrest.  I said, 'Sir, to be honest with you, based on everything
that's been happening with the original arrest . . . I felt that
I could not do that.'  And I said, 'I was reaffirmed, because, on
my radio, my supervisor was informed by Captain Ortiz that I was
to stay away from all persons involved.'" Tolnay Dep. at 55:12-
20.  At this, Plaintiff contends, Wearing got very angry and told
him that he did not have a right to say what he felt was
unprofessional, especially after comparing his limited experience
with the thirty years of experience that Ortiz had. *Id.* at 57:10-
17.  Tolnay responded that Ortiz' experience "was all the more
reason why he was unprofessional." *Id.* at 57:18-20.  "At that
point, Chief Wearing stood up, pointed his finger in my face and
said, 'Now I know that you caused that incident.  Now I know that
you're a smart mouth, and you're the one who caused the incident
at the church.'" *Id.* at 57:20-25.  At this, according to Tolnay's
testimony, Tolnay stated that the meeting was over and that he
thought he needed legal counsel, after which he would speak with
Wearing again. *Id.* at 58:3-7.  Although his union representative
initially told him to be seated, when Plaintiff told him that the
meeting was over, he then told Plaintiff to go outside into the
hall and wait for him.  Plaintiff's Exhibit 13, Affidavit of Leo
Bombalicki, Jr. (November 21, 2003) at ¶ 13 ("Bombalicki Aff.").
Bombalicki spoke again with Wearing, who allegedly stated that he

did not wish to continue because "everyone was hot". [19]/ *Id.*
Accordingly, another meeting was to be scheduled.

    In summarizing the meeting, Wearing wrote, in pertinent
part, that, when he began to discuss the motor vehicle stop,
"Tolnay offered his perspective and in doing so became highly
critical and disrespectful of Captain Ortiz.  When I interjected
that Captain Ortiz has a lot of experience, Officer Tolnay jumped
from his seat and stated that he wasn't going to answer any more
questions and was going to consult his lawyer. I ordered Officer
Tolnay to sit down and continue the discussion, and he was so
advised by his union representative.  Again, Officer Tolnay
refused to comply and showed absolute disregard for my
authority."  Defendant's Exhibit C, Summary of Incident.

    Bombalicki, Plaintiff's union representative at the meeting,
is supportive of Plaintiff's version of the meeting.  In an
affidavit, Bombalicki describes Wearing's behavior as "unusually
aggressive, insulting and provocative."  Bombalicki Aff. at ¶ 8.
In his opinion, Wearing was trying "to bait" Tolnay into an
admission of wrongdoing or a failure of good judgment in
connection with the events of July 26 and August 3.  *Id*. at ¶ 9.
According to Bombalicki, even though Tolnay was polite and
respectful in his attempts to answer Wearing's questions, Tolnay

---

    [19]/ Two years earlier, Wearing understood "that in the heat of the
battle tempers may flare and the tone of each party might become
confrontational or hostile."  Plaintiff's Exhibit 15, Personnel Memorandum 00-
23, Detective Marc Calafiore (September 18, 2000).

was "frequently unable to complete a full sentence as every time
he attempted to explain or answer a question, former Chief
Wearing repeatedly interrupted him, cut short his answers and
appeared agitated that Officer Tolnay was defending his conduct."
*Id.* at ¶ 10.  Bombalicki witnessed Wearing thrusting his finger
toward Tolnay's face, referring to him as a "smart mouth".  *Id.*
at ¶ 11. Bombalicki interpreted Wearing's comments as inferring
that Tolnay was responsible for, and at fault for, the arrests of
Hernandez and Rodriguez.  *Id.*  Bombalicki also was of the opinion
that Wearing had insinuated that Tolnay had harassed Rodriguez
with the traffic stop. *Id.*

Bombalicki described Wearing as "particularly incensed" and
"visibly angry" at what Wearing saw as Tolnay's criticism of the
conduct of Ortiz.  *Id.* at ¶ 12.

> It was and remains my opinion based on what
> I observed in that meeting that former Chief
> Wearing was deliberately aiming and attempting
> to provoke Officer Tolnay into losing his
> composure.  The more Officer Tolnay tried
> calmly to defend himself, the more agitated
> Chief Wearing became and the more provocative
> his accusations and demeanor became.  Toward
> the end of the meeting, Officer Tolnay became
> visibly upset and frustrated at his inability
> to get a word in in his defense and rose from
> his chair stating that he thought the meeting
> should be over and that he should seek legal
> counsel. . . .

*Id.* at ¶ 13.

> As the meeting progressed the Chief became
> more and more agitated and frustrated with
> Officer Tolnay's refusal to admit any wrong

doing or failure of judgment and the Chief
thereafter failed to abide by any of those
norms and expectations regarding proper
decorum.  It well appeared to me that his
conduct was contrived and designed to produce
the result that it did.

*Id.* at ¶ 15.

The continuation of this meeting was scheduled for August 15. [20]/  At that time, however, there was no resumption of the earlier discussion; rather, upon Plaintiff's and Bombalicki's arrival, Wearing announced Plaintiff's 10-day suspension for: failing to extend proper courtesy and respect toward superior officers in the Police Department; committing an act contrary to good order and discipline; engaging in an act constituting conduct unbecoming an officer; and committing an act of insubordination or disrespect toward a superior officer. At this same meeting, Wearing further advised Tolnay that, upon his return, he was to be reassigned to desk duty for an unspecified amount of time.  Lastly, Wearing ordered Tolnay to undergo sensitivity training "in areas dealing with interpersonal interactions with supervisors and the community", in order to be eligible to go back on patrol duty.  *See* Plaintiff's Exhibit 12, Personnel Memorandum 02-19, Officer Arpad Tolnay; Tolnay Dep. at 66:1-24; 66:24-25; 67:1; 67:8-11.

Lt. Bombalicki, a twenty-five year veteran in the New Haven

---

[20]/ The head of Internal Affairs was in attendance at this second meeting.

Police Department, is one of three elected members of the
Executive Board of the police officers' union.  He avers that, in
this capacity, and by experience gained through his attendance at
many disciplinary hearings, he is familiar with the rules and
practices in the Police Department with respect to officer
discipline.  Bombalicki Aff. at ¶ 3.  He is also familiar with
the patterns and practice of the Department with respect to the
level and severity of discipline imposed on officers found to
have engaged in rule violations, misfeasance or misconduct.  *Id.*
at ¶ 4.  Based on this familiarity, Bombalicki avers that the
suspension given Tolnay "is considered highly excessive and is
unprecedented."  *Id.* at ¶ 16.  It is also a "departure from
established practice".  *Id.* at ¶ 17.[21]/

---

[21]/ To support this alleged departure, Plaintiff has submitted seventeen
personnel memoranda of disciplinary action taken against seventeen officers
and employees of the Police Department charged with insubordination or
disrespect to a superior officer and conduct unbecoming an officer.
Plaintiff's Exhibit 15.  A review of this submission indicates that these
officers and other employees received discipline ranging from a written
reprimand to a five-day suspension (later reduced to 2.5 days) for such
conduct, with the average suspension being one to two days.  Also, Plaintiff's
counsel spent considerable time in Wearing's deposition reviewing with him the
disciplinary status, if any, of other officers who faced "equal or more
serious allegations".  Wearing Dep. at 74:3-4; pp 70-84.  Specifically,
counsel delved into the recent arrests of two New Haven police officers, one
for trafficking in narcotics, the other for breach of peace, in another
jurisdiction, when she hollered racial slurs at a bank teller and, generally,
created an angry, hostile atmosphere in a public place, while in uniform.
Additionally, both officers had a tumultuous behavioral history.  Wearing
could not recall if either had ever been disciplined for their conduct,
including their arrests, inasmuch as "lots of police officers [in the New
Haven Police Department] are arrested."  He has had so many of his officers
arrested for criminal conduct, that he could not remember their names.
Wearing Dep. at 80:20-23.  "It's what you want to make of it but there's [sic]
officers who get arrested, domestic violation [sic] situations, some fights at
bars from time to time, those kinds of things happen.  You know they aren't
arrested for selling drugs or consorting, you know, with known criminals . . .
."  *Id.* at 81:2-7.

24

**LEGAL ANALYSIS**

## I.   **The Standard of Review**

In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See also* <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 256 (1986)(plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322-23.  However, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996).

The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party. . . ."  <u>Aldrich</u>

25

v. Randolph Cent. Sch. Dist., 963 F.2d. 520, 523 (2d Cir.), *cert. denied*, 506 U.S. 965 (1992); Heilweil v. Mt. Sinai Hospital, 32 F.3d 718, 721 (2d Cir. 1994).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255, *quoted in* Keeney v. City of New London, 196 F.Supp.2d 190, 195 (D.Conn. 2002).

"[T]he requirement is that there be no *genuine* issue of *material* fact.  As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247-48 (emphasis in original).  When reasonable persons, applying the proper legal standards, could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

II.  **The Standard As Applied**

A.  **The First Amendment Claim**

Public employees may not be compelled to abandon all of their constitutional rights as a prerequisite to obtaining or continuing their employment.  Lewis v. Cohen, 165 F.3d 154, 161 (2d Cir. 1999).  Among the rights retained by public employees is that of freedom of expression as guaranteed by the First

26

Amendment.  *See, e.g.,* United States v. National Treasury Employees Union, 513 U.S. 454, 465 (1995); Rankin v. McPherson, 483 U.S. 378, 338-84 (1987); Connick v. Myers, 461 U.S. 138, 142 (1983); Perry v. Sinderman, 408 U.S. 593, 597 (1972); Pickering v. Board of Education, 391 U.S. 563, 568 (1968). "It is well settled that persons do not relinquish their first amendment rights to comment on matters of public interest by becoming government employees." Piesco v. City of New York, 933 F.2d 1149, 1155 (2d Cir. 1991)(internal quotations and citations omitted)).

In order to establish a First Amendment claim of retaliation as a public employee, Tolnay must show that "(1) his speech addressed a matter of public concern, and (2) he suffered an adverse employment action and (3) a causal connection existed between the speech and the adverse employment action." Konits v. Valley Stream Central High School District, 394 D.3d 121, 124 (2d Cir. 2005)(citation omitted); Mt. Healthy City School District Board of Educ. v. Doyle, 429 U.S. 274, 283-87 (1977).  In particular, the causal connection must be sufficient to warrant an inference that the protected speech was a substantial motivating factor in the adverse employment action. Mt Healthy, 274 U.S. at 287; Blum v. Schegel, 18 F.3d 1005, 1010 (2d Cir.

1994).[22]/

Thus, in determining whether employee speech is protected by the First Amendment, a court must first decide whether the speech addresses a matter of public concern.  National Treasury Employees Union, 513 U.S. at 466.  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  Connick, 461 U.S. at 147-48.  "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude . . . without intrusive oversight by the judiciary . . . ."  Id. at 146.  On the other hand, courts must be scrupulous in making sure that governmental entities do not use their status as employers as a facade to undermine free speech.  As our Supreme Court has warned, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the contents of employees' speech."  Rankin, 483 U.S. at 384.

Second, the determination of whether a public employer has violated the First Amendment by disciplining an employee "for

---

[22]/ Once a plaintiff establishes these three factors, the government may avoid liability if it demonstrates, by a preponderance of the evidence, that it would have taken the same action regardless of the protected speech.  Mt. Healthy, 429 U.S. at 87.

engaging in speech requires 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Rankin, 483 U.S. at 384 (alteration in original) *quoting* Pickering, 391 U.S. at 568. *See also* Connick, 461 U.S. at 150. This weighing is commonly known as the "Pickering" balancing test, as the test was first enunciated therein. *See* Pickering, 391 U.S. at 562; *see also* Vasbinder v. Ambach, 926 F.2d 1333, 1339 (2d Cir. 1991). [23]/  In balancing these interests, a court must consider whether an employee's statement, for which he seeks protection, "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships . . . or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin, 483 U.S. at 388. [24]/

---

[23]/ In his Memorandum of Law, Plaintiff declares, "[s]ince defendant denies a nexus between the speech and the adverse actions, there is no occasion for the court to balance any competing interests of the employer . . . .", citing to Pickering.  The Court cannot agree with this contention, inasmuch as Defendant argues, in the alternative, initially asserting that Plaintiff's speech is not protected *in toto*, but next arguing that, even if the Court finds protected speech, the interests of the police department outweigh those of Plaintiff.

[24]/ The public concern and balancing analyses raise questions of law for the court.  "The inquiry into the protected status of speech is one of law, not fact." Connick, 461 U.S. at 148, n.7; *see also* Lewis, 165 F.3d at 164 ("As a preliminary matter, the magistrate judge erred when he submitted the Pickering balancing test to the jury to resolve."); Wren v. Spurlock, 798 F.2d 1313, 1318 (10th Cir. 1986)("[t]he trial court erred in leaving that [Pickering] balance to the jury, rather than rule on it as a matter of law . . . .").

The more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown. <u>Connick</u>, 461 U.S. at 152 ("[t]he [government's] burden in justifying a particular discharge varies depending upon the nature of the employee's expression.").  It is the government which bears the burden of demonstrating that the speech threatens to interfere with government operations. <u>National Treasury Employees Union</u>, 513 U.S. at 466; *accord* <u>Jeffries v. Harleston</u>, 52 F.3d 9, 13 (2d Cir.), *cert. den'd.*, 516 U.S. 862 (1995).

 The Second Circuit has held that, even if the <u>Pickering</u> balance is resolved in the employer's favor, the employee may still demonstrate liability by proving that the employer disciplined the employee in retaliation for the speech, rather than out of fear of a disruption. <u>Sheppard v. Beerman</u>, 94 F.3d 823, 827 (2d Cir. 1996)(". . . such 'retaliatory' discharge is always unconstitutional.").

The Court now turns to an application of these rules of law.

1) **<u>Matter of Public Concern</u>**

_____Courts which have considered the issue are unanimous in finding that "[s]peech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import". <u>Starrett v. Wadley</u>, 876 F.2d 808, 817 (10th Cir.

1989)(public employee's private statements regarding her
supervisor's alcohol problem were matters of public concern) *See*,
*e.g.*, Connick, 461 U.S. at 148 ("actual or potential wrongdoing
or breach of public trust" by a public official constitutes a
matter of public concern); Nebraska Press Ass'n v. Stuart, 427
U.S. 539, 606 (Brennan, J., concurring)("[C]ommentary on the fact
that there is strong evidence implicating a government official
in criminal activity goes to the very core of matters of public
concern."); Johnson v. Ganim, 342 F.3d 105 (2d Cir. 2003)(First
Amendment protection to letter containing allegations "tantamount
to corruption and crime" in city government); Catletti v. Rampe,
334 F.3d 225 (2d Cir. 2002)(employee testifying about mental
health concerns in prison protected by First Amendment; qualified
immunity rejected); Vasbinder, 926 F.2d at 1340 ("potential
fraud, theft, and misallocation of funds were matters of serious
public concern."); Dobosz v. Walsh, 892 F.2d 1135 (2d Cir.
1989)(viable First Amendment claim when police officer subjected
to retaliation after working with FBI and testifying against
fellow officer); Rookard v. Health and Hospital Corp., 710 F.2d
41, 46 (2d Cir. 1983)(nursing director's allegations of corrupt
and wasteful practices privately communicated to HHC inspector
"obviously" involved matter of public concern). *See also* Conaway
v. Smith, 853 F.2d 789, 796 (10th Cir. 1988)(public employee's
private reports to superiors concerning possible departmental

wrongdoing "concerned information in which the public would definitely be interested"); Southside Public Schools v. Hill, 827 F.2d 270 (8th Cir. 1987); Daniels v. Quinn, 801 F.2d 687, 690 (4th Cir. 1986); Marohnic v. Walker, 800 F.2d 613 (6th Cir. 1986); Knapp v. Whitaker, 757 F.2d 827, 840 (7th Cir.), *cert den'd.*, 474 U.S. 803 (1985).

    After thorough analysis of these precedents, discussed further *infra*, the Court finds that, in the present case, Plaintiff's expressed concerns over the possible ramifications of enforcing the law as to certain members of the public, due to their political involvement with city officials, would be of great moment to the public, if shared with the citizenry. This finding applies, in the first instance, to Plaintiff's written Case Incident Report, his defense of his professional conduct on July 26 and August 3 during the meeting of August 13 with Wearing, and his critique of the actions of Ortiz, made in his Report and during the August 13 meeting. As to the latter, "debate on public issues . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government officials." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964).

    As noted above, Defendant's sole focus in his Motion for Summary Judgment is the August 13th meeting, devoid of any of the background scenario leading to that meeting. He declares that

Plaintiff's suspension was based strictly on said meeting.  He provides:

> Based on the plaintiff's deposition
> testimony, the essence of plaintiff's
> statements during the August 13, 2002
> meeting were: (1) he did nothing wrong
> in the July 26, 2002 and August 3, 2002
> incidents; (2) he was worried about what
> would happen to his job if he arrested
> Rodriguez or gave him a ticket in the
> August 3, 2002 incident; (3) Captain
> Ortiz acted inappropriately over the
> radio and was unprofessional; and (4)
> he was "done," the meeting was over,
> and the next time he would speak to the
> defendant Chief Wearing would be after he
> consulted with an attorney.

Defendant's Memorandum of Law in Support of Motion for Summary Judgment (August 29, 2003) at 9.[25]/

Based on this synopsis of the case, Defendant first postulates that Plaintiff's statements did not have a broad public purpose, were not made in a public forum, were not made while he was off-duty, were not given to the media, and were not circulated throughout the Police Department.  Hence, he concludes, they do not consist of speech to be protected by the First Amendment.  *Id*. at 9-10.

"The First Amendment forbids abridgment of the 'freedom of speech.'  Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to

---

[25]/ Defendant further asserts that (4) above is the most important statement made.

communicate privately with his employer rather than to spread his
views before the public." <u>Givhan v. Western Line Consolidated</u>
<u>School District</u>, 439 U.S. 410, 415-16 (1978)(teacher's complaints
and criticism of school policies and practices communicated
privately to principal held protected by First Amendment).
*Accord* <u>Rankin</u>, 483 U.S. at 386-87, n.11 (statement made to co-
worker; private nature of statement does not vitiate status of
statement as addressing matter of public concern); <u>Rookard</u>, 710
F.2d at 46 (nursing director's allegations of corrupt and
wasteful practices privately communicated to HHC inspector
"obviously" involved matter of public concern).  Clearly, then,
the fact that Tolnay chose a private forum, rather than public,
to express his concerns, does not remove them from First
Amendment protection.  Further, Defendant has provided no
authority in support of his references to the duty status of
Plaintiff, the media, or circulation throughout the Police
Department, assuming that such references are made in order to
undermine the public nature of Plaintiff's speech.  The Court has
found no such authority and, accordingly, rejects Defendant's
nebulous assertions.

Second, Defendant claims, the Plaintiff's statements relate
only to **his** job performance, **his** future employment, and **his**
personal grievances.  The Court disagrees.  Plaintiff's defense
of his professional conduct on both July 26 and August 3, his

concerns regarding his ability to enforce the law absent
political machinations as stated in his August 3 Case Incident
Report, and his critiques of Ortiz each had its genesis in
events, and reports, of great public concern.  The Court need
look no further than the outcry of members of the Police
Department in response to the dismissal of the criminal charges
and the Mayor's apology, the apology itself, the march and rally
of approximately 1,000 persons to protest the events of July 26,
and the editorials in, and letters to the editor of, the New
Haven Register, in order to find an evidentiary basis for its
holding that each concern the citizenry at large and are not
personal to Tolnay alone.

    Finally, Defendant claims that Plaintiff's statements, made
when putting an end to the August 13 meeting, have "everything to
do with why the plaintiff was suspended . . . ."  *Id.* at 11.  In
his deposition, Plaintiff testified that, immediately following
Wearing's accusation that he had "more or less" caused the July
26 incident, he stood up and stated, ". . . . this meeting is
over with . . . I think that I'm done and I think I need legal
counsel.  The next time I speak with you, it will be after I've
spoken to legal counsel." [26]/  Tolnay Dep. at 57:20-25; 58:3-7;
63:20-22.  In his Personnel Memorandum, suspending Plaintiff,

_____

    [26]/ There is nothing in the record which indicates whether Tolnay sought
legal counsel between the time of the August 13th  and August 15th meetings. He
was not accompanied by counsel on August 15th, but attended the meeting with
Bombalicki, as his union representative.

Wearing wrote that Plaintiff "leap[t] from his seat, refuse[d] to answer questions, and state[d] that we'd hear from his lawyer." Plaintiff's Exhibit 12.  In his affidavit, Bombalicki averred, "Toward the end of the meeting, Officer Tolnay became visibly upset and frustrated at his inability to get a word in in his defense and rose from the chair stating that he thought the meeting should be over and that he should seek legal counsel."

An examination of the content, form, and context of Plaintiff's given statement, as revealed by the whole record, Connick, 461 U.S. at 147-48, leads this Court to hold that this, too, under the narrow facts of this case, is protected speech. The entire unfolding of events, as set forth above and as uncontested by Defendant, led to the meeting of August 13. They cannot be divorced from what occurred at that meeting. "The statement at issue will 'not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, **as is the context in which the dispute arose**.'" Piesco, 933 F.3d at 1155, *quoting* Rankin, 483 U.S. at 388 (emphasis added).

Plaintiff contends that he was directed to attend a meeting with the Chief of Police immediately following the receipt by the Chief of the Ortiz memorandum, in which Ortiz plainly stated that it was the **content** of Plaintiff's Case Incident Report which was

**"unacceptable"** and **"inappropriate."**[27]/  Plaintiff had witnessed the firestorm which followed the events of July 26, after he had made lawful arrests with probable cause, in which Rodriguez was intimately involved.  Even prior to Ortiz' engagement on August 3, Plaintiff stated that he was reluctant to enforce the law against Rodriguez, due to what he perceived as Rodriguez' political ties to high city officials.  He felt "reaffirmed" in this reluctance by the conduct of Ortiz on that date, including both Ortiz' directive to stay away from Rodriguez and his personal visit to Rodriguez' home to take a "citizens [sic] complaint".  Thus, considering the record as a whole, the context of the speech was in a highly-charged meeting, with political overtones and inferences of wrongdoing on Plaintiff's part, which Plaintiff terminated, stating his belief that he needed legal counsel before he spoke with Wearing again.  Even if Plaintiff's manner was "angry", indicative of the visible frustration as observed by Bombalicki, this Court would not strip Plaintiff's speech of protection, as it is well established that speech of an angry nature may only be proscribed in three very limited circumstances: (1) the speech constitutes "fighting words" that

---

[27]/ When determining whether Plaintiff's speech was a motivating or substantial factor in his suspension, a reasonable jury could find that such language implicates a motivating factor for Plaintiff's discipline. The same could be true with Wearing's expressed "trust that [Plaintiff] has learned some lessons, such as . . . preparing police reports which reflect his observations and **not his political speculations."**  Plaintiff's Exhibit 12, Personnel Memorandum 02-19: Oficer Arpad Tolnay.

"by their very utterance inflict injury or tend to incite immediate breach of the peace," Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942); (2) the speech constitutes "advocacy [that] is directed to inciting or producing imminent lawless action and is likely to incite or produce such action," Brandenburg v. Ohio, 395 U.S. 444, 447 (1969); and (3) the speech constitutes a "true threat" by which "the speaker means to communicate a serious expression of intent to commit an act of unlawful violence to a particular individual or group of individuals." Virginia v. Black, 538 U.S. 343, 359 (2003).  There can be no doubt that Plaintiff's statement does not fall into any of these extreme categories.

In Cygan v. Wisconsin Department of Corrections, 388 F.3d 1092 (7th cir. 2004), the plaintiff, a corrections officer, was terminated for violating a rule prohibiting the use of demeaning and abusive language in dealing with others.  Plaintiff had become highly upset when her supervisor started a meal, attended by hundreds of violent inmates in a maximum security prison, without the requisite number of security guards in place.  Just outside the dining hall, but within hearing of other staff members and inmates, she yelled extreme profanities in objection. She loudly confronted a fellow officer, a union representative, and told him that he was not doing his job in protecting his fellow officers.  Her supervisor, who was also present for her

38

outburst and at whom her complaints were directed, was required to return from the cafeteria to the area just outside it, in order to demand that her conduct cease.  Even after describing the conduct as "a profanity-laced fit", the Court of Appeals concluded that this speech was protected, as it touched on matters of public concern, that is, prison security issues. *Id*. at 1100-01.  "Even though Cygan could be accurately characterized as a disgruntled employee and her speech may have been partially motivated by her dissatisfaction at GBCI and by concerns for her own personal safety, speech touching on issues of internal prison security in a maximum state prison like GBCI is undoubtedly a matter of public concern."  *Id.* at 1100.[28]/

Tolnay's speech and conduct pale in comparison to that found protected in Cygan.  This Court has found that Tolnay's speech concerning the possibility of politically-based law enforcement practices in New Haven is of great public concern to this community.  The August 13 meeting was called to "fully investigate" the arrests which "resulted in tremendous controversy in the community".  Defendant's Exhibit C, Summary of Incident (drafted and signed by Wearing).  Thus, the Defendant

---

[28]/ The court found, nevertheless, that the plaintiff's termination did not violate her First Amendment rights inasmuch as, under the Pickering balancing test, the correctional institution's interest in maintaining order and control over inmates outweighed plaintiff's speech. The plaintiff's "decision to announce the shortage of staff in the presence of inmates could have endangered both staff and inmates by exposing them to opportunistic acts of violence."  Cygan, 388 F.3d at 1101.  "The time, place, and manner of Cygan's speech and its potential for disruptiveness . . ." was determinative, to be contrasted with the present case.

ordered Tolnay to report to his office to speak of matters which the Defendant himself realized were of great public concern. It is an understatement to say that Wearing and Tolnay disagreed during the meeting. However, "the party who defended against the motion for summary judgment . . . will have his allegations taken as true, and will receive the benefit of the doubt when his assertions conflict with those of the movant." Piesco, 933 F.3d at 1154, quoting 10 Wright, Miller & Kane, Federal Practice and Procedure § 2716 (1983). Accordingly, for this reason also, Tolnay's version of the events of the August 13 meeting, including his assertion that he believed he needed legal counsel after Wearing "more or less" accused him of causing the events of July 26 must be credited; hence, protected. As in Cygan, it matters not that, in part, Plaintiff was personally concerned about his own ability to enforce the law of this State without concern as to whom he was enforcing it.

In summation, the Court holds that Plaintiff's speech is of significant public concern. Inasmuch as it has so found, it turns to Pickering.

### 2) **The Pickering Balancing Test**

As discussed above, the second step of the First Amendment examination concerns an application of the Pickering balance test, wherein the employee's interest in free comment upon matters of public concern is weighed against the government's

interest in the efficiency of its public services.  Pickering,
391 U.S. at 568.  Under Pickering, Tolnay's First Amendment
rights are protected "unless the employer shows that some
restriction is necessary to prevent the disruption of official
functions or to insure effective performance by the employee."
Conaway v. Smith, 853 F.2d 789, 797 (10th Cir. 1988).  Put
another way, "the burden is on the public employer to show that
its interest in the efficient performance of its duties outweighs
the employee's speech interest." Vasbinder, 926 F.2d at 1339,
citing Pickering, 391 U.S. at 568.  To reiterate, the extent of
the government's burden varies, depending on the nature of the
employee's expression.  "We caution that a stronger showing may
be necessary if the employee's speech more substantially involved
a matter of public concern." Connick, 461 U.S. at 150.  An
employee's charge of unlawful conduct, for example, is given far
greater weight in the balancing exercise than is a complaint as
to the fairness of internal office operations. See Connick, 461
U.S. at 150-154; Mandell v. County of Suffolk, 316 F.3d 368, 383
(2d Cir. 2003)(plaintiff's testimony criticizing police
department's approach "to fighting organized crime, its
resistance to change, and it systemic anti-racism and
antisemitism clearly matter of public concern"; defendants showed
no disruption in police department). In Vasbinder, the plaintiff,
a public employee, went to the FBI after discovering financial

improprieties, potentially illegal, in a federally funded program overseen by his employer, a state agency.  At the direction of the FBI, Vasbinder revealed to his supervisor that he had reported what he had found to the FBI.  Shortly thereafter, he was demoted.  Our Court of Appeals recognized that potential fraud, theft, and misallocation of public funds were matters of "serious public concern" and, as such, were entitled to "greater weight" in the Pickering balance.  Vasbinder, 926 F.2d at 1339-40.  In so holding, it compared two prior decisions: Giacalone v. Abrams, 850 F.2d 79, 85-86 (2d Cir. 1988)[29]/ with Rookard.  The Appeals Court had therein held that the complaint about tax law interpretation in Giacalone carried little weight in the balancing, whereas the complaint of fraudulent and corrupt practices in Rookard carried "great" weight.  Vasbinder, 926 F.2d at 1339.  Resultingly, "the [district] court properly rejected any suggestion that the states's efficiency interests outweighed Vasbinder's First Amendment rights." Id. at 1340.

> When balancing the rights of the employee
> against those of the employer, an employee's
> First Amendment interest is entitled to
> greater weight where he is acting as a
> whistle blower in exposing government
> corruption.  See Foster v. Ripley, 645
> F.2d 1142, 1149 (D.C. Cir. 1981).  Speech

---

[29]/ In his memorandum, defense counsel cites Giacalone as "holding the general principle that a public employee retains First Amendment rights and may not generally be discharged for the exercise of those rights was too broad to be controlling in a qualified immunity context."  Giacalone holds no such thing.  Counsel is strongly advised to more carefully consider the actual holding of a case before he cites it as precedent to a court.

> that seeks to expose improper operations
> of the government or questions the
> integrity of government officials clearly
> concerns vital public interests. . . .

Conaway, 853 F.2d at 797. *See also* O'Brien v. Town of Caledonia,

448 F.2d 403 (7th cir. 1984)(balancing weighed in favor of

plaintiff; communications regarding graft and corruption in

police department "deserving of vigilant protection by the First

Amendment. . . The public's interest in being informed of serious

governmental misconduct is very great."); Brockell v. Norton, 732

F.2d 664 (8th Cir. 1984)(balancing weighed in favor of plaintiff;

public has vital interest in integrity of those commissioned to

uphold law).

The facts of this case are strikingly dissimiliar to any

other case analyzed through exhaustive research by this Court,

making the Pickering balancing test an anomoly. Here, the

evidence demonstrates that it is possible for a jury to believe

that it was the actions of Defendant, the Mayor, and other city

officials - - rather than the Plaintiff - - which had "a

detrimental impact on close working relationships for which

personal loyalty and confidence are necessary" and which

"impede[d] the performance of the speaker's duties or

interfere[d] with the regular operation of the enterprise."

Rankin, 483 U.S. at 388. Plaintiff, along with the entire New

Haven police force saw: an arrest with probable cause; a demand

for an apology for that arrest by a group with apparent political

43

connections; the dismissal of the charges by the Supervisory State's Attorney following a personal visit from Wearing; and an apology for the incident from the Mayor.[30]/  It is beyond peradventure that their public reaction, that they were "sold out" by the Mayor and the Defendant, is the antithesis of necessary confidence in their leaders and connotes interference with their ability to do their jobs.  It is an undisputed fact that Plaintiff felt that he could not effectively enforce the law as against Rodriguez due to perceived political connections and "clout."

Defendant's submission is devoid of any affidavit or other evidence tending to show that it was Tolnay's speech which had an actual or potential effect of disruption within the Police Department.  *Accord* Conaway, 853 F.2d at 798 n. 10 (denying summary judgment after performing Pickering balancing test, in part, for lack of defense evidence). Defendant has failed to show even a "likely interference" with the operations of the Police, much less "an actual disruption." Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir.), *cert. den'd.*, 516 U.S. 862 (1995).  The burden was on Defendant.  He has not met it.  Without any demonstrated adverse impact on the employer's operations caused by Plaintiff, and in consideration of the importance of protecting reports of

---

[30]/ Plaintiff, along with the other officers listening to the communications channel on the night of August 3, heard an explicit order to "stay away" from anyone involved with the July 26 incident.

official misconduct, the Court holds that Tolnay's First
Amendment interest in the speech at issue in this case outweighs
the governmental interest at stake herein.

### 3. __Motivating and Substantial Factor__

"Summary judgment is inappropriate when 'questions of motive
predominate in the inquiry about how big a role the protected
behavior played in' the employment decision." Piesco, 933 F.2d
at 1155, *quoting* Peacock v. Duval, 694 F.2d 644, 646 (9th cir.
1982). "Without a searching inquiry into these motives, those
intent on punishing the exercise of constitutional rights could
easily mask their behavior behind a complex web of *post hoc*
rationalizations." Peacock, 694 F.2d at 646. "This classic
motivational question is one of fact." Daniels v. Quinn, 801
F.2d 687, 689 (4th Cir. 1986)(citing to Mt. Healthy, 429 U.S. at
287).

Plaintiff herein has submitted indicative evidence that his
oral and written speech were a motivating and substantial factor,
*i.e.*, a causative factor, in the discipline Wearing took against
him. Further, his allegations and the inferences reasonably
elucidated therefrom are drawn in his favor at this procedural
moment. On the other hand, Defendant is steadfastly mute as to
Plaintiff's assertions, claiming that Plaintiff was disciplined
for one thing and one thing only - - his conduct in the August 13
meeting. Thus, the one who must sort out this conflicting state

45

of events is the jury.  Genuine issues of material fact abound as to motivation and causation herein.[31]/

## B.  __Qualified Immunity__

_____"In the context of a summary judgment motion, we must view the record most favorably to [Plaintiff], as the party opposing the motion, and 'accept his account of the reasons for his dismissal.'" Piesco, 933 F.2d at 1160, *quoting* Giacalone, 850 F.2d at 85.  Thus, "it is assumed that [Defendant] retaliated against [Plaintiff] because of [his concerns and observations of possible politically-based law enforcement]." Piesco, 933 F.2d at 1161(reversing grant of qualified immunity; plaintiff's speech of "clear public concern" and the right was "clearly established"; thus unreasonable for defendants to believe they could discharge plaintiff).  *See also* Dobosz, 892 F.2d at 1141 ("Because Dobosz has adequate evidentiary support for his claim of retaliation to withstand Walsh's motion for summary judgment, we must assume for purposes of discussion that Walsh did retaliate against Dobosz."; denying qualified immunity in First Amendment case).  *See also* Dehne v. Hill, 2003 WL 22088664 at * 2 (9th Cir. 2003)(summary judgment; assuming retaliatory motivation); Korzen v. Local Union 705, International Brotherhood

---

[31]/ At trial, then, Plaintiff will bear the burden of proving that his protected speech was a motivating or substantial factor in the discipline meted out against him.  The burden will then shift to Wearing to show that he would have reached the same decision even in the absence of the protected conduct.  Mt. Healthy, 429 U.S. at 287.

of Teamsters, 75 F.3d 285, 288 (7th Cir. 1996)(same).  In
accordance with this mandatory and persuasive precedent, taking
Plaintiff's reasons for the discipline levied against him as
true, as supported by the present record in full, the Court
assumes that the disciplinary action taken by Wearing against
Plaintiff was retaliatory; thus, in violation of his First
Amendment rights, as already established herein.

This finding of a constitutional violation answers the
"threshold question" in a qualified immunity analysis.  Saucier
v. Katz, 533 U.S. 194, 201 (2001).  "[T]he next, sequential step
is to ask if the right was clearly established."  Id.  Such an
inquiry requires this Court to define the Constitutional right
with specificity.  "[T]he right the official is alleged to have
violated must have been 'clearly established' in a more
particularized, and hence more relevant, sense: The contours of
the right must be sufficiently clear that a reasonable official
would understand that what he is doing violates that right."
Anderson, 483 U.S. at 640. "The relevant inquiry in not whether
the defendant[] should have known that there was a federal right,
in the abstract, to 'freedom of speech,' but whether the
defendant[] should have known that the specific actions
complained of violated the plaintiff's freedom of speech."
Lewis, 165 F.3d at 166-67.

The proper inquiry in this context, then, is whether it was

47

clearly established in 2002 that suspension from the police force, and other disciplinary actions, based on speech alleging possible political misconduct by high officials in the City, including the Mayor and Chief of Police, in enforcing the laws of this jurisdiction, was violative of Plaintiff's First Amendment rights.  The inquiry must be answered in the affirmative.  From the many cases cited herein, and their progeny, it is clear that, for decades, courts have recognized the significant public concern in reports of governmental misconduct.  As the Vasbinder Court recognized, and as held in Dobosz, in this Circuit, such a right was clearly established by 1981. Vasbinder, 926 F.2d at 1341; Dobosz, 892 F.2d at 1141-2.  In 1982, the Connick Court recognized the special import of "bring[ing] to light actual or potential wrongdoing or breach of public trust . . . ." Connick, 461 U.S. at 148.  Plaintiff's allegations of politically-based law enforcement demonstrate a manifest "danger to the [police department] in that political rather than official effort may earn advancement and to the public in that governmental favor may be channeled through political connections." Public Workers v. Mitchell, 330 U.S. 75 (1947).

Inasmuch as this Court has found that Tolnay's speech on possible misconduct on the part of city and police officials is protected speech, it now finds that it would not be reasonable for Wearing to conclude that it was lawful to take disciplinary

action against him based on that speech.[32]/

This Court would deny summary judgment on the grounds of qualified immunity under yet another rationale.  Defendant ignores Plaintiff's allegations in full, basing his entire claim to qualified immunity on the solitary August 13 meeting.  He enigmatically argues that qualified immunity is available to him because: "The myriad factors involved in this cause of action surely could not put a chief of police, who is the head of a paramilitary organization and is entitled to latitude as to the manner in which he/she disciplines employees, on notice that he/she is clearly violating the law through disciplinary actions."  Defendant seemingly fails to realize that the present "cause of action" is a First Amendment retaliation claim, wherein Tolnay alleges the discipline imposed against him was motivated by Wearing's retaliatory desire to put an end to any charges or "speculations" (as put by Wearing) of politically-based law enforcement in New Haven.  Thus, Wearing's argument betrays a fundamental misconception of the application of the qualified immunity doctrine to constitutional claims for which intent is an element.  Granted, in the usual case, subjective motive is not an issue.  "But where a more specific intent is actually an element of the plaintiff's claim as defined by clearly

---

[32]/  Then, too, as in _Piesco_, "[t]he claim of qualified immunity is further undercut by [defendant's] failure to present any evidence of harm resulting from [plaintiff's speech]." _Piesco_, 933 F.2d at 1161.

established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." <u>Locurto v. Safer</u>, 264 F.3d 154, 168 (2d cir. 2000), *citing* <u>Crawford-El v. Britton</u>, 523 U.S. 574, 585 (1998)(noting "retaliation for the exercise of free speech" as an example of a "claim[] for which an official's motive is a necessary element"); <u>Sheppard</u>, 94 F.3d at 828 ("[T]he employer's actual (subjective) motive is *not* irrelevant in a qualified immunity inquiry" on a First Amendment claim.)(emphasis in original).  To accept Defendant's approach would effectively "immunize all defendants in cases involving motive-based constitutional torts, so long as they could point to objective evidence showing that a reasonable official could have acted on legitimate grounds." <u>Hoard v. Sizemore</u>, 198 F.3d 205, 219 (6th Cir. 1999), *cited in* <u>Locutor</u>, 264 F.3d at 169.  This was the exact approach rejected by the Supreme Court in <u>Crawford-El</u> when it declined to adopt a heightened evidentiary standard for intent-based constitutional torts.  <u>Crawford-El</u>, 523 U.S. at 593-94 (rejecting "Justice Scalia's unprecedented proposal to immunize all officials whose conduct is 'objectively valid,' regardless of improper intent.").

> Upon a motion for summary judgment asserting
> a qualified immunity defense in an action in
> which an official's conduct is objectively
> reasonable, but an unconstitutional subjective
> intent is alleged, the plaintiff must proffer
> particularized evidence of direct or circumstantial
> facts . . . supporting the claim of an improper
> motive in order to avoid summary judgment.

<u>Sheppard</u>, 94 F.3d at 98, *quoting* <u>Blue v. Koren</u>, 72 F.3d 1075, 1084 (2d Cir. 1995).

> This standard allows an allegedly offending
> official sufficient protection against
> baseless and unsubstantiated claims, but
> stops short of insulating an official whose
> objectively reasonable acts are besmirched
> by a prohibited unconstitutional motive.

<u>Sheppard</u>, 94 F.3d at 828. *See also* <u>Mandell</u>, 316 F.3d at 385(retaliatory intent element of First Amendment claim; plaintiff's evidence of same sufficient to make defendant's motive triable issue of fact, denying qualified immunity).

As set forth at length in this opinion, Plaintiff has indeed proffered the particularized evidence required in this Circuit. Accordingly, the Court holds that the Defendant herein is not immune from the claims set forth in Plaintiff's Complaint, under each qualified immunity analysis set forth.[33]/

## <u>CONCLUSION</u>

---

[33]/ Defendant relies heavily, indeed almost exclusively, on the case of <u>Heil v. Santoro</u>, 147 F.3d 103 (2d Cir. 1998), in that section of his memorandum analyzing qualified immunity. Although the Court is nonplussed by this reliance, it will address <u>Heil</u> briefly. First, the case is not a qualified immunity case, nor is the doctrine referenced therein. Second, the court therein found no violation of Heil's First Amendment rights; therefore, disciplining him for insubordination for refusing to return to a meeting with the Chief of Police was plainly lawful. *Id.* at 110-11. It is beyond cavil that <u>Heil</u> is inapposite to the present case. Further, defense counsel cites nine cases from nine courts of appeal for the proposition that "A majority of circuits have held that the <u>Pickering</u> test for First Amendment retaliation cases requires a fact-sensitive, context specific balancing of competing interests and the law regarding public-employee free speech claims will rarely be sufficiently 'clearly established' to preclude qualified immunity under <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct 2727, 2738, 73 L.Ed 2d 396 (1982), and its progeny." It is unfortunate for Defendant that the Second Circuit Court of Appeals, which Circuit controls this case, (and not the nine appellate courts he relies on) is in the "minority", having never so recognized such a broad proposition.

For all of reasons stated herein, Defendant's Motion for Summary Judgment is hereby DENIED.  Under the substantive law governing this First Amendment case, Plaintiff has set forth numerous genuine issues of material fact.  The final determination of this litigation must lie in the hands of a jury. It cannot be determined as a matter of law.

The selection of the jury for trial of this matter will take place on Tuesday, June 14, 2005.  Should the parties wish to explore settlement of this case with Magistrate Judge Joan G. Margolis, they may contact these chambers for the proper referral.

_____

_____SO ORDERED

_____   _____

ELLEN BREE BURNS

SENIOR UNITED STATES DISTRICT JUDGE


Dated at New Haven, Connecticut this ____ day of March, 2005.

_____

_____

_____