Page 57

1    Q  Exhibit No. 3 represents an -- I assume
2  to be a true copy of the letter to the editor, is
3  that correct?
4    A  This is --
5    Q  No, wrong one.
6    A  Yes.
7    Q  Exhibit 2.
8       (The witness reviewed said document.)
9    A  Yes, I recollect this letter.
10    Q  Does that piece of paper before you
11  appear to be an accurate reprint of comments
12  published by the Register?
13    A  Yes.
14    Q  Now, if you'll take a look at Exhibit 3,
15  do you recognize any -- do you recognize that as
16  an example of press reports indicating that many
17  police officers and the leadership of the police
18  union were very upset at your conduct in
19  connection with the arrest of Hernandez and
20  Rodriguez?
21       (The witness reviewed said document.)
22    A  I recognize it to be a news report of
23  the incident. I don't know that it's
24  representative of anything other than what it is.

Page 58

1    Q  Well, isn't it true that your
2  intervention in the matter by your contact with
3  Hernandez and your appearance at the church to
4  apologize sparked a controversy within the New
5  Haven police department?
6    A  I don't believe that's the case.
7    Q  When the leader of a police union
8  accuses you of political pandering for votes, you
9  don't think that's critical and controversial?
10    A  I've had, a couple months ago, large
11  numbers of the police union come out in protest to
12  the mayor's night out. I have had cavalier
13  complaints about any number of things, it's the
14  nature of his job and my job, which sometimes --
15    Q  Do you deny, Mr. Mayor, that some people
16  express the view that you sold out a hard working,
17  well-meaning officer for the sake of pandering to
18  the members of that church because they
19  represented a political vote block for you?
20    A  I accept the fact that everyone's
21  entitled to their own position and that, frankly,
22  to get elected you don't have to get 100 percent
23  of the vote, you have just got to get a majority
24  of the vote because there is a diversity of

Page 59

1  opinion about any number of issues. And I
2  recognize that that feeling was articulated by
3  some members of the police community. And I
4  respect that.
5    Q  Did you give any thought prior to
6  appearing at that church, whether you would
7  embarrass Arpad Tolnay by that appearance?
8    A  I recognized -- I did not reflect
9  specifically on the impact of any particular
10  officer. I did recognize that it was important to
11  acknowledge, as I did, both in my letter as I
12  recollect, and my remarks, that the police work
13  with this community, that is what they serve in
14  good faith to do and that's what I believe they
15  did the night they appeared at Second Star of
16  Jacob.
17    Q  Would you agree that Arpad Tolnay, as a
18  police officer in an urban city like New Haven
19  with its violence on the streets, risks his life
20  when he goes out on patrol?
21    A  I was present half an hour after Officer
22  Fumiani was shot directly in the head. I saw him
23  before he went into surgery. As the son of a city
24  police officer, I very much appreciate what the

Page 60

1  men and women of this department and other
2  departments like it do.
3    Q  Okay. Then given for not a whole lot of
4  money they accept those risks for the sake of
5  protecting the public, do you think that the
6  police officers deserve the utmost support from
7  you as their mayor?
8    A  In point of fact most of them don't do
9  it for money, they do it because they are
10  committed to their profession and to their
11  colleagues and to their communities that they
12  serve. And I think, in point of fact, one of the
13  reasons why crime has dropped more than 50 percent
14  in the city is because of the dedication of our
15  police officers and because of the kind of
16  policing we do now, as opposed to when my father
17  was on the job here in New Haven, which I believe
18  was more adversarial and antagonistic.
19    Q  Then don't you think Arpad Tolnay and
20  other officers deserve your support?
21    A  I can't speak to what this officer
22  believes he deserved from me, but I do believe the
23  officers deserve not only my support but clear
24  expectations as to their behavior of how they

Page 65

1 really speak in an informed fashion about what
2 someone may have felt about that.
3     Q  Prior to appearing at the Second Star of
4 Jacob Church, did you give any thought to the fact
5 that if the mayor of the city of New Haven were to
6 make such a public apology that it would encourage
7 Hernandez and Rodriguez and others to be
8 oppositional and resistent and disrespectful
9 toward police officers in their future encounters
10 with them because they think that all they need to
11 do is call you?
12     A  Well, again, they didn't call me, to the
13 best of my recollection. What I felt then and what
14 I feel now, I was responding to was how our police
15 department, who has dozens of transactions in that
16 neighborhood with the people who live there
17 everyday, could best serve the purpose to which
18 they are committed professionally to do, how a
19 community which is being served by the police can
20 think about what their, my expectations for my
21 police interaction with them are to be.
22         I certainly, to the best of my
23 recollection of my remarks which were not prepared
24 and which I do not have a transcript of, did not

Page 66

1 seek to convey anything other than the fact that I
2 expect collaboration between the community and the
3 police.
4         MS. TORRE: I'm going to adjourn it
5 now but not terminate it, given that it's 12:30
6 and I promised I would get you out of here on
7 time.
8         In the event we need to resume the
9 examination I will call you and, hopefully, after
10 my review of documents produced by you on behalf
11 of the mayor responsive to Schedule A, request
12 Nos. 4 and 5, I may or may not feel the need to
13 conduct any further examination.
14         MR. BEAMON: I will say for the
15 record that I don't believe the records are
16 referenced by an individual's church as the mayor.
17 I don't know if the individual records in 4 and 5
18 are referenced by someone's church. Now, for any
19 records ever made by Reverend Hernandez or
20 Reverend Rodriguez, that's a different answer
21 because you are referencing certain people. But
22 for example, in regard to question 4, "Any and all
23 documents which reflect in any way any
24 participation or volunteer work performed by

Page 67

1 members of the Second Star of Jacob Church in any
2 of your electoral campaigns for the office of
3 mayor." If these documents do not reference Second
4 Star of Jacob specifically, you know, we may not
5 know how to get those documents.
6         MS. TORRE: Sure. I am not asking
7 for documents that actually identify a campaign
8 volunteer as a member of a certain church,
9 obviously, having been involved in many campaigns
10 myself --
11         MR. BEAMON: As I have.
12         MS. TORRE: Sent over various
13 telephone solicitors, Jerry Brown, among other
14 people in years past that I do know that campaigns
15 will know if you have a certain union or church
16 sends over 10 people to make phone calls they have
17 records of who they are. So what I'm asking for is
18 documents which would corroborate any information
19 in this regard that you already possess with
20 respect to any members of that church known as
21 such to the mayor and his campaign officials as
22 members of the church who may have volunteered for
23 the campaign.
24         As to No. 5, those obviously are records

Page 68

1 that are asking for campaign contributions made by
2 named individuals which are required under the
3 disclosure laws.
4         Anyway, I would, given the mayor's
5 indication he has run for mayor six times, I would
6 agree to pare that down a bit to avoid undue
7 burden and agree to accept the list for the last
8 four campaigns as opposed to the past six.
9         MR. BEAMON: So eight years.
10         MS. TORRE: Well, no. It would be
11 four runs for office, so --
12         MR. BEAMON: Okay.
13         MS. TORRE: So four campaign donor
14 lists. All right. Thank you, Mr. Mayor.
15         THE WITNESS: Thank you for
16 accommodating my schedule.
17         (The deposition was adjourned at 12:27
18 o'clock p.m.)

### Page 61

1 engage with the community in the City and
2 generally believe they meet those expectations
3 each and every day.
4    Q  Do you think that Messrs. Fernandez and
5 Rodriguez are upstanding citizens of New Haven?
6    A  I do not know Mr. Fernandez.
7    Q  Hernandez.
8    A  No, I was going to to say Fernandez not
9 Hernandez, right? I do not know Mr. Fernandez,
10 quite honestly, other than meeting him a handful
11 of times --
12    Q  Who is Mr. Fernandez?
13    A  I am sorry, what are the fellows' names?
14 Rodriguez. Thank you. I don't know
15 Mr. Rodriguez -- Mr. Fernandez is my development
16 administrator -- I do not know Mr. Rodriguez
17 outside of a handful of meetings with him, I can't
18 offer any judgment about him.
19       I have known Reverend Hernandez over the
20 years and, more importantly, have witnessed his
21 interaction with his faith community and I have a
22 great deal of respect for him.
23    Q  You have a great deal of respect for
24 him?

### Page 62

1    A  Yes.
2    Q  Did you become aware of an incident, a
3 motor vehicle incident involving Mr. Hernandez
4 which occurred not long after the July 26th arrest
5 by Officer Tolnay?
6    A  With Armando Hernandez?
7    Q  Yes.
8    A  Or do you mean --
9    Q  Rodriguez.
10   A  I generally -- I became aware of it,
11 although I don't specifically recall how.
12   Q  Did you take any attempts to intervene
13 in the issuance of a motor vehicle violation to
14 Rodriguez?
15   A  I have no recollection of doing that.
16   Q  Are you aware that Rodriguez was
17 speeding down the streets of New Haven with
18 children hanging off the back of an open vehicle?
19   A  I'm not specifically aware of the
20 incident.
21   Q  Were you ever aware of the incident?
22   A  I don't have a recollection of being
23 specifically contemporaneously aware of the
24 circumstances of a motor vehicle violation with

### Page 63

1 him.
2    Q  Did it ever come to your attention that
3 Rodriguez tore up a ticket and threw it in the
4 face of one of your officers?
5    A  I have no knowledge of whether he did or
6 didn't do that.
7    Q  Did it come to your attention that
8 Rodriguez thinks that he's got enough political
9 pull with your office and with Wearing, that he
10 felt he can virtually spit in the face of an
11 officer who gave him a ticket?
12   A  I can't really speak to what
13 Mr. Rodriguez knows or feels at any given time.
14   Q  And you have a great deal of respect for
15 Mr. Hernandez, you said?
16   A  Yes.
17   Q  Okay. And are you aware of Mr. Hernandez
18 producing any offspring which are on the docket of
19 New Haven Superior Court for selling cocaine?
20       MR. BEAMON: Object to the form of
21 the question.
22   A  You know, I have a hard enough time
23 being responsible for my own behavior without
24 being responsible for the behavior of my 16 or

### Page 64

1 18-year-old. And I pray that Kathy and I have done
2 a good job raising them and I do accept
3 responsibility for my children's behavior.
4 However, I don't confuse the two nor do I
5 generalize from what they may face in their life
6 or not.
7       You asked me if that changes my opinion
8 of Reverend Hernandez, the fact that his son was
9 arrested for that. No, it doesn't change my
10 opinion of Reverend Hernandez.
11   Q  Do you believe that your conduct toward
12 Hernandez and the arrest of him served to give him
13 and his family, including his children, a feeling
14 that they would be largely immune from
15 accountability for violating the laws in the City
16 of New Haven?
17   A  My action wasn't directed -- my
18 inquiries about this and my discussion about it
19 were not directed at benefitting Reverend
20 Hernandez. They were involved with how do our
21 police department, in a large faith community and
22 a group of neighbors, best problem solve around
23 the real issue and their neighborhood. As to what
24 someone may have felt as a result of that, I can't

Page 69

INDEX OF WITNESS
Page

JOHN DeSTAFANO, JR.

Direct Examination by Ms. Torre     4

INDEX OF PLAINTIFF'S EXHIBITS

| Description | No. | Page |
|---|---|---|
| Subpoena, six pages. | 1 | 4 |
| New Haven Register article from August 8, 2002 | 2 | 7 |
| New Haven Register article from August 7, 2002 | 3 | 7 |

Page 70

JURAT

Deponent: JOHN DeSTAFANO, JR.

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this the       day of           , 2003.

                Notary Public

My Commission expires:

Page 71

CERTIFICATE

STATE OF CONNECTICUT )
                     ) ss.
COUNTY OF NEW HAVEN  )

I, Cheryl Dickson Toman, a Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that the foregoing record is a correct and verbatim transcript of the proceeding hereinbefore set forth.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this proceeding is taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal on May 19, 2003.

                Cheryl Dickson Toman

My commission expires: June 30, 2005.

# EXHIBIT B

**Westlaw.**

Not Reported in F.Supp.                                                                                                           Page 1
Not Reported in F.Supp., 1992 WL 373732 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.
L.D. LEASING CORP., INC., Staten Island Commuter, Inc. and Robert Greeves, Plaintiffs,
v.
Philip A. CRIMALDI, both individually and in his capacity as Sheriff of the City of New York, the City of New York Department of Taxation, the City of New York Department of Transportation and the City of New York Department of Finance, Defendants.
**No. 91-CV-2430(EHN).**

Dec. 1, 1992.

Satterlee, Stephens, Burke & Burke, New York City by Daniel G. Gurfein, for plaintiffs.
O. Peter Sherwood, Corporation Counsel, New York City by Edwin M. Levy, Assistant Corporation Counsel, for defendants.

MEMORANDUM and ORDER

CADEN, United States Magistrate Judge.
*1 This case was initially referred to the undersigned for all pretrial purposes by order of District Judge Eugene H. Nickerson dated September 24, 1991. The parties are presently before the court on defendants' motion for a protective order pursuant to Federal Rule of Civil Procedure 26(c)(1), vacating plaintiffs' Notice of Deposition of New York City Mayor David Dinkins, dated June 19, 1992. For reasons more fully explained herein, the protective order is granted.

FACTS

Plaintiffs' action arises out of the seizure of several buses by the New York City Sheriff's Department in order to satisfy delinquent taxes owed by corporations having common ownership with the plaintiff corporations in this case. Although the New York State Supreme Court ordered the release of the buses, plaintiffs subsequently filed this federal action under 42 U.S.C. § 1983 based on alleged violations of their due process rights.

One of plaintiffs' theories of liability is that "the City of New York promulgated and implemented a policy to increase collections of debts allegedly owed the City by appointment of an aggressive Sheriff whose tactics would inevitably cause some illegal and improper seizures of property." See letter by Daniel G. Gurfein, Esq. to Magistrate Judge Caden, dated November 24, 1992. In connection with this claim, plaintiffs seek to depose Mayor Dinkins, whom they assert initiated and established the policy at issue in order to increase City revenue. In addition, plaintiffs wish to examine the Mayor regarding the purposes behind the 1990 enactment of a Local Law that gave the Mayor power to choose the Sheriff personally, outside of the civil service appointment system.

DISCUSSION

In general, a party may only obtain the deposition of a high-level government official by showing that official has particularized first-hand knowledge that cannot be obtained from any other source. *Sweeny v. Bond,* 669 F.2d 542, 546 (8th Cir.), *cert. denied,* 459 U.S. 878 (1982); *Community Federal Savings and Loan v. Federal Home Loan Bank Board,* 96 F.R.D. 619, 621 (D.C.Cir.1983); *Sneaker Circus, Inc. v. Carter,* 457 F.Supp. 771, 794, n. 33 (E.D.N.Y.1978). The purpose of this rule is not only to leave officials free to conduct government business, *see, e.g., Martin v. Valley National Bank of Arizona,* 140 F.R.D. 291, 314 (S.D.N.Y.1991), but also to protect the mental processes of executive and administrative officers in order promote open channels of communication within government.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1992 WL 373732 (E.D.N.Y.)  
**(Cite as: Not Reported in F.Supp.)**

Page 2

*United States v. Morgan,* 313 U.S. 409, 422 (1941); *Simplex Time Recorder Co. v. Secretary of Labor,* 766 F.2d 575, 586-87 (D.C.Cir.1985); *Ernest and Mary Hayward Weir Foundation v. United States,* 508 F.2d 894, 895 n. 2 (2d Cir.1974) (*per curiam* ); *In Re Franklin National Bank Securities Litigation,* 478 F.Supp. 577, 581 (E.D.N.Y.1979).

In this case, plaintiffs concede that the Mayor has no first-hand knowledge relating to the seizure of the buses at issue. Further, they have already deposed several key individuals in the Sheriff's Office and the Department of Finance with respect to the City's policy of aggressively collecting overdue debts. Finally, the examination of Mayor Dinkins with respect to the enactment of a Local Law is exactly the "prob[ing] of mental processes" prohibited by *Morgan. See* 313 U.S. at 422.

CONCLUSION

*2 For all of the foregoing reasons, defendants' motion for a protective order is granted, and plaintiffs' Notice of Deposition of Mayor David Dinkins is hereby vacated. It is further ordered that the defendants are precluded from calling Mayor Dinkins as a witness at trial or from offering his affidavit at any time in this action.

SO ORDERED.

E.D.N.Y.,1992.  
L.D. Leasing Corp., Inc. v. Crimaldi  
Not Reported in F.Supp., 1992 WL 373732 (E.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:91cv02430 (Docket) (Jul. 03, 1991)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1998 WL 132810 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

H
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Marisol A., by her next friend, Rev. Dr. James Alexander Forbes, Jr., et al., Plaintiffs,
v.
Rudolph W. GIULIANI, Mayor of the City of New York, et al., Defendants.
**No. 95 CIV. 10533(RJW).**

March 23, 1998.

MEMORANDUM DECISION AND ORDER

WARD, D.J.
*1 Defendants Rudolph W. Giuliani ("Mayor Giuliani" or "Mayor"), Marva Hammons, and Nicholas Scoppetta ("Commissioner Scoppetta" or "Scoppetta") (collectively referred to as "City defendants") move this Court for an order quashing the notice of deposition of Mayor Giuliani and for a protective order precluding the deposition of the Mayor pursuant to Fed.R.Civ.P. 26(c). For the following reasons, City defendants' motion is granted.

BACKGROUND

In December 1995, plaintiffs filed this action, alleging that systemic deficiencies in the Child Welfare Administration ("CWA") were endangering the well-being of thousands of children in the City of New York. Mayor Giuliani, on December 18, 1995, announced that CWA would be reorganized, and on January 10, 1996, "he created-for the first time in the city's history-a free-standing agency, reporting directly to him, that would be charged with, in his words, 'first, last, and always' protecting the children of this city." Honorable Rudolph W. Giuliani and Nicholas Scoppetta, *Protecting the Children of New York: A Plan of Action for the Administration for Children's Services* 6 (Dec. 19, 1996) (hereinafter "Protecting the Children of New York"). CWA was thereafter transformed into the New York City Administration for Children's Services ("ACS"), and Nicholas Scoppetta ("Commissioner Scoppetta" or " Scoppetta") became commissioner of this new agency on February 10, 1996. Although familiarity with the Court's earlier decisions in this action is assumed, the Court will summarize the facts relevant to the motion to quash the notice of deposition of Mayor Giuliani.

Discovery for this case has been ongoing. On January 16, 1998, City defendants represented that over 25,000 pages of documents have been produced. *See* King Decl. Supp. of City Defs.' Mot. to Quash and for a Protective Order Precluding the Deposition of Mayor Rudolph W. Giuliani ¶ 11 ("King Decl."). Plaintiffs have also been provided access to an extensive list of knowledgeable persons for the purposes of depositions. Included among these are Commissioner Scoppetta, John Linder ("Linder") who was the consultant on ACS's reform plan, and many Assistant and Deputy Commissioners of ACS. In addition, on December 19, 1997, this Court denied City defendants' motion to quash the deposition of Howard Wilson ("Wilson"), the City's former Commissioner of Investigation.

After the death of Eliza Izquierdo, in November 1995, Mayor Giuliani asked Wilson to chair an inter-agency task force designed to review the operations of CWA and to recommend to the Mayor potential improvements to CWA. Giuliani Decl. Supp. of City Defs.' Motion to Quash and for a Protective Order Precluding the Deposition of Mayor Rudolph W. Giuliani ¶ 3 ("Giuliani Decl."). In an oral ruling the Court denied defendants' motion to quash the deposition of Wilson, holding that Wilson's deposition "may include questions concerning the facts ascertained during his investigation of the former Child Welfare

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 132810 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 2

Administration, which led to public statements by Mayor Giuliani." Hearing Transcript of 12/19/97 at 40, line 7-10. Since Mayor Giuliani had made public comments regarding advice received from Wilson, which were reported in the press, this Court ordered that Wilson's deposition could include the factual underpinnings of these publicized recommendations and conclusions. *Id.* at 40.

*2 Pursuant to Rule 30 of the Federal Rules of Civil Procedure, plaintiffs served Mayor Giuliani with a notice to appear for a deposition on December 23, 1997. In submissions to the Court and correspondence between the parties, plaintiffs claim that there are a variety of issues on which only Mayor Giuliani is qualified to present testimony. Among these are Mayor Giuliani's: (1) reasons for requesting Wilson to investigate CWA and the findings which Wilson presented to Mayor Giuliani; (2) reasons for ordering the creation of ACS; (3) retention of Linder to draft a reform plan for CWA; (4) involvement in the setting of policy for ACS; and (5) reasons for appointing Scoppetta as the first commissioner of ACS. Plaintiffs also wish to question Mayor Giuliani regarding an alleged discrepancy between Commissioner Scoppetta's testimony concerning the deficiencies existing in ACS when he became commissioner of the agency and Mayor Giuliani's public statements regarding the shortcomings of the agency. *See* Pls.' Mem. Opp. Mot. to Quash the Notice of Deposition of Mayor Rudolph W. Giuliani ("Pls.' Mem."); Letter from Marcia Robinson Lowry to the Court of 1/19/98 at 5-10 ("Pls.' Letter to Court"); King Decl. Ex. B: Letter from Marcia Robinson Lowry to Gail Rubin of 12/18/97 at 3-4 ("Pls.' Letter to Rubin").

The City defendants now ask the Court to quash the notice of deposition of Mayor Giuliani.

DISCUSSION

I. Deposition of High Level Government Official

A. Legal Standard

Rule 30 of the Federal Rules of Civil Procedure provides for broad access to persons during the discovery process. Fed.R.Civ.P. 30(a). Parties, however, may be limited in their pursuit of depositions under Rule 26(c), which provides that courts can issue a protective order to prevent " undue burden" in the discovery process. Fed.R.Civ.P. 26(c). While granting a protective order and quashing a deposition is the exception rather than the rule, the burden a deposition would place on a high ranking government official must be given special scrutiny.

While case law in the Second Circuit is scant on the issue of deposing high ranking government officials, the Court finds the two prong test applied by both plaintiffs and city defendants to be the standard when evaluating deposition notices of high ranking officials. Depositions of high level government officials are permitted upon a showing that: (1) the deposition is necessary in order to obtain relevant information that cannot be obtained from any other source and (2) the deposition would not significantly interfere with the ability of the official to perform his governmental duties. *See Martin v. Valley Nat'l Bank,* 140 F.R.D. 291, 314 (S.D.N.Y.1991); *see also Sanstrom v. Rosa,* 1996 U.S. Dist. LEXIS 11923, *11-13 (S.D.N.Y. Aug. 16, 1996) (permitting the deposition of Governor Cuomo, after his governorship ended, because he possessed particular information necessary to the case that could not reasonably be obtained by other discovery devices). As a general proposition, high ranking government officials are not subject to depositions. *See National Nutritional Foods Ass'n v. F.D.A.,* 491 F.2d 1141, 1144-46 (2d Cir.), *cert. denied,* 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); *Simplex Time Recorder Co. v. Secretary of Labor,* 766 F.2d 575, 586-87 (D.C.Cir.1985); *Church of Scientology v. I.R.S.,* 138 F.R.D. 9, 12 (D.Mass.1990).

*3 The first prong of this standard, which requires that the deposition be necessary to obtain relevant information not available from other sources, is strictly imposed. Courts, before permitting the involuntary deposition of a high ranking government official, require that the party seeking the deposition demonstrate that the official's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 132810 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 3

testimony will "likely lead to the discovery of admissible evidence and is essential to that party's case." *Warzon v. Drew,* 155 F.R.D. 183, 185 (E.D.Wis.1994) (citing *Sweeney v. Bond,* 669 F.2d 542, 546 (8th Cir.), cert. denied, 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982)). If the information is available through alternative sources, courts discourage the deposing of high officials. *Id.*

Further, when applying the first prong, courts only permit the deposition of a high ranking government official if he has unique personal knowledge that cannot be obtained elsewhere. For example, in *L.D. Leasing Corp., Inc. v. Crimaldi,* the court granted a protective order prohibiting the deposition of then Mayor David Dinkins ("Mayor Dinkins"). 1992 U.S. Dist. LEXIS 18683, *3-4 (E.D.N.Y. Dec. 1, 1992). In quashing the notice of deposition of Mayor Dinkins, the court found that: (1) Mayor Dinkins had no first-hand knowledge of the information being sought; (2) several key individuals had already been deposed; and (3) the examination with regard to a Local Law is the type of mental probing of officials that is prohibited. *Id.* The court held that, "[i]n general, a party may only obtain the deposition of a high-level government official by showing that official has particularized first-hand knowledge that cannot be obtained from any other source." *Id.* at *2-3 (citations omitted).

In a similar case, a court suppressed the deposition of the Mayor of Philadelphia. *Hankins v. City of Philadelphia,* 1996 U.S. Dist. LEXIS 13314 (E.D.Pa.1996). The court placed the burden on those seeking the deposition to "demonstrate that [the official's] testimony is likely to lead to the discovery of admissible evidence, is essential to that party's case and that this evidence is not available through any alternative source or less burdensome means." *Id.* at *3-4 (citations omitted). While the Mayor of Philadelphia was one of three members of the City's Administrative Board, which approved changes to job requirements, the court found that the he had no unique personal knowledge of the particular reasons for the proposed changes. *Id.* (" High ranking government officials are generally entitled to limited immunity from being deposed concerning matters about which they have no unique personal knowledge.") (citations omitted).

High ranking government officials are granted this limited immunity from being deposed when they have no personal knowledge to ensure that they have the time to dedicate to the performance of their governmental functions. *See Warzon,* 155 F.R.D. at 185; *In re U.S.,* 985 F.2d 510, 512 (11th Cir.), cert. denied, 510 U.S. 989, 114 S.Ct. 545, 126 L.Ed.2d 447 (1993); *Kyle Eng'g Co. v. Kleppe,* 600 F.2d 226, 231-32 (9th Cir.1979). "If the head of a government agency were subject to having his deposition taken concerning any litigation affecting his agency ..., we would find that the heads of government departments and members of the President's Cabinet would be spending their time giving depositions and would have no opportunity to perform their functions." *Capitol Vending Co. v. Baker,* 36 F.R.D. 45, 46 (D.D.C.1964); see also *Church of Scientology,* 138 F.R.D. at 12. In weighing the concerns of those seeking depositions of government officials, courts must place " reasonable limits" so as to conserve the time and energies of public officials and prevent the disruption of the primary functions of the government. *Community Fed. Sav. and Loan Ass'n v. Federal Home Loan Bank Bd.,* 96 F.R.D. 619, 621 (D.D.C.1983); *Wirtz v. Local 30, Int'l Union of Operating Eng'rs,* 34 F.R.D. 13, 14 (S.D.N.Y.1963) ("[C]ommon sense suggests that a member of the Cabinet and the administrative head of a large executive department should not be called upon personally to give testimony by deposition, either in New York or elsewhere, unless a clear showing is made that such a proceeding is essential to prevent prejudice or injustice to the party who would require it.").

B. The Standard as Applied to Plaintiffs' Request to Depose Mayor Giuliani

*4 After reviewing plaintiffs' reasons for requesting the deposition of Mayor Giuliani, the Court finds that the legal standard applicable to high ranking government officials is not met. The information plaintiffs seek from the deposition of the Mayor can be obtained through other sources, and therefore the deposition would place an undue burden on an official who already has large demands on his time. FN1

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 4

Not Reported in F.Supp., 1998 WL 132810 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

FN1. Any information which plaintiffs could garner only from the Mayor involves executive privilege. These issues are addressed in Section II of this Discussion entitled "Executive Privilege."

The Court will briefly outline the issues plaintiffs would like to question the Mayor about and explain why they do not warrant his deposition. First, plaintiffs indicate that they wish to depose Mayor Giuliani about his reasons for asking Wilson to investigate CWA and the findings which Wilson presented to the Mayor. See Pls.' Letter to Rubin at 3. Since this Court allowed Wilson's deposition to go forward, it appears obvious that such information can be gathered from him. Deposing the Mayor on this basis would be unduly burdensome as any relevant information regarding Wilson's investigation can be obtained from an alternative source, Wilson himself.

Second, plaintiffs indicate their desire to depose Mayor Giuliani regarding his retention of Linder to draft a reform plan for CWA. See Pls.' Letter to Rubin at 3. Plaintiffs have already been given the opportunity to depose Linder, and it is clear to the Court that any information regarding recommendations made to the Mayor by Linder could be obtained from Linder. It would be a burden to a high ranking official to require his deposition on subject matter that can be obtained from another source.

Third, plaintiffs attempt to demonstrate a discrepancy between Commissioner Scoppetta's deposition testimony and Mayor Giuliani's public statements regarding the condition of the agency. Pls.' Mem. at 8-10; Pls.' Letter to Court at 5-6. This Court has reviewed the first two hundred pages of Commissioner Scoppetta's deposition transcript and the newspaper and television reports featuring the Mayor's comments on child welfare. See King Reply Decl. Supp. of City Defs.' Mot. to Quash and for a Protective Order Precluding the Deposition of Mayor Rudolph W. Giuliani Ex. A ("King Reply Decl."); Peters Decl. Supp. of Pls.' Mem. Opp. Mot. to Quash the Notice of Deposition of Mayor Rudolph W. Giuliani Ex. F ("Peters Decl."). The Court is in agreement with City defendants that Commissioner Scoppetta's statements do not contradict those of the Mayor, nor do they exhibit an incongruity between the positions of the Mayor and Scoppetta with regard to child welfare in New York City. When questioned regarding specific areas of CWA or ACS, Scoppetta did not always indicate that the area was below legal standards or requirements or that the functions within the agency area were inadequate. He did acknowledge, however, the "ills of the agency" and that "Child Welfare needed a lot of attention." King Reply Decl. Ex. A: Scoppetta's Dep. at 13. Further, Scoppetta stated in the affirmative that there were unaddressed problems within ACS as of February 1996. King Reply Decl. Ex. A: Scoppetta's Dep. at 33. Scoppetta acknowledged that he was concerned with improving most areas within ACS's domain and that a global problem did exist.

*5 As plaintiffs point out, Mayor Giuliani acknowledged "widespread problems" within the agency. See Pls.' Mem. at 9. But, plaintiffs also state that the "topics about which [they] seek to depose Mayor Giuliani do not involve the specific day-to-day-operation of ACS, but rather more global issues." Pls.' Mem. at 13. The Court does not find any inconsistencies between the Mayor's global statements, about the agency as a whole, in the press and those made by Scoppetta in his deposition. Both the Mayor's public statements and Scoppetta's deposition testimony highlight that general problems existed in the area of child welfare. There is no divergence since the Mayor did not comment on the specific areas within the agency. While Scoppetta was unable to comment as to the effectiveness of every specific area within the purview of ACS, this provides no reason for deposing Giuliani. Further, the Mayor clearly states in his affidavit that he does not have first-hand knowledge of the factual affairs of ACS, so it is highly unlikely that the Mayor would be in a better position than Scoppetta to comment on the specific areas of ACS that plaintiffs refer to when attempting to show a schism between the Mayor and Scoppetta. FN2 See Giuliani Decl. ¶ 6-8. Plaintiffs have put forth no evidence showing contradictions, nor do they offer any evidence indicating the Mayor's testimony will add crucial information to that already received. As the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 132810 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 5

plaintiffs have already been given access to government officials better able to provide the information plaintiffs seek, including Scoppetta and the Assistant and Deputy Commissioners, the Court finds no reason to allow the deposition of Mayor Giuliani to go forward.

> FN2. If the Court is to believe plaintiffs when they state that they do not wish to seek specific data from the Mayor, then the information on which plaintiffs rely to prove a disagreement between the Mayor and Scoppetta is wholly unfounded. Plaintiffs attempt to assert that Scoppetta's lack of knowledge on specific areas of ACS demonstrates a discrepancy in views. *See* Pls.' Mem. at 8-9. There is no discrepancy, on the contrary, Scoppetta has acknowledged the overall problems facing the agency but did not recall specifics with regard to such things as family preservation services and preventive services.

Fourth, plaintiffs claim that they need to depose the Mayor in order to learn his reasons for ordering the creation of ACS. Plaintiffs argue that the factors involved in initiating a reform plan are necessary for plaintiffs to determine the durability of the reform. *See* Pls.' Mem. at 7. As the Mayor has indicated, any facts on which he based the need for reform were facts garnered from others, specifically from Wilson or Scoppetta. *See* Giuliani Decl. ¶ 6-7. In addition, as is discussed below, any new information that Mayor Giuliani could possibly supply to plaintiffs is subject to the executive privilege. FN3

> FN3. Plaintiffs' additional reasons for seeking the deposition of Mayor Giuliani will be discussed in Section II of this Decision.

Plaintiffs have failed to establish that the deposition of Mayor Giuliani is necessary to obtain information that is not available from any other source. Further, deposing the Mayor on the bases that plaintiffs assert would unduly burden an official whose duty is not just to set the policy of ACS, as plaintiffs point out, but to be the policy maker for the city as a whole. It would be improper to depose the Mayor regarding every topic that he at some point in time addressed in a public statement, and as he has no personal or unique knowledge regarding child welfare, this case should be no exception. Allowing for depositions where no personal knowledge existed would open up a floodgate of depositions, consuming much of the Mayor's time-a clear interference with his ability to perform his governmental functions.

II. Executive Privilege

A. Legal Standard

*6 City defendants claim that much of the information plaintiffs seek is subject to the executive privilege. The deliberative process privilege, or executive privilege, "protects the decisionmaking processes of the executive branch in order to safeguard the quality and integrity of governmental decisions." *Hopkins v. H.U.D.,* 929 F.2d 81, 84 (2d Cir.1991); *see also NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); *Local 3, Int'l Brotherhood of Electrical Workers, AFL-CIO v. NLRB,* 845 F.2d 1177, 1180 (2d Cir.1988); *New York City Managerial Employee Ass'n v. Dinkins,* 807 F.Supp. 955, 956 (S.D.N.Y.1992); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318, 324 (D.D.C.1966), *aff'd,* 384 F.2d 979 (D.C.Cir.), *cert. denied,* 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967). This privilege is premised on the notion that effective decisionmaking requires a free flow of information amongst government officials and that this free flow would be constrained if these communications had the potential to be revealed to outsiders. *New York City Managerial Employee Ass'n,* 807 F.Supp. at 956-57 (*citing In re Franklin Nat'l Bank Sec. Litig.,* 478 F.Supp. 577, 580-81 (E.D.N.Y.1979); *Archer v. Cirrincione,* 722 F.Supp. 1118, 1122 (S.D.N.Y.1989)); *see also Carl Zeiss Stiftung,* 40 F.R.D. at 324-25.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 6

Not Reported in F.Supp., 1998 WL 132810 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

The deliberative process privilege exists when communications are both (1) predecisional and (2) deliberative. *Hopkins,* 929 F.2d at 84; *New York City Managerial Employee Ass'n,* 807 F.Supp. at 957. Predecisional communications are those communications generated in order to assist the agency decisionmaker in making a decision. *See Hopkins,* 929 F.2d at 84; *New York City Managerial Employee Ass'n,* 807 F.Supp. at 957. Deliberative communications are those relating to the process by which policies are formulated. *See Hopkins,* 929 F.2d at 84; *New York City Managerial Employee Ass'n,* 807 F.Supp. at 957. Such communications are used to aid a decisionmaker in arriving at a policy decision.

In addition to communications with others, the executive privilege extends to the mental processes by which an executive reaches a decision. The Supreme Court has clearly stated that the mental processes of executives should not be probed. *See United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) (holding that "the integrity of the administrative process must be [] respected," and therefore discouraged the practice of calling high level officials as witnesses); *Morgan v. United States,* 304 U.S. 1, 18, 58 S.Ct. 773, 82 L.Ed. 1129 (1938) (recognizing that it is " not the function of the court to probe the mental processes of the Secretary [of Agriculture] in reaching his conclusions"); *see also Carl Zeiss Stiftung,* 40 F.R.D. at 325-26. "[T]op executive [] officials should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions." *Simplex Time Recorder Co.,* 766 F.2d at 586.

*7 Exceptions to the deliberative process privilege do exist. "Where the decision-making process itself is the subject of the litigation, the deliberative privilege may not be raised as a bar against disclosure of critical information." *Burka v. New York City Transit Authority,* 110 F.R.D. 660, 667 (S.D.N.Y.1986). The mental processes, which are normally privileged under the deliberative process privilege, may also be discoverable where there are allegations of misconduct or misbehavior. *United States v. American Telephone and Telegraph Co.,* 524 F.Supp. 1381, 1389 (D.D.C.1981) (permitting staff members to be questioned regarding information normally considered deliberative privilege where the allegation involves inappropriate influence on the Commission in excess of the rules or customary practices of the Federal Communications Commission). In some instances, even when the court recognizes that an exception to the deliberative process privilege must be given as the allegation is personal to the defendant, the court still does not allow for the probing of the mental processes of the deponent. *See Union Sav. Bank v. Saxon,* 209 F.Supp. 319, 319-20 (D.D.C.1962) (permitting the deposition of the Comptroller of the Currency as he is accused of issuing a branch certificate to a bank on the basis of ex parte representations and a personal relationship between the Comptroller and the president of the bank).

This Court recognizes that a deposition cannot be barred simply because a deponent may be asked about privileged information. *See Sanstrom,* 1996 U.S. Dist. LEXIS 11923, *14 ("the mere fact that a witness may be asked questions that seek to elicit privileged matter does not provide a colorable basis for precluding the entire deposition"). But, when no other information is sought from a deposition, this privilege can bar the deposition.

B. The Executive Privilege of Mayor Giuliani

The Court now turns to the few assertions plaintiffs put forth as reasons for deposing the Mayor which this Court finds barred by the executive privilege.

Plaintiffs seek to depose the Mayor regarding both his reasons for creating ACS and for appointing Scoppetta as its first commissioner. Pls.' Mem. at 4; Pls.' Letter to Court at 5-7. These decisions involve both factual underpinnings and the mental processes of the Mayor. This Court will take plaintiffs at their word that they "do not seek to probe the underlying mental processes that culminated in the Mayor's decisions regarding child welfare." *See* Pls.' Mem. at 12. That being the case, the Court finds no non-privileged information regarding the Mayor's decisions that cannot be obtained from alternative sources. As the Mayor

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 7
Not Reported in F.Supp., 1998 WL 132810 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

has stated, any reasons for creating ACS are based on facts obtained from other individuals, primarily Wilson. Giuliani Decl. ¶ 6-8. Therefore, the only additional information that plaintiffs could potentially garner from the Mayor involves the thought processes of the Mayor. Any examination by plaintiffs as to the Mayor's mental processes would be barred by the executive privilege.

**\*8** This Court recognizes that the deliberative process privilege cannot be raised as a bar to all decisionmaking processes, especially when such processes are the subject of litigation. Plaintiffs in the instant case, however, are not challenging the process by which decisions were made. Therefore, the Court finds no reason to overrule the deliberative privilege.

Further, the Mayor has not waived his executive privilege by issuing press releases or documents, including "Protecting the Children of New York: A Plan of Action for the Administration for Children's Services." Plaintiffs argue that "[t]o the extent that executive privilege might have ever applied to these subjects, such privilege has been waived as a result of voluntary action on the part of defendants in making this information public." Pls.' Mem. at 12. None of the authority on which plaintiffs base their claim persuades this Court that the Mayor waived his executive privilege. The court in *In re Sealed Case,* found that the "release of a document only waives [the deliberative process privilege] for the document or information specifically released, and not for related materials." 121 F.3d 729, 741 (D.C.Cir.1997). Accordingly, the Mayor's statements only waived the privilege with respect to the information provided in them, and clearly any additional underlying information which is not privileged can be obtained from other sources. FN4

> FN4. "Protecting the Children of New York: A Plan of Action for the Administration for Children's Services," was a policy statement and plan of action issued jointly by Mayor Giuliani and Commissioner Scoppetta. Therefore, any information which plaintiffs seek regarding this document can be obtained from Scoppetta. Plaintiffs will still have access to the material, but are not permitted to unduly burden an additional high ranking government official.

### CONCLUSION

For the foregoing reasons, City defendants' motion to quash the notice of deposition and for a protective order precluding the deposition of Mayor Giuliani is granted.

It is so ordered.

S.D.N.Y.,1998.
Marisol A. v. Giuliani
Not Reported in F.Supp., 1998 WL 132810 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:95cv10533 (Docket) (Dec. 13, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.