the jury was given the free reign to issue an inflated award of damages. As demonstrated by the excessive $150,000 award of compensatory, noneconomic economic damages and $5 million in punitive damages, the failure to directly instruct the jury that it should not assume that New Haven would pay any award resulted in the jury being uninformed on a key issue. Indeed, the jury was instructed to not consider who would be paying any award. Absent the correct information, the jury was jury was free to issue a grossly inflated and inappropriate award. That is what it did. That action constituted a manifest injustice. Consequently, a new trial must be ordered.

## VII. A NEW TRIAL IS REQUIRED BASED ON THE COURT'S ADMISSION OF TESTIMONY AND EXHIBITS REGARDING UNRELATED PAST INCIDENTS OF DISCIPLINARY ACTION OR LACK OF DISCIPLINARY ACTION

Prior to trial, Chief Wearing filed a motion in limine seeking to exclude the plaintiff from introducing evidence regarding other incidents of discipline or lack of discipline of police officers. (D. Ct. Elec. Docket Entry No. 47) Specifically, Chief Wearing argued that only evidence of discipline where the factual situation was substantially similar to the situation at issue in the case a bar should be admitted. Absent substantial similarity any probative value should be outweighed by the prejudice to Chief Wearing. See Fed. R. Evid. 403. As there were no incidents of insubordination by an officer directly to the Chief of Police, Chief Wearing maintained that none of the exhibits or testimony should be allowed into evidence. The Court denied Chief Wearing's motion. (D. Ct. Elec. Docket Entry No. 55)

During argument on the motion, the plaintiff relied upon Arlio v. Lively, 392 F.Supp.2d 317 (D. Conn. 2005). (12/1/05 Trial Tr. at 3-8) Arlio distinguished Rosa v. Town of East Hartford, 2005 WL 752206 (D. Conn. Mar. 31, 2005). In Rosa, the court denied the plaintiff's motion in limine by which he sought to introduce evidence of approximately 32 other dog bite

15

incidents involving the defendant police officer and his police dog. 2005 WL 752206, at *2-3. The defendants argued that such evidence was inadmissible under Federal Rule of Evidence 404(b) and because it was overly prejudicial. Id. The court agreed. It held that "[e]vidence of other incidents where Officer Proulx used [his police dog] to effectuate an arrest would not be probative...because the other incidents occurred under facts and circumstances that were not sufficiently similar to the facts and circumstances of [the plaintiff's] arrest." Id. (citing Ricketts v. City of Hartford, 74 F.3d 1397, 1414 (2d Cir. 1996) (reasoning that it would be an abuse of discretion to admit similar act evidence if the other act was not sufficiently similar)).

In Arlio, the court concluded that the defendant was not entitled to a new trial based on the admission of testimony "concerning acts of politically-motivated retaliation committed against them by defendant Lively." 392 F.Supp.2d at 323. The court distinguished Rosa and found that the evidence was admissible because the defendant was attempting to draw too fine a line between motivation to discipline officers of a particular persuasion and impermissible propensity evidence under Rule 404(b). Arlio, 392 F.Supp.2d at 323. The Arlio court concluded that the "case law supports admission of testimony by other similarly-situated employees in statutory employment discrimination cases, where the plaintiff similarly must prove discriminatory motive or intent." Id. With regard to the "unduly inflammatory" effect of the evidence, the court concluded that the prejudicial effect was cured by a curative instruction trial was given to the jury. Id. at 324.

In the instant case, the Court noted that it had come to the same conclusion as the Arlio court, as that case was described by Tolnay's counsel. (12/1/05 Trial Tr. at 8) The Court's ruling constituted harmful error and Chief Wearing is entitled to a new trial in the instant because the probative value of the documents, (Pl.'s Trial Exs. 19-35), and testimony allowed into

16

evidence was outweighed by its prejudicial effect. Fed. R. Evid. 403. Arlio confirms that prior disciplinary evidence can only be admitted into evidence where the prior incidents were "similar." 392 F.Supp.2d at 323. Rosa, 2005 WL 752206, at *2 ("sufficiently similar"). In Arlio, the testimony at issue related to other incidents of "politically-motivated retaliation." 392 F.Supp.2d at 323.

By contrast, here, the documents and testimony were not regarding similar situations. Rather, they involved a broad spectrum of factual situations, none of which involved either direct insubordination by an officer to the Chief of Police or first amendment retaliation. (12/06/05 Trial Tr. at 8)[5] Moreover, there was no curative instruction given to the jury regarding the purpose of the evidence. Instead, the jury was presented with a broad and confusing spectrum of unrelated disciplinary incidents. This forced Chief Wearing into the position of having to explain the context and background of several different incidents or assume the jury could understand the evidence. In essence, he had to engage in a number of unrelated mini-trials within this trial. The documents and testimony submitted did not assist the jury in making any measurement or comparison to the discipline imposed upon the plaintiff. To the contrary, the introduction of the evidence confused the jury by diverting its attention from the subject of the trial, the interaction between Chief Wearing and the plaintiff in August 2002. See Garraghty v. Jordan, 830 F.2d 1295, 1298 (4th Cir. 1987). Consequently, the evidence should not have been admitted. Its admission constituted a manifest injustice to Chief Wearing and thus harmful error. Accordingly, the Court should order a new trial.

---

[5]/  The transcript for December 6, 2005 is mistakenly labeled December 4, 2005.

17

## VIII. A NEW TRIAL IS REQUIRED BECAUSE THE AWARD OF DAMAGES WAS AGAINST THE WEIGHT OF THE EVIDENCE

### A. A New Trial Is Required On The Emotional Distress/Noneconomic Damages Award

The Second Circuit has recognized that "'a plaintiff is not permitted to throw himself on the generosity of the jury. If he wants damages, he must prove them.'" Bracey v. Board of Educ. of City of Bridgeport, 368 F.3d 108, 119 (2d Cir. 2004). In the instant case, a new trial is required on the award of compensatory, noneconomic damages because the amount of the award, $150,000, was not supported by the evidence. In particular, Tolnay's evidence in support of emotional distress damages consisted of three, brief statements that he was "depressed" "embarrassed" by what happened and feels his reputation was harmed. (12/2/05 Tr. at 38, 45, 150) There was no corroborating testimony from any other witnesses. Nor was there any testimony of Tolnay having sought any mental health treatment or of him having suffered any physical manifestations, such as loss of sleep. Tolnay's limited evidence does not satisfy the standard governing the award of emotional distress damages and cannot support an award of $150,000. Patrolmen's Benevolent Ass'n v. City of New York, 310 F.3d 43, 55-56 (2d Cir. 2002). Consequently, allowing the award to stand would constitute a manifest injustice. Accordingly, the Court should order a new trial. See Otero v. Housing Auth. of the City of Bridgeport, 263 F.Supp.2d 440, 445 (D.Conn. 2003)(ordering new trial based on jury's inaccurate and excessive damages award).

### B. A New Trial Is Required On The Punitive Damages Award

In order for the jury to have awarded punitive damages against Chief Wearing, it had to have found that he acted with evil motive or malice. The evidence at trial did not support the awarding of $5 million in punitive damages. Even when viewing the evidence in the light most

18

favorable to Tolnay, his alleged injury amounted to his attendance at an unpleasant meeting, his loss of 5 days pay, his reassignment to a different duty function for seven months and his attendance at sensitivity training. This limited evidence does not support the award of $5 million in punitive damages. In particular, Chief Wearing's conduct did not rise to a level justifying such a punishment and the amount far exceeds any level needed to serve as a deterrence. Thus, allowing the award to stand constitutes a manifest injustice. Accordingly, the Court should order a new trial. See Otero, 263 F.Supp.2d at 445.

### IX. THE PUNITIVE DAMAGES AWARD WAS CONSTITUTIONALLY EXCESSIVE AND REQUIRES THE ORDERING OF A NEW TRIAL

#### A. The Legal Standard Governing Punitive Damages: State Farm and The Gore Factors

It is well established that the United States Constitution imposes procedural and substantive constitutional limitations on the award of punitive damages. State Farm Mut. Automobile Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003). The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. Id. at 416-17. The reason for the prohibition is that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574 (1996). See State Farm, 538 U.S. at 417. To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property. State Farm, 538 U.S. at 417.

To determine whether a defendant has been given adequate notice, as required by the Constitution, courts must examine a punitive damages award under the three guideposts established in Gore. 517 U.S. at 575. The three "guideposts" are: (1) the degree of

19

reprehensibility; (2) the disparity between the harm or potential harm and the punitive damages award; and (3) the difference between the remedy and the civil penalties authorized or imposed in comparable cases. Id. 574-75. See Disorbo v. Hoy, 343 F.3d 172, 186 (2d Cir. 2003).

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, 517 U.S. at 575. Reprehensibility in this context entails more than merely asking whether the conduct was acceptable. Disorbo, 343 F.3d at 186; Lee, 101 F.3d at 809. Thus, exemplary damages imposed on a defendant should reflect "the enormity of his offense." Gore, 517 U.S. at 575. "This principle reflects the accepted view that some wrongs are more blameworthy than others." Id. For example, Gore noted that the "flagrancy of the misconduct is thought to be the primary consideration in determining the amount of punitive damages." 517 U.S. at 575 n.23. See id. at 575 n.24 (punishment should fit the crime).

The fact that conduct is sufficiently reprehensible so as to trigger tort liability and damages "does not establish the high degree of culpability that warrants a substantial punitive damages award." Gore, 517 U.S. at 580. See Disorbo, 343 F.3d at 186. The Court in Gore identified certain aggravating factors to be considered when assessing the degree of reprehensibility: (1) whether a defendant's conduct was violent or presented a threat of violence; (2) whether a defendant acted with malice as opposed to mere negligence; and (3) whether a defendant has engaged in repeated instances of misconduct. 517 U.S. at 576. In further articulating on these factors, the Court noted that it had previously recognized that "nonviolent crimes are less serious than crimes marked by violence or the threat of violence." Gore, 517 U.S. at 575-76. Similarly, the Court recognized that "trickery and deceit" are more reprehensible

20

than negligence. Id. at 576. It emphasized the principle that punitive damages may not be "grossly out of proportion to the severity of the offense." 517 U.S. at 576.

With regard to the next "guidepost," the Gore Court recognized that ratio, the second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award, refers to the ratio of the award to the actual harm inflicted on the plaintiff. 517 U.S. at 580. To assess the appropriateness of the ratio of the punitive damages award to the harm, "the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." 517 U.S. at 581. See Disorbo, 343 F.3d at 187. This consideration requires courts to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." State Farm, 538 U.S. at 426. Thus, in analyzing the excessiveness of a punitive damages award, a court must compare the amount of the compensatory award with the punitive award. Gore, 517 U.S. at 581 (comparison "is significant").[6]

---

[6]    In State Farm Mut. Automobile Ins. Co. v. Campbell, 538 U.S. 408 (2003), the Court reexamined the Gore guideposts. With regard to the second guidepost, it noted that it has been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to a plaintiff and the punitive damages award. Id. at 424. Although the Court declined to impose a bright-line ratio which a punitive damages award could not exceed, it recognized that "[o]ur jurisprudence and the principles it has now established demonstrate, however, that in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." State Farm, 538 U.S. at 425. For example, "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." Id. at 425. In Gore, the Court had referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, triple or quadruple damages to deter and punish. 517 U.S. at 581. In State Farm, the Court recognized that while these ratios were not binding, they are instructive. 538 U.S. at 425. "They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . or, in this case, of 145 to 1." Id.

21

The third guidepost in Gore is the disparity between the punitive damages award and the "civil penalties authorized or imposed in comparable cases." 517 U.S. at 575. See State Farm, 538 U.S. at 428. In conducting this analysis, although the Supreme Court has looked to the existence of a criminal penalty, it has also recognized that "[w]hen used to determine the dollar amount of the award, however, the criminal penalty has less utility. Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof." State Farm, 538 U.S. at 428. Thus, "[p]unitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award. Id.

### B. The Second Circuit's Analysis of Punitive Damages

Even before Gore, the Second Circuit recognized that a jury's damage award is excessive when "the award is so high as to shock the judicial conscience and constitute a denial of justice." O'Neil v. Krzeminski, 839 F.2d 9, 13 (2d Cir. 1988). Further, "[a] damage award is excessive if it is the result of a miscarriage of justice and represents a windfall to the plaintiff without regard to [his] injury." Oliver v. Cole Gift Ctr., Inc., 85 F.Supp.2d 109, 114 (D. Conn. 2000). See Lee v. Edwards, 101 F.3d 805, 808-09 (2d Cir. 1996). Thus, where a jury's award of damages is excessive, a district court abuses its discretion by not ordering a new trial. Bracey, 368 F.3d 108, 119.

With regard to the third Gore guidepost, the Second Circuit has recognized that consideration of criminal sanctions does not end the inquiry. Mathie v. Fries, 121 F.3d 808, 816 (2d Cir. 1997). Rather, "even where the punitive award is not beyond the outer constitutional limit marked out, however imprecisely, by the three Gore guideposts, we retain an appellate

22

responsibility to review punitive awards for excessiveness in applying federal statutes such as section 1983." Id. at 816-17; Lee, 101 F.3d at 811-12. The Second Circuit has recognized that in addition to the three Gore guideposts, courts must engage in an additional analysis. See Disorbo, 343 F.3d at 188. "That task requires comparison with awards approved in similar cases . . . to determine, as with compensatory awards, whether the punitive award is 'so high as to shock the judicial conscience and constitute a denial of justice.'" Mathie, 121 F.3d at 817.

The Second Circuit has also recognized that in analyzing a punitive damages award, courts should be mindful that such an award "should not be so high as to result in the financial ruin of the defendant." Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992). Nor should it constitute a disportionately large percentage of a defendant's net worth. Id. Thus, "even outrageous conduct will not support an oppressive or patently excessive award of damages." Id. Consequently, in applying the principles governing the analysis of punitive damages awards, courts must engage in an "independent and 'detailed appraisal of the evidence bearing on damages.'" Id.

    **C.**    **The Application Of The Gore Guideposts Demonstrates That The Punitive Damages Award Was Constitutionally Excessive**

        **1.**    **The Reprehensibility Guidepost Weighs Heavily in Favor of Vacating the Punitive Damages Award**

Even if unacceptable, Chief Wearing's conduct was not reprehensible as that concept is defined under Gore. Simply being liable is insufficient to justify the $5 million punitive damages award at issue. The jury's award is a gross distortion of the offense at issue. It does not reflect the nature of the offense. Under the factors used to analyze reprehensibility, the jury's award of $5 million is grossly excessive and thus unconstitutional.

23

First, Chief Wearing's conduct was not violent. There was no physical injury to Tolnay. Nor did he testify regarding any loss of sleep or other difficulties. Nor was Chief Wearing's conduct deceitful. At worst, he was agitated and pointed a finger at Tolnay. Three other NHPD employees were present. Thus, Tolnay cannot claim, for the first time in post-trial motions, that he was afraid. Moreover, the Court observed the physical size of both Chief Wearing and Tolnay and the difference in their. In fact, Lieutenant Bombalicki testified that both Chief Wearing's and Tolnay's were "hot" at the meeting.

Second, it cannot be said that Chief Wearing acted with malice. His conduct more closely resembles negligence. His interaction with Tolnay was brief. It occurred during the August 13 meeting, held 11 days after the motor vehicle stop. There was a short follow up meeting, at which Tolnay apologized for his conduct at the previous meeting. Lieutenant Bombalicki described Chief Wearing as having gotten agitated at the meeting. The Chief testified that he got upset at a subordinate being insubordinate directly to the Chief of Police and viewed it as threatening discipline within the police department.

Finally, there is no evidence of repeated misconduct by Chief Wearing. His interaction with Tolnay was limited to the meeting and brief follow up meeting. Thus, the analysis of the reprehensibility guidepost demonstrates that the $5 million punitive damages award in this case was grossly excessive and must be vacated under Gore.

### 2. The Ratio to Actual Harm Guidepost Weighs Heavily in Favor of Vacating the Punitive Damages Award

In the instant case, assuming that the compensatory damages are not reduced, the ratio between the punitive damages ($5 million) and the compensatory damages ($151,900) is more than *33 to 1*. That number is grossly excessive and violates the Due Process Clause. There is no reasonable relationship between the injury actually suffered by Tolnay and the punitive damages

24

award. The award constitutes a windfall for the plaintiff and is thus inappropriate as a matter of constitutional law. Any ratio beyond a single-digit is constitutionally inappropriate in all but the most extreme cases. See State Farm, 538 U.S. at 425 (recognizing double and triple ratios as instructive that single-digit multiples are more likely to comport with due process). The evidence at trial demonstrated this is not an "extreme" case justifying a punitive damages anywhere near the $5 million awarded. The comparison of the facts in this case to other similar cases confirms that conclusion. Moreover, somewhat like the situation in State Farm, a review of the evidence and Tolnay's theory of the case confirms that Chief Wearing was "punished" for the conduct of others. Accordingly, the punitive damages award is excessive a new trial must be ordered. See Bracey, 368 F.3d at 119.

### 3. The Comparison to Similar Cases Guidepost Weighs Heavily in Favor of Vacating the Punitive Damages Award

No criminal statute appears to provide a basis for comparison. However, a comparison of this case to similar cases strongly supports the vacating of the punitive damages award as excessive. The cases analyzed below demonstrate that no previous jury verdict addressed by the Second Circuit or this District approaches the $5 million punitive damages awarded by the jury in the case at bar. In fact, in some cases, there was no award of punitive damages at all. More than just the numerical figures, the facts of the cases discussed below reveal that when confronted with conduct far worse than the conduct at issue in this case, juries have awarded damages in amounts far lower than the amount awarded here. Moreover, courts have still found it to be necessary to set aside many of those awards. In those cases where the award was not set aside, the award was far lower than the amount at issue here and the conduct at issue was far more reprehensible. Consequently, even the cases affirming awards support the vacating of the awards in the instant case. Further, the amount awarded in this case far exceeds any amount

25

needed for punishment or deterrence. As such, the award is grossly excessive and unconstitutional.

### a. A Review of Second Circuit Cases Demonstrates that the Punitive Damages Award Was Excessive

In Phillips v. Bowen, 278 F.3d 103 (2d Cir. 2002), a jury found that the defendants, who were the plaintiffs' work supervisors in a sheriff's department, retaliated against her after she exercised her first amendment rights. Id. at 106. In particular, the plaintiff alleged that the defendants, the sheriff and chief deputy sheriff, harassed her because she supported the 1993 election campaign of an individual who ran for sheriff and lost. Id. The district court and Second Circuit declined to overturn the jury's award of $200,000 against each defendant in compensatory damages. Id. at 111-12. The Second Circuit cited the plaintiff's evidence of ongoing harassment by each defendant over a five-year period. The plaintiff and her boyfriend also testified in detail over her emotional distress, physical illness, and the effects of the defendants' conduct on her lifestyle and relationships. Id. The plaintiff's co-workers testified about the deterioration they observed in the plaintiff. Id. Nevertheless, there was no award of punitive damages.

In Moskowitz v. Coscette, 3 Fed. Appx. 1 (2d Cir. 2001), a police officer brought a § 1983 action against the town and police chief alleging retaliation in violation of the First Amendment and the Uniform Services Employment and Reemployment Act. Specifically, the jury found that the police chief and town violated the plaintiff's First Amendment right to free speech and discriminated against him based on his military status in violation of 38 U.S.C. § 4311. The jury awarded the plaintiff $125,000 in compensatory damages and $75,000 against the police chief in punitive damages on the § 1983 claim. As part of its analysis, the Second Circuit concluded that the percentage of punitive to compensatory damages, 60 percent, was

26

generally reasonable. Id. at *6. It also concluded that the award did not shock the judicial conscience when compared to similar claims. In particular, it considered the figures and facts from a 1988 case from the Second Circuit, a 1997 case from this District, a 2000 case from the Northern District of New York and a 1996 case from the Eastern District of Pennsylvania. The award in the Northern District of New York case was $400,000. The awards in the other three cases were all $100,000 in compensatory damages.

By way of comparison, assuming no reduction in the compensatory damages, a 60% award, in the instant case would result in a $90,540 award of punitive damages, $4.9 million less than the amount awarded by the jury. This analysis highlights the excessiveness of the punitive award in this case.

In Lewis v. Cowen, 165 F.3d 154 (2d Cir. 1999), a case in which the Court, Burns, J., sat as a member of the panel, the Second Circuit reversed the district court's denial of qualified immunity in the First Amendment retaliation case. Id. at 167. The court did not analyze the propriety of the jury verdict. Nevertheless, the ratio of the jury's punitive damages award to the compensatory damages award, and the factual scenario in that case, supports the vacating of the punitive damages award in the case at bar because it is grossly excessive. The plaintiff in Lewis was the person in charge of Connecticut's lottery. He was fired by his supervisors for refusing to publicly support a change in the lottery. Claiming a deprivation of his First Amendment rights, the jury had awarded the plaintiff $1,028,196 in compensatory damages and $640,644 in punitive damages. Id. at 160. The jury's award also included a finding of liability under Connecticut State law. Id. at 157. The plaintiff, as part of his duties, had managed over 30 employees and reported directly to the Executive Director of the Connecticut Division of Special Revenue. Id. at 158. He was responsible for designing lottery games and for maintaining the security of and

27

public confidence in the lottery. Id. Part of the plaintiff's job also included communicating with the media and public as "the official lottery spokesman." Id. He had also obtained national prominence in the public gaming community. He served as secretary, vice president, and president of the National Association of State and Provincial Lotteries, an association of public gaming executives in the United States and Canada, and published several articles in a trade magazine on whose cover he had been featured. Id. His termination arose out of a series of events in 1988 and 1989. Id. at 158-60.

In Vasbinder v. Scott, 976 F.2d 118 (2d Cir. 1992), the plaintiff, Vasbinder, was a statewide coordinator of placement services for handicapped persons for the Office of Vocational Rehabilitation of the New York State Department of Education ("OVR"). Switzer was Vasbinder's immediate supervisor. Switzer reported to Scott, the overall head of the OVR. Vasbinder was terminated from his statewide position and was reassigned to an inferior position as a result of his having reported what thought to improper duplicate billing and overcharging in the administration of a federally funded program to the FBI. The apparent improprieties were thought by Vasbinder to involve individuals with close personal relationships to Switzer.

The matter was tried before a jury, which rendered a verdict in Vasbinder's favor for back pay (later determined by the court to amount to $32,529.49), $50,000 for emotional distress, and punitive damages in an undetermined amount. The district court vacated the award of punitive damages. After a reversal of that decision by the Second Circuit, a second jury returned separate verdicts on the punitive damages in the amounts of $150,000 against both Scott and Switzer. Scott and Switzer then moved for judgment notwithstanding the verdict on the ground that the punitive damages award was excessive and should be reduced. The district court, "while expressing sympathy for their position," denied the motion, deeming itself bound

28

by prior Second Circuit decisions. 976 F.2d at 120. On appeal, the Second Circuit reversed that decision. It found the awards of $150,000 against both Scott and Switzer to be excessive. Id. at 122 ("award of punitive damages substantially exceeds that necessary to punish the defendants and deter similar conduct in the future, and therefore represents an unjustifiable windfall to Vasbinder."). It held that awards of no more than $20,000 as to Switzer and $30,000 as to Scott would satisfy the proper purposes of punitive damages. Id. at 122. Thus, it remanded the case for Vasbinder to determine whether he would accept those amounts or opt to conduct a new trial. Id. at 123.

Petramale v. Local No. 17 of Laborers' Int'l Union of N. Am., 847 F.2d 1009 (2d Cir. 1988) stemmed from discipline meted out by Local No. 17 to the plaintiff, Petramale, a union member, for making allegedly slanderous accusations against union officials and for disrupting a union meeting. Petramale appealed to the parent international union. After a hearing, the discipline essentially was upheld, although the punishment was reduced. Petramale commenced a lawsuit against Local 17, its three chief officers, and the international union. He alleged that the discipline and the union constitutional provisions on which it was based violated his statutory rights of free speech as protected by the Labor-Management Reporting and Disclosure Act. At the trial on the issue of damages against Local 17 and the union officials, Petramale claimed that he should recover for emotional distress, his marital separation and loss of reputation. The jury awarded Petramale $200,000 in compensatory damages against Local 17; $50,000 in punitive damages against Local 17 and $5,000 in punitive damages against each of the three individual union officers. The district court granted a motion for j.n.o.v. and ordered that Petramale should receive nominal damages of $1.00. On appeal, the Second Circuit reversed the district court. However, it held that the testimony at trial simply did not support a verdict of the magnitude of

$200,000. Rather, it concluded that an award of $100,000 was "quite adequate." Accordingly, it remanded the case for a new trial on the issue of compensatory damages, unless Petramale agreed to remit all compensatory damages in excess of $100,000. With regard to the issue of punitive damages, it concluded that the award of $50,000 in punitive damages was excessive. Accordingly, it held that the award should be reduced to $10,000.

In Stolberg v. Members of Board of Trustees for the State Colleges of the State of Connecticut, 474 F.2d 485 (2d Cir. 1973), the plaintiff, Stolberg, formerly an assistant professor of geography at Southern Connecticut State College ("SCSC"), appealed from a judgment largely in his favor in his action under § 1983 against the former president of SCSC and members of the board of trustees for the state colleges of Connecticut. The plaintiff's claim was based on the defendants' nonrenewal of his teaching contract and his consequent denial of tenure, in violation of his First Amendment and Due Process rights. Chief Judge Blumenfeld, sitting without a jury, found that the defendants' actions were in retaliation for Stolberg's exercise of his First Amendment rights and awarded him reinstatement with tenure and no loss of seniority and $9,000 to recover his salary loss. However, Chief Judge Blumenfeld denied additional compensatory damages, punitive damages or attorneys' fees. He deemed it unnecessary to address the due process claim.

On appeal, the Second Circuit affirmed, except as to the denial of attorney's fees. In reviewing the facts of the case, the Second Circuit noted that they revealed "an unpleasant picture, characterized by reactionary and rather high-handed conduct on the part of a college president toward a faculty member, approved by some trustees and tolerated by others." Id. at 487. In particular, the situation with Stolberg related to his position on the Vietnam War and had taken place over two school years.

30