IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| ARPAD TOLNAY | : CIVIL ACTION NO. |
| Plaintiff | : 3:02-CV-1514 (EBB) |
| | : |
| V. | : |
| | : |
| MELVIN WEARING | : |
| Defendant | : DECEMBER 28, 2005 |

## MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

Jonathan H. Beamon, Esq.
CT Fed. Bar No. 22937
Assistant Corporation Counsel
**OFFICE OF THE NEW HAVEN CORPORATION COUNSEL**
165 Church Street, 4th Floor
New Haven, CT 06510
Tel:   (203) 946-7958
Fax:   (203) 946-7942
E-Mail:  JBeamon@Newhavenct.net

Robert A. Rhodes, Esq.
CT Fed. Bar No. 13583
**HALLORAN & SAGE LLP**
315 Post Road West
Westport, CT 06880
Tel:   (203) 227-2855
Fax:   (203) 227-6992
E-Mail:  Rhodes@halloran-sage.com

and

John B. Farley, Esq.
CT Fed. Bar No. 02239
Ralph W. Johnson III, Esq.
CT Fed. Bar No. 15277
**HALLORAN & SAGE LLP**
One Goodwin Square
225 Asylum Street
Hartford, CT  06103
Tel:   (860) 522-6103
Fax:   (860) 548-0006
E-Mail:  Johnsonr@halloran-sage.com

*Counsel for the Defendant,
Melvin Wearing*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................... 1

    I.    THE PLAINITFF'S CASE INCIDENT REPORT AND HIS TRIAL TESTIMONY ............................................................................. 1

    II.    CHIEF WEARING'S TRIAL TESTIMONY ............................................... 5

    III.    LIEUTENANT BOMBALICKI'S TRIAL TESTIMONY ........................... 7

    IV.    THE COURT'S IDENTIFICATION OF THE PROTECTED SPEECH ........................................................................................................ 7

STANDARD OF REVIEW .................................................................................................... 8

ARGUMENT .......................................................................................................................... 8

    I.    JUDGMENT AS A MATTER OF LAW SHOULD BE ENTERED IN FAVOR OF CHIEF WEARING BECAUSE THE PLAINTIFF'S SPEECH WAS NOT PROTECTED UNDER THE FIRST AMENDMENT .................................................................... 8

        A.    A Police Officer's Statements In A Case Incident Report And At An Internal Investigatory/Disciplinary Meeting Do Not Constitute Speech "As A Citizen" Concerning A Matter Of Public Concern ............................................. 8

            1.    The Plaintiff's Speech Was Not Protected Under the Case Law from Courts Within the Second Circuit .................................................................. 10

            2.    The Plaintiff's Speech Was Not Protected Under the Case Law from Other Circuit Courts .......................... 19

        B.    The Context Of The Plaintiff's Statements Demonstrates That It Was Not Protected Under The First Amendment ........................ 24

        C.    An Application Of The Pickering Balancing Test Demonstrates That The Government's Interest In Maintaining Loyalty And Discipline Within The Police Department Outweighed Any Of The Plaintiff's Interests ................ 25

| | | | |
|---|---|---|---|
| II. | | CHIEF WEARING IS ENTITLED TO QUALIFIED IMMUNITY | 29 |
| | A. | Qualified Immunity: Fundamental Principles | 29 |
| | B. | Qualified Immunity Within The Context Of First Amendment Retaliation Cases | 31 |
| | | 1. The Status of the "As a Citizen" Requirement Under Connick | 31 |
| | | 2. The Fact-Intensive Nature of the Pickering Balancing Test | 32 |
| | C. | An Application Of The Qualified Immunity Analysis Demonstrates That Judgment Should Be Entered In Favor Of Chief Wearing | 34 |
| III. | | JUDGMENT AS A MATTER OF LAW SHOULD BE ENTERED ON THE AWARD FOR NONECONOMIC DAMAGES BASED ON A LACK IN THE SUFFICIENCY OF THE EVIDENCE | 37 |
| IV. | | JUDGMENT AS A MATTER OF LAW SHOULD BE ENTERED ON THE PUNITIVE DAMAGES AWARD BASED ON A LACK IN THE SUFFICIENCY OF THE EVIDENCE | 38 |
| CONCLUSION | | | 40 |

## PRELMINARY STATEMENT

The defendant, Melvin Wearing, the former Chief of Police for the City of New Haven, submits this memorandum of law in support of his motion for the entry of judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(b). In further support of his motion, Chief Wearing has submitted an appendix of exhibits (1 through 46). For the reasons set forth below, the Court should grant Chief Wearing's motion and enter judgment in his favor.

## BACKGROUND

### I. THE PLAINTIFF'S CASE INCIDENT REPORT AND HIS TRIAL TESTIMONY

In the last three paragraphs of his August 3, 2002 case incident report regarding the motor vehicle stop the previous day, the plaintiff, Arpad Tolnay, wrote as follows:

> This Officer feels that he was not able to act to his full potential at that time based on the circumstances of said situation. This Officer feels that in the moment in question he acted with judgment that was imposed on his police jurisdiction due to the identity and political involvement of Rodriguez. This Officer was reaffirmed by his actions after the completion of said incident as this Officer was instructed by the Patrol Shift Supervisor Capt. F. Ortiz not to have any contact with person(s) involved in the incident that occurred on 07/26/02 CN 02-42911.
>
> Officer C. Colon who was dispatched as a cover unit arrived after Daniel Rodriguez was told he was able to leave. The transaction took approx. 45 seconds in which C. Colon was not able to arrive in time.
>
> In closing, this Officer would like to state that at no time did the incident that occurred on 07/26/02 influence the motor vehicle stop with the exception of the actions taken after the stop. Simply stated, this Officer observed a vehicle traveling north on Poplar Street and I observed said vehicle to be in violation of the motor vehicle laws as defined.

(Pl's Trial Exhibit 4 at pp. 4-5)

At trial, Tolnay testified that he was required to prepare a case incident report for the July 26, 2002 arrest and that he prepared his report concerning that arrest in the normal course of his duties. (12/1/05 Tr. at 114-15) When asked by his counsel why he prepared the case incident report for the motor vehicle stop on August 2, 2002, (Pl's Trial Exhibit No. 4), Tolnay testified as follows:

> Because after my initial arrest, all the information that I have received regarding how powerful people they were had frightened me. Because, you know, I'm a patrol man and my duty is to do my job, and I'm not involved in politics. I go out and do my job. I was always very proud of how proactive and how much I enjoyed doing police work.
>
> And because it was my misfortune to be the officer that gets sent to that location and has to take the action that I did I was now going to suffer the consequences of what I had to do.

(12/1/05 Tr. at 175-76) In particular, Tolnay testified that he put that last paragraph in because:

> At that point in time, when I made that motor vehicle stop, after what was happening, and what I knew I was in store for, I felt like I needed to explain what had happened and the reason why I was not able to basically take police action.
>
> It was my firm belief that had I actually enforced the law and given Daniel Rodriguez an infraction or a summons or whatever applicable charges apply to him for what I have observed, I don't even know what the ramifications could have been. So I felt the need to explain that in my report.

(12/1/05 Tr. at 183) Tolnay did not give either of the two case incident reports to the New Haven Register. (12/1/05 Tr. at 192) Nor did he provide a copy of the reports or the account of his fellow officer to any news station. (Id.) In fact, Tolnay did not make any public statements. (Id.) He also never asked for permission to speak with the media. (12/2/05 Tr. at 106)

Tolnay testified that at the time of the August 2, 2002 motor vehicle stop he felt that "[he] was going to be in trouble." (12/1/05 Tr. at 169; see id. ("I")) More specifically, he testified:

2

> I felt that this was an individual that if I were to take any police action against, I would have to suffer even more of a consequence of what I had felt was going to happen from the onset of my first arrest.

(Id. at 170)

With regard to Captain Ortiz's alleged statement on the radio following the August 2, 2002 motor vehicle stop, Tolnay testified that Ortiz made the following statement on the radio directed to Tolnay's supervisor:

> I'm not quite sure what you're getting from that Fair Haven officer, but just tell him to be professional and to just do his job and not engage in...silly conversations.

(12/1/05 Tr. at 179-80) Tolnay further testified that Ortiz stated "just tell him to stay away from all those people involved." (Id. at 180)

Tolnay further testified that Reverend Rodriguez had filed a citizen's complaint against him. (12/1/05 Tr. at 185, 220) With regard to the meeting with Chief Wearing on August 13, 2002, and his alleged statements during that meeting, Tolnay stated as follows:

> ...As I began to explain to him how the events unfolded, he kept asking me if I felt that I handled the situation correctly. Every time I did say that I handled the situation correctly. At one point I stated that I believe that the only reason that I was in the office was because of the fact that the two individuals involved had very strong political ties...

(12/1/05 Tr. at 236)

Tolnay further testified that during the August 13 meeting, Chief Wearing believed that Tolnay could have handled the July 26 incident differently. (12/1/05 Tr. at 239-40) In addition to maintaining that Tolnay should have called a supervisor earlier, according to Tolnay, Chief Wearing made a reference to the fact that Tolnay was still a rookie and probably should have

3

handled the matter differently. (Id. at 239) Tolnay disagreed with the Chief's evaluation and maintained that he had gained a lot of experience in dealing with the community. (Id. at 239-40)

Tolnay further testified that during the meeting with Chief Wearing, when he was asked why he did not arrest Reverend Rodriguez on August 2, 2002, he responded "[b]ecause I would be afraid to have to come sit through a second meeting based on who these people are." (12/1/05 Tr. at 241) Tolnay testified that during the meeting, he stated as follows:

> Well, sir, I believe I'm here today because these two individuals have political connections and they have people who are in high places within this city and that's why I feel that I'm here. I'm here for no [other] reason, through no conduct of mine as a police officer.

(12/1/05 Tr. at 241) Tolnay told Chief Wearing that he believed that Captain Ortiz's comments to his supervisor Sergeant Burgh about Tolnay over the radio were "very inappropriate." (12/1/05 Tr. at 243) After Chief Wearing pointed out the difference between his less than four years of experience and Ortiz's twenty years of experience, Tolnay replied that he believed that was all the more reason why he believed Ortiz's behavior on the radio was inappropriate. (Id. at 243)

According to Tolnay, in reaction to his comments regarding Captain Ortiz, Chief Wearing became angry, pointed his finger at him and called him a smart mouth. (12/1/05 Tr. at 243-44) According to Tolnay, the Chief also stated that he knew that Tolnay caused the incident at the church on July 26, 2002. (Id. at 244) In response to the Chief's alleged statements, Tolnay testified that he stood up and stated:

> Chief, if you know that to be true, than you [know] more about this than I do. I said this meeting is over. The next time that I speak with someone it will be after I have spoken to an attorney.

4

(Id. at 244) Tolnay then stated I want to leave. (Id.) His union representative, Lieutenant Bombalicki told him to wait outside. (Id.) Tolnay left the meeting because, "there was no reason for me to be there, other than the fact that I was in jeopardy. And a reason was being sought after to punish me for some reason." (Id. at 246)

At what became the end of the meeting with Chief Wearing on August 13, 2002, Tolnay stood up and said this meeting is over with. (12/2/05 Tr. at 124) He further stated that I think I'm done and I think I need legal counsel. (Id.) The next time I speak with you will be after I have spoken with legal counsel. (Id.) When Tolnay made this statement he was in the process of leaving. (Id. at 125) Chief Wearing did not tell Tolnay that he had permission to leave the meeting. (12/2/05 Tr. at 125-26)

## II.  CHIEF WEARING'S TRIAL TESTIMONY

With regard to the July 26, 2002 incident at the church, Chief Wearing testified that he believed that Tolnay should have gotten a supervisor involved much earlier. (12/2/05 Tr. at 194) He further testified that he had concerns about the safety implications of the way Tolnay handled the incident. (Id. at 198) In particular, he was concerned about what could have transpired. (Id.) He believed that Tolnay could have handled the situation differently. (Id.) A supervisor should have been called sooner because the situation called for mediation. (Id. at 198) Tolnay knew that it was a hostile environment and should have consulted with a supervisor earlier than he did. (Id. at 198, 209-12)

As a general matter, Chief Wearing testified that when New Haven police officers encounter individuals who are refusing to comply with requests and are acting in an angry or irate manner, the officers are encouraged to call their supervisors. (12/6/05 Tr. at 18) Supervisors generally have more experience than patrolmen. (Id.) Moreover, supervisors have

5

more experience in mediating situations. (Id.) Based on Chief Wearing's approximately 33 years of experience as a police officer, he believed that Tolnay should have called his supervisor for assistance with the July 26 incident. (Id. at 18-20, 23)

    Chief Wearing testified that he disciplined Tolnay:

> Because he jumped up from his seat, stating that this meeting is over. I don't have to hear this. It's all political. And he walked out of the office.

(12/6/05 Tr. at 32) Chief Wearing considered Tolnay's conduct at the meeting to be insubordinate. (Id. at 33) This type of conduct had never happened during his six years as police chief and the five years he was assistant police chief. (Id.) Chief Wearing was disturbed by Tolnay's conduct. (Id.) Tolnay was disrespectful and insubordinate in the presence of Lieutenant Bombalicki and Officer Abate. (Id.) He thought it was inappropriate for Tolnay to feel that he could act that way in front of the police chief. (Id.)

    Moreover, Chief Wearing was concerned about the impact of Tolnay's conduct upon the police department. (Id.) Specifically, Chief Wearing testified:

> The Chief in the department sets the tone and he sets the respect and integrity and discipline in the department. And if I allowed this to go without severe consequences, I feel I would have lost control of the department and any officer could do the same thing; walk out and have no respect for the chief officer. I could not allow that to happen in the department.

(12/6/05 Tr. at 34) Chief Wearing further stated that Tolnay's insubordination was different than other instances of insubordination they had dealt with in the past. (Id.) In particular, he had no recollection of such direct insubordination to the police chief of New Haven ever having happened before. (Id.) Chief Wearing believed that direct insubordination to the chief is more severe and serious than insubordination to an immediate supervisor. (Id.) He explained the difference as follows:

6

> Because the Chief is the Chief. He's responsible for all of his officers. And if a patrol officer can act that way, act out his frustration to the Chief and walk out of a meeting, than everybody else would feel they could do the same thing.

(12/6/05 Tr. at 34-35) At no time during the August 13 meeting did the Chief Wearing tell Tolnay that he was free to leave or that the meeting was over. (Id. at 35) Chief Wearing did not believe that Tolnay's actions at the meeting were protected by the First Amendment. (Id. at 36)

### III. LIEUTENANT BOMBALICKI'S TRIAL TESTIMONY

Lieutenant Bombalicki, Tolnay's union representative, who was present during the August 13, 2002 meeting, testified that Tolnay got out of his chair and demanded a lawyer after Chief Wearing rose from his chair, pointed his finger at Tolnay and called him a smart mouth. (12/6/05 Tr. at 142) Bombalicki told Tolnay to sit down and calm down. (Id.) He also told him to go outside and wait for him. (Id.) He believed that both Tolnay's and Chief Wearing's tempers at this point were hot. In fact, he testified that during the meeting in general, Tolnay's and Chief Wearing's tempers were hot. (Id. at 164-65) Tolnay's tone of voice increased during the meeting. (Id. at 165) By the time he stood up and demanded an attorney, Tolnay's voice was elevated and agitated. (Id.) Bombalicki also testified that it was not uncommon for an officer to meet directly with the Chief of Police concerning a civilian complaint without the matter having gone through the Internal Affairs division. (Id. at 167-68)

### IV. THE COURT'S IDENTIFICATION OF THE PROTECTED SPEECH

In its charge to the jury, the Court identified Tolnay's protected speech as the "Plaintiff's expressed concern over possible ramifications of enforcing the law as to certain members of the public due to their political involvement with city officials; [and] any speech by plaintiff concerning possible wrong doing by the New Haven Police Department or other city officials." (12/8/05 Tr. at 139)

7

## STANDARD OF REVIEW

A Rule 50(b) motion may be granted when considering the evidence in the light most favorable to the non-moving party and drawing all reasonable evidentiary inferences in that party's favor, there is "no legally sufficient evidentiary basis for a reasonable jury to find" in favor of the non-moving party. See Fed. R. Civ. 50(a). See Bracey v. Board of Educ. of City of Bridgeport, 368 F.3d 108, 113 (2d Cir. 2004). The standard for judgment as a matter of law is the same as the standard for summary judgment under Rule 56. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000). Accordingly, judgment as a matter of law can be entered where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against [him]." LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir. 1995).

## ARGUMENT

I. **JUDGMENT AS A MATTER OF LAW SHOULD BE ENTERED IN FAVOR OF CHIEF WEARING BECAUSE THE PLAINTIFF'S SPEECH WAS NOT PROTECTED UNDER THE FIRST AMENDMENT**

    A. **A Police Officer's Statements In A Case Incident Report And At An Internal Investigatory/Disciplinary Meeting Do Not Constitute Speech "As A Citizen" Concerning A Matter Of Public Concern**

A detailed analysis of the governing case law demonstrates that Chief Wearing is entitled to judgment as a matter of law because Tolnay's speech was not protected by the First Amendment. As a preliminary matter, Tolnay's speech was not made "as a citizen" on a matter of public concern. Rather, it was made as part of his official duties and the motivation for the speech was personal. An examination of the context, time, place and manner, within which

Tolnay made his statements, as detailed above, further confirms the entry of judgment as a matter of law is required under the governing case law.

In <u>Connick v. Myers</u>, 461 U.S. 138 (1983), the Supreme Court attempted to clarify its test as set forth in <u>Pickering v. Board of Educ.</u>, 391 U.S. 563 (1968). The <u>Connick</u> Court confronted a challenge brought by a public employee who claimed that her First Amendment rights had been violated when she was fired after having circulated an internal office questionnaire that was "most accurately characterized as an employee grievance concerning internal office policy." 461 U.S. at 154. <u>Connick</u> stressed the distinction between employee and citizen speech:

> The repeated emphasis in <u>Pickering</u> on the right of a public employee 'as a citizen, in commenting upon matters of public concern,' was not accidental. This language, reiterated in all of <u>Pickering</u>'s progeny, reflects both the historical evolution of the rights of public employees, and the common sense realization that government offices could not function if every employment decision became a constitutional matter.

461 U.S. at 143. Thus, <u>Connick</u> teaches that the relevant constitutional distinction is not merely between speech touching on matters of public significance and speech that does not, but between speech spoken "*as a citizen* upon matters of public concern [and that offered] *as an employee* upon matters only of personal interest." 461 U.S. at 147 (emphasis added).

Consequently, the first step in deciding whether speech by a public employee is constitutionally protected is a determination whether the plaintiff is speaking "as a citizen upon matters of public concern." <u>Connick</u>, 461 U.S. at 147. See <u>Kelly v. City of Mount Vernon</u>, 344 F.Supp.2d 395, 402 (S.D.N.Y. 2004). Speech will be fairly characterized as a matter of public concern if it relates to any matter of political, social, or other concern to the community. <u>Connick</u>, 461 U.S. at 146. See <u>Kelly</u>, 344 F.Supp.2d at 402. "However, speech that relates primarily to matters of personal interest or internal office affairs, in which the individual speaks

9

as an employee rather than as a citizen, will not support a First Amendment retaliation claim." Id.

"[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick, 461 U.S. at 147. See Kelly, 344 F.Supp. 2d at 403. "'Even as to an issue that could arguably be viewed as a matter of public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment right to comment on that issue is entitled to little weight.'" Kelly, 344 F.Supp. 2d at 403. "The fundamental question is whether the employee is seeking to vindicate personal interests or bring to light a matter of political, social, or other concern to the community." Mishk v. Destefano, 5 F.Supp.2d 194, 200 (S.D.N.Y. 1998) (Parker, J.). Merely because a plaintiff's speech touches on matters of public concern does not mean it is protected "if her motive was private and personal." LaForgia v. Davis, 2004 WL 2884524, at *5 (S.D.N.Y. Dec. 14, 2004).

### 1. The Plaintiff's Speech Was Not Protected Under the Case Law from Courts Within the Second Circuit

A review of the case law from courts within the Second Circuit demonstrates that Tolnay's speech was not protected. In Pappas v. Giuliani, 290 F.3d 143 (2d Cir. 2002), Judge McMahon recognized that to fall within the realm of "public concern," an employee's speech must satisfy two criteria. Id. at 152 (McMahon, J., concurring). First, it must relate to a matter of political, social or other concern to the community. Id. Second, the employee must speak "'as a citizen upon matters of public concern,' not simply 'as an employee upon matters only of personal interest.'" Id. (quoting Connick, 461 U.S. at 147). Judge McMahon emphasized that

10

"[c]ontext as well as content matters." Pappas, 290 F.3d at 152 ((McMahon, J., concurring). Thus, as part of its analysis, a "court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." Lewis v. Cowen, 165 F.3d 154, 163-64 (2d Cir. 1999). See Pappas, 290 F.3d at 153 (McMahan, J., concurring).

In Pappas, the plaintiff, a former police officer, sued the city and police commissioner alleging retaliation in violation of his free speech rights. The plaintiff was fired after an internal affairs investigation revealed that he had sent inappropriate materials in reply to a solicitation from a charitable organization. The plaintiff had sent the materials in an effort to have his name removed from the mailing list. He also alleged that he had sent the materials as part of a protest. Pappas, 290 F.3d at 144-45. The majority opinion in Pappas affirmed the grant of summary judgment in favor of the defendants based upon its conclusion that the police department's interests in maintaining discipline outweighed the plaintiff's alleged First Amendment interest. Id. at 151. In her concurring opinion, Judge McMahan, however, concluded that the grant of summary judgment should be affirmed because the plaintiff had engaged in purely private speech. Pappas, 290 F.3d at 152 (McMahan, J., concurring). As part of her analysis, she noted that the plaintiff had made no effort to forward his alleged "protest" to parties who might profit from knowing about the public's dissatisfaction over unsolicited direct mailing fundraising (such as the Better Business Bureau, charitable oversight agencies, IRS, the media, or the public at large). She believed that this lack of effort by the plaintiff belied his effort to cloak his private interest in the garb of "public concern" speech. Id. at 154.

In Kelly, 344 F.Supp.2d 395, the plaintiff, Robert Kelly, a police officer, brought an action against a municipality alleging retaliation in violation of his rights under the First

11

Amendment. Specifically, Kelly was a supervisor in the detective division of the Mount Vernon Police Department. Judge McMahon, citing decisions by then-District Judge Barrington Parker, dismissed Kelly's First Amendment retaliation claim, finding that none of the speech that allegedly motivated Kelly's reassignment qualified as constitutionally protected speech. Kelly, 344 F. Supp. 2d at 403.

With regard to Kelly's report memorializing his discussions with the police commissioner regarding gambling at the VFW Post, the court noted that it was an internal report to the commissioner. Id. The report detailed what actions had been taken, and made a record of the fact that Kelly had brought these issues to the attention of the commissioner. Id. The court held that it was, "in the common parlance, a 'CYA' memo." Id. It was not addressed to the commissioner's supervisor, so no effort was being made to bring a pervasive or systematic cover-up in the police department to the attention of the relevant authorities or to the public. It was, therefore, purely private speech. Id. (citing Mishk, 5 F.Supp.2d at 201-02; Cahill v. O'Donnell, 75 F.Supp.2d 264, 273 (S.D.N.Y. 1999)).

With regard to the report concerning an interview of the mayor about a crime involving his grandson, the complaint gave no indication that the report was "anything other than the type of report that is regularly filed as part of Plaintiff's job." Kelly, 344 F. Supp. 2d at 403. The court recognized that "'[a] communication by an employee to an employer in the course of the employee's normal duties, in routine form, and containing standard contents, is not likely to address a matter of public concern.'" Id. The court further recognized that Kelly's work in the police department was undoubtedly important; any investigations at the department are in a general way, a matter of public concern. However, the write-up of an interview with a criminal suspect is part of Kelly's day-to-day professional obligations and was not fairly distinguishable

12

from any other ordinary police responsibilities. Id. The court considered this to be true regardless of whom the suspect's grandfather might be. Id. at 404. The court opined that if Kelly had contacted someone and revealed that the mayor tried to intervene in the handling of his grandson's case, his speech would have been protected. Id. But the speech in question did not fit that description. Id.

With regard to Kelly's refusal to re-classify crimes per the police commissioner's request, the court believed that the classification of crimes was again part of Kelly's duties as a police officer. Id. Again, the court believed that had Kelly complained to higher-ups, formerly or informally, regarding what he saw as unethical conduct on the part of the commissioner, his speech would have been protected. Id. However, his complaint only alleged that Kelly refused to follow the orders of the commissioner and on occasion did the opposite of what he requested. Kelly failed to voice his opposition in any cognizable way that could come under the ambit of protected speech. Id.

With regard to the July 2003 press release about the arrest of an officer's son, the court concluded that it was a departmental statement about a pending case, it was not Kelly's own constitutionally protected speech. Id. at 404. In sum, Judge McMahon noted:

> I do not mean to minimize the seriousness of plaintiff's allegations. Some of what he intimates in his complaint suggests serious misconduct on the part of his supervisor. But the fact that plaintiff was mistreated (assuming it to be true) does not automatically give him a federal claim. Only acts that, fairly pled, implicate retaliation for public concern speech belong in this Court. Since none of the speech cited in Plaintiff's complaint qualifies as protected speech for purposes of a § 1983 First Amendment retaliation claim, the first count is dismissed.

Id. at 405. She further noted:

> The investigations, reports and statements made by Plaintiff that are the subject of this lawsuit occurred in the ordinary course of

13

> Plaintiff's work as an Officer and Captain in the Mount Vernon City Police Department. While this fact does not preclude a determination that his speech implicated matters of social or public significance, the fact that the speech arose during the usual performance of his duties weighs strongly against a characterization of the speech as relating to a matter of public concern.

Kelly, 344 F.Supp.2d at 403.

In Cahill v. O'Donnell, 75 F.Supp.2d 264 (S.D.N.Y. 1999) (Parker, J.), the plaintiffs, members of the Internal Affairs Division of the New York State Police Department, brought an action against the superintendent of state police, a lieutenant colonel in the state police, a sergeant who served as the president of the Police Benevolent Association for the state troopers, and the chief inspector in charge of the Internal Affairs division. The plaintiffs maintained that their activities in the Internal Affairs unit related to investigations, including the investigation of an alleged cover-up of a hit-and-run accident in which the brother of a trooper had been involved, and an investigation of a conflict between troopers and demonstrators at an Indian reservation, constituted speech on a matter of public concern. Id. at 273.

Then-District Judge Parker concluded that the investigations and the statements made incident to them, upon which the plaintiffs relied, had occurred in the "ordinary course of plaintiffs' work as members of Internal Affairs. While this fact does not preclude a determination that their speech implicated matters of social or public significance, the fact that the speech arose during the usual performance of their duties weighs strongly against a characterization of the speech as relating to a matter of public concern." Id. "'A communication by an employee to an employer in the course of the employee's normal duties, in routine form, and containing standard contents, is not likely to address a matter of public concern.'" Id. Judge Parker further recognized: