> The plaintiffs' work in the Internal Affairs department is undoubtedly important, and the vigilance and integrity of police officers is, in a general way, a matter of public concern. Plaintiffs' actions, under the circumstances presented here, were encompassed within their day-to-day professional obligations within their department and are not fairly distinguishable from the responsibilities of all personnel within Internal Affairs. In this case, the plaintiffs were not attempting to bring to the public's attention pervasive and systematic cover-up in Internal Affairs. Rather they simply exercised their duties, as Internal Affairs personnel, to investigate allegedly improper occurrences within the State Police, and to report their findings as requested. The speech documented in this lawsuit was not public, but was intramural.

Cahill, 75 F.Supp.2d at 273.

Judge Parker also concluded that neither statements made by the plaintiffs to the superintendent and chief inspector of the Internal Affairs division requesting "some showing of support" for them in the wake of a PBA sanctioned lawsuit and derogatory PBA newsletters, nor their complaints about the superintendent's administrative and discretionary decisions, were matters of public concern. Id. Rather, the court determined that the evidence submitted by the plaintiffs illustrated that they were not speaking out in an attempt publicly to expose institutional problems or police cover-ups, but rather complaining to their superiors about their perceived mistreatment by the PBA and the lack of support by the upper level officials. Id. Thus, given the content, form and context of their statements, the plaintiffs were commenting on personal, internal, departmental disagreements. They were not speaking out on matters of public concern. Id.[1]

---

[1]   Judge Parker recognized that although generally an employee seeking to publicize actual or potential wrongdoing by a public employee is addressing a matter of public concern, and arguably the plaintiffs' comments to the superintendent and chief inspector were motivated by apparent concerns over police wrongdoing, "the substance, tenor and purpose of the speech they have adduced was not public speech in any realistic sense but was motivated by private interests or pertained to routine business and normal police duties." Id. at 273. Accordingly, Judge

15

In the instant case, under <u>Kelly</u>'s and <u>Cahill</u>'s application of <u>Connick</u>, Tolnay's speech was not protected under the First Amendment. Two passing references to the word "political" are not enough for the protection of the First Amendment. A close examination of what Tolnay actually wrote and said, as well as the context, reveals that he was not speaking "as a citizen" on a matter of public concern. See <u>Schad v. Jones</u>, 415 F.3d 671, 675 (7th Cir. 2005), <u>petition for cert. filed</u>, 74 USLW 3248 (U.S. Oct. 10, 2005) (No. 05-469) (must "delve deeper into the precise content"). Rather, he made his speech as part of his normal duties as a police officer. His August 3 case incident report was prepared as part of his duties. Its preparation was part of his job. (12/1/05 Tr. at 114-15) Similarly, he participated in the August 13 meeting with Chief Wearing and the other officers, as part of his duties in connection with a citizen's complaint and upon receiving an order to meet with the Chief. (12/6/05 Tr. at 167-68)

A close examination of Tolnay's speech reveals that its content was not that of a citizen speaking out on a matter of public concern. Rather, to use the language of <u>Kelly</u>, Tolnay's August 3 case incident report was, in the common parlance, a "CYA" memo. After describing the motor vehicle stop, the last portion of the case incident report talks about Tolnay's feeling that *he* could not do *his* job. (Pl.'s Trial Ex. 4, at pp. 4-5) The report also identifies what Tolnay considers to be evidence supporting his feelings, Ortiz's instructions over the radio. Notably, there is no indication in the report concerning an alleged improper use of the radio by Ortiz. Finally, the report "memorializes" Tolnay's position that his stopping Rodriguez had nothing to do with the July 26 incident. (<u>Id.</u>) As such, the portion of the report upon which Tolnay bases his claim is personal in nature.

---

Parker granted the defendant's motion for summary judgment on the plaintiff's First Amendment retaliation claim.

16

Tolnay's testimony regarding why he wrote what he did confirms that the August 3 report was not protected by the First Amendment. (12/1/05 Tr. at 175-76, 183) His motivation was personal. He wrote what he did at the end of the report because of his "misfortune" in connection with the July 26 arrest and because of his resulting fear. He also wrote what he did because he "knew what [he] was in store for," and he felt like he needed to "explain" what had happened and why he did what he did. (Id. at 183) The entire focus of or motivation for the report is Tolnay's personal concern for his employment position. (Id. at 175-76, 183; see id. at 170 ("I would have to suffer... consequence")) This does not constitute protected speech under the First Amendment. There is no mention of his fellow officers or the police department in general. The small portion of the report on which Tolnay relies addresses matters of personal concern to Tolnay.

Moreover, the context of the report weighs heavily against it being considered protected speech. Tolnay was not a whistleblower. He did not contact the Internal Affairs Division, a prosecutor's office, the State Police or any other agency. The preparation of the report was part of his routine duties. He never testified that he intended for the report to be seen by anyone, let alone a high-ranking official. Nor did he testify that he prepared the report to expose anything. He never gave the report to anyone and did not discuss the report with the media or any other member of the public. Nor did he testify regarding any intent to follow up on the report after it was prepared. He was not trying to bring anything to light; rather, he was concerned about his job and getting into trouble. Thus, the report was not protected by the First Amendment under the case law from courts within the Second Circuit, including decisions authored by a current member of the court of appeals.

17

Likewise, Tolnay's brief statements at the August 13 meeting are not protected speech. As with the report, both the content and the context weigh heavily against a finding of protected speech. Tolnay was at the meeting because he received an order to be there. A citizen's complaint had been filed by Rodriguez. Tolnay had his union representative with him at the meeting. Thus, Tolnay's participation was part of his official duties as a police officer. (12/6/05 Tr. at 167-68) At a more fundamental level, he was an employee explaining his employment actions to a supervisor. The content of Tolnay's statements at the meeting was highly personal. Tolnay told the Chief that he believed that he was at the meeting because the ministers had political connections. (12/1/05 Tr. at 241) Thus, the thrust of Tolnay's statement was his rationalizing the reason for his having to attend the meeting. Similarly, Tolnay made a statement about his belief that Ortiz's use of the radio was inappropriate as part his rationalizing his being required to attend the meeting. (Id. at 243) He apparently made the comment about Ortiz again in response to Chief Wearing's pointing out the difference between Tolnay's less than 4 years experience and Ortiz's 20 years of experience. (Id.) This was personal speech made as part of Tolnay's defense of his employment situation. Tolnay vehemently challenged Chief Wearing's evaluation of Tolnay's limited experience. (Id. at 239-40) Tolnay maintained that he had gained a lot of experience. (Id.)

The context of Tolnay's speech at the meeting and his motivation also demonstrate that his brief statements were not protected by the First Amendment. Tolnay never testified that he spoke as he did at the meeting to expose anything at the police department. Nor was there any indication that Tolnay spoke as he did to inform the public or that he followed up on the statement with an effort to awaken public awareness on some unidentified matter. Tolnay's motivation for the statements was personal. He was being questioned by the Chief and he

18

disagreed with the Chief's evaluation of his limited experience. The tempers at the meeting, in the words of a non-party witness were "hot," and Tolnay felt he was getting inappropriately blamed for something. Thus, as part of his concern for his employment situation, he made a passing reference to why he thought he was at the meeting and he accused Ortiz of inappropriately using the radio to transmit an instruction to him regarding his interaction with the ministers from the July 26 arrest, i.e., how Tolnay carried out his duties.

Simply stated, Tolnay's speech was not "as a citizen" upon a matter of public concern. It was undertaken as part of his normal and official job duties, including his position as an employee. A review of the content and context of the speech and Tolnay's personal motivation confirms that none of his speech was protected. Accordingly, judgment should be entered in favor of Chief Wearing.

2. **The Plaintiff's Speech Was Not Protected Under the Case Law from Other Circuit Courts**

A review of case law from outside the Second Circuit further demonstrates that Tolnay's speech was not made "as a citizen," upon a matter of public concern and thus, it was not protected under the First Amendment.

At least six circuits have recognized the importance of Connick's citizen speech - employee speech distinction.[2] As Judge O'Scannlain recognized in Ceballos v. Garcetti, 361 F.3d 1168, 1193 (9th Cir. 2004), cert. granted, 125 S.Ct. 1395 (2005):

> Properly understood, Connick teaches that although speech uttered by public employees must address an issue of public import in order to come within the protective shelter of the First

---

[2]   See, e.g., Gonzalez v. City of Chicago, 239 F.3d 939, 942 (7th Cir. 2001); Urofsky v. Gilmore, 216 F.3d 401, 407 (4th Cir. 2000)(en banc); Buazard v. Meredith, 172 F.3d 546, 548-49 (8th Cir. 1999); Gillum v. City of Kerrville, 3 F.3d 117, 120-21 (5th Cir. 1993); Thomson v. Scheid, 977 F.2d 1017, 1020-1021 (6th Cir. 1992); Koch v. Hutchinson, 847 F.2d 1436, 1442-43 (10th Cir. 1988) (en banc).

>Amendment, satisfaction of such a virtually necessary condition is not by itself sufficient to trigger constitutional constraints on governmental action. Instead, employee speech solicits the protection of the First Amendment only when it also results from the employee's decision to express his or her *personal* opinions - that is, those views he or she holds *as a citizen* and not as a public employee. The First Amendment, in short, does not protect public employees' routine and required speech on behalf of the government.

Id. at 1193 (O'Scannlain, J., specially concurring).

In Sparr v. Ward, 306 F.3d 589 (8th Cir. 2002), the plaintiff was an administrative assistant to the county assessor and the chief deputy assessor. In 2000, when the county assessor decided to retire and the chief deputy decided to run for his position, the plaintiff was offered the position of chief deputy, assuming that the current chief deputy was successful in his election campaign. The plaintiff decided to reject the offer and drafted a memorandum in which she set out her decision. She provided a copy of the memorandum to the county assessor and sought his advice about presenting it to the chief deputy. The assessor advised the plaintiff not to share a copy of the memorandum with the county personnel director. Despite the advice, the plaintiff provided copies of the memorandum to the personnel director as well as the chief deputy. The next day the county assessor, after learning that the memorandum had been shared with the personnel director, terminated the plaintiff.[3]

---

[3]/ The Eighth Circuit found that the context in which the plaintiff's speech occurred was relevant. Sparr, 306 F.3d at 595. It emphasized that the "internal nature" of the plaintiff's speech had to be considered. Id. In particular, the court noted that the plaintiff's statements "were entirely internal to the County Assessor's office." Id. It also noted that the plaintiff had presented no evidence suggesting her motivation for providing the memorandum to the personnel director was intended to bring the allegations of discrimination into the public eye. Id. Thus, the Sparr court concluded that the plaintiff was motivated by a concern that her decision not to support the deputy chief might adversely affect her employment. Although her concerns were entirely understandable, the court held that they belied her contention that she was motivated by a desire to speak out as a concerned citizen on matters of public concern. Id. at 595-96. See id.

20

The Eighth Circuit concluded that the content, form and context of the plaintiff's speech demonstrated that she was not speaking out as a private citizen on matters of public concern. Id. at 596. In particular, it noted that the memorandum had been only addressed to the county assessor, chief deputy and personnel director. The personnel director received a copy for placement in the plaintiff's personnel file. It was only the last paragraph of the memorandum that contained allegations of sexual harassment and mismanagement. Id. at 594-95. However, the Eighth Circuit concluded that the plaintiff was speaking out as an employee, not as a concerned citizen. Id. at 595. "Her memorandum to [the chief deputy assessor] was driven by her understandable self-interest in protecting her employment in the event [he] won the election - not by a desire to introduce matters of public concern into a public forum." Id. Thus the Sparr court held that as the plaintiff's speech was motivated "primarily by concerns over her employment, and not by her concern about matters of public concern," it was undeserving of First Amendment protection. Id.

In Morris v. Crow, 142 F.3d 1379 (11th Cir. 1998) (per curiam), the Eleventh Circuit applied the role or capacity focused analysis from Connick to a claim of retaliatory discharge asserted by a deputy sheriff based upon his statements in an accident report. The plaintiff alleged that his accident report was protected because he reported on a co-employee's policy violations and negligence that jeopardized public safety and subjected his employer to substantial liability. Id. at 1381. The Eleventh Circuit rejected the plaintiff's claim and affirmed the entry of summary judgment in favor of the sheriff and two other members of the sheriff's office. Id. at 1382-83. As part of its analysis, it recognized that the accident report was generated by the plaintiff pursuant to "his official and customary duties as an accident investigator" and that the

---

("primary purpose" of speech was to ensure that plaintiff "would keep her job."). See also Bausworth v. Hazelwood Sch. Dist., 986 F.2d 1197, 1198-99 (8th Cir. 1993).

21

plaintiff prepared the report "because that was his job." Id. at 1382. See id. (report generated "in the normal course of [plaintiff's] duties"). Moreover, the court recognized that there was nothing in the record to indicate that the plaintiff's purpose in writing the accident report was to bring to light any wrongdoing or to do any more than accurately report an accident in the course of his employment. Id. As part of its analysis, the Morris court commented on the nature of police reports:

> Police reports reflect information of general public interest and any information concerning police conduct and public safety could be considered to reach matters of public interest. The fact that such information may be of general interest to the public, however, does not alone make it of 'public concern' for First Amendment purposes.

Morris, 142 F.3d at 1381.[4]

In Schad, 415 F.3d 671, the plaintiff, a police officer, brought a civil rights claim against the city and police chief, alleging First Amendment retaliation. Specifically, he claimed that he was transferred to a less prestigious unit in retaliation for his protected speech concerning the location of a fugitive. The Seventh Circuit reversed the district court's denial of the defendant's motion for summary judgment, holding that the plaintiff's disclosure of a tip concerning the location of a fugitive to an officer in another unit was not protected speech on a matter of public concern. It recognized that although police protection and public safety are generally a matter of

---

[4]    See Elliott v. Blacksburg-Virginia Polytechnic Institute Sanitation Auth., 2005 WL 2675106, at **5-6 (W.D. Va. Oct. 20, 2005) (First Amendment did not protect speech because it was "overwhelmingly motivated by a grievance over his treatment in the workplace, and the issue of [defendant's] corrupt practices ...were only tangential issues."); Fagan v. City of Marco Island, 2005 WL 1667662, at **3-4 (M.D. Fla. July 15, 2005), aff'd, 148 Fed. Appx. 920 (11th Cir. 2005) (dismissing police officer's retaliation claim against chief of police, city and city manager where officer advised citizen on how to obtain copy of police report) ; Langlois v. City of Deerfield Beach, 370 F.Supp. 2d 1233, 1244-45 (S.D. Fla. 2005).

22

public concern, not all speech by police department employees is "upon matters of public concern" under the Connick analysis. 415 F.3d at 674-75. More specifically, it concluded:

> While speech addressing matters of police protection and public safety are matters of public concern, we have cautioned that if every facet of internal operations within a governmental agency were of public concern, and therefore any employee complaint or comment upon such matters constitutionally protected, no escape from judicial oversight of every government activity down to the smallest minutia would be possible.

415 F.3d at 675 (citation omitted).[5]

Finally, the Fourth Circuit's hypothetical in Urofsky is helpful in understanding the importance of the need to focus the analysis on the capacity of the speaker:

> suppose an assistant district attorney, at the District Attorney's direction, makes a formal statement to the press regarding an upcoming murder trial - a matter that is unquestionably of concern to the public. It cannot seriously be doubted that the assistant does not possess a First Amendment right to challenge his employer's instructions regarding the content of the statement. In contrast, when the same assistant district attorney writes a letter to the editor of the local newspaper to expose a pattern of prosecutorial malfeasance, the speech is entitled to constitutional protection because it is made in the employee's capacity as a private citizen and touches on matters of public concern.

216 F.3d at 407-08 (footnote omitted). Urofsky further explained that "restrictions on speech by public employees in their capacity as employees are analogous to restrictions on government-funded speech." Id. at 408 n.6. For example, in Rust v. Sullivan, 500 U.S. 173 (1991), the Court

---

[5]/ Rather than merely relying on the fact that the plaintiff's speech concerned the general topic of law enforcement, the Schad court concluded that that it had to "delve deeper into the precise content" to determine whether what was said on this topic was of public concern. 415 F.3d at 675. The dispositive point for the Schad court was the form of the plaintiff's speech. In particular, he had relied on a routine call to an officer in another unit. Id. at 676. The Seventh Circuit concluded that the form of the plaintiff's speech and his conduct supported the conclusion that the plaintiff did not speak as a citizen addressing a matter of public concern. Id. It believed that the plaintiff's choosing a form of speech routinely used for intra-office communications suggested that the plaintiff did not set out to speak as a citizen. Id. It also noted that the plaintiff's call was made as part of him doing his job. Id. See Gonzalez, 239 F.3d at 941.

23

rejected an argument that regulations prohibiting abortion counseling in a federally funded project violated the First Amendment rights of the staff of clinics accepting federal funds, reasoning that "[t]he employees' freedom of expression is limited during the time that they actually work for the project; but this limitation is a consequence of their decision to accept employment in a project, the scope of which is permissibly restricted by the funding authority." Rust, 500 U.S. at 199. "In both situations - public employee speech and government-funded speech - the government is entitled to control the content of the speech because it has, in a meaningful sense, 'purchased' the speech at issue through a grant of funding or payment of a salary." Urofsky, 216 F.3d at 408 n.6.

The case law outside the Second Circuit strongly supports the entry of judgment in favor of Chief Wearing. Tolnay's speech and the context of that speech resemble the situations in Sparr and Schad. Tolnay's speech made as part of his normal duties and his motivation was "his" future employment. The reasoning in the other decisions provides further foundations for the conclusion that Tolnay's speech was not protected.

### B. The Context Of The Plaintiff's Statements Demonstrates That It Was Not Protected Under The First Amendment

As discussed above, Connick "directs courts to examine the 'content, form, and context of a given statement, as revealed by the whole record' in assessing whether an employee's speech addresses a matter of public concern." City of San Diego v. Rowe, 125 S.Ct. 521, 525 (2004). Thus, "'manner, time, and place' in which the speech occurs is important in determining whether it is protected." Lewis, 165 F.3d at 162.

In addition to the content of Tolnay's speech, as analyzed above in detail and set forth above in the factual background section, the context, time, place and manner, within which Tolnay's speech occurred demonstrates that it is not protected under the First Amendment.

24

Tolnay did not bring anything to the public's attention. He did not testify that by placing anything in a report it would expose anything or bring anything to any official's attention. With regard to timing, it is telling that Tolnay made statements exclusively at moments when he perceived himself to be in a difficult employment situation. With regard to place, Tolnay was memorializing events in order to protect his employment. The place and manner of the communications are very limited and not intended to bring anything to light. Tolnay wrote the report and said what he did at the meeting in order to protect *himself* and his employment position from what he believed to be the consequences of the July 26 incident. This is a personal matter and does not fall under the protection of the First Amendment.

    C.    **An Application Of The Pickering Balancing Test Demonstrates That The Government's Interest In Maintaining Loyalty And Discipline Within The Police Department Outweighed Any Of The Plaintiff's Interests**

Even assuming arguendo that the Court holds that Tolnay's speech was protected, Chief Wearing is entitled to judgment as matter of law under the Pickering balancing test. In particular, his and the city government's interest in maintaining discipline and loyalty within the police department outweighed any interest held by Tolnay. Based on what Chief Wearing considered to be insubordination, any First Amendment rights held by Tolnay were secondary. A review of the governing case law confirms that it supports the entry of judgment in favor of Chief Wearing.

"[I]t has been established law for over 30 years, since the Supreme Court decided Pickering v. Board of Education, that 'the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" Melzer v. Board of Educ., 336 F.3d 185, 192 (2d Cir. 2003). "Thus, the government may impose restraints on the First Amendment

25

activities of its employees that are job-related even when such restraints would be unconstitutional if applied to the public at large." Id. Under what is called the Pickering balancing test, a court must consider the "'balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Melzer, 336 F.3d at 192. The balancing test allows the government a degree of control over its employees to permit it to provide services to the public efficiently and effectively. Id. at 192-93.

In Waters v. Churchill, 511 U.S. 661 (1994), the Court recognized that, in applying the balancing test, the extent of the injury caused by the employee's speech need not be actual; rather, the government's burden is just to show that the speech threatened to interfere with government operations. See id. at 673-74. See Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir. 1995). The Waters Court emphasized that greater deference must be given to the government when it acts as employer rather than as sovereign:

> [W]e have given *substantial weight* to government employers' *reasonable predictions of disruption, even when the speech involved is on a matter of public concern*, and even though when the government is acting as sovereign our review of legislative predicitions of harm is considerably less deferential.

511 U.S. at 673 (emphasis added).

The State has greater leeway to control employees' speech that threatens to undermine its ability to perform its legitimate functions. Lewis, 165 F.3d at 161. In engaging in the Pickering balancing test, a court "must consider whether the statement sought to be protected 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships…or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" Id. at 162. In making its showing the government "need

26

show only a *likely* interference with its operations, and not an *actual* disruption." Id. at 163 (emphasis in original).

In applying the Pickering balancing test, courts have recognized that, among governmental agencies, police departments should be accorded particular deference. "Police departments are quasi-military organizations; public safety depends upon good order and discipline." Kokkinis v. Ivkovich, 185 F. 3d 840, 846 (7th Cir. 1999). See Cygan v. Wisconsin Dep't of Corrections, 388 F.3d 1092, 1101 (7th Cir. 2004) (police departments are managed like military organizations and "respecting the authority of supervising officers is essential"); Williams v. Seniff, 342 F.3d 774, 784 (7th Cir. 2003) (in a police department "discipline and respect for the chain of command are critical to accomplishing the entity's mission of maintaining order and public safety."). Accordingly, in Kokkinis, the Seventh Circuit recognized the importance of a court's deference to an employer's judgments when the governmental employer is a law enforcement agency. Specifically, it recognized:

> Deference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement. '[T]here is a particularly urgent need for close teamwork among those involved in the "high stakes" field of law enforcement. Speech that might not interfere with work in an environment less dependent on order, discipline, and esprit de corps could be debilitating to a police force. Such considerations are permissible in weighing constitutional violations.'

185 F. 3d at 845. Kokkinis concluded that a police chief may take action to remedy disruption - both actual and potential - where a subordinate's statements in his presence and the presence of other co-workers created a "potential problem in maintaining authority and discipline within the department." 185 F. 3d at 846.[6]

---

[6]   The Seventh and Eighth Circuits are not alone in recognizing the importance of courts deferring to disciplinary decisions made by a police chief or police department in the context of

Similarly, Tyler v. City of Mountain Home, 72 F.3d 568-570 (8th Cir. 1995), is instructive on the special need for deference to employment decisions of those responsible for ensuring public safety:

> It has been recognized that a police department has a more significant interest than the typical government employer in regulating the speech activities of its employees in order 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence.'... Because police departments function as paramilitary organizations charged with maintaining public safety and order, they are given more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer.' ... The public safety employer's determinations of both the potential for disruption as a result of the speech, as well as the employer's response to the actual or perceived disruption, are *entitled to 'considerable judicial deference.'*

Tyler, 72 F.3d at 570 (emphasis added).

The Second Circuit has similarly accorded deference to the decisions of police departments. For example, in Heil v. Santoro, 147 F.3d 103 (2d Cir. 1998), then-District Judge Parker granted summary judgment finding that the potential disruption to departmental discipline outweighed the plaintiff's interest in pressing charges for unfair labor practice. Id. at 109. The Second Circuit affirmed. It concluded that the plaintiff was lawfully ordered to return to the meeting, was insubordinate in failing to comply with that order and was disciplined as being found guilty of insubordination. Id. at 110-11. It further noted that the plaintiff had presented no evidence to suggest that the Village would not ordinarily have disciplined a police officer for refusing to obey an explicit order from the Chief of Police to answer questions in a lawful

---

First Amendment retaliation cases. See Graham v. City of Mentor, 118 Fed.Appx. 27, 31 (6th Cir. 2004) ("police chief needs authority over and loyalty from his subordinates."); Lytle v. City of Haysville, 138 F.3d 857, 867 (10th Cir. 1998); Bradshaw v. Township of Middletown, 296 F.Supp.2d 526, 539 (D.N.J. 2003) ("a police department, as a law enforcement agency, has 'wide latitude to regulate an employee's speech when that speech impacts on areas such as discipline, morale, harmony, uniformity and trust in the ranks.'"), aff'd 145 Fed.Appx. 763 (3d Cir. 2005).

28

investigation. Id. at 111. Thus, the fact that the plaintiff had engaged in speech that arguably touched on a matter of public concern did not immunize him from discipline for his subsequent insubordination hindering the lawful investigation of his dissemination of confidential material. Id.

Here, as set forth above in detail in the background section, Chief Wearing testified about the importance of maintaining discipline within the police department and the threat that Tolnay's insubordination could injure the efficient functioning of the department. (See supra, Background, § II; 12/6/05 Tr. at 32-36) Under the governing case law, Chief Wearing's employment decision is entitled to substantial deference. Moreover, under Tolnay's theory, he could never be subject to discipline, criticism or supervision. Such a result would damage the efficiency of police departments and is inconsistent with the governing case law. Accordingly, under that case law, Chief Wearing is entitled to judgment as a matter of law.

## II. CHIEF WEARING IS ENTITLED TO QUALIFIED IMMUNITY

Even assuming arguendo that the Court does not agree with the foregoing arguments, Chief Wearing is entitled to judgment as a matter of law under the doctrine of qualified immunity.

### A. Qualified Immunity: Fundamental Principles

Qualified immunity is more than a simple defense - it is "an entitlement not to stand trial or face the other burdens of litigation, ... an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). See Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949) (L. Hand, C.J.). The question of qualified immunity can be decided as a matter of law by the court. Warren v. Dwyer, 906 F.2d 70, 76 (2d Cir. 1990).

29

In Saucier v. Katz, the Supreme Court recognized that the "requisites of a qualified immunity defense must be considered in proper sequence." 533 U.S. 194, 200 (2001). See Ehrlich v. Town of Glastonbury, 348 F.3d 48, 54-55 (2d Cir. 2003). That sequence requires consideration as a threshold matter the question of whether the official's conduct violated a constitutional right. Saucier, 533 U.S. at 201. "This must be the initial inquiry." Id. In setting forth the sequence approach to qualified immunity, the Supreme Court "speaks in mandatory terms -- lower courts *must* determine the violation before engaging in a qualified immunity analysis." Ehrlich, 348 F.3d at 55 (emphasis in original).

In determining whether the violation of a constitutional right has been alleged, the validity of the qualified immunity analysis "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. 635, 639 (1987). Thus, at the first stage of the inquiry, courts must not define the relevant constitutional right in overly general terms, less they strip the qualified immunity defense of all meaning. International Action Ctr. v. United States, 365 F.3d 20, 25 (D.C. Cir. 2004). For example, it does no good to allege that a public official violated the right to free speech, and then conclude that the right to free speech has been "clearly established" in this country since 1791. Id. Instead courts must define the right "to a degree that would allow officials reasonably to anticipate when their conduct may give rise to liability for damages." Id.

If a violation is established, "the next, sequential step is to ask whether the right was clearly established." Saucier, 533 U.S. at 201. The Second Circuit recently described the process of determining whether a right was "clearly established" in Huminski v. Corsones, 396 F.3d 53, 87-89 (2d Cir. 2005). In that case, the court recognized that a right is "clearly established" if its "'contours...[are] sufficiently clear that a reasonable official would understand

30