UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ARPAD TOLNAY | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil No.  3:02CV1514 (EBB) |
| V. | : | |
| | : | |
| MELVIN WEARING | : | |
| | : | March 20 , 2006 |
| Defendant. | | |

**PLAINTIFF'S OBJECTION AND MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

I.    **THE FACTS AS FOUND BY THE JURY.**

Based on the allegations, the trial evidence and the verdict form the jurors can be said to

have the following facts.  At the time of the events complained of, Arpad Tolnay was a New

Haven police officer with an excellent record.  He is married with two young daughters, his wife a

part-time hairdresser.  Tolnay graduated from local schools, served in the United States Army, in

its mechanized infantry, and thereafter continued to serve the country for ten years in the Reserves

as a military police officer.  Free of any controversy or disciplinary problems, Tolnay was

honorably discharged, thereafter served in several jobs and then pursued his dream of becoming a

police officer as a permanent occupation.  He joined the New Haven Police Department

("NHPD") in December of 1998.  Tr. Vol. 2 at pp. 62-68.[1]  From the date he joined the NHPD

---

[1] The trial transcripts  have been submitted along with defendants' moving papers and are otherwise
in the record set forth by designated volumes for each day of proceeding.  Citations to the record

until the summer of 2002 when the events which led to this action took place, Tolnay had never

been involved in any controversy or scandal, had never engaged in conduct which brought

embarrassment or disrepute to the department; nor was he the subject of disciplinary action. Id. at

pp. 68-69. Tolnay later was assigned to patrol in New Haven's "Fair Haven section", a large

district populated mainly Hispanics. Tolnay was exposed to the area as a result of plainclothes

duty in a narcotics unit and work with the DEA on a federal narcotics task force handling many

investigations originating from the Fair Haven section.. Tolnay enjoyed the assignment as it was

his favorite district in the city. He came to know the district well and its residents and culture.

Tolnay himself is Hispanic and fluent in both English and Spanish which served him well in the

assignment. Id. at pp. 70-72. He distinguished himself in the assignment and was the recipient of

letters of commendation and recommendations for awards. He also received commendatory

letters from residents and his supervisors were always pleased with his work. Id. at p. 72.

The NHPD is a large department with approximately 480 law enforcement officers. Id. at

p. 73. Police Chief Melvin Wearing was a political appointee of the Mayor, who, under the city

charter, has the sole power of political appointment of the city's police chief. Mayor John

DeStefano has been in office some 14 years, must run for re-election every two years and for a

_____

herein are by designation to the volume and pages of such volume as: "Vol. ____ at pp. ____". All
exhibits will be referred to herein as "Exh. ____." and will denote a plaintiff's exhibit unless
otherwise stated.

long time has enjoyed the political support of Armando Hernandez and Daniel Rodriguez, two Hispanic ministers who lead large evangelical congregations in the city. Hernandez in particular is a valuable political supporter of the Mayor, was part of a group of ministers who endorsed the Mayor at public press conferences and whose leadership of the large congregation of the Second Star of Jacob Church in the Fair Haven district makes him an influential leader of a valued voting bloc. Rodriguez is a colleague of Hernandez who is also politically valued by the Mayor and who, according to Wearing, has a criminal arrest history.

On July 26, 2002, the NHPD received repeated calls from residents in the area of Hernandez's church which is located in a residential neighborhood; residents were disturbed by loud music coming from the church. Responding officers, Tolnay not among them, arrived to find a large group of people involved in an outdoor service in a parking lot using concert-sized speakers blaring excessively loud music. Those present were told to bring the service inside and to lower the volume; the incident was considered resolved. In reality, the congregants and their leaders, although they moved inside, still positioned the amplifiers in open windows such that the music was projected outward which led to additional complaints by neighbors. Tolnay was dispatched and while in his vehicle four blocks away could hear very loud music despite the fact that the air conditioning was on in his patrol car and the windows were closed completely. Id. at pp. 82-83. Upon arrival at the church, the music was deafening and the concert-sized speakers were on stands rising above Tolnay's height of 6' 2". Officer Jamie Abate arrived as back-up. Id.

3

at pp. 83-85.  Tolnay and Abate thereafter experienced the unexpected in confronting the Rev. Armando Hernandez.  Rather than cooperate and comply with the officers' request for a lowering of the volume, Hernandez flatly refused, became loud and belligerent and engaged in theatrics, insisting that officers handcuff and arrest him. Hernandez's conduct led to the exit and gathering of churchgoers.  The crowd was hostile and unruly and, incited by Hernandez, screamed at and converged on the officers and surrounded their patrol vehicles,  invading the officers' "safety zone".  While Tolnay was removing  Hernandez to another location for safety reasons, one Sgt. Hoffman, summoned by Tolnay, arrived.  At this point, Daniel Rodriguez roared up to the curb in a van, jumped out and interfered with the officers, engaging in similar theatrics as Hernandez, insisting that he be arrested as well.  He was arrested after refusing repeated demands to desist and after he chest bumped Sgt. Hoffman who made the decision to arrest Rodriquez.  Throughout the incident, the officers heard individuals in the crowd shouting profanity and abuse, including comments suggesting they believed they enjoyed a privileged status with the Mayor.  Among the comments were, " You don't know who you're dealing with", "we're going to call the Mayor", and "the Mayor will be out her in five minutes."  Others hurled verbal abuse at the officers and still others made vulgar gestures, including giving the officers "the finger".  One individual, perceiving Tolnay as White, subjected Tolnay to the worst vulgarity ("Fuck you, white officer") Id pp. 93, 99-100;  Exhs. 1, 2.

Immediate and prominent media attention to the arrests ensued.  Exh. 3.  As early as July

4

31, 2002, Hispanic leaders and Fair Haven aldermen were demanding an apology from city officials. Tolnay became the central figure in a political firestorm and a punching bag for those who had clout with the Mayor and those who viewed it in their interest to indulge his political needs. The ministers commenced organizing a protest march on the police station[2]. Wishing to maintain the good graces of the arrestees and the members of their respective flocks, the Mayor planned a public apology to them. In furtherance of the Mayor's political interests in this regard, Wearing, only six days after the arrests and after conferring with the Mayor, made a surprise appearance in New Haven Superior Court and exercised political muscle on the chief prosecutor in an effort to get the charges dismissed. The prosecutor, David Newman, quickly acceded and effected an immediate dismissal of all charges against Hernandez and Rodriquez long before the men were due to appear in court. Both Wearing and Newman denied this account but Sheri Murowski, Newman's secretary, confirmed the event as aforedescribed and noted that the manner of Newman's disposition was unprecedented and the incident gave rise to shock and consternation among courthouse staff. Jurors obviously determined that Wearing lied when he denied having pressed Newman for a dismissal.

The exercise of political influence in getting the charges dropped was timed to coincide

---

[2]The ministers led some 1,000 people in a protest march through the streets toward the police station at One Union Avenue. Wearing and the Mayor allowed this march, which disrupted business and downtown traffic , without requiring the ministers to undergo the permit process with which everyone else is required to comply.

with the Mayor's appearance at the Second Star of Jacob Church to enable him to announce the dismissal of the charges, take credit for it and ingratiate himself with the crowd. The Mayor's conduct ignited another firestorm of controversy and a huge front-page headline and article in the New Haven Register recounting DeStefano's public apology and the reaction of officers as voiced by their union President that the Mayor had "sold out" his own officers for political gain. Exhs. 6, 7. Despite the Mayor's apology, the mass march took place and prominent press attention came with it, including to Tolnay's embarrassment and humiliation, an account by the New Haven Register of a city official soliciting Hernandez' opinion at the protest on the matter of discipline to be imposed on Tolnay

Amid these events, on August 3, 2002, Tolnay was on patrol, accompanied by Officer Walesta Bermudez, when they observed an individual recklessly driving a topless Jeep with children hanging off of the roll-bar. Bermudez told Tolnay to pull the driver over. Upon approach, Tolnay discovered the driver was none other than Daniel Rodriguez. Given the political firestorm which had ensued over the July 26th incident, Tolnay feared taking action against Rodriguez and allowed him to go on his way, especially since Rodriguez was using the children hanging off of the roll-bars to distribute fliers announcing the planned protest of Tolnay's earlier actions. In connection with this incident, Tolnay immediately advised his supervisor and this in turn resulted in an order being barked over the radio (for all including civilians to hear) by Captain Francisco Ortiz who criticized Tolnay and ordered him to stay away from Rodriguez and

Hernandez. Ortiz, who had close ties to Hernandez, Rodriguez and the Hispanic community, and who aspired to succeed Wearing as Chief, was thus viewed by Tolnay as improperly interfering with officers' ability to discharge their duty. Tolnay accordingly drafted a report recounting the incident with Rodriguez, stated his opinion that he was unable to discharge his duty due to the political influence and connections of Rodriguez and further added that his feelings in this regard were confirmed by the oral order issued by Ortiz. Tolnay repeated, at the close of his report, his view that he felt hampered in his duties due to the political involvement of Rodriguez. Exh. 4. Rodriquez' political clout gave him direct access to Ortiz, who, as head of patrol, held a high place in the NHPD hierarchy and reported directly to Wearing. Rodriguez complained about the motor vehicle stop.

In furtherance of his own personal and political self-interest, Captain Ortiz personally visited Rodriguez' home and collaborated with Rodriguez in the lodging of a "civilian complaint" against Tolnay in connection with the motor vehicle stop. Although the incident was, by itself, of little import, Rodriguez' status of a valued political ally of the Mayor transformed the incident into one of political magnitude. After demanding reports of all officers involved or with knowledge of the MV stop, Ortiz forwarded to Wearing a memorandum which contained a variety of lies and false allegations against Officers Tolnay, Bermudez and Colon. Rodriguez, spurred by Ortiz, concocted a host of allegations of rude and insensitive conduct on the part of the officers. Those allegations turned out to be patently false.

7

Ortiz, by his own account was "very disturbed" by the content of Tolnay's Case Incident Report, in particular Tolnay's opinion that he cannot perform his duties due to the political influence of Rodriguez. Ortiz considered such an opinion "unacceptable" and Tolnay's other like comments "inappropriate" and indicated that unspecified action will be taken against Tolnay upon his return from vacation. Exh. 16. Upon receipt of Ortiz' memorandum, Wearing to punish and retaliate against Wearing for having raised the issue of political corruption within the department. In the wake of Ortiz' memo, Wearing thus summoned Tolnay to his office.

Since the July 26, 2002 arrests of the ministers was entirely lawful (and in fact effected by a supervisor of Tolnay and Abate) Wearing knew that he could not, with any pretense of legitimacy, take action against Tolnay on account of the arrest. Rather, Wearing orchestrated a meeting with Tolnay with the aim of concocting another pretext under which he could retaliate against Tolnay for his expressed opinions and chill him and others from engaging in any further expression on the matter of the Mayor's and the Chief's political interference with law enforcement. Thus, at an August 13, 2002 meeting, Wearing, who had not bothered to read any of the officers' reports respecting both incidents, proceeded to bully and attempt to bait Tolnay into admitting that he had done something wrong. Tolnay resisted the baiting and defended his conduct in all respects and the more he did so, the angrier Wearing became. Throughout the meeting, Wearing was accusatory and persistently interrupted Tolnay as he tried to answer the Chief's questions. Wearing became particularly incensed when Tolnay repeated his opinion that

8

the conduct of Captain Ortiz was inappropriate and that the meeting and the controversy were the result of politics. Although Jamie Abate was in the meeting, Wearing for the most part ignored her and focused on Tolnay who was the target of the intended retaliation. Incensed at Tolnay's opinion that Ortiz' conduct was inappropriate and unprofessional, and Tolnay's comment about the political character of the meeting, Wearing, a tall and large man, jumped to his feet, thrust his finger in Tolnay's face and hurled a series of abusive comments at Tolnay. Tolnay stated he wished to speak to an attorney and got up to leave at which point Lieutenant Leo Bombalicki, a Union representative, told Tolnay to go out in the hallway and wait for him as he spoke to Wearing. Jamie Abate followed Tolnay out into the hallway. Wearing immediately ordered another meeting to be scheduled with Tolnay. Vol.I, pp. 229-244; Vol. IV, pp.132-147 (testimony of Leo Bombalicki); Vol. 5, pp. 121-126 (testimony of Jamie Abate Sanchez) NHPD Human Resources Manager Scott Nabel, also present at the meeting[3], confirmed under cross-examination that Wearing became most agitated at the point at which Tolnay expressed his opinion about Ortiz. Vol. V, p.195. On August 14, 2002, Wearing ordered Tolnay to his office again for a "continuation of our discussion" regarding the Rodriguez MV stop and Tolnay's conduct during the meeting the day before. Upon arrival in the chief's office, however, there was no discussion

---

[3] Nabel authored for the Chief all disciplinary memoranda and his presence at the meeting along with a union representative clearly foretold Wearing's intent to use the meeting as a basis to discipline Tolnay.

9

as before anyone said anything, Wearing suspended Tolnay from his employment for a period of ten days (effectively 15 days) on a variety of concocted charges, all of which boiled down to an allegation of insubordination and disrespect toward the Chief.  Exhs. 17 and 18.  In a further retaliatory act, Wearing ordered Tolnay to one of the most undesirable duties in the NHPD, desk duty in a dank and windowless detention area where Tolnay was relegated to fingerprint and other booking duties.  Wearing also humiliated Tolnay by ordering him to submit to "diversity" or "sensitivity" training, the implication being that Tolnay harbored some sort of ethnic hostility or insensitivity toward New Haven's Hispanic community.  Since Tolnay is himself Hispanic, the order to undergo such training was a personal wound and served to besmirch his character. Tolnay was left to languish in the detention center for some seven months and the reassignment itself signaled to the entire department that Tolnay had displeased the administration.

Tolnay, who before all this had been a conscientious officer with a good record and superb reputation in the community, and proud of it, was extremely embarrassed by these events and all of  media attention to it.  News of Tolnay's suspension and reassignment also was the subject of newspaper attention.  Tolnay's wife and daughters were also exposed to the media attention.

In publicly apologizing to the congregation of the Second Star of Jacob Church, Mayor DeStefano had given no forethought to the effect his conduct would have on morale in the NHPD. Nor did he consider the fact that among the crowd of people to whom he was apologizing were those who had engaged in near mob violence against city officers and otherwise placed them in

10

fear for their safety.  Nor did the Mayor consider whether his apology would serve not only to

exonerate  but encourage those who wished to engage in such conduct toward officers in the

future.  Finally, the Mayor gave no thought to whether, in light of the unconditional dismissal of

the criminal charges he was by his conduct exposing Tolnay and his colleagues to a civil suit for

false arrest and putting himself in the position of having his apology used as evidence  in

furtherance of any such claims.

   Officer Jamie Abate (now Sanchez) confirmed Tolnay's account of events and his and

Bombalicki's account of the office meeting with Wearing.  In terms of the effect of Wearing's

misconduct, Officer Sanchez recounted a subsequent incident in which she received a bizarre

order from her supervisor to travel to a business location in the Fair Haven district and "retrieve

something" from a man who will meet her there.  As it turned out, the nephew of Daniel

Rodriguez had been arrested for interfering with a police officer, a class A criminal misdemeanor.

He evidently had complained to his uncle who in turn once again used his political clout with city

officials to influence the outcome.  In particular, Rodriguez had directly telephoned and called

upon Captain Ortiz to intercede. Sanchez arrived at the Grand Avenue location, she was met by

Daniel Rodriquez who, possessed of the arrest summons issued to his nephew, tore it up into little

pieces and thrust it at Sanchez stating, "Here, I don't need this".  Sanchez was shocked. Vol. V,

pp. 128-130.

   Sanchez was asked to testify regarding the impact retaliation against Tolnay has had on

11

her as a law enforcement officer.  Sanchez told the jurors that if she were in the future faced with a situation where she was duty-bound to arrest,  for example, Daniel Rodriquez, she is not confident that she would proceed to enforce the law and make an arrest.  She confessed that she might hesitate because she does not wish to experience what Arpad Tolnay endured as a consequence of his enforcement action against the Mayor's political supporters. Id. p.131.  The disciplinary and other actions taken by Wearing against Tolnay were in stark contrast, and known as such, to Wearing's established approach to discipline - a rather disgraceful history as Wearing has tolerated (and apparently had no problem with) the worst type of conduct by NHPD officers, including criminal activity, disorderly conduct resulting in criminal arrest, drug dealing, disrespect and insubordination toward superiors, wife-beating, telling one's supervisor to "shove it up his drunk ass", dereliction of duty,  disruptive temper tantrums in public areas of the department, vulgar and offensive conduct toward other officers on account of their ethnicity, sleeping while on duty, sleeping while assigned to protect a terrorist target location during a state of national alert (placing the public at risk), threatening supervisors with physical violence and, last but not least, public urination. See Exhs. 19-35.

The jury found that Wearing not only retaliated against Tolnay for the exercise of first amendment rights but found that Wearing did so intentionally and with malice.

## II.    **PROCEDURAL BACKGROUND**

On September 2, 2003, the defendant filed a motion for summary judgment accompanied by a supporting memorandum of law (Dkt.## 12, 13).  By those moving papers, defendant argued in the first instance that plaintiff's speech and expression regarding the improper, politically-based interference by a city official with neutral law enforcement was unprotected by the First Amendment. In the alternative, defendant posited that even if he were found to have maliciously retaliated against plaintiff on account of such protected speech, he was nevertheless entitled to qualified immunity from liability for the consequent harm suffered by Officer Tolnay.  The plaintiff submitted opposition papers including an extensive memorandum of law.  On March 9, 2005, the court issued a 52-page ruling denying defendant's motion for summary judgment in its entirety.  (Dkt. # 29)

The matter proceeded to trial before a jury of eight, commencing on December 1, 2005 and concluding on December 12, 2005 when the jury returned a verdict in favor of Officer Tolnay.. Judgment thereafter entered in accordance with the verdict on December 14, 2005.  By the verdict form, the juries indicated their rejection of defendant's claim that he took adverse action against Officer Tolnay for the sole and legitimate reason that Tolnay had engaged in insubordinate and disrespectful conduct toward the Chief.  Rejecting Wearing's stated justification for the adverse actions as a pretext for what was in reality retaliation for plaintiff's expression of opinion regarding political influence-peddling resulting in political patrons and supporters being relieved from

13

obedience to state laws and city ordinances.  Jurors found that in truth plaintiff would not have been

disciplined on alleged charges of disrespect and insubordination in the absence of his protected

speech.  Jurors also found that Chief Wearing acted with malice and/or in reckless disregard of

Officer Tolnay's civil and constitutional rights.

On December 7, 2005, upon the close of the plaintiff's case-in-chief, defendant, through his

counsel, advanced and argued a motion for judgment as a matter of law pursuant to Rule 50 of the

Federal Rules of Civil Procedure.  The motion was terse, to say the least, and consisted of a series of

skeletal, conclusory statements, unaccompanied by specific references to the trial record and devoid

of a single citation to legal authority.  Defense counsel argued as follows:

> Your Honor, at this time, pursuant to Rule 50, we move for judgment as a
> matter of law on the following grounds:
>
> First, that the plaintiff did not engage in any protected speech.  He did not
> speak out on any matters of public concern.  Rather, we believe that the
> evidence shows that he spoke on matters which were of personal interest to
> him.
>
> Second, we believe that the evidence also shows that the plaintiff was
> suspended because of his insubordinate conduct, and not because of any
> alleged protected speech.
>
> Third, we believe that the evidence shows that the Defendant's interests in
> maintaining the discipline in the department outweighs the plaintiff's First
> Amendment rights concerning any protected speech.
>
> Fourth, we believe that the evidence shows that the defendant would have
> suspended the plaintiff even in the absence of any alleged protected speech.

14

> Finally, we believe that the evidence shows that the defendant is entitled to qualified immunity as a reasonable employer. In the position of the defendant, we would believe that the plaintiff did not engage in protected speech. And that a reasonable employer, in the shoes of the defendant, we would believe that he could suspend the plaintiff based on his conduct, which occurred at the August 13, 2002 meeting.
>
> And we believe that the evidence would not support a reasonable jury's finding in favor of the plaintiff on his claims.

Tr. 12/7/05 at pp. 141-42.

In response to this wholly insufficient Rule 50 motion, plaintiff's counsel advised the court that the motion, devoid of content, and consisting of but a series of conclusory statements, could give rise to no more than simple denials in response. Tr. 12/7 at pp. 142-43. Defense counsel thereafter purported to make an effort to reinitiate a Rule 50 motion with more particularity, arguing that the several instances of plaintiff's expressions were not on a matter of public concern and were therefore unprotected. Other than making a generalized reference to defendants' "jury charges" and "the law which was submitted in [defendant's] prior motion for summary judgment", defense counsel neither cited nor discussed any authority, much less applied any such authority to the actual trial testimony and documentary evidence. In closing his comments, defense counsel also urged a grant of qualified immunity based on his belief that "it was reasonable for Chief Wearing to believe that he could suspend the plaintiff based on [the conduct in the meeting] without violating [Tolnay's] First Amendment right." Counsel furthered that "a jury would find and must find that the plaintiff would have been suspended absent any alleged political speech. And that's about it Your Honor". Id. at

15

146.

The court thereafter properly noted that the issue of First Amendment protection of plaintiff's speech had already been addressed in the court's ruling on defendant's motion for summary judgment.  The court further stated its belief that the other arguments advanced by counsel all involved questions of facts for a jury to decide, including, but not limited to, the issue of whether it were true as defendant claimed, that h would have taken punitive action against the plaintiff even in the absence of the protected speech.[4]

## III.   ARGUMENT

### A.   DEFENDANT'S POST-JUDGMENT MOTION FOR JUDGMENT AS A MATTER OF LAW MUST BE CONSTRUED AS A RENEWAL OF HIS RULE 50 MOTION ADVANCED AT TRIAL WITH THE COURT'S CONSIDERATION LIMITED TO THOSE CLAIMS AND ARGUMENT ADVANCED AT TRIAL.

Under Rule 50(a) a JMOL  must be made prior to the submission of the case to the jury.  The Rule requires a party to "specify the judgment sought and the laws and the facts on which the moving party is entitled to the judgment."  Id.  Rule 50(b) allows for a renewal of the motion after an unfavorable verdict but "[t]he post-trial motion is limited to those grounds that were specifically

---

[4]Or put another way, whether the defendant in truth suspended the plaintiff for insubordinate or disrespectful conduct or whether, as plaintiff claims, such was defendant's "cover story" for what was in reality the intent to punish plaintiff for raising the issue of corruption and to chill the plaintiff from making any other statements regarding it.  As is shown herein, this is a distinction which defendant to this day fails to acknowledge.

16

raised in the prior motion for [JMOL]." <u>Galdieri-Ambrosini v. Nat'l Realty and Development Corp.</u>, 136 F.3d 276, 286 (2d Cir. 1998) (internal quotations and citations omitted). <u>Id.</u> The requirement that the movant articulate grounds for the motion with specificity is obligatory as the movant must "give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury." <u>Id.</u> This was not the first time that the Second Circuit cautioned parties that they must comply with the rule. <u>See</u>, <u>e.g.</u>, <u>Holmes v. United States</u>, 85 F.3d 956 (2d Cir. 1996) (JMOL motion may not be made for the first time post-trial); <u>McCardle v. Haddad</u>, 131 F.3d 43, 51 (2d Cir. 1997) (The defendant was obligated to advance his JMOL with "sufficient particularity" to inform the court and the plaintiff of the grounds on which he relied).

Defendant filed a 40-page memorandum of law in support of his "Motion For Judgment As A Matter Of Law." As the foregoing authority establishes, however, the rules do not permit a post-judgment filing of a Rule 50 motion for judgment as a matter of law. Rule 50 (b) merely allows a party to renew a motion advanced pursuant to Rule 50 (a) prior to the submission of the case to the jury. Clearly, the rule, and the cases arising under the rule, are designed to prohibit parties ambushing their opponents in the court with a host of claims, arguments and law which, for whatever reason, they failed to articulate with particularity at trial. Perhaps this can be explained by the fact that the author of defendant's brief is an attorney who heretofore had nothing to do with this case.[5] While it

---

[5] The post-judgment was authored by Attorney Ralph W. Johnson III whose post-judgment appearance in this case is recent.

17

is easy for new counsel to pick apart the trial evidence and now litter the record with a host of case

citations, it was incumbent upon the defendant at trial to advance, with particularity, the <u>laws</u> and the

<u>facts</u> on which the purported entitlement to judgment is based.  Among other reasons, one of the

requirements for particularity, as the Second Circuit observed back in 1998, is to allow the other

party, in this instance Tolnay, an opportunity to cure any defects in proof.  See Galdieri-Ambrosini,

supra at 286.  Although defendant has mistitled his motion (as it is a renewed motion), it remains that

the court's consideration of the motion is strictly limited to the facts and law advanced by defendant

in support of his Rule 50 trial motion.  The court is not obligated to entertain, ingest, or analyze 40

pages of factual and legal citations presented for the first time post-judgment.  The Second Circuit

has made it clear that this type of "terse presentation" of a JMOL during trial does not suffice to call

for a court's review of the merits of such a motion.  McCardle v. Haddad, 131 F.3d at 50.

In particular, in respect to defendant's time-of-trial claim to qualified immunity, defense

counsel's articulation of the basis of that claim is terse to say the least.  It consisted initially of the

following unhelpful statement:

> Finally, we believe that the evidence shows that the defendant is
> entitled to qualified immunity as a reasonable employer.  In the
> position of the defendant, we would believe that the plaintiff did not
> engage in protected speech.  And that a reasonable employer, in the
> shoes of the defendant, we would believe that he could suspend the
> plaintiff based on his conduct, which occurred at the August 13, 2002
> meeting.

12/7/05 Tr. at p. 141.

18

Counsel's statement advised the court and counsel of nothing.  Moreover, as he did before during the summary judgment process, defendant based his claim of immunity solely on his underlying claim that the speech was unprotected as a matter of law.  He did not, pretrial or during the trial, separate the two.  Once again, defendant's persistent failing in this regard stems from his refusal or inability to acknowledge that the First Amendment claim was not predicated on plaintiff's allegedly "disrespectful" or "insubordinate" conduct toward defendant but was based on his expressions of opinion (as set forth both in his case-incident report and during his meeting with the Chief) regarding favorable treatment accorded to political supporters of the Mayor and those with connections to City Hall.  At no time during his trial motion, did defense counsel even touch upon this issue much less articulate it and argue it with the type of particularity that is required.  Defense persisted in framing the qualified immunity issue (without any citation to law) as centering on solely on the question of the applicability of immunity to discipline for conduct <u>unrelated to</u> the protected First Amendment expression.

By way of the "law" which defense counsel was to articulate under Rule 50 (a), counsel neither mentioned nor discussed any law.  Indeed, only after plaintiff's counsel cited her inability to respond in substance given the wholly insufficient presentation, did defense counsel purport to address this failing.  But all defense counsel did was refer the court and counsel to the "law" submitted in defendant's prior motion for summary judgment and in the "jury charges".  What did he expect the court and plaintiff's counsel to do?  Take a recess to read these documents to determine

19

which cases the defendant was relying on and how they applied to the facts and evidence at trial?

Moreover, to the extent defense counsel expected the court and counsel to peruse his motion for summary judgment for enlightenment, defendant's memorandum of law in support of his motion for summary judgment was equally skeletal, terse and conclusory.  As the court noted in its ruling denying summary judgment:

> Defendant ignores plaintiff's allegations in full, basing his entire claim to qualified immunity on the solitary August 13 meeting.  He enigmatically argues that qualified immunity is available to him because: 'the myriad factors involved in this cause of action surely could not put a Chief of Police, who is the head of a paramilitary organization and is entitled to latitude as to the manner in which he/she disciplines employees, on notice that he/she is clearly violating the law through disciplinary actions.'  Defendant seemingly fails to realize that the present 'cause of action' is a First Amendment retaliation claim, wherein Tolnay alleges the discipline opposed against him was motivated by Wearing's retaliatory desire to put an end to any charges or 'speculations' (as put by Wearing) of politically-based law enforcement in New Haven.  Thus, Wearing's argument betrays a fundamental misconception of the application of the qualified immunity doctrine to constitutional claims for which intent is an element.

Ruling on Motion for Summary Judgment (Dkt. # at p. 49).[6]

The extent to which either the plaintiff or the court is now required to consider and analyze

_____

[6]Indeed, the court noted that in his moving papers, defendant relied heavily, and indeed almost exclusively on the case of <u>Heil v. Santoro</u>, 147 F.3d 103 (2nd Cir. 1998) in support of his argument for qualified immunity.  This court stated that it was "non-plussed by this reliance" because <u>Heil v. Santoro</u> was not a qualified immunity case nor was the doctrine of immunity even referenced in the opinion.

defendant's 40-page legal tome on the issue is a matter for the court in the end to decide but plaintiff submits that it really does not much matter as, for the reasons set forth below, defendant's post-verdict attempt for the first time to articulate the legal and factual bases for a grant of qualified immunity (and for a withdrawal of First Amendment protection for plaintiff's speech) is still, as before, entirely without merit.

**B.    DEFENDANT'S CLAIM THAT THE PLAINTIFF'S SPEECH WAS NOT PROTECTED BY THE FIRST AMENDMENT IS FRIVOLOUS AS IS DEFENDANT'S CLAIM OF ENTITLEMENT TO QUALIFIED IMMUNITY FOR WELL-ESTABLISHED AUTHORITY SUPPORTS THE COURT'S DETERMINATION THAT THE SPEECH WAS ON A MATTER OF PUBLIC CONCERN AND WAS THUS FULLY PROTECTED AND THAT AN ESTABLISHED INTENT TO RETALIATE FOR SUCH SPEECH PRECLUDES A GRANT OF QUALIFIED IMMUNITY.**

Defendant's arguments with respect to the issue whether plaintiff's speech was protected was not articulated at trial.  Defendant's renewed Rule 50 motion, however, is nothing but an expanded version of claims and arguments recycled from defendant's earlier unsuccessful motion for summary judgment.  The court has already considered, analyzed and rejected all of the arguments defendant now advances post-trial.  Defendant has provided no basis for the court to revisit that decision except upon a misrepresentation of the evidentiary trial record.  Defendant recycles his claim, advanced in his motion for summary judgment, that Tolnay's statements in his case/incident report concerning the ministers' arrests and his statements to Wearing during his meeting with the Chief were not on a matter of public concern and were motivated by an otherwise related merely to matters personal

21

interest.  See Def.'s Brief at pp. 8-24.  Among other arguments, defendant asserts that plaintiff's statements in his case/incident report were akin to a "CYA" memo and were otherwise nothing more than the type of report that is regularly filed as part of his job.  Id. at pp. 12, 16.  Elsewhere, defendant argues that plaintiff's speech is stripped of First Amendment protection because it was expressed internally within the walls of the NHPD.  Defendant notes that Tolnay did not turn over his case/incident reports to the New Haven Register nor did he provide copies to any news station.  Defendant further notes that Tolnay made no public statements nor ask for permission to speak with the media.  Id. at p.2.  Defendant, citing Ceballos v. Garcetti, 361 F.3d 1168, 1193 (9th Cir.), cert. granted 125 S.Ct. 1395 (2005) argues that Tolnay's speech was unprotected because the First Amendment "does not protect public employees' routine and required speech on behalf of the government".  Any such argument is wholly inapplicable to this case, however, for it is uncontested that, as the jurors found, Tolnay incurred the wrath of Captain Ortiz and Chief Wearing by including his comments about political interference in his case/incident report precisely because neither man thought such comments belonged in there.  In fact, Ortiz' own memorandum, upon which Wearing instigated the meeting with Tolnay, took umbrage with the propriety of Tolnay's inclusion in his case/incident report of comments regarding political interference.  In particular, Ortiz wrote:

> **This officer's written report is unacceptable and his comments are inappropriate and have no relevance to the initial motor vehicle stop.**

Plaintiff's Exh. 16 (August 8, 2002 memorandum from Captain Ortiz to defendant Wearing.

Defendant claims that Tolnay's speech, in both instances, was unprotected because Tolnay was motivated by his personal interest in protecting himself. First, even if that were true, as the Hon. Janet C. Hall has noted, the existence of a second, personal, motive does not render speech unprotected, so long as the speech was also of public concern. See Russo v. City of Hartford, 341 F.Supp. 2d 85, 97-98 (D. Conn. 2004). Moreover, defendant's claim that plaintiff's speech was motivated purely by personal interest is based on defendant's self-serving cherry-picking of trial testimony. While defendant quotes testimony from Tolnay regarding the reasons why he included the subject comments in his case/incident reports and why he made the subject comments to the Chief in the meeting of August 13, 2002, see Def.'s Br. at pp. 2-3, defendant omits entirely the additional testimony Tolnay gave respecting his motivations. Notably, against the repeated objections of defense counsel, Tolnay testified that in forming and expressing his beliefs at set forth in the case incident reports, he was not only concerned about his own ability to enforce the law in New Haven but concerned about the ability of other officers to do so. Tr., Vol. II at pp. 204-206.[7]

The fact that Officer Tolnay did not communicate his comments and beliefs to the public or the press but expressed them internally in his reports and in his meeting with the Chief does not strip the expression of First Amendment protection. See Givhan v. Western Consolidated School District,

---

[7]Incredibly, defense counsel objected to Tolnay's testimony regarding his thoughts and motivations on the grounds of "hearsay." Indeed, the trial record, see Vol. II at pp. 208-213, shows defense counsel vigorously resisting the introduction of any evidence on this very point.

99 S.Ct. 693 (1979) (employee speech need not be "public" to be accorded first amendment protection); see also Dill v. City of Edmond, 155 F.3d 1193 (10th Cir.1998)(officer's internal memo to police chief stating he was aware of exculpatory evidence respecting department's prime suspect in murder case where investigators appeared bent on pursuing suspect was protected by the first amendment). Thus the fact that Officer Tolnay chose a private forum within the police department is of no consequence. See also Conaway v. Smith, 853 F.2d 789, 797 (10th Cir. 1988). "[P]olice officers have the same rights that other citizens have to reveal or bring forward information of general importance despite any contrary desire by their superiors". They are not "gagged by loyalty to the chain-of-command concept". Oladeinde v. City of Burmingham, 118 F. Supp. 2d 1185, (N. D. Ala. 1998). It is likewise immaterial that plaintiff's case incident reports, particularly the one involved in the Rodriguez motor vehicle stop, were made in the course of his duties as a police officer for at least a portion of the report was clearly designed to address an issue of perceived of improprieties on the part of superiors. See Dill v. City of Edmond, supra at 1202 ("Plaintiff's speech concerned possible wrongdoing by the police officers investigating the . . . homicides"); cf. Koch v. The City of Hutchinson, 847 F.2d 1436 (10th Cir. 1988) ( Fire Marshall's routine report regarding the cause of a fire was not of public concern since there was no evidence that the report was "motivated or inspired by . . . alleged improprieties or by the desire to expose those improprieties" Id. at 1448. And of course in Dillon v. Bailey, 445 F.Supp 2d 167 (D. Conn. 1999), Judge Arterton found the plaintiff law enforcement officer's disclosures of possible wrongdoing by other agents fully and absolutely

protected by the First Amendment although it was undisputed in that case that the disclosures by Dillon were included in a private internal memorandum to his boss.

Defendant's arguments run contrary to every established principle of qualified immunity and is completely unhinged from the factual allegations and trial evidence. It is well-established that qualified immunity is unavailable to a government official who subjects a public employee to discipline in retaliation for protected expressed activity. Defendant also appears to believe that credibility determinations by the jury, among others the issue of defendant's motive, are irrelevant to the issue of immunity. To the contrary, in a first amendment case alleging retaliation for first-amendment protected speech, the issue of intent, and thus, credibility predominates. Under the circumstances, of this case, Wearing's claim of entitlement to qualified immunity is not only wholly unsupported by case authority but is frivolous.

Qualified immunity, especially in a First Amendment case which turns on a defendant's state of mind, is a fact-bound issue. The Second Circuit Court of Appeals has rejected the notion that subjective intent is irrelevant to the inquiry into the objective reasonableness of a defendant's conduct. In Locurto v. Safir, 264 F.3d 154 (2d Cir. 2001), the Court of Appeals observed:

> This argument betrays a fundamental misconception of the application of the qualified immunity doctrine to constitutional claims for which intent is an element. In the usual case where intent is not an element, bare allegations of malice coupled with otherwise legitimate government action do not yield a viable constitutional claim. In such a case, the qualified immunity doctrine focuses only on whether the government officials' actions were objectively reasonable in light of clearly established law, without regard for possible subjective malice. *[Citation omitted]* But where a more

25

> specific intent is actually an element of the plaintiff's claim as defined  by clearly
> established law, it can never be objectively reasonable for a government official to act
> with the intent that is prohibited by law.

Id. 264 F.3d at 169.

Thus, the Court concluded, "[an] employer's actual subjective motive is not irrelevant in a qualified

immunity inquiry on a First Amendment retaliation claim". Id. quoting Sheppard v. Beerman, 94

F.3d 823 (2d Cir. 1996).  To accept defendant's approach to qualified immunity would, as the Court

of Appeals noted, serve to "immunize all defendants in cases involving motive-based constitutional

torts, so long as they could point to objective evidence showing that a reasonable official could have

acted on legitimate grounds". Id.

In terms of the state of existing law at the time of the defendant's wrongful acts committed

in April of 2001, without question it was well-established at that time that a government official may

not take adverse punitive action against government employees in retaliation for the exercise of

protected rights of expression.  See Velez v. Levy, 401 F.3d 75 (2d Cir. 2005)("[i]f it is true ... that

defendant acted deliberately to bring about plaintiff's removal and retaliation for her political views,

defendant cannot avail himself of qualified immunity").  Cobb v. Pozzi, 363 F.3d 89 (2d Cir.

2003)(judgment as a matter of law is improper in cases where questions concerning the employer's

state of mind predominate the inquiry); Johnson v. Ganim, 342 F.3d 105 (2d Cir. 2003)(prohibition

against suspending employees for the content of their speech was clearly established since 1968);

Munafo v. Metro Transportation Authority, 285 F.3d 201 (2d Cir. 2002)(defendant's motive and state

26

of mind is a fact-bound inquiry).

For years, the Second Circuit has repeated and emphasized the interplay between the elements of qualified immunity and the elements of a Section 1983 action involving adverse employment actions in retaliation for protected speech and activity, on each occasion making it clear that the element of state of mind not only drives the analysis but a jury's determination of the element governs the outcome.  If a defendant is found to have maliciously retaliated against the employee on account of protected activity, immunity is unavailable. See, e.g., Vasbinder v. Ambach, 926 F.2d 1333 (2d Cir. 1991); Dobosz v. Walsh, 892 F.2d 1135 (2d Cir. 1989) (immunity denied to police chief who transferred whistleblowing officer to dog pound); Rookard v. Health and Hospitals Corp., 710 F.2d 41 (2d Cir. 1983); Piesco v. Koch, 12 F.3d 332 (2d Cir. 1993) (discussing Dobosz v. Walsh); Bieluch v. Sullivan, 999 F.2d 666 (2d Cir. 1993) (retaliatory transfer of state trooper to Litchfield); Cahill v. O'Donnell, 7 F. Supp. 2d 341 (S.D.N.Y. 1988) (involuntary transfer for report of corruption); Broderick v. Roache, 996 F. 2d 1294 (1st Cir. 1993) (discussing impact of malicious intent to retaliate on qualified immunity analysis).

Defendant's motion and memorandum fail entirely to acknowledge, much less apply, these cases to the evidence and jury findings in the case.  Clearly, defendant is not entitled to judgment and his motion should accordingly be denied.

Finally, defendant's claims with respect to the Pickering balance, see Def's. Br. at pp. 25 to 28, have already been addressed in Plaintiff's Objection And Memorandum of Law in Opposition to

Defendant's Motion for a New Trial and Motion for Remittitur dated March 20, 2006 (specifically at pages 47-50) and will not be repeated here.  Likewise, in its March, 2005 ruling denying entirely Wearing's motion for summary judgment, the Court at length considered, addressed and rejected the argument defendant recycles in his renewed Rule 50 motion, see Ruling at pp. 40-45, and defendant has provided no reason, and the trial evidence no basis, upon which to reach a different conclusion. It is worth noting that in its ruling, the court took note of Wearing's complete failure to offer any evidence that Tolnay's protected speech had "an actual or potential effect of disruption with the Police Department." Id. At p. 44.  At trial, Wearing failed to offer any such evidence, resting instead on his trial strategy of denying any nexus whatever between Tolnay's protected speech and the adverse actions.  For the reasons set forth at pp. 47-50 in Plaintiff's Memorandum of Law as above-stated, Wearing provided no evidentiary basis useful to the Pickering balance, he failed to submit a proposed verdict form on the issue, and expressly approved of the form of verdict which went to the jurors.  For the reasons  set forth and upon the case authority cited in the court's earlier ruling, Wearing could not, consistent with that authority prevail under any stretch of the Pickering balance.

For the foregoing reasons, and those set forth in the court's previous ruling, defendant's motion must be denied.

28

THE PLAINTIFF

ARPAD TOLNAY


BY:_____
        KAREN LEE TORRE
        Federal Bar No. ct01707
        Law Offices of Karen Lee Torre
        51 Elm Street
        Suite 307
        New Haven, CT 06510
        (203) 865-5541


## **CERTIFICATION**

    I hereby certify that a copy of the foregoing was mailed on this 20th day of March, 2006 to:

Robert A. Rhodes, Esq.
Halloran & Sage, LLP
315 Post Road West
Westport, CT 06880

John Burns Farley, Esq.
Ralph W. Johnson III, Esq.
Halloran & Sage
One Goodwin Square
225 Asylum St.
Hartford, CT 06103


        _____
        KAREN LEE TORRE