UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ARPAD TOLNAY                          :
                                      :
            Plaintiff,                :
                                      :    Civil No.  3:02CV1514 (EBB)
V.                                    :
                                      :
MELVIN WEARING                        :
                                      :    March 20, 2006
            Defendant.                :

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S RULE 59 MOTION FOR NEW TRIAL
AND MOTION FOR REMITTITUR**

**I.    THE FACTS AS FOUND BY THE JURY.**

Based on the allegations, the trial evidence and the verdict form the jurors can be said to have

the following facts.  At the time of the events complained of, Arpad Tolnay was a New Haven police

officer with an excellent record.  He is married with two young daughters, his wife a part-time

hairdresser.  Tolnay graduated from local schools, served in the United States Army, in its

mechanized infantry, and thereafter continued to serve the country for ten years in the Reserves as

a military police officer.  Free of any controversy or disciplinary problems, Tolnay was honorably

discharged, thereafter served in several jobs and then pursued his dream of becoming a police officer

as a permanent occupation.  He joined the New Haven Police Department ("NHPD") in December

of 1998. Tr. Vol. 2 at pp. 62-68.[1] From the date he joined the NHPD until the summer of 2002 when

the events which led to this action took place, Tolnay had never been involved in any controversy or

scandal, had never engaged in conduct which brought embarrassment or disrepute to the department;

nor was he the subject of disciplinary action. Id. at pp. 68-69. Tolnay later was assigned to patrol

in New Haven's "Fair Haven section", a large district populated mainly Hispanics. Tolnay was

exposed to the area as a result of plainclothes duty in a narcotics unit and work with the DEA on a

federal narcotics task force handling many investigations originating from the Fair Haven section..

Tolnay enjoyed the assignment as it was his favorite district in the city. He came to know the district

well and its residents and culture. Tolnay himself is Hispanic and fluent in both English and Spanish

which served him well in the assignment. Id. at pp. 70-72. He distinguished himself in the

assignment and was the recipient of letters of commendation and recommendations for awards. He

also received commendatory letters from residents and his supervisors were always pleased with his

work. Id. at p. 72.

　　　The NHPD is a large department with approximately 480 law enforcement officers. Id. at p.

73. Police Chief Melvin Wearing was a political appointee of the Mayor, who, under the city charter,

---

[1]　　The trial transcripts have been submitted along with defendants' moving papers and are
otherwise in the record set forth by designated volumes for each day of proceeding. Citations to the
record herein are by designation to the volume and pages of such volume as: "Vol. ____ at pp. ____".
All exhibits will be referred to herein as "Exh. ____." and will denote a plaintiff's exhibit unless
otherwise stated.

has the sole power of political appointment of the city's police chief.   Mayor John DeStefano has been in office some 14 years, must run for re-election every two years and for a long time has enjoyed the political support of Armando Hernandez and Daniel Rodriguez, two Hispanic ministers who lead large evangelical congregations in the city.  Hernandez in particular is a valuable political supporter of the Mayor, was part of a group of ministers who endorsed the Mayor at public press conferences and whose leadership of the large congregation of the Second Star of Jacob Church in the Fair Haven district makes him an influential leader of a valued voting bloc.  Rodriguez is a colleague of Hernandez who is also politically valued by the Mayor and who, according to Wearing, has a criminal arrest history.

On July 26, 2002, the NHPD received repeated calls from residents in the area of Hernandez's church which is located in a residential neighborhood;  residents were disturbed by loud music coming from the church.  Responding officers, Tolnay not among them, arrived to find a large group of people involved in an outdoor service in a parking lot using concert-sized speakers blaring excessively loud music.  Those present were told to bring the service inside and to lower the volume;  the incident was considered resolved.  In reality, the congregants and their leaders, although they moved inside, still positioned the amplifiers in open windows such that the music was projected outward which led to additional complaints by neighbors.  Tolnay was dispatched and while in his vehicle four blocks away could hear very loud music despite the fact that the air conditioning was on in his patrol car and the windows were closed completely.  Id. at pp. 82-83.  Upon arrival at the

3

church, the music was deafening and the concert-sized speakers were on stands rising above Tolnay's height of 6' 2''.  Officer Jamie Abate arrived as back-up.  Id. at pp. 83-85.  Tolnay and Abate thereafter experienced the unexpected in confronting the Rev. Armando Hernandez.  Rather than cooperate and comply with the officers' request for a lowering of the volume, Hernandez flatly refused, became loud and belligerent and engaged in theatrics, insisting that officers handcuff and arrest him. Hernandez's conduct led to the exit and gathering of churchgoers.  The crowd was hostile and unruly and, incited by Hernandez, screamed at and converged on the officers and surrounded their patrol vehicles,  invading the officers' "safety zone".  While Tolnay was removing  Hernandez to another location for safety reasons, one Sgt. Hoffman, summoned by Tolnay, arrived.  At this point, Daniel Rodriguez roared up to the curb in a van, jumped out and interfered with the officers, engaging in similar theatrics as Hernandez, insisting that he be arrested as well.  He was arrested after refusing repeated demands to desist and after he chest bumped Sgt. Hoffman who made the decision to arrest Rodriquez.  Throughout the incident, the officers heard individuals in the crowd shouting profanity and abuse, including comments suggesting they believed they enjoyed a privileged status with the Mayor.  Among the comments were, " You don't know who you're dealing with", "we're going to call the Mayor", and "the Mayor will be out her in five minutes."  Others hurled verbal abuse at the officers and still others made vulgar gestures, including giving the officers "the finger".  One individual, perceiving Tolnay as White, subjected Tolnay to the worst vulgarity ("Fuck you, white officer")  Id. pp. 93, 99-100;  Exhs. 1, 2.

4

Immediate and prominent media attention to the arrests ensued. Exh. 3. As early as July 31, 2002, Hispanic leaders and Fair Haven aldermen were demanding an apology from city officials. Tolnay became the central figure in a political firestorm and a punching bag for those who had clout with the Mayor and those who viewed it in their interest to indulge his political needs. The ministers commenced organizing a protest march on the police station[2]. Wishing to maintain the good graces of the arrestees and the members of their respective flocks, the Mayor planned a public apology to them. In furtherance of the Mayor's political interests in this regard, Wearing, only six days after the arrests and after conferring with the Mayor, made a surprise appearance in New Haven Superior Court and exercised political muscle on the chief prosecutor in an effort to get the charges dismissed. The prosecutor, David Newman, quickly acceded and effected an immediate dismissal of all charges against Hernandez and Rodriquez long before the men were due to appear in court. Both Wearing and Newman denied this account but Sheri Murowski, Newman's secretary, confirmed the event as aforedescribed and noted that the manner of Newman's disposition was unprecedented and the incident gave rise to shock and consternation among courthouse staff. Jurors obviously determined that Wearing lied when he denied having pressed Newman for a dismissal.

The exercise of political influence in getting the charges dropped was timed to coincide with

_____

[2]The ministers led some 1,000 people in a protest march through the streets toward the police station at One Union Avenue. Wearing and the Mayor allowed this march, which disrupted business and downtown traffic , without requiring the ministers to undergo the permit process with which everyone else is required to comply.

5

the Mayor's appearance at the Second Star of Jacob Church to enable him to announce the dismissal of the charges, take credit for it and ingratiate himself with the crowd. The Mayor's conduct ignited another firestorm of controversy and a huge front-page headline and article in the New Haven Register recounting DeStefano's public apology and the reaction of officers as voiced by their union President that the Mayor had "sold out" his own officers for political gain. Exhs. 6, 7. Despite the Mayor's apology, the mass march took place and prominent press attention came with it, including to Tolnay's embarrassment and humiliation, an account by the New Haven Register of a city official soliciting Hernandez' opinion at the protest on the matter of discipline to be imposed on Tolnay

Amid these events, on August 3, 2002, Tolnay was on patrol, accompanied by Officer Walesta Bermudez, when they observed an individual recklessly driving a topless Jeep with children hanging off of the roll-bar. Bermudez told Tolnay to pull the driver over. Upon approach, Tolnay discovered the driver was none other than Daniel Rodriguez. Given the political firestorm which had ensued over the July 26th incident, Tolnay feared taking action against Rodriguez and allowed him to go on his way, especially since Rodriguez was using the children hanging off of the roll-bars to distribute fliers announcing the planned protest of Tolnay's earlier actions. In connection with this incident, Tolnay immediately advised his supevisor and this in turn resulted in an order being barked over the radio (for all including civilians to hear) by Captain Francisco Ortiz who criticized Tolnay and ordered him to stay away from Rodriguez and Hernandez. Ortiz, who had close ties to Hernandez, Rodriguez and the Hispanic community, and who aspired to succeed Wearing as Chief, was thus

6

viewed by Tolnay as improperly interfering with officers' ability to discharge their duty. Tolnay accordingly drafted a report recounting the incident with Rodriguez, stated his opinion that he was unable to discharge his duty due to the political influence and connections of Rodriguez and further added that his feelings in this regard were confirmed by the oral order issued by Ortiz. Tolnay repeated, at the close of his report, his view that he felt hampered in his duties due to the political involvement of Rodriguez. Exh. 4. Rodriguez' political clout gave him direct access to Ortiz, who, as head of patrol, held a high place in the NHPD hierarchy and reported directly to Wearing. Rodriguez complained about the motor vehicle stop.

In furtherance of his own personal and political self-interest, Captain Ortiz personally visited Rodriguez' home and collaborated with Rodriguez in the lodging of a "civilian complaint" against Tolnay in connection with the motor vehicle stop. Although the incident was, by itself, of little import, Rodriguez' status of a valued political ally of the Mayor transformed the incident into one of political magnitude. After demanding reports of all officers involved or with knowledge of the MV stop, Ortiz forwarded to Wearing a memorandum which contained a variety of lies and false allegations against Officers Tolnay, Bermudez and Colon. Rodriguez, spurred by Ortiz, concocted a host of allegations of rude and insensitive conduct on the part of the officers. Those allegations turned out to be patently false.

Ortiz, by his own account was "very disturbed" by the content of Tolnay's Case Incident Report, in particular Tolnay's opinion that he cannot perform his duties due to the political influence

of Rodriguez.  Ortiz considered such an opinion "unacceptable" and Tolnay's other like comments "inappropriate" and indicated that unspecified action will be taken against Tolnay upon his return from vacation.  Exh. 16.  Upon receipt of Ortiz' memorandum, Wearing to punish and retaliate against Wearing for having raised the issue of political corruption within the department.  In the wake of Ortiz' memo, Wearing thus summoned Tolnay to his office.

Since the July 26, 2002 arrests of the ministers was entirely lawful (and in fact effected by a supervisor of Tolnay and Abate) Wearing knew that he could not, with any pretense of legitimacy, take action against Tolnay on account of the arrest.  Rather, Wearing orchestrated a meeting with Tolnay with the aim of concocting another pretext  under which he could retaliate against Tolnay for his expressed opinions and chill him and others from engaging in any further expression on the matter of the Mayor's and the Chief's political interference with law enforcement.  Thus, at an August 13, 2002 meeting, Wearing, who had not bothered to read any of the officers' reports respecting both incidents, proceeded to bully and attempt to bait Tolnay into admitting that he had done something wrong.  Tolnay resisted the baiting and defended his conduct in all respects and the more he did so, the angrier Wearing became.  Throughout the meeting, Wearing was accusatory and persistently interrupted Tolnay as he tried to answer the Chief's questions.  Wearing became particularly incensed when Tolnay repeated his opinion that the conduct of Captain Ortiz was inappropriate and that the meeting and the controversy were the result of politics.  Although Jamie Abate was in the meeting, Wearing for the most part ignored her and focused on Tolnay who was the target of the intended

8

retaliation.  Incensed at Tolnay's opinion that Ortiz' conduct was inappropriate and unprofessional, and Tolnay's comment about the political character of the meeting, Wearing, a tall and large man, jumped to his feet, thrust his finger in Tolnay's face and hurled a series of abusive comments at Tolnay.  Tolnay stated he wished to speak to an attorney and got up to leave at which point Lieutenant Leo Bombalicki, a Union representative, told Tolnay to go out in the hallway and wait for him as he spoke to Wearing.  Jamie Abate followed Tolnay out into the hallway.  Wearing immediately ordered another meeting to be scheduled with Tolnay.  Vol.I, pp. 229-244; Vol. IV, pp.132-147 (testimony of Leo Bombalicki); Vol. 5, pp. 121-126 (testimony of Jamie Abate Sanchez)  NHPD Human Resources Manager Scott Nabel, also present at the meeting[3], confirmed under cross-examination that Wearing became most agitated at the point at which Tolnay expressed his opinion about Ortiz.  Vol. V, p.195.  On August 14, 2002, Wearing ordered Tolnay to his office again for a "continuation of our discussion" regarding the Rodriguez MV stop and Tolnay's conduct during the meeting the day before.  Upon arrival in the chief's office, however, there was no discussion as before anyone said anything, Wearing  suspended Tolnay from his employment for a period of ten days (effectively 15 days) on a variety of concocted charges, all of which boiled down to an allegation of insubordination and disrespect toward the Chief, based on the allegation that Tolnay "walked out"of the meeting

---

[3]      Nabel authored for the Chief all disciplinary memoranda and his presence at the meeting along with a union representative clearly foretold Wearing's intent to use the meeting as a basis to discipline Tolnay.

without permission.[4]  Exhs. 17 and 18.  In a further retaliatory act, Wearing ordered Tolnay to one of the most undesirable duties in the NHPD, desk duty in a dank and windowless detention area where Tolnay was relegated to fingerprint and other booking duties.  Wearing also humiliated Tolnay by ordering him to submit to "diversity" or "sensitivity" training, the implication being that Tolnay harbored some sort of ethnic hostility or insensitivity toward New Haven's Hispanic community.  Since Tolnay is himself Hispanic, the order to undergo such training was a personal wound and served to besmirch his character.  Tolnay was left to languish in the detention center for some seven months and the reassignment itself signaled to the entire department that Tolnay had displeased the administration.

Tolnay, who before all this had been a conscientious officer with a good record and superb reputation in the community, and proud of it, was extremely embarrassed by these events and all of media attention to it.  News of Tolnay's suspension and reassignment also was the subject of newspaper attention.  Tolnay's wife and daughters were also exposed to the media attention.

In publicly apologizing to the congregation of the Second Star of Jacob Church, Mayor DeStefano had given no forethought to the effect his conduct would have on morale in the NHPD.  Nor did he consider the fact that among the crowd of people to whom he was apologizing were those who had engaged in near mob violence against city officers and otherwise placed them in fear for

---

[4]        Notably, Officer Abate was not disciplined although she followed Tolnay out the door.

their safety. Nor did the Mayor consider whether his apology would serve not only to exonerate but encourage those who wished to engage in such conduct toward officers in the future. Finally, the Mayor gave no thought to whether, in light of the unconditional dismissal of the criminal charges he was by his conduct exposing Tolnay and his colleagues to a civil suit for false arrest and putting himself in the position of having his apology used as evidence in furtherance of any such claims.

Officer Jamie Abate (now Sanchez) confirmed Tolnay's account of events and his and Bombalicki's account of the office meeting with Wearing. In terms of the effect of Wearing's misconduct, Officer Sanchez recounted a subsequent incident in which she received a bizarre order from her supervisor to travel to a business location in the Fair Haven district and "retrieve something" from a man who will meet her there. As it turned out, the nephew of Daniel Rodriguez had been arrested for interfering with a police officer, a class A criminal misdemeanor. He evidently had complained to his uncle who in turn once again used his political clout with city officials to influence the outcome. In particular, Rodriguez had directly telephoned and called upon Captain Ortiz to intercede. When Officer Sanchez arrived at the Grand Avenue location, she was met by Daniel Rodriguez who, possessed of the arrest summons issued to his nephew, tore it up into little pieces and thrust it at Sanchez stating, "Here, I don't need this". Sanchez was shocked. Vol. V, pp. 128-130.

Sanchez was asked to testify regarding the impact retaliation against Tolnay has had on her as a law enforcement officer. Sanchez told the jurors that if she were in the future faced with a situation where she was duty-bound to arrest, for example, Daniel Rodriguez, she is not confident

11

that she would proceed to enforce the law and make an arrest. She confessed that she might hesitate because she does not wish to experience what Arpad Tolnay endured. Id. p.131. The disciplinary and other actions taken by Wearing against Tolnay were in stark contrast, and known as such, to Wearing's established approach to discipline - a rather disgraceful history as Wearing has tolerated (and apparently had no problem with) the worst type of conduct by NHPD officers, including criminal activity, disorderly conduct resulting in criminal arrest, drug dealing, disrespect and insubordination toward superiors, wife-beating, telling one's supervisor to "shove it up his drunk ass", dereliction of duty, disruptive temper tantrums in public areas of the department, vulgar and offensive conduct toward other officers on account of their ethnicity, sleeping while on duty, sleeping while assigned to protect a terrorist target location during a state of national alert (placing the public at risk), threatening supervisors with physical violence and, last but not least, public urination. See Exhs. 19-35.

The jury found that Wearing not only retaliated against Tolnay for the exercise of first amendment rights but found that Wearing did so intentionally and with malice.

## II. ARGUMENT

**A. ____THE JURY'S NON-ECONOMIC COMPENSATORY AWARD IS ON THE LOW END OF AMOUNTS TYPICALLY AWARDED BY JURIES IN LIKE CASES, IT FAIRLY REFLECTED THE DISTRESS, EMBARRASSMENT, HUMILIATION, REPUTATIONAL AND PROFESSIONAL INJURY TOLNAY SUFFERED AND THUS CANNOT, AS A MATTER OF LAW, CONSTITUTE A DENIAL OF JUSTICE OR SERVE TO SHOCK THE COURT'S CONSCIENCE.**

The grant of a new trial is a drastic act by any trial court which should be a rare event for it is in effect a statement by the court that its conscience is shocked by the jury's award of damages. We have the general proposition that trial courts should proceed on the presumption that substantial deference should be accorded to the judgments of jurors.  "It is well-settled that calculation of damages is the province of the jury".  Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990) The standard for review of damage awards, either compensatory or punitive, "is whether the award is so high as to shock the judicial conscience and constitute a denial of justice".  Id. citing O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir. 1988); see also Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir. 1978).

The jury based its determination of compensatory damages on the Court's instruction that plaintiff may also be compensated for such intangibles as emotional distress, anguish, embarrassment, inconvenience and reputational injury.  See Memphis Comm. School Dist. v. Stachura, 477 U.S. 299, 307 (1986)(". . . compensatory damages may include not only out-of-pocket loss and other monetary harm, but also such injuries as 'impairment of reputation. . .'"; Bernheim v. Litt, 79 F.3d 318 (2d Cir. 1996)(compensable injuries may include not only monetary losses but such injuries as personal humiliation and mental anguish); Henry v. Gross, 803 F.2d 757 (2d Cir. 1996)(juries may compensate for great worry and unhappiness).

In deciding whether the jury's compensatory award of $150,000.00 for these types of injuries may fairly be considered to shock the judicial conscience, reference to other awards is helpful although not required.  Such a determination "should not be made in a vacuum" nor should a court

limit its frame of reference to federal §1983 cases.  Ismail v. Cohen, 899 F.2d at 186.  In our own

District, this compensatory award is tucked well within, and indeed on the very low end of, the range

of non-economic compensatory awards, a number of which are recounted in the affidavit of plaintiff's

counsel appended to plaintiff's Motion for Award of Attorney's Fees and Costs previously submitted

to this Court.  In the Circuit, comparable and greater non-economic compensatory awards were

sustained by trial and appellate courts.  See, e.g., Gonzalez v. Bratton, 147 F.Supp. 2d 180 (S.D.N.Y.

2001) ($250,000 compensatory award for distress in harassment and retaliation case not excessive);

Phillips v. Bowen, 115 F.Supp. 2d 303 (N.D.N.Y.  2000)(upholding award of $400,000.00 for

emotional damages in a Section 1983 First Amendment retaliation case); Ikram v. Waterbury Bd. Of

Educ., 1997 U.S. Dist. LEXIS 14619, 1997 WL 597111, at *3-4 (D. Conn. Sept. 9,

1997)(compensatory award of $100,000.00 reasonable in First Amendment retaliation claim);

Petramale v. Local No. 17 of Laborers' Int'l. Union of N.Am., 847 F.2d 1009 (2d Cir.

1988)($100,000.00 compensatory damages for emotional distress in case involving  retaliation for

protected speech); Vitale v. Hagan, 132 A.D.2d 468, 517 N.Y.S. 2d 725 (1987)(court not shocked

by jury's award of one million dollars, $900,000.00 of which was for pain and suffering) mod. on

other grounds 71 N.Y. 2d 955, 528, N.Y.S. 2d 823 (1988); Town of Hempstead v. State Div. of

Human Rights, 233 A.D. 2d 451, 649 N.Y.S. 2d 942 (1996)(emotional distress award for $500,000.00

sustained despite no medical treatment); Ramirez v. N.Y.C. Off-Track Betting Corp., 112 F.3d 38

(2d Cir. 1997)($1.9 million dollar verdict upheld - - remanded for re-adjustment of discount rates

only); <u>Lewis v. Cowan</u>, 979 F. Supp. 99 (D.Conn. 1997)($500,000.00 emotional distress award not shocking to the Hon. Thomas P. Smith although the legal cause of action itself later failed on appeal). Even where a court examines and compares a challenged award with awards made in similar cases the Court must do so while "bearing in mind that any given judgment depends on a unique set of facts and circumstances".  <u>Nairn v. Nat'l. RR Passenger Corp.</u>, 837 F.2d 565, 568 (2d Cir. 1988).

In <u>Ismail v. Cohen</u>, 899 F. 2d 183 (2d Cir. 1990), the Court of Appeals noted that "[w]ith respect to mental distress damages, we have been willing to uphold  substantial awards where warranted" <u>id</u>., at 187, and pointed to its previous holding in <u>Hughes v. Patrolmen's Benevolent Ass'n</u>, 850 F.2d 876, in which the Court sustained a $225,000.00 emotional distress damages award even though plaintiff suffered no permanent harm from the adverse action.  And of course in <u>Phillips v. Bowen</u>, 278 F.3d 103 (2d Cir. 2002) the Court of Appeals rejected defendant's claim that a jury's compensatory award of $400,000.00 was excessive because the plaintiff did not prove economic damages or physical injury and presented only minimal evidence of emotional distress.  The Court of Appeals noted that the trial jury had determined that $400,000.00 was a fair assessment of the damages and the award was not so excessive that it shocks the judicial conscience.  Finally, most recently in <u>Arlio v. Lively,</u> 392 F. Supp. 2d 317 (D. Conn. 2005) the Hon. Janet Bond Arterton refused to lower an identical compensatory award of $150,000 to a police officer unlawfully suspended for several days, finding that the award was tucked well within the norm for compensatory

awards in such cases.[5]  In this case, Tolnay, by all accounts, enjoyed an excellent reputation and while

reputational injury is exceedingly difficult to measure, this element of damage is easily inferred by

widespread knowledge of his suspension, which was reported in the media.  The embarrassment and

distress Tolnay suffered cannot be trivialized and it extended to his wife and family.  Tolnay also

suffered a stigma as a result of his reassignment, known in the NHPD, as Lt. Bombalicki confirmed,

to be an undesirable post.  The order to undergo diversity/sensitivity training was a particular

humiliation and insult given that Tolnay, who is Hispanic, enjoyed and took pride in the positive

relationships he had before established with the Hispanic community in Fair Haven.  Finally, Wearing

attempted at trial to downplay the damage to Tolnay's career as a result of the suspension by noting

that the union contract provides for an "erasure" of the discipline after a period of years[6]. But that is

only useful within the confines of the NHPD.  Wearing conceded that officers often seek to move up

and on to other agencies such as the State Police, the FBI and, of late, Homeland Security agencies,

all of which have exacting hiring standards.  Having to disclose on an application that he was

---

[5]    Defendant, at page 32 of his brief, mischaracterizes <u>Arlio</u> (a case tried by the undersigned counsel) as involving a "sabotaging [of Arlio's} chances to be promoted." This is incorrect.  The jury in that case found by their verdict form that Arlio had failed to prove that his chances for promotion were harmed by defendant.

[6]    "Erasure" in this context means that, after a time, the discipline may not be used as the basis for further adverse action.  Obviously, the records remain and can pop up under other circumstances as evidenced by the fact that, during discovery in this case, the city turned over to plaintiff's counsel numerous disciplinary records presumably subject to what Wearing calls "erasure" and which were admitted into evidence at trial.  Thus, the claim that Tolnay's suspension has been "erased" does not mean that it will not continue to embarrass him in the future.

disciplined for insubordination and disrespect to a superior officer is a matter which will forever vex

Tolnay.  Vol.  III, pp. 169-170.   For these reasons, there is no merit in defendant's challenge to the

compensatory award

**B.**    **THE JURY'S ASSESSMENT OF PUNITIVE DAMAGES IS NOT UNCONSTITUTIONAL AS DEFENDANT WAS ON NOTICE FOR DUE PROCESS PURPOSES THAT HE WAS EXPOSED TO SUCH AN AWARD, THE AWARD PROPERLY REFLECTS THE EGREGIOUS NATURE OF DEFENDANT'S ABUSE OF HIS PUBIC OFFICE AND THE HARM HE CAUSED TO PLAINTIFF AND OTHER LAW ENFORCEMENT OFFICERS AND IT REPRESENTS THE JURY'S COLLECTIVE AND CONSIDERED JUDGMENT AS TO THE AMOUNT NECESSARY TO EFFECTIVELY DETER MAYORS, POLICE CHIEFS AND OTHER OFFICIALS FROM TRADING LAW ENFORCEMENT FOR POLITICAL DONATIONS AND SUPPORT IN CONTRAVENTION OF PUBLIC SAFETY**.

"The Due Process clause of the Fourteenth Amendment prohibits the imposition of grossly

excessive or arbitrary punishments on a tort-feasor." State Farm Mut. Auto Ins. Co. v. Campbell, 538

U.S. 408, 416, 123 S.Ct. 1513 (2003).  The factors to be considered in determining excessiveness of

punitive damages are the degree of reprehensibility of the defendant's misconduct; the disparity

between compensatory and punitive damages awarded; and the difference between punitive damages

awarded and the civil penalties authorized or imposed in comparable cases.  Id. at 418, citing BMW

v. Gore, 517 U.S. 559, 116 S.Ct. 1589 (1996).  "The most important indicium of the reasonableness

of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, 517

U.S. at 575.  In assessing the degree of reprehensibility, courts generally consider the existence of

aggravating factors, including: 1) whether defendant's conduct was violent or presented a threat of

17

violence; 2) whether a defendant acted with malice as opposed to mere negligence; and 3) defendant

has engaged in repeated instances of misconduct." [7] Id.  For the reasons which follow, the punitive

award in this case, although substantial, is  necessary and appropriate and it reflected the jury's just

outrage at Wearing's gross misconduct and malice toward a decent officer, coupled by the intolerable

damage Wearing has caused to the NHPD, the confidence of its officers, and their ability to protect

the public free from fear that political influence will interfere with the apprehension and punishment

of criminals.

1.    <u>Defendant's Conduct Was Malicious And Without Question, Reprehensible.</u>

The jury in this case agreed that Chief Wearing intentionally and maliciously concocted a

pretext under which he could harm an honest officer for the purpose of punishing him for raising the

issue of politically based law enforcement in New Haven and for the further purpose of chilling him

and others from speaking to such issue in the future.  Wearing did so in utter disregard for Tolnay's

rights and for the injury he would cause to his name, his career and the resulting distress to him and

to his family.  Wearing also thereby  telegraphed an ominous message to the rank and file of the

---

[7]      In this respect, plaintiff submits that Wearing enjoyed an undue advantage when this court disallowed plaintiff's counsel from questioning him regarding the fact that not long before this case, another federal jury found that he maliciously retaliated against two other NHPD officers on account of their exercise of first amendment rights. Vol. III, pp. 230-231. This evidence was, however, admissible as relevant to punitive damages. <u>Campbell</u>, 538 U.S. at 423 (evidence of prior misconduct, which need not be identical but only similar, is admissible as relevant to issue of reprehensibility for purposes of punitive damages assessment)

NHPD by holding up Tolnay in the police community as an example of what will befall an officer who speaks out about anything in the department or its relationship and interactions with city hall. Wearing sought to quash disclosures and discussion not on a workplace topic solely of personal interest to NHPD employees but on a matter of public interest - indeed on a subject that was relevant to the citizenry's judgment of the Mayor's fitness for the office he now occupies and for the office of Governor which he now seeks. In this respect, Wearing succumbed to pressure to act not as a Police Chief but as a campaign manager whose mission is to protect the candidate from public scrutiny of any misdeeds.  Without question, defendant's conduct was reprehensible and the jury clearly agreed.  Consistent with the court's charge (Vol V, p. 148) jurors determined that Wearing's conduct was in fact "shocking and offensive" and that punitive damages were in order "to set an example in order to deter him and others from committing similar acts in the future" and as "an expression of the jury's indignation at the misconduct." The factual determination of reprehensibility was a matter for the jury and its finding in this regard should not be disturbed.  It serves to provide an important - indeed, as the courts have repeatedly stated, the most important - predicate in a court's review of the propriety of the amount of the award.  BMW v. Gore, supra, at 575 (degree of reprehensibility of defendant's conduct is the most important indicium); Campbell, supra, at 419. The "flagrancy of the misconduct is thought to be a primary consideration in determining the amount of punitive damages.", Gore at 575, and the flagrancy of Wearing's malicious misconduct was well established in the trial record. For this and the reasons which follow, including the fact that the

Supreme Court has repeatedly stated that it eschews a mechanical formula or a bright-line rule on excessiveness of punitive awards, the jury's assessment, representing the conscience of the community and its considered judgment as to that amount which is necessary to effectively deter politicians and their appointees from such mendacity ought to be respected.

> **2.     The Harm Caused By Defendant's Conduct Goes Beyond Officer Tolnay As It Has Chilled Other Officers From Enforcing The Law Against The Mayor's Known Political Supporters And The Punitive Assessment Was Appropriately Designed By Jurors To Mitigate The Harm To Public Safety Caused By It And Prevent Its Recurrence**

The harm which Melvin Wearing inflicted by his malicious conduct and abuse of his office transcends the personal or career interests of Arpad Tolnay. Once again, jurors, by their verdict form, clearly indicated their agreement with plaintiff's theme and theory of the case. The individual who occupies the office of Chief of Police of New Haven is a political appointee. This political appointment is made by the Mayor who has the sole power under the Charter of the City of New Haven to choose the city's Chief of Police. The New Haven Police Department is a large law enforcement agency, employing nearly 500 officers supported by a large force of civilian personnel. New Haven is a large urban environment in which serious crimes take place with new victims every day. Chief Wearing engaged in extraordinary departures from normal and expected conduct in this case. After speaking with the Mayor in the wake of the arrests of Hernandez and Rodriguez, he traveled to and strolled into the New Haven Superior Court and exercised improper influence on the

supervisory Assistant State's Attorney in charge of handling all criminal cases at the 121 Elm Street courthouse. He used political muscle to prod prosecutor David Newman to effect an unusual disposition of the cases in contravention of established practice at that courthouse, to the shock and consternation of courthouse staff. He did this despite the fact that both arrestees had engaged in conduct which placed three of his officers at risk of physical harm by an unruly crowd who, encouraged and incited by the ministers, engaged in the most despicable behavior and abusive language toward the officers.

All police officers have a reasonable expectation that their Chief will back them up in their difficult and dangerous work – and officers most certainly expect that neither their Chief nor the Mayor will interfere with a perfectly lawful arrest and take up the cause of those who brazenly refuse to comply with the law and further place officers in fear and at risk of physical harm. Ironically, Wearing, throughout this litigation, including in this post-judgment phase, has invoked the interests of "morale" and respect for authority in justifying his suspension of Tolnay from his employment. Nothing, however, has served more to harm morale and respect for authority than Wearing's own conduct.

Melvin Wearing did not preside over a private security firm but was entrusted with an important public office in which he, more than anyone else, is sworn to uphold the law. His responsibility, as a matter of law and morality, is to ensure that his officers are and feel free to enforce the law neutrally without favor or disfavor to anyone. By extension, the public has the right to have

21

neutral enforcement action taken against all offenders.  Public confidence in the integrity of law enforcement is severely undermined by evidence of special favors or dispensations to lawbreakers on the basis of their political clout or connections.  Apart from the public's confidence in the integrity of law enforcement, there is, quite simply, a public safety risk to any politicization or corruption of law enforcement.  The citizens of New Haven (and surrounding communities) cannot be put at risk- for example by a drunk driver - because an officer recognizes an offender as one who is important to the Mayor and, mindful of what happened to Tolnay, would rather just walk away, as Tolnay did in the motor vehicle incident involving Rodriguez.  Moreover, apart from favors being dispensed to those with political clout, Wearing's malicious course of retaliation against Tolnay, highly publicized, no doubt served to chill officers from making disclosures or expressing opinions about other equally or more serious matters in the future.  If an officer believes that a Chief, a Mayor, police officer or politically "connected" individual was driving drunk, in possession of an illegal substance, or engaged in graft or took a bribe, how free would he/she feel to come forward?  In terms of deterrence, this jury saw an unconscionable, brazen and craven sacrifice of a decent officer for private political gain.  As Judge Arterton observed in <u>Dillon v. Bailey,</u> protecting the first amendment rights of law enforcement officers is critical for "without disclosure by law enforcement insiders ... willing to report their well-founded beliefs of the existence of wrongdoing by fellow law enforcement officers, such corruption is most difficult to detect, prove or prevent."  45 F. Supp. 2d 167, 174 (D. Conn. 1999) A remittitur as requested by Wearing would undermine this public interest, diminish the

22

deterrent force of the penalty and further serve to encourage officials to persist in such conduct without fear of a civil jury's penalty which would be viewed a mere nuisance along the path to judicial override of the jury's decision.

> **3.    The Ratio Of Punitive To Compensatory Damages Of 33:1 Is Permissible Under the Unique Facts Of This Case As It Involves Not A Garden-Variety State Tort But Serious And Unquantifiable Harm to the Public Interest And Need For Criminal Law Enforcement Free Of Corruption And Political Influence Peddling.**

Relying on <u>State Farm Mut. Auto. Ins. Co. v Campbell</u>, defendant submits that this court should sustain a punitive award of no more than nine times the compensatory award. <u>See</u> Def.'s Br. at p. 21, n. 6.  In <u>Campbell</u>, an action by a couple alleging bad faith in an insurer's failure to settle a claim, the jury awarded the couple $1,000,000 in compensatory damages and $145, 000,00 in punitive damages, a ratio of 145:1.  Plaintiffs suffered no tangible injury but were generously awarded one  million dollars for "a year and a half of emotional distress".  The Supreme Court noted that the harm "arose from a transaction in the economic realm ..." <u>Id</u>. at 425.  There is more than one notable distinction between <u>Campbell</u> and the case at bar.  First, <u>Campbell</u> involved a state court tort action and the conduct of private parties to a contract as opposed to the instant case involving government misconduct of constitutional magnitude and resulting in harm which transcends the plaintiff and undermines law enforcement and public safety.

In further distinction from that case, the <u>Campbell</u> court found fault with the punitive award

having been based on a substantial amount of evidence admitted by the trial court respecting State

Farm's practices in numerous jurisdictions outside of the state of Utah.  Justice Kennedy noted that

as a matter of law, State Farm's practices in other jurisdictions were indeed lawful.  Thus, the court

stated, "[a] State cannot punish a defendant for conduct that may have been lawful where it occurred."

Id. at 421 (citations omitted).[8]  The fact that a defendant engaged in previous like conduct, according

to the court, is indeed relevant and admissible on the most important factor of "reprehensibility" and

while opining that "courts should look to the 'existence and frequency of similar past conduct'", in

the case of State Farm, the Utah Supreme Court based its approval of the jury's punitive award on

evidence of State Farm's practices in other states which bore no relationship to its conduct toward

the Campbells and which, as the court noted previously, was lawful.  Id. at 423 quoting Pacific Mut.

Life Ins. Co. v. Haslip. 499 U.S. 1, 21-22, 111 S.Ct. 1032 (1991).

Noteworthy, and in greatest distinction to Tolnay's case, Justice Kennedy noted "the

Campbells' inability to direct us to testimony demonstrating harm to the people of Utah (other than

those directly involved in this case) indicates that the adverse effect on the state's general population

---

[8]

   In applying this precept to the state court jury's assessment of punitive damages in a state tort
   case, the Supreme Court turned not to due process principles but to core principles of states'
   sovereignty,  citing, for example, Huntington v. Attrill, 146 U.S. 657, 669, 13 S.Ct. 224
   (1892) ("Laws have no force of themselves beyond the jurisdiction of the state which enacts
   them ...") In contrast, the instant case was brought under 42 U.S.C. §1983 to vindicate federal
   constitutional rights and no such problem or consideration is therefore present.

24

was in fact minor". <u>Id</u>. at 427 (emphasis supplied).[9]   In contrast, Melvin Wearing's malicious course

of retaliation against Tolnay was not only widely known in the NHPD but was the subject of ongoing

and prominent media attention.   In assessing punitive damages, this jury no doubt and rightfully took

into account the harm and potential harm of Wearing's conduct not just on Tolnay but on other law

enforcement officers and the public at large.   They heard  evidence of this harm upon Tolnay's

testimony that, subsequent to the arrest of the ministers, he feared taking enforcement action against

the Rev. Daniel Rodriguez when Rodriguez was seen recklessly operating an open jeep with children

hanging off of the roll bars.   Rodriguez was violating at least three different statutes at the time

(including the felony of Risk of Injury To A Minor) and was acting in gross disregard for the safety

of the children who were at risk of physical injury or even death upon his need to swerve or stop the

vehicle suddenly.   The children are lucky that Rodriguez did not have to brake hard and suddenly for,

because of Wearing's conduct in carrying out the Mayor's desire to trade law enforcement for

personal favors, Rodriguez was permitted to continue on his way by an officer scared into a failure

of duty. And, as previously noted, the jury heard further evidence of the effect Wearing's misconduct

had on Officer Sanchez who confessed that her reluctance in the future to fulfill her duty to effect the

arrest of an offender she recognizes as politically connected. Apart from this fear, Wearing's conduct,

---

[9]Moreover, upon remand in <u>Campbell</u>, the Utah Supreme Court, despite the United States Supreme
Court's conclusive observation that the harm caused by defendant did not extend to the people of
Utah, nevertheless imposed a substantial punitive assessment of $9 million.   <u>Campbell v. State Farm
Mutual Automoblie Ins. Co.</u>, 98 P.3d 409 (Ut. 2004).

viewed in tandem with the conduct of the Mayor (which drove Wearing to commit the acts against Tolnay) has also served to provide an insidious incentive for officers not possessed of Tolnay's character to grant dispensations to politically connected offenders in the expectation that they will be rewarded (by promotion or other means) for it.   In fact, the trial provided a front row glimpse at the pernicious nature of New Haven's system of political horse-trading.   The influence of the Hispanic community led by Hernandez and Rodriquez had already succeeded in gaining a backdoor dismissal of the criminal charges.   Captain Francisco Ortiz wanted to be the next Chief and at the time of these events, Wearing's retirement was imminent. This no doubt explained why Ortiz, on the highest rung of authority in this large department next to the Chief, would personally visit the home of Daniel Rodriguez, a man with a criminal arrest record no less, and agree to be Rodriguez' personal conduit for a patently false and fabricated "civilian complaint" against Tolnay while others, including those with legitimate complaints against NHPD officers, are relegated to the bureaucracy of the civilian complaint process.   Upon Wearing's retirement, Mayor DeStefano, per the city charter, had sole authority to appoint Wearing's successor.   As the evidence revealed, the Hispanic community lobbied for the appointment of Ortiz, led by none other than Mssrs. Hernandez and Rodriguez who circulated petitions demanding the Mayor appoint Ortiz and threatened mass protests if the Mayor did not give them what they demanded.   Tr., Vol. V at pp. 69-84 (testimony of Chief Francisco

Ortiz)[10]  Ortiz' support from these individuals came on the heels of the incident in which Officer Jamie Abate endured the indignity of having an arrest summons torn into little pieces and thrust at her by Rodriguez after being ordered by her supervisor to travel to meet Rodriguez so he could do this to her.  As the examination of Ortiz disclosed, this disgraceful incident was prompted by a call from Rodriguez to Ortiz complaining about the arrest of his nephew.  After Rodriguez's nephew was also relieved from responsibility for a crime, Ortiz enjoyed Rodriguez' full-thwarted support and political muscle directed at DeStefano and Ortiz became the new Chief.   These incidents are hardly petty but are emblematic of a situation in New Haven which, if left unchecked, is bound to lead, if it hasn't already, to corruption on a most destructive scale.

In a state where citizens have seen their governor and the mayors of two of its largest cities imprisoned for abusing their offices for private and political gain, any significant weakening of the jury's penalty will undermine that which the jurors clearly intended to accomplish in fixing the amount of punitive damages.

Thus, in distinction to one of the considerations cited by the <u>Campbell</u> court, there is evidence in this case of harm to the public, and not of purely economic character but harm that goes to the very integrity of self-government.

---

[10]    Ortiz admitted that at the time, his competitor for the Chief's job was Capt. Bryan Norwood, whose candidacy was being championed by African-American leaders of the Board of Alderman - thus the competing and ratcheted political pressure on DeStefano by Hernandez and Rodriguez.

For this reason, the damages ratio of 33:1 in the circumstances of this case does not as a matter of law offend Gore or its progeny.  Cf. TXO Prod. Corp. V. Alliance Resources Corp., 509 U.S. 443 (1993)(approving 526:1 ratio because of the "potential harm" of defendant's behavior".) See Lee v. Edwards, 101 F. 3d 805 (2d Cir. 1996)(employing Gore guideposts yet permitting a ratio of 75:1) The unique circumstances of this case warrant the award and the public's interest will be served by it.

BMW v. Gore is a case with quirky facts – it involved a complaint over the undisclosed repainting of a new car.  In its decision, the Supreme Court specifically noted that BMW's conduct was not "egregiously improper" and, thus, was not sufficiently "reprehensible" to warrant a $2 million punitive award.  The Supreme Court's reasoning also included the fact that BMW inflicted only economic harm and the victim was not financially vulnerable.  BMW's conduct manifested no indifference to health or public safety and there were no deliberate false statements or acts of affirmative misconduct.  Id., 517 U.S. at 575.  The BMW court "rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award".  Id. at 582.  The 500:1 ratio in BMW v. Gore was one the court found "breathtaking".  The ratio in the instant case is not breathtaking.  It is 33:1.  In the wake of BMW v. Gore, courts, consistent with these principles, have permitted ratios greater than the maximum 9:1 ratio which defendant seems to believe this court is constrained to permit.  See, e.g., Swinton v. Potomac Corp., 270 F.3d 794 (9th Cir. 2001) (in assessing reprehensibility factor, Court

of Appeals permitted a 28:1 ratio, and thus upheld a one million dollar punitive award in a race discrimination case).[11]  The Ninth Circuit reasoned that it was precisely the type of case envisioned by the Supreme Court – one involving particularly egregious acts and "non-economic harm that might have been difficult to determine." Id. at 818.  The Court of Appeals also took into account the harm likely to result from the employer's conduct.  Id. at 819.  This is exactly the type of consideration which the Court of Appeals and the Supreme Court envisioned when it expressly stated it was eschewing any rigid mathematical formula or imposing any specific cap in terms of a ratio.  This consideration is present in the instant case for, as is discussed herein, the harm which has resulted to others beyond Tolnay and the harm "likely to result" from this highly-publicized misconduct of Wearing is serious in nature but difficult to quantify.  In Argentine v. United Steelworkers of America, 287 F.3d 476 (6th Cir. 2002), the Court of Appeals approved of a 42.5:1 ratio in a free speech case, after noting the BMW court's recognition that ratios higher than 10:1 may be permitted where the harm is particularly egregious but the economic harm is minor or the monetary value of the injury is difficult to assess.  The Court of Appeals observed

---

[11]A higher than single-digit ratio after BMW v. Gore was permitted by the Ninth Circuit on remand in Cooper Industries Inc. v. Leatherman Tool Group, Inc., 285 F.3d 1146, 1150 (9th Cir. 2002), despite the Ninth Circuit's finding that the defendant's conduct was more foolish than reprehensible and caused relatively little actual harm.  See also Zhang v. American Gem Seafoods, Inc., 339 F.3d 1020 (9th Cir.2003) (upholding $2.6 million punitive award in employment discrimination case because intentional discrimination is a different kind of harm in that it is an affront to personal liberty and further noting that race discrimination has often resulted in large punitive awards.  Id. at 1044.)

**In this case, plaintiffs' reputations and free speech rights were impaired. These injuries are without a ready monetary value as opposed to the injuries in *BMW*. Thus, while the 42.5 to 1 ratio is larger than the 10 to 1 ratio approved by the court in *BMW*, we cannot say it is unreasonable. *** The cases [defendant] relies on, however, involve economic harm to a plaintiff which is much easier to quantify than the impairment of one's free speech rights. In cases where the harm to the plaintiff involved free speech rights, the courts allow for higher ratios ... After considering the three factors prescribed in *BMW*, we decline to exercise to order a remittitur in this case.**

287 F.3d 476 at 488, citing <u>Kinslow v. American Postal Workers Union</u>, 222 F.3d 269 (7th Cir. 2000) (150:1 ratio of punitive to compensatory damages permitted in LMRDA case). This is especially true in the instant case where the court gave a standard instruction that damages can not be awarded for a constitutional violation alone but must be awarded for any injuries suffered thereby. The instant punitive award, consistent with the above authority, appropriately reflects the affront to the First Amendment involved here.

This case does not involved a damaged BMW nor the failure of a private insurer to make good on its contractual obligation. While there does not appear to be a case whose facts are on all fours as the instant one, Tolnay's case unquestionably presents as one in which the jury's assessment cannot be haphazardly chopped, as defendants would have it, without reference to these important considerations and distinctions including, perhaps most importantly, the need for deterrence to be effective. Neither Wearing, nor Chief Ortiz, and certainly not Mayor DeStefano, are going to be deterred by anything other than an award which stings and thus serves to provoke needed attention

30

by the citizens and tax-payers to the endemic problem which led to this dispute. A punitive award which defendants, insurance carriers and indemnifying municipalities can bury in their budget or shrug off as a nuisance is not going to accomplish the goal which the eight jurors in this case obviously had in mind. For these reasons, the punitive award should be left undisturbed or, in the alternative, only modestly reduced so as not to render this entire litigation a mere procedural nuisance for city officials.

Campbell, as before stated, involved a bad faith insurance claim with no resulting harm to anyone other than the plaintiffs. The Supreme Court in both cases, however, expressly stated that despite its views of the facts of those cases, it "declines to impose a bright-line ratio which a punitive damages award cannot exceed." Campbell, 538 U.S. at 425. A higher ratio is also called for and may be justified in cases in which the injury is hard to detect or, as in this case, very difficult to quantify because of the pernicious effect such official misconduct has on police officers and the public at large. See Gore, 517 U.S. at 582.[12] Nothing in the Campbell court's opinion suggests that it was overruling or rejecting in any respect its previous decision in TXO Production Corp. v. Alliance

_____

[12]Defendant also cites this court's own previous opinion in Stack v. Jaffee, 306 F.Supp. 2d 137 (D.Conn. 2003). In Stack, this court, in assessing a punitive award, searched for statutory criminal offenses analogous to the civil misconduct and looked at statutory criminal fines. Id. at 141. This approach does not comport with the Campbell court's opinion that resort to review of criminal penalties "has less utility" in determining the appropriate dollar amount of a punitive award. Accordingly, this court should not engage in such an analysis in light of this, especially since criminal fines are but an appendage to what is the real punishment in criminal statutes – imprisonment.

31

Resources Corp., 509 US 443 (1993), in which the court upheld a state court punitive award 526 times greater than the actual damages awarded by the jury.  Nor did the court overrule or express a departure from acknowledging other circumstances which support  a higher ratio.  See, e.g., Browning-Ferris Ind., Inc.  v. Kelco Disposal, Inc., 492 U.S. 257, 262 (1989) (ratio of punitive to compensatory damages was over 100:1).

**Comparable Civil Penalties**

The opinion in Gore was grounded by due process considerations but the defendant Wearing was indeed on notice, for due process purposes, that he stood exposed to such an award.  The Court's task is not to substitute its judgment for that of the jurors, nor to consider whether the court, on a bench trial, would have assessed punitive damages in a lower amount.  The court's task is to determine whether the judgment of the eight jurors in this case violated the constitutional rights of Chief Wearing.

In this regard, the instant defendant was on fair notice for there have been numerous punitive awards by juries in the seven figure range in employment, civil rights and whistleblower cases.  A current search employing VerdictSearch confirms the fact that in these types of cases involving government misconduct which harms not only an individual but implicates the public interest, civil penalties imposed by jurors have been consistently substantial.  As the report by VerdictSearch[13]

───────────────

[13]For reasons of space limitation, docket numbers and dates of verdicts are not set forth above.  But the court's attention is directed to the two VerdictSearch summaries attached hereto giving

32

indicates, the jury's award in this case hardly sets this jury apart as a runaway jury grossly departing

from the conscience of the average community.  Such verdicts include:


   –    <u>Rosenfield v. Yale University</u>  (Three doctors awarded $5.5 million in damages in a
        case involving retaliation for exercise of First Amendment rights)

   –    <u>Snyder v. Texas State Tech. College Sys</u>.  ($20 million and $15 million punitive
        damages assessments against public officials who retaliated against police chief and
        dean of students for reporting on misconduct of public officials) (District Court –
        Texas)

   –    <u>Ambrosio v. City of Garland</u>  (Punitive damage assessment of $25 million by federal
        jury in case involving retaliation against police officers for reporting perceived
        misconduct in their department)  (District Court Texas)

   –    <u>Delgadillo v.Levi Strauss & Co.</u>  (State court jury's assessment of $10 million in
        punitive damages in case involving retaliation by company officials against employees
        for filing workers' compensation claims)

   –    <u>Grassilli v. Barr</u>  (State court jury assessed in excess of $4 million in punitive
        damages against two police officers for maliciously retaliating against business owner
        for exercise of First Amendment right)

   –    <u>Abramczyk v. City of Southgate</u>  (Total of $33 million dollars in case involving
        firefighters who were retaliated against for reporting illegal taping of personal and
        business calls)

   –    <u>Renzulli v. Fairleigh Dickinson University</u> (New Jersey state court jury assessed $3.5
        million in punitive damages in case involving retaliation against professor)

_____

information regarding jury punitive damage assessments in this range in similar cases, also set forth
at VerdictSearch.com.  Any subsequent treatment or appellate proceedings in these cases has not been
researched as irrelevant to the issue whether Wearing was, for due process purposes, on notice that
he was exposed to an award in this range for engaging in the complained-of misconduct

– <u>Reid v. Brinker International, Inc.</u> ($4,350,000 assessed by federal jury in retaliation-sexual harassment case)

– <u>Williams v. Waffle House, Inc.</u> (State court jury assessed $3,460,000 in punitive damages in case alleging retaliation and sexual harassment)

– <u>Antoine v. Yellow Freight Systems, Inc.</u> (Federal court jury assessed $3 million in punitive damages in case involving hostile environment discrimination and retaliation)

– <u>Ledbetter v. Goodyear Tire & Rubber Company, Inc.</u> (Federal court jury assessed punitive damages of $3,285,000 in case involving sex discrimination and retaliation)

– <u>Talbot-Lima v. Federal Express Corp.</u> (Federal court jury assessed $2 million in punitive damages in case of gender discrimination and retaliation)

– <u>Sadowski v. Phillips Medical Systems</u> (State court jury assessed $6 million in punitive damages in case of age discrimination and retaliation for filing complaint)

– <u>EEOC. v. Bon Secours DePaul Medical Center, Inc.</u> (Federal court jury assessed $3 million in punitive damages in employment retaliation case)

– <u>EEOC v. Daimler-Chrysler Corp.</u> (Federal jury assessed $4.5 million in punitive damages in employment discrimination and retaliation case)

– <u>Miller v. Media General Operations, Inc.</u> (Federal court jury assessment of $2 million in punitive damages in pregnancy discrimination and retaliation case)

– <u>Hardeman v. City of Albuquerque</u> (Federal court jury assessed in excess of $3 million against defendants in case involving retaliation for exercise of First Amendment rights)

– <u>Kavadias v. Randolph</u> (Federal court jury assessed $4 million in case involving Mayor who violated the First Amendment by retaliating against political opponents and using his office for personal and political gain).

– <u>Ulrich v. City and County of San Francisco</u> (State court jury awarded $4.3 million to doctor on First Amendment and Fourteenth Amendment claims against compensatory damage award of $430,000

– <u>Greenbaum v. Hendelsbauken</u>, 26 F. Supp. 2d 649 (S.D.N.Y. 1998) ($1,250,000 award although reduced to comply with Title VII cap).

– <u>Passantino v. Johnson & Johnson</u>, 982 F. Supp. 786 (W.D. Wa 1997) ($1 million emotional distress, $8,600,000 punitive—trial court employing caps enters judgment for $3,400,000).

Since space does not permit an exhaustive listing, the plaintiff wishes to note generally that punitive awards in government misconduct/whistleblower and civil rights cases have been substantial, and many have fallen in the range of $1 million to $5 million dollars. Whistleblower cases frequently involve substantial damages, both compensatory and punitive, in the high six-figure and multi-million dollar range. <u>See</u> <u>The New York Jury Verdict Reporter</u> (disclosing average punitive damages verdicts for 1988-1997 ranging from $900,000 to $6 million); <u>The MA, CT, RI VERDICT REPORTER</u> (disclosing 15 cases with recovery in the range of $800,000 to $8 million, compensatory and punitive, in free speech/retaliation/reputational injury cases; 1998 LRP Publications <u>Verdict Finder</u>, (disclosing 23 civil rights verdicts ranging from $500,000 to $6,250,000; 58 reputational injury judgments ranging from $550,000 to $86,500,000, and 20 employment retaliation verdicts ranging from $500,000 to $27,700,000); <u>see also</u> PERSONAL INJURY VALUATION HANDBOOK, LRP Publications, Jury Verdict Research Series, Vol. 5 (giving statistical ranges and averages for emotional distress and punitive damage awards in employment and civil rights cases in both the

private and public sector).

Accordingly, given the reprehensibility of Wearing's conduct, the harm it caused to Tolnay, indeed the entire department, the fact that it undoubtedly has served to undermine the public's interest and public safety, and the fact that Wearing was on notice that his conduct might indeed result in such a punitive award, since many other juries have imposed like penalties, it cannot be said as a matter of law that Wearing's constitutional rights have been violated for the just punishment he has received for his malicious violation of the constitutional rights of others.l

**C.    DEFENDANT'S VARIOUS CLAIMS OF ERROR WITH RESPECT TO THE ISSUE OF INDEMNIFICATION AND SOURCE OF PAYMENT OF THE AWARDS ARE ALL WITHOUT MERIT.**

Defendant assigns as error the court's alleged decision to "allow the plaintiff to question the Mayor regarding the details of indemnification and the City of New Haven's past indemnification of police officers." See Def.'s Br. at p. 7. Elsewhere, defendant claims error in the court's response to the jury's request (see Court Exh. 1) for information regarding the source of payment for any award. See Def.'s Br. at pp. 13-15. Neither of these claims has merit.

**1.    Plaintiff Did Not Examine The Mayor Regarding Details Of The City's Indemnification Of The Defendant But Rather Responded Only To A Gratuitous And Self-Serving Statement By The Mayor**

Defendant completely mischaracterizes the ruling of the court in respect to testimony by the Mayor regarding indemnification. At no time did plaintiff's counsel seek to elicit testimony from the Mayor on the issue of whether the City of New Haven was, for purposes of this action, indemnifying

36

Melvin Wearing.  To the contrary, the word "indemnification" was uttered by the Mayor when he was

questioned about his thoughtlessness in apologizing to the congregation:

> Q.  Did you give any thought at all to whether, by taking the podium at that church and issuing an apology, that would in any way put Officer Tolnay in jeopardy in terms of civil liability?
>
> A.  Well, generally, we indemnify our officers in the performance of their responsibilities ...

Tr. IV at p. 36.[14]  Clearly, the Mayor's answer was not responsive to the question and he attempted,

by a suggest mitigation, to downplay the significance of his disregard for Officer Tolnay's interest.

Having made such a gratuitous and self-serving comment, and further used a term that it is not

generally understood by non-lawyers, plaintiff's counsel properly asked him to explain his answer.

The court permitted the Mayor to clarify what he meant whereupon, plaintiff's counsel, quite

properly, challenged the Mayor's seeming suggestion that his public apology for Tolnay's conduct

should not be viewed of a mayor sacrificing the interests of a police officer for the sake of his own

political gain because Tolnay would have been indemnified and thus would have suffered no harm

from being sued.  This was an entirely proper response by plaintiff's counsel in challenge to the

Mayor's credibility on this issue.  With that, plaintiff's counsel moved on to another subject and did

not delve further into the issue.  At no time did plaintiff's counsel question or attempt to question the

---

[14]This testimony was given on December 6, 2005.  Apparently, the transcript for proceedings for December 6, 2005 is incorrectly dated December 4, 2005.

Mayor on the issue of indemnification has it related to the defendant and his liability in this case.  As in all trials, a witness who includes in an answer a self-serving and gratuitous comment, such as the Mayor did here, can not expect to allow it to float in the courtroom without challenge.  Defendant's assignment of error in this regard is entirely without merit.

**2.    The Challenge To The Court's Response To The Jury's Note Is Frivolous As Defense Counsel Agreed To It.**

Defendant's claim of error in the court's response to the note inquiring about the source of payment is curious inasmuch as defense counsel expressly agreed to the content of the court's response.  After extensive discussion with counsel regarding the matter, the court proposed a simple advisement to the jurors that the source of payment is not a proper matter for their consideration and they were not to speculate regarding the matter.  When asked if such an instruction would be "all right", Attorney Rhodes responded, "That's fine, Your Honor."  The court repeated the content of the proposed response and once again, Attorney Rhodes stated, "That's fine, Your Honor", whereupon the court gave the instruction.  Tr. Vol. V at pp. 167-168.  Having expressly agreed to the content of the instruction, defendant cannot now be heard to complain.  Moreover, for the reasons which follow, defendant was entitled to no further instruction on the issue nor an instruction suggesting that Chief Wearing alone would satisfy any judgment.

**3.    Having Made A Tactical Decision To Forego Evidence Of His Personal Finances And A Claim That He Would Be The Sole Source Of Payment Of The Awards, Defendant's Claim Of Error With Respect To The Instruction On Punitive Damages Is**

**Without Merit.**

The jurors were interested in knowing whether Melvin Wearing would be paying damages from his own personal finances or whether he was fully indemnified by the City of New Haven. First, it must be noted that defendant is solely responsible for any juror interest in the issue. On the issue of indemnification, the defendant has engaged (and continues to engage by his post-judgment filings) in disingenuous gamesmanship. First, the defendant and his counsel ambushed the plaintiff and the court on this issue. Defendant never disclosed to plaintiff his intent to offer evidence of his finances, indemnification and source of payment. Moreover, the parties were under order, in connection with the preparation and submission of the Joint Trial Memorandum ("JTM") to identify their trial witnesses **and** to give a summary description of the anticipated testimony of each such witness. Defense counsel, in his witness list submitted as part of the JTM, identified Melvin Wearing and set forth the following description of his anticipated testimony**:**

> **"Former Chief Wearing will testify as to his knowledge and/or his participation in the events that are enumerated in plaintiff's complaint."**

See Dkt. #51.

This terse and content-deprived description in no way served to apprise the court or plaintiff of his intent to place into issue his personal finances.. Had he done so, as required in the JTM, plaintiff's counsel certainly would have alerted the court of an anticipated controversy over the scope and extent of such testimony and would properly have properly the issue. Instead, on December 7,

2005, in the defense case-in-chief, defense counsel called Mr. Wearing to the witness stand for what

turned out to be the sole purpose of eliciting testimony regarding his assets in a manner, plaintiff

notes, calculated to mislead jurors about the source of payment of any awards.  It is apparent that

Wearing did not intend, to offer, nor did his counsel intend to elicit, any further testimony beyond a

statement of his personal finances, that is, Wearing did not intend to disclose his personal finances

in tandem with a sworn assertion that he had *no other source of payment* available to him.  Plaintiff

immediately objected and counsel conferred with the court at sidebar.  Vol. 5,. at pp. 196-198.  When

asked for the purpose of such evidence, Wearing's counsel responded:  "Your Honor, she's seeking

punitive damages, so, I'm going to put on evidence as to his net worth, because otherwise, if they do

return punitive damages, I need a basis for any remitter (sic) or anything like that."  Plaintiff's counsel

advised that Attorney Rhodes was "trotting down a very thickety path" and warned that if Wearing

to put in issue his financial ability to pay a punitive damages award, plaintiff would necessarily

inquire by cross-examination into indemnification by the City of New Haven and put forth evidence

that the city in fact intended to pay the entire award, including punitive damages.[15]  Before the

---

[15]During this colloquy, plaintiff's counsel also reminded Mr. Rhodes that in a recent earlier verdict by a federal jury against Melvin Wearing, the city paid the award and this and other examples will be delved into. Id. at p. 196.  Attorney Rhodes thereafter asked for time to confer with Wearing "just to confirm these facts", indicating that he "will withdraw the question, if that's the issue". Id.  In response to a question by the court, Mr. Rhodes stated he was unaware of what Wearing knew about this issue. After conferring privately with Wearing and city counsel, Mr. Rhodes abruptly abandoned the entire line of questioning.  It is noteworthy that when the court put the question of whether the City of New Haven intended to pay any punitive award squarely to Mr. Rhodes, he dodged the

objection and sidebar conference, left hanging in the air before the jurors was Attorney Rhodes'

question to Wearing, "What is your annual salary?".  The question was never answered because

defense counsel chose to abandon the line of inquiry for fear that jurors would be advised that

Wearing is in fact fully indemnified by the City of New Haven.  By his post-judgment motion,

Wearing now complains about the jury's note and the court's response to it when it was the improper

conduct of his own counsel which led to the note.[16]  It is clear by the attempted questioning of

Wearing in this regard that defense counsel intended to mislead the jury into assuming that Wearing's

personal assets were all that existed to satisfy any judgment.  While Wearing had a right to put his

finances before the jury as relevant to the jury's consideration of the amount of the punitive award,

he voluntarily waived that right.  See Keenan v. City of Philadelphia, 983 F.2d 459 (3rd Cir. 1992)

(defendants waived right to present financial ability to pay $1.2 million punitive assessment); see also

Ikram v. Waterbury Bd. Of Educ., 1997 WL 59711 at *2 (D. Conn.) citing Smith v. Lightning Bolt

Prod., Inc. 861 F.2d 363 (2nd Cir. 1988).

Contrary to defendant's assertion, supported only by out-of-circuit authority, that evidence of

─────────────────────

question.  Id. at 197.

[16] Had Mr. Rhodes not abruptly changed course and abandoned the line of questioning, plaintiff
would have, upon a return to sidebar, further asked the court to preclude this evidence on the ground
that plaintiff was unfairly surprised and at an unfair disadvantage in respect to responding to this
evidence by defendant's complete failure to disclose this as an anticipated subject matter of testimony
in the Joint Trial Memorandum.

indemnification is disallowed in all circumstances, see Def.'s Br. at pp. 8-9, evidence of indemnification is indeed appropriate especially where, as defendant attempted to here, the party attempts to mislead a jury on the issue of available sources of payment.[17]  Defendant fails, however, to cite and take note of other contrary decisions, notably one arising in our own circuit.[18]

Wearing made an aborted attempt at what the courts call "poor-mouthing".  Neither Rule 411 nor Rule 403 of the Federal Rules of Evidence serves to exclude evidence of even liability insurance when the defendant opens the door to admissibility of such evidence by "poor-mouthing".  See Weiss v. La Suisse Societe D'Assurances Sur La Vie, 293 F. Supp. 2d 397, 413-414 (S.D.N.Y. 2003).  Where a party puts into issue his ability to pay damages, the door is opened.  Id.; see also Bernier v. Board of County Road Comm'rs for Ionia County, 581 F.Supp. 71, 78 (W.D. Mich. 1983); D.S.C. Communs. Corp. v. Next Level Communs., 929 F.Supp. 239, 248 (E.D. Tx. 1996) (defense counsel opened the door to admissibility of evidence of defendant's indemnification); see also Wright & Miller, Federal Prac. & Proc. § 5368 (noting that even the existence of insurance, otherwise inadmissible under Rule 411, becomes relevant and admissible in response to "poor-mouthing" by

---

[17]In support of this argument, defendant cites and relies entirely on decisions from the Eighth and Ninth Circuits and several out-of-circuit trial court rulings on motions in limine.  See Def.'s Br. at p. 8, n. 2.

[18]Plaintiff briefs this issue not because there was in fact evidence of indemnification introduced at the trial but to address defendant's claim that he had a right to have the court essentially advise the jurors that they were to assume that Wearing is the sole source of payment, an advisement that had no basis in the trial record since Wearing chose,  for reasons of self-interest, not to put such evidence in the record.

defendants). There is also a distinction between indemnity and insurance since Rule 411 only speaks to insurance and indemnification does not fall within the parameters of the rule. <u>DSC. Communications Corp.</u>, 929 F.Supp. at 243. Evidence of indemnification may, however, be deemed inadmissible as irrelevant under Rule 403 in normal circumstances. Where a defendant opens the door, however, particularly by "poor-mouthing", evidence of indemnification is admissible as is evidence of insurance ordinarily precluded by Rule 411. <u>DSC Communications Corp.</u>, at 248-250; <u>Larez v. Holcomb</u>, 16 F.3d 1513, 1524 n. 3 (9th Cir. 1994) (noting the opinion of Judge Pregerson concurring in part and dissenting in part); <u>Pinkham v. Burgess</u>, 933 F.2d 1066, 1072 (1st Cir. 1991); 23 CHARLES A. WRIGHT & KENNETH W. GRAHAM, Federal Practice and Procedure: Evidence § 5364 (1980) ("Finally, Rule 411 does not prohibit the use of evidence of insurance where it is relevant to the issue of damages or punitive damages ... This was also the rule at common law."); Newell H. Blakely, <u>Article IV: Relevancy And Its Limits</u>, 30 Hous.L.REV. 281, 487 n. 871 (Spring 1993) (asserting that insurance coverage is valid evidence of a defendant's "net worth when resolving punitive damages"); <u>Eurico v. Parnell Oil Company</u>, 552 F.Supp. 499, 502 & n. 2 (D.Mass. 1982), aff'd, 708 F.2d 852 (1st Cir. 1983); Leon Green, <u>Blindfolding the Jury</u>, 33 Tex.L.REV. 157, 162 (1954) ("On the issue of damages, the ability to pay is a highly significant fact, as it is in all affairs of life."). After noting this authority, the District Court in <u>DSC Communications Corp.</u> ruled that indemnity agreement were properly admitted in that case.

Wearing's counsel abandoned the line of inquiry no doubt because he was aware that he was

thus opening the door for introduction of Wearing's indemnification by the city. Bernier, supra; see also Younts v. Baldor Elec. Company, 310 Ark. 86, 832 S.W.2d 832, 834 (1992) ("When a party testifies about his/her financial condition in a false or misleading manner, however, he or she opens the door for the introduction of evidence which might otherwise be inadmissible und the collateral source rule". Seventh Circuit Court of Appeals Judge Richard Posner's observations on the matter are particularly applicable to the instant case:

> **The defendant should not be allowed to plead poverty if his employer or an insurance company is going to pick up the tab ... It is bad enough that insurance or other indemnification reduces the financial incentive to avoid wrongdoing – which is why insuring against criminal liability is prohibited. It would be worse if the cost of insurance fell, reducing the financial disincentive to engage in wrongful behavior, because the insurance company knew that its insured could plead poverty to the jury.**

Kemezy v. Peters, 79 F.3d 33, 37 (7th Cir. 1996).

In the wake of the jury's note, prior to consenting to the court's eventual instruction in response to the note, defense counsel insisted that the court advise jurors that "[they were] not to assume that anyone other than Chief Wearing would be liable for damages". See Def.'s Br. At p.14. Of course, this would have been telegraphed to jurors that Melvin Wearing had nothing but his own personal assets. As noted above, however, there was absolutely no evidence in the record to support such a charge by reason of Wearing's tactical decision to forego a claim of personal responsibility in

order to avoid cross-examination challenging the credibility of such claim.[19]

**D.    DEFENDANT'S CLAIM THAT THE COURT ERRED BY NOT SUBMITTING TO JURORS INTERROGATORIES RELATED TO A "PICKERING" BALANCE IS  MERITLESS AS HE DID NOT SUBMIT A PROPOSED VERDICT FORM, EXPRESSLY APPROVED OF THE FORM OF VERDICT SUBMITTED TO THE JURY, OFFERED NO EVIDENCE AT TRIAL TO WARRANT SUCH INTERROGATORIES AND THE ISSUE WAS OTHERWISE ONE OF LAW FOR THE COURT TO DECIDE.**

Defendant misstates the law in claiming that it is the role of juries to determine whether speech is protected and that the  court erred further in not submitting "Pickering" interrogatories to the jury.  First, it is beyond cavil that the issue whether any speech or expressive activity by the First Amendment is strictly a matter of law to be decided by the court.[20]  Connick v. Myers, 461 U.S. 138, 148 n. 7 (1983); Ezekwo v. New York City Health & Hospitals Corp., 940 F.2d 775, 781 (2nd Cir. 1991).  This court had previously determined that plaintiff's allegedly protected speech was in fact

_____

[19] The plaintiff notes that Chief Wearing has since submitted an affidavit to this court by which he engages in "poor-mouthing".  The affidavit was attached to his motion seeking relief from the responsibility to post security for the judgment.  See Def.'s March 2, 2006 "Motion For Stay Of Enforcement And Execution of Judgment ...".  The plaintiff advises the court of his intent shortly to file an objection to that motion on numerous grounds, including the impropriety of Wearing submitting self-serving, unexamined testimony in the form of an affidavit, testimony which he deliberately withheld at trial for the very reason that he did not wish to be cross-examined on it. Wearing's post-judgment affidavit is very carefully parsed and is silent on the issue of indemnification.  The entire pleading and the affidavit give rise to serious concern of a post-judgment collaboration to secrete evidence of indemnification in connection with which plaintiff will seek a hearing.

[20]Despite this long-established principle, defense counsel incredibly insisted after the charge that the jury should have decided whether the plaintiff's speech was protected.  See Tr. Vol. V  at p. 154.

45

fully protected by the First Amendment in its decision denying summary judgment and plaintiff rests upon, and thus does not repeat, those reasons here.[21]  Second,  defendant was not entitled to have the jury engage in a <u>Pickering</u> balance.  Defendant's argument on this point, set forth in a single paragraph at pages 5-6 of his brief, is simply incoherent and can best be described as a complaint that the jury was not instructed to balance, for purposes of First Amendment protection of the speech, any disruption caused by unspecified conduct by Tolnay.  The problem for defendant is that he offered no evidence of disruption on the efficiency and operations of the NHPD caused by the plaintiff's <u>protected speech.</u>  The simple reason for this is that Wearing denied that the plaintiff's protected speech had anything to do with the adverse actions.  Moreover, he failed to submit into the record a proposed verdict form or interrogatories.

> **1.    Defendant Failed To Submit A Requested Verdict Form And Interrogatories And Otherwise Expressly Agreed To The Content Of The Verdict Form.**

The Joint Trial Memorandum submitted by counsel for the parties was to include proposed verdict forms by both sides.  Plaintiff submitted a proposed verdict form.  Defendant did not but merely indicated that he would at a later date.  <u>See</u> Joint Trial Memorandum, Docket # 51.  Defendant failed thereafter to propose a form of verdict and interrogatories and, although there was an unrecorded chamber's conference in which these issue were discussed, defendant did not submit any

---

[21]Defendant does make this baseless claim in his renewed motion for judgment as a matter of law and plaintiff briefs the First Amendment issue in opposition.

proposals nor did he orally advance particular proposals on the record.[22]  Moreover, after the jury was

charged, the court asked counsel for their position on the form of verdict and interrogatories prepared

by the court.  The record reflects the following:

> **THE COURT**:  Just take a look at the Jury Verdict Form, if you would, please.
> **MS. TORRE**:   I've done that and the plaintiff is fine with it, Your Honor.
> **MR. RHODES**: Your Honor, we reviewed it also and we believe this is exactly what we had
>                 discussed in the conference.

Tr. Vol. V at p. 157 (emphasis supplied).  With this, defendant can hardly be heard now to complain

about the form and content of the interrogatories and the verdict form.

> **2.      Defendant's Proposed Jury Charge On the "Pickering" Balance
>           Test Was Itself A Complete Misstatement Of The Law As Applied
>           To The Facts of This Case And The Defendant Otherwise Offered
>           No Evidence Upon Which The Requested Instruction Could Be
>           Given.**

Notably, in his request to charge, Wearing reiterated his complete denial that the plaintiff's

constitutionally-protected speech had anything whatever to do with the adverse actions.  See Def.'s

Proposed Jury Instructions (Doc. #51-5 filed 11/29/05 at p. 1) ("Chief Wearing denies that he

retaliated against the plaintiff for any protected speech and claims that the plaintiff's suspension was

---

[22]As the court is aware, defendant attempts belatedly to account for this failing by improperly
attempting to "correct" the record post-judgment.  See "Defendant's Motion to Correct/Supplement
Record" dated December 28, 2005.  In his opposition to said motion filed January 12, 2006,  plaintiff
notes that no rule of civil procedure or other authority permits a party to attempt, post-trial, to alter
or create a new record.  Plaintiff's objection further notes the impropriety of "correcting" the record
with a post-judgment filing that is itself incomplete and undated.

based solely on his conduct in walking out of their meeting of August 13, 2002".)    Wearing

maintained this trial strategy throughout.   In his opening statement to jurors, defense counsel

expressly and repeatedly denied that any of the identified protected speech had anything to do with

the adverse actions.   Instead, defense counsel insisted, it was Tolnay's act of "walking out" of the

meeting on the Chief, and that act alone, which motivated Wearing to take the challenged actions.

Tr. Vol. II at pp. 58-60.   Throughout his testimony Wearing flatly denied any nexus between the

speech deemed protected as a matter of law and the adverse actions. Defense counsel kept to this

theme throughout his entire closing argument to the jury – denying any connection whatever between

the protected speech and the adverse actions.   Consistent with this trial strategy, at no time did

Wearing claim or offer evidence that Tolnay's presumptively protected speech served to disrupt

NHPD operations and/or impede efficiency and morale such that the employer's interest in this regard

outweighed the value of the speech and, hence, the level of First Amendment protection accorded to

it.   Of course, had Wearing conceded a nexus between the protected speech and the discipline, he

would have been hard-pressed to show how such speech was disruptive and outweighed in any

Pickering by the employer's interest.   See e.g. Conaway v. Smith, 853 F.2d 789, 797 (10th Cir. 1988)

(a government employee's speech is protected "unless the employer shows that some restriction is

necessary to prevent the disruption of official functions or to ensure effective performance by the

employee").   See also Vasbinder v. Ambach, 926 F.2d 1333, 1339 (burden is on the employer to show

that the speech's disruption of the efficient performance of its operations outweighs the employee's

48

speech interest).  In his request to charge, while stating the generic balancing concept, defendant

failed to distinguish between what plaintiff asserts was the motivating factor (i.e., the protected

speech) and what the <u>defendant</u> claims was the motivating factor (i.e., walking out of the meeting ).

<u>See</u> Def.'s Proposed Jury Instructions at p. 5.[23]  Although it would have been unsuccessful as a matter

of law, Wearing could have conceded a nexus between the protected speech and then, by his own

testimony or that of other witnesses, offered evidence of any alleged disruption the speech had on

operations, efficiency and morale.  While it is true that the Second Circuit stated that "it can envision

cases in which the question of the degree to which the plaintiff's speech could reasonably have been

deemed to impede the employer's efficient operation would properly be regarded as a question of

fact, to be answered by the jury prior to the court's application of the <u>Pickering</u> balancing test",

<u>Vasbinder</u> at 1339, a  party, however, is not entitled to a jury instruction for which there is no factual

predicate in the trial record.  <u>See</u>, <u>e.g.</u>, <u>Perry v. Ethan Allen, Inc.</u>, 115 F.3d 143, 153 (2nd Cir. 1997).

In <u>Vasbinder v. Ambach</u>, also a case involving retaliation for protected speech, the Second Circuit

rejected the very claim Wearing makes here.  Defendant in that case expressly denied any nexus

between the plaintiff's protected speech and the adverse actions and then challenged the trial court's

---

[23]     Where defendant proposes the following: "In other words, you may still find in favor of Chief
Wearing if you find he reasonably believed Officer Tolnay's <u>conduct</u> would potentially interfere with
or disrupt the activities of the police department in a way which outweighed the plaintiff's First
Amendment rights."  Defendant did not elaborate on which "conduct" he was referring to, rendering
the proposed instruction meaningless and confusing.

failure to submit factual questions to the jury for resolution of the Pickering test. 926 F.2d at 1340. While noting that there may be instances in which a jury must resolve certain questions of fact that may be relevant to the court's application of Pickering, no such issue for the jury exists where the defendant does not provide one. Id. ("In the present case, however, given the [defendants'] defense that Vasbinder's contact with the FBI had nothing to do with their decisions, we agree that there was no fact issue for the jury.") (Emphasis supplied.) In short, Wearing offered no evidence for the jury to weigh in any balance. He gambled entirely on his wholesale denial of any nexus between plaintiff's protected speech and the disciplinary action.[24] The jury did not believe him and the evidence amply supports their decision. The trial evidence also amply supports the jury's outrage over these events and their considered and collective judgment as to the amount necessary to ensure against a repeat of such misconduct by officials in utter disregard for their oaths of office, the rights of others and the rights of the citizens who entrust those offices to them.

For all of the foregoing reasons, defendant's motion for a new trial should be denied.

---

[24]Once again, plaintiff does not wish to be heard as arguing that Wearing would have had a viable Pickering claim even if he conceded a nexus. Upon the authority extensively set forth by the court in its ruling denying summary judgment, it is well-established law that the more an employee's speech involves substantial matters of public concern, the greater the government's burden in proving that resulting disruption outweighs the value of the speech. Moreover, speech regarding government corruption, charges of unlawful conduct, particularly disclosed by law enforcement whistle-blowers, occupies the highest rung of first amendment protection and is rarely if ever outweighed in the Pickering balance by the employer's interest in efficiency of operations. See Ruling at pp. 40-44.

THE PLAINTIFF
ARPAD TOLNAY


BY:_____
KAREN LEE TORRE
Federal Bar No. ct01707
Law Offices of Karen Lee Torre
51 Elm Street
Suite 307
New Haven, CT 06510
(203) 865-5541

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed on this 6th day of March, 2006 to:

Robert A. Rhodes, Esq.
Halloran & Sage, LLP
315 Post Road West
Westport, CT 06880

John Burns Farley, Esq.
Ralph W. Johnson III, Esq.
Halloran & Sage
One Goodwin Square
225 Asylum St.
Hartford, CT 06103


_____
KAREN LEE TORRE

51