United States District Court
District of Connecticut
FILED AT NEW HAVEN
3/22
Kevin F. Rowe, Clerk  20 06
By /s/ [signature]
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ARPAD TOLNAY

        Plaintiff,

V.

MELVIN WEARING

        Defendant.

: Civil No. 3:02CV1514 (EBB)

: March 20, 2006

**PLAINTIFF'S OBJECTION AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

**I.    THE FACTS AS FOUND BY THE JURY.**

Based on the allegations, the trial evidence and the verdict form the jurors can be said to have the following facts. At the time of the events complained of, Arpad Tolnay was a New Haven police officer with an excellent record. He is married with two young daughters, his wife a part-time hairdresser. Tolnay graduated from local schools, served in the United States Army, in its mechanized infantry, and thereafter continued to serve the country for ten years in the Reserves as a military police officer. Free of any controversy or disciplinary problems, Tolnay was honorably discharged, thereafter served in several jobs and then pursued his dream of becoming a police officer as a permanent occupation. He joined the New Haven Police Department ("NHPD") in December of 1998. Tr. Vol. 2 at pp. 62-68.[1] From the date he joined the NHPD

---

[1] The trial transcripts have been submitted along with defendants' moving papers and are otherwise in the record set forth by designated volumes for each day of proceeding. Citations to the record

until the summer of 2002 when the events which led to this action took place, Tolnay had never been involved in any controversy or scandal, had never engaged in conduct which brought embarrassment or disrepute to the department; nor was he the subject of disciplinary action. Id. at pp. 68-69. Tolnay later was assigned to patrol in New Haven's "Fair Haven section", a large district populated mainly Hispanics. Tolnay was exposed to the area as a result of plainclothes duty in a narcotics unit and work with the DEA on a federal narcotics task force handling many investigations originating from the Fair Haven section.. Tolnay enjoyed the assignment as it was his favorite district in the city. He came to know the district well and its residents and culture. Tolnay himself is Hispanic and fluent in both English and Spanish which served him well in the assignment. Id. at pp. 70-72. He distinguished himself in the assignment and was the recipient of letters of commendation and recommendations for awards. He also received commendatory letters from residents and his supervisors were always pleased with his work. Id. at p. 72.

The NHPD is a large department with approximately 480 law enforcement officers. Id. at p. 73. Police Chief Melvin Wearing was a political appointee of the Mayor, who, under the city charter, has the sole power of political appointment of the city's police chief. Mayor John DeStefano has been in office some 14 years, must run for re-election every two years and for a

---

herein are by designation to the volume and pages of such volume as: "Vol. ____ at pp. ____". All exhibits will be referred to herein as "Exh. ____." and will denote a plaintiff's exhibit unless otherwise stated.

long time has enjoyed the political support of Armando Hernandez and Daniel Rodriguez, two Hispanic ministers who lead large evangelical congregations in the city. Hernandez in particular is a valuable political supporter of the Mayor, was part of a group of ministers who endorsed the Mayor at public press conferences and whose leadership of the large congregation of the Second Star of Jacob Church in the Fair Haven district makes him an influential leader of a valued voting bloc. Rodriguez is a colleague of Hernandez who is also politically valued by the Mayor and who, according to Wearing, has a criminal arrest history.

On July 26, 2002, the NHPD received repeated calls from residents in the area of Hernandez's church which is located in a residential neighborhood; residents were disturbed by loud music coming from the church. Responding officers, Tolnay not among them, arrived to find a large group of people involved in an outdoor service in a parking lot using concert-sized speakers blaring excessively loud music. Those present were told to bring the service inside and to lower the volume; the incident was considered resolved. In reality, the congregants and their leaders, although they moved inside, still positioned the amplifiers in open windows such that the music was projected outward which led to additional complaints by neighbors. Tolnay was dispatched and while in his vehicle four blocks away could hear very loud music despite the fact that the air conditioning was on in his patrol car and the windows were closed completely. Id. at pp. 82-83. Upon arrival at the church, the music was deafening and the concert-sized speakers were on stands rising above Tolnay's height of 6' 2". Officer Jamie Abate arrived as back-up. Id.

at pp. 83-85. Tolnay and Abate thereafter experienced the unexpected in confronting the Rev. Armando Hernandez. Rather than cooperate and comply with the officers' request for a lowering of the volume, Hernandez flatly refused, became loud and belligerent and engaged in theatrics, insisting that officers handcuff and arrest him. Hernandez's conduct led to the exit and gathering of churchgoers. The crowd was hostile and unruly and, incited by Hernandez, screamed at and converged on the officers and surrounded their patrol vehicles, invading the officers' "safety zone". While Tolnay was removing Hernandez to another location for safety reasons, one Sgt. Hoffman, summoned by Tolnay, arrived. At this point, Daniel Rodriguez roared up to the curb in a van, jumped out and interfered with the officers, engaging in similar theatrics as Hernandez, insisting that he be arrested as well. He was arrested after refusing repeated demands to desist and after he chest bumped Sgt. Hoffman who made the decision to arrest Rodriquez. Throughout the incident, the officers heard individuals in the crowd shouting profanity and abuse, including comments suggesting they believed they enjoyed a privileged status with the Mayor. Among the comments were, " You don't know who you're dealing with", "we're going to call the Mayor", and "the Mayor will be out her in five minutes." Others hurled verbal abuse at the officers and still others made vulgar gestures, including giving the officers "the finger". One individual, perceiving Tolnay as White, subjected Tolnay to the worst vulgarity ("Fuck you, white officer") Id pp. 93, 99-100; Exhs. 1, 2.

    Immediate and prominent media attention to the arrests ensued. Exh. 3. As early as July

4

31, 2002, Hispanic leaders and Fair Haven aldermen were demanding an apology from city officials. Tolnay became the central figure in a political firestorm and a punching bag for those who had clout with the Mayor and those who viewed it in their interest to indulge his political needs. The ministers commenced organizing a protest march on the police station[2]. Wishing to maintain the good graces of the arrestees and the members of their respective flocks, the Mayor planned a public apology to them. In furtherance of the Mayor's political interests in this regard, Wearing, only six days after the arrests and after conferring with the Mayor, made a surprise appearance in New Haven Superior Court and exercised political muscle on the chief prosecutor in an effort to get the charges dismissed. The prosecutor, David Newman, quickly acceded and effected an immediate dismissal of all charges against Hernandez and Rodriquez long before the men were due to appear in court. Both Wearing and Newman denied this account but Sheri Murowski, Newman's secretary, confirmed the event as aforedescribed and noted that the manner of Newman's disposition was unprecedented and the incident gave rise to shock and consternation among courthouse staff. Jurors obviously determined that Wearing lied when he denied having pressed Newman for a dismissal.

The exercise of political influence in getting the charges dropped was timed to coincide

---

[2] The ministers led some 1,000 people in a protest march through the streets toward the police station at One Union Avenue. Wearing and the Mayor allowed this march, which disrupted business and downtown traffic, without requiring the ministers to undergo the permit process with which everyone else is required to comply.

5

with the Mayor's appearance at the Second Star of Jacob Church to enable him to announce the dismissal of the charges, take credit for it and ingratiate himself with the crowd. The Mayor's conduct ignited another firestorm of controversy and a huge front-page headline and article in the New Haven Register recounting DeStefano's public apology and the reaction of officers as voiced by their union President that the Mayor had "sold out" his own officers for political gain. Exhs. 6, 7. Despite the Mayor's apology, the mass march took place and prominent press attention came with it, including to Tolnay's embarrassment and humiliation, an account by the New Haven Register of a city official soliciting Hernandez' opinion at the protest on the matter of discipline to be imposed on Tolnay

Amid these events, on August 3, 2002, Tolnay was on patrol, accompanied by Officer Walesta Bermudez, when they observed an individual recklessly driving a topless Jeep with children hanging off of the roll-bar. Bermudez told Tolnay to pull the driver over. Upon approach, Tolnay discovered the driver was none other than Daniel Rodriguez. Given the political firestorm which had ensued over the July 26th incident, Tolnay feared taking action against Rodriguez and allowed him to go on his way, especially since Rodriguez was using the children hanging off of the roll-bars to distribute fliers announcing the planned protest of Tolnay's earlier actions. In connection with this incident, Tolnay immediately advised his supevisor and this in turn resulted in an order being barked over the radio (for all including civilians to hear) by Captain Francisco Ortiz who criticized Tolnay and ordered him to stay away from Rodriguez and

6

Hernandez. Ortiz, who had close ties to Hernandez, Rodriguez and the Hispanic community, and who aspired to succeed Wearing as Chief, was thus viewed by Tolnay as improperly interfering with officers' ability to discharge their duty. Tolnay accordingly drafted a report recounting the incident with Rodriguez, stated his opinion that he was unable to discharge his duty due to the political influence and connections of Rodriguez and further added that his feelings in this regard were confirmed by the oral order issued by Ortiz. Tolnay repeated, at the close of his report, his view that he felt hampered in his duties due to the political involvement of Rodriguez. Exh. 4. Rodriquez' political clout gave him direct access to Ortiz, who, as head of patrol, held a high place in the NHPD hierarchy and reported directly to Wearing. Rodriguez complained about the motor vehicle stop.

In furtherance of his own personal and political self-interest, Captain Ortiz personally visited Rodriguez' home and collaborated with Rodriguez in the lodging of a "civilian complaint" against Tolnay in connection with the motor vehicle stop. Although the incident was, by itself, of little import, Rodriguez' status of a valued political ally of the Mayor transformed the incident into one of political magnitude. After demanding reports of all officers involved or with knowledge of the MV stop, Ortiz forwarded to Wearing a memorandum which contained a variety of lies and false allegations against Officers Tolnay, Bermudez and Colon. Rodriguez, spurred by Ortiz, concocted a host of allegations of rude and insensitive conduct on the part of the officers. Those allegations turned out to be patently false.

7

Ortiz, by his own account was "very disturbed" by the content of Tolnay's Case Incident Report, in particular Tolnay's opinion that he cannot perform his duties due to the political influence of Rodriguez. Ortiz considered such an opinion "unacceptable" and Tolnay's other like comments "inappropriate" and indicated that unspecified action will be taken against Tolnay upon his return from vacation. Exh. 16. Upon receipt of Ortiz' memorandum, Wearing to punish and retaliate against Wearing for having raised the issue of political corruption within the department. In the wake of Ortiz' memo, Wearing thus summoned Tolnay to his office.

Since the July 26, 2002 arrests of the ministers was entirely lawful (and in fact effected by a supervisor of Tolnay and Abate) Wearing knew that he could not, with any pretense of legitimacy, take action against Tolnay on account of the arrest. Rather, Wearing orchestrated a meeting with Tolnay with the aim of concocting another pretext under which he could retaliate against Tolnay for his expressed opinions and chill him and others from engaging in any further expression on the matter of the Mayor's and the Chief's political interference with law enforcement. Thus, at an August 13, 2002 meeting, Wearing, who had not bothered to read any of the officers' reports respecting both incidents, proceeded to bully and attempt to bait Tolnay into admitting that he had done something wrong. Tolnay resisted the baiting and defended his conduct in all respects and the more he did so, the angrier Wearing became. Throughout the meeting, Wearing was accusatory and persistently interrupted Tolnay as he tried to answer the Chief's questions. Wearing became particularly incensed when Tolnay repeated his opinion that

8

the conduct of Captain Ortiz was inappropriate and that the meeting and the controversy were the result of politics. Although Jamie Abate was in the meeting, Wearing for the most part ignored her and focused on Tolnay who was the target of the intended retaliation. Incensed at Tolnay's opinion that Ortiz' conduct was inappropriate and unprofessional, and Tolnay's comment about the political character of the meeting, Wearing, a tall and large man, jumped to his feet, thrust his finger in Tolnay's face and hurled a series of abusive comments at Tolnay. Tolnay stated he wished to speak to an attorney and got up to leave at which point Lieutenant Leo Bombalicki, a Union representative, told Tolnay to go out in the hallway and wait for him as he spoke to Wearing. Jamie Abate followed Tolnay out into the hallway. Wearing immediately ordered another meeting to be scheduled with Tolnay. Vol.I, pp. 229-244; Vol. IV, pp.132-147 (testimony of Leo Bombalicki); Vol. 5, pp. 121-126 (testimony of Jamie Abate Sanchez) NHPD Human Resources Manager Scott Nabel, also present at the meeting[3], confirmed under cross-examination that Wearing became most agitated at the point at which Tolnay expressed his opinion about Ortiz. Vol. V, p.195. On August 14, 2002, Wearing ordered Tolnay to his office again for a "continuation of our discussion" regarding the Rodriguez MV stop and Tolnay's conduct during the meeting the day before. Upon arrival in the chief's office, however, there was no discussion

---

[3] Nabel authored for the Chief all disciplinary memoranda and his presence at the meeting along with a union representative clearly foretold Wearing's intent to use the meeting as a basis to discipline Tolnay.

9

as before anyone said anything, Wearing suspended Tolnay from his employment for a period of ten days (effectively 15 days) on a variety of concocted charges, all of which boiled down to an allegation of insubordination and disrespect toward the Chief. Exhs. 17 and 18. In a further retaliatory act, Wearing ordered Tolnay to one of the most undesirable duties in the NHPD, desk duty in a dank and windowless detention area where Tolnay was relegated to fingerprint and other booking duties. Wearing also humiliated Tolnay by ordering him to submit to "diversity" or "sensitivity" training, the implication being that Tolnay harbored some sort of ethnic hostility or insensitivity toward New Haven's Hispanic community. Since Tolnay is himself Hispanic, the order to undergo such training was a personal wound and served to besmirch his character. Tolnay was left to languish in the detention center for some seven months and the reassignment itself signaled to the entire department that Tolnay had displeased the administration.

Tolnay, who before all this had been a conscientious officer with a good record and superb reputation in the community, and proud of it, was extremely embarrassed by these events and all of media attention to it. News of Tolnay's suspension and reassignment also was the subject of newspaper attention. Tolnay's wife and daughters were also exposed to the media attention.

In publicly apologizing to the congregation of the Second Star of Jacob Church, Mayor DeStefano had given no forethought to the effect his conduct would have on morale in the NHPD. Nor did he consider the fact that among the crowd of people to whom he was apologizing were those who had engaged in near mob violence against city officers and otherwise placed them in

10

fear for their safety. Nor did the Mayor consider whether his apology would serve not only to exonerate but encourage those who wished to engage in such conduct toward officers in the future. Finally, the Mayor gave no thought to whether, in light of the unconditional dismissal of the criminal charges he was by his conduct exposing Tolnay and his colleagues to a civil suit for false arrest and putting himself in the position of having his apology used as evidence in furtherance of any such claims.

Officer Jamie Abate (now Sanchez) confirmed Tolnay's account of events and his and Bombalicki's account of the office meeting with Wearing. In terms of the effect of Wearing's misconduct, Officer Sanchez recounted a subsequent incident in which she received a bizarre order from her supervisor to travel to a business location in the Fair Haven district and "retrieve something" from a man who will meet her there. As it turned out, the nephew of Daniel Rodriguez had been arrested for interfering with a police officer, a class A criminal misdemeanor. He evidently had complained to his uncle who in turn once again used his political clout with city officials to influence the outcome. In particular, Rodriguez had directly telephoned and called upon Captain Ortiz to intercede. Sanchez arrived at the Grand Avenue location, she was met by Daniel Rodriquez who, possessed of the arrest summons issued to his nephew, tore it up into little pieces and thrust it at Sanchez stating, "Here, I don't need this". Sanchez was shocked. Vol. V, pp. 128-130.

Sanchez was asked to testify regarding the impact retaliation against Tolnay has had on

11

her as a law enforcement officer. Sanchez told the jurors that if she were in the future faced with a situation where she was duty-bound to arrest, for example, Daniel Rodriquez, she is not confident that she would proceed to enforce the law and make an arrest. She confessed that she might hesitate because she does not wish to experience what Arpad Tolnay endured as a consequence of his enforcement action against the Mayor's political supporters. Id. p.131. The disciplinary and other actions taken by Wearing against Tolnay were in stark contrast, and known as such, to Wearing's established approach to discipline - a rather disgraceful history as Wearing has tolerated (and apparently had no problem with) the worst type of conduct by NHPD officers, including criminal activity, disorderly conduct resulting in criminal arrest, drug dealing, disrespect and insubordination toward superiors, wife-beating, telling one's supervisor to "shove it up his drunk ass", dereliction of duty, disruptive temper tantrums in public areas of the department, vulgar and offensive conduct toward other officers on account of their ethnicity, sleeping while on duty, sleeping while assigned to protect a terrorist target location during a state of national alert (placing the public at risk), threatening supervisors with physical violence and, last but not least, public urination. See Exhs. 19-35.

The jury found that Wearing not only retaliated against Tolnay for the exercise of first amendment rights but found that Wearing did so intentionally and with malice.

## II.   PROCEDURAL BACKGROUND

On September 2, 2003, the defendant filed a motion for summary judgment accompanied by a supporting memorandum of law (Dkt.## 12, 13). By those moving papers, defendant argued in the first instance that plaintiff's speech and expression regarding the improper, politically-based interference by a city official with neutral law enforcement was unprotected by the First Amendment. In the alternative, defendant posited that even if he were found to have maliciously retaliated against plaintiff on account of such protected speech, he was nevertheless entitled to qualified immunity from liability for the consequent harm suffered by Officer Tolnay. The plaintiff submitted opposition papers including an extensive memorandum of law. On March 9, 2005, the court issued a 52-page ruling denying defendant's motion for summary judgment in its entirety. (Dkt. # 29)

The matter proceeded to trial before a jury of eight, commencing on December 1, 2005 and concluding on December 12, 2005 when the jury returned a verdict in favor of Officer Tolnay.. Judgment thereafter entered in accordance with the verdict on December 14, 2005. By the verdict form, the juries indicated their rejection of defendant's claim that he took adverse action against Officer Tolnay for the sole and legitimate reason that Tolnay had engaged in insubordinate and disrespectful conduct toward the Chief. Rejecting Wearing's stated justification for the adverse actions as a pretext for what was in reality retaliation for plaintiff's expression of opinion regarding political influence-peddling resulting in political patrons and supporters being relieved from

13

obedience to state laws and city ordinances. Jurors found that in truth plaintiff would not have been disciplined on alleged charges of disrespect and insubordination in the absence of his protected speech. Jurors also found that Chief Wearing acted with malice and/or in reckless disregard of Officer Tolnay's civil and constitutional rights.

On December 7, 2005, upon the close of the plaintiff's case-in-chief, defendant, through his counsel, advanced and argued a motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. The motion was terse, to say the least, and consisted of a series of skeletal, conclusory statements, unaccompanied by specific references to the trial record and devoid of a single citation to legal authority. Defense counsel argued as follows:

> Your Honor, at this time, pursuant to Rule 50, we move for judgment as a matter of law on the following grounds:
>
> First, that the plaintiff did not engage in any protected speech. He did not speak out on any matters of public concern. Rather, we believe that the evidence shows that he spoke on matters which were of personal interest to him.
>
> Second, we believe that the evidence also shows that the plaintiff was suspended because of his insubordinate conduct, and not because of any alleged protected speech.
>
> Third, we believe that the evidence shows that the Defendant's interests in maintaining the discipline in the department outweighs the plaintiff's First Amendment rights concerning any protected speech.
>
> Fourth, we believe that the evidence shows that the defendant would have suspended the plaintiff even in the absence of any alleged protected speech.

14

> Finally, we believe that the evidence shows that the defendant is entitled to qualified immunity as a reasonable employer. In the position of the defendant, we would believe that the plaintiff did not engage in protected speech. And that a reasonable employer, in the shoes of the defendant, we would believe that he could suspend the plaintiff based on his conduct, which occurred at the August 13, 2002 meeting.
>
> And we believe that the evidence would not support a reasonable jury's finding in favor of the plaintiff on his claims.

Tr. 12/7/05 at pp. 141-42.

In response to this wholly insufficient Rule 50 motion, plaintiff's counsel advised the court that the motion, devoid of content, and consisting of but a series of conclusory statements, could give rise to no more than simple denials in response. Tr. 12/7 at pp. 142-43. Defense counsel thereafter purported to make an effort to reinitiate a Rule 50 motion with more particularity, arguing that the several instances of plaintiff's expressions were not on a matter of public concern and were therefore unprotected. Other than making a generalized reference to defendants' "jury charges" and "the law which was submitted in [defendant's] prior motion for summary judgment", defense counsel neither cited nor discussed any authority, much less applied any such authority to the actual trial testimony and documentary evidence. In closing his comments, defense counsel also urged a grant of qualified immunity based on his belief that "it was reasonable for Chief Wearing to believe that he could suspend the plaintiff based on [the conduct in the meeting] without violating [Tolnay's] First Amendment right." Counsel furthered that "a jury would find and must find that the plaintiff would have been suspended absent any alleged political speech. And that's about it Your Honor". Id. at

15

146.

The court thereafter properly noted that the issue of First Amendment protection of plaintiff's speech had already been addressed in the court's ruling on defendant's motion for summary judgment. The court further stated its belief that the other arguments advanced by counsel all involved questions of facts for a jury to decide, including, but not limited to, the issue of whether it were true as defendant claimed, that h would have taken punitive action against the plaintiff even in the absence of the protected speech.[4]

### III. ARGUMENT

#### A. DEFENDANT'S POST-JUDGMENT MOTION FOR JUDGMENT AS A MATTER OF LAW MUST BE CONSTRUED AS A RENEWAL OF HIS RULE 50 MOTION ADVANCED AT TRIAL WITH THE COURT'S CONSIDERATION LIMITED TO THOSE CLAIMS AND ARGUMENT ADVANCED AT TRIAL.

Under Rule 50(a) a JMOL must be made prior to the submission of the case to the jury. The Rule requires a party to "specify the judgment sought and the laws and the facts on which the moving party is entitled to the judgment." Id. Rule 50(b) allows for a renewal of the motion after an unfavorable verdict but "[t]he post-trial motion is limited to those grounds that were specifically

---

[4]Or put another way, whether the defendant in truth suspended the plaintiff for insubordinate or disrespectful conduct or whether, as plaintiff claims, such was defendant's "cover story" for what was in reality the intent to punish plaintiff for raising the issue of corruption and to chill the plaintiff from making any other statements regarding it. As is shown herein, this is a distinction which defendant to this day fails to acknowledge.