UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ARPAD TOLNAY | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil No.  3:02CV1514 (EBB) |
| V. | : | |
| | : | |
| MELVIN WEARING | : | |
| | : | June 30, 2006 |
| Defendant. | | |

**PLAINTIFF'S MEMORANDUM OF LAW ON THE ISSUE OF THE UNITED
STATES SUPREME COURT DECISION IN *GARCETTI V. CEBALLOS***

**I.    BACKGROUND**

On May 30, 2006, the United States Supreme Court delivered an opinion in the case of

Garcetti v. Ceballos, 547 U.S. ____ (2006).[1]  On June 2, 2006, this court issued an order, *sua*

*sponte*, directing counsel for the parties in this action to submit briefs addressing the question

whether and to what extent the Garcetti opinion bears on Tolnay's case.

**II.    SUMMARY OF THE PLAINTIFF'S POSITION**

Upon analysis of the facts and opinion in Garcetti and other relevant and applicable

Supreme Court precedent, plaintiff, for the reasons set forth herein, submits that the opinion in

Garcetti does not provide a basis on which to disturb the verdict and judgment in this case.  Set

forth below, *seriatum*, are: (1) an overview of the facts of Garcetti and the reasoning of the

majority opinion; (2) an overview of the facts and opinion in the cases of Givhan v. Western Line

---

[1]References to the decision will be made by citations to the pages of the Slip Opinion.

Consol. School Dist., 439 U.S. 410 (1979) and other related cases, the continued vitality of which was confirmed by the Garcetti majority; (3) an overview of the facts of the instant case as established by the trial evidence and the jury verdict; and (4) plaintiff's legal analysis and argument.

As the record demonstrates, the expressions which formed the basis of Tolnay's First Amendment claims were not required by and made pursuant to his official duties as a New Haven police officer and did not constitute speech which Tolnay's employer commissioned or created. To the contrary, and by defendant's own admission (and that of Captain, now Chief, Francisco Ortiz) Officer Tolnay's speech was perceived as unwanted and improper political commentary and complaints unrelated to his official job duties, which places Tolnay's case squarely within the Givhan, Connick, Rankin line of cases and their progeny in this circuit all of which this Court invoked in denying Wearing's motion for judgment and all of which is still good law. In addition, the particular factual circumstances of Tolnay's case yield the conclusion that, apart from pure retaliatory punishment, Wearing sought by his actions to effectively chill Tolnay and other officers from engaging in further complaints and expression of opinion – of whatever manner and in any other fora – regarding politically based interference with law enforcement and misconduct of city officials.

As plaintiff will demonstrate, the opinion in Garcetti is not, as Chief Wearing prefer it to be, a departure from the court's established jurisprudence in the area of government employee

speech.  To the contrary, the <u>Garcetti</u> majority cautioned against such interpretation, stating its view that its holding was consistent with the court's precedents. The very position of the parties in <u>Garcetti</u> together with the text of the opinion show that the Supreme Court was redressing the Ninth Circuit Court of Appeals' unjustified departure from the established jurisprudence.

Finally, throughout this litigation, from its beginning to judgment, Chief Wearing never advanced a claim grounded upon the considerations and principles which underlie the <u>Garcetti</u> holding, no doubt  because defendant has never and cannot now claim that the speech on which Tolnay's First Amendment claims were predicated owed its existence to Tolnay's official job duties or was otherwise commissioned by Tolnay's employer.  Chief Wearing advanced no such claim in his motion for summary judgment nor did he advance any such claim or argument in support of his motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 upon the close of evidence at trial.  To the contrary, Chief Wearing's own statements and position on the nature and character of Tolnay's speech belie any post-judgment effort to recast the record to fit the confines of the <u>Garcetti</u> holding.

## III.    <u>GARCETTI V. CEBALLOS – OVERVIEW</u>

### A.  <u>The Facts Of Garcetti</u>

The plaintiff in <u>Garcetti</u>, Richard Ceballos, was employed as a Deputy District Attorney for the Los Angeles County District Attorney's Office.  Ceballos was a "calendar deputy" in a branch office and among his official job duties was the duty to review and assess new warrant-

based arrests and prepare "disposition memorand[a]" for transmittal to his supervisors.  <u>Garcetti</u> <u>v. Ceballos</u>, 547 U.S. ___ (2006), Slip Op. at pp. 1-2. [2]  In connection with a pending criminal case, Ceballos had received a call from the defense attorney handling the matter who requested Ceballos' review of perceived inaccuracies in the affidavit which provided the basis for a search warrant, a request, the Court noted, which was not unusual for Calendar Deputies.  <u>Id</u>. at p. 2. After looking into the matter, Ceballos determined that the warrant affidavit contained misrepresentations and, in his written disposition memorandum to his supervisors, recommended dismissal of the case based upon these concerns.  <u>Id</u>.

Ceballos later had a meeting to discuss the matter with his superiors, also attended by the warrant affiant and others from the Sheriff's Department, a meeting which "became heated, with one Lieutenant sharply criticizing Ceballos for his handling of the case".  <u>Id</u>.  Ceballos' superiors decided nonetheless to proceed with the prosecution pending the trial court's disposition of the arrestee's dispositive motion based on the search warrant affidavit's inaccuracies.  Ceballos was called by the defense to appear and testify at the trial court's hearing on the defendant's motion during which he "recounted his observations about the affidavit. . . .".  <u>Id</u>. at pp. 2-3.  Ceballos

---

[2]

 Justice Kennedy delivered the opinion of the majority and while the opinion does not go into great detail regarding the range and particulars of Ceballos' daily work duties, fairly deduced from the opening pages of the opinion is the fact that a routine duty for Ceballos as Calendar Deputy was the assessment of incoming cases and the preparation of disposition memoranda to superior prosecutorial officials setting forth the strengths and weaknesses of these cases and recommendations for disposition, which presumably would include suggestions alternately to plea bargain a case out, dismiss it or prosecute it fully.

later brought an action against his supervisors  asserting a violation of his First Amendment rights based on alleged retaliation against him, for, among other expressive activity, the fact and content of his disposition memorandum.  Id. at p. 3.  There was no dispute that the memorandum was not crafted for any purpose independent of Ceballos' completion of routine job tasks. Ceballo's supervisors determined not to drop charges based on Ceballos' recommendation but to allow the trial court to make the determination upon a hearing at which the very same attorney who contacted Ceballos about the perceived warrant inaccuracies would presumably advance the same facts.

The District Court granted defendants' motion for summary judgment, holding that Ceballos' submission of the disposition memoranda with the assessments contained therein was a required job duty and therefore this expressive activity was not entitled to constitutional protection.  The Court of Appeals for the Ninth Circuit reversed, confining its analysis and opinion of the First Amendment issue to the disposition memorandum.  Id. at pp. 3-4.[3]  The United States Supreme Court granted certiorari; see 543 U.S. 1186 (2005), reversed and remanded the action to the Ninth Circuit Court of Appeals for further proceedings consistent

---

[3]

Again focusing solely on Ceballos' disposition memorandum, the Ninth Circuit then proceeded to assess the balance of interests pursuant to Pickering v. Board of Ed. of Township High School Dist., 391 U.S. 563 (1968) and hold that Ceballos' speech was not outweighed by the interest of the employer in the efficiency of its operations.  Id. at p. 4.

with its opinion.  Id. at pp. 5, 14.[4]

**B.    The Reasoning Of The Majority Opinion.**

The majority commenced its discussion of the applicability of the First Amendment to

Ceballos' disposition memo by reciting, with no disapproval the Court's long-established

jurisprudence on government employee speech, from the core premise that the government may

not condition employment on the relinquishment of first amendment rights[5], the establishment

of a balancing test by which the value of presumptively protected speech is weighed against

countervailing interests of the employer[6], the requirement that speech touch upon a matter of

public concern and not  matters of solely personal interest to the speaker,[7] and the established

rule that on-the-job expressions, voiced privately to superiors and within the confines of the

employer's premises are constitutionally protected.[8]  See Garcetti, Slip Op. at pp. 5-9.

The Court further reiterated its view that the government employee's interest in speaking

on matters relating to his employment or the functioning (or the dysfunction) of the agency for

---

[4]
The nature of the remand to the Court of Appeals is also significant and is addressed
infra.

[5]Perry v. Sinderman, 408 U.S. 593, 597 (1972).

[6]Pickering v. Board of Ed. Of Township Dist., 391 U.S. 563 (1968).

[7]Connick v. Myers, 461 U.S. 138 (1983).

[8]
Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 414 (1979); Rankin v.
McPherson, 483 U.S. 378 (1987).

which he works is inextricably tied to the rights and interests of the public in receiving the information and views of government employees.  Id. at p. 7, quoting in part, from Pickering, 391 U.S. at 572 (noting that "teachers are 'the members of a community most likely to have informed and definite opinions' about school expenditures") and from San Diego v. Roe, 543 U.S. 77, 82 (2004) (*per curiam*) ("were [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues.  The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it"); see also United States v. Treasury Employees, 513 U.S. 454, 470 (1995) ("the large-scale disincentive to Government employees' expression also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said") (cited and quoted at Slip Op. at p. 8).[9]

With the principles and holdings of these cases in mind, the Court turned to that factual aspect of Ceballos' case on which the Ninth Circuit focused, the content of Ceballos' disposition memorandum submitted to his superiors.  Citing its previous decision in Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 414 (1979), the majority first observed that the fact that

---

[9]

See also Waters v. Churchill, 511 U.S. 661, 674 (1994) (plurality opinion) ("[G]overnment employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions."; City of San Diego v. Roe, supra at 82. ("[P]ublic employees are . . . likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public.  Were they not able to speak on these matters, the community would be deprived of informed opinions on important issues").

Ceballos engaged in in-house speech, rather than public expression outside of the workplace, was

of no matter:

> **That Ceballos expressed his views inside his office, rather than publicly, is not dispositive . . . Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like 'any member of the general public' to hold that all speech within the office is automatically exposed to restriction.**

547 U.S.   (2006), Slip Op. at 9 (internal citation omitted).

The Court followed with the observation that the fact that Ceballos' memorandum related

to matters of his employment was likewise of no dispositive significance:

> **The memo concerned the subject matter of Ceballos' employment, but this, too, is non-dispositive.  The First Amendment protects some expressions related to the speaker's job.  As the Court noted in *Pickering*: 'Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the school should be spent.  Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal . . . The same is true of many other categories of public employees.**

Slip Op. at p. 9 citing <u>Givhan</u> at p. 414 and quoting in part <u>Pickering</u>, 391 U.S. at 572.

In denying First Amendment protection to the content of Ceballos' disposition

memorandum, however, the Court, distinguishing Ceballos' situation from the aforesaid cases,

stated that "[t]he controlling factor in Ceballos' case is that his expressions were made pursuant

to his duties as a calendar deputy".  <u>Id</u>. at p. 9.

8

The Court proceeded to explain the basis for distinguishing Ceballos' speech from, for example, that of the plaintiff in <u>Givhan</u>. The distinction was predicated on the uncontested fact that Ceballos' disposition memorandum was job-required speech which the employer essentially directed and purchased and thus could control and/or restrict. As the Court reasoned:

> **Ceballos wrote his disposition memo <u>because that is part of what he, as a calendar deputy, was employed to do</u>. . . . The significant point is that the memo was written pursuant to Ceballos' official duties. Restricting speech that <u>owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.</u> It simply reflects the exercise of employer control over <u>what the employer itself has commissioned or created</u>.**

<u>Id</u>. at p. 10 (emphases supplied).

In this respect, Ceballos' situation was likened to that line of cases involving ideological strings attached to the government's appropriation of public funds for the very purpose of promoting a particular policy. <u>Id</u>. citing <u>Rosenberger v. Rector and Visitors of the Univ. Of Va.</u>, 515 U.S. 819, 833 (1995) (holding that when the government grants money for the purposes of promoting a particular policy, it is entitled to control the speech attendant to the use of the funds). Equating Ceballos' "speech" (the disposition memo) with the aforesaid speech of grant recipients, the majority reasoned that the speech itself was what Ceballos was paid to engage in since, quite simply, one of his official duties as calendar deputy was to write such a disposition memorandum containing the very observations and assessments which it contained. <u>Id</u>

9

Drawing on the body of the Supreme Court's employee-speech jurisprudence as established in <u>Pickering</u>, <u>Perry</u>, <u>Givhan</u>, <u>Connick</u> and <u>Rankin</u>, the majority opined that Ceballos, unlike the plaintiffs in those cases, did not speak as a citizen on a matter of public concern when he discharged his core duty of preparing the disposition memorandum but was simply performing a task that he was in fact paid to perform, a task which required him to engage in the very content of speech which formed the basis of his First Amendment claim. <u>Id</u>. at p. 10.

By the text of its opinion and reasoning, the Court clearly embraced the very position advanced by Petitioner Garcetti and by the United States as amicus[10] which equated Ceballos' "speech" in his disposition memo with government-funded speech, which, commissioned and in effect purchased by the government can thus be subject to government restriction and control. <u>See</u> Brief of the United States at pp. 19-20 ("Instead, their speech, 'in actuality,' is 'the state's . . . because it is the government's message that is being conveyed and the government has in effect 'purchased' the speech'". <u>Id</u>. quoting <u>Urofsky v. Gilmore</u>, 216 F.3d 401 (4th Cir. 2000) (en banc).); <u>see also</u> Petitioner's Brief at pp. 31-35.[11] (Likewise presenting the argument that the case involved job-required speech)

---

[10]

The United States supported the position of Garcetti and appeared before the Supreme Court and submitted a brief as *amicus curiae*.

[11]

The brief to the Supreme Court by the Petitioner Garcetti is accessible at:

http://supreme.lp.findlaw.com/supreme_court/briefs/04-473/04-473.mer.pet.pdf

The Court did not announce any departure from its established jurisprudence; to the contrary, the majority noted that its holding was entirely consistent with the Court's precedents. Slip Op.at pp. 10, 12.

Rejecting the Ninth Circuit's view that depriving Ceballos' memorandum of constitutional protection would present a "doctrinal anomaly", the Court, stating that such view "misconceives the theoretical underpinnings of [its] decisions", insisted that no such anomaly should spring from the holding since the principles established by such cases as Pickering, Connick, Givhan and Rankin were not implicated. In distinction to these cases, the majority reasoned that because Ceballos' very speech was required by his employment responsibilities, "there is no relevant analogue to speech by citizens who are not government employees". The Court continued:

> **The Court of Appeals' concern also is unfounded as a practical matter. The perceived anomaly, it should be noted, is <u>limited in scope</u>: <u>It relates only to the expressions an employee makes pursuant to his or her official responsibilities, not to statements or complaints (such as those at issue in cases like *Pickering* and *Connick*) that are made outside the duties of employment.</u>**

Id. at p. 12.

Highly pertinent in the Court's view was the fact that the parties were in agreement that Ceballos' memorandum was job-required. Indicating it wished to emphasize "two final points [which] warrant mentioning", the Court added:

11

> **First, as indicated above, the parties in this case <u>do not
> dispute that Ceballos wrote his disposition memo pursuant to
> his employment duties.  We thus have no occasion to
> articulate a comprehensive framework for defining the scope
> of an employee's duties in cases where there is room for
> serious debate.</u>**

<u>Id</u>. at pp. 12-13. (emphasis supplied)

The Court closed by rejecting  any suggestion that employers could act to further restrict employees' free speech rights by "creating excessively broad job descriptions," stating that "[t]he proper inquiry is a practical one" and noting that "formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes."  <u>Id</u>. at p. 13.

**C.  <u>The Remand in Garcetti</u>.**

The effect of the court's holding was not a direction for the entry of judgment in favor of Petitioner Garcetti.  The case was instead remanded to the Court of Appeals because the opinions of both reviewing courts considered only the disposition memorandum and not the other instances of expression which Ceballos alleged motivated the retaliation.  Slip Op. at p. 15 (Souter, J., dissenting).  As the dissent noted, upon remand, the Ninth Circuit is now to consider whether, apart from the disposition memorandum, the First Amendment nevertheless accords protection to: (1) Ceballos' spoken statements to his superiors during meetings; (2) his hearing

12

testimony in the criminal case, and (3) his speech regarding this very issue to members of the Mexican-American Bar Association.  As Justice Souter noted in his dissent, the Ninth Circuit will now have to determine  whether those statements were also made pursuant to Ceballos' official duties.  Id. at pp. 17-18.


**IV.    OVERVIEW OF SUPREME COURT PRECEDENTS THE CONTINUED VALIDITY OF WHICH WAS AFFIRMED BY THE <u>GARCETTI</u> COURT**

**A.  <u>Givhan v. Western Line Consol. School District.</u>**

In deciding <u>Garcetti v. Ceballos</u>, the majority did not revisit and overrule any of its previous holdings in the area of government employee speech.  To the contrary, as before noted, the majority expressly rejected any concern that its holding was a departure from or was otherwise at odds with the establish body of jurisprudence.  Among the cases cited in the majority opinion as being undisturbed and as having continued validity is its 1979 decision in <u>Givhan v. Western Consol. School Dist.</u>, 439 U.S. 410, 99 S.Ct. 693 (1979), the fact of which are pertinent to Officer Tolnay's case.  The plaintiff, Bessie Givhan, was dismissed from her job as an English teacher at a public school, allegedly in consequence of comments and opinions she expressed in a private encounter with the principal of the school at which she worked.  Givhan conveyed to the school principal her belief that the school engaged in racially discriminatory

employment policies.  <u>Givhan</u>, 439 U.S. at p.412.[12]

On appeal, the Fifth Circuit Court of Appeals reversed the judgment of the trial court on the notable ground that Givhan had "privately expressed her complaints and opinions to the principal, [and therefore] her expression was not protected by the First Amendment."  <u>Id</u>. at p. 413.[13]  In reversing, the Supreme Court indicated that it did not intend by its previous  to suggest that private expression by a government employee is not accorded constitutional protection.  It further rejected the Fifth Circuit's conclusion that Givhan had no constitutional right to "press

---

[12]

There was in Givhan's case, as in most such cases, a factual dispute over what drove the decision to discharge Givhan.  Givhan alleged that the termination was in retaliation for her views expressed as aforedescribed.  The school district countered that she was instead discharged for behavior in a meeting with the principal which he had deemed "insulting", "hostile", "loud", and "arrogant". Givhan also made what he deemed "petty and unreasonable demands" on him.  <u>Id</u>.  That factual dispute was evidently resolved in Givhan's favor by the District Court which, in holding the termination violated the First Amendment, found that Givhan "on but two occasions" did complain but that the complaints "were neither 'petty' nor 'unreasonable' in so much as [they] involved employment policies and practices at [the] school which [Givhan] conceived to be racially discriminatory . . ."  <u>Id</u>. at pp. 412-13.

The school district offered other seemingly serious justifications for Givhan's discharge, among them that she downgraded the work of white students,  threatened to refuse to come to work, protected a student during a "weapons shakedown" at the school by hiding the student's knife and finally (and akin to the instant case), "walked out of a meeting about desegregation . . .".  Givhan actually admitted having concealed the student's knife during the weapons search but the District Court did not find it credible that this was a reason for the discharge.  <u>Id</u>. at 413 n. 2.

[13]

As the Supreme Court observed, the Fifth Circuit erroneously derived this proposition from the Supreme Court's opinions in <u>Pickering</u> and <u>Mt. Healthy City Bd. Of Ed. v. Doyle</u>, 429 U.S. 274 (1977).  <u>Id</u>. at 414.

even 'good' ideas on an unwilling recipient", <u>id</u>., observing that the principal, "[h]aving opened his door to [Givhan] . . ."  was hardly in the position to argue that he was the "unwilling recipient" of her views.  Categorically rejecting the notion that "private expression of one's views is beyond constitutional protection", <u>id</u>. at 414, the Court further flatly rejected a suggestion that "in-house" speech of this sort, privately communicated between the employee and his boss, is stripped of First Amendment protection:

> Neither the [First] Amendment itself nor our decisions indicate that this freedom is lost to the public employee who <u>arranges to communicate privately with his employer rather than to spread his views before the public.  We decline to adopt such a view of the First Amendment.</u>

<u>Id</u>. at pp. 415-416.[14]

## B.  Connick v. Myers

The Supreme Court's opinion and holding in <u>Connick v. Myers</u>, 461 U.S 138 (1983), handed down fifteen years after <u>Pickering</u>, is perhaps the most oft-cited t opinion in briefing and decisions in the area of government employee speech.  <u>Connick</u> in tandem with <u>Pickering</u> present the established formula for courts in assessing whether speech is presumptively protected

---

[14]

The <u>Givhan</u> court did recognize that such in-house expression would, because it occurs on the job and in the workplace, "bring additional factors to the <u>Pickering</u> calculus" for the obvious reason that an employee's direct confrontation with his boss would provide a basis on which an employer could demonstrate a level of disruption that would tip the <u>Pickering</u> balance in its favor.  439 U.S. at 415 n. 4.

in the first instance and the rung it occupies in the balance of competing interests.  Connick is

frequently cited for the generalized proposition for which it stands: The First Amendment draws

a distinction between speech which touches upon "a matter of public concern" and that which

is merely of private interest to the speaker.  461 U.S. at 143.  Often overlooked, however, is the

one aspect of Connick which is of considerable significance to Tolnay's case.  In Connick, the

plaintiff Myers was a prosecutor disgruntled after being transferred to a different assignment.

Myers crafted and circulated a questionnaire by which she solicited co-workers' views

concerning the employer's transfer policy, office morale, supervisor competence and finally, the

issue whether employees felt pressured to work in political campaigns.  461 U.S. at pp. 140-41.

The distribution of the survey during work hours was deemed by the employer as a "mini-

insurrection" and an insubordinate act and Myers was accordingly discharged.  Id, at 141.  In

assessing whether Myers' questionnaire was protected, the Supreme Court held that, with one

exception, its content did not "fall under the rubric of matters of 'public concern'".  Id. at p. 148.

Myers' conduct was primarily designed "not to evaluate the performance of the office but rather

to gather ammunition for another round of controversy with her superiors".  Id.

Notable, and of import to Tolnay's case, was the Court's exemption from this

characterization of that portion of Myers' questionnaire which related to the issue whether

employees felt pressured to work in political campaigns.  The Court found this one question did

touch upon a matter of public concern.  Id. at 149.  Myers simply lost in the Pickering balance

as the value of her protected speech in this regard was far outweighed by the disruption to office operations it caused.  <u>Id</u>. at 150-54.

In striking the <u>Pickering</u> balance in favor of Myers' employer, the Supreme Court took care to note that such was  hardly a "defeat for the First Amendment"but only a recognition that the safeguarding of a public employees' First Amendment rights should not be "confused with the attempt to constitutionalize the employee grievance" that Myers presented.  <u>Id</u>. at p. 154.  It was undisputed that Myers engaged in the expression at work, a factor not deemed dispositive but merely relevant in the <u>Pickering</u> balance. Most important was the Court's observation that Myers did not "seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others".  <u>Id</u>. at p. 148.[15]

### C.  Rankin v. McPherson

Four years after its holding and opinion in <u>Connick v. Myers</u>, the Supreme Court once again addressed the extent to which constitutional protection is to be accorded to on-the-job expressions.  In <u>Rankin v. McPherson</u>, 483 U.S. 378 (1987), the issue presented was whether a law enforcement agency could, consistent with the First Amendment, discharge an employee for expressing during work an offensive opinion on the matter of the attempted assassination of President Ronald Reagan.  McPherson was employed as a deputy constable  in the office of the

---

[15]

The Court noted that Myers' questionnaire, "if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo".  <u>Id.</u>

Constable of Harris County, Texas, although her daily duties were clerical in nature.  Id. at pp. 380-81.  In the spring of the 1981, McPherson, in reaction to radio reports of the attempted assassination of the President, engaged in conversation with a co-worker during which she is alleged to have said, "[i]f they go for him again, I hope they get him".  Id. at p. 381.  McPherson was evidently African-American and made the offensive statement in the context of speaking of the economic status of African-Americans and expressing her anger over the Reagan administration's cutback on Medicaid and food stamp entitlements.  Id.  Quoting from its prior decision in Pickering, and noting that "the threat of dismissal from public employment . . . a potent means of inhibiting speech" and further emphasizing that "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse . . .", the Supreme Court, despite the offensive nature of McPherson's speech found that it did touch upon a matter of public concern and was thus accorded First Amendment protection.  Id. at pp. 385-86.

There was no dispute that McPherson uttered her opinions to colleagues while on the job, to the upset of a superior who heard them.  Noting the Court's prior decision in Givhan, however, the Court rejected the proposition that the speech was unprotected because it occurred in the context of a one-on-one conversation at work: "The private nature of the statement does not, contrary to the suggestion of the United States . . . vitiate the status of the statement as addressing a matter of public concern."  Id. at p. 387, n. 11, citing Givhan v. Western Line

Consol. School Dist., 439 U.S. 410, 414-16 (1979).[16]

## V.    OVERVIEW OF THE EVIDENCE AND PROCEEDINGS
##        IN THE INSTANT CASE

### A.  Summary Of The Testimony and Documentary Evidence

The court's familiarity with the facts and circumstances of Tolnay's role in effecting the arrests of Messrs. Armando Hernandez and Daniel Rodriguez on July 26, 2002 is presumed. Two separate instances of expressive conduct form the bases of Officer Tolnay's First Amendment claims.  The first concerns Tolnay's statements and opinions set forth in a report he authored concerning the August 3, 2002 motor vehicle stop of Daniel Rodriguez.  See Plaintiff's Exh. 4.  As thoroughly analyzed and discussed by the court in its ruling denying Wearing's motion for summary judgment, and as the court's instructions to the jury indicate, this court properly accorded First Amendment protection to that portion of Tolnay's writing in which he:  (1) expresses an opinion that he is unable to act to his "full potential" (in respect to the Rev. Rodriguez) and that he "acted with judgment that was imposed on his police jurisdiction due to the identity and political involvement of Rodriguez"; and (2) discloses an order from New Haven Police Department Captain  Francisco Ortiz to stay away from the ministers who were arrested on July 26, 2002.  According to Tolnay's statement, he was "reaffirmed" in his belief (that he

---

[16]

By way of ultimate disposition, the Supreme Court affirmed the judgment of the Court of Appeals in holding that McPherson's employer failed to demonstrate its operational interests outweighed McPherson's speech interest in the Pickering balance.

was unable to take enforcement action against Rodriguez because of Rodriguez' political connections) by the conduct of Captain Ortiz. Id. at p. 2.

The background leading up to Tolnay's statements and expressions of opinion are informative and are summarized here. The July 26, 2002 arrests of Hernandez and Rodriguez resulted in a political firestorm well publicized by the local media. This included a prominent New Haven Register headline and article of July 31, 2002 which recounted public statements on the controversy by Wearing and those of a New Haven Alderman who protested the arrests and demanded an apology from the city administration. See Pltf.'s Exh. 3. According to Tolnay, there was a stir within the department and talk of the ministers' plan to organize and lead a mass public march to protest the arrests.

On August 3, 2002, Tolnay was on patrol in his assigned district when his partner, Officer Waleska Bermudez, spotted a reckless driver and asked Tolnay to intercept. The driver was operating a topless Jeep with children hanging off the vehicle and holding on to its roll bars. Tolnay stopped the vehicle, approached and discovered the driver to be Daniel Rodriguez. It was discovered that Rodriguez was using the children to distribute leaflets announcing a march in protest of the July 26 arrests. Although Rodriguez had committed multiple statutory offenses by operating the vehicle with the children in this manner, Tolnay feared taking enforcement action given the obvious political ties and clout Rodriguez wielded as evidenced by the fact that his July 26 arrest, otherwise a run-of-the-mill event, had quickly become a political cause celebre

20

attended by prominent newspaper attention and immediate condemnation of the arresting officers by elected officials who not only were ignorant of the facts surrounding the arrest but had not seen Tolnay's detailed arrest report. Given the politically charged climate which already existed as of that date, Tolnay feared taking action against Rodriguez.[17]

Rodriguez escaped the incident without a check of his license, registration and status of insurance coverage in addition to enjoying a pass from Tolnay on the multiple offenses he committed by the reckless transfer of the children. 12/1/05 Tr. at pp. 167-70. Tolnay was fearful of suffering consequences if he took such action because he was, by the aforesaid background events, well aware of Rodriguez' status as an important figure in the Hispanic community and his political ties to elected city officials. Id. at pp. 170-72. Ortiz, upon learning of the MV stop, issued an order over the police radio channel directing Tolnay to "stay away" from the ministers.

Since no enforcement action was taken on this routine motor vehicle stop, Tolnay explained the reasons why he decided nonetheless to write a report on the matter. 12/1/05 Tr. at pp. 176-177.[18] When asked why he was so concerned about the identity of the driver such that

---

[17]

Tolnay's concerns turned out to be well-founded since, although Rodriguez was allowed to go on his way without answering to the law for his violations, he made a bee-line to Captain Ortiz, with whom he had a cozy personal and political relationship, and collaborated with Ortiz in the lodging of a civilian complaint against Tolnay in connection with the motor vehicle stop, a civilian complaint which defendant himself was forced to concede was based on deliberate lies about the conduct of the officers and was otherwise completely fabricated. See Pltf.'s Exh. 16. See also 12-05-05 Tr. at pp. 41-42.

[18]

This is in contrast to the departmental memorandum regarding the Rodriguez MV stop which

he felt it necessary to write that kind of report, Tolnay explained:

> Because after my initial arrest, all the information that I had received regarding how powerful people they were had frightened me. Because, you know, I'm a patrolman and my duty is to do my job, and I'm not involved in politics. I got out and I do my job. I was always very proud of how pro-active and how much I enjoyed doing police work. And because it was my misfortune to be the officer that gets sent to that location and have to take the action that I did I was now going to suffer the consequences of what I had to do.

12/1/05 Tr. at 176.

Officer Tolnay explained that the order which Captain Ortiz issued over the police radio channel would not only have been overheard by one-third of NHPD members but by civilians who monitor the same channel. Id. at 178. Tolnay continued that he felt the need to document the incident and Ortiz's order because he did not know what he "was in store for" and "what the ramifications could have been" had he enforced the law against Rodriguez. Id. at 183.[19]

Particularly because he was a junior member of the force, Tolnay feared that he was already a

_____

he was ordered to prepare per order of Captain Ortiz. The parties do not dispute that Tolnay did not include any opinions or commentary of a political nature in that memorandum ordered by Captain Ortiz and the content of that memorandum was not a basis of a First Amendment claim. See 12/1/05 Tr. at pp. 178-79; Pltf'.s Exh. 12 (August 3, 2002 memo from plaintiff to Captain Ortiz.)

[19]

Tolnay testified that when he authored the report regarding the MV stop of Rodriguez, he sought to locate his arrest report in connection with the 7/26/02 incident only to find that it was mysteriously missing from department records as well as from the State's Attorney's files as Tolnay received a request for the report from a prosecutor in New Haven Superior Court. Id. at 186-187.

target for retaliation and that he would suffer further consequences if he took enforcement action against Rodriguez. Id. at 170-172.

A review of Tolnay's August 3, 2002 report (Pltf's. Exh. 4) shows he used a two-page standardized form document, and accompanied it with a three-page typewritten narrative. The standard form has numerous sections and headings. Tolnay drew a line through most of the sections as they did not apply to the situation. Most of the sections are left blank.. Other than a reference to Daniel Rodriguez, his address and the date, the first page is left blank. The second page, similarly cluttered with various sections and subsections to complete, is left blank except for the names of Sergeant Burgh and Officer Colon. Notably, Captain Ortiz is listed by Tolnay as a subject of the report. There is no supervisor's signature in the numerous sections where such is to be placed.

Tolnay's decision to author the 8/3/02 report also came after he heard Captain Ortiz' order over the radio channel. Tolnay's police vehicle had a computer with e-mail capability, allowing for electronic communications from one patrol unit to another. After Ortiz issued his order, Tolnay received e-mails from other officers, including one that stood out in his mind.[20] Without disclosing the content of the e-mails, Tolnay testified he became all the more concerned about the propriety of Ortiz' conduct and the effect it would have on his and fellow officers' ability to enforce the law with respect to those wielding political clout with the administration.

_____

[20]Wearing's counsel objected to Tolnay's recounting the content of any of these e-mails.

Id. at pp. 204-05.

Against repeated objections of Wearing's counsel to any evidence of other officers' concerns and what role they played in Tolnay's decision to author the report, Tolnay was allowed to give limited testimony in this regard.  Notwithstanding defense counsel's success at excluding this evidence,[21] Tolnay testified that his concerns over these events and the conduct of Captain Ortiz did not relate solely to himself.  He was also motivated by concern for the ability of other NHPD officers to take action against Rodriguez or Hernandez in the event either engaged in further lawbreaking.  Id. at 206.[22]

After writing this report, Tolnay went on vacation with his wife and daughters.  While he was away, what was already a politicized incident became a political fire storm.  After speaking with the Mayor, Chief Wearing exercised improper influence on the chief prosecutor in New Haven Superior Court and secured a dismissal of all charges against the ministers which caused a buzz among  Superior Court staff and in department circles.  The interference with the prosecution was timed to coincide with the Mayor's intended address to the congregation of the

---

[21]

Plaintiff's counsel took the position that the evidence of other officers' expressed concerns as expressed to Tolnay was not inadmissible hearsay because it was being offered not for the truth of the statements but to show their effect on Tolnay and the opinion he formed, the expression of which formed the basis of his First Amendment claims.

[22]

 In a weak attempt to argue that Tolnay's speech was of mere personal concern, in his December 28, 2005 post-judgment renewal of his Rule 50 motion advanced at trial, Wearing misrepresents the record in this regard in claiming that there is "no mention of [Tolnay's] fellow officers."  See Def.'s Memorandum of Law at p. 17.

Second Star of Jacob Church.  The Mayor appeared before its huge throng of congregants, apologized for the conduct of the arresting officers, and announced (and took credit for) the dismissal of all criminal charges. Mayor DeStefano had succeeded in his aim which was to ingratiate himself with and maintain the good graces of valued political supporters who led a sizeable voting bloc.  Notwithstanding the Mayor's conduct, the ministers nevertheless proceeded to lead a march of some 1,000 protesters through the City streets complaining about the officer's conduct.  The Mayor and Chief Wearing allowed this to occur without requiring Rodriquez and Hernandez to obtain the mandatory permit required of everyone else who plans to conduct a public march.  The event was well-publicized in the New Haven Register (Pltf's. Exh. 5).  Mayor DeStefano's public apology for the conduct of officers whose physical safety was threatened by an unruly mob and who were subjected to degrading abuse provoked more controversy and a prominent headline recounting a charge by the President of the Police Union that the Mayor had sold out his own officers for political gain.  (Pltf's Exhs. 6, 7)  On August 11, 2002, the Editor of the Register, although he had no access to the officer's reports or details concerning the conduct of the ministers and their congregants, ran a lead editorial which implicated Tolnay's competence and judgment and served to greatly embarrass him.  Still on vacation, Tolnay received calls from colleagues advising him about these developments.  Tolnay worried about being away while the protests and the ongoing media publicity were unfolding. 12-1-05 Tr. at pp. 188-189.  Tolnay did not publicly respond to any media-publicized criticisms

25

of his conduct by the Mayor and Chief Wearing because he believed himself constrained per

departmental rules from issuing statements to the media.  Id. at pp. 190-194.

Captain Ortiz, who at the time of these events, hoped to succeed Wearing as the next

Chief by political appointment of Mayor DeStefano, read Tolnay's report of August 3, 2006.

Upon receiving a cell phone complaint from Rodriguez regarding the MV stop, Ortiz also

ordered Tolnay and  all officers he thought were involved in the MV stop to prepare memoranda

detailing their involvement in the incident.  Pltf.'s Exh. 16 at p. 2.  Tolnay immediately complied

with the order.  Pltf.'s Exh. 12.  Officers Colon and  Bermudez also complied.  Pltf.'s Exhs. 12,

13, 14, 15.  Notwithstanding the content of all of these reports, which established that the officers

had committed no misconduct in respect to Mr. Rodriguez, Ortiz proceeded to author a

memorandum to Chief Wearing on August 8, 2002 in which he relates Rodriguez' fabricated

allegations against Tolnay and the officers as if they were fact.[23]

Ortiz closed his memorandum with the following comments which are relevant to both

instances of expressive activity which form the bases of Tolnay's First Amendment claims:

> **In addition to the memos submitted by the officers, I also read
> the report completed by Officer Arpad Tolnay (refer to CN
> 44465) and find myself very disturbed by the <u>content</u>, which
> reflects his  opinion that he can not adequately or effectively**

---

[23]

Ortiz' memo is remarkably offensive for its tone and phrasing which are entirely consistent
with Ortiz having knowingly collaborated with Rodriguez to fabricate a basis on which to
besmirch the officers.  For example, Ortiz refers to "the officers' harassment" and their "rude
and disrespectful attitudes toward [Rodriguez]" as matters of truth.  Pltf.'s Exh 16 at p. 1.

> **perform his duties due to the political influence he believes has been exerted by Rev. Daniel Rodriguez.  This officer's written report is unacceptable and <u>his comments are inappropriate</u> and have no relevance to the initial motor vehicle stop.  At the time of this writing, Officer Tolnay is on vacation and this matter <u>will continue</u> upon his return to duty.**

Pltf.'s Exh. 16. (Emphases supplied.)

Anxious to further the Mayor's political interests by appeasing his valued supporters, Chief Wearing ordered Tolnay to a meeting in his office on August 13, 2002, attended by Lt. Leo Bombalicki, Officer Jamie Abate, and NHPD Human Resources Representative Scott Nabel. The presence of Mr. Nabel foretold that Tolnay was being targeted for discipline as Nabel was usually the one who sets up all such disciplinary meetings with the Chief and he ghost-writes all of the Chief's disciplinary memoranda.  The presence of a union representative was likewise foretelling.

Given the political swirl around  the July 26 arrests, Tolnay believed he was summoned to meet with the Chief because the arrestees were politically connected individuals and "because Daniel Rodriguez and Armando Hernandez had friends in high places". <u>Id</u>. at pp. 229-30. Tolnay's belief in this regard was buttressed by his knowledge of Mayor DeStefano's conduct. <u>Id</u>. at pp. 230-32.  He was also aware of the march on the police station during which, according to the press, Hernandez made a statement which indicated city officials were already targeting

Tolnay for retaliation.  Id. at pp. 232-34.[24]  Although the jury was not told of the actual content

of Hernandez's quoted remarks, Tolnay had read the article and thus, heading into the meeting

with Wearing, was clearly of the opinion that the purpose of the meeting was consistent with a

pre-determined plan to target him for discipline for political purposes.  Id. at pp. 231-33.

Among the many other things aforedescribed, the Mayor's conduct also factored into

Tolnay's formulation of opinion that improper political factors were at play in the case.  Id. at

p. 234.  Tolnay proceeded to the meeting with Wearing on August 13, 2004.  Though Officer

Abate was present, Wearing largely ignored her and focused on Tolnay.  Because Wearing had

not bothered to read any of Tolnay's reports, he was unaware that Officer Tolnay was not among

the officers initially dispatched to the Second Star of Jacob Church on July 26, 2002 in response

to the first complaints lodged with the NHPD by residents complaining of excessive noise.

Because Wearing was not familiar with the facts he engaged in a frustrating back-and-forth with

Tolnay who attempted in vain to explain to Wearing that he was not involved in the earlier

appearance at the Church.  Wearing peppered Tolnay with questions but did not allow him to

answer, cut Tolnay off each time he attempted to answer questions and otherwise appeared to

---

[24]

Excluded from evidence upon Wearing's objection  was the actual content of the New Haven
Register article of August 6, 2002 and thus only a fully redacted version was admitted.  The
actual article quotes a statement to the crowd by Hernandez indicating that "he declined an
inquiry from a city administrator over whether the arresting officer [meaning Tolnay] should
be disciplined."  See Original Pltf.'s Exh. 5.  Tolnay, however,  was permitted to testify that
a statement was made which added to his beliefs in this regard.

be baiting Tolnay into an admission of wrongdoing or exercise of bad judgment in connection with the July 26 events. Tolnay refused to be baited and persisted in an attempt to defend himself but was repeatedly interrupted. The more Tolnay defended himself, the more agitated Wearing became. Id. at pp. 234-40; see also 12/6/05 Tr. at pp. 130-43 (Test. of Lt. Bombalicki).

Tolnay expressed his opinion that he had done nothing improper and that the meeting was solely political. 12/1/05 Tr. at pp. 234-37. Tolnay stated to Wearing that he "believed the only reason [he] was in the office was because of the fact that the two individuals involved had very strong political ties," in response to which Wearing became very angry. Id. at p. 236. This expression of opinion seemed to "upset [Wearing] tremendously." Id. at p. 236.

The discussion then turned to the issue of Captain Ortiz and the 8/3/02 MV stop of Rodriguez. Tolnay explained that he did not take enforcement action because he "would be afraid to have to come sit through a second meeting [with the Chief] based on who these people are." Tolnay also stated the following:

> **"Well, sir, I believe I'm here today because these two individuals have political connections and they have people who are in high places within this City and that's why I feel that I am here. I am here for no other reason, through no conduct of mine as a police officer."**

Id. at p. 241.

Chief Wearing's tone, demeanor and gestures became more intimidating at the point at which Tolnay complained about the conduct of Captain Ortiz and expressed his opinion that

Ortiz' comments and order over the radio were very inappropriate.  Id. at p. 243.  Wearing cut

Tolnay off, stating that Tolnay's opinions were inappropriate given Ortiz' resume and twenty-

plus years of service.  Tolnay responded by expressing the additional opinion that "with all [of

Ortiz'] experience, it's all the more reason why [Ortiz'] behavior was inappropriate using the

radio."  Id. at p. 233.  With that, Wearing lost his temper, rose to his feet, leaned over the desk

and thrust his finger in Tolnay's face, calling Tolnay a "smart  mouth" and accusing Tolnay of

having "caused that incident at the Church."  Wearing repeated the remarks, continuing to jab

his finger at Tolnay.  Id. at pp. 243-44. [25] Wearing's conduct served to confirm Tolnay's opinion

that the meeting was in fact arranged for the sole purpose of concocting a pretext under which

Tolnay could be disciplined.  Id. at pp. 246-47.

NHPD Human Resources Representative Scott Nable contradicted Wearing's claim that

he met with other officers, as Nable neither attended nor was he aware of any such meetings.

12/7/05 Tr. at pp. 179-80.  Nable confirmed that Wearing focused exclusively on Tolnay

although Officer Abate was present.  Id. at p. 180.  Nable recalled the discussion regarding

Tolnay's 8/3/03 report and allegations of improper conduct by Captain Ortiz.  Id. at p. 185.

Notably, Nable admitted that Wearing's tone and demeanor changed at the point at which Tolnay

expressed his views regarding the misconduct of Captain Ortiz.  Id. at pp. 193-94.

---

[25]

 The Court will recall Lt. Bombalicki's demonstration to jurors regarding Wearing's physical
conduct.  See 12-6-05 Tr. at 139.

Under cross-examination Tolnay reiterated that officers are instructed not to speak to the press/media. 12/2/05 Tr. at pp. 105-06. Defense counsel proceeded to challenge Tolnay on the issue whether Tolnay's political commentary belonged in a report, insisting the comments were irrelevant and did not belong in there. Id. at pp. 116-18.

Chief Wearing did not deny that between July 26, 2002 and the date he suspended Tolnay, he talked to Mayor DeStefano. 12/2/05 Tr. at p. 182.[26] Wearing was also aware of the media reports, had spoken to the media himself and was further aware that one elected city official was demanding action and an apology for Tolnay's conduct. Id. at p. 185. He conceded that the July 26 arrests were politicized within days of the event by elected officials. Id. at p. 187. He further admitted that on July 31, 2002, before he ever even spoke to Tolnay, he was criticizing Tolnay in the press. Id. at 188.

Captain (now Chief) Ortiz was aware the ministers were political activists and leaders of the Hispanic community and further, that the Second Star of Jacob Church was one of the largest congregations in the city. 12/7/05 Tr. at p. 30. He also admitted having received an immediate cell phone call from Daniel Rodriguez after the MV stop of August 3, 2005. Id. at p. 48. Ortiz did not deny the content of his radio communication ordering Tolnay to stay away

---

[26] In addition to admitting that he spoke with Mayor DeStefano prior to suspending Tolnay, Wearing admitted that he "thinks" he spoke with Mayor DeStefano before going to see Prosecutor David Newman. Wearing was shown that part of his deposition testimony where, in answer to the same question, he stated, "I would think so." Id. at p. 107.

from the ministers but would merely say, "I stand by whatever I told him." Id .at pp. 48-40. Ortiz claimed that Tolnay's political commentary did not belong in his report as "[a]ll that other stuff had no relevance to the motor vehicle stop." Id. at p. 66 (emphasis supplied).

Wearing likewise asserted that Tolnay should have omitted from his 8/3/02 report any such political comments. 12/6/05 Tr. at p. 80; see also 12-5-05 Tr. at p. 44. (stating that such opinions did not belong in there) Wearing repeated the assertion, 12-6-05 Tr. at p. 81, characterizing Tolnay's commentary as improper and irrelevant. Id. at p. 82. Notably, Wearing waffled somewhat on the question whether Tolnay should have obeyed the order from Captain Ortiz, opining that no one should prevent a police officer from discharging his duty. Id. at pp. 83-85. In contrast to his temper tantrum in the office meeting upon Tolnay's complaints about Ortiz, Wearing conceded under cross-examination some improprieties on Ortiz' part in issuing the controversial order. 12-6-05 Tr. at 23. He stated that perhaps Ortiz "could have handled it differently". Id. at 24. Ironically, perhaps hypocritically, Wearing , in the August 13 meeting, tried to bait Tolnay into making just such an admission in respect to the arrests of the ministers. Ortiz was not called into a meeting with the Chief nor called on the carpet.

Wearing admitted that  Sergeant Hoffman received did not receive a like order to appear in his office to discuss the matter and further admitted that no other officer complained about political interference with law enforcement. Id. at pp. 87-88. Only Tolnay expressed the opinion that the Chief's conduct was politically driven. Id. at p. 89. Wearing further conceded that if

Tolnay's account of the Chief's conduct in the meeting were true (to wit: that Wearing jumped to his feet, yelled, called Tolnay a "smart mouth" and thrust his finger in Tolnay's face) such would indeed constitute improper behavior on his part. Id. at p. 90.

Immediately after the August 13, 2002 meeting, Tolnay was ordered to reappear the next day in the Chief's office for what Wearing represented was a "continuation of our discussion regarding motor vehicle stop CN02- 44465". The order indicated that Tolnay's conduct during the meeting of the day before would also be a subject of continued discussion. Pltf.'s Exh. 17. There was, however, no such discussion for upon Tolnay's arrival at the Chief's office, Wearing advised him that he was there not to talk but to be suspended. 12/5/02 Tr. at pp. 35-36.

Although he claimed he suspended and transferred Tolnay for insubordination, in his memorandum setting forth the alleged reasons for the actions, Wearing included the following comments which are material to Tolnay's First Amendment claims:

> **[I] trust [Tolnay] has learned some lessons, such as utilizing supervisors to mediate sensitive disputes <u>and preparing police reports which reflect his observations and not his political speculations.</u> The discipline imposed therefore is based entirely on his outrageous behavior in my office. <u>When Officer Tolnay began to trash talk the Captain of patrol</u> and I attempted to steer him toward the issue of his actions, <u>he reacted by disrespectfully expressing his position that this meeting was solely political.</u>**

Pltf.'s Exh. 18.

33

**B.     Wearing's Summary Judgment Motion**

Chief Wearing moved for summary judgment on August 29, 2003 and submitted  a
supporting memorandum of law.  A review of the 23-page memorandum, shows that, with
respect to the issue whether Tolnay's subject expressions were protected by the First
Amendment, it focused for the most part on Wearing's claim that the speech had nothing to do
with the adverse actions.  Wearing emphasized repeatedly that the discipline, and the severity
of it, were due solely to Tolnay's alleged act of "walking out" of the August 14, 2002 meeting.
Because Wearing denied any nexus between the protected speech and the adverse action, this
factual issue remained for resolution by a jury.  What is pertinent about defendant's moving
papers is that at no time did he submit any evidence into the record or otherwise take the position
that the very expressions which formed the basis of Tolnay's First Amendment claims
constituted job-required speech made pursuant to his official responsibilities.  See Defendant's
August 29, 2003, Motion for Summary Judgment and Memorandum of Law in support thereof.

**C.    Defense Counsel's Rule 50 Motion for Judgment as a Matter of Law
       Advanced at Trial**

Plaintiff rested his case on December 7, 2005, and immediately thereafter Wearing's
counsel moved for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil
Procedure.  See 12/7/05 Tr. at p. 140.

Defense counsel's Rule 50 motion consisted of but a series of skeletal and otherwise
conclusory statements of entitlement to judgment on the following grounds: (1) the plaintiff did

not speak on a matter of public concerns but on a matter of personal interest to him; (2) plaintiff

was suspended for insubordination and not because of protected speech; (3) Wearing's interest

in maintaining discipline outweighed the plaintiff's First Amendment rights; (4) Wearing would

have suspended Tolnay even in the absence of protected speech; (5) defendant is entitled to

qualified immunity since, in his position, he reasonably believed that plaintiff did not engage

in protected speech and could punish Tolnay's "conduct" during the August 13, 2002 meeting.

Id. at pp. 140-42.[27]  In response thereto, plaintiff's counsel noted that defendant's Rule 50 motion

was "content-skeletal at best and consists primarily of a series of conclusory statements by

counsel . . ." Id. at p. 142.  Accordingly, there was nothing of substance advanced by defense

counsel to which plaintiff could respond.  In contravention of the clear mandates of Rule 50,

regarding the particularities of matters of fact and law, defense counsel did not address any of

the documentary or testimonial evidence, nor discuss case authority  but simply made bald and

generalized assertions.  Id. at pp. 142-43.  In rebuttal, defense counsel  decided to be more

forthcoming about the evidentiary basis for his Rule 50 motion but again, this second recitation

consisted of little more than a reiteration of the claim that Tolnay's speech involved "statements

---

[27]

Defense counsel did not explain which "conduct" he was referring to. Moreover, Wearing's
attempt to cure this defect post-judgment is addressed in plaintiff's memorandum in
opposition to Wearing's (mistitled) Rule 50 motion filed after the verdict, an improper
submission since all Wearing was permitted to do under the rules was renew the motion
advanced by his counsel at trial.  Instead he filed a new motion setting forth a host of new
grounds for judgment, a move strictly disallowed by the Second Circuit.

which concern only the plaintiff, and are not statements of concern to the public . . ." Id. at p. 145.  Thus, Wearing's Rule 50 motion, cursory and conclusory as it were, rested on the claim that Tolnay's speech was on a matter of purely personal interest and did not touch upon a matter of public concern.  It was but an abbreviated series of generalized propositions with no reference to the evidence or any applicable authority. Id. at pp. 143-45.  Defense counsel further advanced the meritless claim that there was no factual dispute as to what conduct motivated the suspension.  Finally, defense counsel asserted that Tolnay in fact would have been suspended even in the absence of his protected speech, id. at p. 146, a patently incorrect proposition for its failure to recognize that such dispute was a matter not for the court but for the jury to decide.  The jurors considered Wearing's assertion. They simply did not believe it.

Of course, Wearing did not offer any evidence at trial in his defense (or through cross-examination of plaintiff's witnesses) designed to establish what would be a novel, if not startling proposition: that plaintiff's political commentary and complaints about Captain Ortiz' conduct were among  his official job responsibilities.  Thus, in advancing his Rule 50 motion at trial, defense counsel voiced no such claims or argument.  Consistent with this, no such position is advanced in Wearing's post-judgment renewal of his Rule 50 motion.

**D.    Defense Counsel's Summation to the Jury**

With respect to Officer Tolnay's speech as set forth in the report he generated in connection with the MV stop of Daniel Rodriguez, Chief Wearing's own understanding and

position that the subject comments were not part of Officer Tolnay's official responsibilities is borne out by his counsel's summation to the jurors on December 8, 2005. In his summation, defense counsel spoke of Officer Tolnay's written report and noted that the form of report that Tolnay used is "supposed to be for the purpose of prosecuting the offense as set forth therein". Defense counsel continued to claim that those are the "rules and guidelines" for such reports as established by the trial evidence and testimony. 12/8/05 Tr. at p. 61.

In particular reference to the memorandum authored by Captain Ortiz in which he complains of improper political commentary by Tolnay (Pltf.'s Exh. 16) defense counsel argued to jurors as follows: "[N]obody's saying that he [Tolmay] couldn't say that, that he couldn't write it. They are just saying, this isn't the appropriate area to put it in . . . " Defense counsel continued : "The only criticism of Officer Tolnay in this case is that he put something in a report that didn't belong in a report". Id. at pp.77-78.

With respect to the other and distinct aspect of Tolnay's protected speech -  his comments, complaints and expressions of opinion during the meeting with the Chief and other officers - defense counsel's argument to jurors, the record shows, was wholly dedicated to convincing jurors that it was not the protected speech that motivated the discipline but rather the alleged fact that Tolnay had walked out of the meeting. Consistent with Wearing's entire defensive strategy in this case, he never once, nor did his counsel, concede a nexus between the protected speech and the adverse actions.

37

VI.    **ARGUMENT**

    A.    **THE DECISION IN <u>GARCETTI V. CEBALLOS</u> DOES NOT REPRESENT A DEPARTURE FROM ESTABLISHED JURISPRUDENCE IN THE AREA OF GOVERNMENT EMPLOYEE SPEECH BUT WAS GROUNDED ON THE VERY WELL-ESTABLISHED PRINCIPLES WHICH THIS COURT ALREADY APPLIED TO AND FOLLOWED IN THIS CASE.**

While Wearing will no doubt present <u>Garcetti</u> as a new watershed in First Amendment jurisprudence which serves to strip constitutional protection from all on-the-job speech, the <u>Garcetti</u> holding is much more cabined than defendant would wish or have it appear. The most important aspect of the <u>Garcetti</u> opinion is not what it did but what it did not do – which was revisit and overrule <u>Connick</u>, <u>Rankin</u> or, most importantly, <u>Givhan</u>, and all of their progeny in the Second Circuit upon which this Court relied in correctly denying Wearing's motion for summary judgment. <u>See</u> Ruling at pp. 30-34 and cases cited therein.

    A.    <u>**This Court's Previous Rulings And Analysis In This Case Are Consistent With The Garcetti Holding.**</u>

As the foregoing overview of <u>Garcetti</u> demonstrates, the Supreme Court neither expressly nor implicitly retreated or otherwise departed from its established jurisprudence in the area of government employee speech. To the contrary, the text of the opinion, when viewed in tandem with the positions and arguments of the parties and the United States in that case established that the petitioner sought, and the court granted, a writ of certiorari to address the Ninth Circuit Court

of Appeals' departure from that very established jurisprudence.[28]  As the Petitioner noted, this was not the first time that the Supreme Court was called upon to redress an overreach by the Ninth Circuit in this area of First Amendment law, having had to reverse the Ninth Circuit only eighteen months earlier after the Circuit held that the First Amendment prohibited a police department from taking action against an officer who marketed on the Internet videotapes in which he is shown stripping off his police uniform and masturbating.[29]    The Supreme Court reversed that holding without even hearing oral argument.

Plaintiff's counsel does not wish to be heard to denigrate a Court of Appeals but wishes merely to note that the <u>Garcetti</u> holding, serving as it does to conform the Ninth Circuit's approach to employee speech with the Supreme Court's established jurisprudence, should not be confused with or mistaken for a novel development or "new rule" for District Courts to employ in public employee speech cases.  The overturning of a fringe decision of a circuit court on the other side of the country does not provide Chief Wearing an escape route in the instant

_____

[28]
<u>See</u> Brief of Petitioner Gil Garcetti (arguing *passim,* and repeatedly at pp. 28-38, that the opinion below by the Ninth Circuit represented a significant and unjustified departure from the established jurisprudence).  The brief is accesssible at http://supreme.lp.findlaw.com/supreme_court/briefs/04-473/04-473.mer.pet.pdf.

[29]
<u>See</u> <u>City of San Diego v. Roe</u>, 125 S.Ct. 521 (2004).  In other areas of First Amendment law, the Ninth Circuit's pronouncements have fared no better. Again, and within months, the Supreme Court also reversed the Circuit's opinion that the Pledge of Allegiance violates the First Amendment.  <u>See</u> <u>Elk Grove School District v. Newdow</u>, 542 U.S. 1 (2001)

case.

Far from being a novel proposition, the notion that the First Amendment accords no protection to speech which an employee is required to express as part of his official job duties - equated with speech which is therefore essentially the government's speech - is well-recognized.. See, e.g., Gonzalez v. City of Chicago, 239 F.3d 939, 941-42 (7th Cir. 2001); Urofsky v. Gilmore, 216 F.3d 401 (4th Cir. 2000) and cases cited therein.  The existence of such cases is consistent with the most important aspect of Garcetti,  which is the court's own view that its holding and reasoning are consistent with its precedents, namely Connick, Rankin and Givhan - all cases which establish that on-the-job speech which is otherwise of public concern is not stripped of protection because it occurs on the job nor because it relates to the subject matter of the speaker's employment.

          The Seventh Circuit in Gonzalez, supra, already recognized the approach the Garcetti court believed the Ninth Circuit had failed to follow.  In interpreting its own "Garcetti" approach to public employee speech cases, and consistent with the very rationale and principles articulated by the Garcetti majority, the Seventh Circuit has recognized that speech akin to Officer Tolnay's is not unprotected as it is not made in discharge of a job duty but the result of an independent, discretionary decision to raise the issue of corruption or other official misconduct.  See e.g. Delgado v. Jones, 282 F.3d 511, 518-20 (7th Cir. 2002) (opining that officer's speech raising the specter of politically-based law enforcement was not unprotected under Gonzalez as it was not

part of his regular job duties to engage in such speech).

**B.    Tolnay's Speech Was Not Job-Required Or Commissioned By His Employer.**

Chief Wearing tried without success to convince this court to dismiss Tolnay's claims on the ground that the subject speech did not touch upon a matter of public concern.  See Def.'s Memorandum of Law in Support of Motion for Summary Judgment at pp. 8-11.  Wearing's argument was not predicated, however, on an undisputed factual claim that the speech was job-required; rather, Wearing argued that the speech, under Connick, was not of public concern because it related solely to matters of personal interest to Tolnay.  Viewing Tolnay's speech not in a vacuum and with blinders on but in content, in context and against the backdrop of its surrounding circumstances as Connick instructs, this court quite correctly rejected Wearing's argument for the reasons set forth in its ruling denying him summary judgment.  See Ruling at pp. 36-37 (considering the speech against the record as a whole and in the context of the politically charged environment in which it occurred, with press and public interest already at a height).

Far from being a personalized grievance, see Connick at p. 147, this court properly deemed Tolnay's expressions as speech which not only touches upon a matter of public concern but is unquestionably "of great public concern."  Ruling at pp. 35, 39.

Although Wearing never took the position at any stage of the proceeding that Tolnay's expressions constituted job-required speech which "owed its existence" to the discharge of his

official duties, see Slip Op.at p. 10, he would be hard-pressed to do so now for the same reason

he did not do so before, which is this:  It would be a startling, if not bizarre, matter to assert that

among Tolnay's official job responsibilities was the duty to disclose and complain about

perceived "political misconduct by high officials in the city, including the Mayor and Chief of

Police, in enforcing the laws of this jurisdiction." See Ruling on Motion for Summary Judgment

at p. 48.  Nor, of course, was there any evidence introduced at trial to support the counter-

intuitive proposition that Tolnay, by his commentary in his 8/3/02 report and his 8/14/02

expressions to the Chief, was conveying a message his employer "commissioned." See Slip Op.

at 10. Quite to the contrary, the evidence established that both Captain Ortiz and Chief Wearing

were upset and angered by the very fact, and especially the content, of Tolnay's speech and

neither thought it was appropriate for Tolnay to have engaged in it.  Ortiz' memo to Wearing

of August 8, 2002 reveals his hostile reaction to Tolnay's disclosure of Ortiz' misconduct and

the consequences of that misconduct.  See Pltf.'s Exh. 16.  In his own words, Ortiz was "very

disturbed by the content" of Tolnay's report "which reflects his opinion" with respect to the

political influence he believes has been exerted by Daniel Rodriguez.  Id. at p. 2.  Ortiz found

the report "unacceptable" and Tolnay's comments "inappropriate".  Id.  Although understandably

grasping at Garcetti, Wearing cannot be seriously heard to argue now that Tolnay was conveying

his employer's message.

By their verdict, the jurors no doubt credited Tolnay's and other witnessess' account of

42

the August 13 meeting in the Chief's office, including the fact that Wearing, who had already

acted in an accusatory and aggressive manner toward Tolnay, completely lost composure and

control in reaction to Tolnay's complaints and criticisms of Captain Ortiz and after expressing

his opinion that the meeting was the result of politics and the political connections of arrestees

who had friends in high places.  Apart from the jury's determination of whom to believe on this

point, the evidence includes Wearing's own writings in which he expressed objection to Tolnay's

report on the ground that it reflected his "political speculations" and in which he further took

issue with what he described as Tolnay's "trash talk[ing]" of Captain Ortiz.  See Exh. 18.[30]  If

an officer came forward with information that a Deputy Chief or other Captain took a bribe,

query if Wearing's position is that such is unprotected because it amounts to "trash-talking" and

disrespect for the upper echelon of the NHPD.

   The implications for the public of Tolnay's speech in this case are not too far removed

from the above hypothetical for, as the trial evidence revealed, Ortiz, who aspired to succeed

Wearing, but who faced competition for this political appointment from an African-American

candidate championed by African-American community leaders, received the full-throated

support of Hernandez and Rodriguez.  Indeed, their lobbying and support for Ortiz' candidacy

---

[30]

See 12/5/05 Tr. at pp. 75, 83-85, 87 (recounting Wearing's testimony by which he confirmed
his view that Tolnay's complaints and criticisms regarding Ortiz' conduct constitute "trash
talk" and "disrespectful" behavior because the complaints and criticisms were directed at a
"Captain" and thus showed no respect for "the ranks".)

included circulated petitions and a threat to march on City Hall should Mayor DeStefano fail to

give the job to Ortiz.  This alone buttresses the evidence showing the political clout these men

wielded.  It also serves to heighten what should be the public interest in Tolnay's speech because

it gives rise to a troublesome inference regarding Ortiz' conduct, both in ordering Tolnay to stay

away from the ministers and in offering unusual aid and support to a convicted criminal in

lodging a patently false civilian complaint against a police officer.

C.   **Far from Constituting The Government's Message, Or The Discharge of a Job Duty, Tolnay's Speech Was On A Topic Deemed By His Employer To Be Off-limits For Workplace Discussion.**

Chief Wearing will no doubt make an awkward attempt in this post-judgment stage to

convince this court to determine as a matter of <u>fact</u> and law that Tolnay's expressive activities

come within the four corners of the <u>Garcetti</u> holding.  Such position is completely belied by the

evidentiary record in this case and Wearing's position as articulated by his own counsel.

Wearing will present Tolnay's 8/3/02 report regarding the MV stop together with its content to

constitute a discharge of his ordinary job duties.[31]  However, as before discussed, both Captain

Ortiz and Chief Wearing took issue with Tolnay's engaging in this conduct.  Both claimed he

_____

[31]

In this respect, Wearing has already engaged in a creative misrepresentation of the trial
testimony.  In his December 28, 2005 memorandum of law (in support of his motion for
JMOL), Wearing, citing to Tolnay's testimony on December 1, 2005 (Tr. at pp. 114-15),
claims Tolnay admitted his activity was part of his normal duties as a police officer.  <u>See</u>
Defendant's Memo. of Law at p. 16.  This is inaccurate.  The cited testimony related to
Tolnay's official case/incident report concerning the July 26 arrests, not the 8/3/02 report.

engaged in improper political speculations and commentary.  Ortiz was so upset he crafted a lengthy memorandum in objection.

Wearing, in disciplining Tolnay, by his own admission hoped that Tolnay would refrain in the future from engaging in further political "speculations."  Without question, as this court aptly noted in its earlier ruling, the evidence suggests Wearing not only sought to punish Tolnay for his speech but to quash any further discussion of the matter by Tolnay and others.  Indeed, while Wearing did not say exactly what message he intended to convey to the NHPD community, he wanted it to be a "strong" one.  See 12/5/05 Tr. at pp. 93-94.  Thus, it well appears that Wearing sought by his actions to chill any further expressions by Tolnay and others on this others on this issue of the mendacity of city officials.

It must be remembered that the Garcetti majority saw fit to emphasize that there was no factual dispute between the parties on the issue whether Ceballos was required by his official job responsibilities to engage in the very speech in question, Slip Op. at p. 13, an agreement which the court considered a "controlling factor."  Id. at p. 9.  In contrast, there is no evidence in the instant case upon which this court may declare, as a matter of fact, that Tolnay's speech in all respects was delivered pursuant to his official job responsibilities.  First and foremost, Wearing made no such claim before or during the trial and offered no evidence on this issue at trial.  All of the evidence, testimonial and documentary, much of it from the Wearing's and Ortiz' own

mouths and writings, establish just the opposite.[32]

Clearly then, no rational distinction can be drawn between Tolnay's speech and that of Bessie Givhan in confronting her boss with what she perceived as racially discriminatory practices at their school.  Nor can a rational distinction be drawn from the <u>Connick</u> plaintiff's office questionnaire raising the issue of pressure on employees to contribute to her boss' political campaigns.[33]

For the same reasons, Wearing's inartful attempt to characterize as job-required the speech expressed by Tolnay at the 8/13/02 meeting is wholly belied by the trial evidence as aforedescribed.[34]

That Tolnay chose this forum to raise the issue of official misconduct does not transform his speech into job-required expression, especially where Wearing is on record as slamming Tolnay for bringing the subject up.

---

[32]

Ironically, the nature and character of Tolnay's speech related to his and other officers' inability to discharge their very job responsibilities as that ability had been corrupted by the official misdeeds of Wearing, Ortiz and DeStefano.

[33]

Although the facts of the case are far removed from those in the instant case, the principle which underlies the Supreme Court's holding in <u>Rankin v. McPherson</u> equally undermines Wearing's arguments.

[34]

Wearing's attempt will now include the notion that Tolnay's presence at the meeting was part of his official job duty to participate in an investigation of a citizen's complaint.  Wearing, however, claimed that he was determined to confront Tolnay about his conduct before he received Ortiz' "civilian complaint."  12/5/05 Tr. at pp. 45-47.

Notably, in connection with the MV stop, Wearing conceded that Rodriguez had engaged in serious offenses, including the felony offense of risk of injury to a minor. 12/5/05 Tr. at pp. 28-35. He also conceded that Rodriguez' civilian complaint consisted entirely of lies. Id. at pp. 41-42. He understood Tolnay's complaints and criticisms of Ortiz related to Ortiz' improper radio order. Id. at p. 74.

Most notably, on the issue of Tolnay's official job duties, Wearing conceded that Tolnay was duty-bound to enforce the law and was not free to choose who will be accountable for law-breaking and who will not. Id. at p. 27. In the same vein, Wearing conceded improprieties in respect to Ortiz' order. Id. at pp. 22-24. Tolnay expressed his concerns regarding Ortiz' conduct after hearing from other officers who overheard the same radio transmission and testified at trial that his concerns were not driven solely by personal interests, as defendant now suggests, but were motivated as well by its implications for fellow officers. It must be borne in mind that Tolnay was not transferred in the immediate wake of the July 26 arrests but was still a patrol officer assigned to the very neighbor hood in which Hernandez and Rodriguez circulated. Tolnay's duty was to enforce the law neutrally in his patrol area yet he was under orders from a superior to "stay away" from these individuals. Wearing's own acknowledgment that Tolnay was duty-bound not to stay away from these individuals clearly demonstrates that Tolnay's speech, as it related to Ortiz, was hardly the "government's message," but was speech in direct challenge to the government's message, an independent and wholly discretionary act on Tolnay's

47

part.

Again, drawing the analogy with <u>Garcetti</u>, Ceballos was subject to discipline if he did <u>not</u> write the subject disposition memorandum because it was his obligation to do so.  In contrast, it would appear ridiculous for Wearing to suggest that Tolnay would have been subject to discipline for <u>not</u> engaging in the subject speech.  Such would involve the equally absurd proposition that Tolnay could have been called into a meeting and on the carpet for not complaining about official corruption.

### <u>CONCLUSION</u>

For all of the foregoing reasons, the plaintiff respectfully submits that the holding in <u>Garcetti v. Ceballos</u> provides no basis for this court to question the correctness of its prior rulings in this case nor any basis to disturb the jury's findings and verdict.

THE PLAINTIFF

ARPAD TOLNAY


BY:_____
KAREN LEE TORRE
Federal Bar No. ct01707
Law Offices of Karen Lee Torre
51 Elm Street
Suite 307
New Haven, CT 06510
(203) 865-5541

His Attorney

48

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed, this 30th day of June, 2006, to:

Robert A. Rhodes, Esq.
John Burns Farley, Esq.
Ralph W. Johnson III, Esq.
Halloran & Sage, LLP
315 Post Road West
Westport, CT 06880


Norman A. Pattis, Esq.
649 Amity Road
P.O. Box 280
Bethany, CT 06524

Hubert J. Santos, Esq.
Sandra L. Snaden, Esq.
Santos & Seeley, P.C.
51 Russ Street
Hartford, CT 06106


_____
KAREN LEE TORRE