IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ARPAD TOLNAY | : | CIVIL ACTION NO. |
|     Plaintiff | : | 3:02-CV-1514 (EBB) |
| | : | |
| V. | : | |
| | : | |
| MELVIN WEARING | : | |
|     Defendant | : | JUNE 30, 2006 |

## DEFENDANT'S MEMORANDUM OF LAW RE: GARCETTI V. CEBALLOS, 126 S.CT. 1951 (2006)

Robert A. Rhodes, Esq.
CT Fed. Bar No. 13583
**HALLORAN & SAGE LLP**
315 Post Road West
Westport, CT 06880
Tel:   (203) 227-2855
Fax:   (203) 227-6992
E-Mail:  Rhodes@halloran-sage.com

and

Ralph W. Johnson III, Esq.
CT Fed. Bar No. 15277
**HALLORAN & SAGE LLP**
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
Tel:   (860) 522-6103
Fax:   (860) 548-0006
E-Mail:  Johnsonr@halloran-sage.com

*Counsel for the Defendant,*
*Melvin Wearing*

**ORAL ARGUMENT REQUESTED**

# **TABLE OF CONTENTS**

      **PAGE**

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ............................................................................................................. 1

    I.    THE SUPREME COURT'S DECISION IN <u>GARCETTI V.
        CEBALLOS</u> ................................................................................................. 1

        A.    Factual Background ........................................................................... 1

        B.    Procedural Background ..................................................................... 2

            1.    The District Court's Ruling Granting
                 Summary Judgment ............................................................... 2

            2.    The Ninth Circuit's Decision ................................................ 3

                a.    The Majority Opinion .............................................. 3

                b.    Judge O'Scannlain's Special
                     Concurrence ............................................................. 3

        C.    The Opinion of the Court .................................................................. 4

    II.    JUSTICE STEVENS' DISSENT ...................................................................... 8

    III.    JUSTICE SOUTER'S DISSENT ..................................................................... 8

    IV.    JUSTICE BREYER'S DISSENT ................................................................... 10

    V.    TOLNAY'S CASE INCIDENT REPORT ..................................................... 11

    VI.    TOLNAY'S TESTIMONY .............................................................................. 13

    VII.    THIS COURT'S IDENTIFICATION OF THE SPEECH
         AT ISSUE ......................................................................................................... 22

ARGUMENT ................................................................................................................. 23

    I.    CHIEF WEARING IS ENTITLED TO THE ENTRY
        OF JUDGMENT AS A MATTER OF LAW IN HIS
        FAVOR BASED ON <u>GARCETTI V. CEBALLOS</u> ......................................... 23

|   | A. | The Plaintiff's Speech Is Not Protected By The First Amendment ..................................................................23 |
|---|----|---|
|   | B. | The Plaintiff's Claim Fails As A Matter Of Law Under The <u>Pickering</u> Balancing Analysis ...........................34 |
|   | C. | Chief Wearing Is Entitled To Qualified Immunity ..................37 |
| III. | | <u>GARCETTI V. CEBALLOS</u> SUPPORTS THE GRANTING OF THE MOTION FOR A NEW TRIAL ON ALL THE ISSUES ...................................................................................39 |
|   | A. | If The Court Does Not Enter A Judgment In Favor Of Chief Wearing It Must Order A New Trial To Resolve Any Factual Issues ..................................................39 |
|   | B. | The Need For The Submission Of The <u>Pickering</u> Balancing Issues To The Jury Is Even Greater After The Supreme Court's Decision In <u>Garcetti</u> ......................40 |
| IV. | | IN THE ALTERNATIVE: <u>GARCETTI V. CEBALLOS</u> SUPPORTS THE ORDERING OF A NEW TRIAL OR A SUBSTANTIAL REMITTITUR ON THE COMPENSATORY AND PUNITIVE DAMAGES ........................40 |
| CONCLUSION ........................................................................................................40 | | |

**PRELIMINARY STATEMENT**

Pursuant to the Court's order entered on June 1, 2006, the defendant, Melvin Wearing, the former Chief of Police for the City of New Haven, submits this memorandum regarding the impact of Garcetti v. Ceballos, 126 S.Ct. 1951 (2006). As demonstrated below, under Garcetti, Chief Wearing is entitled to a judgment as a matter of law because the speech at issue is not protected by the First Amendment and/or because the balancing analysis under Pickering v. Board of Educ., 391 U.S. 563 (1968), weighs in his favor. Moreover, under Garcetti, Chief Wearing is entitled to qualified immunity. Finally, at a minimum, Garcetti requires the ordering of a new trial and/or a remittitur. Accordingly, this memorandum is incorporated into Chief Wearing's reply/supplemental memoranda in support of his Rule 50(b) and Rule 59 motions and his motion for a remittitur, in the alternative.

**BACKGROUND**

**I.    THE SUPREME COURT'S DECISION IN GARCETTI V. CEBALLOS**

**A.    Factual Background**

Richard Ceballos was a deputy district attorney in Los Angeles. Garcetti, 126 S.Ct. at 1955. Specifically, he was a calendar deputy. Id. In February 2002, a defense attorney contacted Ceballos about a pending case. The attorney stated that there were inaccuracies in an affidavit used to obtain a search warrant. Id. He informed Ceballos that he had filed a motion to challenge the warrant and that he wanted Ceballos to review the case. Id.

After examining the affidavit and visiting the location described in it, Ceballos determined that the affidavit contained serious misrepresentations. Id. Subsequently, he spoke on the telephone with the deputy sheriff who signed the affidavit, but he did not receive a satisfactory explanation for the perceived inaccuracies. Id. Ceballos relayed his findings to his

1

supervisors, Carol Najera and Frank Sundstedt, the petitioners, and followed up by preparing a disposition memorandum. Id. The memo explained Ceballos' concerns and recommended dismissal of the case. Id. at 1955-56. On March 2, 2000, Ceballos submitted the memo to Sundstedt for his review. Id. at 1956. A few days later, Ceballos presented Sundstedt with another memo, describing a second telephone conversation between Ceballos and the deputy sheriff who signed the affidavit. Id.

Based on Ceballos' statements, a meeting was held to discuss the affidavit. Id. The attendees included Ceballos, Sundstedt, and Najera, as well as the deputy sheriff who signed the affidavit and other employees from the sheriff's department. Id. "The meeting allegedly became heated, with one lieutenant sharply criticizing Ceballos for his handling of the case." Id. Despite Ceballos' concerns, Sundstedt decided to proceed with the prosecution, pending disposition of the defense motion. Id. The trial court held a hearing on the motion. Ceballos was called by the defense and recounted his observations about the affidavit. Id. However, the trial court denied the defense's motion. Id.

### B. Procedural Background

#### 1. The District Court's Ruling Granting Summary Judgment

Subsequently, Ceballos commenced an action in the federal district court alleging that Sundstedt and Najera violated the First and Fourteenth Amendments by retaliating against him based on his March 2 memo. Id. Sundstedt and Najera responded that no retaliatory actions were taken against Ceballos and that all the actions of which he complained were explained by legitimate reasons such as staffing needs. Id. at 1956. They further contended that in any event, the March 2 memo was not protected speech under the First Amendment. Id. The petitioners moved for summary judgment and the district court granted their motion. "Noting that Ceballos

wrote his memo pursuant to his employment duties, the court concluded he was not entitled to First Amendment protection for the memo's contents. It held in the alternative that even if Ceballos' speech was constitutionally protected, petitioners had qualified immunity because the rights Ceballos asserted were not clearly established." Garcetti, 126 S. Ct. at 1956.

### 2.    The Ninth Circuit's Decision

#### a.    The Majority Opinion

On appeal, the Ninth Circuit reversed. It determined that Ceballos' memo, "which recited what he thought to be governmental misconduct, was 'inherently a matter of public concern.'" Garcetti, 126 S.Ct. at 1956. It did not, however, consider whether the speech was made in Ceballos' capacity as a citizen. Id. Having concluded that Ceballos' memo satisfied the public-concern requirements, the Ninth Circuit proceeded to balance Ceballos' interest in his speech against his supervisors' interest in responding to it. Id. at 1957. The court struck the balance in Ceballos' favor, noting that petitioners "'failed even to suggest disruption or inefficiency in the workings of the District Attorney's Office' as a result of the memo." Id. at 1956. The court further concluded that Ceballos' First Amendment rights were clearly established and that petitioners' actions were not objectively reasonable. Id.

#### b.    Judge O'Scannlain's Special Concurrence

Judge O'Scannlain filed a special concurrence in the case.[1] In it, he concluded that that circuit law should be revisited and overruled. Garcetti, 126 S.Ct. at 1957. In his view, "'when public employees speak in the course of carrying out their routine, required employment obligations, they have no *personal* interest in the content of that speech that gives rise to a First Amendment right.'" Id. (emphasis original).

---

[1]/    Chief Wearing's initial memorandum of law in support of his Rule 50(b) motion relied on Judge O'Scannlain's special concurrence.

3

### C. The Opinion of the Court

At the outset of its analysis, the majority opinion, authored by Justice Kennedy, reviewed the Court's decisions in this area.[2] Specifically, it recognized that:

> Pickering and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

Garcetti, 126 S.Ct. at 1958 (citations omitted).

The Court also recognized that when a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. Id. Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public service. Id. Public employees, moreover, often occupy trusted positions in society. Id. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions. Id.

---

[2] The Supreme Court's employee-speech jurisprudence has "sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions." Garcetti, 126 S.Ct. at 1959. Consequently, "[u]nderlying [the Supreme Court's] cases has been the premise that while the First Amendment invests public employees with certain rights, *it does not empower them to 'constitutionalize the employee grievance.'*" Id. (emphasis added).

4

With these principles in mind, the Court turned to Ceballos' case. It noted that Ceballos believed that the affidavit used to obtain the search warrant contained serious misrepresentations. Id. He conveyed his opinion in a memo to his supervisor. Id. at 1959. The Court recognized that the "controlling factor in Ceballos' case [wa]s that his expressions were *made pursuant to his duties* as a calendar deputy." Id. at 1959-60 (emphasis added). The Court concluded that "the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case -- [d]istinguishes Ceballos' case from those in which the First Amendment provides protection against discipline." Id. at 1960. Accordingly, the Court "h[e]ld that when public employees *make statements pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. (emphasis added). In further explaining its holding, the Court recognized as follows:

> Ceballos wrote his disposition memo because *that is part of what he*, as a calendar deputy, *was employed to do*. It is immaterial whether he experienced some personal gratification from writing the memo; his First Amendment rights do not depend on his job satisfaction. The significant point is that the memo was written *pursuant to Ceballos' official duties*. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

Id. at 1960 (emphasis added)(citing Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 833 (1995)("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes.")). As an example of a contrast to Ceballos' memo, the Court identified "the expressions made by the speaker in Pickering, whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day." Garcetti, 126 S.Ct. at 1960.

5

In further explaining why Ceballos' speech was not protected under the First Amendment, the Court emphasized:

> Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. ***When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee.*** The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.

Id. (emphasis added).[3] The Court further believed that its holding was supported by the "emphasis of [the Supreme Court's] precedents on affording government employers sufficient discretion to manage their operations." Id. In particular, employers have heightened interests in controlling "*speech made by an employee in his or her professional capacity.*" Id. at 1960 (emphasis added). It recognized that "[o]fficial communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." Id. The Court believed that Ceballos' memo illustrated the importance of the discretion which the courts provided to governmental employers. Id. In particular, Ceballos' memo "demanded the attention of his supervisors and led to a heated meeting with employees from the sheriff's department. If Ceballos' superiors thought his memo was inflammatory or misguided, they had the authority to take proper corrective action." Id. at 1960-61.

---

[3]/ The Court believed that the result in Garcetti was "consistent with [its] precedents' attention to the potential societal value of employee speech." Id. Refusing to recognize First Amendment claims "based on government employees' work product" did not prevent them from participating in public debate. Id. The employees retained the prospect of constitutional protection for their contributions to the civic discourse. Id. Nevertheless, the Court emphasized that "[t]his prospect of protection, ... *d[id] not invest them with a right to perform their jobs however they see fit.*" Id. (emphasis added).

6

In rejecting the Ninth Circuit's and Ceballos' proposed contrary rule, the Court emphasized the dangers of that rule:

> [The rule] adopted by the Court of Appeals, would commit state and federal courts to a new, permanent, and intrusive role, mandating judicial oversight of communications between and among government employees and their superiors in the course of official business. This displacement of managerial discretion by judicial supervision finds no support in our precedents. When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences. When, however, the employee is *simply performing his or her job duties*, there is no warrant for a similar degree of scrutiny. To hold otherwise would be to demand permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers.

Garcetti, 126 S.Ct. at 1961 (emphasis added). Consequently, "[w]hen a public employee *speaks pursuant to employment responsibilities*, ..., there is no relevant analog to speech by citizens who are not government employees." Id. (emphasis added). Accordingly, the Court recognized that the "[p]roper application of our precedents thus leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions *made pursuant to official responsibilities*." Id.

Moreover, the Court noted that it was not articulating a comprehensive framework for defining the scope of an employee's duties in cases where there was "room for serious debate." Id. Rather, it believed that the "proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee is actually expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." Id. at 1961-62. Thus, although the Court recognized that exposing

7

governmental inefficiency and misconduct is a matter of considerable significance, the Court concluded its decision as follows:

> We reject,..., the notion that the First Amendment shields from discipline the *expressions employees make pursuant to their professional duties*. Our precedents do not support the existence of a constitutional cause of action behind every statement a public employee *makes in the course of doing his or her job*.

Garcetti, 126 S.Ct. at 1962 (emphasis added).

## II.   JUSTICE STEVENS' DISSENT

The dissenting opinions filed in Garcetti also provide some insight. In particular, they highlight the broad scope and dispositive impact the decision has on the case at bar. In his dissenting opinion, Justice Stevens acknowledged that a governmental "supervisor may take corrective action when ... speech is 'inflammatory or misguided.'" Garcetti, 126 S.Ct. at 1962 (Stevens, J., dissenting).

## III.   JUSTICE SOUTER'S DISSENT

As part of his attempt to distinguish Garcetti from Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410 (1979), Justice Souter noted that the difference between the two was that in this case, "the subject of Ceballos's speech *fell within the scope of his job responsibilities*." Garcetti, 126 S.Ct. at 1965 (emphasis added). In addressing the scope of the majority decision, and in describing the importance of speech by government employees on subjects that fall within their duties, Justice Souter stated as follows:

> ...Would anyone doubt that a school principal evaluating the performance of teachers for promotion or pay adjustment retains a citizen's interest in addressing the quality of teaching in the schools? (Still, the majority indicates he could be fired without First Amendment recourse for fair but unfavorable comment when the teacher under review is the superintendent's daughter.) Would anyone deny that a prosecutor like Richard Ceballos may claim the interest of any citizen in speaking out against a rogue law

8

>enforcement officer, simply because his job requires him to express a judgment about the officer's performance? (But the majority says the First Amendment gives Ceballos no protection, even if his judgment in this case was sound and appropriately expressed.)

Id. at 1965-66 (Souter, J., dissenting).[4]

Perhaps the most direct and telling description of the dispositive impact of the majority's decision in Garcetti on the case at bar is contained in Justice Souter's statement that:

>Nor is there any reason to raise the counterintuitive question whether the public interest in hearing informed employees evaporates when they speak as required on some subject at the core of their jobs. Two Terms ago, we recalled the public value that the Pickering Court perceived in the speech of public employees as a class: 'Underlying the decision in Pickering is the recognition that public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public. Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it.' This is not a whit less true when an employee's job duties require him to speak about such things: when, for example, a public auditor speaks on his discovery of embezzlement of public funds, when a building inspector makes an obligatory report of an attempt to bribe him, or *when a law enforcement officer expressly balks at a superior's order to violate constitutional rights he is sworn to protect. (The majority, however, places all these speakers beyond the reach of First Amendment protection against retaliation.)*

Garcetti, 126 S.Ct. at 1966-67 (Souter, J., dissenting)(emphasis added, citation omitted).

In criticizing the majority opinion, Justice Souter also recognized that the majority decision in Garcetti accepts that "any statement *made within the scope of public employment* is

---

[4]/   Justice Souter's dissenting opinion acknowledged that a statement by a government employee complaining about nothing beyond treatment under personnel rules raises no greater claim to constitutional protection against retaliatory response than the remarks of a private employee. Id. at 1964 (Souter, J., dissenting). He also acknowledged that the Supreme Court had regarded "eligibility for protection by Pickering balancing as the proper approach when an employee speaks critically about the administration of his own government employer." Id.

9

(or should be treated as) the government's own speech, ..., and should thus be differentiated as a matter of law from the personal statements the First Amendment protects." Id. at 1968 (Souter, J., dissenting)(emphasis added). In fact, he considered the formulation of this proposition to be extremely broad and quoted the majority opinion as follows:

> 'Restricting speech that *owes its existence to a public employee's professional responsibilities* does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.'

Id. at 1969 (Souter, J., dissenting)(emphasis added). See id. ("Consider the breadth of the new formulation").

### IV. JUSTICE BREYER'S DISSENT

Justice Breyer's dissenting opinion also offers some insights for the instant case. First, it confirms that, as argued in Chief Wearing's opening brief in support of his Rule 50(b) motion, even before the majority decision in Garcetti, Tolnay's speech was not protected by the First Amendment. In particular, Justice Breyer recognized that "where a government employee speaks 'as an employee upon matters only of personal interest,' the First Amendment does not offer protection." Id. (quoting Connick, 461 U.S. at 147).

Second, Justice Breyer's opinion confirms the mandatory application of the Pickering balancing test. In particular, he recognized that even "[w]here the employee speaks 'as a citizen ... upon matters of public concern,' the First Amendment offers protection *but only where the speech survives a screening test*. That test, called, in legal shorthand, 'Pickering balancing,' requires a judge to 'balance ... the interests' of the employee 'in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the

10

public services it performs through its employees.'" Garcetti, 126 S.Ct. at 1973 (Breyer, J., dissenting)(emphasis added).

Finally, Justice Breyer's dissenting opinion confirms that Chief Wearing is entitled to qualified immunity in the instant case. In particular, in commenting on the majority opinion, Justice Breyer noted that "[o]ur prior cases do not decide what screening test a judge should apply in the circumstances before us, namely when the government employee both speaks upon a matter of public concern and does so in the course of his ordinary duties as a government employee." Id. at 1974. "The majority answers the question by holding that 'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.' ... In a word, the majority says, 'never.'" Id.

## V.     TOLNAY'S CASE INCIDENT REPORT

In the last three paragraphs of his August 3, 2002 case incident report regarding the motor vehicle stop the previous day, the plaintiff, Arpad Tolnay, wrote as follows:

> This Officer feels *he* was not able to act to *his* full potential at that time based on the circumstances of said situation. ***This*** Officer feels that at the moment in question *he* acted with judgment that was imposed on his police jurisdiction due to the identity and political involvement of Rodriguez. This Officer was reaffirmed by *his* actions after the completion of said incident as this Officer was instructed by the Patrol Shift Supervisor Capt. F. Ortiz not to have any contact with person(s) involved in the incident that occurred on 07/26/02 CN 02-42911.
>
> Officer C. Colon who was dispatched as a cover unit arrived after Daniel Rodriguez was told he was able to leave. The transaction took approx. 45 seconds in which C. Colon was not able to arrive in time.
>
> In closing this Officer would like to state that at no time did the incident that occurred on 07/26/02 influence the motor vehicle stop with the exception of the actions taken after the stop. Simply stated

11

> this Officer observed a vehicle traveling north on Poplar Street and
> *I* observed said vehicle to be in violation of the motor vehicle laws
> as defined.

(Def.'s Post-Trial Ex. 5; Pl.'s Trial Ex. 4 at pp. 4-5)(emphasis added)

The August 3 case incident report was prepared on "NHPD FORM A - REV. 8/2000." This is the same form as the case incident report prepared by Tolnay for the July 26, 2002 arrests at the church. (Def.'s Post-Trial Ex. 2; Pl.'s Trial Ex. 1) Both the August 3 and July 26 case incident reports were signed by Tolnay underneath the statement that "[t]his report signed under the penalties of state law for making a false statement." (Def.'s Post-Trial Exs. 2, 5) In fact, all five pages of the August 3 report are signed by Tolnay underneath that representation. The August 3 report assigns a complaint number "02-44465" and cross-references the complaint number for the July 26 case incident report, "02-42911." The August 3 report further assigns an incident code number, "3001" and describes the incident as a "motor vehicle violation." The report includes Daniel Rodriguez's date of birth, street address, telephone number, height, weight, hair color and color of his eyes. As officers involved, the report lists Tolnay, his supervisor Sergeant Burgh, Officer C. Colon and Captain Ortiz. Pages 3 through 5 of the report then purport to describe the motor vehicle stop with some detail.

The text of the August 3 report references the complaint number for the July 26 report three times. It further notes that Tolnay ultimately informed Rodriguez that he was "fine to go" and Rodriguez left without any incident. The August 3 report also notes that upon Rodriguez leaving the scene, Tolnay contacted Sergeant Burgh and notified him of the incident that had just occurred and "that I would be writing a report to document such." The August 3 report then goes on to indicate that Rodriguez had been:

> [I]n fact in violation of the infraction 14-272a for improper
> operation of a truck or other motor vehicle with a child under 16

12

years of age in an open rear section or bed without safety belt as defined in the State of Connecticut Motor Vehicle Statutes which is punishable by an infraction of $121.00. In addition Rodriguez in the course of operating said vehicle with the (2) young males could have been charged with risk of injury to a minor (2 counts) which is a violation of the [CGS] 53-21 which states the actor (Daniel Rodriguez) willfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that it's (sic) life or limb is endangered, or it's (sic) health likely to be injured, or it's morals likely to be impaired as defined in the Connecticut Penal Code. Daniel Rodriguez did place the (2) young males in a position where there could have been severe injury to to (sic) his operation on a main roadway."

(Def.'s Post-Trial Ex. 5 at p. 4)

### VI. TOLNAY'S TESTIMONY

Tolnay testified that under the regulations of the New Haven Police Department, he was required to prepare a case incident report in connection with the July 26, 2002 incident at the Second Star of Jacob Church. (12/1/05 Tr. at 114-15) He prepared the report on that incident "in the normal course of [his] duties at the conclusion of [his] shift that evening." (12/1/05 Tr. at 115)[5]

On August 3, 2002, Tolnay was on duty in his patrol car. (12/1/05 Tr. at 158) He was "in the vehicle for the regular patrol session." (Id.) He picked up Officer Waleska Bermudez, who had been on a walking patrol detail. (12/1/05 Tr. at 159-60) Subsequently, Tolnay and Bermudez observed two young children hanging off the side of a jeep. (Id. at 159) Bermudez said "let's stop the vehicle." (Id. at 160) She expressed concern for the safety of the children. (Id.) Tolnay and Bermudez "initiated a motor vehicle stop of the vehicle to basically tell the

---

[5]/ Tolnay went on vacation in the first week of August 2002 for approximately ten days. (12/1/05 Tr. at 157)

13

operator children couldn't ride on the side of the jeep." (12/1/05 Tr. at 159)[6] The driver of the jeep turned out to be Daniel Rodriguez. (Id. at 161) Rodriguez was one of the ministers who had been arrested at the church on July 26, 2002.

As Tolnay was walking towards the vehicle, he observed that it was Rodriguez from the rear-view mirror. (12/1/05 Tr. at 162) Tolnay had not yet approached the driver's side. (Id.) He stopped and very loudly explained to Rodriguez that he had every right to pass out the flyers regarding the rally, but that the children needed to be inside the cab of the vehicle and that they needed to have their seatbelts on. (12/1/05 Tr. at 162) At that point, Tolnay turned around and notified his supervisor, Sergeant Burgh, over the radio that he had made a stop of one of the individuals from the previous arrest the week prior and that he had given him a verbal warning and had not taken any other action. (Id.) During his radio transmission to Sergeant Burgh, Tolnay did not mention the name of the individual. (Id.)

Tolnay wrote a case incident report "in connection with [his] stop of the vehicle." (12/1/05 Tr. at 174, 176) A copy of that case incident report was introduced as plaintiff's Exhibit 4 at the trial. (Id. at 175; Def.'s Post-Trial Ex. 5) Tolnay prepared the report after the stop. (12/1/05 Tr. at 176) When asked by his counsel "[w]hy were you so concerned about who this man was, that this kind of report became necessary?" Tolnay responded as follows:

> Because after my initial arrest, all the information that *I* had received regarding how powerful people they were had *frightened me*. Because, you know, *I'm* a patrolman and my duty is to do my job, and *I'm* not involved in politics. *I* go out and *I* do my job. *I* was always very proud of how proactive and how much *I* enjoyed doing police work.

---

[6]/ When asked to identify the laws that Rodriguez was violating at that time of the stop, Tolnay did not identify any law. (12/1/05 Tr. at 173-74) Rather, consistent with his testimony that his intention for stopping the vehicle was to give a warning, he only identified the safety of the children. (Id.)

14

> And because it was *my* misfortune to be the officer that gets sent to that location and have to take the action that *I* did, *I* was now going to suffer the consequences of what *I* had done.

(12/1/05 Tr. at 176)(emphasis added)

After Tolnay had communicated to Sergeant Burgh on the police radio that he had conducted a motor vehicle stop, and informed him that it was one of the individuals whom he had arrested the week earlier, Sergeant Burgh asked Tolnay if anything had happened. (12/1/05 Tr. at 179) Tolnay said "[n]o, I issued a verbal wering (sic) and he's free to go." (Id.) According to Tolnay, while he was still on the channel with Sergeant Burgh, Captain Ortiz called for the sergeant on the radio and stated "'I'm not quite sure what you're getting from that Fair Haven officer, but just tell him to be professional and to just do his job and not engage in' ... 'silly conversation.'" (12/1/05 Tr. at 179-80) Tolnay further maintained that Captain Ortiz told the sergeant to "'[j]ust tell him to stay away from all those people involved.'" (Id. at 180)[7]

On direct examination by his attorney, Tolnay was directed to the last paragraph of page 3 of the case incident report for the motor vehicle stop. (Id. at 182-83) After pointing out this section of the report, Tolnay's counsel asked him "[w]hy did you feel the need to include that opinion in your official department report?" (Id. at 183) Tolnay responded as follows:

> At that point in time, when *I* made that motor vehicle stop, after what was happening, and what *I* knew *I* was in store for, *I* felt like *I* needed to explain what had happened and the reason why *I* was not able to, basically, take *police action*.

---

[7]  According to Tolnay, at the time of Captain Ortiz's statement to the sergeant, Tolnay was listening to the information channel on the police radio. (12/1/05 Tr. at 179-80) According to Tolnay, the police department has broken down the City of New Haven into ten different districts, half of the department operates on Channel 2. (Id.) The other half operates on Channel 3. (Id. at 180-81) Police officers go to Channel 1 to get information on driver's licenses and plates. (Id. at 181). It is the channel where the records division operates on. (Id.) Also, when officers do not want to tie up the radio, they can normally go to Channel 1 and they can speak to another officer over the radio. (Id.)

15

> It was my firm belief that had *I* actually enforced the law and given Daniel Rodriguez an infraction or a summons or whatever applicable charges apply to him for what *I* had observed, *I* don't even know what the ramifications could have been. So *I* felt the need to explain that in my report.

(12/1/05 Tr. at 183)(emphasis added)

When he wrote his report for the motor vehicle stop, Tolnay contacted the police department's records division and asked it to fax him a copy of his original report for the July 26 incident so that he could "cross-reference" it. (12/1/05 Tr. at 187-88) Shortly after the motor vehicle stop, Tolnay proceeded to a police sub-station "to write [his] report." (12/1/05 Tr. at 177) Sergeant Burgh came to Tolnay's location and advised him that Captain Francisco Ortiz wanted a memo from him. (Id.) Specifically, Tolnay was "informed by [his] supervisor that [he] needed to complete a department memorandum explaining why [he] had pulled over Daniel Rodriguez, and that it needed to be completed before the termination of [his] shift and submitted to [his] supervisor." (12/1/05 Tr. at 179) It was Tolnay's understanding that the order from Sergeant Burgh had come from Captain Ortiz. (Id. at 179, 193-94)[8]

In connection with the motor vehicle stop, Officer Colon also prepared a memorandum to Captain Ortiz. (12/1/05 Tr. at 197) Tolnay testified that Colon's memorandum was part of the business records generated by the New Haven Police Department in connection with the motor vehicle stop. (Id. at 198) It was kept in the ordinary course of the department's records. (Id.)

Tolnay testified that he was never contacted by the media. (12/1/05 Tr. at 190) Nor did he ever give a statement to the media. (Id. at 190-91) In fact, he testified that there were constraints within the police department which impeded his ability to make any statement to the

---

[8]/ A copy of Tolnay's memo to Captain Ortiz was introduced into evidence as Plaintiff's Trial Exhibit 12. (12/1/05 Tr. at 194; Def.'s Post-Trial Ex. 9) Tolnay's memo expressly cross-referenced the case incident report for the July 26, 2002 arrests by that report's number, 02-42911. (12/1/05 Tr. at 194)

16

media. (Id. at 191) Tolnay never made a public statement and did not provide a copy of either case incident report to the media. (Id. at 192) No reporter ever contacted Tolnay regarding these matters. (Id. at 193) Tolnay never asked Chief Wearing for permission to speak to the media. (12/2/05 Tr. at 94-95)

With regard to the motor vehicle stop, Tolnay testified that by the time Officer Colon arrived at the scene, Rodriguez had already been allowed to leave. (12/2/05 Tr. at 86) Tolnay confirmed that neither Chief Wearing, Captain Ortiz nor Sergeant Burgh ever instructed him not to issue a ticket or make an arrest of Rodriguez in connection with the motor vehicle stop. (12/2/05 Tr. at 87) Captain Ortiz's statements on the radio occurred after Tolnay had already allowed Rodriguez to leave. (Id.) Tolnay alone made the decision not to issue a ticket to Rodriguez. (Id. at 87-88)

Tolnay further described Captain Ortiz's comments on the radio as follows:

> I think ... he said, I'm not sure what you were getting from that Fair Haven officer. Tell that officer to do his job and stop engaging in silly and ridiculous conversations and not have any contact with those persons along those lines.

(12/2/05 Tr. at 90)

Tolnay testified that at some unidentified point in time he became concerned that he was not the only police officer who would be afraid to enforce the law against Daniel Rodriguez and/or Armando Hernandez. (12/1/05 Tr. at 205) More particularly, Tolnay answered "Yes" in response to a question from his counsel, which asked whether Tolnay had become concerned "[a]t any time." (Id.) Tolnay also responded "Yes" in response to a question by his counsel asking whether as a result of the two incidents and the communication from Captain Ortiz he was concerned about the ability of fellow officers to take action against either Rodriguez or Hernandez in the event that either was seen breaking the law. (Id. at 206)

17