Tolnay testified that he became aware of Captain Ortiz's August 8, 2002 memorandum (Def.'s Post-Trial Ex. 37) recording the citizen's complaint against Tolnay through his union. (12/1/05 Tr. at 217)[9] In particular, the police union president gave Tolnay a copy. (Id.) Tolnay maintained that in reaction to the citizen's complaint, Chief Wearing ordered him to appear at the Chief's office with or without union representation. (12/1/05 Tr. at 225) Thus, Tolnay appeared in Chief Wearing's office in response to an order from the Chief. (Id. at 226) He was accompanied by a union representative. (Id.) The meeting occurred on August 13, 2002, after Tolnay had returned from vacation. (Id. at 226-28) Specifically, Tolnay had received a memorandum from the Chief directing him to attend the meeting. (Id. at 229) The memorandum was introduced into evidence as Defendant's Trial Exhibit G. (Def.'s Post-Trial Ex. 36) It stated that Tolnay was to report "upon [his] return to duty." Tolnay indicated that the notice from the Chief stated that he wanted him in his office in connection with a certain case incident report. (12/1/05 Tr. at 229) Tolnay maintained that in addition to himself and Chief Wearing, his union representative and Scott Nabel, the human resources coordinator for the New Haven Police Department, were present at the meeting. (12/1/05 Tr. at 228)[10]

When asked by his counsel to describe what happened at the first meeting with Chief Wearing, Tolnay testified that "[f]rom the beginning of the meeting, Chief Wearing began asking me questions regarding the first incident regarding the noise complaint." (12/1/05 Tr. at 234-35)

Tolnay further described the first meeting as follows:

> [Chief Wearing] continued to ask me questions regarding if I had felt that [I] had handled the situation appropriately....

---

[9]/    Tolnay confirmed that the subject of the memorandum by Captain Ortiz, Plaintiff's Trial Exhibit 16, was in fact a citizen's complaint. (12/2/05 Tr. at 95)

[10]/    Under the union contract, Tolnay had a right to have his union representative with him. (12/2/05 Tr. at 111) He did not have a right to have an attorney present. (Id. at 111-12)

> As I began to explain to him how the events unfolded, he kept asking me if I felt that I had handled the situation correctly. Every time I did say that I handled the situation correctly. At one point I stated that I believed that the only reason I was in the office was because of the fact that the two individuals involved had very strong political ties. And that seemed to make the chief very angry. At one point I believe he pointed to my union rep and instructed my union rep to have me answer questions.
>
> *And my whole intent was to answer questions.* My demeanor was never loud. *I never addressed the chief in any other manner except chief or sir throughout the entire meeting.*
>
> . . .
>
> The main theme of the meeting was did you feel you did the right thing? Did you think you could have handled it differently? Do you think you could handle it different? And at one point he questioned me as to why I did not contact [ ] a supervisor.

(12/1/05 Tr. at 236-37)(emphasis added)

Tolnay indicated that at this point of the meeting Chief Wearing was referring to the July

26 incident. (Id. at 237) He further testified as follows:

> We're still speaking regarding the July 26th arrest. And he kept asking me if I felt I handled it correctly. And I said I handled it absolutely correctly. And I felt that I afforded them more patience and courtesy than they had required....

(12/1/05 Tr. at 237-38) Tolnay also maintained that Chief Wearing made statements during the

first meeting that he thought Tolnay should have done something differently. (Id. at 239)

According to Tolnay, Chief Wearing also made references to the fact that Tolnay was young and

was still a rookie and probably should have handled it different. (Id. at 239-40) In response to

Chief Wearing's comments, Tolnay stated that he had been working in the Fair Haven section

and had "a lot of experience in dealing with the community." (Id. at 240) Tolnay maintained

that Chief Wearing was getting angry because Tolnay did not answer questions that Tolnay

characterized as not being relevant. (Id. at 240-41)

In response to questions by his counsel as to whether at one point during the first meeting there was a statement regarding Captain Ortiz, Tolnay testified as follows:

> Yes, that took place when we had – when we began to discuss the motor vehicle stop. Chief Wearing did have a copy of my motor vehicle arrest form from August 3rd. And he took a moment to read it. And he used his hands and he read it. He kind of kept waving his hand and saying, 'There's a lot of charges.' And he looked at me and said, 'Well, how come you didn't arrest him for these charges.' And that's, basically, how the question was posed.
>
> And I said, 'Well, sir,' I said '*because I would be afraid to have to come sit* through a second meeting based on who these people are.'
>
> And then he said, 'Well, you wouldn't.'
>
> *And I said, 'Well, sir, I believe I'm here today because these two individuals have political connections and they have people who are in high places within this city and that's why I feel that I am here. I am here for no reason, through no conduct of mine as a police officer.'*
>
> And you know my tone was no different than throughout the beginning of the meeting throughout the middle of the meeting. *My tone was that of a professional.* And at that point in time I believe that I was referred to as being smart mouth.
>
> And in my mind, as I'm answering questions, sitting in the office, you know, thoughts were going through my mind that *this is just something that I shouldn't have to be subjected to* because I'm not a politician; I'm a patrol officer.
>
> I did my job. And as a matter of fact, my own belief is that I handled that situation, you know, as well as it could have been handled. And there was just no other recourse to my actions at that time.

(12/1/05 Tr. at 241-42)(emphasis added)

When asked about his statement that Hernandez and Rodriguez had political connections and that that was why he was present in the meeting, Tolnay responded as follows:

>...When I make reference to the situation being political[ly] influence[d], that's what I had meant. I didn't have different ideas about what was going on. I only had one idea how it was being handled and how it influenced me.

(12/2/05 Tr. at 135)(emphasis added)

Tolnay further maintained that during the first meeting, Chief Wearing raised his voice.

(12/1/05 Tr. at 243)  He further described the events at the first meeting as follows:

>During the conversation regarding the motor vehicle arrest, once I had explained all my actions, I made a comment that I felt – and more or less in the same words – I felt that Captain Ortiz's comments *to me* or Captain Ortiz's comments Sergeant Burgh *about me* over the radio were very inappropriate.

>And as I began to say it, I got off.  And he said, You don't even have four years on this job.  And I don't know exactly – Captain Ortiz has 20-some odd years, he worked his way up from patrol, to sergeant, to captain of patrol.

>And when he was done verbalizing Captain Ortiz's resume, I said, well, with all that experience, it's all the more reason why his behavior was inappropriate *using the radio*.

>At that point in time, he got up and he leaned over the desk and he pointed his finger and he said, 'You know what, you're a smart mouth and I know that you called (sic) that incident at the church. He says, I know that you caused that incident.  I know you caused what happened at the church,' pointing his finger at me.' (sic)

>And at that point in time, I had decided that I had entertained the meeting enough.  *I was well aware that I was in a meeting with the chief of police.  At no time was my demeanor otherwise.*  But at that point in time, I felt like I was in jeopardy, because there was nothing else for me to do and there was no other way for me to explain my actions.

>So I stood up, and I said, 'Chief, if you know that to be true, then you know more about this than I do.  'I said,' This meeting is over. The next time that I speak with someone it will be after I have spoken to an attorney.'

>I went to leave.  My union rep said just wait outside.  I said, okay, I'll wait outside.  I walked out of the office.

> And as I'm walking, the chief said, Union rep schedule another
> hearing with this officer immediately. And that's all that happened
> and I walked out. I had reached that point.

(12/1/05 Tr. at 243-45)(emphasis added)

In describing his standing up and leaving the meeting, Tolnay testified:

> Based on my statement that I felt that another officer, granted a
> higher ranking officer, acted inappropriately, to be accused of
> causing what happened at the church, I realized that there was no
> reason for me to be there, other than the fact that *I was in
> jeopardy*. And a reason was being sought after to punish me for
> some reason. And I realized, at that time, that I had to leave
> because I needed to speak to an attorney because *I felt jeopardized*.
> This is the only job that I ever wanted to do.

(12/1/05 Tr. at 247)(emphasis added)[11] After Tolnay walked out of the first meeting, his union

representative informed him that a second meeting would be scheduled because the chief

"wanted to continue to ask me questions regarding the motor vehicle stop." (12/2/05 Tr. at 30)

Tolnay confirmed that when he stood up and indicated that he was going to leave, he had

not received permission from the Chief to leave the meeting. (Id. at 112)

## VII.    THIS COURT'S IDENTIFICATION OF THE SPEECH AT ISSUE

In the charge, with regard to the alleged protected speech, the Court instructed the jury as

follows:

> Specifically, the plaintiff claims that he was suspended without
> pay, reassigned to less desirable duty, and forced to undergo
> sensitivity/diversity training because of his statements made in his
> case incident report of August 3, 2002 regarding the motor vehicle
> stop involving Daniel Rodriguez and during the meeting on August
> 13, 2002, regarding his conduct of July 26th and August 3rd and the
> conduct of then-Captain Francisco Ortiz.

---

[11]/    Tolnay maintained that during the first meeting with Chief Wearing, he was calm the
entire time and never raised his voice. (12/2/05 Tr. at 116) By contrast, Tolnay maintains that
Chief Wearing was yelling during the meeting and pointing his finger at him. (12/2/05 Tr. at
127)

> The plaintiff claims that his statements, that he believed political
> considerations and influence were improperly affecting his neutral
> enforcement of the laws, are protected by the First Amendment,
> and that Chief Wearing retaliated against him because of the
> content of those statements.

(12/8/05 Tr. at 136-37)  Shortly thereafter, the court instructed the jury that:

> The question whether the plaintiff's speech is protected by the First
> Amendment is a question of law, it is not a question for you to
> consider. I have decided that the Free Speech Clause of the First
> Amendment protects the following: Plaintiff's expressed concerns
> over the possible ramifications of enforcing the law as to certain
> members of the public due to their political involvement with city
> officials; any speech by plaintiff concerning possible wrongdoing
> by the New Haven Police Department or other city officials.

(12/8/05 Tr. at 139)

## ARGUMENT

## I.   CHIEF WEARING IS ENTITLED TO THE ENTRY OF JUDGMENT AS A MATTER OF LAW IN HIS FAVOR BASED ON GARCETTI V. CEBALLOS

### A.   The Plaintiff's Speech Is Not Protected By The First Amendment

Under Garcetti, Tolnay's speech is not protected by the First Amendment. As

demonstrated above, a review of Tolnay's August 3 case incident report and the evidence from

the trial regarding that report and the August 13 meeting in Chief Wearing's office reveals that

all of the speech at issue was made by Tolnay "pursuant to his duties" as a police officer. Thus,

under Garcetti, there is no First Amendment protection. The dissenting opinions' discussion of

the broad-sweeping nature of the holding in Garcetti confirm this conclusion. Accordingly,

Chief Wearing is entitled to the entry of judgment as a matter of law in his favor.

Specifically, with regard to the August 3 case incident report, as detailed above, it was an

official police department form and signed under penalty of perjury by Tolnay. It cross-

referenced the July 26 case incident report at at least 4 points. In fact, Tolnay confirmed that

under the police department's regulations, he was required to prepare the case incident report for the July 26 incident. (12/1/05 Tr. at 114-15) He prepared that report in the normal course of his duties. (Id. at 115) Officer Abate testified that the first responding officer "usually" writes the case incident report. (12/7/05 Tr. at 117) Tolnay never differentiated between the status of the report regarding the July 26 incident and the August 3 stop.

After Tolnay let Rodriguez go on August 3, he informed Sergeant Burgh of the incident and that he would be preparing a report to "document" the incident. (Def.'s Post-Trial Ex. 5) Tolnay then proceeded to a sub-station to write the case incident report. (12/1/05 Tr. at 177) In fact, Tolnay contacted the police department's records division and had it fax him a copy of his July 26 case incident report so he could cross-reference it while he wrote the case incident report for the August 3 stop. (12/1/05 Tr. at 187-88) Thus, Tolnay wrote the case incident report "in connection with" the vehicle stop. (Id. at 174, 176) Specifically, he wrote the report to "explain" what happened and why he could not take "police action." (Id. at 183) In other words, he writing occurred as part of his job. Thus, the speech is within the scope of Garcetti.

At the sub-station where Tolnay went to write the case incident report, Sergeant Burgh informed Tolnay that Captain Ortiz had ordered that Tolnay prepare a departmental memorandum explaining why he stopped Rodriguez. (12/1/05 Tr. at 177-79) That memo had to be completed before the end of the shift and submitted to Tolnay's supervisor. (Id. at 179) Officer Colon also had to prepare a memorandum. (Id. at 197) Tolnay testified that Colon's memorandum to Captain Ortiz, (Def.'s Post-Trial Ex. 10), was part of the business records generated by the police department and was kept in the ordinary course of the department's recordkeeping. (12/1/05 Tr. at 197-98) Tolnay's memorandum (Def.'s Post-Trial Ex. 9) refers

24

Captain Ortiz to Tolnay's case incident report on the August 3 stop for the "full and complete details regarding [the] motor vehicle stop."

With regard to the meeting in Chief Wearing's office on August 13, 2002, Tolnay appeared in the Chief's office in response to an "order." (12/1/05 Tr. at 226; 12/5/05 Tr. at 45-46) In particular, he received a memorandum directing him to attend the meeting. (12/1/05 Tr. at 226-27) The memorandum authored by Captain Ortiz was dated August 9, 2002 and expressly "ordered" Tolnay to appear on August 13 upon his "return to duty." (Def.'s Post-Trial Ex. 36) It indicated that Tolnay could have a union representative with him and was copied to the Chief and union president. (Id.) It was Tolnay's right under the union contract to have a union representative present with him during the meeting. (12/2/05 Tr. at 111) Lieutenant Bombalicki attended the meeting as Tolnay's union representative. (12/1/05 Tr. at 225; 12/6/05 Tr. at 120) Officer Abate and Scott Nabel, the police department's human resources manager, were also present. (12/7/05 Tr. at 171-72)

As confirmed by Tolnay's testimony summarized above, Chief Wearing's testimony (12/2/05 Tr. at 173-89; 12/5/05 Tr. at 45-75), Officer Abate's testimony (12/7/05 Tr. at 121-22), Scott Nabel's testimony (12/7/05 Tr. at 172-89) and Lieutenant Bombalicki's testimony (12/6/05 Tr. at 120-26), the questions at the meeting related to the handling of the July 26 arrests and August 3 motor vehicle stop. Moreover, Rodriguez had made a citizen's complaint against Tolnay and other officers. (12/1/05 Tr. at 225; 12/2/05 Tr. at 95; Def.'s Post-Trial Ex. 13) In fact, Tolnay maintained that Chief Wearing had ordered him to his office in reaction to that citizen's complaint. (12/1/05 Tr. at 225) Lieutenant Bombalicki confirmed that it was not uncommon for the Chief to get directly involved in response to a citizen's complaint without the Internal Affairs Division becoming involved. (12/6/05 Tr. at 150 ("Absolutely"))

At trial, Tolnay maintained that his "whole intent" during the interview "was to answer questions." (12/1/05 Tr. at 236) He was "well aware" that he was in a meeting with the Chief of Police. (Id. at 244) Accordingly, Tolnay testified that throughout the meeting his tone was that of a "professional." (Id. at 241-42)

Consequently, Tolnay's statement of his belief that the reason for his presence in this official, business meeting discussing two police actions, was because of the political connections of the two ministers, was made pursuant to his duties. In other words, it was made in Tolnay's professional capacity and in the course of Tolnay doing his job. Tolnay was speaking in the meeting because he was under a written order to be there. The topic of the meeting was questioning regarding how the July 26 arrests and August 3 stop were handled. Tolnay was simply doing part of what he was employed to do. It was his intent to answer questions and speak as a "professional."

Tolnay's comment in the August 13 meeting about Captain Ortiz's "inappropriate" use of the meeting was not relied upon by Tolnay in his closing argument. Tolnay's counsel only relied on two statements by Tolnay. (12/8/05 Tr. at 6-7 ("both instances")) Thus, any claim based on that comment was waived or withdrawn.[12] To the extent that the Court considers the comment regarding Captain Ortiz to be at issue, the analysis is the same as with the other statement at the meeting and the August 3 case incident report. Tolnay was speaking at the meeting because he

---

[12]/    Specifically, in Tolnay's counsel's closing argument, she described the "two" instances of protected speech (which the jury was going to be instructed by the Court on ) as: (1) the comments in the August 3 case incident report and (2) the statement by Tolnay at the August 13 meeting "to the effect that he believes that this was all politics, and based on the political connections of the people involved." (12/8/05 Tr. at 6-7) As noted above, the Court instructed the jury that the protected speech was "[p]laintiff's expressed concerns over the possible ramifications of enforcing the law as to certain members of the public due to their political involvement with city officials; [and] any speech by plaintiff concerning possible wrongdoing by the New Haven Police Department or other city officials." (Id. at 139)

was under orders to be there. His statement was made in the course of Tolnay doing his job and as part of his official duties/responsibilities. He maintains that he was speaking as a "professional" throughout the meeting.

It is beyond dispute that an analysis of two arrests and a motor vehicle stop is part of Tolnay's professional duties. Moreover, to the extent the statements are characterized as reporting on wrongdoing, which as discussed below, is inaccurate, that would similarly be part of Tolnay's professional duties or within the scope of his professional capacity. As the court in Dillon v. Bailey, 45 F.Supp.2d 167 (D. Conn. 1999) recognized, a law enforcement officer has a "legal obligation...to report or otherwise attempt to stop unlawfulness coming to his attention." Id. at 174. Further, in discussing the broad "scope" of the decision in Garcetti, Justice Souter included the scenario of a law enforcement officer's balking at a superior's order to violate constitutional rights - as being beyond the First Amendment's protection under the holding in Garcetti. 126 S.Ct. at 1966-67 (Souter, J., dissenting). More generally, Justice Souter explained that any statement "within the scope of public employment" is treated as the government's speech under Garcetti. Id. at 1968. Thus, there is no First Amendment protection if the speech "owes its existence to a public employee's professional responsibilities." Id. at 1969 (Souter, J., dissenting).

Accordingly, in the instant case, Tolnay's speech is not protected by the First Amendment and Chief Wearing is entitled to a judgment as a matter of law. This conclusion is further supported by the decisions that have applied Garcetti.

In Brewster v. City of Poughkeepsie, 2006 WL 1676143 (S.D.N.Y. 2006), the court applied Garcetti to a factually similar case and dismissed the plaintiff's First Amendment retaliation claim. The plaintiff in Brewster alleged that she was prevented from filing criminal

27

charges against citizens with whom she had confrontations, and ultimately was terminated from

her position as a civilian Parking Enforcement Agent, as a result of her husband's criticism of the

Police Chief's decision to dismiss two pending traffic summons issued by her husband, a police

officer. In response to a verbal request and a written directive that the tickets be dismissed, the

plaintiff's husband, Officer Brewster, through his attorney, wrote a letter to the Police Chief and

Deputy Chief of Police "strongly object[ing] to the dismissals." Id. at *1. By a second letter,

Officer Brewster (again through counsel) complained to the District Attorney that the Chief had

"abuse[d] his discretion" and requested that the prosecutor's office investigate the matter to

determine whether the Chief's actions constituted official misconduct. Id.

The Brewster court believed that the facts before it were "striking[ly] similar" to those in

Garcetti. It noted that Officer Brewster was a police officer. His speech related to his

supervisor's decision to dismiss two pending traffic summons he had issued. His first letter to

the Chief and Deputy Chief reiterated his opinion that the tickets should not be dismissed, and

emphasized that the individual whose tickets he was ordered to dismiss was "guilty of both

violations," that the "charged individual acknowledged traveling more than double the posted

speed limit and, according to the evidence available, clearly violated the provisions of law which

prohibit crossing a double yellow line." Id. at *1. Officer Brewster's letter to the District

Attorney complained that "[d]espite the operator's admission to speeding and video surveillance

confirming that the operator crossed onto, if not over, the double yellow line in violation of the

vehicle traffic law, Chief Knapp has demanded that Officer Brewster dismiss the summons." Id.

at *1.

The Brewster court concluded that like Ceballos' memo expressing his position on the

proper disposition of the pending criminal case, Officer Brewster's letters related to his "'daily

professional activities,'" which included "determining whether sufficient evidence existed to prosecute pending traffic tickets." Brewster, 2006 WL 1676143 at *2. Accordingly, the court held that Officer Brewster's expressions were not protected speech and could not form the basis of a First Amendment retaliation claim. Id.

Similarly, in Bailey v. Department of Elementary and Secondary Educ., 2006 WL 1716151 (8th Cir. June 23, 2006), the court applied Garcetti and held that the employee's speech was not protected by the First Amendment. Like Brewster, Bailey is factually similar to the instant case. In particular, David Bailey, a former employee of the Missouri Department of Elementary and Secondary Education, sued his employer and his supervisors, alleging they terminated his contract in response to protected speech he made on matters of public concern. Following a jury trial, the jury found certain instances of Bailey's speech were motivating factors in the defendant's decision to terminate Bailey's contract. After the verdict, the district court entered judgment as a matter of law against Bailey, holding that his speech was not protected under the First Amendment, and even if it were, Bailey's termination was justified based on the Pickering balancing test. Id. at *1.

In relevant part, Bailey argued that the statements he made during a meeting with Neil Scully, the deputy administrator of the Social Security Disability Determinations Unit and other management employees in the office of Bailey's supervisor, Carolyn Otterson, touched upon matters of public concern. Id. at *1, 4. The meeting had, however, been called by Scully "to address problems with Bailey's unwillingness to sign off on [Speech and Language Pathologist (SLP)] decisions, particularly one SLP's complaint about Bailey's denial of a case." Id. at *1. Bailey testified that during the meeting he:

> reiterated why I was making the conclusions I was making [about particular cases, that I looked at things on a case by case basis and

that I was following the regulations….And the main thrust of that meeting was that Mr. Scully liked the numbers he was getting…He told me to comply with that in no uncertain terms if I wanted to stay with the program.

Id. at *1.[13]

Although the district court submitted these statements to the jury, after the verdict, it held that Bailey's statements during the meeting did not deserve First Amendment protection. Id. The Eighth Circuit affirmed that decision. Id. In particular, the Eighth Circuit concluded that while Bailey's speech may have tangentially involved a matter of public concern, his speech was concerned primarily with furthering his own interests. Id. at *4. Bailey spoke about how the prototype and SLP programs, as implemented by Scully through the target allowance rate, conflicted with a counselor's professional judgment and would lead to false positives and misapplication of public funds. Id. The Eighth Circuit recognized that although it generally regarded expenditure of public funds to be a matter of public concern, Bailey's protests "only peripherally pertained to public fund payouts." Id.[14] Moreover, the Eighth Circuit believed that the circumstances of the meeting also demonstrated that Bailey's motivation in raising these

---

[13]/    Bailey claimed that during the meeting he was acting as a concerned citizen expressing reservations about improper methods used by a public program which could lead to the misuse of public funds, specifically disagreeing with how SLPs were handling speech and language issues, and expressing his concern that blind adherence to an allowance rate would conflict with a consultant's professional judgment and the case by case nature of the system. Id. at *4.

[14]/    Bailey's testimony about the meeting demonstrated he was concerned not with how the department was discharging its public duties, but with how Scully's implementation of new Social Security policies affected such internal department policies as how counselors such as Bailey could make case by case benefits determinations. Id. Specifically, the private meeting was called by Scully and arose "not out of Bailey's 'efforts to bring these [concerns] to light,'…but out of an SLP's complaint against Bailey concerning Bailey's denial of a particular case, and Bailey's general unwillingness to sign off on SLP decisions." Id. The Eighth Circuit emphasized that "Scully directed pointed questions at Bailey who generally responded with yes or no answers. The meeting's focus was Bailey's unwillingness to follow [department] rules. Any public interest issues Bailey expressed were secondary, never appealed, and not made public." Id.

concerns was not for public interest. Id. Accordingly, the Eighth Circuit affirmed the conclusion

that Bailey's statements during the meeting were not protected by the First Amendment. Id.

Bailey also claimed that he was retaliated against for a letter he sent to Ronald Vessell, an

assistant commissioner. Id. at *2, 5. In rejecting that claim, the Eighth Circuit recognized that

"Bailey's letter appears tangentially to touch upon a matter of public concern, but the letter

primarily involved personal conflicts with Bailey's supervisor Scully." Id. at *5.[15] The letter

discussed "(1) Scully's actions towards Bailey and the fact Scully had Bailey under

investigation; (2) Scully's 'angry, accusatory, and threatening manner'; and (3) Bailey's

'primary complaints with Mr. Scully.'" Id. The Eighth Circuit held that Bailey's vague

comments regarding fraud and illegal violations appeared only as support for "Bailey's personal

problems with Scully." Id. Furthermore, the court recognized that Bailey did not address the

letter to the public outside of the department, but only to Vessell, the agency's Assistant

Commissioner and that this was a factor to consider in the analysis. Id.

The Seventh Circuit applied Garcetti in Mills v. City of Evansville and affirmed the

granting of summary judgment in favor of the Chief of Police and the other defendants. Mills v.

City of Evansville, No. 05-3207, slip op. at 3 (7th Cir. June 20, 2006)(copy submitted as Ex. C).

The plaintiff in Mills, a police officer, attended a meeting on departmental premises regarding

the Chief's plan to move some officers from a special unit to active patrol. Id. at 2. Following

---

[15]/    In particular, Bailey had sent a letter to Vessell making an official complaint regarding
Scully and detailing professional disagreements Bailey and Scully had had over Scully's award
target goal and the SLP program. Id. at *2. The letter contained such phrases as (1) consultants
being asked "to sign off on cases, saying we agree with cases we really do not"; (2) "Mr. Scully
has gone against federal rules and regulations"; (3) "Mr. Scully's behaviors and actions in
relation to me, the SLP project, and state and federal laws and guidelines have been
inappropriate, and may in fact be fraudulent; (4) "Mr. Scully has acted unprofessionally and
unethically with me"; (5) "some of the policies and actions being taken by Mr. Scully will have
state and national impact and implication"; and (6) Bailey considered himself "a perceived
government whistle blower." Id. at *5.

the meeting the plaintiff, other officers and supervisors (including the Chief) discussed the plan

in the building's lobby. The plaintiff stated that the plan would not work and some got the

impression that she would try to enlist community organizations against the plan. Subsequently,

the plaintiff was relieved of her supervisory duties, transferred and a Captain put a "Summary of

Counseling" in her personnel file that disapproved of the plaintiff's attitude at the meeting, her

choice of time and place for presenting her views, and her failure to work through the chain of

command. Id. at 2. In affirming, the grant of summary judgment, Mills recognized as follows:

> Mills was on duty, in uniform, and engaged in discussion with her
> superiors, all of whom had emerged from Chief Gulledge's
> briefing. She spoke in her capacity as a public employee
> contributing to the formation and execution of official policy.
> Under Garcetti her employer could draw inferences from her
> statements about whether she would zealously implement the
> Chief's plans or try to undermine them; when the department drew
> the latter inference it was free to act accordingly.

Id. at 3. See Logan v. Indiana Dep't of Corrections, 2006 WL 1750583, at *1 (S.D. Ind. June 26,

2006)(after Garcetti courts must ask "Did the employee's expression arise from her employment

duties?").

    Brewster, Bailey, Mills and Logan confirm that Tolnay's speech was not protected by the

First Amendment. The speech in Brewster is even stronger than the situation in the instant case.

In Brewster, the police officer expressly objected to the police chief's order that the speeding

charges be dropped. He brought the matter up via letters from his attorney to the Chief, Deputy

Chief and the District Attorney. By contrast, Tolnay never objected to the charges being

dropped and never raised the matter with anyone. He only wrote and spoke pursuant to his job

duties and to protect himself. He did not contact the State Police, the Chief State's Attorney or

the media. He did not even speak with Abate, his partner for the July 26 arrests about any

alleged concerns. Rather, he wrote an official report, signing it under the penalties of perjury

and spoke at a meeting that the Chief ordered him to attend. Thus, like the situation in Mills, Tolnay spoke in his capacity as an employee. In other words, as Logan describes the analysis, Tolnay's speech "arose" from his employment duties. 2006 WL 1750583, at *2.

Likewise, Bailey gives great insight into why comments at a heated meeting with a superior are not protected. As Lieutenant Bombalicki confirmed, Tolnay was "defending" his decisionmaking. (12/6/05 Tr. at 121) With regard to Captain Ortiz, Bombalicki confirmed that Tolnay was upset about being "berated" on the radio. (Id. at 123) Tolnay only testified that he felt Captain Ortiz's comment on the radio "about [him]" was inappropriate. (12/1/05 Tr. at 243; see id. at 244 ("using the radio")) Similarly, with regard to the meeting in general, Tolnay believed that he should not have been subjected to it. (12/1/05 Tr. at 242 ("I")) He considered himself to be in jeopardy, and left. (12/1/05 Tr. at 247)

Like the plaintiff in Bailey, Tolnay's speech at the meeting, in addition to being made pursuant to his duties and in the course of his job - were focused solely on Tolnay's personal interest. A thorough review of Tolnay's testimony confirms that he only made the few vague comments in the August 3 case incident report and at the meeting to protect himself and his job.[16] He was not a whistleblower. He did not speak with the media or with a prosecutor's office. He did not even speak with Abate his partner for July 26 arrests. (12/7/05 Tr. at 127)

Also, like Bailey, Tolnay's comment was part of a personal dispute or grievance he had with his supervisor, Captain Ortiz. This is not a matter of public concern. To the contrary, as Garcetti recognized, the underlying premise in the Supreme Court's cases has been that the First Amendment "does not empower [employees] to 'constitutionalize the employee grievance.'"

---

[16]/    In fact, Tolnay's attorney confirmed this in her questioning of Captain Ortiz. (12/7/05 Tr. at 66-67).

126 S.Ct. at 1959. Accordingly, Chief Wearing is entitled to the entry of judgment as a matter of law.

Presumably, Tolnay will continue to argue, as he did in his opposition to Chief Wearing's Rule 50(b) motion, that the reasoning of Garcetti (as articulated by Judge O'Scannlain) does not apply here because there was testimony that parts of the August 3 case incident report should not have been included in the report. This attempt to distinguish the instant case is without merit. It is based on a fundamental misunderstanding of the law governing retaliation cases. In Garcetti, Ceballos' supervisors were displeased with what he placed in his memorandum. Nevertheless, the focus of the Supreme Court's analysis was not on how the speech was critiqued after it occurred. Rather, the analysis was focused on whether the speech was "ma[d]e in the course of [the plaintiff's] doing his or her job." Garcetti, 126 S.Ct. at 1962. See id. at 1960 ("made by an employee in his or her professional capacity"); id. at 1960 (made statements pursuant to their "official duties"); Logan, 2006 WL 1750583, at * 1 ("If the speech … occurred as part the employee's job"). As Tolnay's speech arose out of his job, under Garcetti, it is not protected by the First Amendment and the Court must enter a judgment in favor of Chief Wearing.

## B.    The Plaintiff's Claim Fails As A Matter Of Law Under The Pickering Balancing Analysis

The cases applying Garcetti further confirm that Chief Wearing is also entitled to judgment as a mater of law under the Pickering balancing analysis.

As an alternative holding to its conclusion that the employee's speech in Bailey was not protected by the First Amendment, the Eighth Circuit held that the Pickering balancing test weighed in the defendants' favor. 2006 WL 1716151, at *5-7. The Bailey court recognized that the Pickering balancing test balances the competing interests of the government-employer and citizen-employee by analyzing six factors:

> (1) the need for harmony in the office or workplace; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.

Bailey, 2006 WL 1716151, at *7. Evidence of actual disruption is not required in order for an employer to succeed in the Pickering balancing analysis. Id. at *6.[17]

Moreover, with regard to the letter, the Eighth Circuit believed that the accusations by Bailey that his superiors were engaged in fraud and legal and ethical violations was sufficient evidence of potential workplace disruption. Id. at *6.[18] Accordingly, the court held that even if Bailey's speech did touch upon a matter of public concern, the Pickering balancing test weighed in favor of the defendants. Id. at *7. See Leonard v. Lipsey, 2006 WL 1644334 (N.D. Ohio June 8, 2006)(entering judgment for defendants after Garcetti).

Chief Wearing's testimony, (12/2/05 Tr. at 141-230; 12/5/05 Tr. at 6-110, 149-214; 12/6/05 Tr. at 7-107), is summarized in his Rule 50(b) reply/supplemental memorandum. That

---

[17]    The Eighth Circuit also rejected Bailey's argument that the defendants had failed to proffer sufficient evidence that Bailey's speech had an adverse impact on his department. Id. at *6. In particular, the court noted that during the meeting, Bailey had argued with his supervisor Scully and other management level employees about the role SLPs were playing in disability determinations. Id. "The meeting became quite heated, with Scully eventually giving Bailey an ultimatum to behave or be fired. Bailey's speech regarding the SLPs eventually led to another confrontation with Scully at a conference." Id. The Eighth Circuit concluded that this was sufficient evidence of disruption. Id.

[18]    The court recognized that the evidence regarding Bailey's numerous conflicts with SLP's, fellow counselors, and his supervisors showed the working relationships within the department were required to be close. Id. at *7. Bailey's speech arose in the context of a meeting to discuss his conflicts with SLPs, and in the context of an accusatory letter sent as a complaint criticizing Bailey's behavior. Id. Bailey's speech also lacked sufficient counterbalancing public interest, and was more concerned with his conflicts with Scully over internal procedures. The jury found Bailey's speech impaired his ability to perform his duties.

testimony as well as the disciplinary documents the Chief created in connection with Tolnay's suspension (Def.'s Post-Trial Exs. 33-34) confirm that the Chief was extremely concerned that Tolnay's direct insubordination to the Chief of Police in the presence of others and in the Chief's office would have a negative impact on discipline, loyalty and respect for the chain of command. As the Bailey court recognized, heated insubordination at a meeting is sufficient evidence to support a reasonable prediction of disruption.

Moreover, it is well established in the context of the Pickering analysis, that courts recognize that law enforcement agencies are unique in their need for loyalty and respect for the chain of command. See Locurto v. Giuliani, 447 F.3d 159, 178-179 (2d Cir. 2006). Accordingly, there is a need for harmony in the work place and there is a close working relationship between co-workers that could have been damaged by Tolnay's insubordination. Further, the time, manner and place of the insubordination was very damaging to the chain of command. It occurred in a business meeting in the Chief's office in the presence of other officers. It also occurred while Chief Wearing was trying to analyze how to deal with similar situations in the future and to avoid citizens' complaints. These significant issues could not be resolved because of Tolnay's insubordination. By contrast, Tolnay's personal criticisms of his superiors and his concerns for his job status were not matters of public interest. Finally, Chief Wearing concluded that Tolnay's insubordination raised serious questions regarding his ability to interact with the community. Accordingly, after Garcetti, the Pickering balancing analysis weighs in favor of Chief Wearing, as a matter of law.

In approaching the Pickering balancing analysis, Garcetti also advises the lower courts that they should avoid imposing "judicial oversight" on the conduct of governmental agencies. 126 S.Ct. at 1961. Here, Chief Wearing testified extensively about his concern over the damage

36

that Tolnay's insubordination would have. (12/5/05 Tr. at 75, 94; 12/6/05 Tr. at 29-33, 81)  He

further had concerns about riots resulting from the July 26 arrests, (12/5/05 Tr. at 7-12), and for

the safety of the officers at the scene. (12/2/05 Tr. at 176-77)  He believed that on July 26,

Tolnay should have called a supervisor sooner than he did. (12/2/05 Tr. at 173, 177, 187-89;

12/6/05 Tr. at 15-17; Def.'s Post-Trial Ex. 34)  These are reasonable concerns and weigh heavily

in Chief Wearing's favor as part of the Pickering analysis.

    **C.    Chief Wearing Is Entitled To Qualified Immunity**

        Even assuming for the sake of argument that this Court were to conclude that Tolnay had

a First Amendment claim after Garcetti, that claim would be barred by the doctrine of qualified

immunity.  In particular, no First Amendment right in the speech at issue was clearly established

in August 2002.

        As the Solicitor General argued in Garcetti, prior to the Supreme Court's May 30, 2006

decision, it was not clearly established at the time of the challenged conduct that public

employees had a First Amendment interest in speech expressed in the course of their doing their

job. (Brief of the United States As Amicus Curiae Supporting Petitioners, in Garcetti v.

Ceballos, No. 04-473, at 27 n.13.)[19]  Specifically, the Solicitor General demonstrated that prior to

the Supreme Court's decision in Garcetti, the "[c]ourts of appeals ha[d] rendered conflicting

decisions on the issue, . . , and "'[i]f judges thus disagree on a constitutional question, it is unfair

to subject [petitioners] to money damages for picking the losing side of the controversy.'" (Id.

(quoting Wilson v. Layne, 526 U.S. 603, 618 (1999)))  In particular, prior to Garcetti, the

Supreme Court had "not specifically addressed the issue of whether speech in the course of and

as a part of an employee's ordinary duties is or is not per se protected." Koch v. Hutchinson,

---

[19]/    A copy of the Solicitor General's brief in Garcetti is submitted as Exhibit B to Chief
Wearing's Exhibits in Support of his Reply/Supplemental Memoranda.

847 F.2d 1436, 1442 (10th Cir. 1988). In other words, "it was, ..., not clear that when an individual presents himself as speaking in his capacity as a public employee, that his speech is protected." DiMeglio v. Haines, 45 F.3d 790, 805 (4th Cir. 1995).

In the instant case, Chief Wearing is also entitled to qualified immunity under Garcetti. Even assuming for the sake of argument that the Court were to conclude that Tolnay's speech is protected by the First Amendment, any such First Amendment right was not "clearly established" in August 2002. In particular, as Garcetti confirms, its holding and reasoning is based on and consistent with the Supreme Court's jurisprudence in this area. Moreover, as demonstrated in the police report cases cited in Chief Wearing's memoranda of law in support of his Rule 50(b) motion, the district courts within the Second Circuit had recognized that plaintiffs in similar cases did not have any First Amendment rights. Consequently, it cannot be held that the contours of any right were sufficiently defined that it would have been clear to Chief Wearing that he was violating that right. See Pena v. DePrisco, 432 F.3d 98, 114-15 (2d Cir. 2005). As the Supreme Court and this Court, (3/9/05 Ruling, at 47), have recognized, the clearly established analysis cannot be circumvented with generalized statements of the right and circumstances at issue. Saucier v. Katz, 533 U.S. 194, 201-02 (2001); Pena, 432 F.3d at 114-15. A more particularized or specific analysis is required. Under the facts of this case, any First Amendment right recognized by the Court would not have been clearly established in August 2002. This is true for both the direct analysis of the right and the Pickering analysis. That is to say, Chief Wearing is entitled to qualified immunity under both the direct determination of whether the speech was concerning a matter of public concern and whether the interests of the police department outweighed Tolnay's interest. In other words, with regard to Pickering, it was

38

not clearly established in August 2002 that Tolnay's rights would have outweighed the police department's interest in maintaining discipline, loyalty and respect for the chain of command.

Moreover, <u>Garcetti</u> confirms that it was objectively reasonable, as a matter of law, for Chief Wearing to act as he did. Reasonable police chiefs could at least disagree about the reasonableness of his conduct. As such, his conduct was objectively reasonable. In particular, <u>Garcetti</u> confirms that not all police chiefs would have believed that Tolnay had any First Amendment rights under the circumstances at issue. Also, <u>Garcetti</u> confirms that not all police chiefs would have concluded that Tolnay's First Amendment rights outweighed the police department's interests in discipline, loyalty or respect for the chain of command. Accordingly, the Court should also enter judgment in favor of Chief Wearing based on the doctrine of qualified immunity.

## III.    <u>GARCETTI V. CEBALLOS</u> SUPPORTS THE GRANTING OF THE MOTION FOR A NEW TRIAL ON ALL THE ISSUES

### A.    If The Court Does Not Enter A Judgment In Favor Of Chief Wearing It Must Order A New Trial To Resolve Any Factual Issues

Based on <u>Garcetti</u>, the Court must also order a new trial. Specifically, a practical review of the record demonstrates that Tolnay spoke in the course of doing his job. There is no room for serious debate on this point. As such, Tolnay's speech is not protected by the First Amendment. However, if the Court has any serious questions about the scope of Tolnay's employment duties, it must order a new trial. Again, it is respectfully submitted that the Court should resolve this issue in Chief Wearing's favor as a matter of law. With such a ruling, a new trial should be ordered in the alternative under Fed.R.Civ. P. 50(c).

**B.    The Need For The Submission Of The <u>Pickering</u> Balancing Issues To The Jury Is Even Greater After The Supreme Court's Decision in <u>Garcetti</u>**

<u>Garcetti</u> also supports the ordering of a new trial based on the Court's declining to instruct the jury regarding the <u>Pickering</u> balancing test and to involve it with that analysis by submitting interrogatories to it. In particular, the scenarios that the Second Circuit has recognized as calling for the involvement of the jury to resolve factual questions are amplified as a result of <u>Garcetti</u>. After <u>Garcetti</u>, any First Amendment right held by Tolnay was minimal at best and there is a further need for the involvement of the jury. <u>See</u> <u>Mills</u>, slip op. at 4 ("power of transfer is essential").

**IV.    IN THE ALTERNATIVE: <u>GARCETTI V. CEBALLOS</u> SUPPORTS THE ORDERING OF A NEW TRIAL OR A SUBSTANTIAL REMITTITUR ON THE COMPENSATORY AND PUNTIVE DAMAGES**

<u>Garcetti</u> also supports the ordering of a new trial or a substantial remittitur on the compensatory and punitive damages awards. Specifically, <u>Garcetti</u> confirms that at most, Tolnay's First Amendment rights were minimal, if any at all. Any limited rights held by Tolnay cannot justify the $150,000 emotional distress and $5 million punitive damages awards. Accordingly, because the jury should be instructed on exactly what First Amendment rights were at issue, the Court should order a new trial on all issues. In the alternative, it should order a new trial on the damages issues. In the further alternative, the Court should order a drastic remittitur.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should enter judgment in favor of Chief Wearing, pursuant to Fed. R. Civ. P. 50(b). It should also grant Chief Wearing's motion for a new trial under Fed. R. Civ. P. 59. <u>See</u> Fed. R. Civ. P. 50(c). In the alternative, the Court should order a substantial remittitur on both the non-economic, compensatory damages and the punitive damages.

40

Respectfully submitted,

**DEFENDANT**
**MELVIN WEARING**


By: _____

      Robert A. Rhodes, Esq.
      CT Fed. Bar No. 13583
      **HALLORAN & SAGE LLP**
      315 Post Road West
      Westport, CT 06880
      Tel:     (203) 227-2855
      Fax:    (203) 227-6992
      E-Mail:  rhodes@halloran-sage.com

          and

      Ralph W. Johnson III, Esq.
      CT Fed. Bar No. 15277
      **HALLORAN & SAGE LLP**
      One Goodwin Square
      225 Asylum Street
      Hartford, CT  06103
      Tel:     (860) 522-6103
      Fax:    (860) 548-0006
      E-Mail:  johnsonr@halloran-sage.com

      His Attorneys

41

## CERTIFICATION

This is to certify that on this 30th day of June, 2006, a copy of the foregoing was caused to be mailed via U.S. Mail to:

Karen Lee Torre, Esq.
Law Offices of Karen Lee Torre
51 Elm Street, Suite 307
New Haven, CT 06510

Norman A. Pattis, Esq.
649 Amity Road
Bethany, CT 06524

Hugh F. Keefe, Esq.
Lynch, Traub, Keefe and Errante
52 Trumbull Street
P.O. Box 1612
New Haven, CT  06506-1612

Hubert J. Santos, Esq.
Sandra L. Snaden, Esq.
Santos & Seeley, P.C.
51 Russ Street
Hartford, CT  06106

_____
Ralph W. Johnson, III

844408_1 DOC

42