IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ARPAD TOLNAY | : | CIVIL ACTION NO. |
|     Plaintiff | : | 3:02-CV-1514 (EBB) |
| | : | |
| V. | : | |
| | : | |
| MELVIN WEARING | : | |
|     Defendant | : | JUNE 30, 2006 |

# DEFENDANT'S REPLY/SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTION FOR A NEW TRIAL

Robert A. Rhodes, Esq.
CT Fed. Bar No. 13583
**HALLORAN & SAGE LLP**
315 Post Road West
Westport, CT 06880
Tel:   (203) 227-2855
Fax:  (203) 227-6992
E-Mail:  Rhodes@halloran-sage.com

and

Ralph W. Johnson III, Esq.
CT Fed. Bar No. 15277
**HALLORAN & SAGE LLP**
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
Tel:   (860) 522-6103
Fax:  (860) 548-0006
E-Mail:  Johnsonr@halloran-sage.com

*Counsel for the Defendant,*
*Melvin Wearing*

**ORAL ARGUMENT REQUESTED**

## **TABLE OF CONTENTS**

                                                                                                         **PAGE**

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND .............................................................................................................. 1

      I.     LIEUTENANT BOMBALICKI'S TESTIMONY ..................................... 1

      II.    OFFICER ABATE'S TESTIMONY ........................................................ 3

ARGUMENT ..................................................................................................................... 4

      I.     A NEW TRIAL IS REQUIRED BECAUSE THE COURT
SHOULD HAVE CHARGED THE JURY REGARDING
THE <u>PICKERING</u> BALANCING TEST AND SHOULD
HAVE SUBMITTED INTERROGATORIES TO THE
JURY IN CONNECTION WITH THAT TEST ......................................... 4

      II.    A NEW TRIAL IS REQUIRED BASED ON THE COURT'S
FAILURE TO CHARGE THE JURY AS REQUESTED ON
THE "REASONABLE RELATIONSHIP" STANDARD
FOR AWARDING PUNITIVE DAMAGES ............................................. 9

      III.   THE PUNITIVE DAMAGES AWARD WAS
CONSTITUTIONALLY EXCESSIVE AND REQUIRES
THE ORDERING OF A NEW TRIAL ................................................... 11

               A.    The Reprehensibility Guidepost Weighs In Favor
Of Vacating The Punitive Damages Award ................................ 13

               B.    The Ratio To Actual Harm Guidepost Weighs
In Favor Of Vacating The Punitive Damages
Award ......................................................................................... 18

               C.    The Comparison To Similar Cases Guidepost
Weighs In Favor Of Vacating The Punitive
Damages Award ......................................................................... 23

IV.    A NEW TRIAL IS REQUIRED BASED ON THE COURT'S ALLOWING TESTIMONY REGARDING INDEMNIFICATION OF POLICE OFFICERS AND BASED ON ITS FAILURE TO CHARGE THE JURY AS REQUESTED IN RESPONSE TO THE JURY'S NOTE ................................................................................................29

    A.    The Admission Of The Testimony Regarding Indemnification Was Harmful And Prejudicial Error ..............................29

    B.    Chief Wearing Did Not Waive His Objection To The Supplemental Instruction ..............................................................31

V.    A NEW TRIAL IS REQUIRED BASED ON THE COURT'S ADMISSION OF EVIDENCE REGARDING UNRELEASED PAST INCIDENTS OF DISCIPLINARY ACTION OR LACK OF DISCIPLINARY ACTION ..............................33

VI.    A NEW TRIAL IS REQUIRED BASED ON THE COURT'S ALLOWING THE ADMISSON OF INFLAMMATORY AND HEARSAY NEWS ARTICLES ..................................................37

CONCLUSION ..............................................................................................................40

## PRELIMINARY STATEMENT

The defendant, Melvin Wearing, the former Chief of Police for the City of New Haven, submits this reply/supplemental memorandum of law in further support of his motion for a new trial, pursuant to Fed. R. Civ. P. 59. For the reasons set forth below, in Chief Wearing's initial memorandum and in his memoranda regarding Garcetti v. Ceballos, 126 S.Ct. 1951 (2006) and in support of his Rule 50(b) motion, the Court should grant the motion for a new trial.[1]

## BACKGROUND

### I.  LIEUTENANT BOMBALICKI'S TESTIMONY

Lieutenant Leo Bombalicki was present at the first meeting between Tolnay and Chief Wearing on August 13, 2002. (12/6/05 Tr. at 116-17) He was a member of the executive board of the police union and was present because Tolnay had requested union representation. (Id. at 117) Bombalicki did not recall Officer Jaime Abate being at the meeting. (12/6/05 Tr. at 128) Bombalicki only remembers Tolnay being questioned. (Id. at 129)

Bombalicki described Chief Wearing's questions to Tolnay at the meeting as focusing on the "actual arrest of the minister." (Id. at 120) Tolnay "was defending his decision that he made at the scene." (Id. at 121) Bombalicki testified that there was a point in the meeting when the Chief allowed Tolnay to give his full and complete answer to questions. (12/6/05 Tr. at 122) There was also a time during the meeting when Tolnay appeared to become frustrated by his inability to answer questions. (Id.)

---

[1]   To the extent that Chief Wearing does not respond to any of the arguments contained in Tolnay's opposition, he relies on his initial memorandum of law. Tolnay's discussion of the purported facts in this case is largely based on his characterization of the facts and contains only a few citations to the trial transcript. Accordingly, Chief Wearing does not engage in a point-by-point response to those characterizations. Rather, he relies on his discussion of the facts as supported by the trial transcripts and exhibits.

1

Bombalicki described two lines of questioning from the Chief during the meeting. (12/6/05 Tr. at 123) The first related to the actual arrest of the minister. (Id.) The second related to questions on the motor vehicle stop. (Id.) During the second line of questioning, Captain Ortiz's name came up. (Id.) When asked to describe Tolnay's comments regarding Captain Ortiz, Bombalicki stated:

> If memory is correct, I believe the officer was berated on the radio and I guess that's what the issue was; the discipline on the radio or being hollered at on the radio heard by every unit in the City, ...

(Id. at 123)

Bombalicki maintained that during the meeting, Chief Wearing asked Tolnay more than once if he had done anything wrong or could have handled the situation differently. (12/6/05 Tr. at 126) Each time Tolnay was asked those questions, he maintained that he did nothing wrong. (Id.) Bombalicki described Chief Wearing as becoming upset and the tone of his voice going up during the meeting. (12/6/05 Tr. at 123-24) He maintained that before the meeting was over, Chief Wearing stood up, pointed over the desk at Tolnay and called Tolnay a smart mouth. (Id. at 124) After Chief Wearing rose from his chair, Tolnay got up and demanded a lawyer. (12/6/05 Tr. at 127) At that point, Bombalicki told Tolnay to sit down and calm down. (Id. at 127) Bombalicki also told Tolnay to go outside the Chief's office and sit down in the waiting area. (Id. at 127) At this point, Bombalicki described both sides as being hot. (Id.)

Bombalicki acknowledged that during the meeting both sides, Tolnay and Chief Wearing, were hot. (12/6/05 Tr. at 147) Bombalicki confirmed that Tolnay's tone of voice increased during the meeting. (12/6/05 Tr. at 147) In particular, at the time he stood up and stated that the meeting was over and demanded an attorney, Tolnay's tone of voice was elevated and agitated. (Id. Tr. at 148)

2

When Bombalicki was asked if it was uncommon for an officer to meet with the Chief of Police concerning a citizen complaint, he responded "[a]bsolutely not." (12/6/05 Tr. at 150) In fact, there were citizen complaints which were handled directly by the Chief without the involvement of the Internal Affairs Division. (Id.) Thus, it was not uncommon for an investigation of a citizen's complaint to go directly to the Chief's office and to have the Chief resolve the matter. (Id.)

## II. OFFICER ABATE'S TESTIMONY

Officer Jaime Abate was with Tolnay at the church on the evening of July 26, 2002. During her testimony, she confirmed that the first responding officer writes the case incident report. (12/7/05 Tr. at 117) She indicated that that was standard. (Id.)

Abate was present at the August 13 meeting with Chief Wearing. (12/7/05 Tr. at 121) During it, Chief Wearing "was just asking [Tolnay] questions regarding the incident." (Id. at 121) He asked Tolnay whether the officers thought they could have done things differently. (12/7/05 Tr. at 125) Abate further testified that "a few times" Chief Wearing "would just say [to Tolnay], ... well, just get to the point, just answer the question." (Id. at 122) Abate "saw that Officer Tolnay started to get a little bit frustrated because he would try to answer the question but he got cutoff a few times." (Id.) Tolnay and Chief Wearing then went back and forth a couple times about different things. (Id.)

Abate testified that Chief Wearing did not raise his voice. (12/7/05 Tr. at 126) "He wasn't screaming and yelling." (Id.) Rather, Abate remembers that "[t]here was a little bit of sarcasm." (Id.) She felt that Tolnay was being belittled. (Id.) Chief Wearing and Tolnay were reviewing matters back and forth and "the next thing [Abate] remembered was they were both out of their seats." (12/7/05 Tr. at 122) Abate did not remember who stood up first, but they

3

both got out of their seats. (12/7/05 Tr. at 122, 131) At that point, Tolnay said "I am not answering any more questions until I have a lawyer. And he walked out...." (12/7/05 Tr. at 122)[2]

At some point in time after the motor vehicle incident, Abate encountered Rodriguez. (12/7/05 Tr. at 128) Specifically, Officer Colon had issued Rodriguez's nephew a summons. (Id.) Colon told Abate to go to an address and that a gentleman was going to meet her and give her back a ticket. (Id.) When Abate arrived at the location, Rodriguez was there to give her back the ticket. (Id. at 129) The ticket had been ripped up into pieces. (Id.) Abate testified that at this point in time she would probably be hesitant to take action against Rodriguez if she saw him committing an offense. (12/7/05 Tr. at 130) She confirmed that Chief Wearing did not give her the order to go meet with Rodriguez concerning the ticket. (Id. at 138)

## ARGUMENT

I.  **A NEW TRIAL IS REQUIRED BECAUSE THE COURT SHOULD HAVE CHARGED THE JURY REGARDING THE PICKERING BALANCING TEST AND SHOULD HAVE SUBMITTED INTERROGATORIES TO THE JURY IN CONNECTION WITH THAT TEST**

It is axiomatic that a party is entitled to an instruction based on its theory of the case whenever it produces evidence to support it. See Wilson v. Union Pac. R. Co., 56 F.3d 1226, 1230 (10th Cir. 1995). Where a claim is "supported by at least some evidence of probative value," a "jury should [be] given the opportunity to weigh th[e] evidence and apply [a jury] instruction." Anderson v. Branen, 17 F.3d 552, 558 (2d Cir. 1994). In particular, where an issue is at the heart of a party's defense, "it [i]s critical that the court properly guide the jury as to the standard to be applied." Christopher v. Cutter Laboratories, 53 F.3d 1184, 1194-95 (11th Cir.

---

[2]  Abate testified that throughout this time and throughout the meeting, she was unaware of any political statements that Tolnay had allegedly made. (12/7/05 Tr. at 127) Tolnay had never discussed such things with her. (Id.)

4

1995). Accordingly, when jury instructions give the jury a misleading impression or inadequate understanding of the law, a new trial is required. Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 232 (2d Cir. 1991).[3]

Tolnay raises four arguments in support of his claim that the jury did not have to be involved in the balancing analysis under Pickering v. Board of Educ., 391 U.S. 563 (1968). (Pl.'s Mem. at 45-50)  First, he claims that as a general matter, a jury should not be involved in the analysis. (Id. at 45-46)[4]  Second, Tolnay maintains that Chief Wearing did not submit any proposed jury interrogatories. (Id. at 46-47)  As part of the second argument, in connection with the verdict form actually submitted to the jury, Tolnay criticizes counsel's comment that the form was exactly what had been discussed in the charge conference. (Id. at 47)  Third, Tolnay contends that in order for Pickering to apply, regardless of whether the jury was involved, Chief Wearing had to "concede a nexus" between Tolnay's speech and the discipline. (Id. at 47-50)  In

---

[3]  In fact, "[o]n an issue central to a case, it is the trial court's responsibility to charge the jury with the correct applicable law." Davis v. Lane, 814 F.2d 397, 401 (7th Cir. 1987). The district court is not relieved from this duty even if the parties fail adequately to educate the court. Id. The fact that counsel did not tender perfect instruction will not immunize from scrutiny, the failure to instruct the jury adequately concerning the issues in the case. Id. Thus, it is "clear that erroneous jury instructions, as well as the failure to give adequate instructions, are...bases for a new trial." Murphy v. City of Long Beach, 914 F.2d 183, 187 (9th Cir. 1990). See Selzer v. Fleisher, 629 F.2d 809, 814 (2d Cir. 1980)(vacating judgment for plaintiff and remanding for new trial based on error in jury charge); Bartak v. Bell-Galyardt & Wells, Inc., 629 F.2d 523, 528 (8th Cir. 1980)(remanding for a new trial based on failure to give contributory negligence charge); Chicago, Rock Island & Pac. R.R. Co. v. Lint, 217 F.2d 279, 286 (8th Cir. 1954)(remanding for new trial based on failure to charge on theory of the defense). See also Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121, 139 (1st Cir. 2004)(recognizing that failure to give instruction when affirmative defense was clearly viable given testimony was fatal to plaintiff's verdict); Womack v. Tierco Maryland, Inc., 38 Fed.Appx. 850, 855 (4th Cir. 2002)(reversing judgment and ordering new trial based on failure to instruct the jury on defense).

[4]  As part of this argument, Tolnay criticizes what he believes to be the brevity of Chief Wearing's argument. (Pl.'s Mem. at 46)  He ignores the detailed summary of Chief Wearing's trial testimony and the fact that the new trial motion incorporates the memorandum from the Rule 50(b) motion.

5

support of this argument, Tolnay cites Vasbinder v. Ambach, 926 F.2d 1333 (2d Cir. 1991). Finally, Tolnay maintains that in order to have the jury charged regarding the balancing analysis, Chief Wearing had to introduce evidence that Tolnay's speech was actually disruptive. (Pl.'s Mem. at 48)

Each of Tolnay's arguments is without merit. First, his argument that the jury should not be involved in the balancing analysis is belied by the Second Circuit case law discussed in Chief Wearing's initial brief. The Second Circuit has held that there are circumstances under which the Pickering balancing test must be submitted to a jury for the resolution of factual questions. Johnson v. Ganim, 342 F.3d 105, 115 (2d Cir. 2003); Gorman-Bakos v. Cornell Co-op. Extension, 252 F.3d 545, 557 (2d Cir. 2001); Vasbinder, 926 F.2d at 1340. See Bailey v. Dep't of Elementary and Secondary Educ., 2006 WL 1716151, at *2, 6-7 n.2 (8th Cir. June 23, 2006). Moreover, the district courts within the Second Circuit have submitted Pickering issues to the jury via interrogatories. Jeffries v. Harleston, 52 F.3d 9, 11 (2d Cir. 1995)(noting three waves of interrogatories given to jury).

Second, Tolnay's argument that Chief Wearing did not submit jury interrogatories was rejected by the Court in its ruling allowing Chief Wearing to correct the record by filing the interrogatories he provided to the Court during the in-chambers, charging conference. (5/2/06 Ruling, at 1-2) A review of those interrogatories reveals that they addressed the Pickering balancing analysis. (Elec. Docket Entry No. 194) Tolnay also ignores the fact that the Court on December 7, 2005, as part of its denial of Chief Wearing's Rule 50(a) motion, expressly recognized that the Pickering issue was a question of fact for the jury. (12/7/05 Tr. at 146-47) Chief Wearing took an exception to the jury instructions when they did not include any reference to the balancing analysis. (12/8/05 Tr. at 154) Absent the instruction, there was naturally no

6

corresponding jury interrogatory. Further, Chief Wearing's counsel's confirming that the verdict form was consistent with what the Court had identified in the charge conference, in which it rejected the Pickering charge and proposed interrogatories, did not withdraw the objection to the Court's refusing to instruct and involve the jury in the Pickering analysis. See § IV.B (below).

Third, Tolnay's argument that only defendants who concede a nexus between the speech and the discipline are entitled to the Pickering balancing analysis is without merit. Contrary to Tolnay's claim, Vasbinder does not hold that a defendant is not entitled to the Pickering analysis unless the defendant admits that the plaintiff's speech played a role in the employment action. See Vasbinder, 926 F.2d at 1339-40.[5]

Finally, as confirmed by the analysis in Chief Wearing's initial briefs in support of his Rule 50(b) and Rule 59 motions, a defendant does not have to prove actual disruption. (Def.'s Initial Rule 50(b) Mem. at 25-29; Def.'s Initial Rule 59 Mem. at 5-6) Under Waters v. Churchill, 511 U.S. 661, 673 (1994), a governmental employer's "prediction" of disruption is given "substantial weight."

Tolnay's critique of Chief Wearing's proposed jury instruction is also misplaced. The proposed instruction was correct. (Elec. Docket Entry No. 51) Moreover, the operative question is whether the jury should have been involved in the issue. The Court expressly recognized the existence of questions of fact in connection with the Pickering balancing. (12/7/05 Tr. at 146-

---

[5]   Moreover, in footnote 23 of the Court's ruling on the summary judgment motion, it rejected the argument that Tolnay continues to advance regarding the availability of the Pickering analysis. (3/9/05 Ruling, at 29 n.23) The Court recognized that Chief Wearing was arguing in the alternative and was allowed to do so. The Court's ruling was correct and is supported by circuit court authority. Bailey, 2006 WL 171151, at *6 (alternative argument with Pickering is appropriate); Vista Community Services v. Dean, 107 F.3d 840, 845 (11th Cir. 1997)("In those cases where the employer's claimed reasons are unrelated to the speech, we still apply the Pickering balancing test."). See Klunk v. County of St. Joseph, 170 F.3d 772, 775 (7th Cir. 1999).

47) Nevertheless, the jury was never informed that a governmental employer, such as Chief Wearing, can consider and weigh the potential disruptive effect of speech and conduct. (12/8/05 Tr. at 140-41) The jury should have been instructed of these considerations and involved in the process via interrogatories.[6]

The instant case satisfies the criteria envisioned in Gorman-Bakos and Vasbinder. In addition to demonstrating Chief Wearing's deep concerns about the impact of Tolnay's insubordination directly to the Chief of Police, a review of the testimony and disciplinary documents, summarized above and in the Rule 50(b) memoranda, confirms that there were disputes about what actually occurred at the August 13 meeting. As set forth in Chief Wearing's post-trial briefs, Chief Wearing's and Tolnay's testimony contradict each other. Nabel's testimony supports Chief Wearing's version of the meeting, and in particular, Tolnay's insubordination. Abate testified that Chief Wearing was not yelling and could not remember who stood up first. Bombalicki confirmed that Tolnay's tone of voice was raised, which Tolnay had expressly denied.

Accordingly, the Court's failure to charge the jury on the Pickering issue constituted harmful and prejudicial error. It short-circuited the mandatory analysis or deprived Chief Wearing of the principal defense available to defendants in First Amendment retaliation cases. Although there was significant testimony and documentary evidence regarding a concern for the

---

[6]/    For example, in Gorman-Bakos, the Second Circuit noted that the case appeared "to be just the kind of case envisioned by the Vasbinder court." 252 F.3d at 557. In particular, the parties disagreed as to the manner in which the plaintiff's speech was delivered; whether the plaintiff's speech disrupted, or had the potential to disrupt, the defendant's functioning; and whether even if such disruption occurred, plaintiffs were in fact not dismissed because of the disruption, but because of the content of their speech. Id. Thus, the court concluded that "after these underlying factual disputes [were] decided by a factfinder, the district court should consider the factual findings to come to its own legal conclusions about whether the employer's interest in efficiency or the employee's interest in free speech [was] paramount." Id. at 558.

detrimental ramifications of Tolnay's insubordination directly to the Chief of Police, the jury was never instructed that those considerations could outweigh any alleged First Amendment rights. Consequently, a manifest injustice occurred and Chief Wearing is entitled to a new trial.

## II. A NEW TRIAL IS REQUIRED BASED ON THE COURT'S FAILURE TO CHARGE THE JURY AS REQUESTED ON THE "REASONABLE RELATIONSHIP" STANDARD FOR AWARDING PUNITIVE DAMAGES

The Court committed harmful and prejudicial error by denying Chief Wearing's request for a "reasonable relationship" instruction on punitive damages on two occasions. (12/8/05 Tr. at 154-55, 164-65) The Court would not bring the jury back into the courtroom, only moments after it received the charge and it did not want to include the instruction as part of the supplemental instruction in response to the jury's note.

The proposed instruction was a correct statement of the law. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 426 (2003); BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 581 (1996).[7] In State Farm, the Court recognized that "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." 538 U.S. at 426. Here, the requested instruction would have helped cabin the jury's determination of punitive damages and reduced the likelihood of the jury returning the grossly excessive and unconstitutional award that it did.

The Court's refusal to charge the jury as requested conflicts with the approach followed by the Fourth Circuit in Johnson v. Hugo's Skateway, 974 F.2d 1408, 1415, 1418 (4th Cir. 1992)(en banc). In Johnson, the court held Virginia's punitive damage charge unconstitutional because the jury was not required to be instructed that punitive damages must be proportional to

---

[7]/ The principle that punitive damages "must bear a 'reasonable relationship' to compensatory damages has a long pedigree," dating back at least 700 years. Gore, 517 U.S. at 580-81.

9

compensatory damages. See Mattison v. Dallas Carrier Corp., 947 F.2d 95, 109-10 (4th Cir. 1991)(Jury imposing punitive damages law must be instructed that "any penalty imposed should bear a relationship to the nature and extent of the conduct and the harm caused"). Similarly, in Levinson v. Prentice-Hall, Inc., 868 F.2d 558, 565 (3d Cir. 1989), the court ordered a new trial based upon an error in the instruction on punitive damages. Specifically, under the instruction given, the Third Circuit could not conclude that the jury understood that the quantum of punitive damages "were to have any relationship to [the plaintiff's] injury, let alone some reasonable relationship. This failure left the jury without guidance on the fundamental question of how to fix the damages. It only knew that whatever it did was to be done calmly and without bias." Id. at 564.

A defendant has a right to have the jury determine what reasonable punitive damages would be under the proper instruction. Suflas v. Cleveland Wrecking Co., 218 F. Supp. 289, 290 (E.D. Pa. 1963). Accordingly, the Suflas court recognized that "[w]ithout an instruction as to the proper relationship between actual and punitive damages, the jury could well have considered that there need be no such relationship. Under a proper instruction the jury may well have found punitive damages in a substantially lower amount as representing its appraisal of a reasonable relationship between the two. This was denied the defendant and accordingly a new trial must be granted." Id.

In the instant case, the jury instructions regarding punitive damages were standardless. (12/8/05 Tr. at 147-50) The jury was instructed that it was permitted to award punitive damages to punish and to deter the defendant's conduct if the conduct was malicious or wanton. (12/8/05 Tr. at 147-50) As to the amount, no guidance about what to consider in fixing the 'proper' or 'reasonable' amount was given. Given this instruction, which in essence embodied no standard

10

for quantitatively assessing punitive damages against Chief Wearing, the only possible source of constraint on the amount of the award of punitive damages is this Court's review for "excessiveness" under Rules 50(b) and 59. "[T]he degree of scrutiny afforded by these processes is insufficient to remedy an instruction which leaves the jury with nearly absolute discretion to enter any amount of punitive damages it deems 'appropriate to punish and deter.'" Johnson, 974 F.2d at 1415. Thus, the instruction and scheme utilized to award punitive damages in this case constituted harmful and prejudicial error and violated the Due Process Clause.[8] Accordingly, a new trial must be ordered. See Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 18 (1991)(warning that "unlimited jury discretion...in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities").

## IV. THE PUNITIVE DAMAGES AWARD WAS CONSTITUTIONALLY EXCESSIVE AND REQUIRES THE ORDERING OF A NEW TRIAL

Tolnay's analysis of the guideposts under State Farm and Gore is without merit. (Pl.'s Mem. at 17-36) In essence, he maintains that this Court can distinguish or even disregard Supreme Court precedent which dictates how punitive damages award must by analyzed. (Id. at 23-24 (attempting to distinguish State Farm); id. at 25 n.9 (suggesting this Court can disregard State Farm); id., at 28 (Gore "is a case with quirky facts")). For example, Tolnay contends that this Court should disregard its previous analysis and application of State Farm and Gore in Stack v. Jaffee, 306 F. Supp. 2d 137 (D.Conn. 2003)(Burns, J.). (Pl.'s Mem. at 31 n.12)

---

[8] See In re The Exxon Valdez, 296 F.Supp.2d 1071, 1080 (D. Alaska 2004)(jury "specifically instructed to use reason in setting the amount of punitive damages and that any award of punitive damages should bear a reasonable relationship to the harm caused."); Baker v. John Morrell & Co., 266 F. Supp. 2d 909, 961 (N.D. Iowa 2003)(same), aff'd 382 F.3d 816 (8th Cir. 2004). See also Poullard v. Turner, 298 F.3d 421, 423 (5th Cir. 2002)("it is a well-established principle that punitive damages must bear a 'reasonable relationship' to compensatory damages."); Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992)(punitive damages must be "'reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.'").

11

Tolnay's argument that the $5 million punitive damages award is not excessive, is conclusory in nature and based on a fundamental misunderstanding of the governing law. (Pl.'s Mem. at 17-36) For example, Tolnay maintains that the largest punitive damages award in a First Amendment retaliation case in the history of the District of Connecticut, and apparently the entire Second Circuit, is justified because of the damage that Chief Wearing allegedly "caused to the NHPD," and its officers. (Id. at 18) As demonstrated below, neither the jury nor this Court may punish Chief Wearing for alleged damage to non-parties or the public in general. This is particularly so when the non-parties have absolutely no cause of action against the defendant and where the alleged damages are no more than speculation. Similarly, neither the jury nor the Court can award any damages against Chief Wearing for the conduct of others. It is well established that there is no *respondeat superior* liability under 42 U.S.C. § 1983, City of Canton v. Harris, 489 U.S. 378, 385 (1989), and that a defendant cannot be liable under § 1983 if he was not *personally involved* in the constitutional violation. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). Nevertheless, Tolnay seeks to defend the punitive damages award based on the conduct of the Mayor, Captain Ortiz and Reverends Rodriguez and Hernandez, (Pl.'s Mem. at 25-27), and concedes that the jury "agree[d] with plaintiff's theme and theory of the case" which had emphasized the alleged misconduct of these non-parties. (Id. at 20)

It is respectfully submitted that the Court must re-examine the actual conduct in this case and identify the conduct for which Chief Wearing can be held liable. In particular, the interaction between Chief Wearing and Tolnay was limited to a short business meeting on August 13 and the subsequent suspension. At worst, the meeting became heated. However, Tolnay who was 34 years old, 6 feet 2 inches and weighed 209 pounds in the summer of 2002, has never claimed that he feared for his safety. (12/2/06 Tr. at 44) Moreover, he was

12

represented by Bombalicki, a lieutenant, and others were present. The discipline he received resulted in the loss of five (5) days pay ($903) and an assignment that he did not enjoy. Contrary to Tolnay's claim, his attendance at sensitivity training was not an injury. (12/5/05 Tr. at 91-92) There was no allegation that Chief Wearing and Tolnay interacted other than at the August 13 and 15 meetings.

Tolnay's argument that the $5 million punitive damages award is justified in order to encourage "disclosure by law enforcement insiders" is without merit under Garcetti v. Ceballos, 126 S.Ct. 1951 (2006). (Pl.'s Mem. at 20-23) Garcetti confirms that Tolnay had no First Amendment rights under the circumstances of this case. At a minimum, Tolnay's First Amendment rights were extremely limited. Thus, there is no justification for a $5 million punitive damages award.

### A.  The Reprehensibility Guidepost Weighs In Favor Of Vacating The Punitive Damages Award

In State Farm, the Court elaborated on the three guideposts identified in Gore that courts must consider when reviewing punitive damages awards. Namely, (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award; and (3) the difference between the punitive damages award by the jury and the civil penalties authorized or imposed in comparable cases. Gore, 517 U.S. at 574-75. See Stack, 306 F.Supp.2d at 139. With respect to the first guidepost, State Farm identified five factors that courts must consider in determining the reprehensibility of a defendant's conduct.[9] Specifically, State Farm recognized that:

---

[9]   In Clark v. Chrysler Corp., 436 F.3d 594 (6th Cir. 2006), the Sixth Circuit recently examined the reprehensibility factors in detail. It concluded that although the physical harm suffered by the plaintiff weighed strongly in favor of finding Chrysler's conduct reprehensible, after considering the four other factors, the factors as a whole showed that Chrysler's conduct was not sufficiently reprehensible to warrant a $3 million punishment. Id. at 601. Accordingly,

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

538 U.S. at 419. See Gore, 517 U.S. at 575; Stack, 306 F.Supp.2d at 139.

Thus, the proper method for analyzing the reprehensibility guidepost is through the application of the five factors identified in State Farm and Gore. Here, Tolnay does not acknowledge the factors, let alone apply them. The application of the factors to the circumstances in the instant case reveals that Chief Wearing's conduct was not reprehensible or at a minimum, his conduct was not sufficiently reprehensible to support either the $5 million punitive damages award or a ratio beyond 1 to 1.

First, there was no physical harm caused. Second, Chief Wearing's conduct did not evince an indifference to or reckless disregard for the health or safety of others. To the contrary, Chief Wearing testified that the August 13 meeting was held, in part, to review how the July 26 arrests at the church were handled because of his concern about the safety of the officers and the public. (12/2/05 Tr. at 176-77) He was also concerned about avoiding riots and confrontations as a result of the July 26 arrests. (Id. at 189)

Third, there was no evidence introduced that Tolnay was financially vulnerable or that the parties' finances were involved in their interactions in any way. Ultimately, Tolnay's

---

it ordered that the punitive damage award be reduced to $471,258.26. This amount produced a 2:1 ratio in comparison to the compensatory damages awarded. Id. at 608. See Stack, 306 F.Supp.2d at 139-42 (analyzing five reprehensibility factors and reducing punitive damages award from $200,000 to $25,000).

14

suspension was for 5 days salary, $903. Fourth, Chief Wearing's interaction with Tolnay, the only relevant conduct, was an isolated incident, not repeated actions. The Chief's conduct with Tolnay was limited to the August 13 meeting and the brief follow up meeting on August 15. Finally, there is no evidence that the alleged harm to Tolnay was the result of intentional malice, trickery or deceit. At most, the conduct was an accident or a heated exchange.

Accordingly, the application of the reprehensibility factors reveals that the first Gore/State Farm guidepost does not support the $5 million punitive damages award. In particular, all 5 factors weigh against finding Chief Wearing's conduct to be reprehensible. They clearly do not support a ratio beyond 1 to 1. In fact, an application of the factors confirms that any ratio between the compensatory and punitive damages should be 1 to less than 1.

By contrast under Tolnay's approach, a court need only express the subjective conclusion that the defendant's conduct was reprehensible and it can then uphold any punitive award, no matter how disproportionate to the compensatory damages or out of line with similar cases it may be. The Supreme Court has, however, never treated the three guideposts under Gore as independent factors to be traded off against one another.[10] Instead, it has established a range of constitutionally permissive ratios and suggested that the degree of reprehensibility (and the amount of compensatory damages) will determine where within that range the constitutional cut-off falls in a particular case. See Planned Parenthood v. American Coalition of Life Activists, 422 F.3d 949, 962 (9th Cir. 2005), cert. denied, 126 S.Ct. 1812 (2006). The presence of

---

[10]/   As Justice Breyer explained in his concurrence in Gore, assessing the "reprehensibility" of a defendant's conduct "provides little guidance on how to relate culpability to the size of an award." 517 U.S. at 590. By concluding that the ratio guidepost may be in effect overridden in cases where either the court and/or the jury concludes that the conduct was "highly reprehensible," the force of the ratio analysis is constrained in those cases where it is most necessary - those where the facts presented on a particular day to the jury may be swayed by bias or prejudice, or otherwise be tempted to return a grossly excessive and constitutional award (as occurred in this case).

aggravating reprehensibility factors alone does not override the ratio guidepost or even remove a case from the single-digit ratio framework described in State Farm. To the contrary, the degree of reprehensibility, among other factors, helps courts to determine which single-digit multiplier is appropriate.[11] By treating the ratio and comparison guideposts as abstract inquiries that can be overridden by reprehensibility, Tolnay sets punitive damages free of any concrete "reasonable relationship" requirement and conflicts with the Supreme Court's punitive damages jurisprudence.

The jury returned an enormous punitive award because it was urged to punish Chief Wearing for the conduct of others (the Mayor, Captain Ortiz, and the two ministers) and the hypothetical harm that might be suffered by others. The Court in State Farm, however, made it clear that a defendant may be punished only for the harms to the plaintiff before the court - and not for harms that may have been suffered by non-parties. State Farm expressly rejected an aggregate approach to assessing punitive damages, explaining:

> Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis.... Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains.

538 U.S. at 423.

Accordingly, the Eighth Circuit and the California Supreme Court have recognized that a punitive damages award may not be based on hypothetical harms to others not actually

---

[11]/ State Farm itself involved at least two aggravating reprehensibility factors - intentional deceit and a financially vulnerable victim. 538 U.S. at 419-20. Nevertheless, the Court suggested that any award producing a ratio of more than 1 to 1 would be unconstitutionally excessive on the facts of the case. Id. at 429. On remand, the Utah Supreme Court held that a 9 to 1 ratio was permissible after finding all five reprehensibility sub-factors to have been established. Campbell v. State Farm Mut. Auto. Ins. Co., 98 P.3d 409, 414-18 (Utah 2004).

16

adjudicated by the court. Williams v. ConAgra Poultry Co., 378 F.3d 790, 797 (8th Cir. 2004); Johnson v. Ford Motor Co., 113 P.3d 82, 93-94 (Cal. 2005).[12] "In assessing reprehensibility, ..., it is crucial that a court focus on the conduct related to the plaintiff's claim rather than the conduct of the defendant in general." Williams, 378 F.3d at 797. In Williams, the Eighth Circuit described State Farm as emphasizing:

> That courts cannot award punitive damages to plaintiffs for wrongful behavior that they did not themselves suffer. Tying punitive damages to the harm actually suffered by the plaintiff prevents punishing defendants repeatedly for the same conduct: If a jury fails to confine its deliberations with respect to punitive damages to the specific harm suffered by the plaintiff and instead focuses on the conduct of the defendant in general, it may award exemplary damages for conduct that could be the subject of an independent lawsuit, resulting in a duplicative punitive damages award ... [p]unishing systematic abuses by a punitive damages award in a case brought by an individual plaintiff, ..., deprives the defendant of the safeguards against duplicative punishment ....

378 F.3d at 797. See State Farm, 538 U.S. at 422 ("[f]or a more fundamental reason, however, the Utah courts erred ... [t]he courts awarded punitive damages to punish and deter conduct that bore no relation to the Campbells' harm."); Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594, 604 (8th Cir. 2005).

---

[12]/   A claim for punitive damages must be based on some underlying cause of action, since, as a general rule, there is no separate and distinct cause of action for exemplary damages. Thomas B. Colby, Beyond The Multiple Punishment Problem: Punitive Damages As Punishment For Individual, Private Wrongs, 87 MINN. L. REV. 583, 652 nn.260-61 (2003)(citing cases). A party who has no cause of action independent of a supposed right to recover exemplary damages has no cause of action at all. This means that the sufficiency of the allegations and proof of complainant's cause of action is to be determined independently of the complainant's claim for exemplary damages. Id. at 652. "Thus, if a court allows a single plaintiff to collect 'total harm' punitive damages on the theory that the defendant should be punished for committing private legal wrongs against numerous individuals, it must require the plaintiff to prove, and afford the defendant the opportunity to disprove, that the defendant committed an actual legal wrong against all of the alleged victims." Id. at 653-54.

17