In the instant case, subjecting Chief Wearing to punishment via punitive damages for hypothetical injuries suffered by nonparties would violate his rights under the Due Process Clause. Moreover, it would constitute excessive and multiple punishment. See Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832, 839-40 (2d Cir. 1967)(describing multiple-punishment problem).

**B.    The Ratio To Actual Harm Guidepost Weighs In Favor Of Vacating The Punitive Damages Award**

Tolnay's claim notwithstanding, (Pl.'s Mem. at 23), Chief Wearing's initial brief never stated that a punitive damages award of nine (9) times the compensatory damages award would be appropriate in this case, let alone constitutional. Rather, Chief Wearing's initial brief examined State Farm. As discussed below, under State Farm and Gore, as a general rule, punitive damages awards should not exceed a 1 to 1 ratio. Moreover, each case must be subjected to a detailed and specific analysis. In some cases, such as this case, if there are to be any punitive damages awarded, they should be *less than* the compensatory damages. In other words, the appropriate ratio is 1 to *less than* 1.

In State Farm, the Court recognized that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." 538 U.S. at 425. It further recognized that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." Id. In fact, the Court concluded that when "compensatory damages are substantial, than a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." Id. Thus, it held that a low ratio is warranted where, as in the instant case, the compensatory damage award contains a significant amount of non-economic damages.

18

Observing that the compensatory award consisted of $1 million in emotional distress damages,

State Farm explained that:

> The compensatory damages for the injuries suffered here .. likely
> were based on a component which was duplicated in the punitive
> award. Much of the distress was caused by the outrage and
> humiliation the [plaintiffs] suffered at the actions of their insurer;
> and it is a major role of punitive damages to condemn such
> conduct. Compensatory damages, however, already contain this
> punitive element.

538 U.S. at 426.

The Ninth Circuit in Planned Parenthood recognized that the guideposts must be assessed

in tandem with one another. 422 F.3d at 962. The Ninth Circuit's approach appreciates that the

reprehensibility analysis operates within limits set by the ratio guideposts. Consistent with that

approach and analysis, a majority of the lower courts have heeded the Supreme Court's

admonition that "few awards exceeding a single-digit ratio between punitive and compensatory

damages, to a significant degree, will satisfy due process." State Farm, 538 U.S. at 425.[13] For

example, in Boerner, the Eighth Circuit held that even though it found the defendant's conduct

"highly reprehensible," under State Farm, a 1 to 1 ratio was the constitutional maximum given

the substantial compensatory award of $4 million. 394 F.3d at 602-03. Similarly, in Williams,

the court explained that a "large compensatory award" of $600,000 "is a lot of money" and

accordingly reduced the punitive damage award under State Farm to achieve a 1 to 1 ratio. 378

---

[13]/    See, e.g., Clark, 436 F.3d at 596, 612 (reducing $3 million punitive award to
$471,258.26, the amount of compensatory damages); Conseco Fin. Servicing Corp. v. North Am.
Mortgage Co., 381 F.3d 811, 825 (8th Cir. 2004)(reducing $18 million punitive award to $7
million, for a ratio of 2:1); Bach v. First Union Nat'l Bank, 149 Fed. Appx. 354, 366 (6th Cir.
2005)(6.6:1 ratio was "alarming" where compensatory damages were $400,000); Fresh v. Entm't
U.S.A. of Tenn., Inc., 340 F.Supp.2d 851, 860 (W.D. Tenn. 2003)(holding that 4:1 ratio was
constitutional maximum in assault case); Young v. DaimlerChrysler Corp., 2004 WL 2538639,
at *4 (S.D. Ind. Oct. 19, 2004)(holding that 3:1 was maximum permissible ratio in discrimination
case).

F.3d at 799. See also Ceimo v. Gen. Am. Life Ins. Co., 137 Fed. Appx. 968, 970 (9th Cir. 2005)(affirming remittitur to achieve approximate ratio of 1 to 1); Clark, 436 F.3d at 613-14 (Kennedy, J., concurring)("I believe that $235,629.13 is … a substantial compensatory award" and therefore a 1 to 1 ratio is the constitutional maximum under State Farm).

In Simon v. San Paolo U.S. Holding Co., Inc., 113 P.3d 63, 77 (Cal. 2005), the court explained that the "statement in State Farm that 'few awards' significantly exceeding a single-digit ratio will satisfy due process" established "a type of presumption: ratios between the punitive damages award and the plaintiff's actual or potential compensatory damages significantly greater than nine or 10 to 1 are suspect and, absent special justification (by, for example, extreme reprehensibility or unusually small, hard-to-detect or hard-to-measure compensatory damages), cannot survive appellate scrutiny under the due process clause." The Simon court recognized that multipliers less than nine or ten are not "presumptively *valid* under State Farm." Id. (emphasis original). "Especially when the compensatory damages are substantial or already contain a punitive element, lesser ratios 'can reach the outermost limit of the due process guarantee.'" Id. In Simon, there had been a $5,000 award of compensatory damages and a $1.7 million punitive damages award. The court reduced the punitive damages award to $50,000. 113 P.3d at 82.

Tolnay's citations to TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443 (1993), Browning-Ferris Indus. v. Kelco Disposal, Inc., 492 U.S. 257 (1989), Lee v. Edwards, 101 F.3d 805 (2d Cir. 1996) and Argentine v. United Steelworkers of Am., AFL-CIO, 287 F.3d 476 (6th Cir. 2002) are misplaced. (Pl.'s Mem. at 28, 32)

Tolnay's statement notwithstanding, TXO did not "approve" a ratio of 1 to 526. TXO involved a slander of title on which the petitioner "set out on a malicious and fraudulent course

to win back, ..., the lucrative stream of royalties that it had ceded" to the respondent. 509 U.S. at 462-63. The Court did "not consider the dramatic disparity between the actual damages and the punitive award controlling in a case of this character." Id. In fact, in Gore, the Court recognized that in TXO, it confirmed that the proper inquiry is "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." Gore, 517 U.S. at 581. "Thus, in upholding the $10 million award in TXO, ... the relevant ratio was not more than 10 to 1." Id.[14]

The Second Circuit recently confirmed that Lee is an anomaly. Patterson v. Balsamico, 440 F.3d 104, 122 (2d Cir. 2006). Lee highlights how the ratio analysis does not truly apply when there is an extremely low award of compensatory damages. 101 F.3d at 811. See Stack, 306 F.Supp. 2d at 140. In fact, Lee itself characterizes the decision as unique. In Lee, the jury awarded $1 nominal damages and $200,000 in punitive damages. 101 F.3d at 808. After applying the guideposts, the Second Circuit reviewed three other assault and battery, false arrest, and malicious prosecution cases from within the Second Circuit. Id. at 812-13. It held that unless the plaintiff agreed to accept a remitted punitive damage award of $75,000, there would be a new trial. Id. at 813. In setting the amount at $75,000, the court noted that because the plaintiff's municipal employer had agreed to pay the punitive damage award, it was "comfortable here with a punitive damages award that is higher than we might otherwise approve." Id.

Argentine is also distinguishable and does not support the broad sweeping argument advanced by Tolnay. (Pl.'s Mem. at 29-30) In Argentine, three former officers of a local union sued an international union under the Labor Management Reporting and Disclosure Act

---

[14]/    Browning-Ferris is inapposite. It involved a challenge under the Eighth Amendment's Excessive Fine Clause. 492 U.S. at 272. The Court declined to address the argument under the Due Process Clause that it later addressed in Gore, because it was not raised below. Id. at 277.

(LMRDA), challenging their removal from office and imposition of a trusteeship on the local

union. 287 F.3d at 480-82.[15]  With regard to the reprehensible guidepost, the Sixth Circuit found

the union's conduct to be deceitful. Id. at 487-88.  With regard to the ratio between the

compensatory and punitive damages, 42.5 to 1, ($400,000 to $9,406), the Argentine court

believed that the ratio was not unreasonable because the impairment of the plaintiff's reputations

and free speech rights were "without a ready monetary value as opposed to the injuries in

[Gore]." 287 F.3d at 488.  It further concluded that in "cases where the harm to the plaintiff

involved free speech rights the courts allow for higher ratios." Id.  As authority, the Sixth Circuit

cited Kinslow v. American Postal Workers Union, Chicago Local, 222 F.3d 269 (7th Cir. 2000)

and noted that in that LMRDA case the plaintiff was awarded $1 in compensatory damages and

$150,000 in punitive damages.

    Argentine's analysis is suspect  Kinslow does not exempt cases involving free speech

rights from the full analysis under State Farm and Gore.  In fact, in footnote 3 of the decision, the

Seventh Circuit noted that the defendant had made "no argument that the award was excessive in

relation to the amount of compensatory damages awarded." Kinslow, 222 F.3d at 278 n.3.  Thus,

the punitive damages award in Kinslow was not subject to an analysis under State Farm and

Gore.  As such, the analysis in Argentine was in fact based on inaccurate authority.

    Moreover, the broad sweeping statement in Argentine does not overcome the results of

comparing the damages award in this case to the other First Amendment retaliation cases from

---

[15]/    In the first count of the complaint, the plaintiffs alleged that the union violated their free
speech rights contrary to LMRDA. Id. at 482.  The second count alleged that the union imposed
the trusteeship for an improper purpose contrary to the LMRDA. Id.  The third count alleged
that the union breached a contract in violation of the LMRDA. Id.  The jury awarded each of
three plaintiffs $1 compensatory damages for the first count; awarded two of the plaintiffs
$100,000 each and the third plaintiff $200,000 in punitive damages for the first count; awarded
each plaintiff $1 for compensatory damages on count two; and on count three, awarded $3,800 to
two of the plaintiffs and $1,800 to the third in compensatory damages. Id.

this District and from the Second Circuit. That analysis in Chief Wearing's initial brief and in this brief demonstrates that the $5 million punitive damage award in this case was grossly and unconstitutionally excessive. It is unprecedented and breathtaking. In fact, the analysis of the other cases from this District and the Second Circuit confirms that a 1 to 1 ratio would be excessive in this case. If any punitive damages are allowed, they should be for less than the compensatory damages award. Cf. Arlio v. Lively, 392 F.Supp.2d 317, 323 (D. Conn. 2005).

**C.    The Comparison To Similar Cases Guidepost Weighs In Favor Of Vacating The Punitive Damages Award**

Tolnay's arguments regarding the punitive damages issue are more insightful for what they do not say than for anything they do say. Notably, absent from Tolnay's brief, (Pl.'s Mem. at 17-36), is a response to Chief Wearing's analysis of punitive damages awards in First Amendment retaliation cases from this District and the Second Circuit.[16] Instead of addressing that analysis, Tolnay declares that "there does not appear to be a case whose facts are on all fours as the instant one." (Pl.'s Mem. at 30) Tolnay's claim is nothing less than remarkable. The analysis in Chief Wearing's initial memorandum demonstrates that despite conduct and injuries far worse than that involved in the instant case, there has never been a punitive damages award in a First Amendment retaliation case from this District or the Second Circuit that compares with the $5 million awarded in this case.

Tolnay's analysis of "comparable civil penalties" is based on a fundamental misunderstanding of the law and is misleading. (Pl.'s Mem. at 32-36) In Tolnay's view, the fact that juries throughout the country render large punitive damages in many different types of cases,

---

[16]/    The only case that Tolnay briefly discusses is Stack v. Jaffee, 306 F. Supp. 2d 137 (D. Conn. 2003)(Burns, J.). (Pl.'s Mem. at 31 n. 12) He does not address the facts of that case, the verdict or this Court's reduction of the punitive damages award by 75%. Rather, he only maintains that this Court misread State Farm.

is the beginning and end of the analysis. In support of this theory, Tolnay hired a jury verdict search firm to conduct at least 2 searches for cases where there were punitive damages verdicts in excess of $2 million.[17]  One of those searches was expressly for "whistle blower" cases in excess of $2 million. In footnote 13 of his brief, Tolnay concedes that he has not researched the cases identified at pages 33-35 of his brief and in the verdict searches. Without citation to any authority, Tolnay declares that any subsequent treatment or appellate proceedings in connection with the cases is "irrelevant." (Pl.'s Mem. at 32-33 n.13)

Tolnay's reliance on the verdict reporters is misplaced and suspect. By their nature, verdict reporters are inherently limited. Verdict reporters tend to operate by asking lawyers to respond to a series of pre-formatted questions about various particulars of the case. This fill-in-the-blanks approach is of no help in examining the constitutionality of a punitive damages award. In particular, these reports are primarily based on the jury verdict. They do not concern themselves with an examination of the constitutionality of punitive damages awards. Nor do they necessarily indicate whether the verdict has been upheld after post-trial motions or after an appeal.

Moreover, Tolnay cites no authority holding that verdicts from across the country and involving dissimilar facts and legal claims, listed in reports that must be purchased, provide a defendant with the due process, "notice" mandated under <u>State Farm</u> and <u>Gore</u>. In fact, the Second Circuit has recognized that the analysis under <u>Gore</u> "requires comparison with awards *approved* in *similar* cases." <u>Mathie v. Fries</u>, 121 F.3d 808, 817 (2d Cir. 1997)(emphasis added).

---

[17]/    A review of the 2 verdict searches attached to Tolnay's brief reveals that the searches did not seek out factually similar cases. Rather, the "verdict search summaries" and the text of the searches indicate the criteria requested by Tolnay was for verdicts of "$2 million or more." The Court should disregard this result-oriented approach to the analysis of the punitive damages issue. In fact, Chief Wearing moves to have the verdict searches stricken from the record pursuant to Fed. R. Civ. P. 12(f).

Similarly, district courts have looked for cases with "factual scenarios comparable to [the] case [before them]." Casumpang v. International Longshore & Warehouse Union, 411 F.Supp. 2d 1201, 1221 (D. Haw. 2005) To provide the due process "notice" that State Farm and Gore mandate, a verdict should be from within the same district court or circuit court and should arise out of a case that is truly similar on the facts and law. This would be consistent with the Second Circuit's approach to defining when a constitutional right is clearly established for purposes of qualified immunity.

Not surprisingly, an analysis of the post-trial and appellate proceedings in the 21 cases listed by Tolnay verifies that the cases confirm that the $5 million punitive damages award in this case was grossly excessive. In most instances, the verdicts have been reduced or vacated during post-trial or appellate proceedings. In several instances, the actual existence of the case listed in the verdict report could not be confirmed.

Following Tolnay's approach of attaching an analytical exhibit, Chief Wearing's analysis of the 21 verdicts listed at pages 33-35 of Tolnay's brief is set forth in **Exhibit A** submitted in support of Chief Wearing's reply/supplemental memoranda of law. That exhibit contains as sub-exhibits the documentation of the post-trial and appellate proceedings for the cases relied upon by Tolnay, to the extent they could be found. A sampling of the analysis from **Exhibit A** is set forth below.

Tolnay's listing of Rosenfield v. Yale University is a prime example of why the verdict reports he has presented are generally unreliable and how the cases identified in fact support the vacating of this punitive damages award as constitutionally excessive. The case is actually captioned Burrell v. Yale University and is from the Complex Litigation Docket at Waterbury. It did not involve the jury setting an amount of punitive damages. Rather, the trial court set that

amount. More specifically, in Burrell, three faculty members and radiologists at the Yale University School of Medicine brought suit under Conn. Gen. Stat. § 31-51q alleging that Yale retaliated against them for "speaking out concerning allegations of systemic medical malpractice and Medicare fraud within Yale's Department of Diagnostic Radiology." See Burrell v. Yale Univ., 2004 WL 1155350, at *1 (Conn. Super. May 10, 2004).

In the first of two post-trial rulings, the trial court remitted the emotional distress award to Smith from $125,000 to $25,000. Burrell v. Yale Univ., 2004 WL 3049083, at *9 (Conn. Super. Nov. 22, 2004). As part of the ruling, the court further remitted the interest calculations in favor of Burrell and Rosenfeld. Specifically, after the first post-trial ruling, the verdict stood at an award to Rosenfeld of $3,765,187.50, $1,370,629.20 to Burrell and $158,800 to Smith. Burrell v. Yale Univ., 2005 WL 1670613, at *1 (Conn. Super. May 26, 2005). The jury's verdict had indicated that punitive damages were to be determined by the court.

In a second post-trial ruling, the trial court addressed the issue of attorneys' fees and punitive damages.[18] With regard to punitive damages, the court had previously held that the availability of both attorneys fees and punitive damages was possible under § 31-51q. Id. at *3. Consequently, for punitive damages, the court made a second award of attorney's fees to Rosenfeld in the amount of $1,225,062.50, to Burrell in the amount of $456,876.40, and to Smith in the amount of $52,933.33. Burrell, 2005 WL 1670613, at *3. Thus, Burrell resulted in Rosenfeld having a ratio of 3 to 1 between the compensatory ($3,765,187.50) and the punitive ($1,251,593.66) damages awards. Burrell had a ratio of 2.86 to 1 between the compensatory ($1,395,150 (as awarded by jury)) and the punitive ($488,398.27) damages awards. Smith had a

---

[18]/   In Burrell, the plaintiffs had their salaries cut, were removed from administrative positions, and at least one was recalled from sabbatical leave. Rosenfeld described the experience as a "reign of terror." Burrell, 2004 WL 3049083, at *5.

ratio of 3 to 1 between the compensatory ($258,800 (as awarded by jury)) and the punitive ($84,455.20) damages award.

Thus, what <u>Burrell</u> offers to the analysis of the punitive damages issue in this case is that in a far more egregious and reprehensible situation, where the plaintiffs actually spoke out, a judge set the ratio between punitive and compensatory damages at 1 to 3. In this instance, if the emotional distress damages award remains unchanged, that would translate into the punitive damages award being set at $50,301. In fact, given that the actual conduct between Chief Wearing and Tolnay was not egregious in any manner, any punitive damages award should be far below that amount.[19]

Indeed, **Exhibit A** demonstrates that the verdict reports presented by Tolnay confirm that the $5 million punitive damages award is excessive. Based on the relevant conduct, the Court should reduce the ratio to less than 1 to 1.

A comparison of this case with a recent decision within this District further confirms that the $5 million punitive damages award in this case was constitutionally excessive. In <u>Russo v. City of Hartford</u>, 419 F.Supp2d 134 (D. Conn. 2006), a police officer brought a § 1983 action against the Chief of Police, another supervisor, and the City of Hartford, alleging First Amendment retaliation. In relevant part, the jury returned a verdict against the police chief and awarded $22,500 in compensatory damages and $75,000 in punitive damages. <u>Id.</u> at 153.[20]

---

[19]/     Tolnay's listing of <u>Ambrosio v. City of Garland</u> is also without merit. As set out in **Exhibit A**, the verdict was significantly reduced by an amended judgment by the district court. On appeal, the Fifth Circuit entered a judgment for the defendants. <u>Breaux v. City of Garland</u>, 205 F.3d at 150, 164 (5th Cir. 2000). Tolnay's listing of <u>Ledbetter v. Goodyear Tire & Rubber Co. Inc.</u> is another example of why the jury verdict reports are misleading. On appeal, the Eleventh Circuit reversed the district court's denial of a defendant's motion for judgment as a matter of law and entered judgment for the defendant. 421 F.3d 1169 (11th Cir. 2005).

[20]/     With regard to the analysis of the punitive damages award, the court noted that the plaintiff had testified that the police chief "told him, 'I have a couple of detectives in my office

With regard to the reprehensibility guidepost, the <u>Russo</u> court concluded that although the police chief did not commit physical violence against the plaintiff, his statements to the plaintiff could easily be interpreted as a threat of violence, by himself or by approval of violence by others. <u>Id.</u> at 154. It similarly found that the evidence could support a finding that the police chief acted with malice. <u>Id.</u> Finally, the court found at least some evidence that the police chief engaged in repeated instances of misconduct, considering his role in the ongoing retaliation against the plaintiff, including intimidation and a two-day suspension. <u>Id.</u>[21]

With regard to the second guidepost, the <u>Russo</u> court concluded that the ratio between the compensatory and punitive damages was equal to or slightly under 1 to 3. <u>Id.</u> With regard to the third guidepost, the court believed that the police chief's conduct in the phone conversation could "open him up to criminal prosecution for harassment in the second degree pursuant to Conn. Gen. Stat. § 53A-183(a)." <u>Id.</u> at 155. Taking into account all of the guideposts, the court found that the punitive damages award against the police chief did not shock the judicial conscience. <u>Id.</u>

---

who want to kick your f***ing ass'"..., followed immediately by a question as to whether [the plaintiff] was 'assisting or conducting a corruption investigation against his department,'..., and then a statement that he wanted [the plaintiff] to take a polygraph test and that he or the other officers with him 'would take care of' whoever was lying." <u>Id.</u> at 154. Further, the plaintiffs "specifically characterized [the plaintiff's] statement as a 'threat' that he took seriously,..., and his sister gave additional testimony supporting a finding that [the plaintiff] was in fact frightened by [the police chief's] words." <u>Id.</u>

[21]/    In <u>Russo</u>, there were three adverse employment actions charged against the police chief: (1) he physically threatened and reprimanded the plaintiff; (2) he ordered that the plaintiff be drug tested; and (3) he suspended the plaintiff for two days. <u>Id.</u> at 145. Further, the police chief contacted a prosecutor's office about investigating the plaintiff for drug crimes. <u>Id.</u> at 146.

## IV.    A NEW TRIAL IS REQUIRED BASED ON THE COURT'S ALLOWING TESTIMONY REGARDING INDEMNIFICATION OF POLICE OFFICERS AND BASED ON ITS FAILURE TO CHARGE THE JURY AS REQUESTED IN RESPONSE TO THE JURY'S NOTE

### A.    The Admission Of The Testimony Regarding Indemnification Was Harmful And Prejudicial Error

Contrary to Tolnay's claim, the Court committed prejudiced and harmful error when it allowed Tolnay's counsel to question the Mayor regarding indemnification. (Pl.'s Mem. at 36-38) In particular, it was not proper for Tolnay's counsel to ask the Mayor to "explain" his testimony that the City generally indemnifies its officers, so the jury could understand what indemnified meant. (12/6/06 Tr. at 211-12) The Mayor was a non-party witness, who was called to testify by Tolnay. Tolnay cites no authority which holds that either his alleged right to challenge the Mayor's credibility or unexplained need for clarification was a basis for the admissibility of any evidence regarding indemnification. To the contrary, the case law cited in Chief Wearing's initial brief confirms that evidence on indemnification was not admissible and its admission here constituted harmful and prejudicial error. (Def.'s Initial Mem. at 7-9 (citing cases)) See Larez v. Holcomb, 16 F.3d 1513 (9th Cir. 1994); Fed. R. Evid. 403, 411. It left the jury with the improper impression that Chief Wearing would not be bearing the burden of the damages and thus created the likelihood of an inappropriate and inflated verdict. That improper impression resulted in the $5 million punitive damages award. Accordingly, a manifest injustice occurred and a new trial is required on all issues.

Tolnay also submits a confusing argument in defense of the Court's supplemental jury instruction in response to the jury's note. (Pl.'s Mem. at 38-45) Without citation to any relevant authority, Tolnay argues that it was proper to give the jury the impression that the City might pay any damages award because: (1) Chief Wearing was "solely responsible" for the jury's note

29

based on an unanswered question about his salary, (2) if detailed evidence of a defendant's financial resources are introduced, evidence of indemnification is automatically admissible, and (3) there was no evidence that Chief Wearing's assets were the only source for the payment of an award. (Pl.'s Mem. at 39-45) Thus, Tolnay contends that unless a defendant in a § 1983 case proves that there are no third-party sources of payment available, a jury that issues a note requesting clarification as to whether a city will pay any judgment against an individual defendant, must be instructed not to consider who or what will pay a judgment. In other words, in response to such a note, a jury must be left with the impression that the city would, or at least might, be paying the judgment.

Tolnay's argument is without merit for several reasons. First, there is no authority that supports Tolnay's claim that Chief Wearing was required to prove at trial that there was no indemnification. There is also no authority which holds that a jury which hears testimony by a mayor that the city indemnifies its police officers and then issues a note asking whether the city will pay a judgment against its former police chief *must* be instructed not to consider who will pay, i.e., be left with the impression that the city might pay.

Second, Tolnay fails to acknowledge that the Mayor's testimony regarding the City's indemnification of its officers (and exactly what that meant) was the source of the jury's note.

Third, the authorities cited by Tolnay do not support his claim that the supplemental jury instruction was proper. (Pl.'s Mem. at 42-44) To the contrary, they confirm that the Mayor should not have been required to "explain" the City's indemnification of police officers. For example, in <u>Pinkham v. Burgess</u>, 933 F.2d 1066 (1st Cir. 1991), the court concluded that a passing reference to "liability insurance" as part of a description of the plaintiff's husband's dealings with the defendant "was unlikely to have been perceived by the jury as an indication

that there was insurance coverage involved in the case." Id. at 1071-72. It also noted that the

district court had offered to consider a limiting instruction if one was suggested. Id. at 1072.

Finally, Pinkham recognized that the testimony was within the exception to Fed. R. Evid. 411

because it showed the extent of the defendant's involvement in her husband's affairs. Id.

Tolnay's citation to Kemezy v. Peters, 79 F.3d 33 (7th Cir. 1996) is particularly

misplaced. Kemezy recognized that "[w]hen the defendant is to be fully indemnified, such

evidence, far from being required, is admissible." Id. at 37. Here, the Court's ruling and

supplemental instruction were inconsistent with Kemezy because the Court allowed testimony

explaining indemnification by the city of its police officers and left the jury with the impression

that Chief Wearing would, or at least, might be indemnified. Thus, the ruling and the

supplemental jury instruction constituted prejudicial and harmful error. They gave the jury the

ability to render damages based on a misunderstanding of the assets available to satisfy any

verdict. The improper and grossly excessive verdict confirms the prejudicial and harmful error.

## B.    Chief Wearing Did Not Waive His Objection To The Supplemental Instruction

Tolnay's argument that Chief Wearing waived his objection and counterproposals to the

supplemental instruction in response to the jury's note is misplaced. (Pl.'s Mem. at 38)

Tolnay's argument is based exclusively on a passing comment by Chief Wearing's counsel that

indicated, "That's fine," made prior to the Court giving the instruction. Tolnay ignores the

requests that Chief Wearing's counsel made of the Court with regard to the content of the

supplemental instruction. (12/8/05 Tr. at 162-67) He also ignores the fact that Chief Wearing's

counsel objected to the supplemental instruction that the Court gave to the jury. (Id.)

A review of the case law confirms that the comment that Tolnay relies upon did not

constitute a waiver. In general, a "[w]aiver occurs when a defendant intentionally relinquishes a

31

known right." United States v. Murry, 395 F.3d 712, 717 (7th Cir. 2005). Waiver is found when a defendant expressly declines to press a right or make an objection. Id. There is an affirmative aspect to a waiver. See id. Chief Wearing did not expressly decline to assert an objection in this case. To the contrary, the record confirms that his counsel advocated for specific supplemental instructions and objected to the instruction given by the Court. Thus, there was no waiver.

Under the case law, the passing comment did not constitute a waiver or a withdrawal of either objections to the instruction the Court was proposing or the requested instructions that Chief Wearing was requesting. Specifically, in United States v. Pabisz, 936 F.2d 80 (2d Cir. 1991), a defendant was convicted for willfully attempting to evade his federal income taxes. On appeal, the Second Circuit reversed and remanded the matter for a new trial.[22] The defendant's principal claim on appeal was that the district court erred in instructing the jury that they could not credit his good faith defense unless they found his beliefs were reasonable. Id. at 83. The Government contended that the defendant had ratified or stipulated to the instruction that was given. Id. at 83-84. The Second Circuit did not agree. It concluded that the defendant's "requests to charge evidenced his clear desire to have the district court adopt an objective reasonableness standard. And although [the defendant's] counsel said, 'That's fine, Judge,' [the Second Circuit was] unwilling to conclude that [the defendant] affirmatively waived his objections to the charge in the absence of a record of the pre-charge conference." Id. at 84.

---

[22]/    Similarly, in Zidell Explorations, Inc. v. Conval Int'l, Ltd., 719 F.2d 1465 (9th Cir. 1983), the Ninth Circuit held that equivocal remarks will not suffice to establish a waiver. Id. at 1469. During the course of the jury trial in Zidell, the district court instructed counsel that it would rule on a particular issue, not the jury. Counsel responded that "if that be the case, that's fine." Id. On appeal, the Ninth Circuit held that counsel's response could be interpreted either as a waiver of his clients' right to a jury determination of that issue or a mere acquiescence in the trial judge's directive. Id. It held, however, that a waiver must be clearly proved and that equivocal remarks would not suffice. Id. at 1469.

In the instant case, a review of pages 162-67 from the December 8, 2005 trial transcript confirms that Chief Wearing's counsel was advocating for several instructions and opposed the supplemental instruction that the Court gave the jury. Counsel never withdrew either the instructions he was requesting or his objection. Consequently, Tolnay's waiver argument is without merit.

**V.    A NEW TRIAL IS REQUIRED BASED ON THE COURT'S ADMISSION OF EVIDENCE REGARDING UNRELEASED PAST INCIDENTS OF DISCIPLINARY ACTION OR LACK OF DISCIPLINARY ACTION**

The prior disciplinary incidents that were allowed into evidence were not substantially similar to the discipline of Tolnay. They were also extremely inflammatory and allowed Tolnay to base his case on a theory that Chief Wearing had a despicable record in running the police department and should be punished for it. Such a theory was inappropriate and prejudicial to Chief Wearing. The introduction of the evidence also forced Chief Wearing to engage in dozens of mini-trials on the disciplinary decisions.

A review of the presentation of the past incidents where Chief Wearing implemented discipline or did not implement discipline, reveals that the Court allowed Tolnay to introduce into evidence an extended discussion of dozens of incidents, none of which were similar to the situation at issue (direct insubordination by a patrol officer to the Chief of Police, in the presence of other police officers) and most of which were highly inflammatory. In particular, plaintiff's Trial Exhibits 19 through 35 covered 17 different incidents between July, 1997 and October, 2002. (See Def.'s Post-Trial Exs. 16-32) Tolnay's counsel questioned Chief Wearing regarding 16 incidents (Pl.'s Trial Exs. 19-34) of prior discipline imposed by him on employees, who were primarily police officers. (12/5/05 Tr. at 96-110)

33

After going through the first 16 incidents, Tolnay's counsel began questioning Chief Wearing regarding other disciplinary incidents that did not even remotely relate to insubordination. In particular, Tolnay's counsel began with a disciplinary memorandum related to Officer Caminer Lavache dated October 4, 2002. (Def.'s Post-Trial Ex. 32; 12/5/05 Tr. at 149-68) She spent nearly 20 pages of transcript on questions related to Lavache.[23] After Lavache, Tolnay's counsel questioned Chief Wearing regarding 8 other incidents of discipline, none of which involved insubordination.

Prior to this questioning beginning, Chief Wearing's counsel again raised the objection that the evidence was irrelevant and did not involve similar situations. (12/5/05 Tr. at 68-69) In response, Tolnay's counsel admitted that the evidence that she was about to introduce did not involve similar situations. (Id. at 170)[24] Chief Wearing's counsel objected that none of the evidence that was about to be introduced was similar in any way to the situation before the jury regarding Tolnay and that the probative value was far outweighed by the prejudicial effect. (Id. at 171-74) Counsel also objected because the incidents that were about to be reviewed included conduct by police officers off duty and thus further highlighted the lack of similarity. (Id. at

---

[23]/    According to the personnel memorandum, Lavache was caught sleeping on duty on 3 occasions and may have made a threat to a superior. Moreover, there were allegations that Lavache had urinated in public. Chief Wearing issued a 10 day suspension to Lavache and ordered that he submit to a fitness for duty examination before a psychologist. As part of her questioning, Tolnay's counsel emphasized that one of the sleeping incidents was on September 11, 2002, the anniversary of the attack on the World Trade Center. (12/5/05 Tr. at 154-62) On that date, Lavache was assigned to guard the Pitkin Tunnel underneath City Hall. Tolnay's counsel emphasized the fact that the tunnel ran under the very federal courthouse where the jury was sitting, and under buildings containing numerous governmental and law enforcement offices.

[24]/    As grounds for the admission of the evidence, Tolnay's counsel merely argued that it was "totally unfair" to insist that she could only introduce evidence regarding discipline related to insubordination. (Id. at 170) She argued that the acts of discipline that she was about to review were committed in Chief Wearing's presence. (Id. at 170-71) A review of the testimony that followed reveals no such evidence was introduced.

174-78) Chief Wearing's counsel further objected that the incidents that were about to be reviewed would require leading questions and questions based upon facts that were not in evidence. (Id. at 176-78) The incidents that were about to be reviewed were not the subject of any memoranda or other documents. Rather, Tolnay's counsel was simply going to be questioning the Chief based on information that she had available to her alone.[25]

In particular, Tolnay's counsel questioned Chief Wearing regarding the conduct of officer (later lieutenant) Sonya Atkinson (12/5/05 Tr. at 168, 181-89; 12/6/05 Tr. at 50-55), officer Diane Langston (12/5/05 Tr. at 189-200), officer Cleveland Roach (12/5/05 Tr. at 201), officer Kelly Dillon (12/5/05 Tr. at 202-03), officer Michael Hunter (12/5/05 Tr. at 207-10), officer Kenney Howell (12/5/05 Tr. at 210-11), officer John Goad (12/6/05 Tr. at 56-57) and Captain Sorrentino (12/6/05 Tr. at 58-59).

Atkinson had been investigated by the Internal Affairs Division for allegedly lying about a death in her family and then taking bereavement leave. (12/5/05 Tr. at 180-87) Tolnay's counsel also questioned Chief Wearing about Atkinson's arrest in connection with drug dealing charges. (Id. at 187) She also emphasized that Atkinson had been cohabitating with a "notorious drug dealer." (12/6/05 Tr. at 51) As part of her purported questioning of Chief Wearing, Tolnay's counsel declared that by not disciplining Atkinson in connection with the bereavement leave issue, it resulted in Atkinson's eventually being arrested on the drug charges. (12/5/05 Tr. at 187)[26]

---

[25]/     The Court ruled that "I'm not going to allow all of them, but I think a few of them, at least, should come in." (12/5/05 Tr. at 178) In fact, despite the Court's ruling, Tolnay's counsel then proceeded to question Chief Wearing regarding 8 other incidents of past discipline, the full amount of evidence she wanted.

[26]/     Tolnay's counsel's questioning of Chief Wearing regarding Atkinson went beyond disciplinary issues and included questions regarding the Chief's knowledge of Atkinson's having

Tolnay's counsel described Langston as "another one of [Chief Wearing's] problem officers." (12/5/05 Tr. at 188-89) She was allowed to question the Chief about Langston's creating a public disturbance in the lobby of the police station by screaming and yelling in the presence of civilian visitors and making race-based comments. (Id. at 190-91) In particular, the comments included a profanity, which can be abbreviated as "Irish mother f---ers." (Id. at 191)[27] Tolnay's counsel also questioned Chief Wearing regarding Langston's arrest in Hamden, while she was on duty as a New Haven police officer. (12/5/05 Tr. at 194-200) Specifically, Langston was arrested in a bank where she allegedly created a public disturbance by calling a teller "white b****." (12/5/05 Tr. at 194-96) The irrelevance of Langston's situation was even greater because her case was still pending at the time Chief Wearing retired. (12/5/05 Tr. at 196-97)[28]

The introduction of this inflammatory, completely irrelevant and highly prejudicial evidence regarding the history of the other officers' disciplinary histories was a central component of the plaintiff's case. During her closing argument, Tolnay's counsel emphasized the details of these prior disciplinary decisions. (12/8/05 Tr. at 17-18) In particular, she emphasized the "incredible disgrace of Melvin Wearing's disciplinary practice." (Id. at 17) Indeed, it was on the disciplinary actions that were not insubordination based, that Tolnay's

---

an extramarital affair with another officer and getting into a fight with that officer's wife. (12/5/05 Tr. at 188)

27/ Tolnay's counsel was allowed to return to Atkinson's and Langston's misconduct, during her questioning of Lieutenant Bombalicki. (12/6/05 Tr. at 133-39)

28/ With regard to Roach, Tolnay's counsel was allowed to question Chief Wearing regarding his alleged bad behavior, despite the fact Chief Wearing denied any recollection of any incident with Roach. (12/5/05 Tr. at 201) With regard to Dillon, who had been arrested on a DWI charge, Tolnay's counsel was allowed to ask Chief Wearing to make a comparative analysis between the situations with Dillon and Langston. (12/5/05 Tr. at 202-03) With regard to Captain Sorrentino, Tolnay's counsel was allowed to question Chief Wearing regarding Sorrentino's having engaged in the criminal activity of stealing videotapes from the police property room and selling them for cash. (12/6/05 Tr. at 58-59)

counsel focused her closing argument. In particular, she focused on Atkinson, Langston and Lavache. (Id. at 45-46)

As a result of the introduction of this evidence and the plaintiff's closing argument, Chief Wearing was forced to engage in mini-trials and address the past unrelated, inflammatory and prejudicial incidents by discussing them further in his testimony elicited by his counsel (12/6/05 Tr. at 7-10) and as part of his counsel's closing argument. (12/8/05 Tr. at 87-89) Consequently, the introduction of this evidence constituted harmful and prejudicial error and produced a verdict based on inappropriate passion and prejudice. This constitutes a manifest injustice and mandates a new trial. See Ricketts v. City of Hartford, 74 F.3d 1397, 1414 (2d Cir. 1996)("'[w]e would consider it an abuse of discretion to admit [similar act] evidence if the other act were not sufficiently similar to the conduct at issue.'"); Laws v. Cleaver, 140 F.Supp.2d 145, 156 (D. Conn. 2001). See also Fed. R. Evid. 403.

## VI. A NEW TRIAL IS REQUIRED BASED ON THE COURT'S ALLOWING THE ADMISSION OF INFLAMMANTORY AND HEARSAY NEWS ARTICLES

The news articles were, without dispute, hearsay and in fact, in many instances, double and perhaps triple hearsay. Neither Tolnay nor the Court identified any exception to the rule against hearsay that applied to the articles, let alone the statements/quotations within them. The articles were nevertheless admitted without Chief Wearing being given an opportunity to cross-examine the speakers. Moreover, the articles and hearsay statements in them were highly inflammatory and irrelevant to the issues in this trial, (e.g. an alderman's demanding of an apology from the police and the police union president's proclaiming that the "Mayor sold us out."). To the extent the articles and hearsay statements had any remote relevance, it was significantly outweighed by the prejudice to Chief Wearing. Fed. R. Evid. 403.

Plaintiff's Trial Exhibit 3, (Def.'s Post-Trial Ex. 4), was a page from a July 31, 2002 article in the New Haven Register. The story reports on the arrest of the two ministers. It states that "[t]he incident, nearly identical to one two years ago in West Haven that resulted in a federal lawsuit against the police officer, drew outcry from Fair Haven Alderman Raul Avila, D-16. A frequent critic of the City administration, Avila demanded police and City officials explain the incident and apologize." It also quotes Avila in detail regarding his demand for an apology from the highest officials. The article further purports to quote Chief Wearing stating that the matter should have been handled differently and that "'there's really a better way of dealing with these situations than making an arrest.'"

Plaintiff's Trial Exhibit 5, (Def.'s Post-Trial Ex. 6), was a headline from a New Haven Register article from August 6, 2002. The headline reads "1,000 protestors rally over ministers' arrests." Plaintiff's Trial Exhibit 6, (Def.'s Post-Trial Ex. 7), was a New Haven Register article from August 7, 2002. It contains extensive quotations by the president of the police union. The quotations and the headline in bold are highly inflammatory.[29]

Plaintiff's Trial Exhibit 7, (Def.'s Post-Trial Ex. 8), is one page of an undated New Haven Register article. The headline states "Mayor apologizes for arrests." It also contains an inflammatory picture of a purported attendee at the church service where the mayor apologized. The woman in the picture has her hands raised in the air in response to the mayor's apology.

During the argument on whether the articles should be allowed into evidence, the Court noted that it did not want the news article attributing statements to Chief Wearing coming into

---

[29]/    For example, the middle upper case bold headline reads "Cops: Mayor, chief 'sold us out'." A lower headline reads "police union livid over apologies for ministers' arrest." The text of the article also contains quotations by the union president and discussions of the purported sentiment of police officers. It describes some police officers as "seething over the mayor's apology" and "accusing the administration of selling out police for political expedience."

evidence. (12/1/05 Tr. at 131) In particular, the Court did not want the plaintiff to impeach the Chief with the articles. (Id. at 132) Tolnay's counsel represented to the Court that the articles would only be used for establishing the press attention to these issues. (Id. at 134, 136-37) By the end of the first day of testimony from Tolnay, Tolnay had accomplished the purported purpose for which the articles were going to be offered for without having to introduce any of them. (12/1/05 Tr. at 189-93, 232-33) Nevertheless, despite the purported need for the articles having been satisfied, Tolnay's counsel began the second day of testimony by using the articles for the purposes that the Court had prohibited and was concerned about during the Court's analysis of the issue on the previous day. In particular, Tolnay's counsel began questioning him about the content of the July 31, 2002 article, the hearsay statements by the alderman and his demanding of an apology from the police. (12/2/05 Tr. at 8-9)[30]

Again, despite Tolnay's counsel's representations about the purpose and scope of how the articles would be used, she continued to question Tolnay extensively on the content of the articles, not merely the fact that they existed and constituted publicity. (12/2/05 Tr. at 23) For example, she walked Tolnay through the content of the August 7, 2002 article and its discussion of the Mayor's apology. (12/2/05 Tr. at 23-25) She also questioned Tolnay regarding a paper's reporting on his suspension and the content of that article. (Id. at 39)[31]

Tolnay's counsel's misuse of the articles continued with her examination of Chief Wearing. In particular, she returned to the July 31, 2002 article and the alleged quotation of the alderman, who was demanding an apology from the police. (12/2/05 Tr. at 165-68) In fact,

---

[30]/    The Court allowed this testimony over Chief Wearing's counsel's continued objections. (12/2/05 Tr. at 8-9, 21)

[31]/    Later that same day, Chief Wearing's counsel again indicated his objection to the use of the articles and reconfirmed his outstanding objection and the fact that the articles were being admitted into evidence over that objection. (12/2/05 Tr. at 67)

despite the Court's ruling that Chief Wearing could not be impeached by the articles, that was exactly what the plaintiff's counsel did. (Id. at 168)[32] Tolnay's counsel used the articles again extensively in her examination of the Mayor. (12/6/05 Tr. at 179-87) In particular, she reviewed the contents of the articles extensively with the Mayor, with particular emphasis on his apology. (Id. at 179-87)[33] Finally, Tolnay's counsel emphasized the articles in her closing argument by quoting the headline that "The mayor sold us out." (12/8/05 Tr. at 41)

The Court committed harmful and prejudicial error by allowing the articles into evidence. The articles produced a verdict based on the jury's inappropriate passion and prejudice. Thus, a manifest injustice occurred and a new trial must be ordered.

## CONCLUSION

For the foregoing reasons, the Court should grant Chief Wearing's motion and order a new trial on all issues. In the alternative, the Court should order a significant remittitur.

---

[32]/    Despite the Court's earlier prohibition of that tactic, the Court permitted it, over objection. (Id. at 168)

[33]/    At one point, she was reading directly from the articles. (Id. at 183-84) With Exhibit 6, Tolnay's counsel introduced and emphasized, during the Mayor's testimony, the quotation by the police union president that the Mayor had sold out decent officers for the purposes of political pandering. (12/6/05 Tr. at 225, 238)

Respectfully submitted,

**DEFENDANT
MELVIN WEARING**


By: _____

Robert A. Rhodes, Esq.
CT Fed. Bar No. 13583
**HALLORAN & SAGE LLP**
315 Post Road West
Westport, CT 06880
Tel:     (203) 227-2855
Fax:     (203) 227-6992
E-Mail:  rhodes@halloran-sage.com

and

Ralph W. Johnson III, Esq.
CT Fed. Bar No. 15277
**HALLORAN & SAGE LLP**
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
Tel:     (860) 522-6103
Fax:     (860) 548-0006
E-Mail:  johnsonr@halloran-sage.com

His Attorneys

## CERTIFICATION

This is to certify that on this 30th day of June, 2006, a copy of the foregoing was caused to be mailed via U.S. Mail to:

Karen Lee Torre, Esq.
Law Offices of Karen Lee Torre
51 Elm Street, Suite 307
New Haven, CT 06510

Norman A. Pattis, Esq.
649 Amity Road
Bethany, CT 06524

Hugh F. Keefe, Esq.
Lynch, Traub, Keefe and Errante
52 Trumbull Street
P.O. Box 1612
New Haven, CT  06506-1612

Hubert J. Santos, Esq.
Sandra L. Snaden, Esq.
Santos & Seeley, P.C.
51 Russ Street
Hartford, CT  06106

_____
Ralph W. Johnson, III

844407_1 DOC

42