IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ARPAD TOLNAY | : | CIVIL ACTION NO. |
|     Plaintiff | : | 3:02-CV-1514 (EBB) |
| | : | |
| V. | : | |
| | : | |
| MELVIN WEARING | : | |
|     Defendant | : | JUNE 30, 2006 |

**DEFENDANT'S REPLY/SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER
SUPPORT OF HIS MOTION FOR JUDGMENT AS A MATTER OF LAW**

Robert A. Rhodes, Esq.
CT Fed. Bar No. 13583
**HALLORAN & SAGE LLP**
315 Post Road West
Westport, CT 06880
Tel:   (203) 227-2855
Fax:   (203) 227-6992
E-Mail:  Rhodes@halloran-sage.com

and

Ralph W. Johnson III, Esq.
CT Fed. Bar No. 15277
**HALLORAN & SAGE LLP**
One Goodwin Square
225 Asylum Street
Hartford, CT  06103
Tel:   (860) 522-6103
Fax:   (860) 548-0006
E-Mail:  Johnsonr@halloran-sage.com

*Counsel for the Defendant,
Melvin Wearing*

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

                                    **PAGE**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND .........................................................................................................................1

  I.  CHIEF WEARING'S TESTIMONY ..................................................................1

  II.  SCOTT NABEL'S TESTIMONY .......................................................................7

  III.  THE DISCIPLINARY DOCUMENTS REGARDING
     TOLNAY'S INSUBORDINATION ....................................................................9

  IV.  THE RULE 50 MOTION AT THE END OF THE
     PLAINTIFF'S CASE ..........................................................................................10

  V.  THE COURT'S RULING ON THE RULE 50 MOTION .................................12

ARGUMENT ..............................................................................................................................12

  I.  CHIEF WEARING'S MOTON IS PROPER UNDER
     RULE 50 .............................................................................................................12

    A.  The Standard Governing Rule 50(a) and Rule 50(b) ..............................12

    B.  The Issues In Chief Wearing's Rule 50(b) Motion
      Are Properly Before The Court .................................................................16

  II.  THE COURT SHOULD ENTER JUDGMENT IN
     FAVOR OF CHIEF WEARING .........................................................................20

    A.  Chief Wearing Is Entitled To The Entry Of A
      Judgment In His Favor Based On Garcetti v. Ceballos ..........................20

    B.  The Decisions Regarding Police Reports Demonstrate
      That The Plaintiff's Speech Was Not Protected Under
      The First Amendment .............................................................................20

    C.  Tolnay's Speech Fails The Content, Form And
      Context Analysis ......................................................................................24

|   | D. | The First Amendment Did Not Protect Tolnay's Speech Because It Was Merely Criticism Of A Supervisor And Related To An Employment Grievance Or "Employee Beef" | 28 |
|---|---|---|---|
|   | E. | Tolnay's Unexpressed Concerns Are Not Entitled To Protection Under The First Amendment | 31 |
| III. | | CHIEF WEARING IS ENTITLED TO A JUDGMENT UNDER THE <u>PICKERING</u> BALANCING ANALYSIS | 34 |
| IV. | | CHIEF WEARING IS ENTITLED TO QUALIFIED IMMUNITY | 35 |
|   | A. | Any First Amendment Right Was Not Clearly Established | 35 |
|   | B. | Chief Wearing Is Entitled To Qualified Immunity In Connection With The <u>Pickering</u> Balancing Analysis | 38 |
|   | C. | Chief Wearing's Conduct Was Objectively Reasonable | 40 |
| CONCLUSION | | | 40 |

## PRELIMINARY STATEMENT

The defendant, Melvin Wearing, the former Chief of Police for the City of New Haven, submits this reply/supplemental memorandum of law in further support of his motion for the entry of judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(b). For the reasons set forth below, in Chief Wearing's initial memorandum and in his memorandum regarding Garcetti v. Ceballos, 126 S.Ct. 1951 (2006), the Court should grant Chief Wearing's motion and enter judgment in his favor.[1]

## BACKGROUND

### I. CHIEF WEARING'S TESTIMONY

Chief Wearing believed that Tolnay should have called his supervisor sooner than he did on the evening of July 26, 2002 in connection with the incident at the church. (12/2/05 Tr. at 173, 177) In particular, he noted that Tolnay did not call his supervisor until after Reverend Hernandez was already in Tolnay's patrol car and the situation had deteriorated to a point where members of the church had come outside and Reverend Rodriguez had arrived at the scene. (Id. at 173-74)

Chief Wearing was concerned about the safety of the officers at the scene on July 26. (Id. at 176-77) In particular, Chief Wearing noted that Tolnay knew that he was in a hostile environment and the situation called for sensitivity and consultation with a supervisor. (Id. at 177) Chief Wearing believed that when Tolnay first arrived on the scene, he could have reached

---

[1]/ To the extent that Chief Wearing does not respond to any of the arguments contained in Tolnay's opposition, he relies on his initial memorandum of law. Tolnay's discussion of the purported facts in this case is largely based on his characterization of the facts and contains only a few citations to the trial transcript. Accordingly, Chief Wearing does not engage in a point-by-point response to those characterizations. Rather, he relies on his discussion of the facts as supported by the trial transcripts and exhibits.

out to his supervisor. (12/2/05 Tr. at 187-89) It was only a matter of luck that Tolnay's conduct did not cause a riot or result in an officer being hurt. (Id. at 189)[2]

Chief Wearing confirmed that Tolnay was "ordered" to a meeting in his office on August 13, 2002. (12/5/05 Tr. at 45-46; Def.'s Post-Trial Ex. 36)[3] "The first meeting ... was an informational meeting to discuss the incident that happened at the church." (12/5/05 Tr. at 49-50) Chief Wearing did not enter that meeting intending to discipline Tolnay. (Id. Tr. at 50) Rather, Chief Wearing talked with Tolnay about how he could have better handled the situation. (Id. at 53) During the meeting, Chief Wearing did not get annoyed and contrary to Tolnay's counsel's accusations, Chief Wearing did not attempt to get Tolnay to make an admission, at which point he would have disciplined Tolnay. (Id.)

Chief Wearing never lost his temper. (Id. at 54) His tone was calm. (12/5/05 Tr. at 70; Def.'s Post-Trial Ex. 34) It was not confrontational or accusatory in nature. (Id.) Chief Wearing denied jumping out of his chair and pointing his finger in Tolnay's face. (12/5/05 Tr. at 54-55) Chief Wearing also denied yelling at Tolnay and calling him a smart mouth. (Id. at 55) He further denied accusing Tolnay of being responsible for the July 26 incident at the church. (Id. at 55-56) To the contrary, Chief Wearing testified that it was Tolnay who became upset and disrespectful during the first meeting. (Id. at 56) Tolnay became highly critical and disrespectful of Captain Ortiz. (Id. at 74) In addition to defending his position, Tolnay "refused to answer the questions that [Chief Wearing] posed to him." (Id. at 68)

---

[2]    In Chief Wearing's opinion, Tolnay did not properly handle the situation at the church. (12/2/05 Tr. at 189, 193)

[3]    Chief Wearing never instructed Tolnay not to speak with the media concerning any of the events at issue. (12/6/05 Tr. at 41) Nor did Tolnay ever come to the Chief and request permission to speak with the media concerning the events at issue. (Id. at 41-42)

2

During the first meeting, Chief Wearing wanted to discuss the issues related to the July 26 incident at the church and the motor vehicle stop to see how the situation could be handled better in the future. (12/5/05 Tr. at 56, 73) Moreover, based upon Chief Wearing's review of Tolnay's case incident report for the July 26 incident, other than noting that some of the church-goers were screaming, there was no indication that any of the people in the crowd acted violently, physically assaulted or threatened either Tolnay or Officer Abate. (12/6/05 Tr. at 18) Chief Wearing's "whole intention was just to critique the incident so [they could] revisit strategies [on] how [to] deal with these kind of situations. [He] had no intention of suspending anyone for anything." (12/5/05 Tr. at 56) Thus, the purpose of the meeting with Tolnay was to determine if and how negative consequences could be avoided in the future. (Id. at 73) In particular, Chief Wearing was concerned with heading off riots and other disturbances. (Id.) Chief Wearing also wanted to find out what had happened. (Id. at 63)

There came a point in the first meeting when Tolnay was no longer cooperating or participating in the meeting. (12/6/05 Tr. at 32) Specifically, this point came when Tolnay jumped up from his seat and walked out. (Id.)[4] Tolnay did this despite Chief Wearing telling him to sit down. (Id.) Despite those orders, Tolnay said everything is over and "I'm outta here. You will hear from my lawyer." (Id. at 32) After making that statement, Tolnay walked out of Chief Wearing's office. (Id. at 32-33) He walked out of the office despite being ordered to not do so by Chief Wearing. (Id.) Chief Wearing did not believe that Tolnay's action and statements were protected by the First Amendment. (Id. at 33)

---

[4]   During the first meeting with Tolnay on August 13, 2002, Chief Wearing remained on his side of the desk. (12/6/05 Tr. at 36) At the point during the meeting when Tolnay stood up, Chief Wearing was still sitting down behind his desk. (Id. at 37) He stood up "[w]ay after" Tolnay had stood up and walked out of the office. (Id. at 38) Chief Wearing never leaned over his desk and never pointed his finger in Tolnay's face. (Id.)

3

With regard to Tolnay's case incident report for the August 3, 2002 motor vehicle stop, (Def.'s Post-Trial Ex. 5), and more particularly, Tolnay's statements at the bottom of the report regarding his feelings about his ability to act, Chief Wearing had no problem with the statement but only noted that Tolnay "could have left it out of his report." (12/6/05 Tr. at 24) It would have been better for him to put that in a separate memo. (Id.) Chief Wearing also thought that Tolnay's comments in the case incident report regarding his feelings about his inability to act were irrelevant and should not have been in the report. (Id. at 72)[5]

As part of an investigation into a citizen's complaint, it is standard practice in the New Haven Police Department to have a meeting with the officers who are involved in the matter. (12/6/05 Tr. at 27) That is the procedure that was followed in response to Rodriguez's citizen's complaint. (Id.) Chief Wearing met with Officer Bermudez, Sergeant Hoffman and Officer Colon. (Id.) Those meetings were a standard practice in the investigation of a citizen's complaint. (Id. at 104) Tolnay was met with last because he had been on vacation. (Id. at 28) Based upon Rodriguez's filing of a citizens' complaint and the memoranda collected from the officers at issue, it appeared to Chief Wearing that there was a disputed issue. (Id. at 103-04) It was within the Chief's discretion to get involved at an early point in time in the investigation of a citizen's complaint. (Id. at 105)

In a memorandum dated August 14, 2002, Chief Wearing ordered Tolnay to appear at his office for a second meeting in order to continue the discussion of the motor vehicle stop and to

---

[5]/ Chief Wearing was reviewing Tolnay's case incident report regarding the motor vehicle stop "[b]ecause a complaint was filed regarding [it]." (12/6/05 Tr. at 25) He explained that everyone has a right to file a citizen's complaint regarding a police officer. (Id.) This is true regardless of whether or not that person has a criminal record. (Id.) All complaints are investigated. (Id.) The citizens' complaint received by Captain Ortiz from Reverend Rodriguez accused Tolnay and other officers of being rude and insensitive and exhibiting a poor attitude. (12/5/05 Tr. at 37) It also accused Tolnay of targeting Rodriguez. (Id.) Rodriguez wanted the police department to address Tolnay's rude and disrespectful attitude towards him. (Id.)

4

discuss Tolnay's conduct at the first meeting. (12/5/05 Tr. at 75-76; Def.'s Post-Trial Ex. 14 (Pl.'s Trial Ex. 17)) At the beginning of the second meeting, Tolnay was contrite and apologized for his actions. (12/5/05 Tr. at 76-77) Chief Wearing denied that at the outset of the second meeting, he immediately told Tolnay that he was suspended. (Id.) In fact, during the second meeting, Tolnay apologized to Chief Wearing. (12/6/05 Tr. at 38)

Chief Wearing reassigned Tolnay to the detention unit in order to provide him with a cooling-off period. (12/5/05 Tr. at 88, 90) As part of Tolnay's discipline, Chief Wearing "sent a message that [Tolnay] disrespected the police chief and [Chief Wearing] wanted that message to go out in a strong way." (Id. at 91)[6] Chief Wearing denied that the discipline issued to Tolnay was done to stop officers from talking of politics. (Id. at 94) Rather, the discipline "sent a message because [Tolnay] disrespected [Chief Wearing] in [his] office." (Id.) That had "never happened before, and it was the first time, so the message was strong." (Id.) Chief Wearing considered Tolnay's comments to be disrespectful to Captain Ortiz because it was expected that officers would "respect the ranks." (Id. at 75)[7] Chief Wearing believed that Tolnay's statement that the meeting was solely political was also disrespectful. (Id. at 87)

Chief Wearing testified that he disciplined Tolnay:

> Because he jumped up from his seat, stating that this meeting is over. I don't have to hear this. It's all political and he walked out of the office.

---

[6] Chief Wearing did not consider Tolnay's assignment to sensitivity training to be demeaning. (12/5/05 Tr. at 92) All police officers go through sensitivity training, that is training on how to deal with issues such as those that were encountered in the incidents at issue. (Id. at 91-92) The training teaches officers how to deal with minorities in the community. (Id. at 92) Every police officer needs the training. (Id.) It does not matter what ethnic group an officer belongs to; each officer still needs to go through the training as part of the training of being a police officer. (Id.)

[7] If an officer wants to file a complaint against his supervisor, he can do that. (12/5/05 Tr. at 75) A memorandum can be submitted to the Chief's office. (Id.) However, Chief Wearing believed in maintaining respect in the ranks for supervisors. (Id.)

5

(12/6/05 Tr. at 29) This bothered Chief Wearing because Tolnay was being insubordinate. (Id. at 29-30) "[This had] never happened before in [Chief Wearing's] six years as a police chief and another five as assistant chief of police. [Tolnay] was just a vicious cycle upon getting up and making that statement and walking out of [Chief Wearing's] office." (Id. at 29-30) This level of insubordination had never occurred during all of Chief Wearing's time as chief of police and assistant chief of police. (Id. at 30) Chief Wearing "felt terrible" about Tolnay's conduct. (Id.) Tolnay's conduct "was uncalled for." (Id.) Tolnay "had a representative there [and there were] other people in the office. Officer Abate was also there. [Tolnay] was disrespectful [and] insubordinate. He felt like he could do that to the police chief, ...." (12/6/05 Tr. at 30)

Chief Wearing had significant fears about what the impact of Tolnay's conduct would be on the New Haven Police Department. (12/6/05 Tr. at 30) He thought it would set a bad example for other officers. (Id. at 81) Specifically, Chief Wearing described those fears as follows:

> The Chief in the department sets the tone and he sets the respect and integrity and discipline in the department. And if I allowed this to go without severe consequences, I feel I would have lost control of the department and any officer could do the same thing; walk out and have no respect for the chief officer. I could not allow that to happen in the department.

(Id. at 30-31)

In terms of severity, Chief Wearing felt that Tolnay's misconduct was different than other instances of insubordination that the Chief had encountered in the past. (Id. at 31) This level of insubordination had never occurred during Chief Wearing's tenure as police chief as he could not recall it ever happening to any police chief during his ten years as a member of the New Haven Police Department. (Id. at 31) Chief Wearing felt that insubordination to the Chief was more

6

severe and serious than insubordination to an immediate supervisor. (Id.) He had this feeling because:

> Because the Chief is the Chief. He's responsible for all of his officers. And if a patrol officer can act that way, act out his frustration to the Chief and walk out of a meeting, then everybody else would feel they could do the same thing.

(Id. at 31) At no time during the first meeting did Chief Wearing ever tell the plaintiff that the meeting was over or that he was free to leave. (Id. at 32)

## II.    SCOTT NABEL'S TESTIMONY

Scott Nabel was the human resource manager for the New Haven Police Department. (12/7/05 Tr. at 171) He was present during the meeting between Chief Wearing and Tolnay on August 3, 2002. (Id. at 172) Abate and Bombalicki were also present. (Id.) Nabel described the meeting as follows:

> There had been an incident earlier in the summer or it may have been a couple of weeks ahead of time following a noise complaint, where some members of the church were arrested and had quite a bit of light and controversy in the city. And the chief, basically, wanted to meet with the officers involved to get some input as to what had happened and try to make a resolution as to how in the future.
> ...
>
> The chief began asking questions. I believe, he initially directed to Officer Tolnay. And Officer Tolnay began to answer the questions in a manner that wasn't really on point with what the chief had asked.
> ...
>
> The chief really reminded the officer that it was the chief who was asking the questions, that is, he wanted to have some background information as to what went on and he was conducting the interview and asking the questions. And that proceeded for a while longer.

(12/7/05 Tr. at 172-73) Nabel further described the meeting as follows:

7

> It started out on the wrong foot when the chief asked the question and Officer Tolnay wanted to start the story – and I don't recall unfortunately whether it was from an earlier point or from a later point. But he wanted to start the story where Officer Tolnay wanted to start the story. And the chief very succinctly said, I'm the person asking the questions. I want to find out the information. So that's what the initial source of frustration.

(Id. at 184-85)[8]

With regard to Chief Wearing's tone during the meeting, Nabel stated that the Chief "initially came across as very stern, when Officer Tolnay did not answer the questions that the chief had asked." (12/7/05 Tr. at 173) However, "from that point on, for the most part, until it deteriorated, I would say the chief was rather more quiet and reserved." (Id. at 173-74)

When asked to describe how the meeting ended Nabel testified as follows:

> At a certain point, Officer Tolnay jumped up and said he wasn't answering any questions and he demanded to have an attorney. His union representative, Leo Bombalicki, was advising him to calm down and sit down. And when it was obvious, after a period of minutes that that was not going to take place, the meeting was adjourned.

(Id. at 174)

When asked by Tolnay's counsel whether both Chief Wearing and Tolnay were polite up until the point things deteriorated, Nabel testified that "I would not say Arpad Tolnay was polite." (Id. at 180) Nabel also would not agree that Chief Wearing cut off Tolnay before Tolnay could give an answer to a question. (Id. at 182) Contrary to Tolnay's testimony, Nabel does not remember Chief Wearing asking his secretary to retrieve a copy of Tolnay's case

---

[8]/ Nabel further indicated that Chief Wearing was not looking to impose any discipline at the meeting with Tolnay. (12/7/05 Tr. at 186) Rather, the Chief "really just wanted to use this as an opportunity, from a learning experience to kind of quarterback the next day and figure out what was done right and what was done wrong, how could we do things better in the future." (Id. at 186)

8

incident report. (Id. at 182) Nabel also doubted that Chief Wearing started the meeting without having the report and without reading it. (Id. at 183)[9]

### III. THE DISCIPLINAY DOCUMENTS REGARDING TOLNAY'S INSUBORDINATION

By personnel memorandum 02-19, dated August 16, 2002, Chief Wearing issued his suspension of Tolnay for ten days. (Def.'s Post-Trial Ex. 33 (Def.'s Trial Ex. A))[10] Specifically, Chief Wearing determined that Tolnay had violated the following departmental rules:

> Rule 15, item 4: 'On or off duty, in uniform or out of uniform, employees of the Department shall extend the proper courtesy and respect to all superior officers of the Department.'
>
> Rule 15, item 39: 'No employee of the Department shall commit any act contrary to good order or constituting neglect of duty.'
>
> Rule 15, item 42: 'No employee of the Department shall engage in any act which would constitute conduct unbecoming of an officer.'
>
> Rule 15, item 45: 'No employee of the Department shall commit any act of insubordination or disrespect toward a superior officer.'

Chief Wearing's memorandum further reflected on the discipline and Tolnay's "outrageous" conduct during the August 3 meeting:

> When Officer Tolnay began to 'trash talk, the Captain of Patrol and I attempted to steer him toward the issue of his actions, he

---

[9] Contrary to Tolnay's testimony, Nabel did not believe that Chief Wearing became frustrated when Tolnay was explaining to the Chief that he was not involved in the first call on July 26, 2002, the seven o'clock call to the church. (12/7/05 Tr. at 184) Nabel expressly denied Tolnay's attorney's claim that throughout the meeting Chief Wearing tried again and again to bait Tolnay into admitting that he had used bad judgment or could have handled the incident better. (12/7/05 Tr. at 187-88; see id. at 188 ("Absolutely not.")) Moreover, Nabel testified that he certainly did not recall Chief Wearing getting off of his feet during the meeting. (Id. at 188) Nabel expressly denied Tolnay's attorney's claim that Chief Wearing thrust his finger in Tolnay's face. (12/7/05 Tr. at 188-89; see id. at 189 ("Absolutely not."))

[10] In connection with the personnel memorandum, Chief Wearing also prepared a summary of the incident document. (Def.'s Post-Trial Ex. 34 (Def.'s Trial Ex. B)) That summary further described Tolnay's direct insubordination and disrespectful comment regarding Captain Ortiz.

9

> reacted by disrespectfully expressing his position that this meeting was solely political. In fact, to that point, I had reached no conclusions. Captain Ortiz was concerned that the motor vehicle stop *might* have had a retaliatory motive, and he referred the matter to me to gather information by speaking to the officer. For Officer Tolnay to leap from his seat, refuse to answer questions, and state that we'd hear from his lawyer was discourteous, contrary to good order and discipline, unbecoming of an officer, and insubordinate....

In describing the severity of the punishment imposed, Chief Wearing noted that he had previously issued a 5-day suspension where a union representative behaved in a condescending, contentious manner towards investigators from Internal Values & Ethics unit. However, Chief Wearing found "this situation to be even more serious, as it occurred to the Chief of Police." Chief Wearing concluded by noting that "given Officer Tolnay's contrition, which appears sincere, I have decided that a ten-day suspension is sufficient. Officer Tolnay committed extremely serious infractions; moreover, the fact that he would lose his composure before the Chief of Police in an office setting with union representation makes me question how he responds to challenges he faces with the general public."

## IV.   THE RULE 50 MOTION AT THE END OF THE PLAINTIFF'S CASE

Chief Wearing's Rule 50(a) motion, the related colloquy and ruling take up eight pages of transcript. (12/7/05 Tr. at 140-47) First, Chief Wearing argued that he was entitled to judgment as a matter of law because Tolnay "did not engage in any protected speech [and] did not speak out on any matters of public concern." (12/7/05 Tr. at 140) Moreover, the evidence indicated that Tolnay's speech focused "on matters which were of personal interest to him." (Id. at 141)

Second, Chief Wearing argued that the evidence demonstrated that Tolnay was suspended because of his insubordinate conduct, and not because of any alleged protected

10

speech. (12/7/05 Tr. at 141) Third, he argued that the evidence demonstrated that the defendant's interest in maintaining the discipline in the police department outweighed Tolnay's First Amendment rights. (Id.) Fourth, Chief Wearing argued that the evidence demonstrated that Chief Wearing would have suspended Tolnay even in the absence of any alleged protected speech. (Id.) Fifth, he argued he was entitled to qualified immunity. (Id.) Finally, Chief Wearing argued that the evidence would not support the jury's finding in favor of Tolnay on his claims. (Id. at 142).

In opposition to the motion, Tolnay maintained that Chief Wearing's motion was without merit. (12/7/05 Tr. at 142-43) More specifically, he contended that Chief Wearing's Rule 50(a) motion should be denied "for the reasons set forth in the Court's Ruling denying the defendant's summary judgment [motion]." (Id. at 143) In particular, Tolnay argued that in the summary judgment ruling, the Court had "quite comprehensively addressed the issue of immunity with proper citation and application of the laws. And for these same reasons, ... the [Rule 50(a)] motion is entirely without merit." (Id.)[11]

In response to Tolnay's argument, Chief Wearing argued that "based on the law which has been submitted in our jury charges, as well as the law which was submitted in our prior motion for summary judgment, ... these statements are statements which concern only the plaintiff, and are not statements of concern to the public, and therefore, not entitled to First Amendment protection." (Id. at 144-45) Chief Wearing further argued that it was reasonable to believe that he could suspend Tolnay based on Tolnay's conduct without violating the First Amendment. (Id. at 146)

---

[11]/ Tolnay's opposition to the summary judgment motion argued that the law establishing that Chief Wearing had violated his First Amendment rights had been clearly established since 1981. (Elec. Docket Entry No. 25, Pl.'s 11/24/03 Mem. of Law at 39)

11

V. THE COURT'S RULING ON THE RULE 50 MOTION

In response to Chief Wearing's Rule 50(a) motion, the Court ruled as follows:

> With respect to whether or not the defendant or the plaintiff rather, engaged in protected speech, allegations that could have been considered politically motivated actions of the department rather than the appropriate police conduct, would certainly be protected speech. I think we addressed that issue in the summary judgment motion.
>
> The other four items you brought to our attention seems to me are all jury issues, that is, a question of facts the jury must find, whether in fact Mr. Tolnay was suspended because of his own conduct or because of his speech.
>
> The jury must also find whether or not the interest of the chief in protecting his department outweighs the protected speech.
>
> The jury must also find whether he would have been suspended anyway. And the jury must also determine whether the defendant qualifies from any factual issues that are there. And therefore, I'm denying the motion.

(12/7/05 Tr. at 146-47)

## ARGUMENT

I. CHIEF WEARING'S MOTION IS PROPER UNDER RULE 50

Tolnay's claim that the Court cannot consider Chief Wearing's Rule 50(b) motion is without merit. (Pl.'s Mem. at 16-21) A review of the case law governing Rule 50, and in particular, Second Circuit case law, confirms that the arguments in Chief Wearing's Rule 50(b) motion are properly before the Court.

A. The Standard Governing Rule 50(a) and Rule 50(b)

Under Rule 50(a), a party may move for judgment as a matter of law ("JMOL") during trial at any time prior to the submission of the case to the jury. After an unfavorable verdict, Rule 50(b) allows the party to renew its motion. The post-trial motion is to be based to those

12

grounds that were raised in the prior motion for JMOL. Galdieri-Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276, 286 (2d Cir. 1998). Rule 50(a) does not define how specific the motion must be. Id. The purpose of requiring the moving party to articulate the grounds for the Rule 50(a) motion "is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury." Id.

The grounds to be considered on a post-trial motion for judgment as a matter of law under Rule 50(b) "are considered to be sufficiently raised if district court and the nonmoving party are apprised of the basis for the motion." Okruhlik v. University of Arkansas, 395 F.3d 872, 878 n.5 (8th Cir. 2005). "Technical precision in stating the grounds for the motion is not necessary." Id. See id. (district court was "aware" of defendants' arguments in pre-verdict motion); Walsh v. National Computer Sys., Inc., 332 F.3d 1150, 1158 (8th Cir. 2003); Lynch v. City of Boston, 180 F.3d 1, 13 n.9 (1st Cir. 1999)(technical precision not required). Because Rule 50(a) does not itself define "specific grounds," courts must determine in each case whether the purposes the rule embodies have been served. Anderson v. United Telephone Co., 933 F.2d 1500, 1504 (10th Cir. 1991). See id. (a "significant number of cases interpreting Rule 50's specificity requirement have accepted less specificity in directed verdict motions.").

"Because the requirement that a Rule 50(a) motion must proceed a Rule 50(b) motion is 'harsh in any circumstance,' a Rule 50(a) motion should not be reviewed narrowly but rather in light of the purpose of the rules to secure a just, speedy, and inexpensive determination of the case." Kusens v. Pascal Co., Inc., 448 F.3d 349, 361 (6th Cir. 2006). Thus, "where Rule 50(a)'s purpose - i.e., providing notice to the court and opposing counsel of any deficiencies in the opposing party's case prior to sending it to the jury - has been met, courts usually take a liberal view of what constitutes a pre-verdict motion sufficient to support a post-verdict motion." Id.

13

See Rankin v. Evans, 133 F.3d 1425, 1432-33 (11th Cir. 1998)(collecting cases). Technical non-compliance with the rule can be excused when the purposes of the rule have been satisfied. Kusens, 448 F.3d at 361.[12] Accordingly, the fact that a party's argument is more "precise" in the post-verdict motion does not preclude a district court's consideration of a Rule 50(b) motion. Id. at 363.

The Second Circuit has recognized that when analyzing a challenge based on the specificity requirement, a court must examine the Rule 50(a) motion "in the context of the ensuing colloquy between counsel and the trial court, and if that colloquy fleshes out the motion, it may provide the opposing party with the requisite notice." Galdieri-Ambrosini, 136 F.3d at 287. For example, Galdieri-Ambrosini recognized that the defendant's attorney's reference to earlier arguments was sufficient. Id. It also recognized that where the plaintiff had fully set forth her evidence at trial, there is no prejudice to the plaintiff as a result of a defendant's failure to specify a theory as a basis for its Rule 50(a) motion. Id. at 288. See Baker v. Dorfman, 239 F.3d 415, 420 (2d Cir. 2000)(legal issues can be reviewed).

In Wimmer v. Suffolk County Police Dep't, 176 F.3d 125 (2d Cir. 1999), the court analyzed the sufficiency of the defendant's Rule 50(a) motion by reviewing it within the context of the entire colloquy that occurred between the defendant's attorney, the plaintiff's attorney and the district court at the time of the motion. Id. at 136. Based on a review of that colloquy, the court found it to be apparent that the plaintiff's counsel was aware of the defendant's arguments.

---

[12]/  See Rankin, 133 F.3d at 1433 ("[W]here the trial court and all parties actually are aware of the grounds upon which the motion is made, strict enforcement of the specificity requirement of Rule 50(a)(2) is unnecessary to serve the purpose of the rule."); Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 691 (3d Cir. 1993)(motions were sufficient to support a post-verdict motion where the court and opposing counsel had actual notice of the basis of the motion even though it was only "implicitly" raised by defendants' motions); id. (issue raised a "bit obliquely" sufficient).

14

Id. Moreover, the Second Circuit recognized that the defendant had moved for summary judgment on the same ground asserted in the Rule 50(b) motion and that those pleadings provided notice to the plaintiff, thereby satisfying the specificity requirements under Rule 50. Id.[13] Similarly, in Gordon v. County of Rockland, 110 F.3d 886, 887 n.2 (2d Cir. 1997), the court held that when an issue is raised in a summary judgment motion and is a central issue at trial, the court and the plaintiff are aware of that issue. Thus, Rule 50's specificity requirement is satisfied under those circumstances. See id. See Laborers' Pension Fund v. A&C Environmental, Inc., 301 F.3d 768, 777-78 (7th Cir. 2002); Rankin, 133 F.3d at 1433 (court and plaintiff aware of argument because issue was central question in case).

Moreover, in Doctor's Associates, Inc. v. Weible, 92 F.3d 108, 113-14 (2d Cir. 1996), the court recognized that it will not "woodenly apply" the specificity requirement of Rule 50 merely to obtain "an unwarranted triumph of form over substance." Thus, even where a party's motion is not sufficiently specific, a court's hands are not tied. Id. Consequently, relief from the specificity requirement under Rule 50 "is available where necessary to avoid 'manifest injustice.'" Id. See Galdieri-Ambrosini, 136 F.3d at 287. In Doctor's Associates, the Second Circuit recognized that a manifest injustice would result were it not to reach the question of whether the defendant had proved his abusive process counterclaim. 92 F.3d at 113-14. It

---

[13]/ In Rakovich v. Wade, 850 F.2d 1180, 1204 (7th Cir. 1987)(en banc), the court rejected a plaintiff's argument that the defendants had not sufficiently asserted their qualified immunity argument in their Rule 50(a) motion. In particular, it recognized that in the district court the officers had "argued for the protection of qualified immunity." Id. Thus, the "parameters of the argument were clearly set: does a police officer in this situation enjoy a qualified immunity?" Id. Consequently, the Seventh Circuit held that the "question required a legal determination by the district court." Id. Subsequently, it applied a full qualified immunity analysis, including analysis of the issue of whether or not the plaintiff's constitutional rights were clearly established. Id. at 1205-1214. See Rockport Pharm., Inc. v. Digital Simplistics, Inc., 53 F.3d 195, 198 (8th Cir. 1995)(issue adequately presented when it is "inextricably intertwined" with issue presented).

15

concluded that under Connecticut law "as properly stated," the defendant did not and could not present evidence to sustain a verdict against the plaintiffs on the counterclaim. Id. at 114. Accordingly, the court remanded the case with instructions that judgment be entered in favor of the plaintiffs on the defendant's counterclaim. Id. at 117.

Furthermore, a deficiency in a Rule 50(a) motion does not immunize a verdict from post-trial review. In Russo v. State of New York, 672 F.2d 1014, 1022 (2d Cir. 1982), modified on other grounds, 721 F.2d 410 (2d Cir. 1983), the court held that a defendant's failure to raise an issue in a Rule 50(a) motion does not preclude post-judgment relief. In particular, it noted that to "'rule that an unintended flaw in procedure bars a deserving litigant from any relief is an unwarranted triumph of form over substance.'" Id. "'Where a jury's verdict is wholly without legal support, we will order a new trial in order to prevent a manifest injustice,' despite an appellant's failure to move for a directed verdict." Id. Thus, because the plaintiff in Russo had failed to prove one of the four essential elements of a malicious prosecution case, the Second Circuit remanded the case for a new trial. Id. See Sojak v. Hudson Waterways Corp., 590 F.2d 53, 54-55 (2d Cir. 1978)("[w]here a jury's verdict is wholly without legal support, we will order a new trial in order to prevent a manifest injustice."); Dixon v. Stamford Taxi, Inc., 115 F.R.D. 312, 314 (D. Conn. 1987)(recognizing that a new trial may be granted even in the absence of a request for a directed verdict at trial).

**B.  The Issues In Chief Wearing's Rule 50(b) Motion Are Properly Before The Court**

In the instant case, the Rule 50(a) motion supports the arguments raised in the Rule 50(b) motion. In addition to the arguments made expressly at the time of the Rule 50(a) motion, regarding the fact that the speech was not protected by the First Amendment, the fact that the Pickering balancing analysis weighed in favor of Chief Wearing and that Chief Wearing was

entitled to qualified immunity, the colloquy with the Court and the argument by Tolnay's counsel demonstrate that the Court and Tolnay were aware of the arguments raised in the Rule 50(b) motion, which are and have always been the central issues in the case.[14] Moreover, a review of the Court's ruling on the Rule 50(a) motion and the summary judgment ruling entered on March 9, 2005 and the pleadings submitted in connection with the motion and the parties' proposed jury instructions, confirms that the issues raised in the Rule 50(b) were known to both the Court and the plaintiff. (Elec. Docket Entries Nos. 12-14, 22, 24-26, 51, 62) In fact, Tolnay concedes this at page 21 of his opposition when he argues that the Rule 50(b) motion is "nothing but an expanded version of claims and arguments recycled from defendant's earlier unsuccessful motion for summary judgment. The court has already considered, analyzed and rejected all of the arguments defendant now advances post-trial."

In particular, at pages 20-29 of the March 9 ruling, the Court quoted Rankin v. McPherson, 483 U.S. 378, 384 (1987), and recognized that the determination of whether a public employer has violated the First Amendment required "a balance between the interests of the [employee], *as a citizen*, in commenting upon matters of public concern and the interest of the State, *as an employer*, in promoting the efficiency of the public services it performs through its employees." (3/9/05 Ruling, at 28-29)(emphasis added) The ruling also cited to United States v. National Treasury Employees Union, 513 U.S. 454 (1995), Connick v. Myers, 461 U.S. 138, 150 (1983) and Pickering v. Board of Educ., 391 U.S. 563 (1968). (3/9/05 Ruling at 27-30).

In summarizing Chief Wearing's arguments, and in particular, the issue of public concern, the Court stated that he was arguing that Tolnay's speech was not protected by the First

---

[14]/ Chief Wearing's argument that the evidence could not support any jury finding in favor of Tolnay supports his post-trial challenge to the evidentiary bases for the non-economic and punitive damages awards. Accord Kusens, 448 F.3d at 361-63.

17