IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ARPAD TOLNAY | : | CIVIL ACTION NO. |
|     Plaintiff | : | 3:02-CV-1514 (EBB) |
| | : | |
| V. | : | |
| | : | |
| MELVIN WEARING | : | |
|     Defendant | : | AUGUST 15, 2006 |

## <u>DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR RELIEF FROM JUDGMENT</u>

Robert A. Rhodes, Esq.
CT Fed. Bar No. 13583
**HALLORAN & SAGE LLP**
315 Post Road West
Westport, CT 06880
Tel:    (203) 227-2855
Fax:    (203) 227-6992
E-Mail:  rhodes@halloran-sage.com

and

Ralph W. Johnson III, Esq.
CT Fed. Bar No. 15277
**HALLORAN & SAGE LLP**
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
Tel:    (860) 522-6103
Fax:    (860) 548-0006
E-Mail:  johnsonr@halloran-sage.com

*Counsel for the Defendant,*
*Melvin Wearing*

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ............................................................................................ 3

    I.     THE SUPREME COURT'S DECISION IN
          GARCETTI V. CEBALLOS ............................................................... 3

    II.    THE APPLICATION OF GARCETTI BY OTHER
          COURTS ..................................................................................... 4

STANDARD OF REVIEW ............................................................................ 12

    I.     RULE 60(b)(1) ........................................................................... 12

    II.    RULE 60(b)(5) ........................................................................... 14

    III.   RULE 60(b)(6) ........................................................................... 14

ARGUMENT .............................................................................................. 16

    I.     THE COURT SHOULD GRANT CHIEF WEARING'S
          MOTION UNDER RULE 60(b)(1) ............................................... 16

          A.    The Court Should Reconsider Its Denial Of
                Chief Wearing's Motion For Summary Judgment
                In Light Of Garcetti ..................................................... 16

                1.    The Plaintiff's Speech Was Not Protected
                        By The First Amendment ........................... 16

                2.    Chief Wearing Is Entitled To Qualified
                        Immunity ................................................... 22

                3.    The Plaintiff's Claim Fails Under The
                        Pickering-Balancing Analysis ..................... 24

                4.    Chief Wearing Is Entitled To Qualified
                        Immunity In Connection With The Pickering
                        Balancing Analysis ..................................... 26

i

B.    The Court Should Reconsider Its Denial Of
      Chief Wearing's Rule 50(a) Motion In Light Of
      Garcetti.............................................................................. 27

C.    The Court Should Relieve Chief Wearing From
      The Judgment In Light Of Garcetti........................................ 28

II.   THE COURT SHOULD GRANT CHIEF WEARING'S
      MOTION UNDER RULE 60(b)(6) ........................................... 28

III.  THE COURT SHOULD GRANT CHIEF WEARING'S
      MOTION UNDER RULE 60(b)(5) ........................................... 32

CONCLUSION................................................................................ 33

## PRELIMINARY STATEMENT

The defendant, Melvin Wearing, the former Chief of Police for the City of New Haven, submits this memorandum of law in support of his motion for relief from judgment pursuant to Rules 60(b)(1), 60(b)(5) and 60(b)(6) of the Federal Rules of Civil Procedure. In further support of his motion, Chief Wearing incorporates by reference the memoranda and reply/supplemental memoranda of law he submitted in support of his motion for judgment as a matter of law under Rule 50(b), his motion for a new trial under Rule 59 and his motion for a remittitur, in the alternative and the exhibits submitted in connection with those memoranda. Chief Wearing also incorporates by reference his memorandum of law regarding Garcetti v. Ceballos, 126 S.Ct. 1951 (2006). For the reasons set forth below and in his other memoranda of law, the Court should grant Chief Wearing's motion.

It is a fundamental "principle that a court is to apply the law in effect at the time it renders its decision, ...." Bradley v. School Bd. of City of Richmond, 416 U.S. 696, 711 (1974). See Lambert v. Blodgett, 393 F.3d 943, 973 n.21 (9th Cir. 2004)(It "is well-established that a court generally applies the law in effect at the time of its decision, and that if the law changes while the case is on appeal, the appellate court applies the new rule."), cert. denied, 126 S.Ct. 484 (2005); Parker v. Time Warner Ent. Co., L.P., 331 F.3d 13, 20 (2d Cir. 2003)("an appellate court is, of course, bound to apply the law as it exists at the time of the appeal."); RLI Ins. Co. v. Hartford Accident and Indemnity Co., 980 F.2d 120, 123 (2d Cir. 1992)("we apply the law as it exists at the time of our ruling.").

Consequently, in the instant case, the Court must apply Garcetti to all of the pending post-trial motions. By his June 30, 2006 memorandum addressing the impact of Garcetti and the oral argument on July 21, 2006, Chief Wearing demonstrated that the Court should grant his

1

Rule 50(b) motion under <u>Garcetti</u>.[1]  Moreover, Chief Wearing demonstrated that the Court should also grant his motion for a new trial under <u>Garcetti</u> because the Court cannot hold as a matter of law that Tolnay's speech did not arise out of or owe its existence to Tolnay's job duties.

In the alternative, if the Court does not grant Chief Wearing's motions under Rule 50(b) and Rule 59, it should grant his motion for relief from judgment under Rules 60(b)(1), 60(b)(5) and 60(b)(6).  In particular, in light of <u>Garcetti</u>, under Rule 60(b)(1), the Court should: (a) correct its error in denying Chief Wearing's motion for summary judgment, (b) correct its error in denying Chief Wearing's Rule 50(a) motion at the end of the plaintiff's case and (c) grant both Chief Wearing's pending Rule 50(b) and Rule 59 motions.  Furthermore, under Rules 60(b)(5) and (6), the Court should relieve Chief Wearing from the judgment because the Supreme Court's decision in <u>Garcetti</u> constitutes a "change" in or "clarification" of the law governing the analysis of a First Amendment retaliation claim.  Under that change or clarification, Chief Wearing is entitled to judgment as a matter of law and a new trial, as an alternative ruling.

---

[1]    Chief Wearing demonstrated that the Court and the plaintiff had notice of all of the grounds asserted in his Rule 50(b) motion.  For example, at page 28 of the plaintiff's memorandum of law in opposition to Chief Wearing's motion for summary judgment, the plaintiff argued that "[i]t is likewise immaterial that plaintiff's case incident reports, particularly the one involved in the Rodriguez motor vehicle stop, *were made in the course of his duties* as a police officer for at least a portion of the report was clearly designed to address an issue of perceived ... improprieties on the part of superiors."  (Emphasis added).  After this argument the plaintiff cited <u>Koch v. City of Hutchinson</u>, 847 F.2d 1436 (10th Cir. 1998) and described that case as follows:  "Fire Marshall's routine report regarding the cause of a fire was not of public concern since there was no evidence that the report was 'motivated or inspired by ... alleged improprieties or by the desire to expose those improprieties."  <u>Koch</u> was cited in several briefs filed in the Supreme Court in the <u>Garcetti</u> case.

## BACKGROUND

### I.    THE SUPREME COURT'S DECISION IN GARCETTI V. CEBALLOS

Chief Wearing's June 30 memorandum of law discusses the Supreme Court's decision in

Garcetti in detail. Three portions of the decision require further emphasis. First, at page 1961 of

its decision, the Garcetti Court recognized as follows:

> Proper application of our precedents thus leads to the conclusion
> that the First Amendment does not prohibit managerial discipline
> based on an employee's expression made pursuant to official
> responsibilities. Because Ceballos' memo falls into this category,
> his allegation of unconstitutional retaliation must fail.

126 S. Ct. at 1961.[2]

Second, the Court recognized that "[i]f Ceballos' superiors thought his memo was

inflammatory or misguided, they had the authority to take proper corrective action. Id. at 1960-

61.

Finally, the Garcetti Court concluded that when an "employee is simply performing his or

her job duties," there is no basis for balancing the competing interests surrounding the speech

and its consequence, as is the case when an employee speaks as a citizen addressing a matter of

public concern. 126 S. Ct. at 1961. The Court recognized that "[t]o hold otherwise would be to

demand permanent judicial intervention in the conduct of governmental operations to a degree

inconsistent with sound principles of federalism and the separation of powers." Id.

---

[2]    A copy of the district court's January 30, 2002 unpublished decision in Garcetti is
attached hereto as Exhibit A. At pages 9-10 of its decision, the district court in Garcetti held that
the conclusion that speech made as "part of" an employee's job is not protected by the First
Amendment is "premised" on the Supreme Court's holding in Connick v. Myers, 461 U.S. 138,
147 (1983) (speech not made "as a citizen" is not protected).

## II.    THE APPLICATION OF <u>GARCETTI</u> BY OTHER COURTS

A review of the decisions that have applied <u>Garcetti</u> reveals that several courts have: (1) described <u>Garcetti</u> as *changing* the analysis of a First Amendment retaliation claim and (2) reconsidered previous rulings and entered judgment in favor of defendants based on the reasoning in <u>Garcetti</u>.

In <u>Mills v. City of Evansville</u>, 452 F.3d 646 (7th Cir. 2006), the Seventh Circuit noted that <u>Garcetti</u> was issued while the appeal was under advisement. <u>Id.</u> at 647. It described <u>Garcetti</u> as holding:

> that before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job. Only when government penalizes speech that a plaintiff utters 'as a citizen' must a court consider the balance of public and private interests, along with the other questions posed by <u>Pickering</u> and its successors, such as <u>Waters v. Churchill</u>, 511 U.S. 661, ... (1994); <u>Connick v. Myers</u>, 461 U.S. 138, ... (1983); and <u>Givhan v. Western Line Consolidated School District</u>, 439 U.S. 410, ... (1979).

<u>Mills</u>, 452 F.3d at 647-48. The Seventh Circuit affirmed the granting of summary judgment in favor of the defendants concluding as follows:

> Mills was on duty, in uniform, and engaged in discussion with her superiors, all of whom had just emerged from Chief Gulledge's briefing. She spoke in her capacity as a public employee contributing to the formation and execution of official policy. Under <u>Garcetti</u> her employer could draw inferences from her statements about whether she would zealously implement the Chief's plans or try to undermine them; when the department drew the latter inference it was free to act accordingly.

<u>Id.</u>, 452 F.3d at 648.

In <u>Logan v. Indiana Dep't. of Corrections</u>, 2006 WL 1750583 (S.D. Ind. June 26, 2006), the court granted the defendant's renewed motion for summary judgment based on <u>Garcetti</u> and

the Seventh Circuit's decision in Mills. Logan, 2006 WL 1750583, at *1. In describing the impact of Garcetti, the Logan court indicated that "[t]he effect of the holding in Garcetti is *to add a new test* in analyzing the employee's speech in determining whether it is protected under the First Amendment." Id. (emphasis added). After applying that new test, the Logan court held that the plaintiff's speech was not protected and that summary judgment had to be entered in favor of the defendants. Id.

As part of its analysis, the court recognized that "Garcetti requires that 'the court must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job.'" Logan, 2006 WL 1750583, at *1 (quoting Mills). "Stated otherwise, the court must ask, 'Did the employee's expression arise from her employment duties?'" Id. (quoting Garcetti, 126 S.Ct. at 1959-60). If the speech giving rise to a defendant's punitive action against the speaker/employee occurred as part of the employee's job, then the government agency does not infringe any private liberties because the speech "'owes its existence to a public employee's professional responsibilities.'" Logan, 2006 WL 1750583, at *1 (quoting Garcetti, 126 S.Ct. at 1960).

In closing its decision, the Logan court concluded that "Garcetti and Mills have *changed* the analysis in § 1983 First Amendment speech cases, *requiring a new question to be asked and answered* as part of the Connick/Pickering test." 2006 WL 1750583, at *3 (emphasis added). In applying this "newly-formulated template," the Logan court held that it was plain that the plaintiff made her statements pursuant to her job duties and thus they fell outside the scope of First Amendment protection. Id. More specifically, the court believed that there was no "basis for 'reasonable debate'" that the plaintiff's statements were made pursuant to her official duties. Logan, 2006 WL 1750583, at *2.

In <u>Ryan v. Shawnee Mission Unified Sch. Dist. No. 512</u>, 2006 WL 1888326 (D. Kan. July 7, 2006), the court granted a motion for summary judgment based upon its application of <u>Garcetti</u>. <u>Id.</u> at *13-16. The <u>Ryan</u> court indicated that before the issuance of <u>Garcetti</u>, it would have begun its analysis by asking whether the plaintiff's speech touched on a matter of public concern under <u>Connick</u>, <u>Pickering v. Board of Education</u>, 391 U.S. 563 (1968) and their progeny. <u>Ryan</u>, 2006 WL 1888326 at *13. However, the <u>Ryan</u> court believed that <u>Garcetti</u> "instructs courts to ask and answer another question as part of the <u>Connick</u>/<u>Pickering</u> test -- that is, whether the employee made the statement as a citizen or pursuant to his or her official duties." <u>Ryan</u>, 2006 WL 1888326, at *13. Reflecting upon the impact of <u>Garcetti</u> on the case before it, the <u>Ryan</u> court concluded that <u>Garcetti</u> "*significantly changes the landscape* of this case and the extent to which plaintiff's speech was protected by the First Amendment." <u>Id.</u> (emphasis added).

After discussing <u>Garcetti</u> in detail, the <u>Ryan</u> court rejected the plaintiff's attempt to avoid summary judgment based on the reasoning in <u>Garcetti</u>. <u>Ryan</u>, 2006 WL 1888326, at *14. In particular, the plaintiff in <u>Ryan</u> contended that the holding in <u>Garcetti</u> was only limited in nature. The plaintiff emphasized that the <u>Garcetti</u> Court had noted that the parties in that case did not dispute that Ceballos wrote his memo pursuant to his employment duties. Thus, the <u>Garcetti</u> Court did not have the occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there was room for serious debate. The <u>Ryan</u> court found the plaintiff's reliance on this portion of the <u>Garcetti</u> decision to be misplaced because "the scope of plaintiff's job duties [wa]s sufficiently clear from the record that there [wa]s not 'room for serious debate' about whether the bulk of the statements that plaintiff contends constituted protected speech were made pursuant to her duties as a [physical therapist] for the school district." <u>Ryan</u>, 2006 WL 188326, at *14.

6

In <u>Boykin v. City of Baton Rouge/Parish of East Baton Rouge</u>, 2006 WL 2051384 (M.D.

La. July 11, 2006), the court granted the defendants' renewed motion for summary judgment,

after it ordered briefing regarding the applicability of <u>Garcetti</u>. <u>Id.</u> at *1. The court had

previously denied the defendants' motion for summary judgment by an April 7, 2004 ruling. <u>Id.</u>

In analyzing the report at issue, the <u>Boykin</u> court concluded as follows:

> Considering that Boykin was charged with investigating, reporting,
> and making recommendations on diversity within the job force,
> and the fact that the report contained content of this subject matter,
> irrespective of its accuracy, shows that the report was drafted
> pursuant to Boykin's official duties as Human Resources Director.

<u>Boykin</u>, 2006 WL 2051384, at *5. Moreover, the court acknowledged that although the plaintiff

may have had some ulterior motive in drafting the diversification report and disseminating it in a

manner that he knew would bring embarrassment to the Mayor's office, "he was still operating in

his official capacity as Human Resources Director, and the content of the Report was entirely

consistent with the nature of the responsibilities that he was charged with in his official

capacity." <u>Id.</u> Accordingly, the court held that the plaintiff's First Amendment claim had to be

dismissed under <u>Garcetti</u>. <u>Id.</u> at *6.

In <u>Ruotolo v. City of New York</u>, 2006 WL 2033662 (S.D.N.Y. July 19, 2006), the court

had previously denied the defendants' motion to dismiss and motion for summary judgment

directed against the plaintiff's First Amendment retaliation claim. After the issuance of <u>Garcetti</u>,

the court granted the defendant's renewed motion to dismiss based upon <u>Garcetti</u>. The court

concluded that the report prepared by the plaintiff, a police officer, was made pursuant to his

duties and thus the First Amendment did not protect his speech. <u>Id.</u> at *1. As part of its analysis,

the <u>Ruotolo</u> court concluded that the text of the report at issue identified itself as an "employer-

commissioned work, since the 'subject' line of the Report read [ ], 'Survey Pursuant to Request'

and the second paragraph explain[ed] that 'Detective Andrea Brown has submitted an 'Employee Information Request,' for a survey relating to numerous unexplained maladies' at the precinct; the Report then delineate[d] the results of the requested survey." Id. at *3. Consequently, the court held that it was "clear beyond peradventure that the Report was prepared as part of plaintiff's official duties." Id. at *3. As the plaintiff had prepared his report "in the course of his employment duties," the Ruotolo court concluded that his speech was "exactly the type addressed in Garcetti; i.e., employer commissioned work over which the employer is entitled to exercise control." Id.

With regard to the plaintiff's attempt to base his First Amendment claim on his conversation with lawyers from the Police Benevolent Association ("PBA"), the court concluded that it was clear that the plaintiff spoke with the lawyers in his capacity as the safety officer. Ruotolo, 2006 WL 2033662, at *4. Moreover, the plaintiff had acknowledged that the PBA lawyers specifically asked for him because he wrote the report. Id. In speaking with the lawyers, the plaintiff discussed the product that he had produced pursuant to his duties as the safety officer. Id. He was thus satisfying the same duty he discharged from preparing the report, that is, "answering concerns" by or on behalf of police officers about health issues at the precinct. Id. Moreover, the Ruotolo court recognized that there was "no indication that Ruotolo communicated with the PBA lawyers in anything other than his official capacity." Id. at *4.

In closing its First Amendment analysis, the Ruotolo court expressly noted that "[a]fter Garcetti, the *analysis is different*." Id. at *5 (emphasis added). After discussing the Second Circuit's articulation of the analysis of a First Amendment retaliation claim in Konits v. Valley Stream Cent. High Sch. Dist., 394 F.3d 121 (2d Cir. 2005), the Ruotolo court recognized that the analysis under Konits:

was the appropriate analysis prior to the Supreme Court decision in Garcetti. Garcetti requires a separate inquiry; namely whether a public employee's speech was made in the employee's capacity as a citizen. After Garcetti, for a lawsuit adequately to charge a First Amendment retaliation claim, the lawsuit must be predicated on speech made by a public employee *as* a citizen, and not pursuant to his or her official duties.

Ruotolo, 2006 WL 2033662, at *5 (emphasis original).[3]

In Shattuck v. Potter, 2006 WL 2089814 (D. Me. July 27, 2006), the court applied Garcetti and granted the defendant's motion for summary judgment. As part of its analysis, the Shattuck court recognized that the plaintiff bares the burden of proving that she engaged in protected speech. Id. at *4. Moreover, as part of its analysis of a letter that was at issue, the court recognized that "the context in which Plaintiff submitted th[e] letter, as a member of the [District's Threat Assessment Team], demonstrate[d] that it was closely related to her work duties, and less akin to speech made 'as a private citizen.'" Id.

In Sweeney v. Leone, 2006 WL 2246372 (D. Conn. July 31, 2006), the court granted the defendants' motion for summary judgment on the plaintiff's First Amendment retaliation claim. Id. at *10. The defendants in the case were the City of Bristol, Daniel McIntyre and William Leone. McIntyre and Leone were a captain and lieutenant, respectively, in the Bristol Police Department ("BPD"). The plaintiff was employed as a dispatcher within the communications division of the BPD. Bristol had made a decision to consolidate dispatch operations for police, fire and emergency medical dispatch into one dispatch center in 2004. That decision became effective on or around December 1, 2004. Id. at *1. In a November 29, 2004 e-mail, the Chief of Police had stated that in an emergency at the dispatch center, the officer in charge could pull

---

[3]/    Similarly, in the case at bar, this Court cited Konits at page 27 of its March 9, 2005 Ruling denying Chief Wearing's motion for summary judgment. The Court cited Konits as part of its discussion of the elements of a First Amendment retaliation claim.

an officer certified to do dispatch services from other duties, and assign that officer to help in the communication center. Id. On December 2, 2004, when the call volume became higher than normal, the plaintiff contacted Leone, the officer in charge at the time, to request additional support in the dispatch center. Leone denied the plaintiff's request. The plaintiff then contacted McIntyre, the next highest in command, and asked for assistance. McIntyre came to the dispatch center and monitored the situation for a few minutes. Id. at *2. McIntyre did not, however, assign an officer to assist in the center. After viewing the situation in the center, McIntyre had a conversation with Leone in the hallway.

The plaintiff based his claim of First Amendment retaliation on three incidents. The first was his confrontation with McIntyre after overhearing the conversation between McIntyre and Leone in the hallway. In particular, the plaintiff had listened in on McIntyre's conversation with Leone regarding the dispatch center. Id. at *7. The plaintiff took issue with Leone's accusations regarding the dispatcher's work habits. The plaintiff's speech to McIntyre was that "'there are ears all over this place, and...someone could have overheard those comments [about the dispatchers]. [The plaintiff] asked how [McIntyre] could, as a captain, let Lt. Leone talk that way about dispatch.'" Id. at *7. The court, held as a matter of law that this speech did not address a matter of public concern. Id. *8. It concluded that the plaintiff's speech did not bring up his frustrations or concerns regarding the consolidation of dispatch services during the conversation with McIntyre. Rather, the court held that the plaintiff's speech:

> aired personal grievances about the treatment of dispatchers by Defendant Leone and other officers. The speech was not calculated to address a broader public purpose, and it was not offered as a complaint about under-staffing in the dispatch center. Plaintiff's admitted motive was to confront Defendant McIntyre about what he had seen and heard on the intercom system....The conversation between Defendants McIntyre and Leone pertains to

10

the dispatchers' work habits and Defendant McIntyre's failure to
defend the dispatchers.

Id. at *7. Accordingly, the Sweeney court held that the plaintiff could not establish "that he

spoke as a citizen on a matter of public concern." 2006 WL 2246372, at *7 n.10.

The remaining two incidents upon which the plaintiff based his First Amendment claim

were (1) the plaintiff's initial call to Leone requesting extra assistance in the dispatch center and

(2) the plaintiff's subsequent call to McIntyre requesting help. The court held that under

Garcetti, the plaintiff's two calls to request help in the overloaded dispatch center were not

protected by the First Amendment because they were made pursuant to his official duties as the

dispatch supervisor of the shift. Id. at *8.

As part of its analysis, the Sweeney court relied upon the Seventh Circuit's application of

Garcetti in Mills. Sweeney, 2006 WL 2246372, at *8. It recognized that the case before it was

similar to the situation in Mills. Id. at *9. In particular, the Sweeney court noted that like the

situation in Mills, the plaintiff was "on duty" at the dispatch center when he was involved in the

discussions with his supervisors. Id. The Sweeney court recognized that the "context and

content of Plaintiff's requests clearly demonstrate that they were work requests made pursuant to

official departmental policy, following the Chief of Police's November 29 e-mail." Id. at *9.

Thus, the plaintiff was not speaking "as a citizen;" instead, his requests for assistance related to

his "daily professional activities," which included ensuring that all incoming calls to the dispatch

center were answered. Id.

Also, as part of its analysis, the Sweeney court recognized that Mills had held that

because of the context in which the speech was offered and the plaintiff's work duties, speech

that was arguably touching upon a matter of public concern, was not protected by the First

Amendment. Id. at *9. Moreover, the court in Sweeney concluded that even if the content of the

plaintiff's request for assistance could be construed as "complaints" about under-staffing in the dispatch center, such statements "were still made pursuant to Plaintiff's official duties." Id. at *9 n.12. Under Garcetti, this fact was dispositive. Id.

The Sweeney court also noted that "[s]ubsequent decisions in the Seventh Circuit and elsewhere have followed the reasoning of Mills and set out a *new test* to guide constitutional interpretation of the protections accorded specific speech by a public employee." Id. at *9 (emphasis added). Consequently, because the plaintiff's request for assistance in Sweeney was not made as a citizen, but instead as part of his official duties, the statements were not protected under the First Amendment. Id. at *10.

## STANDARD OF REVIEW

### I.    RULE 60 (b)(1)

Rule 60(b)(1) provides that "[o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect." The Second Circuit has recognized that Rule 60(b)(1) provides a method for a district court to correct legal errors by the court. In re: 310 Associates, 346 F.3d 31, 35 (2d Cir. 2003); Schildhaus v. Moe, 335 F.2d 529, 531 (2d Cir. 1964); Tarkington v. United States Lines Co., 222 F.2d 358, 359 (2d Cir. 1955). See Sargeant v. Columbia Forrest Prods., Inc., 75 F.3d 86, 90 (2d Cir. 1996)("'[a] supervening change in governing law that calls into serious question the correctness of the court's judgment.'" justifies the recall of mandate).

In Tarkington, the Second Circuit "held that a change in decisional law as the result of a reversal by a higher court can be considered a 'mistake' for which Rule 60(b)[(1)] provides a remedy." Thompson v. County of Franklin, 127 F.Supp 2d 145, 160 (N.D.N.Y. 2000), aff'd 314

F.3d 79 (2d Cir. 2002). More specifically, <u>Tarkington</u> held that when the Supreme Court

rendered a decision, eleven days after the entry of a judgment, which "conflict[ed] with the case

on which the trial judge relied in directing a verdict, the trial judge should have treated plaintiff's

motion as a motion under Fed. Rules Civ. Proc. [R]ule 60(b), ..., to correct a mistake of the

court." 222 F.2d at 359. <u>See</u> <u>Thompson</u>, 127 F.Supp.2d at 160.

Explaining the rationale of <u>Tarkington</u>, in a subsequent decision, Judge Friendly observed

that the use of Rule 60(b) to correct a district court's mistake of law was much more efficient

than requiring an aggrieved party to appeal. <u>Schildhaus</u>, 335 F.3d at 531. Specifically, Judge

Friendly recognized that:

> Under such circumstances there is indeed good sense in permitting
> the trial court to correct its own error and, if it refuses, in allowing
> a timely appeal from the refusal; no good purpose is served by
> requiring the parties to appeal to a higher court, often requiring
> remand for further trial proceedings, when the trial court is equally
> able to correct its decision in the light of new authority on
> application made within the time permitted for appeal, ....

<u>Schildhaus</u>, 335 F.2d at 531. <u>See</u> <u>In re: 310 Associates</u>, 346 F.3d at 35 ("Judge Friendly's

approach has remained the law of this circuit.")

Consistent with the Second Circuit's approach, other circuits have recognized that a

motion under Rule 60(b)(1) is the logical and proper course for a party to ask the district court to

reconsider an order which is "inconsistent with an intervening decision of [a higher] Court."

<u>D.C. Federation of Civic Associations v. Volpe</u>, 520 F.2d 451, 453 (D.C. Cir. 1975)(per curiam).

<u>See</u> <u>Lairsey v. Advance Abrasives Co.</u>, 542 F.2d 928, 929-30 (5th Cir. 1976)(recognizing that

district court under Rule 60(b)(1) could correct mistake of law based upon post-judgment change

in governing decisional law). In evaluating whether a given case has resulted in a change in the

controlling law, it is necessary to examine the claimed change in law to "'determine what effect, if any, [it] has on the law to be applied in this case.'" Thompson, 127 F.Supp.2d at 152.

## II.   RULE 60(b)(5)

Rule 60(b)(5) provides, in relevant part, that the district court may give relief from a final order if "it is no longer equitable that the judgment should have perspective application." "A change in decisional law is cognizable under Rule 60(b)(5)." Travelers Indemnity Co. v. Sarkisian, 794 F.2d 754, 757 n.4 (2d Cir. 1986). Generally speaking, money judgments do not have perspective application. DeWeerth v. Baldinger, 38 F.3d 1266, 1275 (2d Cir. 1994).

## III.   RULE 60(b)(6)

"Relief under Rule 60(b)(6) 'is appropriate to accomplish justice' in an extraordinary situation." Pierce v. Cook & Co., Inc., 518 F.2d 720, 723 (10th Cir. 1975). Rule 60(b)(6) "'is properly involved when there are extraordinary circumstances justifying relief, when the judgment may work in extreme and undue hardship, and when the asserted grounds for relief are not recognized in clauses (1)-(5) of the Rule.'" DeVino v. Duncan, 215 F.Supp.2d 414, 416-17 (S.D.N.Y. 2002). See id. at 417-19 (granting relief under Rule 60(b)(6) based on change in decisional law).

Rule 60(b)(6) provides that a district court may relieve a party from a final judgment for "any other reason justifying relief from the operation of the judgment." The rule "'confers broad discretion on the trial court to grant relief when 'appropriate to accomplish justice.'" Matarese v. LeFevre, 801 F.2d 98, 106 (2d Cir. 1986). The Second Circuit has recognized that Rule 60(b)(6) "constitutes a 'grand reservoir of equitable power to do justice in a particular case.'" Id. Thus, it is "'properly invoked where there are extraordinary circumstances,' … or where the judgment

may work an extreme and undue hardship, ... and 'should be liberally construed when substantial justice will thus be served.'" Id.

The "subsequent clarification of the law has been held to be a proper basis for relief under Rule 60(b)(6)." Manhattan Cable Television, Inc. v. Cable Doctor, Inc., 824 F. Supp. 34, 36 (S.D.N.Y. 1993)(citing Pierce v. Cook & Co., 518 F.2d 720 (10th Cir. 1975)). In particular, in Adams v. Merrill Lynch Pierce Fenner & Smith, 888 F.2d 696 (10th Cir. 1989), the Tenth Circuit recognized that "a change in relevant case law by the United States Supreme Court warrants relief under Fed. R. Civ. P. 60(b)(6)." Id. at 702.[4] Other courts have similarly recognized that "[a] supervening clarification of controlling law by a higher court can afford a sufficient basis for granting a Rule 60(b)[(6)] motion." Smith v. Holtz, 879 F.Supp. 435, 438-39 (M.D. Pa. 1995)(citing decisions from Eighth, Tenth, and Eleventh Circuits, including Adams), aff'd 87 F.3d 108 (3d Cir. 1996). See Max M. v. Thompson, 585 F.Supp. 317, 321 n.6 (N.D. Ill. 1984)(recognizing that courts have entertained motions in light of intervening change in controlling precedent under both Rules 60(b)(1) and 60(b)(6)), amended in part 592 F.Supp. 1450 (N.D. Ill. 1984). See also Schmitt v. American Family Mut. Ins. Co., 187 F.R.D. 568, 575-76 (S.D. Ind. 1999)(granting Rule 60(b)(6) motion based on decision issued by Supreme Court of Indiana).

District courts within the Second Circuit have also recognized that an intervening change in the law can be the basis for granting relief under Rule 60(b)(6). DeVino, 215 F.Supp.2d at 417-18. See Manhattan Cable, 824 F. Supp. at 36. Moreover, in Sargeant v. Columbia Forrest Prod., Inc., 75 F.3d 86 (2d Cir. 1996), the Second Circuit after analogizing the power to recall a mandate "to the power conferred on district courts by Fed. R. Civ. P. 60(b)" and emphasizing the

---

[4]    As authority the Adams court cited Pierce v. Cook & Co., 518 F.2d 720 (10th Cir. 1975). The Second Circuit relied on Pierce in Matarese. See Matarese, 801 F.2d at 106 (citing Pierce).

importance of a final judgment, id. at 89, held that a "supervening change in governing law that calls into serious question the correctness of the court's judgment may constitute an extraordinary circumstance justifying relief." Id. at 90. See DeVino, 215 F.Supp.2d at 417 (citing Sergeant).

## ARGUMENT

### I.    THE COURT SHOULD GRANT CHIEF WEARING'S MOTION UNDER RULE 60(b)(1)

#### A.    The Court Should Reconsider Its Denial Of Chief Wearing's Motion For Summary Judgment In Light Of Garcetti

After Garcetti, the Court should reconsider its denial of Chief Wearing's motion for summary judgment. Based on the Supreme Court's reasoning in Garcetti and Rule 60(b)(1), the Court should grant Chief Wearing summary judgment on several grounds.

##### 1.    The Plaintiff's Speech Was Not Protected By The First Amendment

A re-examination of the Court's March 9, 2005 Ruling and the pleadings submitted by the parties in connection with Chief Wearing's summary judgment motion confirms that the Court should grant Chief Wearing summary judgment in light of Garcetti. In particular, Garcetti confirms that Tolnay's speech was not protected by the First Amendment.

At page 32 of its March 9 Ruling, the Court found that Tolnay's August 3, 2002 Case Incident Report, Tolnay's "defense of his professional conduct on July 26 and August 3 during the meeting of August 13 with Wearing, and his critique of the actions of Ortiz, made in his Report and during the August 13 meeting" were matters of public concern and thus protected by the First Amendment. (3/9/05 Ruling, at 32, see id. at 32-40) At page 33-35 of its March 9 Ruling, the Court rejected Chief Wearing's arguments inter alia that Tolnay's duty status and the fact that the speech at issue only related to Tolnay's performance of his job, eliminated any First

Amendment protection. In <u>Garcetti</u>, the Supreme Court held that all speech that arises from or owes its origins to the employee's job duties is not protected by the First Amendment. As all of the speech at issue in the case at bar arose out of or owes its existence to Tolnay's job duties, it is not protected by the First Amendment. <u>Garcetti</u>, 126 S.Ct. at 1959-62; <u>Mills</u>, 452 F.3d at 648; <u>Logan</u>, 2006 WL 1750583, at *1; <u>Ryan</u>, 2006 WL 1888326, at *14; <u>Boykin</u>, 2006 WL 2051384, at *5-6; <u>Ruotolo</u>, 2006 WL 2033662, at *3.

At page 14 of the March 9 Ruling, the Court noted that the evidence presented demonstrated that after the motor vehicle stop on August 3, 2002, Sergeant Burgh advised Tolnay and other officers that Captain Ortiz "had ordered memoranda of the incident from them to be filed by the close of their shift. Each complied, with Tolnay referencing his complete Case Incident Report for more details." (3/9/05 Ruling, at 14 (citing Pl.'s S.J. Exh. 11)) Thus, as the Court recognized, Tolnay's August 3 Case Incident Report was prepared as part of his compliance with an "order." Moreover, a review of the August 3 Case Incident Report reveals that it was an official document of the police department. Tolnay's August 3 Case Incident Report and his memorandum to Captain Ortiz, which expressly incorporated the August 3 Report, were submitted as exhibits by Tolnay as part of his opposition to Chief Wearing's motion for summary judgment.[5] The content, context and form of those documents were fully analyzed at pages 11-22 and 23-25 of Chief Wearing's June 30, 2006 memorandum regarding <u>Garcetti</u>.

In sum, by its content and form, it is clear that Tolnay prepared the August 3 Case Incident Report as part of his job duties. The August 3 Report is on an official form, which is the identical form used for the report concerning the arrests on July 26, 2002 and it describes the

---

[5]    A copy of the August 3, 2002 Case Incident Report is attached hereto as Exhibit B. A copy of Tolnay's August 3, 2002 memorandum to Captain Ortiz is attached hereto as Exhibit C.

motor vehicle stop, the laws at issue, the police department reference numbers for other official reports, the personal information of the minister who was stopped and the names of the other police officers and supervisors involved. See Mills, 462 F.3d at 468 (plaintiff was "on duty" and speaking with supervisors); Sweeney, 2006 WL 2246372, at *9 (content and context demonstrate plaintiff not speaking as a citizen).

The context of the August 3 Case Incident Report also demonstrates, as a matter of law, that Tolnay was not speaking "as a citizen," but rather was speaking as a result of his job duties. The case incident report was prepared while Tolnay was "on duty." Moreover, the August 3, 2002 memorandum from Tolnay to Captain Ortiz states in the last paragraph that Tolnay "was informed by Sgt. Burgh that Capt. Ortiz ordered [Tolnay] to complete a memo regarding [the motor vehicle stop] incident and to submit prior to the termination of my shift. For full and complete details regarding said motor vehicle stop please refer to Report CN 02 44465." Report CN 02 44465 is Tolnay's August 3 Case Incident Report.

Consequently, the speech in the August 3 report arises out of or owes its existence to Tolnay's job duties. Thus, under Garcetti and the decisions that have applied it, Tolnay's speech is not protected by the First Amendment and Chief Wearing is entitled to summary judgment. 126 S.Ct. at 1961 ("Because [speech] falls into this category, [plaintiff's] allegation of unconstitutional retaliation must fail").

Similarly, with regard to the August 13 meeting, the March 9 Ruling recognized that "the Defendant ordered Tolnay to report to his office ...." (3/9/05 Ruling, at 39-40) The content, context and form of the statements demonstrate that they arouse out of or owe their existence to Tolnay's job duties. It was undisputed that Tolnay "attended the ... meeting in Wearing's office, at Wearing's directive, in order 'to discuss' the events of July 26 and August 3." (Id. at 16; see

id. at 36 ("Plaintiff contends that he was directed to attend a meeting with the Chief of Police
....")) Tolnay was "ordered" to attend a meeting to discuss the events of July 26 and August 3
and was answering Chief Wearing's questions at the meeting. He made is statements in response
to questions from the Chief. Moreover, it was undisputed that the August 13 meeting was a
business meeting. Lieutenant Leo Bombalicki attended the meeting as Tolnay's union
representative. (3/9/05 Ruling, at 20) Officer Jaime Abate, Tolnay's partner for the July 26
arrests, and Scott Nabel, the Director of Human Resources, were also in attendance at the August
13 meeting. (Pl.'s S.J. Exh. 2, Tolnay 7/9/03 Depo. Tr. at 49-50; 3/9/05 Ruling, at 16 n.15)

Thus, Tolnay's statements at the August 13 meeting arose out of or owe their existence to
Tolnay's job duties. Accordingly, under Garcetti and the decisions that have applied it, there is
no First Amendment protection and Chief Wearing is entitled to summary judgment. 126 S.Ct.
at 1961 ("Because [speech] falls into this category, [plaintiff's] allegation of unconstitutional
retaliation must fail").

A review of the evidence from the summary judgment pleadings further confirms that
after Garcetti, the Court should reconsider its March 9 Ruling under Rule 60(b)(1). As part of
the Local Rule 56 statements, Tolnay admitted that he had been "ordered" to attend the August
13 meeting. (Chief Wearing's Local Rule 56 Statement, ¶ 8; Tolnay's Local Rule 56 Statement,
¶ 8). Tolnay further admitted that when a police officer is ordered to the Chief's office "it is
normal procedure to advise that officer that he or she may have union representation at that
meeting." (Chief Wearing's Local Rule 56 Statement at ¶ 10; Tolnay's Local Rule 56 Statement,
at ¶ 10) Tolnay also admitted that during the August 13 meeting, Chief Wearing "asked the
plaintiff questions regarding the two incidents on July 26, 2002 and August 3, 2002." (Chief
Wearing's Local Rule 56 Statement, at ¶ 11; Tolnay's Local Rule 56 Statement, at ¶ 11)

19