UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
_____
ARPAD TOLNAY,                    :
                                 :
             Plaintiff,          :    CIVIL NO.
                                 :
        v.                       :
                                 :    3:02 CV 1514 (EBB)
MELVIN WEARING,                  :
                                 :
             Defendant.          :
_____ :
```

## RULING ON DEFENDANT'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW, A NEW TRIAL, AND/OR REMITTITUR

### INTRODUCTION

Defendant Melvin Wearing filed motions for judgment as a matter of law, a new trial, or, in the alternative, a remittitur of the substantial jury award in this case. In his motion for judgment as a matter of law, Wearing contends that the plaintiff, Arpad Tolnay, in his incident report, was speaking not "as a citizen on matters of public concern," but rather that he merely engaged in speech and conduct required of him as a New Haven police officer. Defendant further contends that he was entitled to qualified immunity. Finally, defendant Wearing challenges the compensatory and punitive damage awards, claiming that there was a lack of evidence to support either award.

In his motion for a new trial, the defendant raises at least eleven issues. These principal issues are as follows: (1) the Court should have charged the jury regarding the balancing test

of Pickering v. Board of Education, 391 U.S. 563, 568 (1968)
(2) the Court should have submitted interrogatories to the jury
regarding the Pickering balancing test, (3) the indemnification
testimony offered by Mayor DeStefano should not have been allowed
by the Court, (4) the newspaper articles were improperly admitted
as evidence, (5) the Court failed properly to charge the jury
regarding punitive damages and also improperly responded to the
jury's question regarding payment of punitive damages, (6) the
evidence of past incidents of disciplinary action or inaction
should not have been admitted, (7) the damage award was against
the weight of the evidence, (8) the punitive award was
constitutionally excessive, (9) the non-economic compensatory
award was constitutionally excessive, (10) plaintiff's counsel's
closing argument contained inappropriate statements, and (11) the
Court should have submitted interrogatories to the jury regarding
qualified immunity.  For all of these reasons, defendant claims,
a new trial is necessary.

   For reasons explained more fully below, unless the plaintiff
agrees, within thirty days of the date of this ruling, to remit
all portions of the punitive damage award in excess of
$1,350,000,[1] this Court hereby orders a new trial solely on the

---

   [1] No portion of the compensatory award is found herein to be
excessive.  Therefore, the remittitur applies only to the
punitive award.  Should the plaintiff choose to accept the
remittitur, he would receive $903.84 as economic damages, plus
$150,000 as non-economic compensatory damages, plus $1,350,000 as

issue of damages.

## BACKGROUND

Plaintiff, Arpad Tolnay, is a police officer in the New Haven Police Department [NHPD].  He is an Hispanic male and is fluent in Spanish and English.  Defendant Melvin Wearing is a former Chief of Police of the NHPD and served as such at all times relevant to this case.

The events leading to this litigation have been briefed extensively and presented to a jury during trial.  All parties are assumed to be familiar with the facts of this case and, for the sake of brevity, this Court, reviewing the evidence in the light most favorable to the plaintiff, Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F. 3d 276 (2d Cir. 1998), will recount only those facts necessary for a determination of the defendant's post trial motions.

The office of the Chief of Police is an appointed position. The Mayor of New Haven is the sole person with authority to appoint the Chief of Police.  At all times relevant to this litigation, John DeStefano was the Mayor of New Haven.

Armando Hernandez and Daniel Rodriguez are Hispanic ministers who lead large congregations in the city of New Haven and Hernandez has been an active supporter of Mayor DeStefano's

_____

punitive damages.  The total of plaintiff's award, after remittitur, would be $1,500,903.84.

3

reelection campaigns. (Trial Tr, Vol. 4, p. 158)

On July 26, 2002, Officer Tolnay was dispatched to the Second Star of Jacob Church in the Fair Haven district of New Haven and was joined there by Officer Jamie Abate. Hernandez is the leader of the Second Star of Jacob Church. The NHPD had received multiple complaints that day from residents near the Second Star of Jacob Church because of high noise levels. In fact, Tolnay's visit to the church was not NHPD's first visit that day in response to these complaints. On the first visit, officers, not including the plaintiff, asked the church members to move their outdoor service, with loud-speakers, inside the church to reduce the noise. However, apparently, thereafter the church members had so positioned the speakers in the windows of the church that the music played loudly outside.

Despite several requests by Tolnay and Officer Abate to turn down the music, Hernandez and other members of the congregation refused. Furthermore, Hernandez was belligerent and defiant upon the officers' arrival at the church. He confronted the officers immediately and, rather than cooperate with the police, chose to engage in theatrics which nearly incited mob-like behavior at his church. The members of the congregation became excited and began yelling profanities at the officers. Reverend Hernandez insisted that he would not turn down the music and that the officers would have to arrest him. Despite Tolnay's assurances that no arrests

were necessary, Reverend Hernandez continued his aggressive and disruptive behavior.  As the congregation began to converge on the officers, Tolnay moved Hernandez to another location to issue a citation.

About this time, Rodriguez arrived, at high speeds, in a van.  He quickly exited his vehicle and became hostile towards the police, insisting that he, too, be arrested.  After continuing with this behavior and ultimately physically contacting an officer, Rodriguez's demand to be arrested was accommodated and he was taken into custody.  Individuals in the crowd subjected the officers to verbal abuse and warned them that the church had connections to the Mayor and that the officers had no idea with whom they were dealing.

The incidents at the church garnered media attention. Hispanic leaders called for an apology from the city, protests were organized and, inexplicably, an apology by the Mayor was planned despite universal agreement, even at trial, (Trial Tr. Vol. 2, pp. 176, 203) that the citation to Hernandez and the arrest of Rodriguez were lawful.  Chief Wearing visited the State's Attorney's Office six days after the incident to discuss the arrest and citation  and his interest in the ministers not having to come to court and that their cases be taken care of. (Trial Tr., Vol. 5, pp. 14-15)  Immediately thereafter all charges against Hernandez and Rodriguez were nolled and they

5

were never required to appear in court.  After the nolles, Mayor
DeStefano appeared at the Second Star of Jacob Church to announce
to the congregation that the city wanted to apologize and that
the charges had been dropped.

Thereafter, as Tolnay was on patrol on August 3, 2002, he
observed a Jeep Wrangler traveling without its convertible top
and with two children hanging off the sides while distributing
some sort of paperwork.  Tolnay was on patrol with Officer
Walesta Bermudez, who suggested that Tolnay stop the vehicle.
After pulling over the car, Tolnay learned that the driver of the
car was Daniel Rodriguez and the children were passing out
notices of an upcoming protest in response to the incident at the
Second Star of Jacob Church.  Tolnay immediately advised his
supervisor about the situation and shortly thereafter heard a
warning issued over the police radio by then Captain, now Chief,
Francisco Ortiz that Tolnay should stay away from Hernandez and
Rodriguez.

Even though he had already allowed Rodriguez to drive away,
Tolnay felt that this warning was inappropriate and that it
interfered with his ability to discharge his duty.  Tolnay
completed a report of the incident, wherein he explained that,
due to the political influence and connections enjoyed by
Rodriguez, he was unable to fulfill his responsibilities as a
police officer.  He added that Ortiz's radio warning confirmed

6

that suspicion.

Later, Captain Ortiz visited the home of Rodriguez and assisted him in making out a civilian complaint against Tolnay regarding the motor vehicle stop.  Captain Ortiz also drafted a memo to Chief Wearing regarding the stop.  In that memo, he expressed his opinion that Tolnay's comments in the case incident report regarding the political influence enjoyed by Daniel Rodriguez were inappropriate.  Specifically, Ortiz stated he found himself "very disturbed by the content, which reflects his opinion that he cannot adequately or effectively perform his duties due to the political influence he believes has been exerted by Reverend Daniel Rodriguez."  Def.'s Ex. 13, Consolidated App. Of Ex. (Post Trial Motions), Vol. 1.  Ortiz continued, saying that Tolnay's report was "unacceptable and his comments are inappropriate and have no relevance to the initial motor vehicle stop."  Id.  Defendant agrees that Tolnay would have been acting lawfully and appropriately if he had charged Rodriguez for motor vehicle violations and risk of injury to a minor, a felony. (Trial Tr. Vol.  3, pp. 28, 31)

After receipt of Captain Ortiz's memo, Chief Wearing called a meeting for August 13, 2002, and ordered Tolnay to attend. This meeting produced heated dialogue during which Tolnay attempted to justify and explain his actions and Chief Wearing attempted to criticize Tolnay for his handling of the two

incidents.  When it was clear that the meeting was going nowhere, Tolnay rose from his seat and announced that the whole scenario was "political," the meeting was over, and that he needed to speak with an attorney.  On August 14, 2002, Chief Wearing called another meeting and ordered Tolnay to attend.  When plaintiff arrived at this second meeting, Wearing suspended him for a period of ten days.[2]  Wearing claimed that the suspension was the result of Tolnay's disrespectful and insubordinate attitude in leaving the first meeting, not his comments regarding the political influence of Hernandez and Rodriguez.  Tolnay claimed he was suspended because of the content of his speech in the August 3rd Case Incident Report (CIR) following the motor vehicle stop and his comments during the meeting on August 13th.  In addition to his suspension, Tolnay was ordered to an undesirable desk position ordinarily assigned to new officers and required to undergo "sensitivity training."

Tolnay brought this action alleging a First Amendment retaliation claim against Chief Wearing.  After trial, the jury found that Wearing violated Tolnay's First Amendment rights and awarded lost wages in the amount of $903.84, noneconomic damages in the amount of $150,000.00, and punitive damages in the amount of $5,000,000.00.

---

[2] After Tolnay filed a grievance, the suspension was reduced to five days.

## LEGAL STANDARD

Rule 50(b) allows a party to renew its motion for judgment as a matter of law by filing a motion, no later than ten days, after the entry of a judgment.  "In ruling on a motion for judgment as a matter of law under Rule 50(b), a district court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.  The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. The court may properly grant the motion only if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against the moving party." Kinch v. Dollar Rent-A-Car Systems, Inc., No. 00-9506, 2001 WL 682470, at *2 (2d Cir. June 18, 2001).  "Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., supra, at 289.  This Court finds that Chief Wearing's Rule 50(b) renewal of his

previous Rule 50(a) motion is acceptably more precise.  The plaintiff's evidence was comprehensive and he suffered no prejudice by the defendant's oral Rule 50(a) motion.  The purpose of the oral Rule 50(a) motion was satisfied, and the Court declines the plaintiff's invitation to disregard the defendant's Rule 50(b) motion.

A new trial, is appropriate "(1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States ...." Fed. R. Civ. P. 59(a).  "A trial court should only exercise its discretion in granting a motion for a new trial  when it is 'convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" Kiniry v. Metro-North R.R. Co., 2006 WL 680512, at *2 (D. Conn. March 14, 2006), quoting Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 370 (2d Cir. 1988).

## DISCUSSION

## I.    TOLNAY'S SPEECH MADE AS A CITIZEN COMMENTING ON MATTERS OF PUBLIC CONCERN.

"[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a

public agency allegedly in reaction to the employee's behavior."
Connick v. Meyers, 461 U.S. 138, 147 (1983).

In Garcetti v. Ceballos, 547 U.S. ____, 126 S.Ct. 1951
(2006), the Supreme Court "observed that it did not have occasion
to articulate a framework for defining the scope of an employee's
duties in cases where there is room for serious debate." Kodrea
v. City of Kokomo, Ind., 2006 WL 1750071, at *7 (S.D. Ind. June
22, 2006). The Court did, however, note "that in some cases
employees may still receive First Amendment protection for
expressions made at work or related to the employee's job." Id.
"That Ceballos expressed his views inside his office, rather than
publicly, is not dispositive." Id.

There was no evidence that Tolnay's job requirements call
for his opinion regarding Rodriguez's and Hernandez's political
influence. While he may have been required to indicate simply
whether or not an infraction was issued during the August 3,
2002, motor vehicle stop, the defendant did not put forth
sufficient evidence that such detailed reasoning was required in
circumstances where no infraction is issued, or evidence that
such an explanation is typically offered by officers who decide
not to issue an infraction and, in fact, defendant's position was
that Tolnay's explanation had no place in the report.

The Seventh Circuit has emphasized that a government
employee's speech may be protected unless he was "clearly acting

11

*entirely* in an employment capacity when he made those reports."
<u>Delgado v. Jones</u>, 282 F.3d 511, 518 (7th Cir. 2002), quoting
<u>Gonzalez v. City of Chicago</u>, 239 F.3d 939, 941 (7th cir. 2001).
In <u>Delgado</u>, a police officer drafted a memorandum to his
superiors, after receiving a tip, regarding the possibility that
a close relative of an elected official, who was friends with the
Chief of Police, was frequenting a drug house.  The officer later
claimed that he was retaliated against for drafting the
memorandum.  The Seventh Circuit held that the officer's speech,
contained in an intra-department memorandum, was "far beyond some
rote, routine discharge of an assigned duty" and, therefore, was
protected speech.  <u>Delgado</u>, 282 F.3d at 519, 520.

Both Chief Wearing and Captain Ortiz felt that Tolnay's
comments did not belong in the report.  In Chief Wearing's
personnel memorandum regarding Tolnay's suspension, he indicated
that, in the future, Tolnay should "prepar[e] police reports
which reflect his observations and <u>not his political
speculations</u>."

However, Tolnay testified on cross-examination that officers
are instructed not to speak to the press.  Tolnay, therefore, was
not permitted to express his opinions in that public medium, for
example in the New Haven Register or on a local radio station.

"[S]peech that relates *primarily* to matters of personal
interest or internal office affairs, in which the individual

speaks as an employee rather than as a citizen, will not support a First Amendment retaliation claim." Kelly v. City of Mount Vernon, 344 F. Supp. 2d 395, 402 (S.D.N.Y. 2004) (emphasis added). "Even as to an issue that could arguably be viewed as a matter of public concern, if the employee has raised the issue *solely in order to further his own employment interest*, his First Amendment right to comment on that issue is entitled to little weight." Id. at 403 (emphasis added). Of substantial importance is the inquiry into whether the plaintiff is attempting to "bring to light a matter of political, social, or other concern to the community." Mishk v. Destefano, 5 F. Supp. 2d 194, 200 (S.D.N.Y. 1998).

It can hardly be said with real conviction that Arpad Tolnay was speaking "solely in order to further his own employment interest." Id. While the filing of a case incident report and attendance at the internal investigatory meeting with Chief Wearing may have been part of Tolnay's official duties as a police officer, his opinions regarding the selective enforcement of the laws in New Haven and the political influence enjoyed by some members of the community are not required to be included in a case incident report. Nor was Tolnay required to report his feelings on those matters to the Chief of Police. Ceballos' speech in Garcetti that sparked government retaliation was required to be in his memorandum and was, essentially,

13

commissioned by the District Attorney's Office.  The present circumstances are different.  Here, Tolnay was speaking "as a citizen" when he voiced his frustrations.  Merely because an officer's speech on a matter of public concern is intertwined with that officer's official duties does not strip his speech made as a citizen of its First Amendment protection.  By inserting his opinions into a document that would otherwise have been completely a part of Tolnay's official duties as a police officer, Tolnay did not forfeit his First Amendment protection. Chief Wearing and then-Captain Ortiz both felt, and articulated, that Tolnay's opinions did not belong in the case incident report at all.[3]  Chief Wearing stated that Tolnay "could have left it out of his report" and that Tolnay's statements were not relevant to the traffic stop or the July 26, 2002 incident.  Trial Tr. Vol. 4 at 24.)  Further, the Chief testified that the comments "didn't pertain to the actual event.  It was a more subjective point of view expressing how he felt."  Id. at 24.  This testimony is at odds with the defendant's more recent assertion that Tolnay's comments were part of his required duties as a police officer.

In many ways, Tolnay's decision to use the case incident

---

[3]  Then-Captain Ortiz wrote, in his memorandum to Chief Wearing regarding the case incident report: "This officer's written report is unacceptable and his comments are inappropriate and have no relevance to the initial motor vehicle stop."  Pl.'s Ex. 16 (August 8, 2002 Mem.).

report to voice his already mounting frustrations was in the best interests of the municipal government of New Haven.  While electing to express his opinion as a citizen, Tolnay chose to voice his comments directly to his superiors.  The Chief had an opportunity to address Tolnay's concerns – no doubt the concerns of many New Haven residents aware of the Hernandez/Rodriguez incident – without attracting even more unwanted publicity and attention to the police department.  Had Tolnay gone directly to the newspapers or the local radio stations, the conduct of Chief Wearing and Mayor DeStefano would have been forced even further into the public light.  By deciding to suspend Tolnay for making these comments, Chief Wearing removed the possibility that the matter could be handled internally.

It is equally implausible that Tolnay's speech was on matters solely of personal interest.  In fact, there were numerous published articles on the subject by supporters of both sides.  Many segments of the public were interested and concerned about the events of July 26, 2002, and the response and handling of the matter by the New Haven city officials.  Tolnay was not speaking on a matter solely of personal interest to him. Additionally, Officer Abate of the New Haven police department, who was with the plaintiff at the incident at the church, testified that she would be hesitant to effectuate an arrest, even if an arrest is called for, if it involved Hernandez and/or

Rodriguez. (Trial Tr. Vol. 5, p. 130)  Even where there is "no question that [plaintiff] took a personal interest in the matters about which he wrote," if the "predominant content" of the speech addresses matters of public concern, the speech is afforded First Amendment protection.  <u>Russo v. City of Hartford</u>, 341 F. Supp. 2d 85, 98 (D. Conn. 2004).  The voiding of appropriate arrest decisions based on political pandering to a segment of the population is clearly a matter of public concern.

Tolnay's speech was made as a citizen commenting on matters of such public concern.  The defendant's motions for a judgment as a matter of law or a new trial, insofar as they are based on their claim that the speech was unprotected, are hereby denied.

## II.  **QUALIFIED IMMUNITY**

Whether or not a defendant is entitled to qualified immunity is a question of law to be decided by the court.  In fact, this Court has already decided this issue in its summary judgment ruling.

To reiterate, the first question to decide is whether or not the government official's conduct violated a constitutional right.  "The relevant inquiry is ... whether the defendant[] should have known that the specific actions complained of violated the plaintiff's freedom of speech."  <u>Lewis v. Cowen</u>, 165 F.3d 154, 166-67 (2d Cir. 1999).

This Court, on many occasions, has already recognized Officer Tolnay's right to speak freely regarding the political influence of certain members of the New Haven community.  In 2002, the right to comment on political matters of the community was well-established.  It has been long recognized that there is significant public concern regarding the report of government misconduct.  Summ. Judgment Ruling at 48, citing <u>Vasbinder v. Ambach</u>, 926 F.2d 1333 (2d Cir. 1991).  It was not reasonable for Chief Wearing to conclude that it was permissible to discipline Tolnay for his comments on the political influence of Rodriguez and Hernandez.  Qualified immunity is denied.

## III.  <u>PICKERING INTERROGATORIES AND CHARGE</u>

The defendant claims he was entitled to a jury instruction and an interrogatory regarding the <u>Pickering</u> balance test.  The Supreme Court has recognized that a public employee does not surrender his First Amendment right to comment on matters of public concern.  <u>Pickering v. Bd. of Education</u>, 391 U.S. 563, 568 (1968).  At the same time, the State employer has an interest in regulating the speech of its employees.  <u>Id.</u>  As stated in <u>Pickering</u>, the task is to arrive "at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  <u>Id.</u>  In most cases, the issue of

17

whether an employee's speech is protected by the First Amendment is a matter of law to be decided by the Court, not one of fact to be decided by a jury.  Lewis v. Cohen, 165 F.3d 154, 165 (2d Cir. 1999).  Further, a "party is not entitled to have the court give the jury an instruction for which there is no evidentiary predicate at trial."  Perry v. Ethan Allen, Inc., 115 F.3d 143, 153 (2d Cir. 1997).  However, the Second Circuit has stated that it "can envision cases in which the question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation would properly be regarded as a question of fact, to be answered by the jury prior to the court's application of the Pickering balancing test." Vasbinder v. Ambach, 926 F.2d 1333, 1340 (2d Cir. 1991).

A state's burden to justify its decision to discipline varies depending on the nature of the employee's expression. Connick v. Myers, 461 U.S. 138, 150 (1983).  "Although such particularized balancing is difficult, the courts must reach the most appropriate possible balance of the competing interests." Id. (Emphasis added.)  "[A] stronger showing [of interference with the employer's operations] may be necessary if the employee's speech more substantially involved matters of public concern."  Id. at 152.

First, to contend that the trading by a public figure of selective law enforcement for the political support of a large

18

voting population is not a matter of serious public concern is
ludicrous.  Clearly, the plaintiff's expressed concerns over the
backlash he might face if he carried out his duties with respect
to Hernandez and Rodriguez are shared with the public.  On
summary judgment, this Court decided the <u>Pickering</u> issues in
favor of the plaintiff.  <u>See</u> Doc. # 29.  The Court ruled that the
defendant failed to provide evidence, in the form of an affidavit
or otherwise, that Tolnay's protected speech had the actual or
potential effect of disruption within the New Haven Police
Department.  At that stage, the defendant had not shown even a
likely interference with the police department's operations, much
less an actual disruption, caused by the plaintiff's speech.  <u>See</u>
<u>Jeffries v. Harleston</u>, 52 F.3d 9, 13 (2d Cir. 1995).  On the
contrary, as this Court noted, it seemed clear it was the
defendant's actions that caused a greater disturbance within the
police department than the plaintiff's.  In any event, the Court
held that the defendant had not met its burden under the
<u>Pickering</u> balance test to establish that Tolnay's protected
speech had, or could have had, a sufficiently severe impact on
the operations of the police department to conclude that the
state's efficiency interests outweighed Tolnay's First Amendment
rights.

This did not change at trial.  The defendant maintained his
assertion that Tolnay's speech was not the reason for his

discipline, rather, it was his conduct in leaving the August 13, 2002 meeting.  The defendant cites his own testimony at trial regarding "the adverse effect and disruption that an officer's insubordination directly to the Chief of Police can have on a police department."  Def.'s Mem. In Support of New Trial at 6, citing Tr. Vol. 4 at 32-36.  As this testimony makes clear, it was Tolnay's insubordinate behavior that the defendant claims was disruptive, not his protected speech.  Under the Pickering test, if the plaintiff can demonstrate that he suffered adverse employment action as a result of his speech, "the defendant[] may offer evidence that the employee's *protected conduct* interfered with the employer's effective and efficient fulfillment of its responsibilities to the public."  Gorman-Bakos, 252 F.3d 545, 557 (2d Cir. 2001) (internal citations and quotations omitted; emphasis added).

This case is more akin to Vasbinder v. Ambach, 926 F.2d 1333 (2d Cir. 1991), where the plaintiff's supervisors insisted that they did not demote the plaintiff because of his protected speech, but rather, because they felt he was incompetent.  Id. at 1340.  In Vasbinder, defendants Scott and Switzer "made little effort" to demonstrate that the plaintiff's protected speech impeded the efficient operation of the Office of Vocational Rehabilitation ("OVR").  Id.  In fact, they further testified that the discipline imposed on the plaintiff (negative

evaluations and a demotion resulting in a lower salary) had "absolutely nothing to do with Vasbinder's having gone to the FBI." <u>Id.</u> (Internal quotations omitted).  As a result, the Second Circuit ruled that the lower court did not err in its ruling that the defendants failed to meet their burden under the <u>Pickering</u> balance test.  <u>Id.</u>

In this case, Chief Wearing denied that Tolnay's "protected conduct" was the reason for his discipline or was disruptive, claiming it was Tolnay's abrupt and insubordinate departure from their August 13th meeting that gave rise to his suspension, a claim obviously rejected by the jury.  This is not enough to satisfy his burden entitling him to a charge under the <u>Pickering</u> balance test.

## IV. <u>INDEMNIFICATION TESTIMONY</u>

The defendant also claims that a new trial is required because of the testimony offered by Mayor DeStefano.  <u>See</u> Def.'s Mem. (New Trial) at 7.  Mayor DeStefano's self-serving and evasive testimony gratuitously contained an apparent admission that the City of New Haven typically indemnifies its officers in circumstances in which they are found civilly liable.

Under Rule 411 of the Federal Rules of Evidence, evidence regarding the defendant's insurance coverage is not admissible when offered to prove that the "person acted negligently or otherwise wrongfully."  Fed. R. Evid. 411.  As the defendant

21

points out, the Ninth Circuit has found that "[i]t has long been the rule in our courts that evidence of insurance or other indemnification is not admissible on the issue of damages, and, should any such information reach the ears of the jurors, the court should issue a curative instruction." <u>Larez v. Holcomb</u>, 16 F.3d 1513, 1518-19 (9th Cir. 1994), <u>citing</u> <u>Halladay v. Verschoor</u>, 381 F.2d 100, 112 (8th Cir. 1967).  As the court noted in <u>Larez</u>, if the jury learns that a city plans to indemnify its officer, it could be "tempted, out of sympathy for [the plaintiff], to inflate the award beyond the amount necessary to compensate [him or] her." <u>Larez</u>, 16 F.3d at 1519.  The jury's awareness of an indemnification policy "could result in an overly generous award of damages." <u>Griffin v. Hilke</u>, 804 F.2d 1052, 1058 (8th Cir. 1986).  Admittedly, evidence of indemnification could also assuage a jury's concerns that a civil servant defendant might be bankrupted by a substantial, though appropriate, judgment.  However, the opposite is also true.  A jury, with the knowledge of an existing indemnification policy, could be inspired to overcompensate a sympathetic plaintiff.  The fact of the matter is that none of this is appropriately a part of the jury's deliberations.

Rule 61 of the Federal Rules of Civil Procedure allows a court, at every level, to disregard any error "which does not affect the substantial rights of the parties."  Fed. R. Civ. P.

61.  Unless the failure or refusal to give a curative instruction in this case regarding the indemnification testimony offered by Mayor DeStefano "appears to the court inconsistent with substantial justice," the admission of that evidence does not justify the granting of a new trial or "vacating, modifying, or otherwise disturbing a judgment."  Id.

In the instant case, the plaintiff did not solicit the indemnification testimony from Mayor DeStefano.  On the contrary, the Mayor offered it gratuitously in an effort to justify his lack of concern for the potential legal exposure Officer Tolnay might face as a result of the Mayor's widely publicized apology at the Second Star of Jacob Church.  When plaintiff's counsel asked the Mayor whether or not he considered that the apology could expose Tolnay to civil liability, the Mayor responded by testifying that it was his understanding that the city indemnifies its officers.  (Trial Tr. Vol. IV at 211)  While the Mayor was called as a plaintiff's witness, his interests are clearly aligned with the defendant's.  Moreover, his testimony was general and in response to a question regarding Tolnay's hypothetical liability.  At no time did the Mayor mention defendant Chief Wearing's exposure to personal liability or the existence of any indemnification policy applicable to Chief Wearing specifically.  Furthermore, during a sidebar on this issue, the Court instructed plaintiff's counsel not to pursue the

details or existence of any insurance and/or indemnification agreements. (Trial Tr. Vol. 4, p. 215)

The defendant submitted a request in his proposed jury instructions that addressed the issue of indemnification.  Def's Proposed Jury Instructions, Doc. # 51-5 at 13.  This Court declined to accommodate the defendant and instead issued a redacted version of the defendant's instruction, omitting the reference to the defendant's individual liability.  Jury Instructions at 17.  Finally, in response to a question posed by the jury during its deliberations, the Court instructed the jury regarding the source of payment of any damage award as follows: "with respect to, if you find for the plaintiff, who would be paying the damages.  As it happens to be, the source of payment of any damages you may award, if you find for the plaintiff, is not an appropriate matter of concern for the jury.  And you are not to speculate about the source of payment of any damages you may find it appropriate to award."  (Trial Tr. Vol. 6 at 168-69) When the Court proposed this instruction to counsel for both parties, everyone agreed that this instruction was sufficient.[4] The Court continues to believe that this curative instruction

---

[4]The Court: Well, it's my intention to respond to [the jury's] inquiry as follows: You are not to speculate about the source of the payment of any damages you may award in this case if you find for the plaintiff ... Would that be alright?"
Ms. Torre: That's fine, your Honor.
Mr. Rhodes: That's fine, your Honor.
(Trial Tr. Vol. 6 at 167-68)

removes the possibility that the jury was tainted in any way by
Mayor DeStefano's brief general testimony regarding
indemnification.  The defendant's suggested instruction and
interrogatory were not necessary.

## V.    PUNITIVE DAMAGE INSTRUCTIONS AND THE JURY'S NOTE

### A.    THE COURT'S PUNITIVE DAMAGES INSTRUCTION

With respect to the instruction given to the jury regarding
punitive damages, the defendant asserts that a new trial is
warranted based, primarily, on the Court's decision not to
include a particular paragraph of the defendant's proposed
instructions.  Def.'s Proposed Jury Instructions, Doc. # 51-5 at
9.  That paragraph reads as follows:

> Although there is no mathematical formula to
> compute punitive damages, such an award must
> bear a reasonable relationship to the
> plaintiff's injury and any malicious intent
> by Chief Wearing.  Because neither
> compensation nor enrichment is a valid
> purpose of punitive damages, an award should
> not be so large as to constitute a windfall
> to the plaintiff.

Id.; see Lewis v. Cohen, 979 F.Supp. 99, 102 (D. Conn. 1997),
citing Getty Petroleum Corp. v. Island Transp. Corp., 862 F.2d
10, 14 (2d Cir. 1988) and Vasbinder v. Scott, 976 F.2d 118, 121
(2d Cir. 1992).  The defendant claims that the jury was not
properly instructed regarding the need for any punitive damage
award to reflect a "reasonable relationship" to the compensatory

25

award.  Def.'s Mem. (New Trial) at 12.  The defendant cites the
considerable punitive award in this case as evidence that the
jury "was confused about the governing law on punitive damages."
Id.

The jury was instructed, in relevant part, as follows: "If
you decide to award punitive damages, you must use sound reason
in setting the amount.  It must not reflect bias, prejudice, or
sympathy toward any party."  (Trial Tr. Vol. 6 at 148)  The jury
was further instructed that, "in deciding whether to award
punitive damages, you should consider whether defendant may be
adequately punished by an award of actual damages only ...." Id.
at 149.  "You may award punitive damages if the plaintiff proves
by a preponderance of the evidence that the defendant's conduct
was malicious and reckless, not merely unreasonable."  Id. At
147-48.

The Court's instructions to the jury regarding punitive
damages were adequate as the jury was told to use sound judgment
in making its determinations.  This charge is consistent with
numerous charges delivered by this Court in the past in cases
that did not result in inflated punitive damage awards.  The
defendant's request for a new trial based on this Court's
instructions regarding punitive damages is denied.

**B.    THE JURY'S NOTE REGARDING PAYMENT OF DAMAGES**

During its deliberations, the jury proposed a question to

the Court regarding the payment of damages, generally.[5]  The
defendant offered at least two proposed answers to the jury's
question.  First, the defendant suggested, again, that the Court
instruct the jury that any punitive award bear a "reasonable
relationship" to the plaintiff's injury and that the award should
not create a windfall for the plaintiff.  This Court denied that
proposal as irrelevant to the jury's question regarding who will
be responsible for payment of the award.  (Trial Tr. Vol. 6 at
165)

Next, the defendant suggested that the Court instruct the
jury that it should not award damages based on a belief that the
City of New Haven, or anyone other than the defendant, did
anything wrong, and the jury should not assume that anyone other
than Chief Wearing would be responsible for the award.  (Trial
Tr. Vol. 6 at 165-66)  Plaintiff objected based on the obvious
implication sent by that instruction that the jury should assume
Chief Wearing will be paying for any damage award from his
personal assets.  The fact is, there was no testimony directly
addressing this issue and it would be inappropriate to instruct
the jury that Chief Wearing would, or would not, be personally

---

[5] The jury's question was as follows: "In case we decide in
favor Will Melvin Wearing be paying Damages from his own personal
finances?
     or
     Will Melvin Wearing be paying damages from City tax
payers['] dollars?"  (Trial Tr. Vol. 6 at 161); Def.'s
Consolidated App. Of Exs. Vol. 1, Ex. 1 (Jury Note).

responsible for payment of any award.

As mentioned earlier, the Court instructed the jury that the source of payment of any award is not their concern.[6]  This was an appropriate response to the jury's question.  At trial, defense counsel began an inquiry into the defendant's personal finances.  Counsel abruptly abandoned that line of questioning when he was alerted by the plaintiff's counsel that she would follow up with a line of questioning regarding any third party sources of payment available to the Chief.  Therefore, it would have been improper to instruct the jury to consider the issue of payment of the award at all.  For these reasons, the defendant's request for a new trial based on this Court's response to the jury's question regarding payment of damages is denied.

## VI.  EXCESSIVENESS OF JURY AWARDS

"A district court has discretion to find a damage award excessive if it shocks the judicial conscience."  Ikram v. Waterbury Bd. Of Educ., No. 3:95CV2478, 1997 WL 597111, at *3 (D. Conn. Sept. 9, 1997), citing Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 18 (2d Cir. 1996).  "A jury verdict cannot stand if it is the result of a miscarriage of justice and is a windfall to the plaintiff without regard to her injury."  Id.  Clearly,

---

[6]"As it happens to be, the source of payment of any damages you may award, if you find for the plaintiff, is not an appropriate matter of concern for the jury.  And you are not to speculate about the source of payment of any damages you may find it appropriate to award."  (Trial Tr. Vol. 6 at 168-69)

there is "an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable [persons] may differ, but a question of law." Dagnello v. Long Island R.R. Co., 289 F.2d 797, 806 (2d Cir. 1961). If an award is not clearly excessive, or if an excessiveness evaluation results in a "close call," the award should remain undisturbed. See id. "This is especially true in civil rights cases where injuries are often intangible and non-economic." Ikram, 1997 WL 597111 at *4. A determination that an award is excessive does not mean merely that this Court would have preferred a lower amount, but rather that it would be a miscarriage of justice to approve an award of this magnitude.

"In order to determine whether a particular award is excessive, courts have found it useful to review awards in other cases involving similar injuries, while bearing in mind that any given judgment depends on a unique set of facts and circumstances." Nairn v. Nat'l R.R. Passenger Corp., 837 F.2d 565, 568 (2d Cir. 1988). It is not required that such a review be limited to § 1983 cases. This Court's examination of other cases brought under similar circumstances reveals that the jury's award of $150,000 falls within the range of reasonable compensatory awards. The punitive award, however, was excessive.

**A.    COMPENSATORY DAMAGES**

The defendant asserts that the non-economic compensatory

damage award of $150,000 was against the weight of the evidence and a new trial is required.  Def.'s Mem. (New Trial) at 18.  On the other hand, the plaintiff claims that the award "fairly reflected the distress, embarrassment, humiliation, reputational and professional injury" suffered by the plaintiff.  Pl.'s Opp'n (New Trial and Remittitur) at 12.

A plaintiff may receive compensatory damage awards for, among other things, harm to his or her reputation and personal humiliation.  <u>Bloch v. Ribar</u>, 156 F.3d 673, 679 (6th Cir. 1998), citing <u>Memphis Community Sch. Dist. v. Stachura</u>, 477 U.S. 299, 307 (1986).  Evidence that a plaintiff sought medical treatment for his emotional injuries is helpful, but not required. <u>Patrolmen's Benevolent Assoc. Of The City of New York v. The City of New York</u>, 310 F.3d 43, 55-56 (2d Cir. 2002).  Further, the "objective circumstances" of the violation may be sufficient, especially when coupled with the plaintiff's testimony regarding his emotional suffering, to establish the claimed emotional injury.  <u>Id.</u>

In <u>Ikram</u>, the plaintiff, a former special education teacher, was awarded $100,000 in compensatory damages after she suffered retaliation in violation of § 1983 for exercising her First Amendment right to free speech.  She suffered harassment and other retaliatory behavior after reporting that a teacher's aide had purchased weapons from a student at school.  <u>Ikram</u>, 1997 WL

30

597111, at *1.  The court held that the $100,000 compensatory award, which was part of a $350,000 total award, did not shock the judicial conscience.  Id. at *4.

Likewise, in Phillips v. Bowen, 278 F.3d 103, 111 (2d Cir. 2002), the court upheld a $400,000 compensatory award for emotional damages.  There, an employee of the sheriff's department sued the Sheriff of Saratoga, among others, under § 1983 for First Amendment retaliation.  Phillips claimed she was harassed at work because she supported the political opponent of the defendant.  The Second Circuit upheld the award despite the defendant's claim that plaintiff failed to establish economic damages or physical injury and the defendant's assertion that the plaintiff's evidence of emotional harm was minimal.  Id.  The $400,000 compensatory award did not shock the court's conscience. Id.

At trial, Tolnay produced evidence that his reputation within the police force and the community prior to the events that led to this litigation was impeccable.  The jury quite reasonably could have believed, and obviously did believe, that the treatment Tolnay received was very embarrassing.  The extensive press coverage of the Mayor's apology and the public reaction by members of the Second Star of Jacob congregation to the events surrounding the July 26, 2002 incident, are all intertwined with the plaintiff's suspension, relegation to a post

widely considered to be a demotion, and the requirement that he receive "sensitivity training."  The jury clearly felt that the plaintiff suffered extreme embarrassment and humiliation.  Based on the circumstances of this case, the Court finds that the jury's compensatory damages award of $150,000 is not excessive and was amply supported by the evidence at trial.

### B.    PUNITIVE DAMAGES

The Due Process clause of the Fourteenth Amendment prohibits courts from imposing excessive damage awards on a tortfeasor. When assessing a jury's award of punitive damages, it is vital that the court remember that the purpose of punitive damages is to punish the defendant and to deter him, and others similarly situated, from engaging in such reprehensible conduct in the future.  The award must still be reasonable and rational, however, and will not be upheld if it is "so high as to shock the judicial conscience and constitute a denial of justice." Ikram, 1997 WL 597111, at *4.  "[P]unitive damages should not be awarded beyond [an] amount reasonably necessary to secure [the] purposes of such awards." Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992).

To determine the appropriateness of the award, the court must examine (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to compensatory damages, and (3) the difference between this remedy

32

and the civil penalties authorized or imposed in comparable cases (the "Gore guideposts"). BMW of North America, Inc. v. Gore, 517 U.S. 559, 575 (1996). Here, a review of the three guideposts articulated in Gore, as well as the review of similar case law, confirms that the $5 million punitive award is excessive.


### 1. DEFENDANT'S REPREHENSIBLE CONDUCT

The first Gore guidepost requires an analysis of the reprehensibility of the defendant's conduct. Plaintiff established at trial, and the jury reasonably agreed, that the defendant engaged in conduct designed to punish and embarrass the plaintiff because of his statements regarding what he believed to be politically-motivated selective enforcement of the laws in New Haven. This Court finds particularly telling the Chief's admission that the arrests made at the Second Star of Jacob Church were completely lawful. (Trial Tr. Vol. 2 at 176) Further, Chief Wearing admitted that Tolnay would have been acting appropriately if he had charged Mr. Rodriguez in the motor vehicle incident. Nevertheless, the Chief suspended Tolnay after he stated his opinion that he felt unable to perform his duties as a police officer because certain citizens were politically connected.

The plaintiff offered more than adequate evidence that Chief

Wearing's suspension and subsequent relegation of the plaintiff to an undesirable assignment and required sensitivity training was malicious and designed to quell the plaintiff and any other officer who might make similar comments.  See Gore, 517 U.S. at 575-77 (1996) (malice is one of the "aggravating factors associated with particularly reprehensible conduct").  He offered sufficient evidence from which the jury could reasonably find that the Chief's conduct was flagrantly reprehensible.

### 2.    RATIO OF PUNITIVE DAMAGES TO COMPENSATORY DAMAGES

The Supreme Court has said that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." State Farm Mutual Automobile Ins. Co. v. Campbell, et al, 538 U.S. 408, 425 (2003).  Further, while rejecting the notion that a clear-cut mathematical formula can be followed, the Court stated that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety."  Id., citing Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23-24 (1991) and Gore at 581.

The jury awards in the present case resulted in a ratio of punitive to compensatory damages of roughly 33 to 1.  Gore and State Farm instruct that there is, at the least, a presumption that such a ratio constitutes a denial of due process.  Further, it is important to note that where the compensatory damages are

for emotional distress, those awards may already feature punitive elements.

### 3.    *COMPARABLE CIVIL PENALTIES*

A review of similar cases decided within the Second Circuit, and elsewhere – as the third <u>Gore</u> guidepost instructs – helps to guide this Court to the conclusion that the jury's punitive award is excessive.

In <u>Petramale v. Local No. 17 of Laborer's Int'l Union of N. Am.</u>, 847 F.2d 1009 (2d Cir. 1988), the plaintiff brought a First Amendment retaliation claim and won a jury verdict in the amount of $265,000, plus costs. <u>Id.</u> at 1012. $200,000 of the original jury verdict represented the compensatory portion of the award and $65,000 represented the total of four separate punitive damage awards against Local 17 of the Laborer's International Union of North America and three individual union officers. <u>Id.</u> at 1012. However, the Second Circuit ordered a new trial on the issue of compensatory damages unless the plaintiff agreed to remit all compensatory damages in excess of $100,000. <u>Id.</u> at 1013. The court also reduced the punitive award against Local 17 from $50,000 to $10,000 resulting in a total punitive award of $25,000. Thus, despite the fact that the compensatory awards in <u>Petramale</u> ($100,000) and this case ($150,903.84) are similar, the

35

punitive award that Tolnay received is roughly 200 times the punitive award in Petramale.

Though the Supreme Court in TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443 (1993),[7] affirmed a punitive award that was approximately 526 times the compensatory award, it also conceded that TXO's wealth and the fact that millions of dollars were at stake were significant factors in the Court's decision.[8] TXO, 509 U.S. at 460-61.  Because vast sums of money were at stake, and the harm that was likely to occur from TXO's conduct was so great, "the disparity between the punitive award and the potential harm does not, in our view, jar one's constitutional sensibilities."  Id. at 462 (internal citations and quotation marks omitted).  Notably, the compensatory award in TXO of $19,000 is significantly lower than the compensatory award of $150,000 that Tolnay received.

In Vasbinder v. Scott, 976 F.2d 118 (2d Cir. 1992) – another First Amendment retaliation case – the plaintiff was retaliated against after reporting to the FBI that he thought he had uncovered financial improprieties occurring at his place of

_____

[7] TXO was decided prior to BMW of N. America, Inc. v. Gore, 517 U.S. 559 (1996).

[8] The jury in TXO awarded $19,000 in compensatory damages and $10,000,000 in punitive damages.  TXO is "a large company that was engaged in oil and gas production in 25 states," TXO, 509 U.S. at 446, and Alliance controlled the rights to a 1,002.74 acre tract of land thought to possess sufficient natural resources to sustain "a 20 year well and ... produce a lot of money," id. at 462.

employment.  Vasbinder, 976 F.2d at 119.  A jury awarded the plaintiff $32,529.49 in lost wages, $50,000 for emotional distress and, later, $300,000 in punitive damages ($150,000 each against both defendants).  Id. at 120-21.  The Second Circuit found both of the $150,000 punitive awards to be excessive. Focusing on the relative net worth of each defendant, the Second Circuit found the awards were unreasonably large because they would dramatically reduce the defendants' "wealth and retirement expectations," and because the awards greatly exceeded that which is necessary to deter such reprehensible behavior in the future. Id. at 121.  The court held that punitive awards of $20,000 and $30,000, respectively, were sufficient.  Id. at 122.

In Moskowitz v. Coscette, 3 Fed. Appx. 1, 2001 WL 51009 (2d Cir. 2001) (UNPUBLISHED), a police officer brought a § 1983 claim against the Town of Walkill and its police chief.  The plaintiff alleged that the defendants retaliated against him based on his protected "statements related to actions by other officers that involved the safety of the public or corruption within the police department."  Id. at *4-5.  Upon a plaintiff's verdict, Moskowitz was awarded $125,000 in compensatory damages and $75,000 in punitive damages.  Id. at *3.  The Second Circuit upheld both the compensatory and the punitive damage awards.  Id. at *6-*7.

After a review of <u>Gore</u>, <u>State Farm</u>, and their progeny, this Court concludes that the jury's punitive damage award of $5,000,000 exceeds the amount necessary to punish the defendant and to deter him and others from engaging in this type of conduct in the future.  If left alone, the punitive award, although reflective of the outrage of the jury at the actions of the defendant and his treatment of the plaintiff, would constitute a windfall to the plaintiff and a denial of due process to the defendant.  <u>See</u> <u>Vasbinder</u>, 976 F.2d at 122.  Instead, a new trial on damages is hereby ordered unless the plaintiff agrees to remit any amount of punitive damages in excess of $1,350,000.  This amount is equal to roughly nine times the compensatory damage award and, because of the particularly egregious nature of the defendant's conduct and because non-economic harm can sometimes be difficult to quantify, is satisfactory and appropriate.

## VII.  <u>THE ADMISSION OF REDACTED VERSIONS OF NEWS ARTICLES</u>

The plaintiff offered a number of redacted newspaper articles as evidence that the incident occurring on July 26, 2002 and the reaction to that incident received considerable attention by the local press.[9]  The defendant claims that the content of

---

[9]  In particular, one exhibit featured roughly the first half of an article printed in the New Haven Register, including the title and a brief summary, recounting a portion the July 26, 2002 incident and an alderman's subsequent demand for an apology by the police.  Pl.'s Trial Ex. 3.  Another exhibit included only

these articles constitutes inadmissible hearsay, and he seeks a new trial based on this Court's admission of the articles.  The defendant asserts that the newspaper articles were, in fact, offered to prove the truth of the matters asserted therein and not merely as evidence of the existence of media coverage of the arrests and their aftermath.

The Court addressed this issue in its charge to the jury.[10] "The court, however, may consider such statements as newspaper articles so long as they are not submitted for the truth of the matter asserted therein." Krause v. Buffalo and Erie County Workforce Development Consortium, Inc., 2005 WL 2420358, *19 (W.D.N.Y. 2005), citing Shafii v. PLC British Airways, 22 F.3d 59, 64-65 (2d Cir. 1994) (holding that because affidavit submitted in opposition to summary judgment containing affiant's

---

the title of an article printed in the New Haven Register.  Pl.'s Trial Ex. 5.  A third exhibit featured the title, a quote, an eight-word summary, and a portion of the full article about the police union's reaction to the Mayor's apology to the Church. Pl.'s Trial Ex. 6.  Finally, another exhibit included the title, a summary, a portion of the text, and a picture from an article about the Mayor's apology to the congregation.  Pl.'s Trial Ex. 7.

[10] "[W]ith regard to the newspaper articles or portions thereof that were marked as plaintiff's exhibits 3,5,6 and 7, you will recall that when these exhibits were introduced, I instructed you that they were not being admitted for the truth of the matters contained therein, but for the limited purpose of showing that the July 26, 2002 incident and the reaction to it was the subject of newspaper coverage.  What that means is that you are not to consider any of the statements in the articles to be facts which you can consider in deciding this case." Jury Charge at 9.

recollection of statements made by arbitrator was offered, not for the truth of the matter asserted but to establish the fact that such statements had been made, the affidavit did not constitute inadmissible hearsay and could be considered by court). The Court remains confident that its charge was sufficient to obviate any concern that the jury might inappropriately rely on the content of these newspaper articles to make their findings of fact. This, in addition to the vast amount of evidence the plaintiff presented to prove his case, prevented any prejudicial taint from accompanying the evidence into the jury's deliberation room. The defendant's motion for a new trial based on the admission of the news articles is denied.

## VIII.   THE ADMISSION OF EVIDENCE REGARDING PAST INCIDENTS OF DISCIPLINARY ACTION

The defendant claims that evidence of past disciplinary actions taken by him that were the result of something other than insubordination by an officer directly to the Chief should not have been admitted. Such instances, defendant claims, are not sufficiently similar to the case at bar and, absent such substantial similarity, the probative value of the evidence was outweighed by its prejudicial nature.

At trial, the plaintiff introduced evidence of past disciplinary measures taken against other officers in the New Haven police force. Among the conduct engaged in by these officers which led to their discipline was the following: an

officer's refusal to wear his uniform hat (suspended one day),

Pl.'s Trial Ex. 22; a profanity-laced insubordinate response by a

Sergeant referring to the Assistant Chief (suspended two days),

Pl.'s Trial Ex. 23; an outright refusal to obey an order of a

superior occurring only one month after a prior incident of

insubordination (suspended five days), Pl.'s Trial Ex. 26; an

officer's refusal to work a certain shift coupled with that

officer's attempts to influence others to refuse to work the same

shift, all of which occurred roughly a year after the officer had

been disciplined for disruptive behavior (suspended five days),

Pl.'s Trial Ex. 29; public disobedience by a detective towards

her supervising Sergeant (suspended two days), Pl.'s Trial Ex.

30; and a second discipline of an officer for insubordination,

discourtesy, and intimidation of a co-worker (suspended two

days)[11] Pl.'s Trial Ex. 32.

The plaintiff clearly sought to introduce this evidence in

order to prove that the defendant's response to the plaintiff's

comments was unusually harsh.[12]  The admission of this evidence

did not violate Rule 404(b), which disallows evidence of other

crimes, wrongs, or acts offered "to show action in conformity

therewith."  Fed. R. Evid. 404(b).  Though these disciplinary

---

[11] This officer's first incident of discipline, for failure
to follow orders, resulted in a Written Warning.  Pl.'s Trial Ex.
32.

[12] As stated earlier, the plaintiff was originally suspended
for ten days.  The suspension was later reduced to five days.

41

actions do not involve direct insubordination towards the Chief of Police or First Amendment retaliation, they are relevant to establish that the Chief's action was heavy handed and intended to send a message to Officer Tolnay.  Under circumstances that are similar, but did not involve the same type of speech by an officer, less severe discipline was meted out.  Merely because some of plaintiff's examples featured insubordination towards a superior other than the Chief does not render those examples wholly irrelevant.  Whether or not the more severe discipline was a result of Tolnay's "direct insubordinate" behavior toward the Chief, or because of the content of Tolnay's statements, was an issue for the jury to decide.  The defendant's claim that the evidence of other disciplinary actions was admitted in error is without merit.  His motion based on this claim is denied.

## IX.  PLAINTIFF'S COUNSEL'S CLOSING REMARKS DO NOT WARRANT A NEW TRIAL

During her closing arguments, plaintiff's counsel suggested that, absent a strong message sent by the jury, a police officer might be reluctant to perform his or her duties in the future if a politically connected person is involved.  (Trial Tr. Vol. 6 at 50-51)  Therefore, plaintiff's counsel argued, the jury should return a substantial punitive award in order to deter conduct like Chief Wearing's.  As examples of potential consequences of an officer's reluctance to enforce the law, plaintiff's counsel suggested that drunk drivers might be allowed to continue driving

42

for fear of possible repercussions, or that an influential person caught with cocaine might go unpunished so that an officer could avoid the type of backlash experienced by Tolnay.  Id.

The defendant claims that these examples were inflammatory and caused substantial prejudice to Chief Wearing, that the jury was unfairly influenced by these statements, and, therefore, a new trial should be granted.

In support of defendant's argument, he cites Pappas v. Middle Earth Condominium Ass'n, 963 F.2d 534, 539 (2d Cir. 1992), a case of federal diversity jurisdiction.  During the closing in Pappas, defendant's counsel placed the jury squarely in an "us-versus-them" scenario by highlighting the behavior of the out-of-state plaintiffs and suggesting that counsel and the jury members, residents of Vermont, would not, as a group, have behaved like the out-of-state plaintiffs.  Id.  The defendant's lawyer was attempting to align himself with the jury and to create a potential bias towards the out-of-state plaintiffs. "Appeals tending to create feelings of hostility against out-of-state parties are so plainly repugnant that the Supreme Court long ago stated their condemnation required no comment." Id.  It is quite a stretch to equate counsel's remarks in Pappas with those of plaintiff's counsel in the case at bar.

The defendant also cites Brown v. Walter, 62 F.2d 798, 799-800 (2d Cir. 1933).  In that case, the plaintiff's lawyer made

43

several "transparently veiled" suggestions during the summation that the defendant was insured.  Id.  This was entirely inappropriate and irrelevant to the issue of liability.

The attempt, in Pappas, to sway the jury using regional bias was not grounded in the facts of that case.  Conversely, Tolnay's attorney's hypothetical examples are potential consequences of the type of behavior directly at issue in the case at bar.  While her remarks could be interpreted as attempts to appeal to the jury's emotions, they did not cause substantial prejudice to Chief Wearing and a new trial based on those comments is not warranted.

## X.    JURY INTERROGATORIES REGARDING QUALIFIED IMMUNITY

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Saucier v. Katz, 533 U.S. 194, 200 (2001), quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  Chief Wearing asserts that, "to the extent the Court denied qualified immunity to Chief Wearing on perceived disputed factual questions, those questions should have been submitted to the jury under Warren."  Def.'s Mem. (New Trial) at 40.  On summary judgment, the Court denied the Chief the defense of qualified immunity.  Summary Judgment Ruling (Doc. # 29) at 51. During the trial, the Court declined to instruct the jury regarding qualified immunity and, likewise, did not include a jury interrogatory addressing that defense.  Now, the defendant

claims he is entitled to a new trial "if the Court believed that there were disputed factual questions related to the defense of qualified immunity ...." Def.'s Mem. (New Trial) at 40.

The finding of a constitutional violation answers the threshold question in a qualified immunity analysis. This Court, on summary judgment, found that, if the plaintiff's factual allegations were true, a Constitutional violation had occurred. The jury ultimately agreed with the plaintiff's version of the facts. The threshold question has been answered.

Next, the Court determines whether or not the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "The relevant inquiry is ... whether the defendant[] should have known that the specific actions complained of violated the plaintiff's freedom of speech." Lewis v. Cowen 165 F.3d 154, 166-67 (2d Cir. 1999).

The Court determined at summary judgment, and continues to believe, that the actions by Wearing that Tolnay complained of – suspension from the department if in response to Tolnay's comments about politically-based law enforcement – infringed upon a clearly established right, and, therefore, the defense of qualified immunity would not be available to the defendant.

45

Therefore, it would not have been appropriate to submit an interrogatory or give an instruction to the jury that would have allowed the jury to conclude that the defense is applicable. Whether or not Wearing's disciplinary action was in response to Tolnay's protected speech was a fact issue for the jury to determine.  The question of whether the defense of qualified immunity applied, if the jury found Wearing acted in a retaliatory manner, was properly for the Court to decide, not the jury.  The defendant's invitation to the Court to submit jury interrogatories and instructions regarding the qualified immunity defense was properly declined.

## CONCLUSION

For the foregoing reasons, defendant's Motion for Judgment as a Matter of Law (Doc. # 76) is hereby DENIED.  Defendant's Motion for Remittitur (Doc. # 74) is GRANTED, and therefore the plaintiff has the option of accepting a reduced punitive damage award in the amount of $1,350,000.  Should plaintiff choose not to accept this remittitur, defendant's Motion for a New Trial (Doc. # 77) will be GRANTED solely on the issue of damages. Plaintiff shall, within thirty (30) days from the filing of this

ruling, state his election whether or not to accept the reduced award.

                              SO ORDERED


                         _____
                         ELLEN BREE BURNS
                         SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut this _____ day of February, 2007.