# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ARPAD TOLNAY                          :
                                      :
          Plaintiff,                  :
                                      :
                                      :   Civil No. 3:02CV1514 (EBB)
V.                                    :
                                      :
MELVIN WEARING                        :
                                      :   September 8, 2006
          Defendant.                  :

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT

### I.    INTRODUCTION

Upon the verdict rendered in this case, which reflected the nine-member jury's outrage and disgust over the events which led to this litigation, the judgment has given rise to an ever-increasing army of defense lawyers and with them, seemingly endless and repetitive briefing, improper filings, improper motions and questionable tactics.[1]  Defense counsel have already taken more than a few liberties with legal briefing.[2]

On June 2, 2006, this court *sua sponte* issued an order directing counsel to file briefs

---

[1] Among them, the protracted, time-consuming and expensive hearings on defendant's demand for a stay of execution without posting security during which this court was treated to the spectacle of Wearing's own attorneys, including his newest personal counsel, collaborating to convey the suggestion that their client should be held personally responsible for the judgment.

[2] The excesses include, but are not limited to, defense counsel's improper filing of a motion for remittitur accompanied by a voluminous memorandum of law, pleadings which are not permitted under the rules of civil procedure and were not authorized by special leave of court.  The issue of remittitur had already been addressed and extensively briefed by defense counsel in the proper vehicle – in defendant's lengthy Motion for a New Trial filed pursuant to Rule 59. Defense counsel improperly another motion and brief on the issue of remittitur.  Accordingly, before the court is plaintiff's motion to strike the improper pleadings.

regarding the applicability to this case, if any, of the Supreme Court's decision in Garcetti v. Ceballos. In compliance with that order, counsel for both parties submitted substantial briefs. Moreover, this court not only afforded counsel the opportunity to present oral argument on the Garcetti issue but afforded counsel hours, and more than ample opportunity to present such arguments on July 21, 2006.

Now, under the guise of Rule 60, defense counsel have submitted another lengthy brief on the Garcetti issue – a brief which cites and discusses a number of cases which predate the oral argument.[3] Defense counsel had and was certainly provided ample opportunity by this court on July 21, 2006 to argue the matter and direct the court's attention to any case holdings which had been handed down on the issue. No matter what the issue of law is, the District and Circuit Courts in this country issue decisions every day and it is entirely inappropriate for defense counsel to proceed as if they are entitled to keep this case open *ad infinitum* so they can continue to argue and brief the matter.

It readily appears, therefore, that the instant motion by the defendant is a mere dilatory tactic, especially where defendant's mid-August submission relates to a Supreme Court decision issued back on May 30, 2006.

As is demonstrated herein, while it is true that the import of the Garcetti opinion continues

---

[3]For example, in their memorandum of law in support of their Rule 60 motion, Wearing purportedly relies on Logan v. The Indiana Dep't. Of Corrections, 2006 U.S. Dist. LEXIS 43631, a case that was decided on June 26, 2006. Defendant also cites Mills v. City of Evansville, 452 F.3d 646 (7th Cir. 2006), a case that was decided on June 20, 2006, Ryan v. Shawnee Mission Unified School Dist., 2006 U.S. Dist. LEXIS 46311, decided July 7, 2006 and Ruotolo v. City of New York, 2006 U.S. Dist. LEXIS 49903 decided July 19, 2006. Defense counsel were afforded ample opportunity to present this authority on July 21, 2006. Thus, defendant's instant motion readily appears to be a mere dilatory maneuver.

to unfold, it remains that the issue has been and will continue to be the subject of decisions for a long time to come. This does not translate to a right of the defendant to rebrief the issue every time he thinks a new opinion aids his cause for there are cases aplenty which amply support the plaintiff's position.

While perhaps it should be expected that a politically charged and highly publicized case involving this type of punitive assessment would lead to an ever-increasing and exponential growth in the size of the defense team, treating this litigation as a veritable trough for profitable billing causes undue nuisance for the court, the plaintiff and his counsel.

## II.    ARGUMENT

### A.    DEVELOPING CASE AUTHORITY DEMONSTRATES THAT DEFENDANT IS NOT ENTITLED TO JUDGMENT AFTER A FULL JURY TRIAL AND UPON EVIDENCE THAT PLAINTIFF HARDLY ENGAGED IN JOB-REQUIRED OR EMPLOYER-COMMISSIONED SPEECH BUT ENGAGED IN INDEPENDENT, WHOLLY DISCRETIONARY ACTS OF EXPRESSING HIS OWN OPINION ON MATTERS THAT WERE NOT ONLY OF PUBLIC CONCERN BUT THE SUBJECT OF ON-GOING PUBLIC DEBATE AND MEDIA COVERAGE.

While defendant cites several cases in support of his motion for relief from the judgment,[4] for obvious reasons, defendant omits from his brief numerous cases which demonstrate the correctness of this court's ruling denying Wearing summary judgment and the necessity of respecting the jury verdict and judgment in this case. Consideration of the holding and opinion in Garcetti by

---

[4]As defense counsel noted in their brief, they consider themselves to have moved for relief from judgment under Rule 60 at the oral argument on July 21, 2006 upon the authority and arguments set forth in their brief on the Garcetti issue. All but one of defendant's cited cases pre-date the July 21, 2006 oral argument in this case, a fact which further demonstrates the impropriety of defendant's repetitive use of Rule 60 to keep this case open and forestall this court's rulings. Moreover, defendant's cited cases are inapposite to the instant case for reasons discussed *infra* at pp. 26-31 .

the District and Appellate Courts confirms the plaintiff's position articulated at oral argument viz, that application of the <u>Garcetti</u> opinion is a fact-based inquiry to be made on a case-by-case basis and otherwise represents the Supreme Court's application its own prior holdings on public employee speech. As the following cases demonstrate, courts have been guided by two other aspects of <u>Garcetti</u> as made clear by the court's majority: (1) the <u>Garcetti</u> opinion was considered a proper application by the Supreme Court of its own precedents, namely, <u>Connick v. Myers</u>,[5] and <u>Givhan v. Western Consol. School District</u>[6]; and (2) the outcome turned entirely on the parties' stipulation to a key undisputed fact: that the "speech" in question – Ceballos' prosecutorial Disposition Memorandum – was an activity and expression required by his official job duties. While plaintiff does not wish to parrot defendant's repetitive pleadings and arguments, as plaintiff already submitted a 48-page brief on the <u>Garcetti</u> issue and incorporates its contents by reference herein, it does bear mention once again that the <u>Garcetti</u> majority, stating its desire to assuage the concern of the Court of Appeals below, expressly stated the limitations of its holding which, it indicated, would not extend to scenarios such as that in <u>Connick v. Myers</u>. <u>Garcetti</u> Slip Op. at p. 12.[7]

---

[5] 461 U.S. 138 (1983).

[6] 439 U.S. 410 (1979).

[7] Chief Wearing continues to pretend that <u>Connick</u> and <u>Givhan</u> do not exist yet those opinions were expressly left undisturbed by the <u>Garcetti</u> majority, which considered its opinion to be consistent with both cases. Thus, Wearing's seeming proposition – that <u>Garcetti</u> requires reversal of the judgment because Tolnay's expressions occurred at work and were related to his employment is without merit. The Supreme Court pointedly rejected the notion which Wearing advances now for it pointedly emphasized that the fact that Ceballos "expressed his views inside his office, rather than publicly, is not dispositive . . .", nor was it dispositive that Ceballos' memo concerned the subject matter of Ceballos' employment. <u>Garcetti</u>, Slip Op. at p. 9. Thus, Chief Wearing's emphasis on the fact one instance of Tolnay's speech occurred in an office meeting with his boss is unavailing. If the fact that Tolnay's speech occurred in a face-to-face meeting with Wearing were dispositive, then <u>Givhan</u>, which also involved a face-to-face meeting between the plaintiff and her boss, would no

The following cases, supportive of Officer Tolnay's position and arguments, were omitted in the defendant's brief. In <u>Kodrea v. City of Kokomo,</u> 2006 U.S. Dist. LEXIS 42327 (S.D. Ind. June 22, 2006), the District Court considered whether <u>Garcetti</u> operated to deny First Amendment protection to a municipal employee who voiced his concerns about payroll discrepancies and evidence which suggested that another municipal employee was being paid for hours that he had not in fact worked. Kodrea was employed as a recreational programmer for the city's Parks Department. He alleged that city officials retaliated against him after he complained and voiced concerns that an employee was getting paid by the city when in reality he was working for another company. Kodrea's report met with resistance by city officials who were hostile to any attention being brought to the problem and wished to cover it up. <u>Id.</u> at *11. There appears no question that Kodrea's expressions took place at work, were confined to internal complaints and reports to his superiors and otherwise concerned generally the subject matter of his employment and the department's affairs. Kodrea alleged he suffered retaliation in the form of negative performance appraisals, mandatory probation and ultimately discharge. Defendants sought judgment on the basis of the Supreme Court's opinion in <u>Garcetti.</u> The District Court denied judgment to defendants, stating that although Kodrea's job responsibilities "included supervising and coordinating recreational programs and supervising the seasonal staff for concessions stands . . . <u>nothing in Kodrea's job description required him to monitor or report misconduct.</u>" <u>Id.</u> at **9-10 (emphasis supplied). Distinguishing Kodrea's situation from <u>Garcetti,</u> the District Court noted that a "controlling factor" in <u>Garcetti</u> was that the plaintiff's speech was made pursuant to his official duties. <u>Id.</u> at *22, citing <u>Garcetti v. Ceballos,</u> 126 S.Ct 1951, 164 L.Ed. 2d 689 [WL] at *8. The District Court further noted that a distinguishing

---

longer be good law, a notion the <u>Garcetti</u> majority expressly disavowed.

5

feature of <u>Garcetti</u> was the fact that among Ceballos' very job responsibilities was the duty "to investigate concerns and advise his superiors regarding pending cases, a fact that was not disputed by the parties." <u>Id</u>. Recognizing that this fact was a matter of undisputed agreement between the parties in <u>Garcetti</u>, and further noting the Supreme Court's observation that it was not, in <u>Garcetti</u>, presented with an occasion "to articulate a framework for defining the scope of an employee's duties in cases where there is room for serious debate", the District Court found <u>Garcetti</u> inapplicable to Kodrea's speech:

> *Garcetti* reveals that an important factor in addressing whether or not Kodrea's speech was protected is his job responsibilities. Unlike the situation in *Garcetti*, however, there is a factual dispute in this case concerning whether Kodrea's complaints about Campbell's hours in the ASA refund were made pursuant to his ordinary duties. As Kodrea notes, nothing in his job description required him to monitor or report misconduct. Further, Kodrea was not responsible for signing and approving or otherwise completing Campbell's time sheet; that responsibility was handled by Smith and the Parks Department secretaries.

<u>Kodrea v. City of Kokomo</u>, 2006 U.S. Dist. LEXIS 42327 at *24.

Perhaps most noteworthy about the <u>Kodrea</u> opinion is the District Court's emphasis of facts resemblant of Tolnay's case, namely, that Kodrea's supervisors reacted to Kodrea's disclosures with an attitude suggesting that the issue Kodrea was raising was not his problem and that his supervisors would take care of the matter. This evidence, in the District Court's mind, undercut defendants' claim to judgment under <u>Garcetti</u> since it suggested that Kodrea's raising the issue of misuse of public funds was "not part of [his] job at all". The District Court concluded:

> Simply put, there are factual issues about whether Kodrea's ordinary job responsibilities included overseeing Campbell's hours of work and the ASA refunds. Neither activity appears to have been Kodrea's core function as a Recreational Program Director.

<u>Id</u>. at *26.

6

Applying the <u>Kodrea</u> court's reasoning to the instant case, there is not only a complete absence of evidence that engaging in speech concerning the improprieties of Ortiz, Wearing and Mayor DeStefano in relieving criminals from arrest and prosecution based on their political value to DeStefano was among Tolnay's official duties, as before noted in previous briefs, Wearing and Ortiz expressed just the opposite view.

Moreover, the District Court flatly rejected another argument akin to one Chief Wearing repeatedly makes. The defendants in <u>Kodrea</u> argued that plaintiff's speech was not a matter of public concern because it was expressed internally to his superior. In rejecting this argument as inconsistent with the Supreme Court's holding in <u>Givhan</u>, the District Court stated:

> The Court next considers the form of Kodrea's speech. Kodrea initially conveyed his concerns internally to Smith, his supervisor. Defendants contend that Kodrea's speech was not a matter of public concern because he did not seek a forum of communication to air his concerns publicly. However, the First Amendment protection of speech is not limited to only those instances where the speech is broadcast to the world. See <u>Givhan v. W. Line Consol. Sch. Dist.</u>, 439 U.S. 410, 415-16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). <u>The fact that Kodrea may have spoken privately with Smith does not make his speech less a matter of public concern.</u> See <u>Delgado v. Jones</u>, 282 F.3d 511, 518 (7th Cir. 2002) (citing <u>Givhan</u>, 439 U.S. at 415-16) Indeed, as the Seventh Circuit has recognized, 'an employee who attempts to follow internal mechanisms to resolve important issues should not be automatically treated less favorably than the individual who immediately turns to the press or public forum'. <u>Spiegla v. Hull</u>, 371 F.3d 928, 937-38 (7th Cir. 2004). To accept Defendants' argument would be to disregard these principles and place a burden on plaintiffs to become public champions of potential wrongdoing in order to be afforded First Amendment protection, a result not required by the law.

<u>Id.</u> at **29-30 (emphasis supplied).

Finally, the District Court in <u>Kodrea</u> rejected still another argument which Chief Wearing makes here: to wit, that Tolnay's speech should be stripped of protection because he allegedly had a personal stake in its subject matter. While recognizing the established principle that "motive

7

matters to the extent that even speech on a subject that would otherwise be of interest to the public will not be protected if the expression addresses only the personal effect upon the employee", the District Court invoked the equally well-established principle that "[t]he fact that an employee has a personal stake in the subject matter of the speech does not necessarily remove it from the scope of public concern". Id. at *30. Against these principles, the District Court rejected the defendant's contention that Kodrea's only motivation for speaking was "to protect his job", as the context and timing of Kodrea's speech precluded any conclusion "that Kodrea's sole motivation in voicing his concerns was for personal reasons". Id. At *31. But see Reuland v. Hynes, 2006 U.S. App. LEXIS 21346 August 21, 2006) (holding just weeks ago that the motivation of the speaker is irrelevant in a public employee First Amendment case).

As noted in plaintiff's principle brief on the Garcetti issue filed June 30, 2006 and at oral argument on July 21, 2006, and for the same reasons articulated by the District Court in Kodrea, the evidence in this case similarly undercuts Chief Wearing's quest for judgment. As plaintiff has already explicated at length, Tolnay's speech was hardly expressed pursuant to an official duty of the job he held. To the contrary, Chief Wearing and Captain Ortiz not only expressed hostility toward Tolnay's expressions but specifically claimed that Tolnay had no business engaging in the speech to begin with. At no time prior to judgment did Wearing claim or point to any evidence to support the notion, that Tolnay's speech was expressed pursuant to his official job duties. Indeed, Wearing's entire strategic defense in this case hinged on his vociferous denial that Tolnay's speech had anything to do with the adverse actions. Prior to the litigation, Wearing criticized and faulted Tolnay for getting into the issue of political machinations by city officials during the course of his job duties. Once sued, Wearing sought to disconnect the adverse actions from his hostility toward

8

the fact and content of Tolnay's speech by claiming that it was not Tolnay's "political speculations" and "trash-talking" (nor Ortiz's upset with Tolnay's written remarks) which drove the discipline and transfer of Officer Tolnay to the dungeon of the booking room but Tolnay's insubordinate act of "walking out" of the meeting of August 13, 2002. The jurors didn't believe Wearing, and for good reason, given the eye-popping evidence of Wearing's disciplinary practises during his tenure as Chief.[8]

Similarly, in Batt v. City of Oakland, 2006 U.S. Dist. LEXIS 47889 (N.D. Cal.) the District Court rejected a defendant's renewed attempt to gain judgment based on Garcetti in a case involving a police officer alleging a violation of his First Amendment rights after he was forced to quit his job for fear of official retaliation in the wake of his reporting and expression of concerns to superiors regarding the misconduct of other officers. In Batt, the plaintiff police officer witnessed what he believed were illegal and brutal acts on the part of his Superior and three other officers.[9] Officer Batt, whose conscience was rattled after witnessing shocking brutality by other officers, raised his concerns to two immediate superiors. The record indicates that, like the plaintiff in Kodrea, Batt did not air his complaints publicly but internally confronted his superiors with his concerns. By a

---

[8]The evidence on this was contested by the parties and the jurors obviously credited Tolnay's account and that of Lt. Leo Bombalicki who contradicted Wearing's characterization of Tolnay's as insubordinate. Bombalicki testified that it was he who told to step outside while he (Bombalicki) spoke to the Chief alone. There was no evidence that Wearing ordered Tolnay to remain despite Bombalicki's advisement. Moreover, there was uncontested evidence that Officer Jamie Abate followed Tolnay out the door yet Wearing neither disciplined her nor accused her of "walking out" of a meeting with the chief. Wearing, in his various post-judgment maneuvers, fails to acknowledge that the jurors simply did not believe him on any count.

[9] As is evident from the District Court's decision, the Court detailed the facts of the case in its earlier order denying defendants' motion for judgment on the pleadings and was called upon to revisit and reassess its earlier ruling upon motion of the defendants in the wake of the issuance of the Garcetti opinion. Id. at *2.

renewed motion, the defendants argued that Batt's speech was stripped of protection in the wake of the <u>Garcetti</u> holding and posited that one of the officer's job duties was to report misconduct to his superiors. Notably in contrast to Tolnay's case, the District Court's opinion in <u>Batt</u> establishes that there was no evidence to suggest that Officer Batt's superiors believed Batt had spoken out of turn or engaged in improper "trash talking" of other officers or improper political commentary. Quite the contrary, defendant sought judgment based on <u>Garcetti</u> by arguing the opposite, to wit: that it was Batt's <u>duty</u> as a police officer to report such misconduct. <u>Id.</u> at *9. In rejecting the suggestion that <u>Garcetti</u> compelled judgment for the defendant, the District Court emphasized the fact that the <u>Garcetti</u> majority did not issue a rule of law to be interpreted as rendering unprotected all workplace speech:

> The [Supreme] Court later qualified its apparently categorical exclusion of speech made pursuant to a job duty:
>
>> We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there was room for serious debate. We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions....The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employees' written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

<u>Batt v. City of Oakland</u>, 2006 U.S. Dist. LEXIS 47889 at **10-11 (quoting from Garcetti).

Indeed, the defendant in <u>Batt</u> had a far better argument than Chief Wearing has here for he introduced documentary evidence which gave at least some support to the suggestion that among Batt's job responsibilities was the duty to report such misconduct as physical brutality by other officers. The District Court nevertheless rejected the suggestion that such evidence was dispositive:

Here, defendants' argument that plaintiff had a duty to report misconduct rests on OPD rules and regulations - materials which the <u>Garcetti</u> court suggested are not dispositive. The central premise of plaintiff's case is that notwithstanding any official policy of the OPD, the culture of the OPD and the expressed commands of his direct supervisors established that plaintiff had a duty <u>not</u> to report misconduct. Plaintiff has offered a variety of evidence in support of his claim, including plaintiff's experiences at the Academy, his interaction with his superiors, his interaction with his peers following his report to Internal Affairs, and the testimony of Chief Word that plaintiff's career would have been impaired as a result of his report. Thus a fact issue remains as to whether plaintiff's speech was protected under the First Amendment.

<u>Id</u>. at **11-12.

The reasoning of the District Court in <u>Batt</u> on this point is particularly meaningful to Tolnay's case for in <u>Batt</u>, the District Court took note of <u>documentary evidence</u> offered by defendant which at least supported defendant's contention that reporting brutality on the part of fellow officers was a job-required duty yet the District Court, following the cautionary instruction from the <u>Garcetti</u> majority, held that what mattered more was the <u>actual</u> environment in the police department which, contrary to its purported policy, showed that what department brass really expected from officers is to keep quiet about such misconduct.

Applying <u>Batt</u> to the instant case, this Court should take note of the complete <u>absence</u> of any evidence offered by Wearing at any time which could even remotely suggest that it was among Tolnay's duties to make disclosures or express opinions on the issue of the Mayor's political supporters being accorded preferential treatment and allowed to engage in law-breaking without penalty. Likewise, Wearing offered no evidence whatever to suggest that among Tolnay's job duties was to complain about the serious misconduct of Captain Ortiz in ordering Tolnay to stay away from Messrs. Hernandez and Rodriguez - an order directed to the very patrol officer assigned to the district in which both individuals circulated, one of whom had a criminal record, continued to act up and

11

would be further emboldened to engage in law-breaking kowing that he had the protection of Ortiz. Ortiz's order translated to a directive to refrain from enforcing the law against two known political activists who were considered valuable to Mayor DeStefano's mayoral campaigns and gubernatorial ambitions. Worse yet, as the evidence unfolded and revealed at trial, Ortiz was not only indulging the Mayor's personal and political interests but his own interests in succeeding Wearing as Chief. The evidence showed quite clearly that Ortiz, aware of Wearing's impending retirement, was trading law enforcement for support of his bid to be the Mayor's next political appointee to the office of Chief of Police. Toward that end, Ortiz not only ordered the plaintiff to stay away from the ministers but personally visited the home of one of them, sat in his kitchen and collaborated with him in the filing of a patently false civilian complaint against an honest officer with an unblemished record.

The seriousness of Ortiz's conduct should not be understated for it implicates a high-ranking police official's acts of relieving law-breakers from criminal responsibility and shielding them from further arrest in the expectation of receiving their considerable influence and political support for his effort to be the next Chief.[10]

By his own written words and trial testimony, Wearing was of the evident view that a rookie officer had no business criticizing a veteran officer of high rank and Tolnay's "trash talking" of Ortiz set Wearing's temper aflare. As in Batt, the culture of the upper echelon of the NHPD renders such speech not only unwanted but off-limits, as documented by Wearing's expressed hostility to the subject matter. Unlike Batt, in the instant case, Wearing offered no evidence of even the pretense

---

[10]Wearing now takes issue with Tolnay's vocabulary in raising the issue of this corruption, but Tolnay need not prove he used the language of an English professor in order to establish he engaged in speech on a matter of public concern. While Tolnay did not articulate as if he were a lawyer, Wearing and Ortiz had little trouble understanding the issues Tolnay was raising.

of a contrary written or other policy.

In Wilcoxon v. Red Clay Consol. Sch. Dist. Bd. of Educ., 2006 U.S. Dist. LEXIS 45294 (D. De.), the District Court was asked to dismiss the First Amendment claim of a physical education and health teacher who allegedly suffered retaliation after he internally raised the issues of the repeated failure of a co-teacher to show up for work on time and the teacher's frequent disappearances from the classroom – conduct which posed a safety risk for students who were left alone without supervision. Wilcoxon sought advice from two senior teachers who advised plaintiff to keep a journal of details regarding the offending teacher. Wilcoxon believed the journal "would protect him from any discipline in the event that a student was injured while the [colleague] was absent from the class". School officials discovered the journal in plaintiff's office and plaintiff was summoned to a series of mandatory meetings with school officials during they sparred over Wilcoxon's refusal to disclose the identity of the teachers who recommended he start the journal. Id. at **7-8. Wilcoxon thereafter received a negative performance evaluation and the school district later declined to renew Wilcoxon's contract for the next school year. Wilcoxon alleged that the given reasons for non-renewal – that he prepared "poor lesson plans," engaged in "poor classroom management" and made "inappropriate comments" – were a pretext for retaliation for protected speech. After reviewing the facts and reasoning of Garcetti, the District Court rejected defendant's argument that Garcetti required dismissal of Wilcoxon's First Amendment claim, stating:

> Plaintiff's journal containing the absences of a fellow teacher was not written pursuant to his official duties as a teacher. He was not employed to monitor the absences of fellow teachers, and defendants do not allege that he was required to do so.

Id. at *19.

The District Court next rejected the argument that the speech nevertheless did not involve a matter of public concern, opining that "the detailed account of a public school teacher's dereliction of duty to her students and co-workers is a matter of public concern". Id. at *20.

Finally, the District Court as well rejected the school district's argument that Wilcoxon's disclosure was designed primarily to protect himself and thus was unprotected:

> While the speech was found in a private journal, courts, in conducting a First Amendment inquiry, focus not on the audience but on the nature of the information. Furthermore, courts have consistently recognized that the private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern. Thus, a speaker's motive, while often relevant to the context of speech, is not dispositive in determining whether a particular statement relates to a matter of public concern.
>
>        *     *     *
>
> Applied to the facts alleged at bar, it is of no merit that plaintiff kept the journal to protect himself from discipline in the event that a student was injured during one of defendant Freebery's absences. In evaluating the nature of the journal, the dates and times detailing defendant Freebery's truancy and other pertinent information about her actions and omissions is a matter of public concern.

Id. at *22.

For the same reason, Chief Wearing's repeated argument that Tolnay's expressions were nothing more than "CYA"[11] measures is unavailing. Moreover, it is simply counter-intuitive to suggest that Tolnay's opinions expressed in the office meeting with Wearing were "CYA" comments. There is nothing about the speech which compels or even lends to the conclusion that Tolnay needed to express it for the purpose of covering his own "a-s" or other purely personal reasons. To the contrary, the evidence yields the opposite conclusion: Tolnay's independent and discretionary act to engage in political commentary which served further to inflame Wearing's

---

[11]As the Court presumably is aware, the acronym "CYA" stands for "Cover Your A - -."

14

animus toward Tolnay was hardly a self-serving move. Tolnay could have taken the cowardly route, indulged Wearing, sung Ortiz's praises and promised never to speak of corruption by high officials again – and of course this case would never have existed.

In Walters v. County of Maricopa, 2006 U.S. Dist. LEXIS 60272 (D.Az.), still another District Court refused to consider Garcetti as mandating dismissal of a police officer's First Amendment claim alleging adverse action in retaliation for work-related speech regarding misconduct by another officer. The opinion contains a lengthy recitation of the facts which will not here be repeated in detail. It should suffice to note the aspects of Walters which are in common with Officer Tolnay's case. The plaintiff in Walters was a police sergeant whose involvement in a major drug investigation led him to suspect serious improprieties on the part of another officer assigned to the County Prosecutor's office, namely, that officer's suspected leak of a major undercover sting which sabotaged the operation. In summary, controversy erupted between Walters and the suspected officer which led to several tense and confrontational meetings between Walters, his superiors and the prosecutor. Upon accusations that Walters had been dishonest in answering questions during the meeting, Walters was "*Brady*-listed"[12]

Among several causes of action, Walters asserted a First Amendment claim in connection with which the District Court addressed the impact of Garcetti. In refusing to dismiss the claim, the Court emphasized that the Garcetti majority "was careful to note that neither Ceballos' audience nor the subject matter of Ceballos' speech were dispositive factors in its decision" and that "[t]he

---

[12] "*Brady*-listed" meant that Walters would be included in the "Officer Integrity Database" and thus identified as an officer of questionable veracity who must be disclosed as such to criminal defense attorneys pursuant to Brady v. Maryland, 373 U.S. 83 (1963), a status which would seriously damage an officer's career. Id. at **13-14.

15

controlling factor in Ceballos' case . . . was that his expressions were made pursuant to his duties as a Calendar Deputy". Id. at **39-40 quoting Garcetti v. Ceballos, 126 S.Ct. at 1959-60. The District Court proceeded to determine whether the evidence demonstrated that Walters' act of bringing to light the misconduct of a fellow officer was part of Walters' employment duties. Noting the Garcetti Court's advice that the "proper inquiry is a practical one", the District Court rejected defendant's argument that, under Garcetti, the First Amendment accorded no protection to Walters' internal expressions:

> Walters' whistle-blowing here does not fall within the scope of employment duties that he 'was employed to do,' at least as those duties are regarded by the First Amendment. Walters was a police sergeant employed to investigate and assist in the prosecution of criminal drug offenders. Any attempt to inflate Walters' job description so as to include blowing the whistle on other officers would likely exceed the 'practical inquiry' suggested by the Supreme Court. The Supreme Court's narrow 'hold[ing] that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for *First Amendment purposes*,' Garcetti, 126 S.Ct. at 1960, should not be read to overrule all First Amendment whistle blower protection cases by generally categorizing the whistle blowing as part of employees' employment obligations.

Id. at *42.[13]

In Day v. Borough of Carlisle, 2006 U.S. Dist. LEXIS 46434 (M.D. Pa, July 10, 2006), a

---

[13]

In so holding, the District Court in Walters noted that two courts have characterized employees' job duties in a more expansive light in two decisions, one of which Chief Wearing relies on. See id. at *43 n. 10 (taking note of Mills v. City of Evansville, 452 F.3d 646 (7th Cir. 2006) and Springer v. City of Atlanta, 2006 W.L. 2246188 (N.D. Ga. Aug. 4, 2006). The District Court, however, found both decisions inconsistent with the "practical" inquiry suggested by the Garcetti court and noted that it found other authority more persuasive, in particular Day v. Borough of Carlisle, 2006 W.L. 1892711 (M.D. Pa. July 10, 2006) (holding that reporting misconduct by fellow officers was not among the official employment duties of a police corporal).

decision the <u>Walters</u> court found persuasive, the District Court opined that <u>Garcetti</u> did not serve to

deny First Amendment protection to an officer's internal complaints of serious misconduct on the

part of other officers and malfeasance of senior officers in adequately investigating the alleged

offenses. <u>Id</u>. at *17. First, it must be noted that, in the end, the plaintiff in <u>Day</u> lost out in the

<u>Pickering</u> balance based on the employer's uncontested evidence demonstrating serious impact on

and disruption to department operations, morale and relationships caused by Day's widespread

broadcasting of his allegations to department employees, especially Day's decision to speak to

numerous officers of lower rank and outside the chain of command, in violation of a direct order to

refrain from doing so.

    Of note, however, is the District Court's decision that plaintiff's speech was, under <u>Garcetti</u>,

protected and thus subject to the Court's striking of the balance of interests as a matter of law under

<u>Pickering</u>. In discussing <u>Garcetti</u>, the Court stated :

> The subject matter and place of [Officer Day's] expressions are not dispositive.
> <u>Garcetti</u>, 126 S.Ct. at 1959. Rather, the controlling factor is whether the
> statements were made pursuant to plaintiff's duties as Corporal. <u>Id</u>. Although
> the record indicates that plaintiff had supervisory responsibility over junior
> officers, and it may be inferred that he had a duty to report disciplinary
> problems to his superiors, plaintiff has not alleged that he was duty-bound to
> report or investigate infractions by those persons who were the subject of his
> statements. The factual background of plaintiff's initial complaint regarding
> misconduct by fellow officers does not support a finding that plaintiff acted
> within the course of his official duties in making his complaint. The February
> 2003 outburst in the communications room was made during an argument
> plaintiff had with his superior. The April 2003 statements were made by
> plaintiff in order to secure financial assistance from fellow Union members in
> defending against disciplinary action. Viewing the record in a light most
> favorable to non-moving plaintiff, the Court does not find, as a matter of law,

that the statements were made pursuant to plaintiff's duties as Corporal.

Id. at **18-19.[14]

In Hare v. Zitek, 2006 U.S. Dist. LEXIS 50269 (N.D. Ill. July 24, 2006), the District Court assessed the implication of Garcetti and revisited its earlier ruling denying the defendant's motion for summary judgment upon holding that the plaintiff police officer's speech – on-the-job expressions regarding perceived improprieties and corruption on the part of the police chief – was protected by the First Amendment. See Hare v. Zitek, 414 F.Supp.2d 834 (N.D. Ill. 2005). Two months later, when the opinion in Garcetti issued and as the parties were proceeding to jury trial, the District Court addressed the import of Garcetti in the context of plaintiff's motion *in limine* to bar defendant from revisiting the issue of qualified immunity and the constitutional protection accorded to plaintiff's speech. Defendants urged the court to reverse based on Garcetti. In rejecting the notion that Garcetti required a different result, the District Court not only addressed Garcetti but the Seventh Circuit's decision in Mills v. City of Evansville, 452 F.3d 646 (7th Cir. 2006), a case upon which Chief

---

[14]Similarly, in Montle v. Westwood Heights Sch. Dist., 2006 U.S. Dist. LEXIS 39467 (E.D. Mich. June 15, 2006), while the employer also prevailed in the Pickering balance, the District Court held that Garcetti did not operate to deny First Amendment protection to a teacher protesting the failure of the school district administration to reach agreement on a new contract with the teachers' union. The case involved on-the-job speech as the teacher expressed her views by wearing a T-shirt to work which contained a statement that teachers were working without a contract. Applying both Garcetti and Connick, the District Court held the on-the-job expression protected by the First Amendment because it was not merely of personal interest but "extend[ed] beyond the individual teachers and union members" and was a matter of public concern to parents, students and citizens at large since it related to the effectiveness of the school district management. Id. at **7-8.

18

Wearing now relies.[15] Unpersuaded that either <u>Garcetti</u> or <u>Mills</u> commanded a contrary result, the

District Court explained as follows:

> In <u>Garcetti</u>, which was decided just two months ago, the Supreme Court held that 'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.' In <u>Mills</u>, which was decided just one month ago, the Seventh Circuit applied <u>Garcetti</u> to hold that a police officer who, while on duty and in uniform, discussed with her superiors her opinion about the upcoming implementation of an official policy, spoke as part of her job, which meant, under <u>Garcetti</u>, that she could not prove a constitutional violation. In its summary judgment ruling, **the Court determined that Mr. Hare spoke, not as an employee of the police department, but as a citizen. <u>Garcetti</u> and <u>Mills</u> do <u>nothing to change that</u>. Unlike the plaintiffs in those cases, <u>Mr. Hare did not "speak" as part of his professional responsibilities; he wasn't simply doing his job</u>.**

<u>Hare v. Zitek</u>, 2006 U.S. Dist. LEXIS 50269 at **8-9 (internal citation omitted – emphasis supplied).

The District Court in <u>Hare</u> dismissed as "inventive" but "absurd" the defendant's suggestion

that, as a police officer, Hare necessarily "spoke" pursuant to his official duties and in furtherance

of what he was "hired" to do when he discussed his suspicions of misconduct and corruption on the

part of the police chief by "a few emails" with the prosecutor's office, under the theory that part of

a police officer's job is to work closely with the State's Attorney's office. In refusing to characterize

a police officer's duties so broadly and in further rejecting the notion that defendant was now entitled

to qualified immunity under <u>Garcetti</u> on the premise that the law was "unclear" as to whether such

---

[15]The <u>Hare</u> court is in the Northern District of Illinois which is within the Seventh Circuit and accordingly was addressing the law of its own circuit.

speech would be protected, the District Court stated:

> No matter how much the defendants press the point, the court is not persuaded that Garcetti changes anything about the constitutional standards at play in these circumstances.

Id. at **9-10.[16]

In Black v. Columbus Public Schools, 2006 U.S. Dist. LEXIS 57768 (S.D. Oh. August 17, 2006), in an opinion which clearly shows that the defendant was trying the court's patience, defendant filed repetitive motions, the latest a renewed motion for summary judgment based upon Garcetti by which defendant asked the court to reverse its earlier ruling according First Amendment protection to the on-the-job expressions of an assistant school principal complaining of an improper romantic affair between the principal and a parent volunteer, which, in plaintiff's view, "rendered the school office a sexually charged environment and unreasonably interfered with plaintiff's work performance." Id. at *2 (emphasis supplied).[17] Plaintiff reported the rumored affair and discussed its effects on her job duties to another school official.[18] The principal learned of plaintiff's internal

---

[16]The court furthered that even if Garcetti could be considered to change the legal landscape, the decision issued on May 30, 2006 and "defendants have not explained how it could be used to excuse conduct years earlier, when the constitutional standards were clearly established." Id. at *10.

[17]At the time of the alleged affair, both individuals were married and the affair took place on school grounds and to some extent during school hours. Id.

[18]Among the effects of the affair on plaintiff's ability to discharge her own job duties was the principal's unavailability during school hours and inability of plaintiff to carry out disciplinary responsibilities with respect to students. Id. at *3. (Presumably because the disciplinary authority was the principal and he was off attending to his sexual desires.)

complaints and allegedly subjected her to a retaliatory transfer. Id. at *6.

The District Court rejected defendant's argument that Garcetti required a different result, especially where defendant conceded that Garcetti did not change first amendment precedent in the Sixth Circuit. Id. at *12. Moreover, upon facts and a procedural history very much akin to Tolnay's case, the District Court viewed defendant's maneuver for judgment under Garcetti to be nothing but an ambush and a tactic designed to get another bite at the apple after a prior unsuccessful strategic defense. As the court observed:

> In Defendant's original motion for summary judgment, the only argument made by Defendant regarding Plaintiff's First Amendment claim was the contention that her complaints involving the alleged conduct of [the principal] were complaints arising from the effect this conduct had on her own problems at work and that they were motivated by her personal beliefs and thus did not relate to matters of public concern protected by the First Amendment. Defendant did not contend that summary judgment should be rendered in its favor on Plaintiff's First Amendment claim because she made her complaints <u>as part of her official job duties.</u> Consequently, this asserted defense was not considered by this court when it granted summary judgment on plaintiff's First Amendment claim.[19]
>
> Furthermore, such a defense . . . was not made known to the Court of Appeals. Indeed, had it been so argued, the Court of Appeals may well have considered it waived because it was not made in the District Court. <u>See, e.g., U.S. v. Universal Management Services, Inc.,</u> 181 F.3d 750, 759-59 (6th Cir. 1999) (claims not raised before the District Court are considered waived).

---

[19]As the opinion reveals, the court's initial ruling dismissing Black's First Amendment claim was reversed by the Sixth Circuit. Id. at **8-9 citing <u>Black v. Columbus Public Schools,</u> 79 Fed. Appx. 735 (6th Cir. 2003) (remanding the First Amendment cause to the District Court for further consideration).

*        *        *

> [D]efendant had ample opportunity, before filing its first motion for summary judgment in March 1998, to raise the defense to plaintiff's First Amendment based on the argument it now belatedly makes almost on the eve of trial. It could have developed this new defense factually through discovery. It did not. It could have argued that under the law of the Sixth Circuit, including Thompson, summary judgment was required on plaintiff's First Amendment claim for the reason it now belatedly asserts. It did not. Considering the long history of this case and defendant's attempt to now put forth a new reason for granting defendant's proposed fourth motion for summary judgment – a defense to plaintiff's claim that defendant failed to make previously in this court or in the Court of Appeals – the court concludes that this belated defense has been waived or forfeited.

Id. at **14-15.

Notably, the District Court in Black made it a point to observe that even if defendant had previously asserted that the plaintiff's speech was unprotected because it was expressed as part of her official job duties, such defense in the court's view would have no substantive merit. As the court reasoned:

> **Defendant has not produced any objective evidence that an Assistant Principal in the school district has the official job duty of supervising, or at least reporting this conduct on the part of, the principal. Instead, defendant cites the [deposition testimony] of plaintiff in which she merely testified it was her duty to report the alleged misconduct of the [principal]. However, as the Supreme Court made clear in Garcetti, the proper focus is on the employee's official job duties, not necessarily on the employee's motivations – whether based on perceived job duties or personal gratification.**

22

Id. at **15-16 (emphasis supplied – internal record citations omitted).[20]

In concluding its opinion, the court repeated its belief that a "Garcetti"-type defense was waived and further reiterated that such a defense would not have had any substantive merit even if timely argued. Id. at *17.

Officer Tolnay submits that Black in many respects is on all fours with the instant case for Chief Wearing does the same thing here – he attempts to reargue his motion for summary judgment, to reargue his Rule 50(a) motion advanced at trial and to otherwise change course based upon endless, repetitive pleadings in an effort which can fairly be characterized as an unfair ambush upon the plaintiff and this court. As in Black, Chief Wearing had every opportunity to stake out a claim that Officer Tolnay's expressions were job-required and made pursuant to his official job duties based on applicable authority in this Circuit. Defense counsel deposed Officer Tolnay and was also present at the deposition of Chief Wearing. At no time did Chief Wearing ever once, nor did his counsel, offer any evidence whatever, or assert upon the plaintiff's own evidence, that the record as established showed Tolnay's speech was unprotected because it was expressed pursuant to his official job duties.

As already discussed at length in plaintiff's June 30, 2006 memorandum of law on the Garcetti issue, defendant and his counsel proceeded through a full jury trial without ever having

---

[20]The District Court aptly observed in this regard that "any employee may feel obligated, morally and/or professionally, to report misconduct by a supervisor" but such moral imperative does not translate to an official job duty. Id. at n. 6.

offered any evidence (or adduced such evidence through the cross-examination of Tolnay) that plaintiff's speech deemed protected by this court was expressed pursuant to his official job duties and was thus "employer-commissioned speech" subject to restriction without constitutional restraints. The reason why defendant's multiple post-judgment efforts appear as ambush tactics is because there is every reason to believe that evidence necessary to the factual predicate for application of Garcetti does not in reality exist and defendant knows this.[21]

Finally, the Second Circuit Court of Appeals has recently given a clear indication of its application of the Garcetti holding which is consistent with the reasoning of foregoing cases which

---

[21] Against the backdrop of Wearing's and Ortiz's own oral and written characterizations of Tolnay's speech, one is hard-pressed to envision any evidence which defendant could have offered or drawn out from plaintiff's witnesses that would have established as a matter of fact, and hence law, that Garcetti applies to Tolnay's situation. First, defendant staked his entire defense and gambled on his denial that the plaintiff's speech had anything to do with the adverse actions. Second, any such claim that the speech was job-required had already been effectively disposed of by Wearing's and Ortiz's own oral and written comments which in content characterize Tolnay's speech as none of his business as a police officer. Third, defense counsel's own post-judgment motions, notably his (mistitled) Rule 50 motion for judgment as a matter of law (in reality a Rule 50(b) renewal of his trial motion) defense counsel cites pre-Garcetti authority in this circuit which is on all fours with the very principle of Garcetti. (See Defendant's 12/28/05 memorandum of law; see also Argument B (1) herein.) Thus, defendant and his counsel knew all along that they had available to them, both in the summary judgment phase and at trial, an opportunity to present evidence and advance legal arguments that Tolnay's speech was unprotected as it was expressed pursuant to his official job duties. That defendant failed throughout to advance this defense, notwithstanding authority in this Circuit to support it, lends support to plaintiff's position that Wearing's tactics in this regard were strategic as he well knew such a defense would fail. He know seeks to escape the jury's judgment by portraying the Garcetti holding as one which, if issued much earlier, would have altered defendant's summary judgment and trial strategy.

24