plaintiff has discussed above. In Cioffi v. Averill Park Central School Dist. Bd. of Ed., 444 F.3d 158

(2nd Cir. 2006), the Court of Appeals handed down a decision which indicates the Circuit's

disagreement with the interpretation of Garcetti which Wearing urges upon this court. Although the

opinion in Cioffi issued before the release of the Garcetti holding, the Court of Appeals took note of

the Supreme Court's forthcoming decision in Garcetti and, anticipating an outcome in favor of

Garcetti and adverse to Ceballos indicated that the outcome would not affect its disposition of

Cioffi's case which involved a school Athletic Director's claim that he suffered retaliation after

complaining to his employer about the behavior of the school's football coach and expressing his

concern for student health and safety. Notably, the Second Circuit stated the following in reference

to Garcetti:

> The Supreme Court's forthcoming decision in Garcetti v. Ceballos, as to whether
> the First Amendment protects an employee's purely job-related speech about a
> matter of public concern expressed pursuant to the duties of employment does
> not affect the disposition of this case because the record here establishes that
> Cioffi's speech was not made strictly pursuant to his duties as a public employee.
> Rather, he was speaking as a citizen, who also happened to be a public employee,
> about the circumstances that led to criminal activity in the public school system
> and the manner in which school officials were responding to that conduct.

Id. at 167 n.3.

Of additional note is the Second Circuit's recent decision to settle finally any confusion over

whether and to what extent the speaker's personal interest or motivation affects the level of protection

the speech is accorded. Dispensing with still another persistent argument which Wearing has

advanced in this case, the Circuit has now squarely held that a speaker's personal motives are not dispositive and moreover are irrelevant. Thus, the mere fact that one may have spoken out partly "to protect his job and shift blame" was of noimport for what matters is the public interest in the subject matter of the speech. See Reuland v. Hynes, 2006 U.S. App. LEXIS 21346 August 21, 2006).

B.    THE POST-*GARCETTI* DECISIONS UPON WHICH WEARING RELIES ARE INAPPOSITE TO THIS CASE.

Chief Wearing's principal reliance on the June 20, 2006 decision of the Seventh Circuit in Mills v. City of Evansville, 452 F.3d 646 (2006) is misplaced for the facts in that case bear no resemblance to the instance case and the court's reasoning does not here apply. First, the brevity of the opinion, together with the facts of the case, show quite clearly that Mills should have been disposed of on summary judgment even before Garcetti issued. The plaintiff in Mills was a police sergeant who attended a meeting with the Chief of the Department during which a departmental plan to reallocate officers in order to cope with a manpower shortage was announced. Immediately after the meeting, Sergeant Mills spoke about the plan with other officers and indicated her belief that the plan would not work. Mills was counseled and reassigned to patrol duties based on the determination she was indicating a reluctance to implement the policy or would try to undermine the chief in respect to it. Noting that Mills was not fired or even demoted, the Circuit, in an extremely brief opinion by Judge Easterbrook, simply noted that the Chief could lawfully take action against a sergeant under these circumstance and that there was nothing about Mills' speech which indicated that she was

26

speaking as a citizen on a matter of public concern; rather, she was a supervisor who just openly disagreed with a policy plan announced by her boss. Clearly, <u>Mills</u> has little application to Tolnay's case.[22]

Moreover, subsequent to <u>Mills,</u> the Seventh Circuit issued another post- <u>Garcetti</u> decision on July 27, 2006. In <u>Fuerst v. Clarke,</u> an opinion authored by Judge Posner, the court refused to apply <u>Garcetti</u> in circumstances much more akin to Officer Tolnay's than the circumstances in <u>Mills.</u> In <u>Fuerst,</u> the plaintiff was a deputy sheriff concerning his boss' decision to hire a public relations officer as he thought it would constitute a waste of tax-payer money and such a public relations officer would largely serve to advance the Sheriff's political ambitions. Refusing to hold Fuerst's speech unprotect ed under <u>Garcetti,</u> Judge Posner opined:

> [Fuerst's] duties as Deputy Sheriff did not include commenting on the Sheriff's decision to hire a public relations officer – the Supreme Court's recent decision in <u>Garcetti v. Ceballos</u> is inapposite.

<u>Fuerst v. Clarke,</u> 454 F. 3d 770, 2006 U.S. App. LEXIS 18792 at *10.

The Seventh Circuit's reasoning in <u>Fuerst</u> is equally applicable to the instant case for there is no evidence which establishes, nor even any evidence which allows for an inference, that among Officer Tolnay's duties was an obligation to comment on the political influence-peddling and

---

[22]Indeed, the observation of Judge Easterbrook is on all fours with the Second Circuit's decision in <u>Lewis v. Cowen,</u> 165 F.3d 154 (2nd Cir. 1998) in which the plaintiff's First Amendment claim failed for the same reason – he acted to undermine a policy decision of his superior which he was required to support and carry out.

interference with law enforcement in New Haven.[23]

Wearing's citation to <u>Ryan v. Shawnee Mission Unified Sch. Distl</u>, 2006 WL 1888326 (D

Kan. July 7, 2006) is similarly unavailing. First, while Wearing characterized Ryan with broad

strokes, he conveniently omits reference to the particular facts of <u>Ryan</u>. Ryan was a physical therapist

whose numerous instances of allegedly protected speech all related to ordinary communications

regarding plaintiff's assessment and delivery of her Office of Physical Therapy services to students.

The numerous instances of speech analyzed by the District Court included petty back -and-forth

communications between plaintiff and others regarding such matters as bickering over scheduling of

work hours, interpersonal disputes of a strictly personal nature and quibbles over long work hours

and, the annoyance of coming in on one's day off and like problems of no import to the public and

certainly to resemblance whatever to the highly publicized and public controversy about which

Tolnay spoke. For these reasons, <u>Ryan</u> is of no assistance to the court.[24]

Wearing next relies on <u>Ruotolo v. City of New York</u>, 2006 U.S. Dist. LEXIS 49903, which

is readily distinguishable from Tolnay's case. Ruotolo was not an ordinary officer, but was the

---

[23]Of course, while defendant cites and discusses <u>Mills</u>, he completely ignores the Seventh Circuit's decision in <u>Fuerst v. Clarke</u>, undoubtedly because the facts are much more similar to the instant case while the facts of <u>Mills</u> bear no resemblance whatever to this case.

[24]Indeed, it appears that defendant uses <u>Ryan</u> more so for the significance the defendant attaches to the District Court's opinion that <u>Garcetti</u> "significantly changes the landscape ...". While a District Court in Kansas may so opine, for the reasons discussed elsewhere herein, <u>Garcetti</u> did not significantly change the landscape in this circuit. If it did, Wearing's counsel would hardly have been arguing the principle of <u>Garcetti</u> in his December 28, 2005 brief.

department's Training and Safety Officer. He authored "a report identifying possible environmental risks at the precinct", in particular, "possible air and water contamination . . .". Id. at **4-5. Distinguishing features were Ruotolo's own assertion that he submitted the report respecting the environmental evaluation consistent with his duties as the Safety Officer. He alleged retaliation for the submission of the report. Without question, the facts of Ruotolo are on all fours with Garcetti since, as the court noted, "It is clear beyond peradventure that the Report was prepared as part of plaintiff's official duties". Thus, the Report an "employer-commissioned work over which the employer is entitled to exercise control". Id. at *10. In contrast, with respect to Tolnay's motor vehicle report concerning Mr. Rodriguez, the evidence lends to the conclusion that the report was not required – Tolnay had taken no enforcement action at all. That Tolnay decided to use the Department's Case/Incident Report form in order to express his concerns regarding Captain Ortiz's conduct and his belief that his ability to enforce the law had been impaired by political considerations is a fact which Wearing understandably seizes upon.[25] But Tolnay could just as easily recorded his

---

[25]On page 17 of his brief, Wearing attempts another creative misrepresentation of the evidentiary record by merging and conflating two separate memoranda authored by Tolnay. One forms a basis for one of Tolnay's First Amendment claims, the other does not. Tolnay's initial memorandum in which he complained of being disabled from enforcing the law for the reasons stated is part of the speech deemed protected by this court. It was not a writing that Tolnay created in compliance with any job duty – in fact his decision to write it is what got him in trouble. The second memorandum was written in compliance with an indirect order from Captain Ortiz but that writing is not and never has been a part of Tolnay's First Amendment claims. It is apparent that Wearing, seizing on Garcetti, is attempting to bootstrap Tolnay's first memorandum into the Garcetti category by linking it to another writing which Tolnay did create in compliance with a job duty.

29

comments on a blank sheet of paper and his First Amendment claim should not turn on the fact that he use a pre-printed form but must appropriately turn on whether it is an undisputed fact that the very report he authored was one he was one he was required to create as part of his official job duties. Clearly, it was not. If it was, Ortiz certainly would not have been so incensed. Defense counsel summation to jurors included the defense position that Tolnay should not have used the departments Case/Incident form to engage in that commentary.[26] Moreover, the District Court took particular note that Ruotolo was "clearly the individual charged with answering issues about safety issues at the precinct. Id. at *13. In contrast, the defendant is on record as expressing hostility toward Tolnay for delving into the very subject: perceived misconduct on the part of Department and City officials.

Wearing also relies on a recent decision by Judge Dorsey in this district in the case of Sweeney v. McIntyre, 2006 U.S. Dist. LEXIS 57358 (July 31, 2006). The facts in Sweeney are accurately summarized by Wearing at pages 9-10 of his brief. Accordingly, plaintiff does not recite them here. It should suffice to state that the three incidents of "speech" identified by Judge Dorsey, see Sweeney at **20-21, involved run-of-the-mill workplace conversations of a trivial nature between quibbling employees. Such commonplace banter and carping between employees over who needs

---

[26]Interestingly, one supposes that Wearing could have alleged that he disciplined Tolnay for improper use of the Department's Case/Incident forms. He did not. Even if he had, jurors would likely have disbelieved that as readily as they disbelieved that Tolnay's "walking out" of the meeting motivated the discipline. Moreover, Ruotolo provides no persuasive authority to support Wearing's claim that Tolnay's expressions during the office meeting with the defendant and others was unprotected.

help performing which task hardly even meets the threshold requirement that the speech of public concern, much less speech that is protected under Garcetti. Judge Dorsey quite properly held that the speech relating to an employee's dissatisfaction with workplace condition did not even survive the Connick test. Id. at *24. For obvious reasons, Sweeney is of no import.[27]

Wearing's reliance on Logan v. Indiana Dep't. Of Corrections, 2006 U.S. Dist. LEXIS 43631 is equally unavailing for the same reason. Logan was the lead health care administrator at a prison whose broad job responsibilities included acting as "liaison" between prison and personal and public agencies. Consistent with her written job description, she recommended removal of the Directing of Nursing at the prison, a recommendation which caused correctional officials to ask for her transfer and caused an irreparable strain in relationships. Id. Quite clearly, upon reviewing the itemized job description, the court was of the view that making such an evaluation was among her official job duties. Id. at **5-6. For obvious reasons in those already extensively set forth by Officer Tolnay no analogy can be drawn between Logan and Officer Tolnay's case.

In summary, Wearing cites several cases involving facts which are wholly dissimilar to the

---

[27] For the same reason, plaintiff will not spend time discussing defendant's reliance on Boykin v. City of Baton Rouge, 2006 WL 2051386 (N.D. La. July 11, 2006) other than to note that the written report which plaintiff alleged rose to retaliation was, like that of Ceballos, drafted pursuant to Boykin's official duties as a Human Resources Director as Boykin was charged with the very task of investigating, reporting and making recommendations on "diversity" within the job force. His report contained just such information consistent with his job duty. Accordingly, Boykin is inapposite to the instant case.

31

facts at bar. In contrast, the numerous cases cited and discussed by plaintiff more closely resemble the facts of Tolnay's case. In each of the cited cases the District Court or the Court of Appeals found the similar factual scenarios to be distinguishable from <u>Garcetti</u>. The growing body of decisional law on this issue shows that trial and appellate courts are not viewing the <u>Garcetti</u> as Wearing would wish. See also <u>Pittman v. Cuyahoga Valley Career Ctr.</u>, 2006 U.S. Dist. LEXIS 60411 (N.D. Ohio August 25, 2006) (rejecting a broad interpretation of <u>Garcetti</u> in favor of a "more narrow" focus on the simple question of whether the employee's "speech was required by his/her job" – if an employee is "required as part of his job duties to write a memo about parking lot safety", then it would not give rise to a First Amendment claim).

At the time of Tolnay's expressions of opinion, the local newspaper was printing headlines recounting similar opinion by the president of the union representing New Haven officers. The Editor of the New Haven <u>Register</u> was expressing his opinion on the controversy. Indeed, the arrested ministers were expressing their opinion at a protest rally. Tolnay expressed his own opinion regarding a very public controversy in connection with which others were having their say at Tolnay's expense as he was being criticized left and right. Indeed, he was criticized unfairly by the Editor of the New Haven <u>Register</u> who questioned Tolnay's judgment and competence although the Editor was not familiar with the actual circumstances surrounding the July 26 arrests of the ministers. Tolnay testified without contradiction that he was per department rule prohibited from speaking to the media. He nonetheless decided to express his opinion regarding a still-raging controversy and it defies logic

and common sense to suggest he did so pursuant to his official duties as a police officer. Tolnay's speech was no different in character from the speech on the same topic that everyone else was engaging in. That Tolnay chose (or was rather forced) to express his opinion internally does not strip it of protection under the clear dictate of <u>Givhan</u>, a well-established holding reaffirmed by the <u>Garcetti</u> majority.

As noted below, Wearing now manipulates and takes out of context the court's own observation that the facts of this case appear dissimilar to other cases. The lack of merit in defendant's argument equally applies to defendant's seizing upon the language employed by plaintiff's counsel in her brief in opposition to defendant's motion for summary judgment. Citing to p. 28 of plaintiff's brief, defendant now characterizes plaintiff's counsel as having conceded that Tolnay's 8/3/02 M.V. report was prepared in discharge of his official duty. What the pertinent language indicated was plaintiff's view that it was of no matter that the report that the report was generated <u>during</u> the course of plaintiff's official duties. This does not translated to a finding that the report was prepared <u>pursuant</u> to official duties. Read in context, it is clear that plaintiff was responding only to defendant's meritless argument that Tolnay's comments were unprotected because it was internal speech and not speech expressed publicly. Plaintiff was merely pointing out that, under <u>Givhan</u>, the fact that Tolnay expressed his opinions during work is not dispositive, a principle reaffirmed by the <u>Garcetti</u> majority.

33

C.    DEFENDANT'S RENEWED-ARGUMENT FOR QUALIFIED
IMMUNITY IS WITHOUT MERIT AS THE COURT
PROPERLY ANALYZED THE ISSUE PREVIOUSLY AND
*GARCETTI* DOES NOT ALTER THE ANALYSIS.

When Chief Wearing advanced a claim to qualified immunity in his motion for summary judgment, this court properly rejected the claim, holding that, under clearly established law, firing or punishing a public employee for speech or expressive conduct protected under the First Amendment violates the employee's constitutional rights.   The court further properly held that, when Officer Tolnay commented upon improper intrusion of political considerations into the ability of Tolnay and others to do their jobs and the fact that high-level officers were exempting the Mayor's political supporters from accountability for law-breaking, his statements concerned a matter of public concern and that, therefore, such comments were protected by the First Amendment.   Accordingly, the court properly concluded that were a jury to determine that Wearing punished Tolnay for those expressions rather than for any alleged "walking out" of a meeting, the jury would have thus found a constitutional violation.

In light of Garcetti, defendant now claims that the court must reverse itself on the qualified immunity issue because (1) the Garcetti decision demonstrates that the law pertaining to Tolnay's work-related comments was somehow not "clearly established," and (2) when this court ruled on defendant's summary judgment motion, it noted that the facts of the case "are strikingly dissimilar to any other case analyzed through exhaustive research by this Court."   Ruling on Defendant's

Motion for Summary Judgment, March 9, 2005, p. 43; Defendant's Brief at p. 26.

Both arguments rest upon an interpretation of the qualified immunity doctrine that our courts consistently reject. In essence, Wearing argues that because the factual scenario in this case differs from that in other cases, the law regarding Officer Tolnay's constitutional right to comment on matters of public concern, in particular matters related to official corruption, was somehow less than "clearly established." The defendant posits that, in the absence of a precise analogue, he was unable to know that, under these circumstances, the constitution forbade him from penalizing Officer Tolnay for expressive conduct with respect to such issues of public concern as official wrongdoing and corruption of law enforcement.

Wearing's insistence on the necessity of a precise analogue to the situation presented in the instant case runs contrary to the clear mandate of the United States Supreme Court. In <u>United States v. Lanier</u>, 520 U.S. 259 (1997), the Court noted that the due process standard of "fair warning" of the illegality of actions in the criminal context is "not different" from the requirement that a constitutional right be "clearly established" in order for a civil rights plaintiff to prevail in an action seeking damages for an abridgement of that right. In both situations, the test is not whether case law reveals that some previous defendant had been held liable for actions in a "fundamentally similar" situation, but rather whether "prior decisions [of courts] gave reasonable warning that the conduct then at issue violated constitutional rights." <u>Id</u>. at p. 270. As the Supreme Court articulated the standard in <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987), qualified immunity seeks to limit

35

liability to those cases in which "the contours of the right [violated are] <u>sufficiently clear</u> that a reasonable official would understand that what he is doing violates that right" (emphasis supplied).

Applying this standard in a §1983 case, at least one District Court judge in this Circuit held that, because the relevant inquiry is whether a defendant had fair warning that his acts violated the plaintiff's rights, the lack of "a Supreme Court case or a case in the Second Circuit that addresses facts that are analogous to those presented here" carried little weight. <u>Auleta v. LaFrance</u>, 233 F.Supp 2d 396 (N.D. N.Y. 2002). Quoting <u>Lanier</u>, <u>supra</u> at 270-71, the <u>Auleta</u> court noted that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." <u>Auletta</u>. at p. 403 (internal quotation marks omitted) (brackets in original).

Moreover, it is not only contrary to established law but unfair for defendant to seize upon this court's previous observation that this case is "dissimilar" to any other case. First, given the context in which the court made the observation, it is clear that what the court was observing was the startling, if not egregious, character of the political controversy about which Tolnay was expressing his own opinions. This case involved evidence of an unprecedented interference by Chief Wearing with a criminal prosecution and his gaining a dismissal of all criminal charges against arrestees who had engaged in reprehensible conduct toward police officers who behaved in a manner which was entirely lawful and whose safety was threatened by a mob incited by the arrestees. Added to it was the Mayor's extraordinary, indeed revolting, act of apologizing for the officers' lawful conduct before

36

the very crowd which threatened the safety of his officers. Added to this is the evidence that Tolnay was ordered to stay away from these arrestees, thus allowing them to engage in law-breaking at will without any accountability. Throughout these events, the politically charged and controversial nature of these incidents was a matter of prominent media headlines and ongoing public debate. That Chief Wearing and other city officials engaged in such eyebrow-raising mendacity does not mean anything for purposes of qualified immunity other than the case presented as one of the more egregious among First Amendment cases involving police officers. It would be no different had this court on the issue of qualified immunity in a police brutality case involving grotesque brutality previously unseen by the court, leading the court to observe that the underlying facts of the excessive force case were strikingly dissimilar to other cases. No two cases are identical and Wearing cannot claim immunity on the ground that Tolnay cannot point to another situation where city officials behaved as badly under identical circumstances.

Moreover, any such argument was utterly disposed of in Hope v. Pelzer, 536 U.S. 730 (2002). Rejecting the very argument which Wearing now makes, the Court, referring to its previous holding in Lanier, supra, stated as follows:

> Our opinion in Lanier thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in Lanier, we expressly rejected a requirement that previous cases be 'fundamentally similar'. Although earlier cases involving 'fundamentally similar' can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with 'materially similar' facts. Accordingly, pursuant to Lanier, the salient question that the Court of Appeals

37

ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional.

Id. at p. 741. See also Lonegan v. Hasty, 2006 US Dist. LEXIS 41807 at\*16 (E.D. N.Y. – June 22, 2006) (citing Hope v. Pelzer, supra, and holding that an officer was not entitled to qualified immunity he confronted a novel factual situation); see also Auleta v. LaFrance, 233 F.Supp. 2d 396 (N.D. N.Y. 2002) (in First Amendment case, under Hope and Lanier, it is of no matter that the District Court could not find a Supreme Court case or Second Circuit case with facts analogous to those at bar bor even though the very acts in question had not previously been held unlawful, defendant was on fair notice that his conduct would violate established law even in a novel factual cricumstance).

Accordingly, in Hope, the Supreme Court rejected an argument that the defendant could not be held liable for inflicting cruel and unusual punishment on an inmate by handcuffing him to a hitching post to discipline him for disruptive conduct. Defendant in that case made an argument akin to that which Wearing now advances, namely, that because there was no previous case holding that very conduct unconstitutional, the defendant was entitled to qualified immunity. To the contrary, the Court aptly opined that, "[a]rguably, the violation was so obvious that our own Eight Amendment cases the respondents fair warning that their conduct violated the Constitution". Id. The same reasoning applies to Wearing and renders his post-judgment quest for immunity equally unavailing. Moreover, as a practical, factual matter, if Wearing truly believed that he could punish Tolnay for his speech, or reasonably believed that it was "unclear' whether he could lawfully do so, *query*, why

38

Wearing felt the need to lie about it from the very beginning. Throughout the litigation, Wearing took pains to deny that Tolnay's speech drove the decision to discipline and transfer Tolnay. That Wearing felt the need throughout to deny any nexus between the speech and the discipline is itself evidence of a consciousness of civil guilt. By their verdict, the jurors expressly rejected Wearing's testimony that it was Tolnay's alleged "walking out" of a meeting that drove the discipline. If Wearing reasonably believed that he could discipline Tolnay on account of his speech, one should think he would not go to great pains to deny that fact. For the reasons explained, and upon the authorities cited in the court's summary judgment ruling, Wearing was no doubt on fair notice that disciplining Tolnay and retaliating against him for his speech would violate the Constitution. See also, Walters v. County of Maricopa, 2006 U.S. Dist. LEXIS 60272 (D. Az. – August 22, 2006) (defendant had fair notice that retaliation against a police officer for bringing to light another's misconduct and informing his superiors of it was unconstitutional).[28]

---

[28]The Walters court also rejected the argument that Garcetti altered the qualified immunity analysis. Id. at **53-54. See also Hare v. Zitek, supra, at **8-9 (Garcetti and [the Seventh Circuit's decision in] Mills do not provide a basis for qualified immunity to defendant for retaliating against officer's speech).