IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

FILED

2007 UCT 24 P 12: 35

|   |   |   |
|---|---|---|
| ARPAD TOLNAY | : | CIVIL ACTION NO. |
| Plaintiff | : | 3:02-CV-1514 (EBB) |
|  | : |  |
| V. | : |  |
|  | : |  |
| MELVIN WEARING | : |  |
| Defendant | : | OCTOBER 24, 2007 |

**APPENDIX OF EXHIBITS IN SUPPORT OF THE DEFENDANT'S
MOTION FOR STAY OF ENFORCEMENT
AND EXECUTION OF THE JUDGMENT PENDING APPEAL AND FOR IMMEDIATE
STAY PENDING A RULING ON THE INSTANT MOTION**

The defendant, Melvin Wearing, submits this appendix of exhibits in support of his

motion for stay of enforcement and execution of the judgment pending all appellate proceedings.

Specifically, the following exhibits are attached hereto:

A.    Melvin Wearing's Affidavit;

B.    3/6/06 Correspondence from Plaintiff's Attorney with Copy of Lien Placed on

Melvin Wearing's Home by the Plaintiff attached; and

C.    Copy of Melvin Wearing's Initial Appellate Brief Filed with the Second Circuit

on July 2, 2007 (without the Attached Addendum). The Attached Addendum to

the appellate brief consisted of copies of the electronically reported decisions

cited in the brief.

Respectfully submitted,

**DEFENDANT**
**MELVIN WEARING**

By: _____

Robert A. Rhodes, Esq.
CT Fed. Bar No. 13583
**HALLORAN & SAGE LLP**
315 Post Road West
Westport, CT 06880
Tel:      (203) 227-2855
Fax:      (203) 227-6992
E-Mail:  rhodes@halloran-sage.com

and

Ralph W. Johnson III, Esq.
CT Fed. Bar No. 15277
**HALLORAN & SAGE LLP**
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
Tel:      (860) 522-6103
Fax:      (860) 548-0006
E-Mail:  johnsonr@halloran-sage.com

His Attorneys

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ARPAD TOLNAY | : | CIVIL ACTION NO. |
| Plaintiff | : | 3:02-CV-1514 (EBB) |
| | : | |
| V. | : | |
| | : | |
| MELVIN WEARING | : | |
| Defendant | : | OCTOBER 12, 2007 |

## AFFIDAVIT OF MELVIN WEARING

| | | |
|---|---|---|
| STATE OF CONNECTICUT | ) | |
| | ) | ss. Westport |
| COUNTY OF FAIRFIELD | ) | |

**MELVIN WEARING**, being duly sworn and upon personal knowledge, deposes and states as follows:

1.    I am the former Chief of Police for the City of New Haven.  I am over eighteen (18) years of age and believe in the obligations of an oath.

2.    I do not have the assets to pay the judgment for $1,500,903.84 that was entered in the above-captioned action.

3.    My assets can be summarized as follows:

(a)    I own a home (together with my wife) in Connecticut.  It was purchased in 1972 and there is a home equity loan on it with a balance of approximately $6,126.40 remaining;

(b)    I own a vacation home (together with my wife), which is located outside of Connecticut.  There is a mortgage with a remaining balance of $131,173 on it;

    (c)     I own a motor vehicle, model year 2003, with monthly payments of

$679.56 and a remaining balance of $5,967.56;

    (d)     I own an old pick-up truck, which is located outside of Connecticut;

    (e)     I have a bank account of approximately $23,625.00, which is held jointly

with my wife, and a bank account in my name of approximately

$21,895.26;

    (f)     My pension pays me $76,000 per year; and

    (g)     My current salary is $105,000 per year.

    4.     In addition to my wife, I have two grandchildren ages 18 and 19 who will both be

attending college this fall and I am financially responsible for their tuition.

    5.     My wife is employed as a technician at Yale New Haven Hospital and earns

approximately $42,625 per year.

    6.     If I were required to commit any of my assets as security for the judgment, it

would have a significant and adverse impact on my ability to pay my other creditors and to

support my family.  If required to commit my assets in order to obtain a stay of execution on the

judgment, I would be forced to consult with bankruptcy counsel.

Melvin Wearing

Subscribed and Sworn to before me
this /5 day of October 2007.

Notary Public/
Commissioner of the Superior Court

758474_1.DOC

2

*Law Offices of*
# KAREN LEE TORRE

51 Elm Street – Suite 307
New Haven, Connecticut 06510

*Telephone - (203) 865-5541*
*Facsimile - (203) 865-4844*

March 6, 2006

Robert Rhodes, Esq.
Halloran & Sage
315 Post Road West
Westport, CT 06880
FAX: (203) 227-6992

Jonathan H. Beamon, Esq.
Assistant Corporation Counsel
Office of the New Haven Corporation Counsel
165 Church St., 4th Floor
New Haven, CT 06510
FAX: (203) 946-7942

VIA FAX AND REGULAR MAIL

RE:    **Tolnay v Wearing**
       **No. 3:02CV1514 (EBB)**

Dear Counselors:

Enclosed you will find copies of a judgment lien which I have recorded on the real property of the defendant in the above-captioned matter. Since he is represented by counsel, I thought it appropriate to send the copy to you rather than to Mr. Wearing directly.

Very truly yours,

Karen Lee Torre

KLT:dbb

Encs.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ARPAD TOLNAY

v.                                          CIVIL NO. 3:02CV1514 (EBB)

MELVIN WEARING

CERTIFICATE OF JUDGMENT LIEN

JUDGMENT DEBTOR'S NAME          JUDGMENT CREDITOR'S NAME
MELVIN WEARING                  ARPAD TOLNAY

It is hereby certified that **ARPAD TOLNAY** (the "Judgment Creditor") with an address at c/o Karen Lee Torre, Esquire, 51 Elm Street, New Haven, Connecticut 06510 obtained a Judgment in his favor on December 12, 2005 in the U. S. District Court at New Haven, in an action bearing the docket number 3:02CV1514 (EBB) against MELVIN WEARING (the "Judgment Debtor") with an address of Lots 83 and 84 Kilborn Street, West Haven, CT 06516. The original amount of the Judgment Creditor's Judgment is for $5,150,903.84, which Judgment remains unsatisfied.

To secure payment of said Judgment and the lawful post-judgment interest and costs thereon, a Judgment Lien in favor of said Judgment Creditor is hereby placed upon the real property of said Judgment Debtor situated in the City of West Haven, County of New Haven and State of Connecticut, commonly known as:

### Lots 83 and 84 Kilborn Street, West Haven

being the same premises conveyed to said Judgment Debtor by Warranty Deed recorded in the West Haven, Connecticut Land Records in Volume 537 at Page 522.

Dated at New Haven, Connecticut this 6th day of March, 2006.

PLAINTIFF/JUDGMENT CREDITOR
Arpad Tolnay

By: _____
Karen Lee Torre, His Attorney
51 Elm Street
New Haven, CT 06510
(203) 865-5541

cc:    Melvin Wearing
       Lots 83 and 84 Kilborn Street,
       West Haven, CT 06516

SCHEDULE A

All those certain pieces or parcels of land with all the buildings and improvements thereon situated in the Town of West Haven, County of New Haven and State of Connecticut being Lots #83-84 both inclusive on a Map of Hoffman Park belonging to J.W. Wilbur, made by Ernest W. Branch, Surveyor, dated October 16, 1913 on file in the West Haven Town Clerk's Office and bounded:

SOUTHERLY        by Kilborn Street, 60 feet;

WESTERLY         by Lot #85 as shown on said map, 100 feet;

NORTHERLY        by Lots #118 and 119 as shown on said map, 60 feet;

EASTERLY         by Lot #82 as shown on said map, 100 feet.

Said premises are also known as #17 Kilborn Street.

# 07-0959-cv (L)

## 07-1846-cv (CON)

*To Be Argued By:*
RALPH W. JOHNSON III, ESQ.

IN THE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

---

**ARPAD TOLNAY,**
*Plaintiff-Appellee,*

v.

**MELVIN WEARING,**
*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

HON. ELLEN B. BURNS, U.S. DISTRICT COURT JUDGE

---

**BRIEF OF DEFENDANT-APPELLANT MELVIN WEARING
WITH ADDENDUM AND SEPARATE SPECIAL APPENDIX**

---

RALPH W. JOHNSON III, ESQ.
ROBERT A. RHODES, ESQ.
HALLORAN & SAGE LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
Tel. (860) 522-6103
Fax (860) 548-0006

*Attorneys for Defendant-Appellant*

# <u>TABLE OF CONTENTS</u>

**PAGE**

TABLE OF AUTHORITIES.................................................................iv

STATEMENT OF THE ISSUES ......................................................xii

JURISDICTIONAL STATEMENT......................................................1

STATEMENT OF THE CASE ............................................................2

STATEMENT OF THE FACTS ...........................................................3

    I.    BACKGROUND .....................................................3

    II.    TOLNAY'S AUGUST 3 REPORT ........................5

    III.    TOLNAY'S TESTIMONY ......................................6

    IV.    CHIEF WEARING'S TESTIMONY ...................10

    V.    THE DISCIPLINARY DOCUMENTS ...............12

    VI.    NABEL'S TESTIMONY .......................................13

    VII.    BOMBALICKI'S TESTIMONY .......................13

    VIII.  ABATE'S TESTIMONY.......................................14

SUMMARY OF THE ARGUMENT...................................................15

STANDARD OF REVIEW.................................................................16

ARGUMENT .....................................................................................17

    I.    THE DISTRICT COURT COMMITTED
        REVERSIBLE ERROR BY DENYING
        THE RULE 50(b) MOTION...................................17

A.    The Speech Is Not Protected Under
      _Garcetti_ .................................................................. 17

B.    The Speech Is Not Protected Under The
      "Public Concern" Test.......................................... 30

C.    The Speech Is Not Protected Under The
      _Pickering_ Balancing Analysis ............................... 36

D.    Chief Wearing Is Entitled To Qualified
      Immunity ............................................................... 40

II.    THE DENIAL OF SUMMARY JUDGMENT
       CONSTITUTED REVERSIBLE ERROR ....................... 44

III.   THE DISTRICT COURT COMMITTED
       REVERSIBLE ERROR BY DENYING THE
       MOTION FOR A NEW TRIAL ................................... 45

A.    The _Garcetti_ Issue.................................................. 45

B.    The _Pickering_ Analysis .......................................... 46

C.    The Inflammatory Incidents Of Past
      Disciplinary Action ............................................... 47

D.    The Indemnification Testimony ............................. 51

E.    The "Reasonable Relationship" Instruction ............ 52

IV.    THE NON-ECONOMIC DAMAGES AWARD
       MUST BE VACATED OR SIGNIFICANTLY
       REDUCED .............................................................. 53

V.     THE EXCESSIVE PUNITIVE DAMAGES
       AWARD REQUIRES A NEW TRIAL OR A
       FAR GREATER REDUCTION ..................................... 54

A.     Reprehensibility Guidepost ...................................................... 54

B.     Ratio Guidepost ......................................................................... 56

C.     Comparison Guidepost ............................................................. 58

D.     The Financial Ruin Analysis .................................................... 60

CONCLUSION ................................................................................................ 62

# TABLE OF AUTHORITIES

**PAGE**

## CASES

Anderson v. Recore, 446 F.3d 324 (2d Cir. 2006)...................................................16

Annis v. County of Westchester, 136 F.3d 239 (2d Cir. 1998) ...............................54

Arlio v. Lively, 392 F.Supp.2d 317 (D.Conn. 2005),
rev'd 474 F.3d 46 (2d Cir. 2006) .............................................................................59

Arlio v. Lively, 474 F.3d 46 (2d Cir. 2007).......................................................48, 59

Bach v. First Union Nat'l Bank, 486 F.3d 150 (6th Cir. 2007)..............................57

Bailey v. Department of Elementary & Secondary Educ.,
451 F.3d 514 (8th Cir. 2006)...................................................................................36

Bateman v. Fialkievicz, No. 3:04-CV-1379 (JCH),
2006 WL 1359157 (D. Conn. May 15, 2006)....................................................34, 35

Beckwith v. Erie County Water Auth., 413 F.Supp.2d 214
(W.D.N.Y. 2006).......................................................................................................31

Benvenisti v. City of New York, No. 04 Civ. 3166 (JGK),
2006 WL 2777274 (S.D.N.Y. Sept. 23, 2006).........................................................33

Bland v. Winant, No. 03-6091 (SRC), 2007 WL 1237846
(D.N.J. Apr. 27, 2007).........................................................................................26, 29

BMW of N. Am., Inc. v. Gore, 517 U.S. 559,
116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ......................................................17, 52, 54

Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594
(8th Cir. 2005) ..........................................................................................................57

Boykin v. City of Baton Rouge/Parish of East Baton Rouge,
439 F.Supp.2d 605 (M.D.La. 2006) ........................................................................27

Bracey v. Board of Educ., 368 F.3d 108 (2d Cir. 2004) .......................................... 53

Bradley v. James, 479 F.3d 536 (8th Cir. 2007) ....................................................... 21

Brewster v. City of Poughkeepsie, 434 F.Supp.2d 155
(S.D.N.Y. 2006)......................................................................................................... 22

Brochu v. City of Riviera Beach, 304 F.3d 1144
(11th Cir. 2002) ......................................................................................................... 48

Brosseau v. Haugen, 543 U.S. 194, 125 S.Ct. 596,
160 L.Ed.2d 583 (2004) ............................................................................................ 40

Buazard v. Meredith, 172 F.3d 546 (8th Cir. 1999)................................................... 34

Cahill v. O'Donnell, 75 F.Supp.2d 264 (S.D.N.Y. 1999) .................................. 34, 41

Campbell v. Galloway, 483 F.3d 258 (4th Cir. 2007)................................................ 42

Casey v. West Las Vegas Indep. Sch. Dist., 473 F.3d 1323
(10th Cir. 2007) ......................................................................................................... 17

Chicago Title Ins. Corp. v. Magnuson, No. 05-4411,
2007 WL 1461396 (7th Cir. May 21, 2007) ............................................................. 56

Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.,
444 F.3d 158 (2d Cir.), cert. denied sub nom., Averill
Park Cent. Sch. Dist. v. Cioffi, __U.S.__, 127 S.Ct. 382,
166 L.Ed.2d 270 (2006) ............................................................................................ 31

Clark v. Chrysler Corp., 436 F.3d 594 (6th Cir. 2006) ............................................ 55

Cobb v. Pozzi, 363 F.3d 89 (2d Cir. 2004) ............................................................... 17

Cole v. Anne Arundel County Bd. of Educ.,
No. CCB-05-1579, 2006 WL 3626888 (D.Md. Nov. 30, 2006)........................ 21, 22

Connick v. Myers, 461 U.S. 138, 103 S.Ct. 138,
75 L.Ed.2d 708 (1983)................................................................................... 30, 37, 41

Defilippo v. New York State Unified Court Sys.,
No. 00CV2109 (NGG)(JMA), 2006 WL 842400
(E.D.N.Y. Mar. 27, 2006), aff'd 2007 WL 1174135
(2d Cir. Apr. 19, 2007) .................................................................. 35

Defilippo v. New York State Unified Court Sys.,
No. 06-1561-CV, 2007 WL 1174135 (2d Cir. Apr. 19, 2007) ................................ 35

DeLeon v. Little, No. 3:94CV902 (RNC),
1999 WL 1490299 (D.Conn. Sept. 29, 1999) ........................................... 59

Delgado v. Jones, 282 F.3d 511 (7th Cir. 2002) ..................................... 20, 28

Dillon v. Bailey, 45 F.Supp.2d 167 (D.Conn. 1999) ................................... 27, 59

DiSorbo v. Hoy, 343 F.3d 172 (2d Cir. 2003) ........................................... 17

Ethier v. City of Kohoes, No. 1:02-CV-1584,
2006 WL 1007780 (N.D.N.Y. Apr. 18, 2006) ........................................... 33

Ezekwo v. NYC Health & Hosps. Corp.,
940 F.2d 775 (2d Cir. 1991) ........................................................ 31, 35

Fedor v. Kudrak, 421 F.Supp.2d 473 (D.Conn. 2006) .................................... 26

Freitag v. Ayers, 468 F.3d 528 (9th Cir. 2006), cert.
denied sum nom., Ayers v. Freitag, __U.S.__,
127 S.Ct.1918, 167 L.Ed.2d 567 (2007) ........................................ 21, 26, 29, 46

Fritz v. Daly, No. 06-CV-191-PB, 2006 WL 3095755
(D.N.H. Oct. 31, 2006) ............................................................ 23, 33

Fusco v. City of Rensselaer, No. 03-CV-1487
(TJM/RFT), 2006 WL 752794 (N.D.N.Y. Mar. 22, 2006) .................................. 33

Garcetti v. Ceballos, __U.S.__, 126 S.Ct. 1951,
164 L.Ed.2d 689 (2006) ........................................................... passim

Giacalone v. Abrams, 850 F.2d 79 (2d Cir. 1988) ..................................... 31, 33

Gillum v. City of Kerryville, 3 F.3d 117 (5th Cir. 1993)..........................................34

Gonzalez v. City of Chicago, 239 F.3d 939
(7th Cir. 2001) .........................................................................................................34

Gorman-Bakos v. Cornell Co-op. Extension,
252 F.3d 545 (2d Cir. 2001)....................................................................................47

Green v. Board of County Commissioners, 472 F.3d 794
(10th Cir. 2007) .......................................................................................................21

Hanig v. Yorktown Cent. Sch. Dist., 384 F.Supp.2d 710
(S.D.N.Y. 2005)........................................................................................................31

Heil v. Santoro, 147 F.3d 103 (2d Cir. 1998)..........................................................37

Hynes v. Coughlin, 79 F.3d 285 (2d Cir. 1996)........................................................50

Ikram v. Waterbury Bd. of Educ., No. 3:95CV2478 (AHN),
1997 WL 597111 (D.Conn. Sept. 9, 1997) ..............................................................60

In re Exxon Valdez, Nos. 04-35182, 0435183,
2007 WL 1490455 (9th Cir. May 23, 2007) .......................................................56, 57

International Action Ctr. v. United States, 365 F.3d 20
(D.C. Cir. 2004)........................................................................................................40

Johnson v. Hugo's Skateway, 974 F.2d 1408 (4th Cir. 1992)
(en banc) .................................................................................................................52

Kelly v. City of Mount Vernon, 344 F.Supp.2d 395
(S.D.N.Y. 2004)..................................................................................................29, 34

Koch v. Hutchinson, 847 F.2d 1436 (10th Cir. 1988)
(en banc) .................................................................................................................34

Kokkinis v. Ivkovich, 185 F.3d 840 (7th Cir. 1999)..................................................38

Larez v. Holcomb, 16 F.3d 1513 (9th Cir. 1994)......................................................51

Levinson v. Prentice-Hall, Inc., 868 F.2d 558 (3d Cir. 1989) ................................. 52

Lewis v. Cowen, 165 F.3d 154 (2d Cir. 1999)........................................ 30, 36, 37, 59

Linhart v. Glatfelter, 771 F.2d 1004 (7th Cir. 1985).................................................. 31

Locurto v. Giuliani, 447 F.3d 159 (2d Cir. 2006) ...................................................... 38

Logan v. Indiana Dep't of Corrections, No. 1:04-CV-0797-
SEB-JPG, 2006 WL 1750583 (S.D. Ind. June 26, 2006)........................................ 22

Maras-Roberts v. Phillippe, No. 1:05-CV-1148-SEB-JMS,
2007 WL 1239119 (S.D. Ind. Apr. 27, 2007) ........................................................ 22

Mathie v. Fries, 121 F.3d 808 (2d Cir. 1997)............................................................ 58

Mattison v. Dallas Carrier Corp., 947 F.2d 95 (4th Cir. 1991).............................. 52

McGee v. Public Water Supply, Dist. #2, 471 F.3d 918
(8th Cir. 2006) ......................................................................................................... 39

McKee v. Hart, 436 F.3d 165 (3d Cir. 2006) ...................................................... 41, 42

Mihalick v. Town of Simsbury, 37 F.Supp.2d 125
(D.Conn. 1999).......................................................................................................... 59

Milde v. Housing Authority, No. 3:00CV2423 (AVC),
2006 WL 2583086 (D.Conn. Sept. 5, 2006) .................................................... 22, 60

Mills v. City of Evansville, 452 F.3d 646 (7th Cir. 2006) ....................................... 22

Morris v. Crow, 142 F.3d 1379 (11th Cir. 1998).............................................. 30, 34

Moskowitz v. Coscette, 3 Fed. Appx. 1 (2d Cir. 2001) ........................................... 59

Nimely v. City of New York, 414 F.3d 381 (2d Cir. 2003)..................................... 17

Noyola v. Texas Dept. of Human Resources, 846 F.2d 1021
(5th Cir. 1988) ......................................................................................................... 43

Oladeinde v. Birmingham, 230 F.3d 1275 (11th Cir. 2000) ................................... 37

P.C. v. McLaughlin, 913 F.2d 1033 (2d Cir. 1990) ................................................ 16

Pabon v. Wright, 459 F.3d 241 (2d Cir. 2006) ....................................................... 41

Pappas v. Giuliani, 290 F.3d 143 (2d Cir. 2002) ............................................. 30, 37

Patterson v. Balsamico, 440 F.3d 104 (2d Cir. 2006) ............................................ 60

Pena v. Deprisco, 432 F.3d 98 (2d Cir. 2005) ........................................................ 40

Petramale v. Local No. 17 of Laborers' Int'l Union of N. Am.,
847 F.2d 1009 (2d Cir. 1988) ................................................................................ 59

Phillips v. Bowen, 278 F.3d 103 (2d Cir. 2002) ............................................... 58, 59

Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731,
20 L.Ed.2d 811 (1968) .................................................................................. passim

Planned Parenthood v. American Coalition of Life Activists,
422 F.3d 949 (9th Cir. 2005), cert. denied sub nom.,
American Coalition of Life Activists v. Planned Parenthood,
__ U.S. __, 126 S.Ct. 1912, 164 L.Ed.2d 664 (2006) ........................................... 57

Poe v. Leonard, 282 F.3d 123 (2d Cir. 2002) ......................................................... 43

Posey v. Lake Pend Oreille Sch. Dist. No. 84, No. CV05-272-
N-EJL, 2007 WL 420256 (D. Idaho Feb. 2, 2007) ................................................ 22

Rainone v. Potter, 388 F.Supp.2d 120 (E.D.N.Y. 2005) ........................................ 53

Reuland v. Hynes, 460 F.3d 409 (2d Cir. 2006), pet. for
cert. filed, 75 USLW 3663 (May 17, 2007) (No. 06-1601) .................................... 58

Richardson v. Selsky, 5 F.3d 616 (2d Cir. 1993) ................................................... 41

Ricketts v. City of Hartford, 74 F.3d 1397 (2d Cir. 1996) ..................................... 48

Rosa v. Town of East Hartford, No. 3:00CV1367 (AHN),
2005 WL 752206 (D.Conn. Mar. 31, 2005).............................................................48

Ruotolo v. City of New York, No. 03 Civ. 5045 (SHS),
2006 WL 2033662 (S.D.N.Y. July 19, 2006) ........................................................22

Russo v. City of Hartford, 419 F.Supp.2d 134 (D.Conn. 2006) .............................59

Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151,
150 L.Ed.2d 272 (2001) .....................................................................................40

Saulpaugh v. Monroe Community Hosp., 4 F.3d 137
(2d Cir. 1993) .............................................................................................31, 42

Schad v. Jones, 415 F.3d 671 (7th Cir. 2005), cert. denied,
__U.S.__, 126 S.Ct. 2350, 165 L.Ed.2d 278 (2006) ................................................32

Schuster v. Henry County, No. 1:05-CV-239-TWT,
2007 WL 1701795 (N.D. Ga. June 7, 2007) .........................................................21

Sigsworth v. City of Aurora, No. 05-4143, 2007 WL 1518536
(7th Cir. May 25, 2007)...........................................................................20, 27, 28

Spiegla v. Hull, 481 F.3d 961 (7th Cir. 2007)................................19, 20, 27, 28, 29

Stack v. Jaffee, 306 F.Supp.2d 137 (D. Conn. 2003).............................................59

State Farm Mut. Auto. Ins. Co, v. Campbell, 538 U.S. 408,
123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) .............................................52, 55, 56, 57

Thompson v. District of Columbia, 478 F.Supp.2d 5
(D.D.C. 2007) ....................................................................................................21

Thomson v. Scheid, 977 F.2d 1017 (6th Cir. 1992).................................................34

Tomicich v. Pueblo City County Library Dist.,
No. 04-CV-01101-RPM-MJW, 2006 WL 2734250
(D. Colo. Sept. 25, 2006)......................................................................................22

Urofsky v. Gilmore, 216 F.3d 401 (4th Cir. 2000) (en banc) ...................................34

x

<u>Vasbinder v. Ambach</u>, 926 F.2d 1333 (2d Cir. 1991)...............................................47

<u>Vasbinder v. Scott</u>, 976 F.2d 118 (2d Cir. 1992) .......................................................59

<u>Vista Community Services v. Dean</u>, 107 F.3d 840
(11th Cir. 1997) ........................................................................................................36

<u>Waters v. Churchill</u>, 511 U.S. 661, 114 S.Ct.1878,
128 L.Ed.2d 686 (1994)(plurality opinion)..............................................................37

<u>Wernsing v. Thompson</u>, 423 F.3d 732 (7th Cir. 2005),
<u>cert</u>. <u>denied</u>, __U.S.__, 126 S.Ct. 1476, 164 L.Ed.2d 249
(2006)........................................................................................................................31

<u>Williams v. ConAgra Poultry Co.</u>, 378 F.3d 790 (8th Cir. 2004)............................57

<u>Williams v. Dallas Indep. Sch. Dist.</u>, 480 F.3d 689
(5th Cir. 2007) ........................................................................................20, 21, 25, 29

<u>Williams v. Seniff</u>, 342 F.3d 774 (7th Cir. 2003) ....................................................37

<u>Yurman Design, Inc. v. PAG, Inc.</u>, 262 F.3d 101
(2d Cir. 2001) ...........................................................................................................16

## <u>STATUTES</u>

28 U.S.C. § 1291 ........................................................................................................1

28 U.S.C. § 1331 ........................................................................................................1

## <u>RULES</u>

Fed. R. Civ. P. 58 .......................................................................................................1

Fed. R. Evid. 403........................................................................................................51

Fed. R. Evid. 411........................................................................................................51

## STATEMENT OF THE ISSUES

1.    Did the district court err by denying the Rule 50(b) motion?

2.    Did the district court err by denying the motion for summary judgment?

3.    Did the district court err by denying the motion for a new trial and/or only partially granting the motion for remittitur?

4.    Should this Court significantly reduce the $1,350,000 punitive damages award?

## JURISDICTIONAL STATEMENT

Arpad Tolnay, a police officer, commenced this action against Melvin Wearing, the former Chief of Police for the New Haven Police Department, on August 29, 2002. (JA28) He alleged First Amendment retaliation and that the district court had jurisdiction under 28 U.S.C. § 1331. (Id.)

On December 12, 2005, a jury returned a verdict for Tolnay and awarded $903.84 in economic and $150,000 in non-economic, compensatory damages and $5 million in punitive damages. (JA514-17) A judgment was entered on December 14 and Wearing filed a Rule 50(b) motion, a motion for a new trial and a motion for remittitur, in the alternative, on December 28. (JA527-35)

On February 5, 2007, the court denied Wearing's Rule 50(b) motion and rejected his new trial arguments. (SPA95-141) It conditionally granted a new trial on damages unless Tolnay accepted a reduced punitive damages award of $1,350,000. Tolnay accepted on February 27. (JA3623) The court entered an order denying Wearing's motion for a new trial and denying his Rule 60(b) motion as moot on March 30. (SPA142) Wearing filed a notice of appeal on March 6 and an amended notice and second notice of appeal on April 27, 2007. (JA3625-36)

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and Fed. R. Civ. P. 58. The rulings at issue were entered by the Honorable Ellen B. Burns.

## STATEMENT OF THE CASE

On March 9, 2005, the district court denied Wearing's motion for summary judgment. (SPA2-54)  On December 1, 2005, it denied Wearing's motion in limine to preclude Tolnay from introducing evidence related to prior disciplinary decisions. (SPA56)  During the trial, it overruled Wearing's continuing objections to that evidence. (SPA59-60)  It also overruled Wearing's objection to a question which asked New Haven's Mayor to explain what he meant when he testified that the city indemnifies its police officers. (SPA65-66)

The court denied Wearing's Rule 50(a) motion on December 7, 2005. (SPA69-77)  After the jury charge, Wearing took exceptions. (SPA79-81)  Subsequently, the jury issued a note (JA599) asking whether taxpayers or Wearing would pay an award. (SPA85-93)  As noted above, the verdict and post-trial motions followed.

On June 1, 2006, the court ordered the parties to file briefs addressing Garcetti v. Ceballos, 126 S.Ct. 1951 (2006). (JA3012)  On July 21 and August 15, 2006, Wearing moved for relief from judgment under Rule 60(b), in the alternative, based on Garcetti. (JA3373)  The post-trial rulings followed.

2

## STATEMENT OF THE FACTS

### I.    BACKGROUND

On July 26, 2002, Tolnay had been a patrolman for less than four years. (JA825) That evening, he was dispatched to the Second Star of Jacob Church in response to a noise complaint. (JA603) He was joined by Officer Jamie Abate, who had less than one year of experience. (JA1778) The situation became confrontational and Tolnay arrested Reverend Armando Hernandez. (JA604) Reverend Daniel Rodriguez was arrested by Sergeant Jeff Hoffman, who arrived after Hernandez's arrest. (Id.) The ministers were charged with misdemeanors. (JA605) Tolnay prepared a case incident report for the arrests. (JA601-06)

Subsequently, Chief Wearing met with a prosecutor. (SPA8) He was concerned about the impact of the ministers' arrests on the community and the NHPD's efforts at community policing. (JA1445-48) Wearing was also concerned about public safety and demonstrations. (JA1448) The prosecutor nolled the charges. (SPA9) The dropping of the charges was made public by the Mayor when he appeared at the church on August 4, 2002. (SPA10)

In the meantime, on August 3, Tolnay and Officer Waleska Bermudez had stopped a jeep driven by Rodriguez. (JA885-88) Tolnay explained to Rodriguez that he had every right to pass out flyers for a rally related to his arrest, but that the children in the jeep needed to be inside it and have seatbelts on. (JA889) After

3

this verbal warning, Tolnay let Rodriguez go. (JA615)  Tolnay then radioed his supervisor, Sergeant Dennis Burgh and informed him of the stop and of his preparing a case incident report documenting it. (Id.)

Rodriguez contacted Captain Francisco Ortiz after the stop and complained. (JA906-07)  While on the radio, Tolnay heard Ortiz tell Burgh to tell the officer who made the stop to stay away from the individuals arrested on July 26. (Id.)

Tolnay proceeded to a sub-station to prepare a report "in connection with" the stop. (JA901; JA904)  At the sub-station, Burgh advised Tolnay and other officers that Ortiz "had ordered memoranda of the incident from them to be filed by the close of their shift.  Each complied, with Tolnay referencing his complete Case Incident Report for more details." (SPA15)

That night, Rodriguez filed a citizen's complaint.  (JA690)  He accused Tolnay of targeting him.  Ortiz recorded the complaint in a memorandum submitted to Wearing. (Id.)

Subsequently, Tolnay was "ordered" to appear at the Chief's office for a meeting on August 13. (JA688)  In addition to Tolnay and Wearing, Lieutenant Leo Bombalicki attended as Tolnay's union representative. (JA1542-43)  Scott Nabel, the NHPD's human resources manager and Abate also attended. (JA1846; JA1790)  In the end, Tolnay declared that the meeting was over and that he would not speak with the Chief again until he had an attorney. (JA971-72)

4

At a meeting on August 15, Wearing suspended Tolnay for ten days. (JA681) Tolnay was also reassigned to detention duty and required to attend training. (Id.) After a grievance, Tolnay was refunded five days' pay, $903. (SPA102)

## II.    TOLNAY'S AUGUST 3 REPORT

Tolnay's August 3 report was prepared on "NHPD FORM A - REV. 8/2000," (JA612), the same official form as his report for the July 26 arrests. (JA601) The first page included boxes to identify whether an arrest was made. (JA612) Tolnay signed both reports "under the penalties of state law for making a false statement." (JA616)

The August 3 report assigned a complaint number "02-44465" and cross-referenced the number for the July 26 report, "02-42911." It also assigned an incident code number, "3001" and described the incident as a "motor vehicle violation." It included Rodriguez's personal information and described the stop in detail.

The report stated that after Rodriguez left, Tolnay contacted his supervisor, Burgh and notified him of the incident and "that [he] would be writing a report to document such." (JA615) The last portion of the report stated:

> This Officer feels he was not able to act to his full potential at that time based on the circumstances of said situation.   This Officer feels that at the moment in question he acted with judgment that was imposed on his

5

police jurisdiction due to the identity and political involvement of Rodriguez. This Officer was reaffirmed by his actions after the completion of said incident as this Officer was instructed by the Patrol Shift Supervisor Capt. F. Ortiz not to have any contact with person(s) involved in the incident that occurred on 07/26/02 CN 02-42911.

...

In closing this Officer would like to state that at no time did the incident that occurred on 07/26/02 influence the motor vehicle stop with the exception of the actions taken after the stop. Simply stated this Officer observed a vehicle traveling north on Poplar Street and I observed said vehicle to be in violation of the motor vehicle laws as defined.

(JA615-16)

## III.    TOLNAY'S TESTIMONY

In explaining his job, Tolnay discussed his first assignment and the experience it gave him in "writing reports." (JA796) Under the NHPD's regulations, Tolnay was required to prepare a report in connection with the July 26 incident. (JA841-42) He prepared that report "in the normal course of [his] duties." (JA842)

On August 3, 2002, Tolnay was on duty. (JA885) He and Bermudez observed two children hanging off a jeep. (JA886-87) They "initiated a motor vehicle stop ... to basically tell the operator children couldn't ride on the side of the jeep." (JA886)

6

The driver of the jeep was Rodriguez. (JA888) Tolnay gave Rodriguez a verbal warning and let him go. (JA615) Tolnay alone made the decision not to issue a ticket or arrest Rodriguez. (JA1065-66)

Tolnay then proceeded to a sub-station "to write [his] report." (JA904) Burgh advised Tolnay that Ortiz had "ordered" that Tolnay prepare a memorandum regarding the stop. (JA920-21) Specifically, Tolnay's memorandum to Ortiz stated that he "was informed by Sgt. Burgh that Capt. Ortiz ordered [Tolnay] to complete a memo regarding said incident and to submit prior to the termination of my shift. For full and complete details regarding said motor vehicle stop please refer to Report CN 02 44465." (JA624) Report CN 02 44465 was Tolnay's August 3 report. (JA612) Officer Carlos Colon also had to prepare a memorandum for Ortiz. (JA924) It was part of the NHPD's business records generated in connection with the stop. (JA925)

Tolnay wrote the August 3 report "*in connection with* [his] stop of the vehicle." (JA901 (emphasis added)) He testified that the report became necessary:

> [b]ecause after my initial arrest, all the information that I had received regarding how powerful people they were had *frightened me*. Because, you know, *I'm* a patrolman and my duty is to do my job, and *I'm* not involved in politics. *I* go out and *I* do my job. *I* was always very proud of how proactive and how much *I* enjoyed doing police work.
>
> And because it was *my* misfortune to be the officer that gets sent to that location and have to take the action that *I*

did, *I* was now going to suffer the consequences of what *I* had done.

(JA903 (emphasis added))  Tolnay further testified:

> [a]t that point in time, when I made that motor vehicle stop, after what was happening, and what I knew I was in store for, I felt like I needed to explain what had happened and the reason why I was not able to, basically, take police action....

(JA910)  He was afraid of the "ramifications" he might suffer.  (Id.)

Tolnay never made a public statement and did not provide a copy of either report to the media.  (JA919)  He never asked for permission to speak with the media.  (JA1073)

Subsequently, Tolnay received a memorandum "order[ing]" him to attend a meeting with the Chief, "upon [his] return to duty."  (JA688)  In describing the meeting, Tolnay maintained: *"my whole intent was to answer questions."*  (JA963 (emphasis added); see also JA964-65)  He further described the meeting as follows:

> Chief Wearing did have a copy of my motor vehicle arrest form from August 3rd. ... And he looked at me and said, 'Well, how come you didn't arrest him for these charges.'  And that's, basically, how the question was posed.
>
> And I said, 'Well, sir,' I said 'because I would be afraid to have to come sit through a second meeting based on who these people are.'
>
> And then he said, 'Well, you wouldn't.'

8

> *And I said, 'Well, sir, I believe I'm here today because these two individuals have political connections and they have people who are in high places within this city and that's why I feel that I am here. I am here for no reason, through no conduct of mine as a police officer.'*

(JA968 (emphasis added))

With regard to a statement about Ortiz, Tolnay testified:

> During the conversation regarding the motor vehicle arrest, once I had explained all my actions, I made a comment that I felt – and more or less in the same words – I felt that Captain Ortiz's comments *to me* or Captain Ortiz's comments to Sergeant Burgh *about me* over the radio were very inappropriate.
>
> ...
>
> And when [the Chief] was done verbalizing Captain Ortiz's resume, I said, well, with all that experience, it's all the more reason why his behavior was inappropriate *using the radio*.
>
> At that point in time, he got up and he leaned over the desk and he pointed his finger and he said, 'You know what, you're a smart mouth and I know that you called (sic) that incident at the church. He says, I know that you caused that incident....'
>
> And at that point in time, *I had decided that I had entertained the meeting enough....*
>
> *So I stood up, and I said,* 'Chief, if you know that to be true, then you know more about this than I do. 'I said,' *This meeting is over. The next time that I speak with someone it will be after I have spoken to an attorney.'*

(JA970-72 (emphasis added))[1]  When Tolnay indicated that he was leaving, he had not received permission to leave from the Chief. (JA1090)

## IV.  CHIEF WEARING'S TESTIMONY

In Wearing's opinion, Tolnay did not handle the situation at the church properly. (JA1166-67; JA1171)  Tolnay should have called a supervisor. (JA1155)  Wearing was concerned about the officers' safety. (JA1154-55)  It was only a matter of luck that Tolnay's conduct did not cause a riot or result in an officer being hurt. (JA1167)

During the August 13 meeting, Wearing did not attempt to get Tolnay to make an admission. (JA1263)  Wearing never lost his temper. (JA1264)  His tone was calm. (JA1280)  Wearing did not jump out of his chair and point his finger in Tolnay's face. (JA1264-65)  Nor did he yell at Tolnay and call him a smart mouth. (JA1265)  He did not accuse Tolnay of being responsible for the July 26 incident. (JA1265-66)

To the contrary, it was Tolnay who became upset and disrespectful. (JA1266)  Tolnay became highly critical and disrespectful of Ortiz. (JA1284-85)  He also "refused to answer" Wearing's questions. (JA1278)  In the end, Tolnay jumped up from his seat and walked out. (JA1458)  He did this despite Wearing telling him to sit down. (JA1458-59)

---

[1]/    Tolnay did not have a right to have an attorney present. (JA1089-90)

Wearing wanted to discuss the incident at the church and the traffic stop to see how they could be handled better in the future. (JA1266) He also wanted to find out what had actually happened. (JA1273) Also, as part of an investigation into a citizen's complaint, it was standard practice to meet with the officers involved. (JA1453)

With regard to Tolnay's August 3 report, and more particularly, Tolnay's statement regarding his feelings about his ability to act, Wearing had no problem with it but noted that Tolnay "could have left it out of his report." (JA1450) It would have been better for him to put that in a separate memorandum. (Id.) Wearing did not believe that Tolnay's actions and statements were protected by the First Amendment. (JA1459)

At the beginning of the second meeting, Tolnay was contrite and apologized. (JA1286-87) Wearing reassigned Tolnay to the detention unit for a cooling-off period. (JA1298) "[Tolnay had] disrespected [the Chief] in [his] office." (JA1304) Wearing considered Tolnay's comments to be disrespectful to Ortiz because it was expected that officers would "respect the ranks." (JA1285) Wearing also believed that Tolnay's statement that the meeting was solely political was disrespectful. (JA1297)

Wearing also disciplined Tolnay "[b]ecause he jumped up from his seat, stating that this meeting is over. I don't have to hear this. It's all political and he

11

walked out of the office." (JA1455)  This level of insubordination had never

occurred before. (JA1455-57)  It "was uncalled for." (JA1456)

Wearing had significant fears about the impact of Tolnay's conduct and

statements on the NHPD.  He thought they would set a bad example. (JA1507)

Specifically, Wearing described his fears as follows:

> The Chief in the department sets the tone and he sets the
> respect and integrity and discipline in the department.
> And if I allowed this to go without severe consequences,
> I feel I would have lost control of the department and any
> officer could do the same thing; walk out and have no
> respect for the chief officer.  I could not allow that to
> happen....

(JA1456-57)

Wearing felt that insubordination to the Chief was worse than

insubordination to an immediate supervisor because "the Chief is the Chief. He's

responsible for all of his officers.  And if a patrol officer can act that way, act out

his frustration to the Chief and walk out of a meeting, then everybody else would

feel they could do the same thing." (JA1457)

## V.    THE DISCIPLINARY DOCUMENTS

By personnel memorandum 02-19, Wearing suspended Tolnay for ten days

for violating four departmental rules. (JA680-81)  Wearing's memorandum

described Tolnay's "outrageous" behavior during the meeting, including his "trash

talk" regarding Ortiz. (JA680)  Wearing also prepared a summary of the incident

document. (JA683-84) It described Tolnay's insubordination and disrespectful comment regarding Ortiz.

## VI.  NABEL'S TESTIMONY

Nabel described the August 13 meeting as follows: "Officer Tolnay wanted to start the story ... where [he] wanted to start the story. And the Chief very succinctly said, I'm the person asking the questions. I want to find out the information...." (JA1856-57; see also JA1844-45) "[F]rom that point on, for the most part, until it deteriorated, ... the Chief was rather more quiet and reserved." (JA1845-46) The meeting ended when "Tolnay jumped up and said he wasn't answering any questions and he demanded to have an attorney." (JA1846)

Nabel did not consider Tolnay's conduct to be polite. (JA1852) He would not agree with Tolnay's claim that Wearing cut off his answers. (JA1854) Nabel expressly denied Tolnay's claim that Wearing tried to bait Tolnay into admitting that he had used bad judgment. (JA1859-60) He also denied Tolnay's claim that Wearing thrust his finger in Tolnay's face. (JA1861) Nabel did not recall Wearing standing up during the meeting. (JA1860)

## VII.  BOMBALICKI'S TESTIMONY

Lieutenant Bombalicki was on the union's executive board and was Tolnay's representative at the meeting. (JA1542-43) Bombalicki confirmed that it

13

was not uncommon for an officer to meet with the Chief concerning a citizen's complaint. (JA1576)

Bombalicki described two lines of questioning from the Chief. (JA1549) The first related to the arrests of the ministers. The second related to the motor vehicle stop. There was a point when the Chief allowed Tolnay to give his full and complete answers. (JA1548) Bombalicki described Tolnay's answers to the Chief's questions as Tolnay's "defending his decision." (JA1547)

Bombalicki described Tolnay's comment regarding Ortiz as follows: "the officer was berated on the radio and I guess that's what the issue was; the discipline on the radio or being hollered at on the radio heard by every unit in the City, ..." (JA1549)

Bombalicki acknowledged that during the meeting Tolnay and Wearing were both hot. (JA1553) He confirmed that Tolnay's tone of voice increased. (JA1573) When he stood up and stated that the meeting was over, Tolnay's tone of voice was elevated and agitated. (JA1574)

## VIII. ABATE'S TESTIMONY

Abate confirmed that the first responding officer writes the case incident report. (JA1789)

Abate was at the meeting because she was ordered to be there. (JA1790) During it, Wearing "was just asking [Tolnay] questions regarding the incident."

14

(JA1793) Wearing did not raise his voice. (JA1798) "He wasn't screaming and yelling." (Id.)

Wearing and Tolnay were reviewing matters "back and forth" and "the next thing ... they were both out of their seats." (JA1794) At that point, Tolnay said "I am not answering any more questions until I have a lawyer. And he walked out...." (Id.) Abate did not remember who stood up first. (JA1803)

Abate was unaware of any political statements by Tolnay. (JA1799) He never discussed such things with her. (Id.)

## SUMMARY OF THE ARGUMENT

Tolnay's August 3 report and his statements at the August 13 meeting were not protected by the First Amendment. The district court's denial of the Rule 50(b) motion is reversible error. It was based on a misunderstanding or misapplication of Garcetti, the "public concern" test, the balancing analysis under Pickering v. Board of Educ., 391 U.S. 563 (1968) and the doctrine of qualified immunity. It was also based upon a re-characterization of the speech, instead of what Tolnay *actually* wrote and said. The ruling denying summary judgment should be reversed on the same grounds as the Rule 50(b) motion.

The court also committed reversible error by denying the new trial motion. With regard to the Garcetti analysis, Tolnay did not establish as a matter of law that he was speaking "as a citizen," as opposed to an employee. Consequently, the

issue had to be submitted to a jury. The court also erred by not instructing the jury about Wearing's right to balance the NHPD's interests against Tolnay's speech and by not involving the jury in the <u>Pickering</u> balancing via interrogatories.

A new trial should have been granted based on the district court's allowing Tolnay to introduce evidence regarding prior disciplinary decisions which involved dissimilar and inflammatory situations. A new trial should have also been granted based on the court's requiring the Mayor to explain what "indemnification" meant. The court also erred by refusing to instruct the jury that any punitive damages had to bear a "reasonable relationship" to Tolnay's actual injuries.

The $150,000 non-economic, compensatory damages award should have been vacated or reduced because there was insufficient evidence to support it. The district court's reduction of the $5 million punitive damages award to $1,350,000 must also be reversed. The imposition of a ratio between the compensatory and punitive damage greater than 1 to *far less than* 1 is unconstitutional and grossly excessive.

## **STANDARD OF REVIEW**

The denials of a Rule 50 motion, qualified immunity and summary judgment are reviewed *de novo*. <u>Anderson v. Recore</u>, 446 F.3d 324, 328 (2d Cir. 2006); <u>Yurman Design, Inc. v. PAG, Inc.</u>, 262 F.3d 101, 108 (2d Cir. 2001); <u>P.C. v. McLaughlin</u>, 913 F.2d 1033, 1040 (2d Cir. 1990).

The denial of a motion for a new trial is reviewed for an abuse of discretion. Nimely v. City of New York, 414 F.3d 381, 392-93 (2d Cir. 2003).

The propriety of a jury instruction is reviewed *de novo*. Cobb v. Pozzi, 363 F.3d 89, 112 (2d Cir. 2004).

The application of the guideposts from BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996) and the determination of whether a punitive damages award is excessive are subject to *de novo* review. DiSorbo v. Hoy, 343 F.3d 172, 186 (2d Cir. 2003).

## ARGUMENT

## I.    THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY DENYING THE RULE 50(b) MOTION

### A.    The Speech Is Not Protected Under Garcetti

Contrary to the district court's analysis (SPA105), under Garcetti, the plaintiff (not the defendant) has the burden of proof and must "provid[e] evidence that her expressions were made in her capacity as a citizen and not pursuant to her 'official duties.'" Casey v. West Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1328 (10th Cir. 2007). A review of the record, Garcetti and the decisions that have applied Garcetti demonstrates that the denial of the Rule 50(b) motion and if necessary, the Rule 60(b) motion constituted reversible error. As a matter of law, no reasonable jury could find that Tolnay did not speak in his "capacity" as an

17

employee when he prepared his August 3 report and spoke at the August 13 meeting.

Garcetti "h[e]ld that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 126 S.Ct. at 1960. It explained that:

> Ceballos wrote his disposition memo because that is part of what he ... was employed to do. .... The significant point is that the memo was written pursuant to Ceballos' official duties. Restricting speech that *owes its existence* to a public employee's professional responsibilities does not infringe any liberties....

126 S.Ct. at 1960 (emphasis added). "When a public employee speaks pursuant to employment responsibilities, ..., there is no relevant *analogue* to speech by citizens who are not government employees." Id. at 1961 (emphasis added).

Garcetti recognized that "Ceballos did not act as a citizen when he went about conducting his daily professional activities, .... When he ... performed the tasks he was paid to perform, Ceballos acted as a government employee." Id. at 1960. Accordingly, a statement a public employee makes "in the course of doing his or her job" is not protected by the First Amendment. See id. at 1962.

In defining the scope of an employee's duties, Garcetti held that the:

> proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee is actually expected to perform, and the listing of a given

18

> task in an employee's written job description is neither
> necessary nor sufficient to demonstrate that conducting
> the task is within the scope of the employee's
> professional duties....

Id. at 1961-62.

In Spiegla v. Hull, 481 F.3d 961, 965 (7th Cir. 2007), the court recognized

that "[a]fter Garcetti, ..., the threshold inquiry is whether the employee was

speaking as a citizen; only then do we inquire into the content of the speech." The

plaintiff in Spiegla complained about having been prevented by her supervisor

from investigating a possible security breach while she was on duty. "Frustrated"

that she could not do her job, she noted the incident in her log and reported it to an

assistant superintendent. Id. at 962-63.

In a prior decision, the court had concluded that because the plaintiff's

statements "were not part and parcel of her core function[ ] to implement but not

question prison security policies, she acted beyond her employment capacity and

spoke as a private citizen on a matter of public concern." Id. at 966. Spiegla held

that this prior "focus on 'core' job functions [wa]s too narrow after Garcetti, which

asked only whether an 'employee's expressions [were] made pursuant to official

responsibilities.'" Id. The fact that the plaintiff's statements highlighted potential

misconduct did not change the fact that she was speaking pursuant to her official

responsibilities, "not as a citizen 'contributi[ng] to civic discourse." Id. at 967.

Rather, she "acted as a government employee" when she reported the possible misconduct. Id. Consequently, the jury verdict in her favor had to be vacated. Id.

In Sigsworth v. City of Aurora, 2007 WL 1518536, at *3-4 (7th Cir. May 25, 2007), the court rejected the plaintiff's argument that his report of alleged police misconduct was protected because it "exceeded the scope of his official duties." The plaintiff, like the district court in this case (SPA106), relied on Delgado v. Jones, 282 F.3d 511 (7th Cir. 2002), which had found protection because the speech at issue "'went far beyond some rote, routine discharge of an assigned duty'" and contained "'additional facts.'" The Seventh Circuit recognized that Delgado was not helpful because its central concern in that case was the content of the speech and thus it did not address whether the plaintiff was "speaking as a citizen when he made his report." Id. at *3.

In Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689, 693 (5th Cir. 2007), the court addressed "the extent to which, under Garcetti a public employee is protected by the First Amendment if his speech is not necessarily required by his job duties but nevertheless is related to his job duties." The Fifth Circuit focused on the distinction between speech "that is 'the kind of activity engaged in by citizens who do not work for the government,'..., and activities undertaken in the course of performing one's job." Id. It concluded that "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties." Id.

Thus, simply because the plaintiff had written memoranda, which were not demanded of him, did not mean that he was not acting within the course of performing his job. Id. at 694. As the memoranda were written in the course of the plaintiff performing his job, the speech was not protected. Id. See Green v. Board of County Commissioners, 472 F.3d 794, 800-01 (10th Cir. 2007) (even if not explicitly required speech, activities stemmed from and were the type the plaintiff was paid to do); Schuster v. Henry County, 2007 WL 1701795, at *4 (N.D. Ga. June 7, 2007); Thompson v. District of Columbia, 478 F.Supp.2d 5, 9 (D.D.C. 2007).

If the employee's speech has no "analogue" to traditional speech engaged in by citizens, it is not protected. For example, Freitag v. Ayers, 468 F.3d 528, 546 (9th Cir. 2006) recognized that the preparation of "internal forms" by a corrections officer, was "clear[ly]" not protected by the First Amendment after Garcetti. By contrast, letters written to a senator and an independent agency were protected because they bore similarities to letters submitted by citizens. Id. at 545-46.

Moreover, courts applying Garcetti have recognized that speech that is the result of compliance with a request, order or assignment is not protected. See Bradley v. James, 479 F.3d 536, 538 (8th Cir. 2007). Accordingly, speech made at a meeting that an employee attends in his capacity as an employee is not protected. Cole v. Anne Arundel County Bd. of Educ., 2006 WL 3626888, at *6 (D.Md. Nov.

30, 2006); <u>Tomicich v. Pueblo City County Library Dist.</u>, 2006 WL 2734250, at *2 (D. Colo. Sept. 25, 2006).

For example, <u>Milde v. Housing Authority</u>, 2006 WL 2583086, at *6 (D.Conn. Sept. 5, 2006) rejected the plaintiff's argument that because the defendants disciplined her for speech at a meeting, she could not have been acting pursuant to her duties. It recognized that the "argument simply d[i]d not take into account the reality that one can perform one's official duties inadequately or in an insubordinate manner, and still be subject to lawful disciplinary action." <u>Id.</u>

Courts have also recognized that under <u>Garcetti</u>, speech that "arise[s] from" or is in connection with an employee's duties is not protected. <u>Logan v. Indiana Dep't of Corrections</u>, 2006 WL 1750583, at *1 (S.D. Ind. June 26, 2006). Thus, an employee's expressing concerns about his ability to do his job is not protected. <u>Posey v. Lake Pend Oreille Sch. Dist. No. 84</u>, 2007 WL 420256, at *5 (D. Idaho Feb. 2, 2007). And an employee's defending the way he did his job is not protected. <u>Maras-Roberts v. Phillippe</u>, 2007 WL 1239119, at *6 (S.D. Ind. Apr. 27, 2007). This is true even if the employee criticizes or disagrees with his superior. <u>Mills v. City of Evansville</u>, 452 F.3d 646, 648 (7th Cir. 2006); <u>Ruotolo v. City of New York</u>, 2006 WL 2033662, at *3 (S.D.N.Y. July 19, 2006); <u>Brewster v. City of Poughkeepsie</u>, 434 F.Supp.2d 155, 156-57 (S.D.N.Y. 2006) (criticism of

Chief's decision to dismiss traffic summonses related to police officer's professional activities).

For example, in <u>Fritz v. Daly</u>, 2006 WL 3095755, at *5 (D.N.H. Oct. 31, 2006), the plaintiff's statements related to his efforts to defend his performance. As part of his efforts, he claimed that it was his supervisor who acted improperly. The court held that "[s]uch communications are quintessentially a part of an employee's official duties." <u>Id.</u> It recognized that if it were to adopt the plaintiff's conception of the law, "a public employee acting illegally or unethically could avoid the specter of discipline by simply responding to his employer's job-related inquiries with denials and counter accusations of corruption." <u>Id.</u>

Here, as demonstrated above in detail, as a matter of law, Tolnay wrote the August 3 report "pursuant to" his duties, i.e., in his "capacity" as an employee. It was an official NHPD form and signed under penalty of perjury. It cross-referenced the July 26 report. Tolnay was required under the NHPD's regulations to prepare the July 26 report. (JA841-42) He prepared both reports in the course of his duties. Abate confirmed that it was standard for the first responding officer to write the case incident report. (JA1789) Tolnay never differentiated between the capacity in which he wrote the two reports. Nor did he differentiate between the capacity in which he wrote his August 3 report and his memorandum to Ortiz.

After Tolnay let Rodriguez go, he informed his supervisor that he would be preparing a report to "document" the stop. (JA615) At a sub-station, Burgh informed Tolnay that Ortiz had ordered that Tolnay prepare a departmental memorandum explaining the stop. (JA906)

Tolnay contacted the NHPD's records division and asked it to fax him his July 26 report so he could cross-reference it. (JA914-15) He wrote the August 3 report "in connection with" the stop. (JA901) Tolnay wrote it to "explain" what happened and why he could not take "police action." (JA910) He wrote the report on duty and regarding the exercise of his authority as a police officer. (JA904)

There was no evidence that Tolnay had an option to prepare the August 3 report. To the contrary, Ortiz ordered him to prepare a memorandum. Tolnay's memorandum was a cursory document. It acknowledged that he had been ordered to prepare a memorandum "regarding" the stop and referred Ortiz to the August 3 report for the "full and complete details regarding [the] motor vehicle stop." (JA624) As the district court recognized, the report was part of Tolnay's compliance with Ortiz's order. (SPA15) Indeed, the report form itself indicates that it can be used whether or not an arrest is made. (JA612) Consequently, the report is not protected under Garcetti.

Similarly, Tolnay's statements at the August 13 meeting were not protected. A memorandum "ordered" Tolnay to appear upon his "return to duty." (JA688)

At the meeting, the Chief's questions related to the July 26 arrests and the August 3 traffic stop. (JA1549)

Consequently, regardless of the content, nothing Tolnay said at the meeting was protected. Even if the content must be reviewed, it was not protected. Tolnay's statement of his belief that the reason for his presence at an official meeting was because of the ministers' political connections, was made pursuant to or during the course of his duties. Tolnay was answering questions. His responses, which included his statement, were part of what he was employed to do.

The analysis is the same for Tolnay's comment about Ortiz. Tolnay was speaking at the meeting because he was ordered to be there. His comment was part of his answering a question from the Chief. That was part of his job.

Even if Tolnay's August 3 report and his statements at the meeting were not required, they are not protected because they were undertaken in the course of Tolnay's performing his job. Williams, 480 F.3d at 693-94. Neither the report nor the statements were the kind of activities engaged in by citizens. Id. They had no "analogue to speech by citizens who are not government employees." Garcetti, 126 S.Ct. at 1961.

Citizens do not stop fellow citizens for violations of the traffic laws. Citizens do not have access to and do not prepare official NHPD report forms. Nor do they prepare reports at sub-stations explaining their use of police authority.

Similarly, citizens are not ordered to either explain themselves in writing to police captains or to meet with a police chief to answer questions about arrests, a traffic stop and a citizen's complaint. Tolnay's speech "owes its existence" to or "arises out of" his job. He prepared his report and attended the meeting as a result of his job. Indeed, Tolnay interacted with the ministers as a result of his job. Tolnay's speech was the kind of activities he was paid to perform; the kind of activities employees engage in. Thus, the speech is not protected by the First Amendment. Freitag, 468 F.3d at 545-46.

Even if Tolnay had the discretion not to write a report, it would not mean that his preparation of the report was not pursuant to or within the "scope" of his duties. A police officer's ability to exercise discretion on whether to do something or how to do it, does not mean that the action or inaction was not pursuant to his duties. A police officer's duties are inherently discretionary. See Fedor v. Kudrak, 421 F.Supp.2d 473, 481 (D.Conn. 2006).

To the extent the district court (SPA107) considered Tolnay's speech (either in the report or at the meeting) to be an expression of an "opinion" on alleged misconduct, that conclusion is not supported by either the text of what Tolnay *actually* wrote or his testimony about what he *actually* said. However, even if Tolnay was reporting on misconduct, it would be part of or within the scope of his duties. Bland v. Winant, 2007 WL 1237846 at *4 (D.N.J. Apr. 27, 2007)

26

("Investigating and reporting crime are the core functions of a police officer");

Dillon v. Bailey, 45 F.Supp.2d 167, 174 (D.Conn. 1999) (police officer has a

"legal obligation ... to report or otherwise attempt to stop unlawfulness coming to

his attention"). And it would not mean that Tolnay was not speaking in his

"capacity" as an employee. Sigsworth, supra at *3-4. See Boykin v. City of Baton

Rouge/Parish of East Baton Rouge, 439 F.Supp.2d 605, 610-11 (M.D.La. 2006).

Indeed, in discussing the broad scope of Garcetti's holding, Justice Souter included

the example of a police officer balking at a superior's order to violate

constitutional rights - as being beyond the First Amendment's protection. 126

S.Ct. at 1966-67 (Souter, J., dissenting).

    The district court's reliance (SPA106-08) on testimony, that some of what

Tolnay wrote could have been placed in a separate memorandum, to support its

holding that the report was not made pursuant to Tolnay's duties was misplaced. It

incorrectly focused on the content of the speech as opposed to the "capacity" of the

speaker. Spiegla, 481 F.3d at 965. In Garcetti, Ceballos' supervisors were

displeased with the content of his memorandum, which lead to a heated meeting.

Nevertheless, the Court's analysis was not on the content of the speech or how it

was critiqued after it occurred. Rather, it analyzed whether the speech was "made

by an employee in his or her professional capacity." 126 S.Ct. at 1960. Garcetti

recognized that if employers believe that an employee's speech is "inflammatory

or misguided, they ha[ve] the authority to take proper corrective action." Id. at 1960-61.

As demonstrated above, the court's conclusion, (SPA105-09), that Tolnay's August 3 report and his statements at the meeting were not pursuant to his duties because Tolnay was not required to make his opinion or feelings known, was also contrary to the analysis mandated by Garcetti. Again, it incorrectly focused on the content of the speech and ignored the "capacity" in which Tolnay wrote and spoke. In particular, the district court concluded that Tolnay's report survived Garcetti "[b]y [his] inserting his opinions into a document that would otherwise have been completely a part of Tolnay's official duties as a police officer." (SPA108; see SPA107 ("filing ... report and attendance at ... meeting with Chief ... may have been part of Tolnay's official duties")) This analysis nullified or eliminated Garcetti's mandate that the "capacity" of the speaker is dispositive. 126 S.Ct. at 1959-60 ("controlling factor").

Moreover, Sigsworth and Spiegla confirm that the district court's reliance on Delgado and its conclusion that speech is protected unless it is made "entirely" within the plaintiff's employment capacity constituted legal error. (SPA106) The court's finding regarding Tolnay's job requirements were "too narrow," Spiegla, 481 F.3d at 966, and violated Garcetti's admonition that an employee's duties did not have to be listed in a job description. 126 S.Ct. 1961-62.

The dispositive point is that Tolnay was acting as a government employee when he prepared the report and spoke at the meeting. Williams, 480 F.3d at 693-94. Indeed, the district court's analysis acknowledged this when it recognized that the August 3 report "would otherwise have been completely a part of Tolnay's official duties...." (SPA108)  Thus, under Garcetti and the decisions that have applied it, Tolnay's speech was not protected. Spiegla, 481 F.3d at 967.

The district court's belief that Tolnay's speech was protected even though it was "intertwined with [his] official duties," (SPA108), is also contrary to Garcetti. Under Garcetti's "practical" inquiry, when an employee prepares an official form, he speaks in his capacity as an employee and his speech is not protected. Freitag, 468 F.3d at 546. The "intertwined" analysis is also improperly dependent on the content of the speech and ignores the speaker's "capacity."

The preparation of a report regarding a traffic stop is a quintessential aspect of a police officer's duties. See Bland, supra at *4; Kelly v. City of Mount Vernon, 344 F.Supp.2d 395, 403 (S.D.N.Y. 2004) The same is true for attending a meeting regarding arrests, a stop and a citizen's complaint.

As Tolnay's speech was made in his capacity as an employee, it is not protected. Accordingly, judgment must enter for Wearing.

29

## B.    The Speech Is Not Protected Under The "Public Concern" Test

If the speech at issue survives Garcetti, a court must decide whether it

addresses a matter of public concern. "Whether an employee's speech addresses a

matter of public concern must be determined by the content, form, and context of a

given statement, as revealed by the whole record." Connick v. Myers, 461 U.S.

138, 147-48 (1983).

"[S]peaking up on a topic that may be deemed one of public importance

does not automatically mean the employee's statements address a matter of public

concern as that term is employed in Connick." Pappas v. Giuliani, 290 F.3d 143,

152 (2d Cir. 2002) (McMahon, J., concurring). Connick "looked behind the

pretextual 'public concern' rationale proffered by the disciplined employee in

order to discern whether her conduct, taken as a whole, was actually meant to

address matters of public concern, or was simply a vehicle for furthering her

private interests." Id. at 153. Thus, the fact that police reports contain information

that may be of general interest to the public does not alone make a report a matter

of public concern. Morris v. Crow, 142 F.3d 1379, 1381 (11th Cir. 1998).

Consequently, a "court should focus on the motive of the speaker and

attempt to determine whether the speech was calculated to redress personal

grievances or whether it had a broader public purpose." Lewis v. Cowen, 165 F.3d

154, 163-64 (2d Cir. 1999). Whether the motive of the speaker was to inform the

30

public is a relevant factor to the analysis. <u>Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.</u>, 444 F.3d 158, 166-67 (2d Cir. 2006). <u>See</u> <u>Linhart v. Glatfelter</u>, 771 F.2d 1004, 1010 (7th Cir. 1985)("was it the employee's point to bring wrongdoing to light?").

Speech which is "personal in nature and generally related to [the plaintiff's] own situation" is not protected under the First Amendment. <u>Saulpaugh v. Monroe Community Hosp.</u>, 4 F.3d 137, 143 (2d Cir. 1993); <u>Ezekwo v. NYC Health & Hosps. Corp.</u>, 940 F.2d 775, 781 (2d Cir. 1991)(touching on public concern does not alter personal nature of speech).  For example, speech related to a plaintiff's desire to protect his job is not protected. <u>Hanig v. Yorktown Cent. Sch. Dist.</u>, 384 F.Supp.2d 710, 722 (S.D.N.Y. 2005).  Under such circumstances, even an incidental motivation to advance a public interest, will not entitle the speech to protection. <u>Id.</u>  <u>See</u> <u>Beckwith v. Erie County Water Auth.</u>, 413 F.Supp.2d 214, 221-23 (W.D.N.Y. 2006).  Moreover, speakers may not invoke the First Amendment based on unexpressed thoughts. <u>Wernsing v. Thompson</u>, 423 F.3d 732, 753 (7th Cir. 2005); <u>Giacalone v. Abrams</u>, 850 F.2d 79, 86-87 (2d Cir. 1988).

An examination of what Tolnay *actually* wrote and said reveals that he was not speaking on a matter of public concern.  Tolnay's speech fails every aspect of the content, form and context analysis.  All of the factors weigh heavily against a finding that the speech was protected.

31

As part of a retaliation claim, courts "must 'delve deeper into the precise content' to determine whether what was said on the topic was of public concern." Schad v. Jones, 415 F.3d 671, 675 (7th Cir. 2005). There must be a "communicative element to the speech that puts the listener on alert that a matter of public concern is being raised." Id.

Notably absent from the rulings on the Rule 50(b) and the summary judgment motions are quotations and analysis of the actual text of the August 3 report and Tolnay's testimony about what he actually said at the meeting. Instead, the district court's analysis is based on Tolnay's counsel's re-characterization of the speech years after the fact. Specifically, it relied on Tolnay's "opinion[] regarding selective enforcement of the laws," (SPA107), and the "voiding" of arrests based on "political pandering," (SPA110), to hold that Tolnay's speech was protected under Garcetti and the public concern test. However, neither the report nor the statements referred to these points.[2]

The August 3 report only refers to Rodriguez's "political influence" and his "political involvement" and it only does so in connection with Tolnay explaining

---

[2]/    The court also relied on Abate's hesitation to enforce the law. (SPA109) However, Abate's hesitation was based on an encounter after the August 3 stop (JA1800-02) and Tolnay never mentioned it. Thus, it cannot factor into the analysis.

how he handled the stop. It does not mention the dropping of the July 26 charges.[3]
Nor is there any mention of any wrongdoing by any officials. The same is true for
Tolnay's statements at the meeting. There was no mention of charges being
dropped or wrongdoing by any official. Tolnay's issue with Ortiz was the manner
in which he used the radio.

Thus, a thorough examination of the content of what Tolnay *actually* wrote
and said confirms that there was no "communicative element" to put Wearing on
alert that a matter of public concern was being raised. Unspoken words are not
protected. Giacalone, 850 F.2d at 86-87. Even assuming that Tolnay was speaking
on a matter of public concern, any such speech was "buried" in an official report
and answers in response to questions. Such speech is not protected. Fritz, supra at
*6; Benvenisti v. City of New York, 2006 WL 2777274, at *12 (S.D.N.Y. Sept. 23,
2006)

The form of Tolnay's speech was official and job-related. Tolnay kept his
speech internal and private. Benvenisti, supra at *12 (forum is relevant). He *only*
spoke in an official report form and in response to questions at a meeting he was
ordered to attend. Tolnay wrote and spoke in the normal course of doing his job.
Such speech is not protected. Ethier v. City of Kohoes, 2006 WL 1007780, at *5
(N.D.N.Y. Apr. 18, 2006); Fusco v. City of Rensselaer, 2006 WL 752794, at *8-9

---

[3]/    Indeed, Tolnay did not know when the charges were dropped. (JA959)

33

(N.D.N.Y. Mar. 22, 2006); Cahill v. O'Donnell, 75 F.Supp.2d 264, 273 (S.D.N.Y. 1999).[4]

Similarly, the context of Tolnay's speech was that it arose out of his employment. He wrote the August 3 report as part of his job in general and as part of his compliance with Ortiz's order. Tolnay included the last portion of the report because he was concerned about the "consequences" that he might suffer. (JA903) Tolnay did not request the meeting. He was "ordered" to attend.

The fact that the purpose of Tolnay's speech was not to inform or to bring something to light, "is a relevant factor to the analysis." Bateman v. Fialkievicz, 2006 WL 1359157, at *5-7 (D. Conn. May 15, 2006). A review of Tolnay's motivation and his testimony as to "why" he wrote the August 3 report confirms that the purpose of his report, (other than fulfilling his duties), was his personal situation. He wrote the last portion of his report because he was "frightened" about the ramifications and needed to explain because he knew what he was in store for. (JA903; JA910) To use the "common parlance," Tolnay's August 3 report was a "CYA" memo. Kelly, 344 F.Supp.2d at 403. Such speech is not protected. Id.

---

[4]    See Gonzalez v. City of Chicago, 239 F.3d 939, 942 (7th Cir. 2001); Urofsky v. Gilmore, 216 F.3d 401, 407-09 (4th Cir. 2000); Buazard v. Meredith, 172 F.3d 546, 548-49 (8th Cir. 1999); Morris, 142 F.3d at 1382; Gillum v. City of Kerryville, 3 F.3d 117, 120-21 (5th Cir. 1993); Thomson v. Scheid, 977 F.2d 1017, 1020-21 (6th Cir. 1992); Koch v. Hutchinson, 847 F.2d 1436, 1442-43 (10th Cir. 1988).

The district court failed to address the fact that Tolnay was not trying to bring anything to light. (SPA109-10) Tolnay was not on a mission to protect the public welfare. He was not reporting on anything, let alone department-wide problems. Nor was he a whistle blower. He did not approach the media, other law enforcement agencies or a prosecutor's office. Rather, Tolnay was complying with Ortiz's order and seeking to protect himself by documenting the stop in his report. At the meeting, he answered the Chief's questions. Tolnay was "defend[ing] his conduct as a police officer." (JA35; JA1547; JA1914) Tolnay did not request a meeting. He was "ordered" to appear.

Contrary to the court's holding (SPA108-10), the internal expression of alleged "frustrations" about one's ability to do his job and his job situation are not matters of public concern. Tolnay's motivation was to protect and defend his job. Such speech is not protected. Ezekwo, 940 F.2d at 781; Defilippo v. New York State Unified Court Sys., 2006 WL 842400, at *16-18 (E.D.N.Y. Mar. 27, 2006), aff'd 2007 WL 1174135 (2d Cir. Apr. 19, 2007).

Likewise, Tolnay's comment about Ortiz amounted to a personal issue or employment beef. Bateman, supra at *5-8. Tolnay was upset because he believed that Ortiz had "berated" him on the radio. (JA1549) Indeed, Tolnay only felt that Ortiz's comment on the radio "about [him]" was inappropriate. (JA970; see JA971 ("using the radio")) Such statements during a heated meeting with a superior are

35

not protected. Bailey v. Department of Elementary & Secondary Educ., 451 F.3d

514, 519-20 (8th Cir. 2006).

**C.    The Speech Is Not Protected Under The Pickering Balancing Analysis**

Contrary to the district court's post-trial analysis, (SPA113-15), an employer

does not have to admit that he disciplined an employee because of his speech

before the employer can receive the Pickering balancing analysis. Rather,

Pickering can be argued in the alternative. Indeed, the summary judgment ruling

recognized that Wearing could and was doing that. (SPA30, n.23) That ruling was

correct. Bailey, 451 F.3d at 521; Vista Community Services v. Dean, 107 F.3d

840, 845 (11th Cir. 1997)("where the employer's claimed reasons are unrelated to

the speech, we still apply the Pickering balancing test").

Moreover, the court's analysis (SPA113-15) is not supported by the record.

Tolnay's discipline was not based solely on his "behavior." As demonstrated

above, Wearing included the "statements" that Tolnay bases his claim on, as part

of the insubordination for which Tolnay was disciplined.

Consequently, the Pickering balancing analysis must be applied in this case.

Under it, Wearing is entitled to a judgment.

Under Pickering, a court balances the interests of the employer in providing

"'effective and efficient public services,'…, against the employee's First

Amendment right to free expression." Lewis, 165 F.3d at 162. In balancing, a

court must consider whether the statement sought to be protected "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships ... or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Id.

An employer is never required "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." Connick, 461 U.S. at 152. He need only show a "likely interference" with its operations, and "not an actual disruption." Lewis, 165 F.3d at 163. See Waters v. Churchill, 511 U.S. 661, 673 (1994) ("substantial weight to government employers' reasonable predictions of disruption"). An employer need only have "reasonably believed that the speech would potentially interfere with or disrupt the government's activities,...." Pappas, 290 F.3d at 146.

Officials in a paramilitary organization such as a police department have a right to demand from their subordinates a commitment to the agency's mission as defined by the officials. See Williams v. Seniff, 342 F.3d 774, 784 (7th Cir. 2003). Comments concerning co-workers' performance of their duties or superior officers' integrity interfere with the efficient operation of a police department. Oladeinde v. Birmingham, 230 F.3d 1275, 1293-94 (11th Cir. 2000). See Heil v. Santoro, 147 F.3d 103, 109 (2d Cir. 1998).

37

"Deference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement." Kokkinis v. Ivkovich, 185 F.3d 840, 845 (7th Cir. 1999). Consequently, a police chief may take action to remedy disruption, both actual and potential, where a subordinate's statements in his presence and the presence of other co-workers creates a "potential problem in maintaining authority and discipline within the department." Id. at 846.

Wearing's employment decision was entitled to "considerable judicial deference." Id. Tolnay's unilateral ending of a meeting and demanding an attorney before speaking any further constituted insubordination to the NHPD's highest ranking officer. Wearing emphasized the importance of maintaining discipline and respect for the chain of command and the threat that Tolnay's insubordination and disrespectful statements posed to the functioning of the NHPD. (JA1455-59) When weighed against speech arising out of Tolnay's duties, the Pickering analysis weighs overwhelmingly in favor of Wearing. Locurto v. Giuliani, 447 F.3d 159, 178 (2d Cir. 2006)("burden is just to show that speech *threatened* to interfere").

As part of the balancing analysis, this Court must identify Tolnay's interest in making the statements he *actually* wrote and spoke. When viewed in light of Garcetti and the case law regarding a plaintiff's personal motivations and the

absence of First Amendment protection for employment grievances and personal issues, Tolnay had no (or little) interest in the speech at issue.

Tolnay's *actual* speech merely involved his preparing an official report pursuant to his general duties and in compliance with Ortiz's order and his answering questions at a meeting he was ordered to attend. Even assuming that there was something more in the speech, it was, at best, "buried" within Tolnay's personal interests, his employment beef with Ortiz and his compliance with his duties. The Chief's interest in discipline, loyalty and respect for the chain of command outweighed any interest Tolnay had in fulfilling his job duties, protecting his job or advancing his grievance.

Garcetti also confirms that employers can discipline employees for what they consider to be inflammatory or misguided speech. 126 S. Ct. at 1960-61. It prohibits courts from "interven[ing]" in those employment decisions. Id. Here, the district court's explicit criticisms of both Wearing's employment and law enforcement decisions, (SPA44-45; SPA110; SPA113), constituted the judicial "oversight" and "intervention" forbidden by Garcetti. Id. at 1961. See McGee v. Public Water Supply, Dist. #2, 471 F.3d 918, 921 (8th Cir. 2006). Accordingly, Wearing is entitled to judgment under Pickering.

### D.    Chief Wearing Is Entitled To Qualified Immunity

Wearing is entitled to qualified immunity. As demonstrated above, he did not violate Tolnay's constitutional rights. Even assuming that Tolnay had a right, it was not "clearly established."

The analysis of whether a right is clearly established "must be undertaken in light of the case's specific context, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198 (2004). For example, it does no good to allege that a public official violated the right to free speech, and then conclude that the right to free speech has been "clearly established" since 1791. International Action Ctr. v. United States, 365 F.3d 20, 25 (D.C. Cir. 2004). Instead, courts consider:

> (1) whether the right in question was defined with 'reasonable specificity;' (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

Pena v. Deprisco, 432 F.3d 98, 115 (2d Cir. 2005).

The district court's conclusion, (SPA110-11), that a First Amendment right was clearly established based on a general reference to the prohibition against retaliation and a right to report misconduct violates the mandatory analysis. Saucier v. Katz, 533 U.S. 194, 201-202 (2001). Any right had to be defined with specificity and identified within Supreme Court or Second Circuit decisions.

Pabon v. Wright, 459 F.3d 241, 255 (2d Cir. 2006). Those decisions had to involve factual circumstances that corresponded to the circumstances at issue. McKee v. Hart, 436 F.3d 165, 173 (3d Cir. 2006).

The law regarding speaker "capacity" was not clearly established. As the Solicitor General demonstrated in Garcetti, prior to that decision, it was not clearly established that public employees had a First Amendment right in speech expressed in the course of their doing their job. (JA3271 n.13) Prior to Garcetti, at least seven circuits recognized the importance of Connick's citizen speech - employee speech distinction. See supra note 4. District courts in this circuit were applying the same analysis. Cahill, 75 F.Supp.3d at 273.

Given the analysis of judges in this Circuit in decisions addressing police reports, see Cahill, not to mention Connick, 461 U.S. at 147, and the circuit court decisions before Garcetti, Wearing did not have notice of any "clearly established" right held by Tolnay under the circumstances. Richardson v. Selsky, 5 F.3d 616, 623 (2d Cir. 1993). Indeed, Garcetti recognized that the "[p]roper application of our precedents thus leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." 126 S.Ct. at 1961.

Moreover, as demonstrated above, under the "public concern" test, Tolnay had no right in speech prepared in the course of his job, speech that was motivated

41

by his personal situation or speech that constituted a grievance with a superior. The district court itself recognized that despite "exhaustive research" it could not find a factually similar decision. (SPA44) That conclusion required the entry of qualified immunity. McKee, 436 F.3d at 173.

Wearing is also entitled to qualified immunity because it was not clearly established that First Amendment protection extends to "intertwined" speech, the theory on which the district court (SPA108) based its decision. See Saulpaugh, 4 F.3d at 147 (Newman, C.J., concurring) ("a public employee's speech is to be placed either in the "public concern" or the "private interest" category and that determination [is] based on the 'primary aim' of the speech"). Similarly, the district court did not cite a decision by the Supreme Court or this Court that recognized that an employee has a right unless he speaks "entirely" within his capacity as an employee. Nor did it cite a decision recognizing a right in an employee's speech which is made in the course of his doing his job, even if the speech is characterized as "opinion" or job "frustration."

At a minimum, as courts have concluded that the lines between personal grievances/private speech and public concern speech are grey and ill-defined, under the circumstances at issue, any right was not clearly established. Campbell v. Galloway, 483 F.3d 258, 271-72 (4th Cir. 2007).

Given the well-established need for loyalty and respect for the chain of command in police departments, Wearing should have also received qualified immunity under Pickering. It was undisputed that Tolnay declared that the meeting was over and that he would not speak again until he had an attorney. Wearing had serious concerns about the negative impact of Tolnay's disrespectful statements and insubordination.

As Noyola v. Texas Dept. of Human Resources, 846 F.2d 1021, 1025 (5th Cir. 1988) explained:

> One consequence of case-by-case balancing is its implication for the qualified immunity of public officials whose actions are alleged to have violated an employee's first amendment rights. There will rarely be a basis for *a priori* judgment that the termination or discipline of a public employee violated 'clearly established' constitutional rights.

Here, any right held by Tolnay was not clearly established because the Pickering analysis turns upon a fact-intensive balancing and thus the result of the balancing analysis was not clearly established for purposes of qualified immunity.

Finally, Wearing is entitled to qualified immunity because his conduct was "objectively reasonable" as a matter of law. Poe v. Leonard, 282 F.3d 123, 146 (2d Cir. 2002). Based on the analysis above, it cannot be said that no reasonable police chief would find Wearing's conduct to be reasonable. If there was a question of fact in connection with this analysis, contrary to the district court's

43

holding (SPA138-40), a new trial should have been ordered based on its failure to submit interrogatories to the jury.

## II.    THE DENIAL OF SUMMARY JUDGMENT CONSTITUTED REVERSIBLE ERROR

In its summary judgment ruling, the district court held that Tolnay's August 3 report, his "defense of his professional conduct on July 26 and August 3 during the meeting of August 13 with Wearing, and his critique of the actions of Ortiz, made in his Report and during the August 13 meeting" were protected by the First Amendment. (SPA33)

If necessary, the denial of summary judgment (SPA27-54) should also be reversed under the analysis set forth above. As demonstrated above, no right was violated. Tolnay's August 3 report was prepared in his "capacity" as an employee and as part of his compliance with an "order." Indeed, the district court recognized this (SPA15) and Tolnay's opposition brief conceded that his August 3 report was "made in the course of his duties." (JA158) It was also undisputed that Tolnay "attended the ... meeting in Wearing's office, at Wearing's directive, in order 'to discuss' the events of July 26 and August 3." (SPA17; SPA40-41)

Tolnay's affidavit indicated that his statement that the meeting was "solely political" was "made ... in response to the Chief's question regarding the reasons why I did not arrest or issue a summons to Daniel Rodriguez ...." (JA174) Tolnay's deposition described his statement regarding Ortiz as informing Wearing

44

that there was an "etiquette" that "need[ed] to be followed on the radio, no matter who you are, no matter what your rank is in th[e] department." (JA195, at p. 56) He considered Ortiz's comment to be degrading. (Id.)

Thus, Wearing was entitled to qualified immunity. No right was violated and the denial of summary judgment must be reversed under Garcetti, the "public concern" and Pickering balancing analyses set forth above. Moreover, as demonstrated above, any First Amendment right was not clearly established and Wearing's conduct was objectively reasonable. Indeed, the district court recognized that "[t]he facts of this case are strikingly dissimilar to any other case analyzed through exhaustive research...." (SPA44)

## III.    THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY DENYING THE MOTION FOR A NEW TRIAL

### A.    The Garcetti Issue

The district court erred by not ordering a new trial in order for a jury to determine whether Tolnay's speech was made "pursuant to" his job duties. (SPA110)  Under the evidence summarized above, Tolnay did not establish as a matter of law that he was not speaking pursuant to his duties; i.e. in his "capacity" as a citizen and not as an employee.  Thus, if judgment did not enter for Wearing, the Garcetti issue had to be submitted to a jury.  Accordingly, the court's holding constituted an impermissible finding of fact and Wearing is entitled to a new trial.

Moreover, Tolnay's claim is based on two incidents of speech, a portion of the August 3 report and his comments at the meeting. (JA1885-87) If this Court concludes that one of the incidents is not protected, a new trial is required because the jury based its verdict and damages award on two incidents. It was more likely than not that the verdict was affected by the erroneous inclusion of examples of unprotected speech. Freitag, 468 F.3d at 546. Thus, it would constitute a manifest injustice for the verdict to stand based on the underlying assumption that both incidents were protected. Also, the evidence at trial would have been limited to only the protected speech. Consequently, if allowed to stand, the verdict would be based upon evidence that the jury should never have considered.

**B.    The _Pickering_ Analysis**

As part of its denial of Wearing's Rule 50(a) motion, the district court held that the jury would have to resolve questions of fact in connection with the _Pickering_ balancing. (SPA76-77) Nevertheless, despite a proposed charge (JA495-97), proposed interrogatories (JA510-13; JA2206-07) and an exception to the charge (SPA79-81), it did not instruct the jury that an employer, such as Wearing, can consider and weigh the potential disruptive effect of speech and conduct and did not submit interrogatories to it.

It is well-established that there are circumstances where the _Pickering_ balancing test _must_ be submitted to a jury for the resolution of factual questions.

46

Gorman-Bakos v. Cornell Co-op. Extension, 252 F.3d 545, 557 (2d Cir. 2001);

Vasbinder v. Ambach, 926 F.2d 1333, 1340 (2d Cir. 1991). This case satisfied the

circumstances envisioned by this Court.

In addition to the Chief's concerns about the impact of Tolnay's

insubordination, as demonstrated above, a review of the testimony and disciplinary

documents confirms that there were disputes about what actually occurred at the

meeting. Wearing and Tolnay contradicted each other. Nabel supported

Wearing's version. Abate testified that Wearing was not yelling and could not

remember who stood up first. Bombalicki confirmed that Tolnay's tone of voice

was raised, which Tolnay had denied.

Thus, the failure to charge the jury on the Pickering issue and provide it with

interrogatories constituted harmful and prejudicial error. It deprived Wearing of

the principal defense available in retaliation cases. Accordingly, Wearing is

entitled to a new trial.

## C. The Inflammatory Incidents Of Past Disciplinary Action

The district court allowed Tolnay to introduce into evidence extended

discussions of dozens of prior disciplinary incidents, none of which were

substantially similar to Tolnay's situation (insubordination to the Chief of Police).

Moreover, they were extremely inflammatory and allowed Tolnay to assert a

theory that Wearing had a despicable record running the NHPD and should be

47

punished for it. Such a theory was inappropriate and highly prejudicial to

Wearing. See Brochu v. City of Riviera Beach, 304 F.3d 1144, 1159 n.27 (11th

Cir. 2002). A new trial must be granted when the jury's judgment would be

swayed in a material fashion by an evidentiary error. Arlio v. Lively, 474 F.3d 46,

51 (2d Cir. 2007). This is such a case.

The district court committed harmful error by denying Wearing's motion in

limine to preclude this evidence (JA730-35; JA428) and Wearing's continuing

objections at trial. See Ricketts v. City of Hartford, 74 F.3d 1397, 1414 (2d Cir.

1996) ("abuse of discretion to admit [similar act] evidence if the other acts were

not sufficiently similar to the conduct at issue.'"); Rosa v. Town of East Hartford,

2005 WL 752206, at *2-3 (D.Conn. Mar. 31, 2005). In particular, plaintiff's trial

exhibits 19 through 35 covered 17 different incidents. (JA640-78) After

questioning Wearing regarding 16 incidents (JA640-73) of prior discipline

imposed by him, (JA1306-20), Tolnay's counsel began questioning him regarding

other disciplinary incidents that did not involve insubordination. The first was a

memorandum (JA675-78) related to Officer Caminer Lavache. (JA1359-79)[5]

---

[5]   Lavache was caught sleeping on duty three times and may have threatened a
superior. Tolnay's counsel emphasized that one sleeping incident was on
September 11, 2002, the anniversary of the attack on the World Trade Center.
(JA1364-72) On that date, Lavache was assigned to guard a tunnel. Tolnay's
counsel emphasized that the tunnel was a "terrorist target" because it ran under the
courthouse where the jury was sitting and under buildings containing government

48

After Lavache, Tolnay's counsel questioned Wearing regarding 8 other incidents of discipline, none of which involved insubordination.

Prior to this questioning, Wearing's counsel again objected. (JA1378-79) The evidence that was about to be introduced was not similar to Tolnay's situation and any probative value was outweighed by the prejudicial effect. (JA1381-88) Moreover, the incidents would require questions based upon facts that were not in evidence. (JA1386-88) Tolnay's counsel was going to be questioning based on information available to her alone.

In response, Tolnay's counsel admitted that the evidence that she was about to introduce did not involve similar situations. (JA1380-81) Nevertheless, the court allowed her to question Wearing regarding all the incidents. (JA1388)

Tolnay's counsel questioned Wearing regarding the misconduct of officers Sonya Atkinson (JA1378; JA1391-98; JA1476-81), Diane Langston (JA1398-1410), Cleveland Roach (JA1411), Kelly Dillon (JA1412-13), Michael Hunter (JA1417-20), Kenney Howell (JA1420-21), John Goad (JA1482-83) and Captain Sorrentino (JA1484-85). Atkinson was investigated for allegedly lying about a death and taking bereavement leave. (JA1390-97) Atkinson was also arrested on drug dealing charges. (JA1397) Tolnay's counsel emphasized that Atkinson had been cohabitating with a "notorious drug dealer." (JA1477) She declared that by

---

and law enforcement offices. (JA1924) She also emphasized her fear of being in the courtroom because of Wearing's practices. (Id.)

Wearing's not disciplining Atkinson for the leave issue, it resulted in Atkinson being arrested on the drug charges. (JA1397) She also asked about Atkinson's extramarital affair with another officer and her getting into a fight with that officer's wife. (JA1398)

Tolnay's counsel described Langston as "another one of [Wearing's] problem officers." (JA1399) She asked about Langston's creating a disturbance in the NHPD's lobby by screaming in the presence of civilian visitors and making race-based comments. (JA1400-01) The comments included the profanity, "Irish mother f---ers." (JA1401) Tolnay's counsel also questioned Wearing regarding Langston's arrest in a bank where she allegedly created a public disturbance by calling a teller "white b****." (JA1404-08)[6]

The introduction of this inflammatory, irrelevant and highly prejudicial evidence regarding other officers' disciplinary histories was a central component of Tolnay's case. See Hynes v. Coughlin, 79 F.3d 285, 291 (2d Cir. 1996) (discussion in closing, barometer of evidence's importance). During her closing argument, Tolnay's counsel emphasized the details of these prior disciplinary decisions. (JA1896-97) She emphasized the "incredible disgrace of Melvin Wearing's disciplinary practice." (JA1896) Indeed, she focused on the disciplinary actions that did not involve insubordination. (JA1924-25)

_____

[6] She returned to Atkinson's and Langston's misconduct, while questioning Bombalicki. (JA1559-65)

Consequently, Wearing was forced to engage in mini-trials and address the incidents in his testimony elicited by his counsel (JA1433-36) and in his counsel's closing argument. (JA1966-68) The admission of the evidence constituted harmful and prejudicial error and produced a verdict based on inappropriate passion and prejudice. It constituted a manifest injustice and contrary to the district court's holding (SPA134-36), mandates a new trial.

### D.    The Indemnification Testimony

Contrary to the district court's analysis (SPA115-19), it was not proper for Tolnay's counsel to ask the Mayor to explain his testimony that the city indemnified its police officers, so the jury could understand what "indemnification" meant. (SPA65-66) Nor was it proper for the court to ask that question itself over Wearing's objection. (SPA66)

The Mayor was a non-party witness called by Tolnay. (JA1757) Evidence regarding indemnification is not admissible and its admission here constituted harmful and prejudicial error. Larez v. Holcomb, 16 F.3d 1513, 1518-20 (9th Cir. 1994); Fed. R. Evid. 403, 411. It left the jury with the improper impression that Wearing would not be bearing the burden of the damages and thus created the likelihood of an inappropriate and inflated verdict. That improper impression resulted in an unconstitutional and excessive, $5 million punitive damages award. The jury's note asking whether taxpayers or Wearing would pay any award also

confirms this. (JA599) It was improperly focusing on who would pay, rather than on Tolnay's actual damages.

The court's response to the jury's note did not undo the harmful error. The jury was merely instructed that it should not speculate who would pay. (SPA92-93) It was not instructed to disregard the Mayor's testimony about indemnification. Accordingly, a manifest injustice occurred and a new trial is required.

### E.    The "Reasonable Relationship" Instruction

The district court committed harmful and prejudicial error by twice denying Wearing's request for a "reasonable relationship" instruction on punitive damages. (SPA80-82; SPA89)

The proposed instruction (SPA80-81) was a correct statement of the law. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 426 (2003); Gore, 517 U.S. at 580-81. A defendant has a right to have the jury determine what reasonable punitive damages would be under the proper instruction. Johnson v. Hugo's Skateway, 974 F.2d 1408, 1415, 1418 (4th Cir. 1992); Mattison v. Dallas Carrier Corp., 947 F.2d 95, 109-10 (4th Cir. 1991). For example, in Levinson v. Prentice-Hall, Inc., 868 F.2d 558, 564-65 (3d Cir. 1989), the court ordered a new trial because it could not conclude that the jury understood that the quantum of punitive damages "were to have any relationship to [the plaintiff's] injury, let alone some

reasonable relationship. This failure left the jury without guidance on the fundamental question of how to fix the damages. It only knew that whatever it did was to be done calmly and without bias."

Here, the jury was instructed that it could award punitive damages to punish and to deter Wearing's conduct if it was malicious or wanton. (JA2027-30) The instruction contained no standard for quantitatively assessing punitive damages. To the contrary, the jury was instructed that the award could be "as large as [the jury] believe[d] necessary to fulfill the purpose of punitive damages." (JA2029)

The result was a $5 million award that the district court held to be unconstitutional and excessive. Thus, the instruction and scheme utilized to award punitive damages constituted harmful and prejudicial error. Accordingly, Wearing is entitled to a new trial.

## IV.   THE NON-ECONOMIC DAMAGES AWARD MUST BE VACATED OR SIGNIFICANTLY REDUCED

A plaintiff must prove his damages. Bracey v. Board of Educ., 368 F.3d 108, 119 (2d Cir. 2004). There is a "continuum" of damages awards for emotional distress. Rainone v. Potter, 388 F.Supp.2d 120, 122 (E.D.N.Y. 2005). At the low end of the continuum are "garden-variety" distress claims where courts have awarded damages from $5,000 to $35,000. "Garden-variety" remitted awards have typically been rendered where the evidence was presented through a plaintiff's conclusory testimony. Id.

Here, contrary to the district court's holding (SPA125-26), Tolnay did not introduce evidence supporting a $150,000 emotional distress damages award. Nor was there evidence of reputational harm. Tolnay's emotional distress evidence was limited to 8 or 9 words of conclusory testimony. (JA1011-12; JA1014; JA1018) It did not support *any* award for non-economic compensatory damages. At most, Tolnay's testimony fits within the "garden-variety" cases. Accordingly, this Court should enter judgment for Wearing on the non-economic damages award. Annis v. County of Westchester, 136 F.3d 239, 249 (2d Cir. 1998). In the alternative, it should reduce it to $5,000.

## V.    THE EXCESSIVE PUNITIVE DAMAGES AWARD REQUIRES A NEW TRIAL OR A FAR GREATER REDUCTION

### A.    Reprehensibility Guidepost

Courts must consider three guideposts when reviewing punitive damages awards:  (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm suffered by the plaintiff and the award; and (3) the difference between the award and the civil penalties authorized or imposed in comparable cases. Gore, 517 U.S. at 574-75. Courts must consider five factors in determining reprehensibility:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated

54

incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

State Farm, 538 U.S. at 419.

The fact that conduct is sufficiently reprehensible to trigger liability and damages "does not establish the high degree of culpability that warrants a substantial punitive damages award." Gore, 517 U.S. at 580. The proper method for a *court* to analyze reprehensibility is through the application of the factors. Clark v. Chrysler Corp., 436 F.3d 594, 601-08 (6th Cir. 2006). Here, the district court did not acknowledge the factors, let alone apply them. Instead, it made a conclusory statement that Wearing's conduct was malicious and that there was evidence for the *jury* to find reprehensibility. (SPA128)

The application of the factors demonstrates that Wearing's conduct was not reprehensible or at a minimum, not sufficiently reprehensible to support a ratio between the compensatory and punitive damages greater than 1 to *far less than* 1. First, there was no physical harm caused. Second, Wearing's conduct did not evince an indifference to or reckless disregard for the health or safety of others.

Third, there was no evidence that Tolnay was financially vulnerable or that the parties' finances were involved in any way. Ultimately, Tolnay's suspension was for five days salary, $903. Fourth, Wearing's interaction with Tolnay was an isolated incident, not repeated actions. It was limited to the two meetings.

Finally, there is no evidence that the alleged harm to Tolnay was the result of intentional malice, trickery or deceit. At most, the conduct was a heated exchange. Even if it were more, malicious action alone is insufficient to support a finding that a defendant's "behavior was sufficiently reprehensible for an award of punitive damages." Chicago Title Ins. Corp. v. Magnuson, 2007 WL 1461396, at *13 (7th Cir. May 21, 2007).

All five factors weigh heavily against finding Wearing's conduct to be reprehensible. Consequently, the first guidepost does not support the $1,350,000 award.

**B.    Ratio Guidepost**

State Farm recognized that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." 538 U.S. at 425. Moreover, it concluded that when "compensatory damages are substantial, than a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." Id. In particular, a low ratio is warranted where, as in this case, the compensatory damage award contains a significant amount of non-economic damages. Id. at 426. High single-digit ratios are reserved for the "most egregious forms of intentional misconduct, such as threats of violence…." In re Exxon Valdez, 2007 WL 1490455, at *28 (9th Cir. May 23, 2007).

The reprehensibility analysis operates within limits set by the ratio guideposts. See Planned Parenthood v. American Coalition of Life Activists, 422 F.3d 949, 960-63 (9th Cir. 2005). For example, Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594, 602-03 (8th Cir. 2005) held that even though it found the defendant's conduct "highly reprehensible," under State Farm, a ratio of approximately 1 to 1 was the constitutional maximum given the substantial compensatory award. See Bach v. First Union Nat'l Bank, 486 F.3d 150, 154-57 (6th Cir. 2007) (reducing to 1 to 1 ratio); Williams v. ConAgra Poultry Co., 378 F.3d 790, 799 (8th Cir. 2004) (same).

Here, the compensatory damages were substantial. Assuming they are not reduced, the ratio between them ($151,903) and the reduced punitive damages award ($1,350,000) is *1 to 9*. This is grossly excessive and violates the Due Process Clause. There is no reasonable relationship between Tolnay's injuries and the punitive damages award. Tolnay's actual injuries were $903 and a "garden variety" emotional distress claim, generally awarded no more than $5,000.

The evidence does not justify a punitive damages award anywhere near $1,350,000. Nor does it justify a ratio of 1 to 9. The 1 to 9 ratio is "reserved...for conduct done with the most vile of intentions." Exxon Valdez, supra at *18. This case is not one of the "egregious" cases for which high single-digit ratios are reserved. Indeed, even in Exxon Valdez, the ratio was reduced from 1 to 9 to 1 to

5. Id. at *15, 28. In this case, a ratio greater than 1 to *far less than* 1 would be excessive and unconstitutional.

### C.    Comparison Guidepost

This Court has recognized that even where the punitive award is not beyond the outer constitutional limit marked out by the guideposts, it must engage in an additional analysis. "That task requires comparison with awards approved in similar cases ... to determine ... whether the punitive award is 'so high as to shock the judicial conscience and constitute a denial of justice.'" Mathie v. Fries, 121 F.3d 808, 816-17 (2d Cir. 1997).

A comparison of the circumstances of this case to similar cases strongly supports the vacating of the $1,350,000 award. More than just the numbers, the facts of the similar cases demonstrate that when confronted with conduct far worse, juries have awarded damages in amounts far lower than the amount awarded here. Moreover, courts have still found it necessary to set aside those awards as excessive. In some cases, there was no award of punitive damages. Thus, the $1,350,000 award grossly exceeds any amount needed for punishment or deterrence.

Specifically, this Court identified jury verdicts in First Amendment retaliation cases in: Reuland v. Hynes, 460 F.3d 409, 413 (2d Cir. 2006) ($30,000 compensatory, $0 punitive damages); Phillips v. Bowen, 278 F.3d 103, 111-12 (2d

Cir. 2002) ($200,000 compensatory, $0 punitive damages); Moskowitz v. Coscette, 3 Fed. Appx. 1 (2d Cir. 2001) ($125,000 compensatory, $75,000 punitive damages); Lewis, 165 F.3d at 160 (prior to judgment for defendant, jury awarded $1,028,196 in compensatory, $640,644 punitive damages); Vasbinder v. Scott, 976 F.2d 118 (2d Cir. 1992) (reducing $150,000 in punitive damages against two defendants to $20,000 and $30,000); Petramale v. Local No. 17 of Laborers' Int'l Union of N. Am., 847 F.2d 1009 (2d Cir. 1988) (reducing compensatory award from $200,000 to $100,000 and punitives from $50,000 to $10,000).

There are eight cases from the District of Connecticut identifying jury verdicts in First Amendment retaliation cases. The first seven are: Russo v. City of Hartford, 419 F.Supp.2d 134, 152-53 (D.Conn. 2006) ($22,500 compensatory, $75,000 punitive damages); Arlio v. Lively, 392 F.Supp.2d 317, 321-23 (D.Conn. 2005) ($150,000 compensatory, $100,000 punitive damages), rev'd 474 F.3d 46 (2d Cir. 2007); Stack v. Jaffee, 306 F.Supp.2d 137, 140-42 (D. Conn. 2003) ($2,000 compensatory and $200,000 punitive damages, punitives reduced to $25,000); DeLeon v. Little, 1999 WL 1490299, at *2, 8 (D.Conn. Sept. 29, 1999) ($150,000 punitive damages reduced to $7,500); Dillon, 45 F.Supp.2d at 169 ($1.2 million compensatory and $1.5 million punitive damages); Mihalick v. Town of Simsbury, 37 F.Supp.2d 125, 127 (D.Conn. 1999) (reducing compensatory damages award of $3,000,000 to $150,000, plus $3,700 punitive damages) and

Ikram v. Waterbury Bd. of Educ., 1997 WL 597111, at *1 (D.Conn. Sept. 9, 1997)

($100,000 compensatory damages, $75,000 in punitives against each of two

defendants).

The defendants in Russo and Arlio were police chiefs. The First

Amendment rights at issue were far greater and the conduct far worse in those

cases. In the most recent case, Milde, the plaintiff was terminated. 2006 WL

2583086, at *4. A jury awarded $1,000 in punitive damages. (JA3543-75)

In this case, the district court merely summarized four decisions (SPA129-

32), none of which supported either the 1 to 9 ratio or the $1,350,000 award it

imposed. In fact, a comparison of this case to the similar cases demonstrates that a

punitive damages award with a ratio beyond 1 to *far less than* 1 would be

excessive and unconstitutional. It would also shock the judicial conscience and

constitute a denial of justice.

### D.    The Financial Ruin Analysis

This Court will not affirm punitive damages awards that "result in the

financial ruin of the defendant." Patterson v. Balsamico, 440 F.3d 104, 122 (2d

Cir. 2006). The district court did not acknowledge this rule.

As of July 26, 2002 Wearing had been a police officer for approximately 33

years. (JA1443) He retired on May 1, 2003. (JA1472) At the time of the trial, he

was 62 and employed by the Bridgeport Board of Education. (JA1867) With this

60

evidence and judicial notice of the salaries of municipal employees, the district court should have concluded that a person who has been a municipal employee for 37 years would be ruined by a punitive damages award of $1,350,000.

Moreover, Tolnay's post-trial argument that Wearing was "poor-mouthing," (R144, at 45) opened the door and the district court should have considered the evidence submitted with Wearing's motion for a stay. In particular, Wearing's affidavit (JA2101-02) detailed his personal assets. Accordingly, this Court should reduce the punitive damages award to less than $5,000.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in favor of Wearing. In the alternative, it should order a new trial. In the further alternative, it should significantly reduce the punitive damages award.

Respectfully submitted,

**DEFENDANT-APPELLANT**
**MELVIN WEARING**

By: _____

Ralph W. Johnson III
Robert A. Rhodes
**HALLORAN & SAGE LLP**
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
Tel: (860) 522-6103
Fax: (860) 548-0006

His Attorneys

## CERTIFICATION OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), it is hereby certified that the foregoing brief contains 13,999 words.

Ralph W. Johnson III

## <u>CERTIFICATION OF SERVICE</u>

This is to certify that on this 2nd day of July, 2007, the original and 9 copies of this Brief were filed with the Clerk of the U.S. Court of Appeals for the Second Circuit. One additional unbound copy was also filed. Furthermore, two copies were caused to be mailed, postage pre-paid, to the counsel for the appellee:

Karen Lee Torre, Esq.
Law Office of Karen Lee Torre
51 Elm Street, Suite 307
New Haven, CT 06510
Tel: (203) 865-5541
Fax: (203) 865-4844

A copy (without the addendum) was also caused to be emailed to the appellee's counsel at ktorre@choiceonemail.com.

Ralph W. Johnson III

64

**ANTI-VIRUS CERTIFICATION FORM**

Case Name:        Tolnay v. Wearing

Docket Number:    07-0959 (L); 07-1846 (Con)

In compliance with Second Circuit Local Rule 32(a)(1)(E), I, Ralph W.

Johnson III, certify that I have caused the Portable Document Format ("PDF")

version of the Appellant's Brief (without the attached addendum) that was

submitted in this case as an email attachment to briefs@ca2.uscourts.gov to be

scanned and that no viruses were detected.

The name and version of the anti-virus detector that was used was McAfee

Virus Scan Enterprise, Version 8.

Dated:  July 2, 2007

Ralph W. Johnson III

996799_1.DOC

65

## CERTIFICATION

This is to certify that on this 24th day of October, 2007, a copy of the foregoing was caused to be served via U.S. Mail to:

Karen Lee Torre, Esq.
Law Offices of Karen Lee Torre
51 Elm Street, Suite 307
New Haven, CT 06510

Norman A. Pattis, Esq.
649 Amity Road
Bethany, CT 06524

Hugh F. Keefe, Esq.
Lynch, Traub, Keefe and Errante
52 Trumbull Street
P.O. Box 1612
New Haven, CT 06506-1612

Hubert J. Santos, Esq.
Sandra L. Snaden, Esq.
Santos & Seeley, P.C.
51 Russ Street
Hartford, CT 06106

Alexandra K. Block, Esq.
Joseph D. Garrison, Esq.
Garrison Levin-Epstein Chimes
  Richardson
405 Orange Street
New Haven, CT 06511

The Honorable Ellen B. Burns
United States District Court
  for the District of Connecticut
141 Church Street
New Haven, CT 06510
**(Courtesy Copy, Via Hand Delivery)**

Ralph W. Johnson III