UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2007 DEC 28  P 4: 39

U.S. DISTRICT COURT
NEW HAVEN, CT

ARPAD TOLNAY              :

      Plaintiff,         :

                 :    Civil No.  3:02CV1514 (EBB)

V.                        :

MELVIN WEARING            :

      Defendant.         :    December 28, 2007

**PLAINTIFF'S OBJECTION AND MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION FOR
STAY OF ENFORCEMENT AND EXECUTION OF THE JUDGMENT
PENDING APPEAL AND FOR IMMEDIATE STAY PENDING
A RULING ON THE INSTANT MOTION**

## I.    **INTRODUCTION**

By his most recent motion, the defendant seeks an extraordinary generosity from this Court –

a stay of execution of the judgment while being relieved of the obligation to post a bond like

everybody else.  In the alternative, defendant seeks an order for but minimal or meaningless security

for the plaintiff judgment-creditor.  Since Chief Wearing filed the motion, it was and is his burden to

convince this Court that his motion has merit and he is entitled to or deserving of the generosity

which he seeks.  Thus, the question for the court, it seems, is this: Is Chief Wearing's claim or

suggestion that he has no third party sources of payment available to him credible?[1]  Based on the

---

[1]It also appears that a related question is also presented: In light of Wearing's steadfast refusal to
answer asset interrogatories and respond to requests for the production of documents so that plaintiff
can evaluate the credibility of his claim of limited cash and assets, is his testimony that he has little
cash available to him credible?  Plaintiff's just suspicions in this regard were heightened of course by
Wearing's forced disclosure at the hearing of his dual sources of pension and current salary income
(from his new, post-retirement position) which show that he enjoys a handsome annual income,

evidentiary record, which demonstrates that several key facts are undisputed, plaintiff submits that Chief Wearing has not met his burden.

This court is undoubtedly well aware of plaintiff's position as it was articulated throughout the extensive evidentiary hearings this court conducted on the issue of the defendant's available resources to satisfy the judgment in this action. Simply put, plaintiff asserts that Chief Wearing, in concert with his Coregis-appointed lawyers, municipal counsel from the City of New Haven, his personal counsel and counsel for the city's mayor and former corporation counsel have played games with the plaintiff and this court. Those hearings were necessitated by Wearing's refusal to answer asset interrogatories and his further refusal to show up for a deposition examination regarding the circumstances under which he has apparently become temporarily un-indemnified for punitive damages by the City of New Haven.

As this court has already observed in its ruling permitting plaintiff to register the judgment in the District of South Carolina, 2"[t]here is considerably less clarity regarding the question of whether the judgment might be satisfied by funds from some other source [other than Wearing's personal assets]". As this court further noted, "[i]n particular, it is *unclear* whether the City of New Haven will indemnify the defendant." Most importantly perhaps is this Court's assessment that while the plaintiff cannot conclusively establish that either Coregis Insurance Company or the City are

---

together with the fact that he has hired a lawyer who charges $500 per hour. Since Wearing's personal counsel has obviously devoted substantial time to this dispute and the attendant hearings over it, it seems odd, at best, that Wearing would expend the little cash he claims to have paying the highest hourly rates in the Connecticut Bar.

2 See Ruling On Plaintiff's Motion For Order Permitting Registration of Judgment [Doc. No. 155] dated October 25, 2007.

presently committed to paying the punitive damages, plaintiff "may have been successful in calling into question the *credibility* of statements made by representatives of the City . . . " See Ruling at pp. 1-2. (emphases supplied).3

Based upon the remarkable series of events in this litigation, including the conduct of both municipal counsel and Coregis-appointed counsel throughout the pre-trial and post-trial phases of this litigation, coupled with the testimony and evidence adduced at the bond hearings, to conclude that defendant's position has credibility problems is an understatement. As is catalogued and demonstrated below, it well appears that Melvin Wearing is trying to pull a fast one on this court. At its most sanitized, the record simply demonstrates that Wearing has failed to present credible evidence supporting and justifying the extraordinary benefit he seeks.

To truly test the credibility of the rather absurd claims he has made, all this court need do is order Wearing to post a bond to protect the plaintiff's judgment in full plus accrued interest to date or suffer execution on the judgment, including the court-ordered sale of his homes. Plaintiff submits the court shall see just how fast Melvin Wearing becomes "re-indemnified" for punitive damages and/or just how fast Coregis Insurance Company and Halloran & Sage arrange for a supersedeous bond. The plaintiff hereby gives notice that in the unlikely failure of Wearing to post a bond, plaintiff agrees that any proceeds plaintiff gains by execution on the judgment may be deposited into the District Court pending the outcome of appellate proceedings.

---

3 Remarkably, although he seeks to have this court leave Officer Tolnay unsecured by any bond, Wearing had the nerve to oppose registration of the judgment in the District of South Carolina, further indicating his strategy of frustrating the plaintiff's rights at every step in this litigation.

3

## II.    **BACKGROUND**

Long ago, Officer Tolnay filed a motion seeking an order of this court directing Wearing to post security for the judgment. See Plaintiff's Motion for Bond (dated 2-14-06, Doc. # 116). 4 In reaction to same, Wearing filed a competing motion for a stay of execution and further sought relief from having to post security. He appended to that motion a highly questionable and carefully parsed affidavit drafted by his Corgis-appointed attorneys in which Wearing described his personal assets but omitted any and all mention of third party third-party resources available to him, to wit: municipal insurance and municipal indemnification. Wearing's motion was accompanied by a memorandum of law authored by the same attorneys which contained equally carefully parsed representations to this Court respecting such third-party sources of payment, among them a representation that Wearing is unaware of the extent to which Coregis Insurance Company, the liability carrier for the City of New Haven, is responsible for the entire judgment.[5] The memorandum of law was completely silent on the issue of municipal indemnification with the only statement even remotely related to this issue being an observation that the Assistant Corporation Counsel for the City of New Haven has since withdrawn his appearance in the action.[6]

---

4 Contrary to Wearing's suggestion, plaintiff did not ignore the issue of security. He filed a motion seeking a security bond back in early February of 2006 and has awaited a ruling on it since that time.

5

Counsel added an odd representation to this Court that Coregis takes the position that it is not responsible for the entire judgment. Apart from this statement by Coregis-appointed counsel, there is no evidence in the hearing record of Coregis' position on the issue whether it is indeed responsible to pay the entire judgment given its decision to reject pre-trial settlement offers and try the case, decisions which Coregis, its appointed counsel, and city counsel made unilaterally without Wearing's input and approval.

6

As the hearing testimony of Assistant Corporation Counsel Jonathan Beamon indicated, the withdrawal of appearance was due to what City Corporation Counsel now alleges to be "conflict of interest" with their former client.

With this, plaintiff served on Wearing a set of interrogatories designed for judgment debtors by the Superior Court and approved by the State Judicial Department by which Wearing was to disclose all available assets including third-party sources of payment. Wearing refused to answer the interrogatories and his counsel interposed a wholesale set of frivolous objections to them. Plaintiff thereafter summoned Wearing to a deposition for this purpose and by written notice, commanded Wearing to produce at the examination records and other evidence of his assets and available sources of payment. Once again, Wearing refused, interposed frivolous objections and further filed a legally baseless, patently frivolous motion for protective order seeking to block the examination. [7]

In the wake of these obstructive maneuvers, plaintiff's counsel requested a teleconference with this court as a result of which it was agreed, and the court so ordered, that an in-court hearing take place and evidence heard in respect to defendant's motion for a stay without bond. Given that Wearing, by an affidavit, made implied and ambiguous assertions on the issue of third-party sources and that his counsel signed and filed a memorandum of law in support of defendant's motion which: 1) omitted any representations to this court regarding municipal indemnification; and 2) included an ambiguous representation to this court respecting the availability of insurance to cover the entire judgment ( to wit: a representation to this court that Chief Wearing is unaware or unsure of the extent to which insurance is available to him)8, plaintiff was anxious to flesh out the facts and test the

---

7    Apparently, Wearing and his counsel believe they enjoy an exemption from the obligation every judgment debtor has to disclose information regarding his assets.

8  Remarkably, Attorneys Robert Rhodes and Ralph W. Johnson III of Halloran & Sage, who are the Coregis-appointed counsel for Wearing, asserted that Wearing, their own client, is "unaware" of the extent of his insurance coverage from Coregis. Halloran & Sage is one of the oldest, biggest, most established firms in the State of Connecticut, indeed one which prides itself on its "prominence" in the area of insurance expertise, asserts that "insurance coverage litigation is a core practice at Halloran & Sage" and further boasts none other than Ralph W. Johnson III as one of its partners noted for his publications and experience in matters of insurance coverage and carrier liability to insureds. See

credibility of all these assertions. After reporting Wearing's "lack of awareness" on the insurance issue, defense counsel proceeded to represent that Coregis Insurance Company (the City of New Haven's insurer) "takes the position" that it is not responsible for payment of the entire judgment9. Defense counsel's representations on this latter point, however, cannot suffice as evidence for statements of counsel are not evidence under any circumstance; moreover, defense counsel's statements respecting the position of Coregis are hearsay as they are obviously based upon out-of-court statements made to him or others by officials of Coregis.

In the wake of defendant's filing of the motion and self-serving affidavit, plaintiff's counsel sought to depose Chief Wearing and examine him regarding not only the accuracy of the statements in his affidavit but facts which he omitted from his affidavit. He was also to be examined regarding the factual bases for the representations made by his counsel in the memorandum of law submitted in support of his motion and generally on the very issue as to which Wearing avoided all mention in his moving papers: the availability to him of third party sources of payment. See Notice of Deposition dated March 17, 2006 and accompanying demand for the disclosure of documents (attached hereto as Exhibit 1) In response to the notice of deposition, Wearing's counsel promptly filed a motion for a protective order seeking to block the examination.

Defense counsel incredibly objected to a deposition examination of Chief Wearing on the ground that Wearing had moved for a stay of execution of the judgment, a position which is so

---

http://www.halloran-sage.com/About/default.aspx. That two partners from this firm would make such representations in a brief is itself evidence consistent with plaintiff's position that Wearing's assertions are not credible, which explains why counsel persistently threw up the shield of attorney-client privilege in order to prevent any meaningful challenge to them.

patently frivolous that it implicates a violation of Rule 11. The plaintiff has a clear right under the unequivocal provisions of Federal Rule of Civil Procedure 69 to depose Wearing. Notwithstanding this clearly established right, defense counsel sought once again to frustrate any inquiry into this matter by filing a patently improper motion.

As the transcript of the bond hearings demonstrates, this obstruction, of unprecedented proportions, continued throughout the hearings, further compelling the conclusion that Wearing's claims are simply not credible.

III.    **THE UNCONTESTED FACTS AND EVIDENCE
         ADDUCED AT THE HEARINGS.**

Upon review of defendant's most recent memorandum on this issue (dated October 24, 2007), it appears indistinguishable in substance from the memorandum of law submitted with defendant's original motion  seeking a stay of execution without bond.  It consists primarily of a series of citations to cases and iteration of boilerplate and generalized principles of law applicable to stays of execution and the posting of bonds.  Notably, Wearing's memorandum makes no mention whatever of any of the evidence and testimony adduced during the  hearings on this matter, no doubt because the testimony and evidence reveal that Wearing has done nothing more than attempt to pull a fast one on the plaintiff and the court.  The transparency of his effort became readily apparent upon the following uncontested facts.

---

9    Defense counsel presumably offered these and other representations in his memorandum of law based on their
     standing as officers of this court.

1.    Defendant Wearing was represented in this case by the City of New Haven's Office of Corporation Counsel and by the firm of Halloran & Sage, the appointed counsel of the Coregis Insurance Company which is the holder of the City's municipal liability policies.

2.    Wearing was the sole defendant in a previous civil rights action filed in this very court and tried before The Honorable Peter C. Dorsey. In that matter, captioned Kelly v. Wearing, 3:02CV1120 (PCD), the jury found that Wearing had maliciously denied a promotion to two New Haven police sergeants in retaliation for their exercise of First Amendment protected rights. Apart from a substantial compensatory award, the jury, after finding that Wearing acted with malice and/or in reckless disregard of the Kellys' constitutional rights, assessed punitive damages in the amount of one-half million dollars. Judgment entered on the verdict in the amount of $885,000.00.

3.    Wearing settled with the plaintiff in Kelly v. Wearing post-judgment and without an appeal to the Second Circuit Court of Appeals. The settlement sum was $800,000.00. The City of New Haven was Wearing's sole source of payment of the funds.

4.    In the instant case, before the action proceeded to a jury trial, a settlement conference was scheduled and took place before Magistrate Judge Joan G. Margolis. Per standard procedures and orders in the District Court, all parties or others possessed of the authority to engage in settlement negotiations and make decisions were to be present. Melvin Wearing did not appear at that conference nor was he told about it by his counsel. Officer Tolnay was present at the conference.

5.    At the aforesaid pre-trial settlement conference with The Honorable Joan G. Margolis, and in follow-up negotiations attendant to that in court conference, various demands and

8

settlement offers were made and rejected by the party's counsel.

Attorney Ude was involved in the decision-making and representation of Wearing in respect to the Magistrate Judge-supervised settlement conference processes which took place both before and after the trial in this case. Attorney Beamon actively represented Chief Wearing throughout the entire litigation, had moved unsuccessfully for summary judgment in favor of Wearing and later served as co-counsel for Wearing at the jury trial along with Attorney Robert Rhodes of the firm of Halloran & Sage.

For the reasons which follow, it is simply incredible that Wearing was "un-indemmnified" throughout and remains so. Rather, the evidence clearly suggests, Wearing was indeed fully indemnified by the City of New Haven, but when the jury rendered a verdict the size of which embarrassed and presented political discomfort for city officials, Wearing colluded with city officials and agreed to "poor-mouth", both to aid Coregis Insurance Company in avoiding the posting of a bond and to influence this court on the issue of remitittur. The following undisputed facts revealed at the hearing lend to such a conclusion:

1. The city has an established history of indemnifying even the lowest-ranked city employees and committing funds to satisfy punitive awards rendered against them;[10]

_____

[10]Attorney Hugh Keefe, appearing as counsel for witnesses Ude, Beamon, Mayor John DeStefano, Jr. and mayoral spokesman Derek Slap, was quite vocal throughout the hearing, at times voicing comments and clearly erroneous opinions, to wit: it is "illegal" for the city to pay punitive damages (a flatly incorrect assertion belied by the very text of the applicable statute as well as the city's own past practice) and the city "will not" pay any portion of such an award. Mr. Keefe was not a witness in this proceeding and his comments are not evidence, not to mention his statements conflicted with the testimony of his own client, Attorney Ude, who asserted under oath that a final decision with respect to full municipal indemnification of Wearing has not yet been made. Thus, plaintiff expects that this court will ignore the improper comments of counsel for these witnesses.

2. At no time did the City serve Wearing with notice that he was not indemnified nor did any city official or city counsel advise him to seek separate counsel for such purpose;

3. During the pre-trial stage, a settlement conference process took place under the supervision of Magistrate Judge Joan G. Margolis. Plaintiff made a settlement demand. The demand was rejected. A settlement offer was communicated to plaintiff from defense counsel. It was rejected by plaintiff. Additional settlement talks failed to produce an agreement, thus necessitating a trial. Chief Wearing neither attended nor participated in that settlement conference and he did not even know about it. Nor, according to Wearing, was he aware of the demands and offers communicated. Thus, plaintiff's pre-trial settlement proposal was rejected by Wearing's counsel without his knowledge;

4. During the jury trial, defense counsel called Wearing to the stand in the defense case-in-chief for the purpose of eliciting evidence from Wearing regarding his finances. While this was improper (as defense counsel never gave notice of his intent to offer this evidence as was his obligation to do so as part of his compliance with this Court's standard order in respect tot he parties' Joint Trial Memorandum) what matters for present purposes is defense counsel's immediate turn about and decision to have Wearing leave the stand once he became aware at sidebar that plaintiff's counsel intended to challenge the credibility of any suggestion by Wearing that his personal assets would be the sole source of payment of any punitive award;

5. During their deliberations, the jurors sent a note, the content of which suggested they had decided the issue of liability in Tolnay's favor, had moved on to the issue of damages and wished to know the source of payment of any award. With that, and outside the presence of the jury, this

10

court suggested to defense counsel that they might wish to speak to plaintiff's counsel about settlement before the jury returned with a verdict. It was a wise suggestion from the court but unfortunately completely ignored by defense counsel. Defense counsel abruptly and with little comment rebuffed plaintiff's counsel's settlement overture in the hallway outside the courtroom. Since Wearing was not even there, this rebuff obviously occurred without his knowledge and without his being consulted. With this, Halloran & Sage would have this court believe that they were then of the understanding that they were representing an un-indemnified client who might be personally responsible for paying the punitive portion of whatever verdict the jury was poised to return? This sounds more like a pitch to sell the Brooklyn Bridge.

6.      The evidentiary hearing commenced but did not conclude on March 28, 2006. In the midst of these events, Attorney Jonathan Beamon filed a motion to withdraw his appearance for the defendant for unexplained reasons.[11]

7.      Chief Wearing was examined at the bond hearings. In sum, Wearing appears to be at sea on the issue of the extent to which Coregis Insurance Company is the responsible source of payment for the entire judgment in this case. On the issue of municipal indemnification, Chief Wearing expressed a seeming understanding that he is not, at present, fully indemnified by the City with respect to any judgment of punitive damages. It appears without question that Wearing's

---

[11] Attorney Beamon, however, did not comply with Local Rule 7(e) as he failed to include in his motion an attestation that a certified copy of it was served upon his client. Plaintiff's counsel noted this failure by way of objection whereupon Attorney Beamon filed another motion to withdraw his appearance which complied with the local rule requirement.

assertions on these matters are based <u>entirely</u> on information conveyed to him by 1) the Coregis-appointed attorneys who unsuccessfully defended him at trial, and 2) one or more attorneys from the New Haven Corporation Counsel's office. These communications are apparently both oral and written.

## Testimony and Evidence From The March 24, 2006 Hearing

That Chief Wearing's carefully parsed affidavit, and his counsel's equally carefully scripted memorandum of law were designed to mislead this court into concluding that only Wearing's personal assets are available was borne out by the testimony and evidence at the hearings.

1.    Although Robert Rhodes of Halloran and Sage filed an appearance in the District Court action on behalf of Chief Wearing on August 31, 2005, he sent a letter to Wearing regarding this fact for the first time on October 27, 2005. Consistent with counsel's own understanding that that he was appearing for a fully indemnified client, Rhodes' belated letter advising of his entry into the case omits any advisement or mention of any understanding on his part that the City of New Haven was not indemnifying his client for punitive damages.

2.    Wearing's affidavit omits any mention of the value of his primary residence, which is fully paid for and has no debt on it. At the hearing, Wearing claims that

12

he doesn't know what the value of this real estate is.  3/24/06 hearing tr. at pp. 22-23.12

3.    Wearing does not know what his North Carolina vacation home is worth.  He has "no clue".  Tr. at p. 26.

4.    With respect to the source of his belief that he is presently without third party sources of payment for the punitive award, Wearing invoked attorney-client privilege to prevent any examination into that matter.  Tr. at p. 32.

5.    At no time during the pre-trial stage of the litigation did the City of New Haven, through any official or agent, advise Wearing that he would not be fully indemnified.  Tr. at p. 34.

6.    Wearing denies ever having been advised by a representative of Coregis Insurance Company that he would not be covered for the punitive award.  Tr. at p. 35.

7.    Attorney Rhodes objected to any questions directed to Wearing regarding communications or discussion between Wearing and his counsel and/or Coregis

_____

12 Citations to the hearing transcripts will hereafter be indicated as : [date] Tr. at  pp. ___.

regarding the issue of indemnification by the City of New Haven or the insurance company.  Tr. at p. 41.

8.    Attorney Keefe, although he does not represent Wearing but only represents City Corporation Counsel Ude, Mayor DeStefano and mayoral spokesman Derek Slap in their role as witnesses, objects to any testimony from Wearing regarding communications between Wearing and City attorneys regarding the issue of municipal indemnification.  Tr. at p. 56.  The objection is based on the invocation of attorney-client privilege.

9.    Keefe further objects to any questions regarding whether Wearing was fully indemnified in the case of <u>Kelly, et al. v. Wearing</u>, in which another jury assessed one half million dollars of punitive damages against Wearing for violating the first amendment rights of two other police officers.

10.    It was <u>not</u> Wearing's understanding that his personal assets would be at stake in satisfying the judgment in this case.  Tr. at p. 79.

11.    Not only was Wearing not present at a post-verdict settlement conference supervised by Magistrate Judge Margolis but he did not even know about it.  Tr. at p. 74.

14

12.     Wearing's counsel objects to questions regarding whether Wearing was involved
        in any way or authorized any offers to settle at the post-verdict settlement
        conference. Tr. at p. 75.

At this point, this court determined that any further examination of Wearing should be
postponed until his new personal counsel, Attorney Hubert Santos, could be present and
thus Wearing left the witness stand. Tr. at pp.103-104.


### The Testimony of New Haven Corporation Counsel Thomas W. Ude, Jr.

On March 24, 2006, New Haven Corporation Counsel Thomas W. Ude Jr. was examined
after Attorney Hugh Keefe unsuccessfully sought to quash a subpoena served on Ude and prevent
his testimony.13 Ude's testified as follows:

1.  He was involved in the pre-trial handling of the defense. He had made an assessment
    of the plaintiff's complaint and the case and determined there was no conflict which
    would prevent his office from defending Wearing. Tr. at 116.

2.  He does not recall what if any steps he took to advise Wearing of his rights and
    responsibilities and in any event did not present Wearing with any written advisement
    spelling out the scope of the representation or the extent to which the city would cover
    (through insurance and otherwise) the entire verdict in the case. Tr. at 117.

3.  He admitted that while state law does not *require* a municipality to pay punitive

---

13  Mr. Ude has since resigned his position and is no longer employed by the City of New Haven.

15

damages for a city employee/official, the City of New Haven has in fact done so in the past.

4. As a matter of practice, if he has a question or doubt about indemnification, he refers the case out. In this case, no referral to conflict counsel was made nor did the city issue a reservation of rights advisement to Wearing. The City took no steps to alert defendant of any potential conflict prior to judgment entering in this case. Tr. at pp. 126-135.

5. Ude did not make any decision regarding indemnification. Tr. at p. 144.

6. He admits he can recall at least 3-4 prior cases where the city in fact paid for punitive damages assessed against a city employee as the city is not prohibited from doing so and may do so in its discretion. He further admitted he could not recall a single case since he became corporation counsel in 1997 in which the city made a decision prior to trial not indemnify a city employee for punitive damages. Tr. at 147-150.

7. Wearing is by law entitled to indemnification for compensatory damages. Tr. at 159.

8. Ude claims he "doesn't know specifically" what Wearing may have been told by Ude's subordinate, Assistant Corporation Counsel Jonathan Beamon, but in any event no letters were sent to Wearing by his office. Tr. at 155-159.

## UDE AND KEEFE'S ADMISSION THAT "TACTICAL STRATEGY" IS BEHIND ANY SEEMING AMBIGUITY REGARDING THE CITY'S INTENT TO PAY THE PUNITIVE DAMAGES.

9. Ude claims the city HAS NOT YET MADE A DECISION respecting the payment of the punitive damages in this case. He has not submitted the matter to the city's Litigation Settlement Committee ("LSC") because of the pendency of "several motions pending at this time". Tr. at 162.

10. Attorney Keefe, on behalf of Ude, objects to Ude answering any questions regarding whether he intends to recommend the punitive damages be paid if the defense's post-verdict motions are unsuccessful. The basis for this objection, according to Keefe, is that Ude's answer would disclose "**tactical strategy**". For these reasons, the LSC has not yet been asked and thus, he claims, no decision has yet been made. Tr. at 162-171.14

11. Ude was aware of the plaintiff's pre-trial offer to settle the case for $500,000 inclusive of everything. Ude also attended the post-verdict settlement conference with Magistrate Judge Margolis and admits that Wearing was not in attendance at that proceeding. Tr. at 173.

12. Both Attorneys Rhodes and Keefe object to any testimony from Ude as to whether Wearing was advised of the conference or consulted in any way about settlement offers and demands being made. Ude does admit that he did not tell Wearing about the conference but does not know if any one else did. Attorney Beamon also attended the conference along with Corgegis-appointed counsel. At that conference, Ude communicated a settlement suggestion to the plaintiff. That figure was written down on

17

a piece of paper by Ude at the hearing and placed under seal with the court. Tr. at 173-196.

Ude claims the defendant's consent was not needed for settlement. Tr. at 215-16.


## ATTORNEY BEAMON'S TESTIMONY

1. Assistant Corporation Counsel Jonathan Beamon represented Wearing throughout the entire litigation through judgment. He and Attorney Rhodes attended the pre-trial settlement conference without their client. Tr. at 241-42.

2. Beamon never advised Wearing to seek counsel to protect his personal interests with respect to the possibility of being denied indemnification for the entire award. Tr. at 241.

3. Plaintiff's settlement demand at the pre-trial conference was rejected. He cannot recall who made that decision but admits Wearing was not present at the conference. Tr. 251.

4. Beamon never advised Wearing that he should consult private counsel nor did he advise Wearing that given the facts and evidence in the case, he was exposed to a significant punitive award. Tr. at 251.

5. Beamon recalls the note from the jurors which led this court to recommend that he and Attorney Rhodes discuss a settlement with plaintiff's counsel before the jury came back with a verdict. He acknowledged that plaintiff's counsel could not speak directly to Wearing but must communicate regarding settlement only through him and his fellow counsel, Rhodes.

---

14 Of course, the "pending motions" to which Ude was referring included Wearing's post-verdict motion for remittitur of the punitive award, further demonstrating that Wearing's legal strategy is but a shell game and an effort to influence he court on the reduction of the punitive award by suggesting Wearing was paying the punitive award himself. Thus, Ude's counsel's objection to Ude's disclosing the "tactical strategy".

Beamon acknowledged that in the wake of the jury's note and the court's recommendation that defense counsel consider settlement, he and Rhodes were approached by plaintiff's counsel regarding settlement and that plaintiff's counsel was rebuffed and no substantive settlement discussion took place. Beamon claims ignorance, however, as to his role in that decision. He doesn't "know"; he "didn't do it". Tr. at 251-254.

6. Although  Beamon is city counsel, he claims it was only after the jury's verdict was rendered that he learned for the first time that the city was not committing to pay the punitive award assessed against his client. Tr. at 255.

7. With respect to any communications Beamon had with Wearing on this issue, Attorneys Rhodes and Keefe strenuously object to any disclosure by Beamon of post-verdict communications with Wearing or with his co-counsel from Halloran & Sage related to the city's intent in pay the award at any point. Tr. at 257-58. In any event, Beamon asserts that no *written* communications exist in this regard. Tr. at 259.


## **TESTIMONY AT THE HEARING OF APRIL 27, 2006**

The hearing resumed on April 27, 2006, this time with Attorney Hubert Santos, Wearing's new personal counsel, in attendance. Wearing resumed the witness stand and testified further. As the record reflects, the examination was again punctuated by endless interruptions as Wearing's various counsel invoke attorney-client privilege to bar disclosure of the information sought:


1. Attorny Santos commences the invocation of privilege. 4/27/06 Tr. at 80.

2.  With respect to his repeated but carefully parsed claim that he might have to "consult" with bankruptcy counsel should any of his "personal" assets be committed to paying the award, Wearing admits that has never done so nor did he get advice regarding whether a punitive award (based as it is on intentional misconduct) is dischargeable in bankruptcy.  Although Halloran & Sage attorneys drafted Wearing' affidavit containing the veiled threat of "bankruptcy", it appears that Halloran & Sage did not advise Wearing that punitive damages are not dischargeable in bankruptcy. Tr. at 85-86.

3.  Wearing never received any letters from Halloran & Sage or from Coregis regarding the scope and extent of insurance payments to which he was entitled.  Tr. at 86-88.

4.  From the date of the verdict to the present, Wearing claims he received no communications from the New Haven Corporation Counsel's office in which the city records its position regarding the full extent of municipal indemnification.  Tr. at 88-89.

5.  Wearing has had *oral* discussions, however, with Attorney Rhodes regarding this very matter but claims Rhodes has put nothing in writing.  Tr. at 90.

6.  Wearing was left out of the loop entirely by all his attorneys, including Halloran & Sage, during the pre-trial settlements efforts and conference.  He was:  a) unaware of plaintiff's pre-trial offer to settle the case as his counsel never told him; b) he was not consulted with respect to the decision to reject plaintiff's settlement demand; and c) he was never consulted by Halloran & Sage or New Haven Corporation Counsel's office on the decision to forego settlement and try to case to verdict.  Tr. at 131.

7.  Wearing was also not present at the post-verdict settlement conference in the District Court.

He was kept in the dark about everything, including the development of the jury's issuance of its pre-verdict note to the court. He was neither advised nor consulted regarding his counsel's reaction to that note or this court's recommendation that the parties consider discussing settlement. Tr. at 134. Instead, his attorneys made a decision to accept the jury's rendering of a verdict and they made that decision without consulting him. Tr. at 134.

8. Wearing claims that Halloran & Sage to date has never afforded him any letter or other advisement in writing in the wake of the verdict regarding who should be responsible for paying this large award given counsel's decision to take the verdict and not settle and do so without consulting their own client and giving him an opportunity to stem his losses (assuming of course, against logic and all evidence to the contrary, that Halloran & Sage attorneys were of the mind that their client was not fully indemnified – an absurd proposition given the presumption of minimal competence on the part of these partners from an established defense firm). Tr. at 136.

9. Wearing was asked for the <u>factual basis</u> for Halloran & Sage counsel's assertion, in their memorandum of law, that Wearing was unsure or unaware of the extent of Coregis' obligations to him in respect to the trial outcome. Remarkably, both Halloran & Sage counsel, and, curiously, Mr. Santos himself, were on their feet objecting to such questions on the ground of attorney-client privilege. Tr. at 100-108.

10. Attorney Santos represents to this court that "Chief Wearing *does not know exactly* what portions of the judgment that Coregis will indemnify". But Santos, while making such representation to the Court, refuses to allow plaintiff's counsel to examine Wearing on that

very representation of what he knows and how he knows it. Tr. at 116.

11. In the wake of these curious maneuvers, this court aptly observed that defense counsel should not have made a representation in their briefs which they expect the court to credit and rely on if they are refusing to permit any examination into or challenge to the truthfulness of such representation. Tr. at 112.

12. Attorney Santos invoked privilege to object to any testimony from Wearing regarding opinions and communications on the issue of Coregis' responsibility to pay the entire judgment given the judgment was one Coregis provoked by failing to settle the case or consult Wearing regarding pre-trial settlement opportunities. Tr. at. 146. Santo and Keefe both joined to object to any testimony regarding what the attorneys know and have said regarding the matter. Tr. at 148. Wearing continued to maintain that he is "unsure" about the full extent of Corgis coverage. Tr. at 146.

13. During a colloquy/argument between counsel and the court regarding Wearing's invocation of privilege, the court pressed defense counsel to be forthcoming about what exactly it is they are representing to the court. Mr. Santos took the position that his client may not have understood the phrase "third-party source" of payment. He also posited that Wearing is entitled to full indemnification and claims to have put the city on notice of that position by letter. He further stated that while Wearing is entitled to full indemnification (according to Santos) "what's going to happen is anyone's guess". Tr. at 152. Santos was careful however, to correct any impression Wearing gave regarding his alleged belief that if ordered to post a full bond, he would be forced to declare bankruptcy. Santos retreated from any

22

such suggestion, clarifying that all Wearing intends to convey is that he may "consult" a bankruptcy counsel should his personal assets be required and "that's a little different", Santo said, from leading the Court to believe that an order to post a bond would lead to bankruptcy. Tr. at 152.

14. Attorney Keefe again interrupts, although it is not his client on the stand, to assert that Wearing will not and has not waived privilege and he objects to any testimony from Wearing about what he knows about the city's intent to indemnify now or in the future (that is, when the rubber hits the road and Wearing is actually ordered to pay or post bond) and further objects to any evidence of communication by and between counsel regarding the matter. Tr. at 154.

15. After considerable argument, this court indicated it would sustain objections by defense counsel and Mr. Keefe to any questions to Wearing calling for disclosure of the factual basis for his belief that the city is not committed to pay the punitive damages on the ground of attorney-client privilege. Accordingly, plaintiff's counsel indicated that the "whole list of questions" intended for Wearing would be scrapped in light of such ruling. Tr. at 165.

16. Former Deputy Corporation Counsel Martin Echter confirmed that the city has paid punitive damages assessed against city employees in the past. He also suggested that the decision is often deferred after city officials see what the trial outcome is. Tr. at 169-174.

17. Although Mr. Santos was hired by Wearing at hourly rate of $500 presumably to advance Wearing's interests in this proceedings, Santos curiously used his examination of Mr. Echter in an effort to lead Mr. Echter to support the position of Mr. Keefe, Tr. at pp.172-182, a

23

matter which did not escape the notice of plaintiff's counsel. Tr. at 183.

18.    Wearing was among the largest financial contributors to DeStefano's failed gubernatorial campaign, having contributed a total of $1,450 dollars. Notably, the largest donation, in the sum of $1,000 was paid to DeStefano by Wearing on December 8, 2005, in the midst of the trial of this case. May 23, 2006 Tr. at 42-43.

19.    Wearing is covered by the city's liability policy issued by Corgeis which provides a one million dollar coverage. Attorney fees and the costs of defense are in addition to the policy limits. The policy further provides that, in addition to the limit of liability, Corgis "shall pay" for appeal bonds "in an amount not to exceed the Company's liability required for the appeal of a covered suit defended by the Company, but the Company shall have no obligation to apply for or furnish any such bonds. Def's. Exh. B (Coregis policy at Section II A.

20.    The Corgis policy elsewhere provides that the *cost* of any appeal bond is its responsibility so long as there is not another entity or insurer which is also obligated to cover such cost. Def.'s Exh. B (Coregis Policy at Section V L at ¶7.

21.    No evidence was offered at the hearings as to whether, in light of the events which led to this verdict, and the role which Coregis and its counsel played in that to the exclusion of their client's involvement, Coregis would not fund the cost of a bond sufficient to protect Wearing and in the full amount of the judgment plus interest. The only evidence in this regard is the ambiguous assertion by Coregis counsel in his memoranda of law and the assertion by counsel that their client remains "unaware" of what Coregis will do.

IV.    **ARGUMENT**

        A.      **OFFICER TOLNAY HAS A RIGHT TO SECURITY AND DEFENDANT WEARING HAS FAILED TO DEMONSTRATE HIS ENTITLEMENT TO THE EXTRAORDINARY BENEFIT OF A STAY OF EXECUTION WITHOUT POSTING A BOND TO PROTECT THE PLAINTIFF.**

        1.      **General Principles**

Federal Rule of Civil Procedure 62(d) provides:

> [w]hen an appeal is taken the appellant *by giving a supersedeas bond may obtain a stay* subject to the exceptions contained in subdivision (a) of this Rule. The bond may be given at or after the time of filing the notice of appeal or of procuring the order allowing the appeal, as the case may be. *The stay is effective when the supersedeas bond is approved by the court.* [emphases supplied]

As Magistrate Judge Holly B. Fitzsimmons recently observed in requiring a losing defendant to post a meaningful and sufficient bond as a *quid pro quo* for the privilege of a stay of execution while defendant undertakes an appeal:

> The philosophy underlying Federal Rule of Civil Procedure 62(d) is that a plaintiff who has won in the trial court should not be put to the expense of defending his judgment on appeal unless the defendant takes reasonable steps to assure that the judgment will be paid if it is affirmed.

Rand-Whitney Containerboard Limited Partnership v. Town of Montville, 245 F.R.D. 65, 69 (D. Conn 2007)[15] citing Lightfoot v. Walker, 797 F.2d 505 (7th Cir. 1986); see also Beatrice Foods Co. v. New England Printing & Lithography Co., 930 F. 2d 1572 (D.Conn. 1991)(the purpose of a bond is to preserve the status quo while protecting the non-appealing party's rights pending the conclusion of the appeal).

In Rand-Whitney plaintiff obtained an approximately $15,000,000 judgment. Defendant sought a stay pending appeal. Plaintiff disputed that the language in the bond adequately protected their judgment, as well as called into question the defendants' ability and willingness to satisfy the judgment. The court held that "[t]he trial judge is the sole party to make the decision on judging the solvency of the sureties and the sufficiency of securities for the purpose of a supersedeas bond." Id. at 68-69. The court considered the wording of the bond and the prior actions and representations of the defendant in considering the requirements that the defendant must meet before a stay pending appeal would be granted, and held that the defendant had not posted an adequate bond to protected plaintiff's interest in order to issue a stay pending appeal.

Given the philosophy and purpose of FRCP 62(d), it is no surprise that district courts have shown a willingness to investigate the underlying factual representations of defendants who seeks a stay pending appeal, and whether the representations regarding the posting of a supersedeas bond are accurate and adequately protect the plaintiff's judgment. See generally, Close-Up International, Inc.

---

[15]See Ruling on Defendants' Motion for Stay of Execution of Judgment And For Expedited Ruling on Motion for Approval of Supersedeas Bond dated September 11, 2007.

v. Berov, 2007 WL 4380154 (EDNY 2007)(holding that defendant's prior representations about his ability to pay the judgment were in direct conflict to the representations made to the court pursuant to the motion to stay the execution pending the appeal without posting a supersedeas bond, and that the defendant's action of placing a mortgage on his property indicated that plaintiffs were the ones who would be harmed should a stay pending appeal be issued without the posting of an adequate sueprsedeas bond.)

The district court is empowered, and indeed obligated,.to examine the defendant's purported reasons against posting a supersedeas bond. See generally, WRIGHT & MILLER, 11 FPP §§ 2901, History of FRCP 62, (quoting Landis v. North Am. Co., 299 U.S. 248, 254-55 (1936)("The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weight competing interests and maintain an even balance".)

Generally, courts have looked at four factors to determine whether a stay pending appeal is appropriate: "'(1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer an irreparable injury if a stay is issued, (3) whether the moveant has demonstrated a substantial possibility, although less than a likelihood of success, on appeal, and (4) the public interest than may be affected.'" Close-Up International, Inc. v. Berov, 2007 WL 4380154 *1 (EDNY 2007)(quoting Lopez Torres v. N.Y. State Bd. of Elections, 462 F.3d 161, 207 (2d Cir. 2006), see also, Connecticut Hospital Assoc. v. O'Neill, 863 F.Supp 59, 61 (D. Conn 1994).

Moreover, the bond must be sufficient to accomplish its purpose and this court, as the trial judge, has the sole authority to make the decision in judging the solvency of the sureties and the

sufficiency of the security for the purpose of a supersedeas bond. <u>Jerome v. McCarter</u>, 88 U.S. 17

(Oct. Term 1874). As the judgment creditor, Officer Tolnay has the right to challenge the adequacy

of the bond before the trial court. <u>Phansalkar v. Andersen Weinroth & Co.</u>, 211 F.R.D. 197,

(S.D.N.Y. 2002). Judgment creditors can raise objections to the conditions of the bond and request

the court to modify the bond so as to achieve its intended purpose. <u>Sheldon v. Munford, Inc.</u>, 128

F.R.D. 663 (N.D. Ind. 1989).

2.            <u>**Wearing's Ambiguous Assertions Are An Insufficient Basis On Which To Grant Him The Extraordinary Benefit And Advantage He Seeks And Leave The Plaintiff Unsecured Where The Evidence Shows He Is Covered By A One-Million Dollar Policy And Has The Right Under It To A Carrier-Funded Appeal Bond.**</u>

As this court has already observed, it was confronted with a unique if not bizarre

situation in which Wearing had demanded a stay of execution without bond despite evidence

that he enjoys a million dollar coverage from Coregis pursuant to a policy which requires

Coregis to pay for an appeal bond and further, despite having repeatedly and successfully

invoked attorney-client privilege to prevent any examination of the credibility of his

suggestion (not a claim – he has only made a suggestion as have his attorneys) that he might

be abandoned by the City of New Haven. Attorney Ude has already admitted that a decision

to pay the punitive damages has not been made by the city, that this deferral of decision was

linked to the post-verdict motions that were pending before the court seeking a reduction of

the awards, and that a decision would be made in the future. Ude and his counsel Mr. Keefe,

remarkably admitted that any details regarding this decision and the communications which

surround it were being withheld as privileged and protected "strategy".

Further straining credulity is the fact that Wearing, while poor-mouthing, carefully parsed his affidavit so as to avoid all mention of third party sources of payment, fought strenuously to avoid a deposition, answering interrogatories or even answering questions at the bond hearing, threw up the shield of privilege and further hired a $500 per hour lawyer to represent his personal interests only to have the court and all see that lawyer collaborating with Halloran & Sage and Attorney Keefe to negate any suggestion that Wearing is really indemnified in full. Wearing had the nerve to demand a stay without bond based solely his affidavit after he and his counsel, for strategic reasons, declined to put the issue to the jury in order to avoid any cross-examination of Wearing regarding his sources of payment. Having made that trial decision, Wearing then pulled a fast one by submitting an affidavit post-trial. He counsel then had the gall to file a motion for protective order insisting their client be relieved from any obligations to answer questions about that affidavit and that this court grant him a stay without bond strictly based on his untested affidavit and the unsworn and highly misleading statements of counsel in their memoranda.

Wearing and his counsel would have this court believe that seasoned defense counsel from one of the state's oldest and most established defense firms would actually have litigated the case the way they did while under the impression that the City of New Haven was not fully indemnifying their client. No first year associate would make the decisions defense counsel made in this case without ever consulting their client, including a decision to try the case and later take the verdict after the jury's note. Clearly, seasoned counsel from Halloran & Sage proceeded based on the understanding their was fully indemnified. The

question is: what happened? The answer is quite simple. After an embarrassing outcome, some one decided to play games with the plaintiff and this court and present the issue of indemnification as a murky question, in the hope that this court would be influenced in the remittitur calculus, and further, that the Second Circuit Court of Appeals could likewise be scammed into presuming something which may not be true.

The bottom line is that Wearing was obligated to put forward credible evidence to support the conclusion that he is unable to post a full bond. He has hardly met that burden. At a minimum, he has not put forward clear and convincing evidence to support an order from this court that Officer Tolnay should remain entirely unsecured while Wearing brings his game to the appellate court.

3.                        **Having Repeatedly And Successfully Invoked The Attorney-Client Privilege To Prevent Any Examination Into And Challenge To The Credibility Of His And His Counsel's Ambiguous Assertions Regarding Available Third Party Sources Of Funds To Post A Bond And Satisfy The Judgment, Wearing Cannot Be Deemed To Have Established His Entitlement To The Extraordinary Benefit Of A Stay Without Bond.**

Chief Wearing has made assertions regarding his understanding of the availability to him of municipal indemnification to the full extent of his liability in this case.  Wearing is also before the court asserting, through his counsel of record, that he is in a state of uncertainty over the extent to which he has or is entitled to insurance coverage and indemnification in respect to the punitive award.

On this latter point, the issue of insurance, Wearing makes these representations also through his counsel as set forth in defendant's memorandum of law in support of his motion. Chief Wearing's understanding is admittedly based <u>solely</u> on alleged communications and information conveyed to him by city counsel and counsel from the firm of Halloran and Sage.[16]

Wearing, however, and surprisingly, invoked attorney-client privilege as the basis for refusing to answer many questions about his knowledge of these matters. He objects to the disclosure of any written communications between himself and the attorneys and further invokes the attorney-client privilege with respect to any oral communications. There is no evidence as yet which shows that defendant received communications directly from Coregis Insurance Company on this issue; rather, to the extent that Wearing knows anything about the issue whether he is, or has a right to be, fully indemnified by Coregis for the entire amount of the judgment (and not just the compensatory award, attorney fees/costs award and statutory interest), it is based solely on what Coregis has conveyed to him through its appointed counsel from Halloran & Sage and what, if anything, was conveyed to him by city corporation counsel who have since withdrawn, citing their conflict of interest with their own client.

As to the extent to which Wearing was and remains indemnified by the City of New Haven, for punitive damages, it is equally obvious that the sole basis for Wearing's knowledge and his attestations on the subject is information conveyed to him by his attorneys, city officials, including city counsel. These communications were curiously never in writing, were entirely oral, and as to all of them Wearing refuses to answer any questions on the ground of privilege.

---

[16]     To the extent Wearing's understanding of these matters is based in part on conversations with others in city government, such communications are obviously not privileged although his attorneys repeatedly invoked privilege to preclude Wearing's disclosing *anything* beyond his mere assertion of his "understanding" with respect to third party sources of payment.

New Haven Corporation Counsel Thomas Ude and Assistant Corporation Counsel Jonathan Beamon  testified at the hearings.  Their private counsel (Attorney Keefe) repeatedly objected to questions posed to both witnesses on the ground of attorney-client privilege.  The invocation of privilege in this respect becomes all the more bizarre in light of the now realized conflict of interest between both of these attorneys and Chief Wearing.  Both attorneys are beholden to the interests of the City of New Haven and its Mayor.  Both attorneys were responsible, along with Coregis-appointed counsel, for making the decisions 1) to forgo settlement in favor of trying the case to a jury, and 2) to reject out-of-hand the court's suggestion, and the efforts of plaintiff's counsel, to discuss settlement during the jury's deliberations after jurors sent a note which telegraphed the probability of a substantial plaintiff's verdict.

It has been established that, with respect to these decisions, Chief Wearing was kept out of the loop and was at the mercy entirely of the very attorneys who now suggest (but do not aver under penalty of perjury) that Wearing does not presently enjoy municipal indemnification nor the full resources of Coregis in satisfying any punitive damage judgment.  Notably, neither Wearing nor his counsel have ever submitted sworn testimony indicating that Coregis would refuse to pay for Wearing's  appeal bond if Wearing is ordered to post it.

Notwithstanding this state of affairs, Wearing remarkably persisted ( not on his own initiative but through the very attorneys whose interests are in direct conflict with his own) to invoke the attorney-client privilege in respect to all communications which form the basis for his (alleged) understanding of his available sources of payment.[17]

---

[17] The Coregis-appointed counsel of record for Wearing largely echoed Attorney Keefe's objections on this ground throughout the March 28, 2006 hearing.  This court quite properly expressed concerns about this matter and it was agreed that no further examination of Wearing should continue until such time as counsel appeared for him who was loyal only to Wearing's interests.

The plaintiff's position throughout this hearing was that the history of this case, including, most especially, the carefully limited phrasing of Wearing's affidavit, the curious statements of defense counsel in his memorandum of law, the history of settlement negotiations in this case coupled with the city's demonstrated history of paying punitive judgments against its officials, strongly suggested a collaboration between Coregis, city officials, counsel and Wearing designed to frustrate the plaintiffs' efforts to gain security for his judgment and to further mislead the plaintiff and the court with respect to Wearing's insurance and indemnification for the improper purpose of influencing this court on the issue of remittitur. In sum, the plaintiff believes that the city and Coregis are hiding behind Wearing's personal assets for this purpose, with a "wait and see" strategy which they hope will survive long enough for them to employ the same strategy before the Second Circuit Court of Appeals.

With the propriety of any such strategy aside and left for another day and another forum, the plaintiff submits that given the record as developed, Wearing must, as a matter of well-established law, be deemed to have waived his right to have this court give any weight or consideration to any of his assertions in light of his refusal, by invocation of the attorney-client privilege, to allow any inquiry into them or challenge to them by meaningful cross-examination, of himself or his municipal counsel.

The record establishes that at the jury trial, defendant and his counsel initially started to put the issue of Wearing's assets before the jurors but then quickly abandoned the effort and retreated when plaintiff's counsel made clear her intention to cross-examine Wearing on the issue and offer other evidence to rebut any express or implied assertion that Wearing's personal assets are all that

exist to satisfy any judgment. Having made that strategic decision, Wearing now attempts to have this court draw conclusions based on his ipse dixit while disallowing any cross-examination into the credibility of his questionable assertions. He declined to offer to the jury and thus asks this court, post-judgment, to perform what is quintessentially a jury function and decide not only the issue of his available assets and sources of payment but the credibility of his and other witnesses' testimony on the issue, credibility questions which they did not wish the eight jurors in this case. Worse yet, he won't put his assertions to the test, and insists on hiding behind the shield of privilege.With plaintiff's position on the scope and use of this evidence thus stated, plaintiff submits that Chief Wearing has improperly attempted to use the attorney-client privilege as both sword and shield in this case; in other words, he wishes to have his cake and eat it too. He demands that this court grant him a privilege and a generosity to which he is not entitled based upon a highly questionable affidavit which itself was carefully scripted to avoid any representations on the existence and extent of third party sources of payment. The affidavit, scripted as such, is itself a strong indication that defense counsel sought to avoid having Wearing make any clear statements under oath regarding the issue of third party payments. Thus, the subject was omitted entirely from the affidavit. Instead, defense counsel improperly made representations to this court in his memorandum of law, statements which are not evidence (as they are statements of counsel) which were not examined and, remarkably, as to which defendant and his counsel refuse to allow any and all examination for purposes of testing their veracity. In sum, defendant and his counsel have made express and implied representations to this court and respond to any challenge to these statements by throwing up the shield of attorney-client privilege. Basic notions of fairness and justice doe not permit such a subterfuge.

The various attorneys whose objections on the ground of attorney-client (and work-product)

privilege punctuated the bond hearings fail to acknowledge the overwhelming body of authority which, applied to this case, required either a voluntary or court-imposed waiver of the privilege (neither of which occurred here) or a refusal by the court to consider as competent evidence any such representations by Wearing as to which he would not allow cross-examination on the ground of privilege. Wearing can not have it both ways.

It is well established that a party who makes assertions which have their basis in otherwise privileged communications is deemed to have waived the privilege with respect to all such communications on the issue. See, e.g., Walsh v. Seaboard Surety Co., 184 F.R.D. 494, 496 (D. Conn. 1999) (Plaintiffs waived attorney-client privilege "by making assertions that have put the communications 'at issue' in the case.") In Walsh, the Honorable Janet C. Hall discussed the "at issue" exception to the doctrine of privilege, noting that under the standard, "even if a party does not attempt to make use of a privileged communication, he may waive the privilege if he asserts a factual claim the truth of which can only be assessed by examination of a privileged communication.". Id. quoting Bowne v. AmBase Corp., 150 F.R.D. 465, 488 (S.D.N.Y. 1993) (emphasis supplied). In addition to waiving the privilege with respect to attorney-client communications, the same "at issue" exception applies equally to a party's refusal to disclose information based on the attorney work-product doctrine. Id. at 497 (citations omitted).

Chief Wearing in this case cannot make assertions and then erect a shield of privilege in order to avoid an examination of or challenge to the truth and accuracy of those assertions as to allow a party to use the privilege as a shield under these circumstances is considered fundamentally unfair to his opponent. See United States v. Bilzerian, 926 F.2d 1285. 1292 (2nd Cir. 1991) ("The privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications.")

The case authority on this is plentiful and clear.  See Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D.Wash. 1975) (asserting party put privileged information at issue by making it relevant to the case and application of the privilege would thereby deny the opposing party information vital to his defense).  The Hearn doctrine has been applied repeatedly and liberally in this circuit.  See Walsh, supra at 496 (Hon. Janet C. Hall holding the Hearn doctrine applicable in the state of Connecticut); Johnson Matthey, Inc. v. Research Corp., 2002 U.S. Dist.

LEXIS 13560, 2002 WL  1728566 at *3 (S.D.N,Y. 2002) (privilege waived when party asserts a position the truth of which can be assessed by examination of privileged communications – claim of fraudulent concealment put in issue facts learned from counsel); In re: Kidderpeabody Secs. Litig., 168 F.R.D. 459, 470 (S.D.N.Y. 1996) (same); Bank Brussels Lambert v. Credit Lyonnaise (Suisse), 1998 U.S. Dist. LEXIS 13611, 1998 WL 567862*1 (S.D.N.Y. 1998) (same); Weizmann Inst. Of Science v. Neschis, 2004 U.S. Dist. LEXIS 4254 (S.D.N.Y.) at **11-12 (party deemed to have waived privilege by placing directly in issue his assertions on communications with attorneys).

Moreover, "when a client selectively discloses portions of communications otherwise protected by the attorney-client privilege, the 'subject matter waiver' doctrine requires that other communications about the same subject matter also be disclosed." Nolan v. City of Yonkers, 1996 U.S. Dist. LEXIS 3221 at *5, citing In re: Von Bulow, 828 F.2d 94, 101-102 (2d Cir. 1987); Brock Equities Ltd. v. Josephthal, Lyon & Ross, Inc., 1993 U.S. Dist. LEXIS 1245, *2, WL 350026, *1 (S.D.N.Y. 1993).  Aptly pertinent to the instant case was the court's observation that "[t]he purpose of this 'fairness rule' is to ensure that fact finding, and the judicial process, are not distorted by the introduction of selectively disclosed and intentionally misleading evidence." Nolan at *6, citing and quoting in part Teachers Ins. & Annuity Ass'n v. Shamrock Broadcasting Co., 521 F.Supp. 638, 641 (S.D.N.Y. 1981).

In this case, defendant has attempted to use the privilege as both "a sword" and "a shield" by making assertions (or, in the case of available insurance, claiming lack of knowledge) which have no factual basis or source other than attorney-client communications. The privilege may not be used as both sword and shield. In re: Von Bulow, 828 F.2d at 103 (citations omitted). See also Kabushiki v. Gruen Ind., Inc., 1986 U.S. Dist. LEXIS 26343 (plaintiff may not use attorney-client privilege as both sword and shield); Palazzetti Import/Export, Inc. v. Morson, 2000 U.S. Dist. LEXIS 10340 (S.D.N.Y.) at * 11 (party asserting privilege by withholding of documents unfairly sought to mislead his opponent).

Moreover, it is not even necessary to deem Wearing to have waived the privilege with respect to any communications from Corregis Insurance Company or the City of New Haven, despite such communications coming to Wearing through his counsel, for those communications merely relay information obtained from a third party. In this case, clearly Wearing was given information by attorneys from Halloran and Sage with respect to the extent to which Corregis Insurance Company: 1) may be liable to pay for the entire judgment, and 2) Corregis' position on whether it is so liable. This is clearly borne out by defense counsels' own memorandum of law in which they make the dual claim that 1) Wearing "does not exactly which portion of the judgment that Corregis will indemnify" and 2) Wearing "can report that Corregis does not consider itself responsible to indemnify any punitive damages award."[18]  To the extent that attorneys from the firm of Halloran and Sage were passing on to Wearing the position of Corregis Insurance Company, such can hardly be considered privileged in the first instance, especially since, for their own self-serving purposes, Corregis-appointed counsel are including, by implication, these very communications in their brief to this

---

[18] See Defendant's Memorandum of Law at p. 2; see also Transcript of March 28, 2006 hearing at p. 81.

court. Under the above-cited and unequivocal authority, Wearing, having made claims and assertions the factual basis of which are the very communications from his counsel, has by law waived attorney-client privilege and must disclose all such communications.

Likewise, with the defendant having waived privilege as a matter of law, it is entirely inappropriate for Attorneys Ude and Beamon to refuse to answer any and all questions regarding their communications with Wearing or anyone else in this case regarding the City's position and strategy with respect to municipal indemnification for the punitive damages judgment.

The federal courts have consistently refused to allow a party to give his opponent only a glimpse into the content of such communications and then invoke the privilege against a fuller disclosure, especially in circumstances where the invocation of a privilege "would be misleading to a court." McGrath v. Nassau County Health Care, Corp., 204 F.R.D. 240, 245 (E.D.N.Y. 2001) (where substantive information gained from privileged communication has been revealed, partial disclosure is not allowed to the prejudice of the opposing party and where invocation of the privilege will result in an unfair proceeding or a party's misleading a court).

It was Melvin Wearing's privilege to invoke the privilege. Having done so, however, plaintiff submits, he is not entitled to have the court credit any of his assertions or rely on them in fashioning its order respecting his obligation to post security for the entire judgment, since he would not allow for any meaningful test of the credibility of any of his bald and ambiguous claims. He cannot have it both ways.

**CONCLUSION**

For the foregoing reasons, this court is respectfully urged to deny Wearing a stay of execution unless he forthwith posts security in the form of an acceptable bond sufficient to satisfy the judgment and interest accrued on it and further submits a form of bond for the court's approval.

THE PLAINTIFF
ARPAD TOLNAY

BY: _____
KAREN LEE TORRE
Federal Bar No. ct01707
Law Offices of Karen Lee Torre
129 Church St., Suite 405
New Haven, CT 06510
(203) 865-5541

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed, this 28[st] day of December, 2007, to:

Robert A. Rhodes, Esq.
Ralph W. Johnson, III, Esq.
Halloran & Sage, LLP
315 Post Road West
Westport, CT 06880

Hubert J. Santos, Esq.
Sandra L. Snaden, Esq.
Santos & Seeley, P.C.
51 Russ Street
Hartford, CT 06106

Norman A. Pattis, Esq.
649 Amity Road
P.O. Box 280
Bethany, CT 06524

Alexandra Block, Esq.
Garrison, Levin-Epstein, Chimes, Richardson
405 Orange Street
New Haven, CT 06511

KAREN LEE TORRE