# EXHIBIT A

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF        CONNECTICUT

ARPAD TOLNAY

V.

MELVIN WEARING

### SUBPOENA IN A CIVIL CASE

Case Number:[1] 02cv1514(EBB)

TO:    John Ward, Corporation Counsel
       City of New Haven
       165 Church Street
       New Haven, CT 06510

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Law Offices of Norman A. Pattis, LLC<br>129 Church St., Suite 405, New Haven, CT 06510 | DATE AND TIME<br>6/26/2008 11:00 am |
|---|---|

☐   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
| | |

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)    *ATTORNEY FOR PLAINTIFF* | DATE<br>6/20/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Norman A. Pattis, Esquire                              203-393-3017
Law Offices of Norman A. Pattis, LLC. 129 Church St, Suite 405, New Haven, CT 06510-   203-865-5541

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                        DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1)(A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2)(A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

# EXHIBIT B

1          A.     I would deem that conflict counsel.

2          Q.     There was no referral of Mr. Wearing to

3     conflict counsel at any point in this case, correct?

4          A.     Correct.

5          Q.     Is it fair to say --

6          A.     Until -- no, there was not a referral to

7     conflict counsel.

8          Q.     You were about to say until after the

9     judgment.  When now, there's all sorts of potential

10    conflict.

11         A.     There's a rather significant conflict,

12    definitely, between Mr. Wearing and the City.

13         Q.     And the City took no steps to alert

14    Mr. Wearing, so far as you know, of this potential

15    conflict prior to the judgment, correct?

16         A.     Correct.

17              MR. KEEFE:  Excuse me.  I object.  It's

18         privileged, your Honor.  Anything that comes

19         from the corporation counsel to Mr. Wearing,

20         who was their client and still is, in some

21         respects.

22              MR. PATTIS:  There's a case, Judge, that

23         I'd refer the Court to.  It's called Caifson,

24         C-a-i-f-s-o-n, Corporation vs. County West

25         Building Corporation.  It's a 62 F.R.D 331,

136

1      1974 decision.

2          And the language reads as follows:  The

3      Court ordered a judgment debtor's attorney to

4      answer questions related to his

5      representation of the judgment debtor,

6      including who retained him for his

7      representation of the judgment debtor and

8      whether he had been or was to be paid, the

9      source of payment, although not the specific

10     terms thereof, and generally, questions

11     concerning his knowledge of the judgment

12     debtor's past financial condition and the

13     source of payments concerning the debtor's

14     various obligations.

15         Our theory of this case is as follows:

16     That Melvin Wearing was represented under a

17     standard policies and procedures at the New

18     Haven Corp. Counsel's office.  The file came

19     in; it was evaluated; it was referred to a

20     lawyer; the case was prepared for filing;

21     went to trial; and all this while Mr. Wearing

22     hadn't received reservation advice or other

23     formal notice from anyone that he might be

24     exposed to paying for these debts himself.

25         At the time the judgment was entered, the

137

1       City realized that in the course of the
2       gubernatorial campaign they had a $5 million
3       fireball on there hands.  And what are they
4       going to do?  Mr. Wearing is no longer
5       employed by the City, so, in a way, they can
6       walk away from it.  However, we don't think
7       they will, because they never have walked
8       away from a punitive damages award in an
9       instance, unless the defendant had been
10      charged with a crime or permanently
11      discharged from employment.
12          And the fact, as Mr. Ude has testified
13      here that that decision has not yet been
14      made, I suspect, although the records is a
15      little unclear and I'll nail that down, is
16      why we say, in terms of the attorney client
17      privilege, not that a crime has been
18      committed, as has been suggested, by brother
19      counsel, but that something akin to a
20      material misrepresentation is being
21      perpetrated on this Court.  That there was
22      and is a commitment to pay, that commitment
23      is sound in practice.
24          A decision has not been made yet not to
25      pay.  But yet we've had Mr. Wearing testify

138

1       that he's too poor to pay the judgment with

2       no affirmative representation from the City

3       that it won't.  And so that's why we're here

4       and that why we're talking crime fraud.

5           That's why we say that as to the cases

6       we've thus far cited, we don't really want to

7       know about legal advice, because we're really

8       not asking about legal advice.  We're asking

9       about communications that have legal effect

10      that provided notice to Mr. Wearing for

11      things that we think are significant in this

12      case.

13          The privilege isn't implicated here.  And

14      to the degree that it is, we think that on

15      the authority that we've thus far recited to

16      this Court can bend it under the interest of

17      justice.  Because it's not an immutable

18      object.

19          As Judge Covello held in the case where a

20      member of this Bar was found liable on a

21      civil RICO case.  Lawyers sometimes do play

22      games in the settlement process and the

23      courts aren't to tolerate them.

24          MR. KEEFE:  That's an interesting

25      speech, but it has nothing to do with the

139

1   objection that's pending, which is what was,

2   according to Wearing, told by the corporation

3   counsels insofar as the reservation of rights

4   go.

5       I have news for Mr. Pattis, the material

6   that is representations to this Court is

7   tantamount to a crime.  And there has been no

8   material misrepresentations, as far as

9   indemnity goes.  The City is not paying

10  punitive damages.  It made that decision.

11  It's not going to change.

12      MR. PATTIS:  Well, that was a useful

13  speech.

14      MR. RHODES:  Your Honor, I'd like to

15  make my own statement for the record.  I'd

16  just object to any reference that this

17  defendant or his counsel is making any

18  misrepresentation of any sort to this Court

19  about the City or about what an insurance

20  company are going to do.

21      I don't represent the City.  I don't

22  represent an insurance company.  We don't

23  have any control over what they are going to

24  do.  So there's been no misrepresentation

25  about it by this defendant or his counsel.

144

1   withdraw was recently granted.

2       Q.    At any point from 2002 to 2005, did another

3   member of the corporation counsel represent Chief Wearing?

4       A.    I don't recall, it may have been.

5       Q.    Did you direct Mr. Beamon to withdraw from the

6   Wearing case?

7       A.    Yes.

8       Q.    Why?

9       A.    Because I believe that there was a conflict

10  between him representing the City and Melvin Wearing.

11      Q.    When did that conflict arise?

12      A.    Probably shortly after the judgment entered.

13      Q.    You say probably shortly after the judgment

14  entered.  What was --

15      A.    When the judgment entered.

16      Q.    I'm sorry?

17      A.    When the judgment entered.

18      Q.    And at that point, did you make a decision

19  yourself that the City was not going to indemnify for some

20  or all of the judgment?

21      A.    I didn't make any decision.  No, I did not

22  make a decision.  I did review and I'm aware that the

23  statutes do not authorize a City to indemnify for punitive

24  damages.

25      Q.    They're not required is what you said.

155

1               of specifics that were said, however.  So are

2               you aware of any such notice, sir?

3                       THE WITNESS:  It is my understanding

4               that it was discussed that punitive damages

5               are not covered.

6      BY MR. PATTIS:

7          Q.    Are you saying, sir, that Mr. Wearing was told

8      that should punitive damages be awarded, he would not be

9      covered?

10         A.    I don't know specifically if it was that?

11         Q.    And you said you were --

12                      MR. KEEFE:  He's not finished.  May he

13              finish, your Honor, please?

14                      THE COURT:  He asked if you have

15              anything to add.  You don't of any such?

16                      THE WITNESS:  I don't know.

17     BY MR. PATTIS:

18         Q.    How did you become aware that this might have

19     happened?

20         A.    I was told that there was conversation

21     concerning punitive damages in which Mr. Wearing was

22     advised that he might not be covered by insurance and that

23     he might be personally responsible for damages.

24         Q.    Who told you that?

25         A.    Mr. Beamon.

158

1          of having read these cases, which I presume

2          Mr. Keefe didn't take the lunch hour and do

3          because two of them involve discovery of the

4          very sort we're involved in now.

5              We're not asking about the contents of

6          the letter, simply whether a letter exists.

7          Should we discover that a letter does exist,

8          we may ask for and then ask for an in camera

9          review.  So I'd ask that the witness be

10         required to answer the question.

11             THE COURT:  I'll overrule the objection.

12             THE WITNESS:  I don't remember the

13         question.

14    BY MR. PATTIS:

15         Q.    Was a letter ever written to Mr. Wearing

16    notifying him that the City took the position prior to

17    trial that it might not indemnify him or had no legal

18    responsibility to indemnify him for punitive damages?

19         A.    The general statutes set that out.  I'm not

20    aware of a letter.

21         Q.    You're not aware of any letter?

22         A.    I'm not aware of a letter.

23         Q.    There's no policy to send one in such

24    circumstances?

25         A.    In sum, no, there isn't.

166

1          I got the judgment against some state

2       troopers subpoenaed --

3          MR. RHODES:  Your Honor, I'm going to

4       object to the references of other cases.

5       Let's stick to this case, rather than have

6       anecdotal references about cases in which

7       counsel at this table had no involvement in,

8       and we don't know anything about it, and have

9       an unfair advantage in trying to argue cases

10      that we weren't involved in.

11         MR. PATTIS:  The senior partner in

12      Mr. Rhodes office was Steven Fogerty and

13      according to --

14         MR. RHODES:  Who is not here, your

15      Honor.

16         THE COURT:  Okay.  Let's not go into

17      that.

18         MR. PATTIS:  The point though, Judge, is

19      we have reason to believe, and I think you

20      now do as well, that no decision has been

21      made, but yet they've offered Mr. Wearing.

22         It's not even clear that it's

23      Mr. Wearing's motion that we're here on

24      today.  He appears without counsel or, in

25      effect, counsel of sorts --

167

1           MR. RHODES:  Objection, your Honor.  We
2       represent Mr. Wearing.  We filed the motion
3       on our client's behalf.  This motion was
4       filed by Mr. Wearing's counsel on his behalf.
5       It has nothing to do with the City of New
6       Haven.
7           MR. PATTIS:  They're paid by the
8       insurance company, and we'll get into the
9       policy in a moment, Judge.
10          THE WITNESS:  This has to be clarified.
11          MR. PATTIS:  You can, Judge.  Will that
12      be okay with Mr. Keefe?
13          MR. KEEFE:  If it helps the Court, I
14      think he should.
15  BY MR. PATTIS:
16      Q.   Go ahead, Tom.
17      A.   You had asked -- the settlement committee
18  rejected the settlement demand.  It was a demand that was
19  presented to them on Mr. Rhodes's recommendation.  I was
20  present and advised the committee, but it was not my
21  recommendation.
22      Q.   Well, isn't it true, sir, that that settlement
23  conference was one that took place post-judgment in this
24  case?
25      A.   Yes.

1          MR. PATTIS:  We're asserting that there
2     has been something less than candor to the
3     Court.  And that holding Mr. Wearing out to
4     be the source of payment is, in fact, as you
5     now know, at least one possibility there or
6     others that the City hasn't yet made.  And
7     what we're trying to avoid is the possibility
8     that the City scooches in behind
9     Mr. Wearing's assets, persuades the Court to
10     conduct remittiter and then say, wow, that
11     was a good day in Court.  Let's pay up now
12     that we've reduced it.
13          MR. KEEFE:  What was the
14     misrepresentation to the Court is what I want
15     to know?  I've heard this now repeatedly.
16     What is the misrepresentation?
17          There's a punitive damages verdict in the
18     case.  There's no legal obligation for the
19     City to pay it.  The City isn't going to pay
20     it.  And they claim, therefore, we're guilty
21     of a material misrepresentation to the Court.
22          Just because we went to a settlement
23     conference, and we had an offer -- a demand,
24     and that was conveyed to the litigation
25     settlement committee, which quickly rejected

1        That's what Mr. Pattis is not only implying,

2        I think he said that.

3            In other words, that if the remittiter is

4        granted the City is going to pay it and walk

5        away.   There's not a scintilla of evidence

6        nor can there be that that's the City's

7        position secretly, publicly, or any other

8        way.

9            The City has a verdict it's not going to

10       pay because it doesn't have to pay it.

11           MR. PATTIS:   No one has said that,

12       except Mr. Keefe, Judge.   The fact of the

13       matter is the City hasn't made a decision.

14       And has proffered an affidavit from the man

15       saying, I'm it, when the City hasn't decided,

16       and in all but one or two cases has routinely

17       paid.   And we'll get into a situation just

18       last year where they paid hundreds of

19       thousands of dollars on punitive damages on

20       Mr. Wearing's behalf.

21           MR. RHODES:   Your Honor, I'm going to

22       object to this because the City hasn't

23       offered or proffered anything.   We did.   We

24       offered a summary of our client's finances

25       and assets.   We do not control the City or

254

1    conduct prohibit me from speaking directly to Melvin

2    Wearing because he's represented by counsel, correct?

3         A.    Sure.

4         Q.    So on the day of the jury deliberations, I

5    could not go to Melvin Wearing and say, hey, Melvin, you

6    better settle, right?  I couldn't talk to him, right?

7         A.    Yes.

8         Q.    I could only talk to Melvin Wearing through

9    his counsel of record, correct?

10        A.    Yes.

11        Q.    And you were his counsel of record?

12        A.    Yes.

13        Q.    Now, you're saying that you didn't make the

14   decision.  Who did?

15        A.    I don't know; I didn't do it.

16        Q.    In the wake of the judgment, when did it

17   become apparent to you that there was a conflict that

18   required your withdrawal of your appearance in this case?

19        A.    Probably after I learned that the punitive

20   damage award would not be paid.

21        Q.    I'm sorry?  I didn't hear that.

22        A.    When I learned that the punitive damage award

23   would not be paid or that the City would not pay the

24   punitive damage award.

25        Q.    What do you mean when you say when you learned

255

1    of that fact?  You learned of that post-judgment?

2        A.    Well, yes.

3        Q.    All right.  Does there exist any written

4    communication between you, your office, and Mr. Wearing,

5    that would include email communication, consistent with

6    what you just said was a post-judgment understanding on

7    your part that the City would not pay the punitive award?

8                MR. KEEFE:  Objection.  Privileged.

9                MS. TORRE:  I didn't ask for the content

10                of communications, I asked to establish their

11                existence.

12                MR. KEEFE:  That's not true.  She asked

13                for the content.  She asked for content.  She

14                asked for communications that establish that

15                it wouldn't be paid.  That's content.

16                It's Dear Mr. Wearing, please be advised

17                that punitive damage verdict will not be paid

18                by the City.

19                How can she say that?

20                MS. TORRE:  I'll rephrase the question.

21    BY MS. TORRE:

22        Q.    Are there any written communications between

23    your office and Mr. Wearing after the verdict where the

24    subject matter of the communication is the extent to which

25    Mr. Wearing will have insurance as a third-party source of

# EXHIBIT C

# SANTOS & SEELEY, P.C.

### ATTORNEYS AT LAW

#### 51 RUSS STREET

#### HARTFORD, CONNECTICUT 06106-1566

HUBERT J. SANTOS
HOPE C. SEELEY
SANDRA L. SNADEN
BENJAMIN B. ADAMS

TELEPHONE
(860) 249-6548
TELECOPIER
(860) 724-5533

April 7, 2008

John R. Ward, Esq.
Office of the Corporation Counsel
City of New Haven
165 Church Street, 4th Floor
New Haven, CT 06510

Re: *Tolnay v. Wearing*

Dear Attorneys Ward:

As you are aware, our firm represents Melvin Wearing in a lawsuit brought by Officer Arpad Tolnay of the New Haven Police Department. Chief Wearing was represented by the Office of Corporation Counsel through Attorney Jonathan Beamon from the inception of this litigation up to and including the trial in which the jury awarded $150,000.00 in non-economic compensatory damages, $903.84 in economic damages and $5,000,000.00 in punitive damages. The award of punitive damages was subsequently reduced to $1,350,000.00. Approximately three months after the trial, Attorney Beamon withdrew his appearance on behalf of Mr. Wearing.

The District Court has recently denied Mr. Wearing's Motion for Stay of Enforcement and Execution of the Judgment in this matter. In this ruling, the court states Mr. Wearing has failed to affirmatively demonstrate that he will not be indemnified by the City of New Haven for punitive damages. In pages 16 through 19 of its Decision, the court recounts conduct by the city and its counsel in support of the conclusion that the City of New Haven will indemnify Mr. Wearing for punitive damages.

April 7, 2008                                                                                    Page 2

    As execution of the judgment would obviously subject Mr. Wearing to economic catastrophe, we now affirmatively request that the City of New Haven indemnify Mr. Wearing and post a bond in the amount of $1,350,000.00 in this matter so that Mr. Wearing may pursue his appeal of this judgment without being further harassed by the plaintiff. We request an immediate response to this letter.

                 Very truly yours,

                 HUBERT J. SANTOS

HJS/mlt

# EXHIBIT D



# HALLORAN
# &SAGE LLP
ATTORNEYS AT LAW

ROBERT A. RHODES   rhodes@halloran-sage.com

April 30, 2008

Vikki Cooper, Deputy
Corporation Counsel
City of New Haven
165 Church Street
New Haven, CT 06510

Re:   Tolnay v. Wearing
      Our File No.   :   07312.0268

Dear Attorney Cooper:

As you are already aware, the District Court has denied Mr. Wearing's Motion to Stay of Execution and Enforcement of the Judgment rendered in this case. The District Court will only stay execution of the judgment if Mr. Wearing is able to post a surety bond in the full amount of the judgment. Attorney Hubert Santos has already requested that the City of New Haven post a bond for $1.35 million to cover the punitive damages award in this case.

On April 29, 2008, we learned that the United States Court of Appeals for the Second Circuit denied Mr. Wearing's Motion to Stay Execution and Enforcement of the Judgment. The second motion was filed directly with the Second Circuit pursuant to Federal Rule of Appellate Procedure Rule 8. On April 29, 2008, I left a voicemail with your office requesting that the City of New Haven post a surety bond or provide a letter stating that it will not. It is our hope that the City of New Haven will protect Chief Wearing and post the surety bond. However, if the city decides not to post the bond, we will need to know of this decision in writing as soon as possible.

Thank you for your attention to this matter.

Very truly yours,

Robert A. Rhodes

RAR/kg
cc: Hubert Santos, Esq.

# EXHIBIT E



# OFFICE OF THE CORPORATION COUNSEL

165 Church Street 4th Floor, New Haven 06510
Tel: 203.946.7958   Facsimile: 203.946.7942
www.cityofnewhaven.com



New Haven
2003

John DeStefano, Jr.
Mayor

John R. Ward
Corporation Counsel

May 28, 2008

Attorney Hubert Santos
Santos & Seeley, P.C.
51 Russ Street
Hartford, CT 06106

**VIA FACSIMILE AND US MAIL**

Re:    <u>Arpad Tolnay v. Wearing 3:02CV1514 (EBB)</u>

Dear Attorney Santos:

In response to your letter dated April 7, 2008 in which you requested the City of New Haven to post bond in the amount of 1.35 million dollars in the above referenced matter, the City of New Haven cannot comply your request. Please feel free to contact me if you have any questions.

Very truly yours,

John Ward

Cc: Attorney Vikki Cooper, Deputy Corporation Counsel
    Attorney Robert Rhodes, Halloran & Sage, LLP

# EXHIBIT F

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2006 WL 1699599 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1699599 (D.Conn.))

**H**Nastasia v. NewFairfieldSchoolDist.
D.Conn.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
Angela **NASTASIA**,-Plaintiff
v.
**NEWFAIRFIELDSCHOOLDISTRICT**,-
Defendant
**No. Civ. 3:04CV925(TPS).**

June 19, 2006.

Jennifer D. Laviano, Ridgefield, CT, Joshua Friedman, Law Office of Joshua Friedman, New York, NY, for Plaintiff.
Christopher J. Picard, Melinda A. Powell, Thomas R. Gerarde, Alexandria L. Voccio, Howd & Ludorf, Hartford, CT, for Defendant.

*RULING ON PLAINTIFF'S MOTION TO COMPEL*

SMITH, Magistrate J.

*1 Plaintiff brings this action against defendant New Fairfield School District alleging that the District violated Title IX of the Education Act of 1972 by failing to properly investigate and remedy plaintiff's complaints of sexual harassment against a Latin teacher ("the Latin teacher") employed at New Fairfield High School. Presently before the court is plaintiff's motion to compel [Dkt. # 49]. For the following reasons the motion is GRANTED in part, and DENIED in part.

Plaintiff's motion requests four separate items of relief which will be discussed in turn.

A. Student Identification Information

Plaintiff deposed New Fairfied's former Title IX Coordinator and Guidance Counselor Thomas Dickau. During that deposition Mr. Dickau indicated that he knew of another student ("Student I") who had complained that the teacher in question made inappropriate remarks. When asked to disclose Student I's identity Mr. Dickau was instructed by defendant's counsel not to answer based on a belief that the information was protected by the Family

Educational Rights and Privacy Act ("FERPA"). The plaintiff has moved to compel New Fairfield to disclose Student I's identification information.

The plaintiff has advanced a number of arguments which, she claims, shows that the identification information requested is not protected by FERPA. The defendant, on the other hand, submits that the information is in fact protected and refuses to disclose the information absent a court order. The court has throughly reviewed plaintiff's arguments, including the supporting citations to case law, the United States Code and the Code of Federal Regulations. After reviewing these and other authorities the court is unconvinced that the identification information is not protected by FERPA. However, the court finds that the issue regarding whether the identification information is protected by FERPA is not essential in order for the plaintiff to receive the benefit of the relief sought because the court is amenable to ordering the information's disclosure.

FERPA permits New Fairfield to disclose a student's educational records to comply with a judicial order. 34 CFR 99.31(9)(i). The court finds that such an order is appropriate here because the information plaintiff seeks is arguably relevant to her claims and is in the exclusive control of the defendant. Therefore, the defendant is ORDERED to disclose the name, address and telephone number of Student I and her parents *within twenty days* of this ruling. To comply with 34 CFR 99.31(9)(ii) the defendant is further ORDERED to inform Student I's parents of this court's order *within five days* hereof.

B.   Information   Regarding   Similar   Student Complaints

The plaintiff asserts that her counsel received the following email from the father of a former New Fairfield High School student:

"We know [the plaintiff Angela Nastasia]. We had a similar situation with my oldest daughter at New Fairfield High School. At that time (1999-2000) my daughter [redacted] was grabbed on both [b]reasts by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 2
Not Reported in F.Supp.2d, 2006 WL 1699599 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1699599 (D.Conn.))

[redacted]. The whole case was glossed over by the Principal ... and the [S]uperintendent.... We heard from other girls who had similar complaints.

**\*2** On October 26, 2005 Judge Squatrito issued the following discovery order which, in relevant part, stated, "Plaintiff's [discovery] requests ... must be narrowed to complaints of 'Inappropriate Conduct' similar to those made by plaintiff *during the time plaintiff attended the high school.*"(Dkt.# 39) (emphasis added).<u>FN1</u> Judge Squatrito's order thus explicitly prevents discovery on the matter discussed in the email because during the 1999-2000 school year the plaintiff did not attend New Fairfield High School. Plaintiff moves that Judge Squatrito's order be modified to permit discovery on the complaints cited in the email.

> FN1. This case was subsequently transferred to the undersigned on consent. (*See* Dkt. # 59).

Judge Squatrito's order carefully balanced the relevance of the school's response to similar complaints with the burden on the school of producing documentary evidence potentially dating back many years and involving actions by administrators who may no longer be employed at New Fairfield. The undersigned finds that the balance is not disturbed by permitting discovery on the complaints cited in the email. The plaintiff has a good faith basis upon which to believe that events similar to those cited in her complaint occurred a year before the she entered New Fairfield High and that the school district potentially did not adequately respond. Thus, the information is clearly relevant to her Title IX claim. Further, the court finds that the burden on the school district to produce these documents is minimal. Therefore, the defendant is ORDERED to produce all documents relating to incidents similar to those described in plaintiff's complaint during the 1999-2000 school year involving either the Principal or the Superintendent involved in the present action *within 20 days hereto.*

C. Board of Education Files

Plaintiff's production requests 13 and 14 asked the defendants to produce any documents concerning the teacher in question or inappropriate conduct which were authored by any School Board member.

Defendant represents to the court that the files have been checked and that no such documents exist. Defendant further represents that the files will be re-checked and if any documents do surface they will be disclosed to the plaintiff. Plaintiff's reply memorandum evidences satisfaction over defendant's response. The court too is satisfied by these representations. Therefore, on this issue the Motion to Compel is DENIED as moot.

D. Proposed Deposition of School District's Attorney

Plaintiff seeks an order compelling the defendant to produce the school district's attorney, Dan Murphy, for a deposition. Plaintiff proposes two lines of questioning: 1) why the school district chose to impose the discipline it did with regard to the Latin teacher; and 2) the role Attorney Murphy played in investigating plaintiff's complaint.

The deposition of an opposing party's attorney is not *per se* prohibited. *In re Subpoena Issued to Dennis Friedman,* 350 F.3d 65, 71-72 (2d Cir.2003)(*"Dennis Friedman"* ). Instead,

**\*3** the judicial officer supervising discovery [may take] into consideration all of the relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship. Such considerations may include the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted.

*Id.* at 72.In light of the above factors the court finds that the deposition of Attorney Murphy is not appropriate.

The plaintiff is correct when she states that she must establish the district's state of mind in order to prove deliberate indifference and thus impose Title IX liability on the school. Where her argument falters, however, is in equating Attorney Murphy with the New Fairfield School District. Attorney Murphy is not the school district, he simply counsels the school and suggests appropriate action. The person who best embodies the "state of mind" of the school district is the ultimate decision maker, New Fairfield's Superintendent Dr. Matusiak. It is Dr. Matusiak, not

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2006 WL 1699599 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1699599 (D.Conn.))**

Attorney Murphy, who makes the ultimate determination as to how the school's employees will be disciplined. The plaintiff has already deposed Dr. Matusiak. Thus, regarding Attorney Murphy's role in determining the level of discipline imposed on the Latin teacher, his deposition is unnecessary as it would lead to less relevant information than that already adduced at Dr. Matusiak's deposition. Additionally, defendant's counsel has represented to the court that Attorney Murphy took no part in the investigation of plaintiff's complaint. The court accepts this representation.

The court further finds that the line of questioning proposed would likely lead to attorney-client privilege and work-product issues. Any advice Attorney Murphy gave the School would be directly related to information provided to him, in confidence, by his client and would thus be privileged. If Attorney Murphy transmitted his impressions and strategies to paper, those documents would likely be protected by the work-product rule. Therefore, in light of the *Dennis Friedman* factors, plaintiff's motion to compel the deposition of Attorney Dan Murphy is DENIED.

This case is before the undersigned pursuant to 28 U.S.C. § 636(c) and D. Conn. Magis. R. 73(A)(1). This is a discovery ruling and order.

IT IS SO ORDERED.

D.Conn.,2006.
Nastasia v. New Fairfield School Dist.
Not Reported in F.Supp.2d, 2006 WL 1699599 (D.Conn.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2007 WL 1732585 (D.Conn.)
**(Cite as: 2007 WL 1732585 (D.Conn.))**

Page 1

**H**
Azevedo v. Club Getaway, Inc.
D.Conn.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
Destini AZEVEDO, Plaintiff,
v.
CLUB GETAWAY, INC., Getaway Adventures,
Ltd., Camp Leonard-Leonore, Inc., The Leonard
Corporation, and Paul Thorn "aka" Peanut, Defend-
ants.
**No. 3:06CV01222(CFD).**

June 11, 2007.

Joel Thomas Faxon, Stratton Faxon, New Haven,
CT, for Plaintiff.
James P. Brennan, Brennan & Isaac, Waterbury,
CT, for Defendants.

***RULING ON NON-PARTY MOTIONS TO QUASH***

THOMAS P. SMITH, United States Magistrate
Judge.

**I. SUMMARY OF FACTS**

*1 This case is a personal injury action brought
pursuant to diversity jurisdiction. The plaintiff al-
leges that she was injured while riding on a motor-
ized watercraft on the premises owned by defendant
Club Getaway, Inc. ("Club Getaway") in Kent,
Connecticut. There are no allegations regarding in-
surance coverage in the complaint. However, ac-
cording to the defendants, Club Getaway had previ-
ously retained an insurance agency, non-party Cap-
itol Risk Management Services, Inc. ("Capitol
Risk"), to represent Club Getaway concerning its
insurance needs, and Capitol Risk arranged the pur-
chase of an insurance policy issued by non-party
Steadfast Insurance Company ("Steadfast"). (D.
Mem. Opp. at 2). Steadfast has refused to provide a
defense to, and indemnify, Club Getaway, relying
on a watercraft exclusion contained in the insurance

policy. *Id.* According to previous submissions to
the court,

[t]he defendants intend to bring a bad faith claim
against the insurer and negligence actions against
their insurance agents for failing to procure the
proper coverage ... Plaintiff and defendants are con-
sidering entering into a stipulated judgment in
which defendants assign their causes of action
against the insurer and/or the insurance agents to
the plaintiff.

[Dkt. # 17 at 1-2]. Accordingly, Club Getaway has
subpoenaed Capitol Risk and Steadfast "seeking in-
formation concerning the basis and validity of
Steadfast's refusal to defend and indemnify it and
whether Capitol Risk properly represented Club
Getaway's interest in procuring the insurance
policy."(D. Mem. Opp. at 2). Capitol Risk and
Steadfast, respectively, have moved for protective
orders to quash the subpoenas duces tecum and de-
position notices served on them by the defendants
[Dkt.11, 13].

**II. STANDARD OF REVIEW**

"Parties may obtain discovery regarding any matter,
not privileged, that is relevant to the claim or de-
fense of any party ... Relevant information need not
be admissible at the trial if the discovery appears
reasonably calculated to lead to the discovery of ad-
missible evidence."Fed.R.Civ.P. 26(b)(1). The
party resisting discovery bears the burden of show-
ing why discovery should be denied. *Blakenship v.
Hearst Corp.,* 519 F.2d 418, 429 (9th Cir.1975).

A court is given broad discretion regarding whether
to issue a protective order under Rule 26(c).*Dove v.
Atl. Capital Corp.,* 963 F.2d 15, 19 (2d
Cir.1992)(grant and nature of protection is singu-
larly within the district court's discretion); *Cruden
v. Bank of New York,* 957 F.2d 961, 972 (2d
Cir.1992)(order regarding sequence of discovery at
discretion of trial judge). However, a court may is-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 2
Slip Copy, 2007 WL 1732585 (D.Conn.)
**(Cite as: 2007 WL 1732585 (D.Conn.))**

sue a protective order only after the moving party demonstrates that good cause exists for the protection of the material. *In re Agent Orange Prod. Liab. Litig.,* 821 F.2d 139, 145 (2d Cir.1987).

### III. DISCUSSION

Pursuant to Fed.R.Civ.P. 45(c)(3)(a)(iv), "[o]n timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it ... subjects a person to undue burden."Similarly, a protective order may issue under Fed.R.Civ.P. 26(c) to protect a person from, *inter alia,* undue burden or expense. Under the circumstances herein, the court finds that Capitol Risk and Steadfast have each met their burden of demonstrating that compliance with the subpoenas and deposition notices would constitute an "undue burden."

*2 The subpoenas at issue seek information and documents which are not relevant to the pending case. The pending case is a traditional personal injury action that does not involve any issues pertaining to insurance. Thus, whether non-party Capitol Risk properly represented Club Getaway's interest in procuring an insurance policy from Steadfast, and whether Steadfast has wrongly denied coverage and refused to provide a defense, are not probative of the claims and defenses at issue in the pending personal injury action. "Rule 45 does not permit a party to use a subpoena to obtain information from non-parties that is unrelated to the action in which the rule 45 subpoena is issued."*Collins v. Experian Credit Reporting Svc .,* 2006 WL 2850411, at *1, No. 3:04CV1905 (MRK) (D. Conn. Oct. 3 2006).

The defendants are free to bring a separate action, or assign their causes of action to the plaintiff, if they wish to pursue claims against Capitol Risk and/or Steadfast.

### IV. CONCLUSION

For the foregoing reasons, the motions by non-parties Capitol Risk and Steadfast for protective or-

ders quashing the subpoenas and deposition notices served by the defendants [Dkt.11, 13] are **GRANTED.**28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 6(a), (e) and 72(a); and Rule 2 of the Local Rules for U.S. Magistrate Judges.

### IT IS SO ORDERED.

D.Conn.,2007.
Azevedo v. Club Getaway, Inc.
Slip Copy, 2007 WL 1732585 (D.Conn.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 2850414 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2850414 (D.Conn.))**

**H**
Stavola v. Northeast Utilities
D.Conn.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
Jean A. STAVOLA, Plaintiff,
v.
NORTHEAST UTILITIES, et al., Defendants.
**No. 3:05cv998 (JBA).**

Oct. 4, 2006.

Ian O. Smith, Thomas G. Moukawsher, Moukawsher & Walsh, Hartford, for Plaintiff.
Janet Marie Helmke, Northeast Utilities, Hartford, CT, Angela Louise Rubano, Northeast Utilities, Berlin, CT, for Defendants.

### RULING ON PLAINTIFF'S MOTION FOR ATTORNEYS FEES [DOC. # 62]

JANET BOND ARTERTON, District Judge.
*1 Following colloquy with counsel on the record on May 26, 2006, the Court denied defendants' motion to compel the deposition of plaintiff's counsel, Attorney Moukawsher, and granted plaintiff's corresponding motion for a protective order, quashing the subpoena for Moukawsher's attendance at the deposition. *See* Endorsement Order [Doc. # 61]. The Court instructed the parties to proceed with briefing plaintiff's request for fees in connection with opposing defendants' motion and moving for a protective order, and defendants' claim of substantial justification for their motion. *See id.*Such briefing now having been completed, for the reasons that follow, plaintiff's motion will be granted.

Fed.R.Civ.P. 37(a)(4)(B) provides that if a motion to compel discovery is denied, "the court may enter any protective order authorized under Rule 26(c) and shall, after affording an opportunity to be heard, require the moving party or the attorney filing the motion or both of them to pay to the party or deponent who opposed the motion the reasonable

expenses incurred in opposing the motion, including attorney's fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust.""Thus the rule is mandatory unless one of the conditions for not making an award is found to exist" and "the burden of persuasion [is] on the losing party to avoid assessment of expenses and fees."Wright & Miller, 8A*Fed. Practice & Procedure* Civ.2d § 2288; *accord Moore's Fed. Practice-Civil* § 37.23[1] ("[A] rebuttable presumption exists in favor of imposing expense shifting sanctions on the party against whom a motion to compel disclosures or discovery is resolved .").

The target of defendants' motion to compel was their subpoena for deposition of Attorney Moukawsher to discover information potentially relevant to their statute of limitations affirmative defense, *i.e.,* when plaintiff first had actual knowledge of her ERISA claim. The Court denied the motion to compel and quashed the subpoena on the basis of Attorney Moukawsher's representations (shared with defendants prior to the Court's ruling on the motion to compel) that he recalled no conversations with plaintiff in 1996 and that none of the staff that then worked at his firm still work there, and that thus any deposition would be pointless, and that any communication Attorney Moukawsher might have had with plaintiff as a prospective client in 1996 would be protected by the attorney-client privilege. Plaintiff now argues that defendants' motion to compel was without substantial justification because defendants were informed prior to filing their motion of Attorney Moukawsher's absence of recollection and offer of an affidavit to this effect, and because his deposition was also futile in that it sought attorney-client privileged information. Defendants contend that, notwithstanding the Court's denial of their motion to compel, there was other potentially relevant non-privileged information that could have been discovered in a deposition of plaintiff's counsel and that therefore

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2850414 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2850414 (D.Conn.))

the motion was not without substantial justification.FN1

> FN1. Defendants also contend that plaintiff's motion for fees should be denied as untimely because it was due on June 9, 2006 but was not filed until June 13, 2006. However, subsequent to defendants filing their opposition, the Court granted *nunc pro tunc* plaintiff's motion for extension of time to June 13, 2006 (*see* [Doc. # 67] ), and thus defendants' objection on this basis is moot.

*2 Depositions of opposing counsel are typically held in a "negative light," "[b]ecause deposition of a party's attorney is usually both burdensome and disruptive [and thus] the mere request to depose a party's attorney constitutes good cause for obtaining a Rule 26(c), Fed.R.Civ.P., protective order.... Deposition of the attorney usually merely embroils the parties and the court in controversies over the attorney-client privilege and more important, involves forays into the area most protected by the work product doctrine-that involving an attorney's mental impressions or opinions."*N.Y. v. Solvent Chem. Co.,* 214 F.R.D. 106, 111 (W.D .N.Y.2003) (internal quotation omitted). Although acknowledging that "[t]he attorney-client privilege recognized at common law is not ... a general and total bar to discovery of any and all transactions and contacts that involve an attorney and a client,"*see Conn. Nat'l Bank v. Rytman,* 2001 WL 1667884, at *3 (Conn.Super.Ct. Dec. 10, 2001), the Court nevertheless rejected defendants' arguments in support of their motion to compel, finding that any recollection Attorney Moukawsher did have of conversations with plaintiff in 1996 relevant to when she acquired actual knowledge would likely be privileged as "communications made in confidence for the purpose of seeking or giving legal advice,"*id* .(citing *Olson v. Accessory Controls & Equip. Corp.,* 254 Conn. 145, 158 (2000)). Moreover, the Court observed that defendants admittedly had prefiling notice of Attorney Moukawsher's lack of re-

collection of any such conversations.

As noted above, defendants claim that there was other potentially relevant non-privileged information that Attorney Moukawsher could have testified to at his deposition, specifically, the identification of people working in his law firm during the 1996 time period who may have had contact with or provided information to plaintiff. Defendants represent that this information was only disclosed to them by Attorney Moukawsher after they filed their motion to compel. It was, however, disclosed before the Court ruled on the motion to compel and correlative motion for a protective order, and thus defendants had an opportunity to withdraw their motion upon receipt of this information, but did not. Further, this information was not the focus of defendants' motion to compel; rather, the focus was conversations Attorney Moukawsher had with plaintiff, of which defendants already knew Attorney Moukawsher had no recollection and which would, in any event, likely be privileged. Defendants' ex-post facto expansion of what their deposition sought as grounds justifying their motion to compel is unpersuasive to rebut the presumption that the losing party pays unless it establishes "substantial justification." Accordingly, plaintiff will be awarded reasonable fees associated with opposing the motion and filing her own motion for a protective order.

Plaintiff seeks fees in the amount of $1,738, consisting of 4.4 hours of Attorney Moukawsher's time, billed at a rate of $395.00 per hour. Defendants do not dispute the reasonableness of Attorney Moukawsher's hourly rate, but claim that they should not be required to reimburse plaintiff for 2 hours of time billed for preparing the instant motion for attorneys fees, to recover for only 2.4 additional hours of billed time. Notwithstanding defendants' objection, however, the Court finds the time spent by Attorney Moukawsher on the motion for a protective order and reply brief, the opposition brief to defendants' motion to compel, and the preparation of this motion for fees to be reasonable.FN2 Fur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2006 WL 2850414 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2850414 (D.Conn.))**

ther, the Court finds Attorney Moukawsher's hourly rate of $395 to be reasonable in light of his substantial experience in the field of ERISA litigation and the prevailing rates in this district. Indeed, it is identical to the rate awarded by this Court in another ERISA case. *See Dobson v. Hartford Fin. Servs. Group, Inc.,* 99cv2256 (JBA), 2002 WL 31094894, at *3 (D. Conn. Aug 02, 2002). Thus, applying the lodestar test, the Court finds that a fee award of $1,738 is reasonable and appropriate in this case.FN3

> FN2. Cf. *Valley Disposal, Inc. v. Central Vt. Solid Waste Mgmt. Dist.,* 71 F.3d 1053, 1059 (2d Cir.1995) (costs of preparing § 1988 motion evaluated and compensated in same fashion as costs of litigating the underlying case).

> FN3. The traditional lodestar method for determining reasonable attorney's fees calculates a figure "based upon the number of hours reasonably expended by counsel on the litigation multiplied by a reasonable hourly rate."*Luciano v. Olsten Corp.,* 109 F.3d 111, 115 (2d Cir.1997) (citing *Blanchard v. Bergeron,* 489 U.S. 87, 94 (1989))."The 'lodestar' figure should be in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."*Id.* (citation and internal quotation marks omitted). The "prevailing community" used to determine the lodestar figure is typically, with few exceptions, "the district in which the court sits," in this case, the District of Connecticut. *See id.*(citation and internal quotation marks omitted)."[T]here is ... a strong presumption that the lodestar figure represents a reasonable fee."*A.R. ex rel. R.V. v. N.Y. City Dep't of Educ.,* 407 F.3d 65, 79 (2d Cir.2005) (citations and internal quotation marks omitted).

**\*3** Accordingly, plaintiff's Motion for Attorneys

Fees [Doc. # 61] is GRANTED and plaintiff is awarded $1,738 in attorneys fees.

IT IS SO ORDERED.

D.Conn.,2006.
Stavola v. Northeast Utilities
Not Reported in F.Supp.2d, 2006 WL 2850414 (D.Conn.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                      Page 1
Slip Copy, 2007 WL 1074894 (N.D.N.Y.)
**(Cite as: 2007 WL 1074894 (N.D.N.Y.))**

C

**Gragg** v. **InternationalManagement** Group
N.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. New York.
Viet **GRAGG**, Plaintiff,
v.
**INTERNATIONALMANAGEMENT** GROUP
(UK), Inc., et al., Defendants.
**Civ. Action No. 5:03-CV-0904 (NPM/DEP).**

April 5, 2007.

Office of Robert C. Kilmer, Robert C. Kilmer, Esq.,
of counsel, Binghamton, NY, for Plaintiff.
Menter, Rudin Law Firm, Mitchell J. Katz, Esq.,
Frances A. Grimaldi, Esq., of Counsel, Syracuse,
NY, Ulmer, Berne Law Firm, Richik Sarkar, Esq.,
Joseph A. Castrodale, Esq., of Counsel, Cleveland,
OH, for Defendants.

*DECISION AND ORDER*

DAVID E. PEEBLES, U.S. Magistrate Judge.
*1 Plaintiff Viet Gragg commenced this action in
2003, asserting various claims growing out of a
failed, prospective business relationship between
Gragg and defendant International Management
Group (UK), Inc., ("IMG") and certain of its affili-
ates, described collectively as "the world's largest
licensing agency." At the heart of plaintiff's com-
plaint is his claim that he was lulled into the belief
that he and IMG were collaboratively to plan and
operate two joint business ventures, but that IMG
ultimately broke off the relationship and independ-
ently embarked upon the contemplated projects,
misappropriating and exploiting his ideas and pro-
prietary work product. Plaintiff's complaint, as
amended, asserts an array of federal and state law
claims including, *inter alia,* under the Racketeer In-
fluenced and Corrupt Organizations Act ("RICO"),
18 U.S.C. § 1961, and for breach of contract.

Currently pending before me for resolution are sev-

eral issues, some of which result from a remand of
the matter from the assigned district judge to me for
reconsideration of certain discovery-related rulings
previously made. The disputes before me have been
fully briefed, and were the subject of oral argument
conducted on March 14, 2007, at the close of which
decision was reserved with regard to certain issues,
while a bench decision was rendered to address oth-
ers. This decision both embraces the matters on
which decision was reserved, and memorializes the
court's oral determinations, which are incorporated
herein by reference.

*I. BACKGROUND*[FN1]

> FN1. In light of the posture of this case,
> which despite its age is still procedurally
> in its formative stage, the following facts,
> which serve as a backdrop for the court's
> rulings, are drawn principally from
> plaintiff's second amended complaint, the
> material contents of which in large part are
> vigorously contested by the defendants.

For more than twenty years, plaintiff has worked as
an independent producer, performer and promoter
of entertainers and entertainment companies, hav-
ing rendered services to clients within the Northern
District of New York, as well as both nationally
and internationally. Second Amended Complaint
(Dkt. No. 129) ¶ 13. Responding to a solicitation
from IMG, a licensing agency whose clients include
athletes, performing artists, writers, fashion models,
broadcasters, lending institutions, sponsors of
world class events, cultural institutions, and recre-
ational resorts, inviting submissions from prospect-
ive clients for business partnership collaborations
and new relationships with the company, Gragg ini-
tiated e-mail contact on April 19, 2001, expressing
an interest in pursuing a joint business venture with
IMG. *Id.* ¶¶ 14, 16.In response to his e-mail in-
quiry, plaintiff was directed to J. Stephen Wright,
who was identified as the managing director of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1074894 (N.D.N.Y.)
**(Cite as: 2007 WL 1074894 (N.D.N.Y.))**

IMG Artists, LLC. *Id.* ¶ 17.On June 13, 2001, plaintiff submitted an introductory letter to Wright, describing a business which Gragg had developed several years earlier in Binghamton, New York, involving the use of lyrics from famous songs in greeting cards, limited edition prints, apparel, jewelry and other merchandise.FN2*Id.* ¶¶ 17-18.

> FN2. Gragg's business venture was marketed by him under the monicker "Lyricatures." Second Amended Complaint (Dkt. No. 129) ¶ 14.

As a result of discussions occurring over the next several months, the parties' relationship ripened to a point where on October 5, 2001, they entered into an agreement appointing plaintiff to act as a consultant to IMG Artists. Second Amended Complaint (Dkt. No. 129) ¶¶ 20-28. Under that agreement, Gragg worked toward development of the Lyracatures project, renamed at his initiative to "Words of Art." *Id.* ¶ 29.

*2 In December of 2001, IMG and Gragg agreed to amend the consultancy pact to allow for the creation of a joint venture business plan, based upon an idea already formulated by Gragg. Second Amended Complaint (Dkt. No. 129) ¶ 30. Pursuant to that amended agreement, Gragg continued to work toward development of the Words of Art project. *Id.* ¶¶ 35-36.A business plan developed for the project was ultimately presented by Gragg in or about January of 2002 to IMG representatives, including Wright, calling for the creation of a joint venture between Gragg and IMG, to be known as "IMG Artchives." *Id.* ¶ 38.It was contemplated that under that banner, the parties would represent artists and cultural institutions seeking to license, brand and merchandise archives stored in various medium formats for both new and existing IMG clients. *Id.* ¶¶ 38-39.

Based upon representations by IMG's Wright, to the effect that the company was planning to move forward with the contemplated joint venture, Gragg was asked to prepare a "deal" memorandum, which

was completed and presented to Wright on January 25, 2002. Second Amended Complaint (Dkt. No. 129) ¶¶ 40-41. On February 1, 2001, IMG sent Gragg an e-mail memorializing the joint venture terms upon which the parties had previously agreed. *Id.* ¶ 45.Following receipt of that agreement, which was to have become immediately effective, Gragg began operating under its terms. *Id.* ¶ 46.

During the weekend of March 23-24, 2002, plaintiff contacted Wright by telephone to discuss the project and a request by Wright for changes to the parties' February 1, 2002 joint venture agreement. Second Amended Complaint (Dkt. No. 129) ¶ 53. Wright thereafter wrote internally on March 25, 2002 to IMG employees Claire Culver, Rebecca Boyle and Claire Dacam, advising them of the terms of the proposal discussed by him with Gragg, and stating he was prepared to act "immediately" on the agreement. *Id.* ¶ 54.On March 25, 2002, Culver responded by sending a revised business plan to Wright, who in turn forwarded an e-mail to Gragg on March 28, 2002 confirming the parties' revised understanding. *Id.* ¶¶ 58-59.

Plaintiff maintains that IMG later improperly repudiated the parties' agreement, claimed as its own the project known as "IMG Artchives", and together with co-defendant Brand DNA, a foreign corporation headquartered in Paris, France, continued to work toward the development of the Words of Art and Artchives projects, without Gragg's participation. Second Amended Complaint (Dkt. No. 129) ¶¶ 66-85.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on July 18, 2003, at the time asserting diversity of citizenship as the basis for this court's subject matter jurisdiction. Dkt. No. 1. In his original complaint, which named only International Management Group (UK), Inc. as a defendant, plaintiff asserted various state law claims, including breach of contract, promissory es-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 3
Slip Copy, 2007 WL 1074894 (N.D.N.Y.)
(Cite as: 2007 WL 1074894 (N.D.N.Y.))

toppel, quantum meruit, breach of fiduciary duty, fraud, and unfair competition. *See id.*

*3 In response to plaintiff's complaint, defendant moved seeking its dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for dismissal of certain of plaintiff's claims based upon the common law doctrine of *forum non conveniens. See* Dkt. Nos. 16-18.In a memorandum-decision and order issued on February 4, 2004, Senior District Judge Neal P. McCurn granted defendant's motion, in part, dismissing all but four counts of plaintiff's complaint-three alleging breach of contract, and the fourth asserting a claim of unfair competition-and additionally denying defendant's motion to dismiss based upon *forum non conveniens.*Dkt. No. 26.

During the course of my oversight in the case, which has been vigorously litigated and as a result has had a tortured procedural history, I have been presented with several discovery issues, one of which concerned the mistaken disclosure by defendants' counsel of certain privileged e-mails contained on a CD-ROM produced to plaintiff's counsel during the course of discovery. Dkt. Nos. 54-57.Following briefing and oral argument, I found that the disclosure of those materials was inadvertent and, after examining the circumstances surrounding that error, concluded that it did not provide a basis for finding a waiver of the attorney-client privilege with regard to the disputed documents.[FN3]

> FN3. My determination regarding inadvertent disclosure was discussed on the record during a hearing conducted on November 3, 2004, and subsequently memorialized in a written order issued on December 1, 2004 incorporating that oral decision by reference. *See* Dkt. Nos. 61, 63.

Another separate but somewhat related issue previously raised before me concerned plaintiff's request to take the deposition of Lisa Levine, Esq., an attorney representing the defendants in this case in a lit-

igation capacity. Applying the test laid out in relevant case law, including principally *Shelton v. American Motors Corp.,* 805 F.2d 1323 (8th Cir.1986), I declined to permit the deposition of Attorney Levine to be taken, finding that such a measure would be ill-advised in light of her capacity as an attorney performing in a litigation role.

Appeal by the plaintiff of my discovery orders resulted in Judge McCurn's issuance of a memorandum-decision and order, dated April 27, 2006, reversing my determination regarding inadvertent waiver, and remanding the matter to me for further consideration. Dkt. No. 249.In that order, Judge McCurn also directed reconsideration of my determination concerning plaintiff's request for permission to depose Attorney Lisa Levine, based upon the potential inter-relationship between that issue and the attorney-client privilege waiver question. *Id.*

On June 6, 2005, plaintiff filed a second amended complaint in the action, naming additional defendants and asserting a variety of claims, including those brought under RICO. Dkt. No. 129.The filing of that amended complaint was met with another dismissal motion, interposed by most of the IMG defendants on July 21, 2005.[FN4]Dkt. No. 148.While defendants' second dismissal motion, which has not yet been argued, is fully briefed, plaintiff now requests the opportunity to make additional submissions with respect to that motion. The defendants, while opposing that request, have also sought leave to submit further materials in the event plaintiff's request is granted.

> FN4. A separate dismissal motion was filed a day earlier by defendant IMG Artists LLC, which at the time was separately represented. Dkt. No. 146.That motion was later withdrawn, *see*Dkt. No. 160, and all of the defendants are now represented by common counsel.
>
> In another motion, also filed on July 21, 2005, defendants sought dismissal of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 4
Slip Copy, 2007 WL 1074894 (N.D.N.Y.)
(Cite as: 2007 WL 1074894 (N.D.N.Y.))

plaintiff's complaint, once again on the basis of *forum non conviens.* Dkt. No. 149. That motion, however, was rejected by the court, with leave to refile depending upon the outcome of the pending dismissal motion.

## III. *DISCUSSION*

### A. *Supplementation of the Record*

**\*4** Having succeeded in an earlier effort to submit materials neither contained within nor expressly referred to in his complaint for consideration by Judge McCurn on the pending dismissal motion, *see* Dkt. No. 205, plaintiff now seeks leave to further augment the record with additional materials in connection with that motion, *see* Dkt. No. 244. That request, which defendants oppose, *see* Dkt. No. 245, has been referred by Senior District Judge McCurn to me for consideration. *See* Dkt. No. 254.

Plaintiff's request for permission to furnish the court with extrinsic materials, including principally deposition transcripts, exposes his fundamental misunderstanding as to the nature of the pending dismissal motion. Defendants' dismissal motion calls upon the court to gauge the facial sufficiency of plaintiff's second amended complaint, applying a standard which is neither controversial nor rigorous in its requirements. Under the prevailing test, a court may not dismiss a complaint unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief.' " *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957)). In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.).

The court's determination as to the sufficiency of a complaint must take into consideration the fact that the governing rules require only that the defendant be afforded "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. at 103; *see Phillips v. Girdich,* 408 F.3d 124, 127-29 (2d Cir.2005).

In support of his request that he be permitted to supply the court with additional evidence for purposes of the pending dismissal motion, plaintiff stresses its relevance to the claims set forth in his complaint. These proffered materials, however, are composed of purely extrinsic materials not attached as exhibits to or otherwise incorporated by reference within plaintiff's complaint, including deposition testimony. Absent conversion of the motion to one for summary judgment, such materials have no place for consideration in a motion to dismiss under Rule 12(b)(6); when materials of a nature now urged by the plaintiff are offered in opposition to a motion to dismiss for failure to state a cognizable claim upon which relief may be granted, they are properly rejected and not considered by the court in ruling on the motion.[FN5] *See Friedl v. City of New York,* 210 F.3d 79, 83-84 (2d Cir.2000); *see also Zeising v. Kelly,* 152 F.Supp.2d 335, 341-42 (S.D.N.Y.2001).

> FN5. A distinctly different situation is presented in cases involving motions challenging jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure. In such instances, the courts have recognized a limited exception to this rule and have countenanced the submission of extrinsic materials when supporting or opposing such motions. *See Visual Sciences, Inc. v. Integrated Communications, Inc.,* 660 F.2d 56, 58-59 (2d Cir.1981); *see also Pilates, Inc. v. Pilates Inst., Inc.,* 891 F.Supp. 175, 178 n. 2 ("Because '[a] Rule 12(b)(2) motion is inherently a matter requiring the resolution of factual issues outside of the pleadings ... all pertinent documentation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 5
Slip Copy, 2007 WL 1074894 (N.D.N.Y.)
**(Cite as: 2007 WL 1074894 (N.D.N.Y.))**

submitted by the parties may be considered in deciding the motion.'") (quoting *John Hancock Prop. & Cas. Ins. Co. v. Universale Reins. Co., Ltd.,* No. 91 CIV. 3644, 1992 WL 26765, at *6 (S.D.N.Y. Feb. 5, 1992)); *American Centennial Ins. Co. v. Seguros La Republica, S.A.,* No. 90 Civ. 2370, 1991 WL 60378, at *3 (S.D.N.Y. Apr. 8, 1991) ("It is well-settled that in considering jurisdictional motions, the Court may consider evidence outside the pleadings in reaching its decision....").

**\*5** Since the materials which plaintiff now proposes to file, however relevant they may be to his claims or any potential defenses, are not properly considered on a dismissal motion, his application for permission to supplement the record will be denied.FN6

> FN6. During the recent March 14, 2007 hearing the court established a supplemental briefing schedule for the submission of additional *legal* argument regarding the pending dismissal motion. That schedule has since been amended, on stipulation of the parties. *See* Dkt. No. 269.

## B. *Inadvertent Disclosure*

Before addressing the merits of the inadvertent disclosure issue and ruling on the plaintiff's claim of attorney-client privilege waiver, I must first determine the appropriate law to be applied. When the issue was first before me, at a time when subject matter jurisdiction in the case was predicated upon diversity of citizenship, IMG argued that English law should apply, discerning it to be more favorable than the corresponding New York law principles advocated by the plaintiff. *See* Defendant's Letter Brief Dated September 15, 2004 (Dkt. No. 54) at p. 3. Now, given an intervening, favorable change in that state's position regarding the issue, defendants urge application of Ohio law, which was not even mentioned as a possible alternative in their earlier submissions, based upon the status of defendant In-

ternational Management Group (UK), Inc. as a corporation formed and operating under Ohio law.FN7

> FN7. In 2006, the Ohio Supreme Court limited the circumstances under which waiver of the attorney-client privilege could be found to those outlined under Ohio Revised Code § 2317.02(A), expressly rejecting judicially created exceptions. *See Jackson v. Greger,* 110 Ohio St.3d 488, at ¶ 1 (2006) (citing *State v. McDermott,* 72 Ohio St.3d 570, 574 (1995) (declining "to add a judicially created waiver to the statutorily created privileged)). Presumably, the holding in *Jackson* also includes the rejection of a judicially created rule of waiver resulting from the inadvertent disclosure of privileged materials. To date, there do not appear to be any reported decisions from that state's courts applying that ruling to the issue of inadvertent disclosure, nor does it appear certain that the view now espoused by the defendants would be shared by the courts there. In a pre-*Jackson* decision, an Ohio appellate court observed that the effect of inadvertent disclosure of privileged documents on the attorney-client privilege was "essentially a matter of first impression in the state of Ohio", adopting a "middle ground", case-by-case approach in which a court should weigh (1) the reasonableness of the precautions taken by the party asserting the privilege; (2) the time taken to rectify the inadvertent error; (3) the scope and nature of the discovery proceedings; (4) the extent of the disclosure in relation to the discovery proceedings; and (5) the overarching question of fairness. *See Miles-McClellan Constr. Co. v. Board of Educ. Westerville,* Nos. 05AP-1112, 1113, 1114 and 1115, 2006 WL 1817223 (Ohio Ct.App. June 30, 2006); *see also Evenflo Co., Inc. v. Hantec Agents Ltd.,* No. 05-CV-346, 2006 WL 2945440, at *5

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1074894 (N.D.N.Y.)
**(Cite as: 2007 WL 1074894 (N.D.N.Y.))**

(S.D.Ohio Oct. 13, 2006) (stating, in a decision issued two days after *Jackson,* that district courts within the Sixth Circuit, as well as Ohio state courts, adopt the "middle ground" approach to cases of inadvertent disclosure of privileged materials during discovery) (citing *Miles-Mc- Clellan).*

Rule 501 of the Federal Rules of Evidence provides that federal common law governs questions of privilege in cases involving federal question jurisdiction, while state law governs in other instances. *See*Fed.R.Evid. 501; *see also Bayne v. Provost,* 359 F.Supp.2d 234, 239 (N.D.N.Y.2005); *Grinnell Corp. v. ITT Corp.,* 222 F.R.D. 74, 76 (S.D.N.Y.2003). Accordingly, were the case postured as it was at the outset, with diversity providing the basis for subject matter jurisdiction, the court would be required to engage in the choice of law analysis in order to determine which jurisdiction should provide the rule of law to be applied in deciding the issue.[FN8]In this instance, however, since the centerpiece of plaintiff's amended complaint is a series of federal claims under RICO, I will look to federal law to inform my analysis of whether waiver has occurred through inadvertent disclosure.[FN9]*See Woodward Governor v. Curtiss-Wright Flight Sys.,* 164 F.3d 123, 126 (2d Cir.1999); *see also von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 141 (2d Cir.1987) (applying federal law of privilege in dispute involving RICO claim as well as state law claims based on pendent and diversity jurisdiction); *Rouson v. Eicoff,* No. 04-CV-2734, 2006 WL 2927161, at *4 (E.D.N.Y. Oct. 11, 2006).

> FN8. As a federal court whose subject matter jurisdiction is premised upon diversity of citizenship, under that circumstance the court would be required to apply the choice of law rules of New York, the forum state.*Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496-97, 61 S.Ct. 1020, 1021-22 (1941); *GlobalNet Financial.com,*

*Inc. v. Frank Crystal & Co., Inc.,* 449 F.3d 377, 382 (2d Cir.2006). Under New York law, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdiction involved."*In re Allstate Ins. Co. (Stolarz),* 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905 (1993). A conflict of law exists "[w]here the applicable law from each jurisdiction provides different substantive rules[.]"*Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998). Upon a finding that the competing laws of the relevant jurisdiction were truly in conflict, the court would then be required to resolve the conflict by engaging in an interest analysis, examining which jurisdiction has the greater concern over the specific issues presented. *Global-Net Financial.com, Inc.,* 449 F.3d at 384;*Schultz v. Boy Scouts of Am., Inc.,* 65 N.Y.2d 189, 197, 481 N.Y.S.2d 90, 95 (1985).

> FN9. As Judge McCurn noted in his decision, New York and federal law do not materially differ with respect to principles governing inadvertent disclosure. Dkt. No. 249 at p. 13;*see also Atronic Int'l, GMBH v. SAI Semispecialists of Am., Inc.,* 232 F.R.D. 160 (E .D.N.Y.2005) (in this diversity action, magistrate judge applied the federal standard, whereas the district judge applied New York law, both arriving at the same result).

Under federal law, whether waiver of an attorney-client privilege will be found, based upon inadvertent disclosure of a privileged document, depends upon examination of four factors, including 1) the reasonableness of any precautions taken to prevent inadvertent disclosure of privileged documents; 2) the relative volume of the privileged documents in relation to the full extent of the discovery at issue; 3) the length of time taken by the producing party to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

raise and rectify the issue; and 4) overarching considerations of fairness.*Atronic Int'l,* 232 F.R.D. at 163-64 (citing *United States v. Rigas,* 281 F.Supp.2d 733, 738 (S.D.N.Y.2003)); *see also Trudeau v. New York State Consumer Prot. Bd.,* 237 F.R.D. 325, 339 (N.D.N.Y.2006) (Treece, M.J.); *In re Natural Gas Commodity Litig.,* 229 F.R.D. 82, 86 (S.D.N.Y.2005). Addressing the first factor, in this instance I find that the measures taken by the defendants to avoid the potential for disclosure of privileged materials were woefully deficient. Based upon versions of the relevant chain of events which are largely non-conflicting, it appears that defendants' outside litigation counsel asked Claire Dacam, Esq., an in-house attorney at IMG, to prepare and produce to him all documents relative to the proposed project with Viet Gragg. That task, in turn, was delegated by Attorney Dacam to Emma Rigney, a non-attorney assistant to Stephen Wright. Ms. Rigney then prepared and compiled in electronic format a disk containing those materials and forwarded them directly to defendants' outside counsel who in turn, without first reviewing the documents, sent the disk to plaintiff's attorney.

*6 Defendants argue that it was reasonable for their outside counsel to rely upon in-house Attorney Dacam to make the requisite privilege review, and to assume that it had been accomplished before the disk was forwarded by Ms. Rigney to counsel. While defendants' litigation counsel indeed may have made that assumption, there admittedly was no discussion between that attorney and Ms. Dacam, Ms. Rigney, or anyone else at IMG that could reasonably have led him to conclude that such an analysis had been made. Given the significance of the attorney-client privilege and the potential consequences associated with a waiver of that privilege, this nonchalance leads me to conclude that reasonable precautions were not taken to prevent the disclosure of privileged materials.

In arguing against a finding of waiver, defendants place heavy reliance upon the Southern District of New York's decision in *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103 (S.D.N.Y.1985). That case, however, is not only readily distinguishable, but the differences between its facts and the circumstances now presented underscore the appropriateness of a finding of waiver in this case. In *Lois Sportswear,* plaintiff's counsel was permitted to review between seven and eight boxes of materials responsive to defendant's document demands. 104 F.R.D. at 104. Following that review, plaintiff requested production of approximately 3,000 pages, representing roughly twenty percent of the documents inspected. *Id.* Included among the requested materials were twenty-two documents claimed by the defendant to be privilege-protected. *Id.* The court noted that the documents provided had been assembled by paralegals under guidance provided by the defendant's deputy general counsel who, upon discerning that some of the documents being produced for inspection were privileged, instructed the paralegals "to segregate documents of that kind from those which would be produced for [plaintiff's counsel's] inspection".*Id.* at 105.Addressing the sufficiency of these measures, the court concluded that "[u]nder these particular facts, the evidence is barely preponderate that the disclosure of the privileged materials was inadvertent and a mistake, rather than a knowing waiver."*Id.* (emphasis supplied).

Turning to the second relevant factor, I note that four privileged documents are at issue, out of a total of only approximately 200 e-mails included within the CD-ROM. This factor weighs heavily in favor of the plaintiff, given that the materials at issue are not particularly voluminous and, consequently, it would appear that the task associated with reviewing the contents of the CD-ROM in order to determine whether it contained any privileged communications would not have been particularly onerous.

The third factor in the *Atronics* test is neutral in this case. To his credit, promptly after reviewing the contents of the CD-ROM in question and determin-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing that it contained some potentially privileged materials, plaintiff's attorney alerted defendants and the court to the potential problem. Consequently, it is unknown when, if at all, defendants would have discovered their mistake and taken measures to rectify it.

**\*7** The last relevant factor requires examination into the overarching consideration of fairness. Defendants have argued that because the disputed materials involve litigation strategy, rather than relating to the underlying transaction, it would be unfair to find waiver despite the inadvertence. While I accept this contention as material to the question, I find that at best the issue of fairness does not militate strongly in favor of either party, and is far overshadowed by the defendant's failure to implement reasonable measures to avoid inadvertent disclosure.

In sum, after weighing the four factors identified as relevant under the federal common law of waiver, and particularly given the casual nature of defendants' efforts to insure against inadvertent disclosure, I find that through their disclosure of such materials defendants have waived the privilege associated with the disputed documents. With this finding, a question remains as to the appropriate scope of that waiver-a matter on which the parties differ markedly. Though citing no cases to support this proposition, plaintiff argues that a subject matter waiver should be applied solely based upon defendants' inadvertent disclosure, opening the door to full disclosure including deposition of defendants' litigation attorneys. Defendants, by contrast, argue for a more reasoned, limited waiver.

The courts which have addressed this issue heavily favor defendants' position, with most finding that in the event of the inadvertent disclosure of privileged documents, a limited waiver should be recognized, extending only to the materials in issue. *See, e.g., Parkway Gallery Furniture, Inc. v. Kittinger/ Pennsylvania House Group, Inc.,* 116 F.R.D. 46, 52 (M.D.N .C.1987); *Martin v. Valley Nat'l Bank of Arizona,* No. 89 Civ. 8361, 1992 WL 196798, at \*4

(S.D.N.Y. Aug. 6, 1992); *see also In re: Grand Jury Proceedings,* 219 F.3d 175, 190 (2d Cir.2000). Because I find that the decisions in these cases are well-reasoned, striking an appropriate balance between the need to preserve the sanctity of the privilege and the importance of a litigant's ability to retain access to relevant documents disclosed through failure to take proper precautions to protect the privilege, and can uncover no persuasive authority militating in favor of a broader finding of waiver, I will limit the scope of my finding of waiver, based upon the finding of inadvertent disclosure, to the documents in issue, which plaintiff's counsel will be allowed to retain and utilize freely for purposes of this litigation.

As additional support for his quest for the finding of a broader, subject matter waiver, plaintiff renews an argument made earlier in the litigation. In essence, Gragg argues that while the inadvertent disclosure itself may not establish a waiver, it is sufficient when considered in combination with other disclosures waiving the attorney-client privilege. Specifically, in support of this argument plaintiff cites defendants' disclosure, after initially claiming privilege, of a series of documents involving in-house attorney Claire Dacam, and additionally contends that in her declaration to the court in support of defendants' dismissal motion, Attorney Levine disclosed privileged documents. Neither of these arguments, however, is at all persuasive.

**\*8** As for Claire Dacam, it has been established to the court's satisfaction that disclosure of documents involving her was made based upon the realization that although she is an in-house attorney, she also served in a business function at IMG, and that the documents in question were overwhelmingly related to the business aspects of her role, and therefore not shielded by the attorney-client privilege. In that regard, when choosing what documents to withhold as privileged the defendants were faced with the conundrum often encountered when attorneys become involved internally with a client's business transactions. As the Second Circuit has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

observed, "[a]ttorneys frequently give to their clients business or other advice which, at least insofar as it can be separated from essentially professional legal services, gives rise to no privilege whatever [sic]."*Colton v. United States,* 306 F.2d 633, 638 (2d Cir.), *cert. denied,*371 U.S. 951, 83 S.Ct. 505 (1963); *see also Elliot Assoc. L.P. v. Republic of Peru,* 176 F.R.D. 93, 97 (S.D.N.Y.1997) (finding that communication is not privileged if the attorney involved is hired for business or personal advice). Because I adhere to my earlier finding, based upon my review, that the documents produced by the defendants, although involving communications with counsel, were predominantly business-related I conclude that the production of those documents does not provide a basis to find a broader waiver, as now urged by the plaintiff.

I have also reviewed carefully the contents of Lisa Levine's declaration to the court, together with its attachments, Dkt. No. 18, to determine whether this second basis for finding a broader waiver contains merit. None of the items attached as exhibits to that declaration appear to be privileged materials. Indeed, the one specifically cited by the plaintiff in support of his position in this regard is a March 28, 2002 e-mail which was sent from J. Stephen Wright to Viet Gragg-a document which therefore does not appear on its face to be privileged. *See*Dkt. No. 18, Exh. E.

In short, despite plaintiff's argument to the contrary I discern no basis to find a wholesale, subject matter waiver of the attorney-client privilege such as that now urged by the plaintiff. Accordingly, I will limit my finding of waiver to those documents inadvertently disclosed by the defendants during the course of pretrial discovery.

### C. *Levine Deposition*

In his initial motion, plaintiff sought leave to depose Lisa K. Levine, Esq. who, according to a declaration given to the court, *see*Dkt. No. 18, at the time was an associate counsel for IMG Worldwide,

Inc. and International Management Group (UK), Inc.[FN10] I initially denied that request, based upon Ms. Levine's status as counsel for plaintiff's adversary and my finding that the matters sought to be covered in the requested deposition would likely be shielded by privilege or encompassed within the work product doctrine. Though not expressly reversing that determination, Judge McCurn remanded the matter to me for further consideration in view of his ruling regarding the privilege question and the potential interplay between the two issues.

> FN10. According to defendants, Ms. Levine left IMG's employ in April of 2005. *See* Sarkar Letter of 2/23/07 (Dkt. No. 263) at p. 12.

*9 Based upon the original briefing and statements made during the earlier oral argument, and as confirmed during the most recent hearing and supplemental submissions, it is abundantly clear to me that plaintiff's avowed intention, in seeking leave to take Ms. Levine's deposition, is to inquire concerning her gathering of documents for presentment to the court in connection with defendants' initial dismissal motion, claiming that certain documents were withheld and that others may have been altered, and additionally to determine why e-mail communications included within the CD-ROM were not disclosed earlier during the litigation. These are matters which are particularly within the realm of Ms. Levine's role as a litigation attorney.

The issue of deposing the attorney for one's advocate was discussed by the Eighth Circuit in its seminal decision in *Shelton v. American Motors Corp.,* 805 F.2d 1323 (8th Cir.1986). There, noting with disapproval the increased propensity for parties seeking to depose an adversary's litigation counsel, that court concluded that the practice should be permitted only in limited circumstances. 805 F.2d at 1326-27. While flatly rejecting the imposition of an absolute rule prohibiting such depositions, the Shelton court cautioned that they should be taken only when 1) no other method exists for obtaining

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1074894 (N.D.N.Y.)
**(Cite as: 2007 WL 1074894 (N.D.N.Y.))**

the required information other than to depose counsel; 2) the information sought is both relevant and non-privileged; and 3) the information is crucial to the preparation of the case. *Id.* at 1327.

Providing helpful guidance to jurists within this circuit, the Second Circuit relatively recently seized upon an opportunity to discuss the issue. *See In re: Subpoena Issued to Dennis Friedman, Esq.,* 350 F.3d 65 (2d Cir.2003). There, while acknowledging Shelton and its underlying rationale, the court cautioned that the Eighth Circuit's analysis in the case should not be applied mechanically to preclude the deposition of an adversary's attorney in every instance.[FN11]*See In re: Friedman,* 350 F.3d at 70-72;*Patsy's Italian Restaurant, Inc. v. Banas,* Nos. 06-CV-00729, 06-CV-5857, 2007 WL 174131, at *2-3 (Jan. 19, 2007); *Nastasia v. New Fairfield School Dist.,* No. Civ. 04-CV925, 2006 WL 1699599, at *2 (D. Conn. June 19, 2006). The Second Circuit went on, however, to articulate many of the same factors cited by the Eighth Circuit in its decision in Shelton as relevant to the question of the propriety of deposing an opposing litigant's attorney, including "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privileged and work-product issues, and the extent of discovery already conducted."*In re: Friedman,* 350 F.3d at 72;*see also Patsy's Italian Restaurant, Inc.,* 2007 WL 174131, at *2.

> FN11. Because the appeal in *In re: Friedman* was ultimately dismissed as moot, the court's discussion regarding *Shelton* constituted *dicta. Patsy's Italian Restaurant, Inc.,* 2007 WL 174131, at *2.

As Judge McCurn noted, in previously rejecting plaintiff's efforts to depose Attorney Levine I focused heavily on the privilege issue, concluding that because the information sought was protected the deposition should not be taken. Since that time, while finding that the four documents inadvertently disclosed to plaintiff's counsel are not privileged, I

have nonetheless declined to adopt the broad subject matter waiver urged by the plaintiff. Consequently, since the matters which plaintiff seeks to probe during Ms. Levine's proposed deposition all quintessentially involve litigation conduct and thus presumptively implicate privilege and/or attorney work product, this factor alone is outcome determinative on the question of whether her deposition should be allowed, without the need to explore the remaining two factors.[FN12]*See, e.g., In re Bilzerian,* 258 B.R. 846, 849 (M.D.Fla.2001) (rejecting discovery request, which would necessitate the deposition of opposing trial counsel, because deposition "would seriously impinge on the work product" of counsel and would produce no relevant, non-privileged information); *S.E.C. v. Morelli,* 143 F.R.D. 42, 46-47 (S.D.N.Y.1992) (refusing to allow defendant to depose members of plaintiff's litigation team because defendant sought to explore the mental processes and strategies of plaintiff's counsel in violation of the work product doctrine).

> FN12. Focusing solely on this element, I could ostensibly permit a limited deposition of Attorney Levine, limited to the four e-mails for which a privilege waiver was found. Because I am convinced, however, based upon the statements of plaintiff's counsel, that such a deposition would invariably entail excursion into areas covered by the work product doctrine and attorney-client privilege, when applying the remaining portion of the test I choose not to permit even that limited deposition.

*10 Addressing the balance of the relevant test under *In re Friedman* and *Shelton,* I additionally find that the remaining two considerations likewise weigh in favor of denying plaintiff's request to depose Ms. Levine.[FN13] While plaintiff's counsel raises and desires to probe with Attorney Levine issues that would be of concern to the court, if substantiated, regarding the potential withholding of documents which should have been produced dur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing the course of pretrial discovery, the court is convinced that there are alternative means available to obtain the information other than to depose the attorney tasked with gathering and producing the documents. One can well imagine that this would be a subject which many, if not most, litigants would wish to explore with counsel for an opposing party, were the practice to be freely endorsed by the courts. Because a ruling permitting plaintiff to depose Attorney Levine would in this instance open the door to the sort of mischief that the courts in *Shelton* and *In re: Friedman* sought to avoid through the imposition of a stringent test for allowing such depositions, I find that this factor weighs against permitting her deposition to be taken.

> FN13. The fact that Attorney Levine is no longer employed by IMG does not alter the *Shelton* calculus, since the privilege remains intact notwithstanding termination of the attorney-client relationship. *See, e.g., Swidler & Berlin v. United States,* 524 U.S. 399, 406, 118 S.Ct. 2081, 2086 (1998) (noting the general rule that the attorney-client privilege survives even the death of the client); *United States v. Tomero,* 471 F.Supp.2d 448, 448 & n. 10-11 (S.D.N.Y.2007) ("[P]rivileged communications do not lose protection simply because the attorney-client relationship ends.").

While one could argue that the third relevant factor may weigh in plaintiff's favor, in that some of the information sought may be critical to the outcome of the case, including on the issue of spoliation, I do not find that it is sufficiently overwhelming as to outweigh the first two factors, and in any event it does not trump the finding that what plaintiff seeks to uncover during Ms. Levine's deposition is overwhelmingly privileged information and/or attorney work product.

The cases cited by plaintiff, in support of his request to depose Attorney Levine, address situations that are readily distinguishable from the circum-

stances at bar. In *Calvin Klein Trademark Trust v. Wachner,* for example, the court, while acknowledging the dangers inherent in sanctioning the practice, permitted a party's non-litigation counsel to be deposed on the limited subject of public disclosures made by counsel and expressly authorized by the client. 124 F.Supp.2d 207, 210-11 (S.D.N.Y.2000). In this case, by contrast, in seeking permission to depose Attorney Levine plaintiff proposes to embark upon an expedition which would by its very manifest nature extend into areas protected by the attorney-client privilege and work product doctrine. *See Nastasia,* 2006 WL 1699599, at *3.

Despite the Second Circuit's apparent modification of the arguably more strict approach taken by the Eighth Circuit in *Shelton,* analysis of its decision in *In re: Friedman* reflects that it continues to give recognition to the dangers inherent in exposing litigation counsel to broad discovery. *In re: Friedman,* 350 F.3d at 70 (citing *Hickman v. Taylor,* 329 U.S. 495, 506-14, 67 S.Ct. 385) (1947)). Like the Eighth Circuit in *Shelton,* the Second Circuit has also recognized that depositions of opposing attorneys are generally disfavored. *United States v. Yonkers Bd. of Educ.,* 946 F.2d 180, 185 (2d Cir.1991). The testimony which plaintiff seeks to elicit from defendants' litigation counsel falls into the same category as that involved in *Shelton,* encompassing counsel's role in responding to discovery, in order to satisfy itself that the adversary has fully complied with outstanding discovery requests. *See Shelton,* 805 F.2d at 1328-29. The danger inherent in permitting such a practice is readily apparent. Accordingly, weighing the relevant factors and finding that plaintiff's need for the deposition testimony of Attorney Levine is far outweighed by the other countervailing factors to be considered, I adhere to my prior ruling and deny plaintiff's application for leave to depose Lisa Levine, Esq.[FN14]

> FN14. My ruling regarding Ms. Levine is limited to the matters which plaintiff announced he would be seeking to explore in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1074894 (N.D.N.Y.)
**(Cite as: 2007 WL 1074894 (N.D.N.Y.))**

her deposition. To the extent that Ms. Levine may possess factual information that is not privileged and is relevant to the claims and defenses in the action, the court might take a different view regarding her deposition.

## IV. *SUMMARY AND ORDER*

**\*11** Because the information which plaintiff seeks leave to add to the record before Senior District Judge McCurn relating to the pending Rule 12(b)(6) dismissal motion would not be properly considered on such a motion, absent its conversion to one seeking the entry of summary judgment, plaintiff's request for permission to supplement the existing record will be denied, without prejudice to the right to submit such materials in the event that the court opts for conversion. Turning to plaintiff's claim of inadvertent disclosure, I find, weighing the four factors informing the court's analysis under federal common law, that there has been a limited waiver of attorney-client privilege through the inadvertent disclosure of privileged materials, but additionally conclude that the waiver should be limited in scope to the materials produced. Lastly, having freshly performed an analysis of the issue, taking into consideration the matters which counsel has announced a desire to probe, I conclude that plaintiff should not be permitted to depose Lisa Levine, Esq., one of defendants' litigation attorneys. Based upon the foregoing it is hereby

ORDERED as follows:

1) Plaintiff's application for permission to supplement the record currently before Senior District Judge McCurn in connection with the pending dismissal motion by the submission of additional evidentiary materials is DENIED, without prejudice. This ruling does not preclude the submission of additional legal argument in accordance with the briefing schedule previously set by this court, as recently amended.

2) Plaintiff's request for a finding of attorney-client

privilege waiver, based upon the inadvertent disclosure of privileged materials by defendants' counsel, is GRANTED, limited only to the materials so provided, which materials plaintiff's counsel shall be permitted to keep and to utilize freely in connection with the pending litigation.

3) Plaintiff's request for permission to depose Lisa Levine, Esq., on matters involving her conduct in connection with this litigation is DENIED.

4) The stay of discovery previously implemented in this case is hereby EXTENDED until lifted by the court.

5) Having announced that he intends to retain new counsel, to be substituted in the place of his current attorney of record, plaintiff is directed to do so promptly, and to arrange for the filing of a proper notice of appearance or substitution of attorney's form, within sixty days following disposition by Senior District Judge Neal P. McCurn of the pending dismissal motion.

N.D.N.Y.,2007.
Gragg v. International Management Group
Slip Copy, 2007 WL 1074894 (N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

**SUMMONS - CIVIL**
(Except Family Actions)
JD-CV-1 Rev. 1-2000
C.G.S. § 51-346, 51-347, 51-349, 51-350, 52-45a,
52-48, 52-259, P.B. Secs 3-1 thru 3-21, 8-1

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
www.jud.ct.gov

| "X" ONE OF THE FOLLOWING: |
| --- |
| *Amount, legal interest or property in demand, exclusive of interest and costs is:* |
| ☐ less than $2,500 |
| ☐ $2,500 thru $14,999.99 |
| ☒ $15,000 or more |
| *("X" if applicable)* |
| ☐ Claiming other relief in addition to or in lieu of money or damages. |

**INSTRUCTIONS**
1. Type or print legibly; sign original summons and conform all copies of the summons.
2. Prepare or photocopy conformed summons for each defendant.
3. Attach the original summons to the original complaint, and attach a copy of the summons to each copy of the complaint. Also, if there are more than 2 plaintiffs or 4 defendants prepare form JD-CV-2 and attach it to the original and all copies of the complaint.
4. After service has been made by a proper officer, file original papers and officer's return with the clerk of court.
5. The party recognized to pay costs must appear personally before the authority taking the recognizance.
6. Do not use this form for actions in which an attachment, garnishment or replevy is being sought. See Practice Book Section 8-1 for other exceptions.

TO: Any proper officer; BY AUTHORITY OF THE STATE OF CONNECTICUT, you are hereby commanded to make due and legal service of this Summons and attached Complaint.

| RETURN DATE (Mo., day, yr.) (Must be a Tuesday) |
| --- |

| | AT (Town in which writ is returnable) (C.G.S. 51-346, 51-349) | CASE TYPE (See JD-CV-1c) | |
| --- | --- | --- | --- |
| ☒ JUDICIAL DISTRICT | New Haven | Major **T** | Minor **90** |
| ☐ HOUSING SESSION   ☐ G.A. NO. | | | |

ADDRESS OF COURT CLERK WHERE WRIT AND OTHER PAPERS SHALL BE FILED (No., street, town and zip code) (C.G.S. 51-346, 51-350)   TELEPHONE NO. (with area code)
235 Church Street, New Haven, CT 06510                                              (203) 503-6800

| PARTIES | NAME AND ADDRESS OF EACH PARTY (No., street, town and zip code) | NOTE: Individuals' Names: Last, First, Middle Initial | | PTY NO. |
| --- | --- | --- | --- | --- |
| FIRST NAMED PLAINTIFF | Melvin Wearing, 17 Kilborn Street, West Haven, CT 06516 | | | 01 |
| Additional Plaintiff | | | | 02 |
| FIRST NAMED DEFENDANT | City of New Haven, c/o Office of the Mayor, 165 Church Street, New Haven, CT 06510 | | | 50 |
| Additional Defendant | Mayor John DeStefano, 165 Church Street, New Haven, CT 06510 | | | 51 |
| Additional Defendant | Thomas W. Ude, Jr., 19 Leetes Island Road, Branford, CT 06405 | | | 52 |
| Additional Defendant | Jonathan H. Beamon, 173 North Ivy Street, Branford, CT 06405 | | | 53 |

(☐ Form JD-CV-2 attached)

## NOTICE TO EACH DEFENDANT

1. YOU ARE BEING SUED.
2. This paper is a Summons in a lawsuit.
3. The Complaint attached to these papers states the claims that each Plaintiff is making against you in this lawsuit.
4. To respond to this Summons, or to be informed of further proceedings, you or your attorney must file a form called an "Appearance" with the Clerk of the above-named Court at the above Court address on or before the second day after the above Return Date.
5. If you or your attorney do not file a written "Appearance" form on time, a judgment may be entered against you by default.

6. The "Appearance" form may be obtained at the above Court address.
7. If you believe that you have insurance that may cover the claim that is being made against you in this lawsuit, you should immediately take the Summons and Complaint to your insurance representative.
8. If you have questions about the Summons and Complaint, you should consult an attorney promptly. The Clerk of Court is not permitted to give advice on legal questions.

| DATE | SIGNED (Sign and "X" proper box) | ☒ Comm. of Superior Court | TYPE IN NAME OF PERSON SIGNING AT LEFT |
| --- | --- | --- | --- |
| 6/23/08 | | ☐ Assistant Clerk | Sandra L. Snaden |

**FOR THE PLAINTIFF(S) PLEASE ENTER THE APPEARANCE OF:**

| NAME AND ADDRESS OF ATTORNEY, LAW FIRM OR PLAINTIFF IF PRO SE (No., street, town and zip code) | TELEPHONE NUMBER | JURIS NO. (if atty. or law firm) |
| --- | --- | --- |
| Santos & Seeley, P.C., 51 Russ Street, Hartford, CT 06106 | (860) 249-6548 | 07230 |

| NAME AND ADDRESS OF PERSON RECOGNIZED TO PROSECUTE IN THE AMOUNT OF $250 (No., street, town and zip code) | SIGNATURE OF PLAINTIFF IF PRO SE |
| --- | --- |
| Melissa Tremblay, 51 Russ Street, Hartford, CT 06106 | |

| # PLFS. | # DEFS. | # CNTS. | SIGNED (Official taking recognizance; "X" proper box) | ☒ Comm. of Superior Court | For Court Use Only |
| --- | --- | --- | --- | --- | --- |
| 1 | 4 | 10 | | ☐ Assistant Clerk | FILE DATE |

IF THIS SUMMONS IS SIGNED BY A CLERK:
a. The signing has been done so that the Plaintiff(s) will not be denied access to the courts.
b. It is the responsibility of the Plaintiff(s) to see that service is made in the manner provided by law.
c. The Clerk is not permitted to give any legal advice in connection with any lawsuit.
d. The Clerk signing this Summons at the request of the Plaintiff(s) is not responsible in any way for any errors or omissions in the Summons, any allegations contained in the Complaint, or the service thereof.

| I hereby certify I have read and understand the above: | SIGNED (Pro Se Plaintiff) | DATE SIGNED | DOCKET NO. |
| --- | --- | --- | --- |

**ORIGINAL**

| RETURN DATE:    AUGUST 5, 2008 | : | SUPERIOR COURT |
|---|---|---|
| MELVIN WEARING | : | JUDICIAL DISTRICT OF NEW HAVEN |
| V. | : | AT NEW HAVEN |
| CITY OF NEW HAVEN, JOHN DESTEFANO, THOMAS UDE AND JONATHAN BEAMON | : | JUNE 23, 2008 |

## COMPLAINT

### FIRST COUNT – Direct Municipal Liability for Negligent Mispresentation Pursuant to Conn. Gen. Stat. § 52-557n (Plaintiff v. City of New Haven)

1. At times relevant to this complaint, the Plaintiff, Melvin Wearing, was a resident of West Haven, Connecticut, and was the Chief of Police of the City of New Haven.

2. The Defendant, City of New Haven, is a municipal corporation organized under the laws of the State of Connecticut.

3. The Defendant, John DeStefano, is the mayor of the City of New Haven and its chief executive officer.

4. The Defendant, Thomas Ude, was at times relevant the Corporation Counsel of the City of New Haven. At times relevant, Mr. Ude was acting within the scope of his employment and within the scope of his authority.

5. The Defendant, Jonathan Beamon, was at times relevant an employee of the Corporation Counsel's Office of the City of New Haven. At times relevant, Mr.

Beamon was acting within the scope of his employment and within the scope of his authority.

6.     On or about August 29, 2002, a City of New Haven police officer, Arpad Tolnay, instituted a lawsuit in the United States District Court, District of Connecticut against Chief Wearing claiming compensatory and punitive damages.

7.     The matter, which was styled <u>Arpad Tolnay v. Melvin Wearing</u>, Docket No. 3:02CV1514 (EBB), went to trial, resulting in a monetary verdict against Chief Wearing on December 5, 2005.

8.     The verdict against Chief Wearing included an award of punitive damages in the amount of $5 million, which was reduced to $1.35 million by Judge Ellen Bree Burns on October 5, 2007.

9.     Prior to the trial of <u>Tolnay v. Wearing</u>, Mr. Ude, in his capacity as the Corporation Counsel for the City of New Haven, stated to Chief Wearing, through Chief Wearing's counsel, that the City of New Haven would indemnify Chief Wearing for any award of punitive damages that would be awarded at the trial.

10.     Prior to the trial of <u>Tolnay v. Wearing</u>, Mr. Beamon, in his capacity as an employee of the Corporation Counsel for the City of New Haven, also stated to Chief Wearing, through Chief Wearing's counsel, that the City of New Haven would indemnify Chief Wearing for any award of punitive damages that would be awarded at the trial.

2

11.    After Mr. Ude and Mr. Beamon, as agents of the City of New Haven, promised Chief Wearing that the City of New Haven would indemnify Chief Wearing for any award of punitive damages, the City of New Haven, through its agents, servants and/or employees, including but not limited to Mayor DeStefano, later refused to do so.

12.    The Defendant has not, in fact, indemnified Chief Wearing for the award of punitive damages assessed against him and does not intend to do so.

13.    The Defendant, acting through its agents, servants and/or employees Mr. Ude and Mr. Beamon, failed to exercise reasonable care in obtaining or communicating the information to Chief Wearing that he would be indemnified for an award of punitive damages in the Tolnay v. Wearing matter.

14.    Chief Wearing relied to his detriment upon the representation made by the Defendant, through its agents, servants and/or employees, Mr. Ude and Mr. Beamon.

15.    As a result of the representations made by the Defendant, through its agents, servants and/or employees Mr. Ude and Mr. Beamon, Chief Wearing has suffered pecuniary loss, including but not limited to the need to hire personal counsel and the resulting incurrence of attorney's fees.

16.    The Defendant is directly liable pursuant to Connecticut General Statutes Section 52-557n.

SANTOS & SEELEY, P.C. • ATTORNEYS AT LAW • 51 RUSS STREET • HARTFORD, CT 06106-1566 • (860) 249-6548 • FAX (860) 724-5533 • JURIS NO. 07230

**SECOND COUNT – Negligent Misrepresentation (Plaintiff v. Thomas Ude & Jonathan Beamon)**

1.    At times relevant to this complaint, the Plaintiff, Melvin Wearing, was a resident of West Haven, Connecticut, and was the Chief of Police of the City of New Haven.

2.    The Defendant, Thomas Ude, was at times relevant the Corporation Counsel of the City of New Haven. At times relevant, Mr. Ude was acting within the scope of his employment and within the scope of his authority.

3.    The Defendant, Jonathan Beamon, was at times relevant an employee of the Corporation Counsel's Office of the City of New Haven. At times relevant, Mr. Beamon was acting within the scope of his employment and within the scope of his authority.

4.    On or about August 29, 2002, a City of New Haven police officer, Arpad Tolnay, instituted a lawsuit in the United States District Court, District of Connecticut against Chief Wearing claiming compensatory and punitive damages.

5.    The matter, which was styled Arpad Tolnay v. Melvin Wearing, Docket No. 3:02CV1514 (EBB), went to trial, resulting in a monetary verdict against Chief Wearing on December 5, 2005.

4

6.    The verdict against Chief Wearing included an award of punitive damages in the amount of $5 million, which was reduced to $1.35 million by Judge Ellen Bree Burns on October 5, 2007.

7.    Prior to the trial of Tolnay v. Wearing, Mr. Ude, in his capacity as an employee of the Corporation Counsel for the City of New Haven, stated to Chief Wearing, through Chief Wearing's counsel, that the City of New Haven would indemnify Chief Wearing for any award of punitive damages that would be awarded at the trial.

8.    Prior to the trial of Tolnay v. Wearing, Mr. Beamon, in his capacity as an employee of the Corporation Counsel for the City of New Haven, also stated to Chief Wearing, through Chief Wearing's counsel, that the City of New Haven would indemnify Chief Wearing for any award of punitive damages that would be awarded at the trial.

9.    After Mr. Ude and Mr. Beamon, as agents of the City of New Haven, promised Chief Wearing that the City of New Haven would indemnify Chief Wearing for any award of punitive damages, the City of New Haven, through its agents, servants and/or employees later refused to do so.

10.    The Defendants have not, in fact, indemnified Chief Wearing for the award of punitive damages assessed against him and do not intend to do so.

11.    The Defendants, Mr. Ude and Mr. Beamon, failed to exercise reasonable care in obtaining or communicating the information to Chief Wearing that he would be indemnified for any award of punitive damages in the Tolnay v. Wearing matter.

5

12.    Chief Wearing relied to his detriment upon the representation made by Mr. Ude and Mr. Beamon.

13.    As a result of the representations made by the Defendants, Mr. Ude and Mr. Beamon, Chief Wearing has suffered pecuniary loss, including but not limited to the need to hire personal counsel and the resulting incurrence of attorney's fees.

### THIRD COUNT – Direct Municipal Liability for Negligent Infliction of Emotional Distress Pursuant to Conn. Gen. Stat. § 52-557n (Plaintiff v. City of New Haven)

1.-14.    Paragraphs 1 through 14 of the First Count are hereby incorporated and realleged as Paragraphs 1 through 14 of this Third Count.

15.    The Defendant, acting through its agents, servants and/or employees, knew or should have known that its actions created an unreasonable risk of causing Chief Wearing emotional distress.

16.    Chief Wearing's distress was foreseeable.

17.    The ongoing emotional distress suffered by Chief Wearing was severe enough that it might result in illness or bodily harm.

18.    The Defendant, acting through its agents, servants and/or employees, actually caused and is still causing Chief Wearing emotional distress.

19.    As a result of the Defendant's actions, acting through its agents, servants and/or employees, Chief Wearing has suffered damages.

6

20.     The Defendant is directly liable pursuant to Connecticut General Statutes Section 52-557n.

**FOURTH COUNT – Negligent Infliction of Emotional Distress (Plaintiff v. Thomas Ude & Jonathan Beamon)**

1.-14. Paragraphs 1 through 14 of the First Count are hereby incorporated and realleged as Paragraphs 1 through 14 of this Fourth Count.

15.     The Defendants, Thomas Ude and Jonathan Beamon, knew or should have known that their actions created an unreasonable risk of causing Chief Wearing emotional distress.

16.     Chief Wearing's distress was foreseeable.

17.     The ongoing emotional distress suffered by Chief Wearing was severe enough that it might result in illness or bodily harm.

18.     The Defendants, Thomas Ude and Jonathan Beamon, actually caused and are still causing Chief Wearing emotional distress.

19.     As a result of the Defendants' actions, Chief Wearing has suffered damages.

**FIFTH COUNT – Negligent Infliction of Emotional Distress (Plaintiff v. John DeStefano)**

1.-14. Paragraphs 1 through 14 of the First Count are hereby incorporated and realleged as Paragraphs 1 through 14 of this Fifth Count.

7

15.    The Defendant, John DeStefano, failed and/or refused to cause the City of New Haven to indemnify Chief Wearing, despite being aware of the promises made by Mr. Ude and Mr. Beamon, and despite a policy that existed within the City of New Haven to indemnify employees for awards of punitive damages.

16.    The Defendant, John DeStefano, knew or should have known that his actions created an unreasonable risk of causing Chief Wearing emotional distress.

17.    Chief Wearing's distress was foreseeable.

18.    The ongoing emotional distress suffered by Chief Wearing was severe enough that it might result in illness or bodily harm.

19.    The Defendant, John DeStefano, actually caused and is still causing Chief Wearing emotional distress.

21.    As a result of the Defendant's actions, Chief Wearing has suffered damages.

## SIXTH COUNT – Direct Municipal Liability for Fraudulent Misrepresentation (Plaintiff v. Pursuant to Conn. Gen. Stat. § 52-557n (Plaintiff v. City of New Haven)

1.-12.    Paragraphs 1 through 12 of the First Count are hereby incorporated and realleged as Paragraphs 1 through 12 of this Sixth Count.

13.    The statements made by the Defendant, through its agents, servants and/or employees who made the statements within the scope of their authority, were

8

false and were known to be false by the Defendant at the time that they were made, or were made with reckless disregard to their truth.

14.    Chief Wearing relied upon these false statements of fact to his detriment.

15.    As a result of these false statements, Chief Wearing has suffered pecuniary loss, including but not limited to the need to hire personal counsel and the resulting incurrence of attorney's fees.

16.    The Defendant is directly liable for these statements made within the scope of its agents', servants' and/or employees' authority, pursuant to Connecticut General Statutes Section 52-557n.

### SEVENTH COUNT – Fraudulent Misrepresentation (Plaintiff v. Thomas Ude and Jonathan Beamon)

1.-12. Paragraphs 1 through 12 of the First Count are hereby incorporated and realleged as Paragraphs 1 through 12 of this Seventh Count.

13.    The statements made by Mr. Ude within the scope of his employment were false and were known to be false by Mr. Ude at the time that they were made; or were made with reckless disregard to their truth.

14.    The statements made by Mr. Beamon within the scope of his employment were false and were known to be false by Mr. Beamon at the time that they were made, or were made with reckless disregard to their truth.

15.    Chief Wearing relied upon these false statements of fact to his detriment.

9

16.     As a result of these false statements, Chief Wearing has suffered
pecuniary loss, including but not limited to the need to hire personal counsel and the
resulting incurrence of attorney's fees.

## EIGHTH COUNT – Breach of Oral or Implied Contract (Plaintiff v. City of New Haven)

1.     At times relevant to this complaint, the Plaintiff, Melvin Wearing, was a
resident of West Haven, Connecticut, and was the Chief of Police of the City of New
Haven.

2.     The Defendant, Thomas Ude, was at times relevant the Corporation
Counsel of the City of New Haven. At times relevant, Mr. Ude was acting within the
scope of his employment and within the scope of his authority.

3.     The Defendant, Jonathan Beamon, was at times relevant an employee of
the Corporation Counsel's Office of the City of New Haven. At times relevant, Mr.
Beamon was acting within the scope of his employment and within the scope of his
authority.

4.     On or about August 29, 2002, a City of New Haven police officer, Arpad
Tolnay, instituted a lawsuit in the United States District Court, District of Connecticut
against Chief Wearing claiming compensatory and punitive damages.

10

5.     ' The matter, which was styled <u>Arpad Tolnay v. Melvin Wearing</u>, Docket No. 3:02CV1514 (EBB), went to trial, resulting in a monetary verdict against Chief Wearing on December 5, 2005.

6.     The verdict against Chief Wearing included an award of punitive damages in the amount of $5 million, which was reduced to $1.35 million by Judge Ellen Bree Burns on October 5, 2007.

7.     Prior to the trial of <u>Tolnay v. Wearing</u>, Mr. Ude, in his capacity as an employee of the Corporation Counsel for the City of New Haven, stated to Chief Wearing, through Chief Wearing's counsel, that the City of New Haven would indemnify Chief Wearing for any award of punitive damages that would be awarded at the trial.

8.     Prior to the trial of <u>Tolnay v. Wearing</u>, Mr. Beamon, in his capacity as an employee of the Corporation Counsel for the City of New Haven, also stated to Chief Wearing, through Chief Wearing's counsel, that the City of New Haven would indemnify Chief Wearing for any award of punitive damages that would be awarded at the trial.

9.     In consideration of Mr. Ude's and Mr. Beamon's oral promises made on behalf of the City, Chief Wearing continued to agree to use the services of the Corporation Counsel and chose not to hire the services of other counsel to represent his interests at the trial.

10.     After Mr. Ude and Mr. Beamon, as agents of the City of New Haven, orally agreed that the City of New Haven would indemnify Chief Wearing for any award of

SANTOS & SEELEY, P.C. • ATTORNEYS AT LAW • 51 RUSS STREET • HARTFORD, CT 06106-1566 • (960) 249-6548 • FAX (860) 724-5533 • JURIS NO. 07230

punitive damages, the City of New Haven, through its agents, servants and/or employees later refused to do so.

11.    The Defendant City of New Haven breached the oral or implied contract with Chief Wearing in that it has not, in fact, indemnified Chief Wearing for the award of punitive damages assessed against him and does not intend to do so, despite its prior promise through its agents, servants and/or employees.

12.    The Defendant City of New Haven has also breached the oral or implied contract with Chief Wearing in that it has failed and refused to post a bond with the United States District Court as security for the award of punitive damages awarded against Chief Wearing while the matter is on appeal.

13.    As a result of the Defendant's breaches, Chief Wearing has suffered damages.

## NINTH COUNT -- Breach of the Implied Covenant of Good Faith & Fair Dealing (Plaintiff v. City of New Haven)

1.-12. Paragraphs 1 through 12 of the Eighth Count are hereby incorporated and realleged as Paragraphs 1 through 12 of this Ninth Count.

13.    By virtue of the oral contract between the Plaintiff and the Defendant, the Defendant had an implied obligation to deal with the Plaintiff in a manner consistent with good faith and fair dealing.

12

14.    The Defendant has breached the implied obligation of good faith and fair dealing.

15.    As a result of the Defendant's breaches, Chief Wearing has suffered damages.

### TENTH COUNT -- Promissory Estoppel (Plaintiff v. City of New Haven)

1.-8.    Paragraphs 1 through 8 of the Eighth Count are hereby incorporated and realleged as Paragraphs 1 through 8 of this Tenth Count.

9.    After Mr. Ude and Mr. Beamon, as agents of the City of New Haven, orally agreed that the City of New Haven would indemnify Chief Wearing for any award of punitive damages, the City of New Haven, through its agents, servants and/or employees later refused to do so.

10.    Chief Wearing detrimentally relied on the promises made by Mr. Ude and Mr. Beamon, as agents of the City of New Haven.

11.    As a result of his reliance on these promises, Chief Wearing acted to his detriment by not hiring personal counsel to represent his interests during the trial.

12.    As a result, Chief Wearing has suffered damages.

13

**WHEREFORE, the Plaintiff claims:**

**As to the Sixth and Seventh Counts:**

　　　1.　　　Compensatory damages;

　　　2.　　　Punitive damages pursuant to the common law, including attorney's fees;

　　　3.　　　Such other relief as may be permitted by law.

**As to All Other Counts:**

　　　1.　　　Compensatory damages, including the attorney's fees incurred in reliance

upon the misrepresentations;

　　　2.　　　Such other relief as may be permitted by law.

　　　　　　　　　　THE PLAINTIFF,
　　　　　　　　　　MELVIN WEARING


By _____
　　HUBERT J. SANTOS
　　SANDRA L. SNADEN
　　SANTOS & SEELEY, P.C.
　　51 Russ Street
　　Hartford, CT  06106
　　Tel. (860) 249-6548
　　Fax (860) 724-5533
　　Juris No. 07230

14

RETURN DATE:    AUGUST 5, 2008    :    SUPERIOR COURT
                                  :
MELVIN WEARING                    :    JUDICIAL DISTRICT OF NEW HAVEN
                                  :
V.                                :    AT NEW HAVEN
                                  :
CITY OF NEW HAVEN, JOHN           :
DESTEFANO, THOMAS UDE AND         :
JONATHAN BEAMON                   :    JUNE 23, 2008

<u>STATEMENT OF AMOUNT IN DEMAND</u>

The amount in demand, exclusive of interest and costs, is in excess of

$15,000.00.


                          THE PLAINTIFF,
                          MELVIN WEARING


                      By  _____
                          HUBERT J. SANTOS
                          SANDRA L. SNADEN
                          SANTOS & SEELEY, P.C.
                          51 Russ Street
                          Hartford, CT  06106
                          Tel. (860) 249-6548
                          Fax (860) 724-5533
                          Juris No. 07230

SANTOS & SEELEY, P.C. • ATTORNEYS AT LAW • 51 RUSS STREET • HARTFORD, CT 06106-1566 • (860) 249-6548 • FAX (860) 724-5533 • JURIS NO. 07230

# CITY OF
# NEW HAVEN,
# CONN.



## Office of the Corporation Counsel
165 Church Street, 4th Floor
New Haven, Connecticut 06510

Date     June 24, 2008

Number of pages including cover sheet     _____

FACSIMILE TRANSMISSION
COVER PAGE

To:

Tom Ude, Esq.

Lambda Legal


Fax Phone    212-809-0055

From:

Vikki Cooper, Esq.

Deputy Corp. Counsel

Voice Phone    (203) 946-7963

Fax Phone    (203) 946-7942

**REMARKS:**

☐ Urgent     ☐ For your review     ☐ Reply ASAP     ☐ Please comment

Please review the attached, and we will speak sometime next week.  Thanks.


THIS DOCUMENT IS INTENDED FOR THE ABOVE ADDRESSEE(S) ONLY.
IT MAY CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION.
IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR,
PLEASE RETURN IT TO US BY U.S. MAIL.